William F. Gray, Jr.
Alison D. Bauer
FOLEY HOAG LLP
1301 Avenue of the Americas
25th Floor
New York, New York 10019
Tel: (646) 927-5500
Fax: (646) 927-5599

*Proposed Attorneys for Debtor and Debtor in Possession*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------- x
                                                        :
In re                                                   : Chapter 11
                                                        :
LIDDLE & ROBINSON, L.L.P.,                              : Case No. 19-12346 (SHL)
                                                        :
       Debtor                                           : (Joint Administration Requested)
------------------------------------------------------- x

## AFFIDAVIT OF JEFFREY L. LIDDLE UNDER BANKRUPTCY RULE 1007-2

STATE OF NEW YORK     :
                        SS:
COUNTY OF NEW YORK    :

Jeffrey L. Liddle, being duly sworn, deposes and says:

1. I am an attorney in New York and have been a partner in the law firm known as Liddle & Robinson, L.L.P. (the "<u>Firm Debtor</u>" or "<u>Firm</u>") since it was originally formed on June 4, 1979.

## NATURE OF DEBTOR'S BUSINESS

**Firm Overview**

2. Liddle & Robinson is a law firm operating as a limited liability partnership under the laws of the State of New York. Since its founding over 40 years ago, the Firm has had a strong litigation practice with an emphasis on corporate, real estate, and employment law.

3.  The Firm's revenue, net of expense reimbursement, from 1998 through 2015, averaged about $13.5 million per year. This revenue generated a significant profit virtually every year. From 2015 until August 2016 revenue declined with the departures of five partners and a number of associates. Also, in 2016, the Firm commenced a new lending relationship with three ostensibly-related businesses of Counsel Financial Services LLC: Counsel Financial II LLC ("CF2"), LIG Capital LLC ("LIG"), and, in 2017, Counsel Financial Holdings LLC ("CF Holdings" and, collectively with CF2 and LIG, "Counsel Financial" or the "Prepetition Lenders"). The predatory lending practices of Counsel Financial have contributed mightily to the Firm's difficulties.

4.  As of the date of the Firm's voluntary petition under Chapter 11 (the "Petition Date"), I am the sole remaining partner and manager of the Firm and now operate Liddle & Robinson effectively as a sole proprietorship. The Firm employs two associate attorneys and one individual in an administrative staff role. The Firm leases offices at 1177 Avenue of the Americas, 5th Floor, New York, New York 10036. There are no other offices. All other partners have withdrawn, the last on or about January 14, 2019.

5.  I filed for Chapter 11 relief as an individual debtor on March 11, 2019. My individual case, *In re Jeffrey Lew Liddle*, Case No. 19-10747 (SHL), is still ongoing and closely related to this case. As detailed below, many of my individual and the Firm's creditors overlap as some of my personal liabilities arise from guarantees of Firm obligations. Moreover, the Firm's business is the source of effectively all my personal income and will provide the financial underpinning of the reorganization plans for my individual case as well as the Firm's.

6.  I intend to continue to operate the Firm's business as a debtor-in-possession under Chapter 11. Liddle & Robinson continues to generate new business and the level of its existing

2

business remains strong, albeit under the stresses expected from operating in Chapter 11. I believe that under the protections granted by Chapter 11, I will be able to continue a robust practice at the Firm and develop a consensual plan for payment of all legitimate creditors.

**Assets and Liabilities**

7. As of the Petition Date, the Firm's assets totalled approximately $10,000,000 consisting of cash, accounts receivable, unbilled work-in-progress, uncollected fee award(s), office equipment, and furniture.

8. As of the Petition Date, the Firm's liabilities (excluding contingent litigation liabilities) amount to approximately $10,000,000, consisting of accounts payable, judgments, wage and benefit obligations to employees and pension and deferred compensation claims, tax liabilities, and loan obligations.

**Debt Facilities**

9. The Firm's existing indebtedness consists principally of loans entered into in 2016 and 2017 with CF2, LIG and CF Holdings. The amount and validity of these loans and the liens associated therewith will be disputed in this case. The Prepetition Lenders have, almost from the inception of the lending relationship, undermined the Firm, engaged in inappropriate lending conduct, interfered with other lending options, tried to orchestrate Liddle & Robinson's merger with other portfolio firms for Counsel Financial's benefit, and administered the loan to the grievous detriment of the Firm and me personally.

10. On August 4, 2016, the Debtor entered into a Revolving Promissory Note and Allonges thereto dated October 13, 2016 and December 21, 2016 with CF2 as the lender (collectively, the "CF2 Note"). In connection therewith, I personally executed a Guaranty of Payment and Performance dated August 5, 2016 (the "CF2 Guaranty"), an absolute and unconditional guaranty of the Firm's payment and performance under the CF2 Note. I also

executed a Security Agreement dated August 5, 2016 (the "CF2 Security Agreement"), both on behalf of the Firm and myself in my individual capacity. Each of the CF2 Guaranty and CF2 Security Agreement were also executed by Blaine H. Bortnick, James Ryan Hubbard, and Christine A. Palmiere, former partners of the Firm.

11. On October 13, 2016, the Debtor entered into a Term Promissory Note with LIG as the lender (the "LIG Note"). In connection therewith, I executed a Guaranty of Payment and Performance dated October 13, 2016 (the "LIG Guaranty"), an absolute and unconditional guaranty of the Firm's payment and performance under the LIG Note. I also executed a Security Agreement, dated October 13, 2016 (the "LIG Security Agreement"), both on behalf of the Firm and myself in my individual capacity and pledged all of our respective assets to secure the Firm's payment and performance under the LIG Note.

12. On June 2, 2017, I executed a Revolving Promissory Note with CF Holdings as the lender (the "CF Holdings Note"). In connection therewith, I executed a Guaranty of Payment and Performance (the "CF Holdings Guaranty"), dated June 2, 2017, an absolute and unconditional guaranty of the Firm's payment and performance under the CF Holdings Note. I also executed a Security Agreement dated June 2, 2017 (the "CF Holdings Security Agreement" and, collectively with the CF2 Note, CF2 Guaranty, CF2 Security Agreement, LIG Note, LIG Guaranty, LIG Security Agreement, CF Holdings Note, and CF Holdings Guaranty, the "Prepetition Credit Documents"), both on behalf of the Firm and myself in my individual capacity and pledged substantially all of the Firm's assets and my personal assets to secure the Firm's payment and performance under the CF Holdings Note.

13. Counsel Financial is an Erie County, New York based non-bank lender focusing on the class action, personal injury and toxic-tort plaintiffs' bar. The Liddle & Robinson Firm

4

represented a new type of law firm borrower, specializing in representing individuals, corporations and partnerships in complex litigation. Counsel Financial's primary business is to provide cash flow funding to contingency fee-based law firms. It is not a typical asset-based lender. Counsel Financial does not lend against cases or accounts receivable, but rather its collateral consists of contingency fees associated with judgments and settlements. This lending is at extremely high interest rates. In the administration of the Liddle & Robinson loans, Counsel Financial consistently did not provide loan availability based on Liddle & Robinson's actual working capital needs, but rather extended credit and moved loan balances among the Prepetition Lenders to maximize its own returns or satisfy other internal demands.

14. As is common for a professional services firm, much of the prepetition collateral consists of the billed and unbilled accounts receivable generated by the Firm, including work-in-process ("WIP") for legal engagements, which after review and processing, becomes an account receivable. As noted, it is estimated that as of the Petition Date, there was approximately $2 million in face amount of uncollected accounts receivable and WIP generated by the Firm, plus several million dollars of other potential collectibles on various litigations, plus over $2 million owed by former partners. In addition, the Firm has approximately thirty active contingency fee matters with significant, although difficult to estimate, settlement or judgment value. As discussed more fully herein, the Firm intends to use these assets to (a) operate the Firm's business, (b) administer the Chapter 11 case, (c) facilitate the collection of its accounts receivable, including the processing of WIP, (d) evaluate, administer and resolve claims against the estate; (e) pay employee wages and benefits; (f) prosecute other Firm claims, and (g) pursue confirmation of a chapter 11 plan.

**Cash Management System**

15. Prior to the Petition Date, the Firm used two Bank Accounts in the course of its business, its Trust Account (as defined below) and the debtor-in-possession account opened for

5

my individual chapter 11 case, which is maintained at Wells Fargo. The Debtor previously used four other bank accounts which have been frozen since late last year pursuant to a court order entered in a case commenced by the Firm's former landlord.

16. Contemporaneously with the filing of this case, the Debtor is opening its own debtor-in-possession operating account (the "DIP Account"). The Debtor intends that all cash flowing into the business, except for funds held in trust for clients, will be deposited into the DIP Account. The sole sources of funds for this account will be (1) accounts receivable from firm clients (arising through contingency fee arrangements, but sometimes through hourly fee arrangements), and (2) retainers from new clients. Disbursements, as approved in the course of the bankruptcy case, will made both via wire transfer (such as payroll payments, which are handled through a payroll company known as Paychex), and paper checks (which is the primary way through which vendor payments are made).

17. The Debtor's trust account (the "Trust Account") is maintained at Citibank. Client Trust Funds in the Trust Account will be segregated from the Debtor's other bank accounts and funds. Previously, after Debtor's other bank accounts had been frozen, and before my personal debtor-in-possession account was opened, the Trust Account was used to hold funds paid into the Debtor's business, and to make operational disbursements subject to ensuring that client funds held in trust were maintained.

**Events Leading to Chapter 11**

18. On March 11, 2019, I filed a voluntary petition as an individual debtor under Chapter 11 (Case No. 19-10747). My individual filing was made in response to efforts by CF2 to enforce two judgments each in the amount of $6,546,448.83 entered on March 7, 2019 in the New York State Supreme Court, Erie County (i) against the Firm, and (ii) me, as guarantor (the "Erie County Judgment"). CF2 had proceeded by an abbreviated court process (under CPLR 3213),

6

"Summary Judgment in Lieu of Complaint," which afforded the Firm and me no opportunity to assert counterclaims, bring in other parties (such as LIG or CFH), or conduct any discovery, etc. The Erie County Supreme Court also improperly entered a "temporary restraining order," not once but twice, under CPLR 6210 against me personally although such TROs are only available against "garnishees" as defined by the CPLR, and I was a defendant, not a garnishee. Both times the Court in Erie County issued TROs without notice, without an opportunity to be heard, *ex parte*, and *in camera*. No transcript was made of those proceedings as required under the New York Constitution of Courts of Record. Through an Order of Attachment, which did not meet the underlying statutory predicate (CPLR 6201(a)(3)), CF2 attempted to enforce the Judgment against me by grabbing the Sale Proceeds derived from the sale of the cooperative apartment owned jointly by my wife and me. Rather than properly perfect its Order of Attachment, which it had ample opportunity to do, CF2 asked the Judge to Order the escrow agent of the Sale Proceeds to deliver the Sale Proceeds to the Registrar of the Court in Erie County – a wholly inappropriate procedure under the CPLR, especially since there was neither Due Process or jurisdiction. The abusiveness of this approach is highlighted by the fact that CF2 sought to enforce this Judgement against my wife's portion of the Sale Proceeds even though she was not a party to the underlying action. This egregious disregard of due process and basic notions of fairness exemplifies CF2's conduct in all their dealings with the Firm, my family and me. The propriety of CF2's collection tactics has been the subject of heated litigation in the individual case.

19.    At the time of the commencement of my individual case, I had received a written offer of partnership and a "guaranteed employment contract" (collectively, the "<u>Offer</u>") from a well-established national litigation firm which would have allowed me to move the Firm, including all staff and associates, to a solid platform for the continued practice of law. The proceeds of that

7

practice were to be used for the benefit of all my creditors and to fund a reorganization plan. That offer was withdrawn on the day of filing my individual case after Counsel Financial interfered with the Offer. The fact of Counsel Financial's interference was communicated to me directly by the managing partner of the offering firm. In sum, Counsel Financial interfered with and caused the revocation of the Offer. Counsel Financial never spoke to me about this. I was, however, told by the managing partner that Counsel Financial wanted the Liddle & Robinson cases to be sent over to the new firm which would split the fees earned with Counsel Financial but that neither I nor any of the associates or staff would be hired.

20. Based on significant evidence which I have gathered, Counsel Financial has acted in concert with former partners of the Firm, to direct existing business away from the Firm and instructing fee-paying clients to pay LIG (on behalf of CF2 and CFH as well as itself) directly rather than pay the Firm the fees due for services rendered, a diversion of payment that has caused the Firm severe financial distress.

21. In the months preceding the filing of my individual case, Counsel Financial, through counsel, also directly or indirectly contacted the Firm's clients demanding direct payment to them of fees due the Firm. When this type of conduct was pointed out to the Court in my individual case, the Court directed that such action stop immediately as the business of the Firm was the "case within the case." On April 8, 2019, I filed a motion in my individual chapter 11 case to extend the automatic stay imposed by section 362(a) to the Firm to stay pending litigation and collection actions against the Firm. In addition to collection threats by CF2 for the Erie County Judgment, the Firm was facing a collection action by Kasowitz Benson Torres LLP in the New York State Supreme Court, New York County, in which the Firm is a judgment debtor in the amount of $189,257.35. In response to that stay relief motion, this Court entered a series of interim

orders extending the automatic stay, including an interim order entered on June 16, 2019 extending the automatic stay imposed by section 362(a) to the Firm through July 22, 2019.

22. The Firm's immediate need for relief in this Court stems from the impending expiration of the Section 105 stay and CF2's actions in the Erie County action, as well as its diversion of client payments. This Chapter 11 filing is necessary to the orderly administration of my individual and the Firm's estates and to enable me to continue the Firm's active practice of law, which currently includes over thirty active litigations.

**First Day Motions**

23. Contemporaneously with this Declaration, the Debtor has filed customary first day motions (collectively, the "First Day Motions") in the Chapter 11 case seeking orders granting various forms of relief. I believe that, among other things, the relief requested in the First Day Motions is necessary to enable the Debtor to conduct continue operating as a debtor-in-possession and pursue the administration of its estate in an efficient, effective and expeditious manner, during the pendency of the Chapter 11 Case.

**Administrative Motions**

**Motion of Debtor Pursuant to Fed. R. Bankr. P. 1015(b) for Entry of an Order Directing Joint Administration of Chapter 11 Cases (the "Joint Administration Motion")**

24. By the Joint Administration Motion, the Debtor seeks an order directing joint administration of its Chapter 11 case with my individual bankruptcy case. Because of the substantial overlap in creditors and interests, the joint administration of these cases will save the Debtor and myself time and expense because it will remove the need to prepare, replicate, file, and serve duplicate notices, applications and orders in each of the cases. The Chapter 11 process will be streamlined for the many creditors holding claims against both the Firm and myself. Joint administration will further ease the burden on this Court of entering duplicative orders and

maintaining duplicative files and dockets and on the United States Trustee (the "U.S. Trustee") from reviewing duplicative pleadings and papers.

25. I believe that the relief requested in the Joint Administration Motion is in the best interest of the Debtor's estate, its creditors, and all other parties in interest. Accordingly, on behalf of the Debtor, I respectfully submit that the Joint Administration Motion be approved.

**Motion of Debtor for Entry of an Order Granting an Extension of Time to File (I) Statement of Financial Affairs and Schedules of Assets and Liabilities, (II) Schedules of Current Income and Expenditures, and (III) Statements of Executory Contracts and Unexpired Leases to Extend Time to File Schedules (the "Schedules and Statements Motion")**

26. By the Schedules and Statements Motion, the Debtor seeks a forty-five (45)-day extension of the time to file its statement of financial affairs and schedules of assets and liabilities, schedules of current income and expenditures, and statements of executory contracts and unexpired leases (collectively, the "Schedules and Statements"). The Debtor has begun compiling the information required to complete the Schedules and Statements, but due to its limited staff who are dedicated to continuing the firm's operations, the number of creditors, and the attention to my individual bankruptcy case, the Debtor has not yet completed this process. Given the focus of the Debtor's remaining employees to continue the Firm's operation and the volume of information that must be included in the Schedules and Statements, the Debtor requires additional time to complete them.

27. I believe that the relief requested in the Schedules and Statements Motion is in the best interest of the Debtor's estate, its creditors, and all other parties in interest, and will enable the Debtor to make a smooth transition to Chapter 11. Accordingly, on behalf of the Debtor, I respectfully submit that the Schedules and Statements Motion be approved.

**Operating Motions**

> **Motion of Debtor for Interim and Final Orders Authorizing, But Not Directing, the Debtor to Pay Prepetition Wages, Compensation and Employee Benefits (the "Wages Motion")**

28. The Debtor requests the entry of interim and final orders authorizing the Debtor, in its sole discretion, to pay prepetition wage claims, to honor obligations and to continue programs, largely consistent with its past practices and policies, relating to Employee Wage Claims and Employee Benefit Obligations, as defined in the Wages Motion. The Debtor seeks the relief requested in the Wages Motion because any delay in paying employees for services rendered and honoring and/ or paying benefits to employees will adversely impact the Debtor's relationship with its valued employees who are crucial to the ongoing operation and management of the Debtor's business.

29. As of the Petition Date, the Debtor has three employees (the "Employees"), in addition to myself. There are two associate attorneys and one administrative staff member (the associates and administrative staff member collectively, the "Non-Partner Employees"). The Debtor anticipates that the number of Employees will increase during the pendency of this case. The Employees' skills, institutional knowledge and understanding of the Debtor's operations and client relations are essential to the administration of all aspects of this Chapter 11 Case.

30. Pursuant to the budget in my chapter 11 case, I receive a monthly distribution of $15,000, paid in the first week of each month.

31. The Non-Partner Employees are paid on a semi-monthly schedule, with pay periods ending on the 5th and 20th of each month. Paychecks are issued on or shortly after the end of each pay period. The Non-Partner Employees are paid approximately $20,000 per pay period.

32. All Employees are paid on a salaried basis and no Employees are eligible for overtime.

11

33. The Debtor routinely reimburses certain Employees for expenses incurred within the scope of their employment, including expenses for travel, lodging, ground transportation, meals, supplies and other miscellaneous business expenses that are not for luxury items (collectively, the "Reimbursable Expenses"). The Debtor estimates that there is approximately $7,500 in outstanding Reimbursable Expenses.

34. The Debtor provides health insurance to me through the UnitedHealthcare Oxford High Plan, and to two of the three Non-Partner Employees through the United Healthcare Oxford Medium Plan. The remaining Employee has opted out of receiving health benefits through the Debtor, and this is not expected to change. Medical benefits for employees are covered entirely by the Debtor; there is no employee contribution.

35. The Debtor pays approximately $5,605.75 per month on account of the medical plans for the Employees. This amount is due on the first day of each month for coverage during that month. As of the Petition Date, the most recent health insurance payment by the Debtor was on or around July 1, 2019. It is anticipated that a payment of $5,605.75 will be made on August 1, 2019; and another payment of $5,605.75 will be made on September 1, 2019.

36. The Debtor pays the premiums on my life insurance policy. This policy is provided through the Principal Financial Group. The quarterly premium is $16,399.69. The most recent premium payment was due on June 5, 2019, and was paid on or around that date. The next premium payment will be due on or around September 5, 2019.

37. All Employees are entitled to four weeks of vacation annually. The four weeks of vacation accrue at an even rate over the course of the year. Employees may take vacation time in advance of the time by which that vacation time has actually accrued (e.g., after three months, an Employee may take two weeks of the total four week allowance, even though only one week has

accrued thus far). However, if an Employee leaves his or her employment having taken more vacation time than had accrued, the difference is subject to being taken out of the Employee's final paycheck. Conversely, an Employee who leaves his or her employment having taken less vacation time than had accrued is entitled to cash out the unused vacation time.

38. The Debtor does not anticipate that this policy will materially affect the Debtor's financial obligations.

39. The Debtor routinely withholds from Employee paychecks amounts that the Debtor is required to transmit to third parties, *i.e.*, the Employee-Related Taxes. Examples of such withholding include social security, FICA, federal and state income taxes, and garnishments. The Debtor believes that such withheld funds, to the extent that they remain in the Debtor's possession, constitute moneys held in trust and therefore are not property of the Debtor's bankruptcy estate. Thus, the Debtor submits that it has authority to direct such funds to the appropriate parties in the ordinary course of business.

40. The continued payment of Employees' wages and provision of benefits is necessary to the operation of the Firm. I believe that the relief requested in the Wages Motion is in the best interest of the Debtor's estate, its creditors, and all other parties in interest. Accordingly, on behalf of the Debtor, I respectfully submit that the Wages Motion should be approved.

**Debtor's Motion for Entry of Interim and Final Orders Pursuant to 11 U.S.C. §§ 105, 361, 362, 363 and 507, Rules 2002, 4001 and 9014 of the Federal Rules of Bankruptcy Procedure (1) Authorizing Use of Cash Collateral, (2) Granting Adequate Protection, (3) Modifying the Automatic Stay, and (4) Scheduling a Final Hearing 2002, 4001 (the "<u>Cash Collateral Motion</u>")**

41. By the Cash Collateral Motion, the Debtor seeks authority to use the Debtor's cash in which the Prepetition Lenders have a lien pursuant to the Prepetition Credit Documents (the "<u>Cash Collateral</u>") and to provide adequate protection to the Prepetition Lenders for any

diminution of their respective interests in the Cash Collateral, as well as an order vacating and modifying the automatic stay to the extent necessary to implement such relief.

42. Aside from the use of Mr. Liddle's personal funds, including the Sale Proceeds, the Debtor needs available sources of working capital in the early stages of the case to operate its business in the ordinary course or to maintain its property. The ability of the Debtor to finance and continue its operations requires the use of the Cash Collateral, absent which serious, immediate and irreparable harm will result to the Debtor, its estate and its creditors. The Debtor therefore seek authority to use the Cash Collateral subject to a cash collateral budget (the "Budget") attached to the Cash Collateral Motion.

43. In exchange for using the Prepetition Lenders' Cash Collateral, the Debtor seeks authority to grant to the Prepetition Lenders as adequate protection certain replacement liens (the "Adequate Protection Liens") on the Debtor's accounts receivable, including billable hours and contingency fees collected on settlements, agreements, and judgments. The Adequate Protection Liens will be granted solely to the extent of any diminution in the value of the Prepetition Lenders' respective interests in the Cash Collateral resulting from the use of Cash Collateral, the authorized use, sale or lease of collateral, and the imposition of the automatic stay.

44. The funding of employee payroll, insurance, file storage, and rent, as well as the investigation, analysis and either prosecution or defense (as the case may be) of claims asserted by or against the Debtor's estate, all in accordance with the Budget, is critical for the Debtor to continue to successfully operate its business while maximizing the value of the Debtor's assets for all creditors. The Debtor requires access to the Cash Collateral for all of the foregoing operations and administration of its chapter 11 case. The relief requested in this Cash Collateral Motion is

therefore necessary, essential, and appropriate for the continued operation of the Debtor's business and the preservation of its property.

45. For these and the other reasons discussed in the Cash Collateral Motion, entry of the proposed Interim Order is in the best interests of the Debtor and the estate.

**Debtor's Motion for Interim and Final Orders Pursuant to Bankruptcy Code Sections 105(a), 345, 363, 364 and 503(b)(1) Authorizing: (I) Continued Maintenance of Existing Bank Accounts and (II) Continued Use of Existing Business Forms (the "Cash Management Motion")**

46. As I described in paragraph 17 above, the Debtor currently uses its Trust Account to hold in trust and segregate client funds. By the Cash Management Motion, the Debtor requests an order allowing it to continue using the Trust Account in addition to utilizing its DIP Account as an operating account for the Firm. The Debtor seeks further authority to continue using its check stock and business forms until they are depleted.

47. The continued use of the Trust Account will enable the Debtor to continue to hold client funds in trust and segregated from the Debtor's operating funds held in the DIP Account, thus fostering the Debtor's continued operation as a law firm while permitting it to receive and disburse funds on account of its operations with transparency to the Bankruptcy Court. Further, the cost, delay and administrative burden of .preparing new business forms, as well as the confusion that such new forms could cause for the Debtor's clients and vendors, is unnecessary and could be harmful to this estate. All creditors will be notified of the Debtor's status as debtor in possession regardless of whether a debtor in possession stamp is affixed to its existing business forms.

48. I believe that the relief requested in the Cash Management Motion is in the best interests of the Debtor's estate, its creditors, and all other parties in interest, and will enable the Debtor to continue to segregate client funds from its operating funds in the DIP Account and thus

15

continue to operate the Firm in an orderly manner. Accordingly, on behalf of the Debtor, I respectfully submit that the Cash Management Motion should be approved.

**Motion of the Debtor for an Order Pursuant to Bankruptcy Code Sections 105, 363, 503, 1107(a) and 1108 Authorizing the Debtor to Maintain Existing Insurance Policies and Pay All Policy Premiums in Connection Therewith (the "Insurance Motion")**

49. By the Insurance Motion, the Debtor requests the entry of an order authorizing, but not directing, it to maintain its existing insurance policy and pay all policy premiums and related obligations in connection therewith to continue its prepetition insurance coverage. In the ordinary course of the Debtor's business, the Debtor has maintained and continues to maintain a professional liability insurance policy that is financed by AFCO (the "Policy") that benefits the Debtor's estate. Continuation of the Policy is essential to the preservation of the Debtor's business, property and assets, and, in many cases, such coverage is required by various regulations, laws and contracts that govern the Debtor's business conduct. The third-party claims that are covered by the Insurance Policy are neither unusual in amount, nor in number, in relation to the extent of the business operations conducted by the Debtor. A cancellation or suspension of insurance coverage could result in the Debtor being exposed to substantial liability to the detriment of all parties in interest.

50. The Debtor believes that there are no outstanding insurance premiums to be paid on account of the Insurance Policy. However, out of abundance of caution, and in the event the Debtor identifies any insurance-related payment obligations arising prior to the Petition Date that are currently unknown to the Debtor, by the Insurance Motion the Debtor seeks authority for the payment of such prepetition obligations, as well as any post-petition fees in the event a change in circumstance requires additional services of the Insurance Carriers. Additionally, the Debtor owes certain insurance-related payments in the ordinary course of business, including payments to AFCO on account of premium financing. Under the premium financing arrangement with AFCO,

16

the Debtor is currently required to make a premium installment of $5,717.82 on the 15th day of every month, including a payment on August 15, 2019. The current policy expires on or around August 15, 2019, and the Debtor will need to renew the policy for another year and pay the new premium set by AFCO. The Debtor expects monthly payments to continue to be due on the 15th day of each month.

51.     I believe that the relief requested in the Insurance Motion is in the best interests of the Debtor's estate, its creditors, and all other parties in interest, and will enable the Debtor to continue to operate its business. I further believe that the relief requested in the Insurance Motion is necessary to avoid immediate and irreparable harm that would result from the failure to authorize the Debtor to maintain the Policy. Accordingly, on behalf of the Debtor, I respectfully submit that the Insurance Motion should be approved.

**Professional Retention Motions**

**Motion of Debtor for Entry of an Order Establishing Procedures for Interim Compensation and Reimbursement of Expenses of Professionals (the "Interim Compensation Motion")**

52.     By the Interim Compensation Motion, the Debtor seeks approval of procedures for the monthly allowance and payment of compensation and the reimbursement of expenses for the services of professionals authorized by this Court. Approval of the Interim Compensation Motion would authorize professionals to file interim fee applications beginning with the period ending on November 30, 2019, and at four-month intervals thereafter, seeking payment of fees and reimbursement of expenses. Establishing procedures for interim compensation will streamline the administration of this Chapter 11 Case and otherwise promote efficiency for this Court and the U.S. Trustee.

53.     I believe that the relief requested in the Interim Compensation Motion is in the best interests of the Debtor's estate, its creditors, and all other parties in interest and will enable the Debtor

to administer its Chapter 11 efficiently and expeditiously. Accordingly, on behalf of the Debtor, I respectfully submit that the Interim Compensation Motion should be approved.

### Motion of Debtor for Entry of an Order Authorizing the Retention and Compensation of Professionals Utilized by the Debtor in the Ordinary Course of Business (the "OCP Motion")

54. By the OCP Motion, the Debtor seeks authority to pay certain professionals it engages in the ordinary course of its business (each, an "Ordinary Course Professional") without the submission of separate retention applications and the issuance of separate retention orders for each Ordinary Course Professional. In the ordinary course of its business, the Debtor employs other attorneys, accountants, tax advisors, pension benefit specialists and other professionals to provide professional services to assist it in carrying out its business as a law firm.

55. Approval of the OCP Motion would permit the Debtor to continue to employee such Ordinary Course Professionals and compensate them in an amount not to exceed $65,000 per professional per month and $120,000 for all professionals in the aggregate per month. Employing the Ordinary Course Professionals in the same manner and for the same purposes as such services were provided prior to the Petition Date will avoid disruption of the Debtor's normal business, which will preserve the value of the estate.. It is essential that the employment of the Ordinary Course Professionals, many of whom are familiar with the Debtor's business and affairs, be continued and it would be costly, time-consuming, and administratively cumbersome for the Debtor and this Court to require each Ordinary Course Professional to apply separately for approval of its employment and compensation through the filing of multiple pleadings in this case.

56. I believe that the relief requested in the OCP Motion is in the best interests of the Debtor's estate, its creditors, and all other parties in interest and will enable the Debtor to continue its operations without interruption. Accordingly, on behalf of the Debtor, I respectfully submit that the Interim Compensation Motion should be approved.

**Information Required by Local Bankruptcy Rule 1007-2**

57. In accordance with Local Bankruptcy Rule 1007-2(a)(3), and to the best of my knowledge, information, and belief, no creditors' committee was organized prior to the commencement of this Chapter 11 case.

58. In accordance with Local Bankruptcy Rule 1007-2(a)(4), a list containing the names and addresses of the Firm's 20 largest unsecured creditors is attached to the Petition as Official Form 204.

59. In accordance with Local Bankruptcy Rule 1007-2(a)(5), a list containing the names of the holders of the Firm's five (5) largest secured claims is attached to the Petition as Official Form 206D.

60. In accordance with Local Bankruptcy Rule 1007-2(a)(6), a summary of the Firm's assets and liabilities is set forth above in paragraphs 7-8. The Firm's assets consist primarily of ongoing client matters. The Firm's books and records are located its offices at 1177 Avenue of the Americas, 5th Floor, New York, New York 10036, which offices are leased.

61. In accordance with Local Bankruptcy Rule 1007-2(a)(8), and to the best of my knowledge, information, and belief, the firm has no assets held in a custodial account.

62. In accordance with Local Bankruptcy Rule 1007-2(a)(11), and to the best of my knowledge, information, and belief, there are no actions or proceedings, pending or threatened, against the Debtor or its property where a judgment against the Debtor or a seizure of its property may be imminent. All actions where a judgment has been obtained are reflected in the list of creditors filed simultaneously with this affidavit.

63. It is my belief and hope that under the protections granted by Chapter 11, I will be able to continue a strong practice, develop a consensual plan for creditors or payment of at the very least manage an orderly disposition of my and the Firm's affairs.

64. The Firm intends to continue in operation and propose a plan of reorganization which treats all creditors in a fair and equitable manner consistent with the Bankruptcy Code.

_____
Jeffrey L. Liddle

Sworn and subscribed to this
___ day of July, 2019

_____
Notary Public

ROSE M. REVERENDO
NOTARY PUBLIC, STATE OF NEW YORK
Registration No. 01RE4908329
Qualified in New York County
Commission Expires February 28, 2022