# <u>EXHIBIT C, Part 1</u>

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

MICHAEL BARR,

         *Plaintiff,*

    -against-

LIDDLE & ROBINSON, L.L.P. and JEFFREY
L. LIDDLE,

         *Defendants.*

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

**Index No. 159781/2014**

**NOTICE OF CROSS-
MOTION FOR
<u>SUMMARY JUDGMENT</u>**

   **PLEASE TAKE NOTICE** that upon, the annexed Affidavit of Alan A. Heller, Esq. dated

August 13, 2018, and the exhibits thereto, the Affidavit of Michael Barr, dated August 13, 2018,

the Affirmation of Hal Lieberman, Esq. dated August 9, 2018 and the exhibits thereto, the

accompanying memorandum of law and upon all the pleadings and proceedings heretofore had

herein and all papers filed herein, Plaintiff will cross-move this Court at the courthouse located at

60 Centre Street, Submissions Room, Part Room 130, New York New York on the 25th day of

September, 2018 at 9:30 a.m. in the forenoon of that day, or as soon thereafter as counsel can be

heard, for an Order, pursuant to §3212 granting Plaintiff summary judgment on his Complaint and

awarding damages to the Plaintiff against the Defendants in the amount of $1,299,999.84 with

interest thereon (i) from January 1, 2003 on the first $433,333.28; and (ii) from January 1, 2004

on the second $866,666.56; together with such other and further relief as this Court deems just and

proper.

   **PLEASE TAKE FURTHER NOTICE,** as per the stipulation of counsel dated July 20,

2018, opposition papers to this cross-motion shall be served so that they are received by Plaintiff's

counsel on or before September 10, 2018.

FILED: NEW YORK COUNTY CLERK 08/13/2018 01:47 PM

NYSCEF DOC. NO. 137

INDEX NO. 159781/2014

RECEIVED NYSCEF: 08/13/2018

19-12346-shl   Doc 55-3   Filed 09/05/19   Entered 09/05/19 18:22:01   Exhibit C
Part 1   Pg 3 of 71

Dated:   New York, New York
         August 13, 2018

                                        GARVEY SCHUBERT BARER

                                        By: _____
                                            Alan Heller, Esq.
                                        *Attorneys for Plaintiff Michael Barr*
                                        100 Wall Street, 20th Floor
                                        New York, New York 10005
                                        (212) 965-4526
                                        aheller@gsblaw.com

TO:   **BRAFF, HARRIS, SUKONECK & MALOOF**
      *Attorneys for Defendants*
      570 W. Mt. Pleasant Ave., Suite 200
      Livingston, New Jersey 07039
      (212) 599-2085

GSB:9634798.1

FILED: NEW YORK COUNTY CLERK 08/13/2018 01:47 PM    INDEX NO. 159781/2014

NYSCEF DOC. NO. 138    19-12346-shl    Doc 55-3    Filed 09/05/19    Entered 09/05/19 18:22:01    Exhibit C    RECEIVED NYSCEF: 08/13/2018

Part 1    Pg 4 of 71

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

MICHAEL BARR,                                         Index No. 159781/2014

                                  *Plaintiff,*        **AFFIDAVIT IN OPPOSITION
                                                      TO DEFENDANTS' MOTION
                                                      FOR SUMMARY JUDGMENT**
                   -against-                          **AND IN SUPPORT OF
                                                      PLAINTIFF'S CROSS-**
LIDDLE & ROBINSON, L.L.P. and JEFFREY                 **MOTION FOR SUMMARY
L. LIDDLE,**                                          **JUDGMENT**

                                  *Defendants.*

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

        **ALAN A. HELLER,** being duly sworn, deposes and says:

        1.      I am a member of the Firm of Garvey Schubert Barer, P.C., attorneys for Plaintiff

Michael Barr ("Barr").    Unless otherwise stated, I am fully familiar with the facts and

circumstances set forth herein.  I submit this Affidavit in opposition to the motion for summary

judgment by Defendants, Jeffrey L. Liddle and Liddle & Robinson, L.L.P. (hereafter,

"Defendants") and in support of plaintiff's cross-motion for summary judgment.

        2.      Annexed hereto are the exhibits detailed below.

        3.      The following Exhibits are submitted in opposition to Defendants' motion and in

support of Plaintiff's cross-motion:

        a.  Exhibit A: Complaint.

        b.  Exhibit B: Answer.

        c.  Exhibit C: Deposition of Lisa Bisaccia, the employee of FleetBoston
            responsible for paying out Barr's Deferred Compensation pursuant to the CEP
            agreement.

        d.  Exhibit D: Deposition of defendant, Jeffrey Liddle.

GSB:9622342.1

FILED: NEW YORK COUNTY CLERK 08/13/2018 01:47 PM
INDEX NO. 159781/2014
NYSCEF DOC. NO. 138
19-12346-shl    Doc 55-3    Filed 09/05/19    Entered 09/05/19 18:22:01    Exhibit C
RECEIVED NYSCEF: 08/13/2018
Part 1    Pg 5 of 71

e.  Exhibit E: Press Release sent by Defendants to Wall Street Journal.

f.  Exhibit F: Revised Press Release sent by Defendants to Wall Street Journal.

g.  Exhibit G: E-mails between Liddle & Robinson L.L.P. and Wall Street Journal in December 2002.

h.  Exhibit H: December 10, 2002 Memorandum from Christine Palmieri to Jeffrey Liddle regarding communications with Wall Street Journal and New York Times with Handwritten Notes by Jeffrey Liddle.

i.  Exhibit I: Pleading from Massachusetts District Court action signed by Defendants.

j.  Exhibit J: Screenshot of Website Press Section for Liddle & Robinson L.L.P. at the time of the Filing of this Action.

k.  Exhibit K: December 12, 2002 E-mail from Susanne Craig at the Wall Street Journal to defendant, Jeffrey Liddle.

l.  Exhibit L: Plaintiff's Expert Disclosure.

WHEREFORE, for the foregoing reasons and for the reasons set forth in the Memorandum of Law submitted herewith, Defendants' motion for summary judgment should be denied in all respects and Plaintiff's cross-motion for summary judgment should be granted.

ALAN A. HELLER

Sworn to before me this
13th day of August, 2018

Notary Public

JEANNE C. BARENHOLTZ
NOTARY PUBLIC-STATE OF NEW YORK
No. 02BA6338075
Qualified in New York County
My Commission Expires 03-07-2020

2

FILED: NEW YORK COUNTY CLERK 08/13/2018 01:47 PM INDEX NO. 159781/2014

NYSCEF DOC. NO. 139          19-12346-shl   Doc 55-3   Filed 09/05/19   Entered 09/05/19 18:22:01   Exhibit C   RECEIVED NYSCEF: 08/13/2018

Part 1   Pg 6 of 71

# EXHIBIT A

FILED: NEW YORK COUNTY CLERK 08/13/2018 01:47 PM INDEX NO. 159781/2014

NYSCEF DOC. NO. 139
19-12346-shl   Doc 55-3   Filed 09/05/19   Entered 09/05/19 18:22:01   Exhibit C
Part 1   Pg 7 of 71
RECEIVED NYSCEF: 08/06/2018

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

MICHAEL BARR,

                                        *Plaintiff,*

               -against-

LIDDLE & ROBINSON, L.L.P. and JEFFREY L.
LIDDLE,

                                      *Defendants.*

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

Index No.  159781/2014

Date Purchased:  10/06/14

*SUMMONS*

**Plaintiff's Address:**
1130 Park Avenue, Suite 2-1
New York, New York

**The basis of the venue designated
is:** Defendants' place of business

**TO THE ABOVE NAMED DEFENDANT(S):**

      YOU ARE HEREBY SUMMONED to answer the complaint in this action and to serve a
copy of your answer, or, if the complaint is not served with this summons, to serve a notice of
appearance, on the Plaintiff's Attorney(s) within twenty (20) days after the service of this
summons, exclusive of the day of service (or within 30 days after the service is complete if this
summons is not personally delivered to you within the State of New York); and in case of your
failure to appear or answer, judgment will be taken against you by default for the relief
demanded in the complaint.

      The basis of the venue designated is CPLR 503(a).

Dated:      New York, New York
             October 6, 2014

                               **GARVEY SCHUBERT BARER**

                               By:

                                 Alan A. Heller
                              *Attorneys for Plaintiff*
                               100 Wall Street, 20th Floor
                               New York, New York 10005
                               (212) 965-4526

FILED: NEW YORK COUNTY CLERK 08/13/2018 01:47 PM
NYSCEF DOC. NO. 139

INDEX NO. 159781/2014

RECEIVED NYSCEF: 08/13/2018

19-12346-shl    Doc 55-3    Filed 09/05/19    Entered 09/05/19 18:22:01    Exhibit C
Part 1    Pg 8 of 71

TO:    LIDDLE & ROBINSON, L.L.P.
       800 Third Avenue
       New York, New York  10022

       JEFFREY L. LIDDLE
       800 Third Avenue
       New York, New York  10022

NY_DOCS:623492.1 [50744.00100]

FILED: NEW YORK COUNTY CLERK 08/13/2018 01:47 PM
NYSCEF DOC. NO. 139
INDEX NO. 159781/2014
RECEIVED NYSCEF: 08/13/2018

19-12346-shl    Doc 55-3    Filed 09/05/19    Entered 09/05/19 18:22:01    Exhibit C
Part 1    Pg 9 of 71

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

MICHAEL BARR,

                          *Plaintiff,*

         -against-

LIDDLE & ROBINSON, L.L.P. and JEFFREY L.
LIDDLE,

                        *Defendants.*

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

Index No.     159781/2014

Date Purchased:   10/06/14

*COMPLAINT*

       Plaintiff, by his attorneys, Garvey Schubert Barer, as and for his Complaint against the

defendants, alleges as follows:

### Introduction

     1.     Plaintiff Michael Barr ("Barr") is a resident of the State of New York with a place of

business at 1130 Park Avenue, Suite 2-1, New York, New York.

     2.     Upon information and belief, Defendant Liddle & Robinson, L.L.P. ("L&R") is a

domestic limited liability partnership with an address at 800 Third Avenue, New York, New York.

     3.     Upon information and belief, Defendant Jeffrey L. Liddle ("Liddle") is an attorney

duly admitted to practice law in the State of New York and is the Founding Partner of L&R.  On the

L&R website, Liddle presents himself as a renowned New York employment lawyer who represents

employees and employers in all areas of employment litigation and contract negotiations.

     4.     The L&R website further states that (i) Mr. Liddle has distinguished himself as an

experienced New York employment lawyer and one of the leading trial lawyers in the country,

having tried to conclusion and won dozens of court cases and arbitrations with claims involving compensation, defamation, unfair competition, discrimination, fraud, breach of contract, wrongful termination and securities-related issues, and (ii) Liddle has worked on numerous cases that have exposed misconduct by Wall Street securities firms, and in particular, the conflicts of interest that existed between the firms' investment banking and research departments and that his work in this area has led to significant media coverage and that he is "lead trial counsel in one of the largest securities industry arbitrations in history, representing over 40 former high-level Robertson, Stephens, Inc. investment bankers with compensation and related claims valued in excess of $500 million."

5.      Plaintiff was one of the "former high-level Robertson Stephens, Inc. investment bankers" referred to in L&R's website.

6.      Morevoer, the L&R website states that "[i]n recognition of his many successes, reporters from leading business and news publications, including The Wall Street Journal, The New York Times, Business Week, Newsweek, Investment Dealers' Digest, Securities Week, The Bond Buyer, Bloomberg, Reuters and The Economist frequently solicit Mr. Liddle's views and commentary on his cases, compensation issues and employment and other practices in the securities industry."

7.      This action arises out of the negligent conduct and legal malpractice of Liddle and L&R where, among other things, Liddle disregarded the contractual rights and obligations of Barr by (i) filing an arbitration (the "Arbitration") on Barr's behalf  (a) twenty-two (22) days before the vesting of 1/3 of $1,299,999.84 in deferred compensation due to Barr pursuant to a Cash Equivalent

FILED: NEW YORK COUNTY CLERK 08/13/2018 01:47 PM
INDEX NO. 159781/2014

NYSCEF DOC. NO. 139

19-12346-shl    Doc 55-3    Filed 09/05/19    Entered 09/05/19 18:22:01    Exhibit C

Part 1    Pg 11 of 71

RECEIVED NYSCEF: 08/13/2018

Deferred Compensation Plan he had with Robertson Stephens, and (b) thirty-seven (37) days before

the six (6) month expiration date of a non-disparagement clause in Barr's agreement with Robertson

Stephens (the clause ultimately used by Robertson Stephens to avoid payment of Barr's entire

deferred compensation), and (ii) eager to get his name in the papers and self-promote himself for his

own and L&R's benefit (and have his quote, and the fact that he was quoted in the Wall Street

Journal, published on his Firm's website), Liddle, without any consideration for the ramifications or

impact on Barr's rights of statements made to the press or others, and without Barr's authorization,

permission or consent, and a mere one (1) day after the lawsuit was filed, discussed his newly filed

$500million Arbitration with Susanne Craig and John Hechinger of The Wall Street Journal and,

while doing so, publically spoke about Barr's former employer Robertson Stephens.

8.       As a direct result of Liddle's comments to the Wall Street Journal, by letter dated

May 2, 2003, Robertson Stephens and its parent FleetBoston Financial Corporation determined that

Barr had violated section 8.1 of his Cash Equivalent Plans, Section 4.6 of the Restricted Unit Plan

and Section 8 of the Restricted Unit Award Agreement and canceled his rights thereunder including,

but not limited to, his rights to $1,299,999.84 in deferred compensation.  This defense was raised

during the arbitration (and subsequent Federal District Court legal proceedings discussed below) as

the basis for the forfeiture of Plaintiff's deferred compensation and was accepted by the New York

Stock Exchange panel of arbitrators, on September 12, 2007, when it rejected plaintiff's claim to his

deferred compensation.

9.       After the NYSE September 12, 2007 Award (the "NYSE Award") was rendered,

Liddle and L&R, maintaining that the NYSE Award did not result in a rejection of plaintiff's

FILED: NEW YORK COUNTY CLERK 08/13/2018 01:47 PM
NYSCEF DOC. NO. 139

INDEX NO. 159781/2014

RECEIVED NYSCEF: 08/13/2018

19-12346-shl    Doc 55-3    Filed 09/05/19    Entered 09/05/19 18:22:01    Exhibit C
Part 1    Pg 12 of 71

deferred compensation, continued its pursuit of plaintiff's deferred compensation in counterclaims interposed by Liddle and L&R on Barr's behalf in the matter of *FleetBoston Financial Corporation, et. al. v. Alt, et. al.* pending in the United States District Court, District of Massachusetts (Case No. 03 Civ. 10597). By decisions dated December 1, 2009 (by the United States District Court) and March 23, 2011 (by the United States Court of Appeals, First Circuit), plaintiff's deferred compensation claims were dismissed as barred by the doctrine of *Res Judicata* (to wit: the NYSE Arbitration award definitively determined that Barr was not entitled to his deferred compensation because Liddle's actions had violated Barr's contractual obligation not to "disparage" or "defame" Robertson Stephens).

10.    After the First Circuit affirmed the Massachusetts District Court dismissal of plaintiff's deferred compensation claim, Liddle and L&R petitioned the Supreme Court of the United States on plaintiff's behalf for writ of certiorari. On October 11, 2011, the Supreme Court of the United States in the matter of *Alt v. Robertson Stephens Group, Inc.*, 132 S. Ct. 414 (2011), denied plaintiff's petition for writ of certiorari.

11.    Accordingly, as a direct result of Liddle's negligent conduct during his representation of Barr which resulted in a final determination on October 11, 2011 that Barr had forfeited his $1,299,999.84 in deferred compensation, Barr has been damaged in the amount of $1,299,999.84 with interest thereon from (i) from January 1, 2003 on $433,333.28 (the date of the first vesting of the deferred compensation lost by Barr as a direct result of Liddle's negligent conduct) and (ii) from January 1, 2004 on $866,666.56 (the date of the second vesting of the deferred compensation lost by Barr as a direct result of Liddle's negligent conduct).

NY_DOCS:621631.1 [50744.00100]                    4

FILED: NEW YORK COUNTY CLERK 08/13/2018 01:47 PM
NYSCEF DOC. NO. 139

INDEX NO. 159781/2014

RECEIVED NYSCEF: 08/13/2018

19-12346-shl    Doc 55-3    Filed 09/05/19    Entered 09/05/19 18:22:01    Exhibit C
Part 1    Pg 13 of 71

## Background

12.    In or about March, 2000, Barr became a Managing Director of Robertson Stephens an investment banking firm organized under the laws of Massachusetts, with headquarters in San Francisco, California and offices in New York, Atlanta, Chicago, Boston and Tel Aviv.

13.    Upon information and belief, Robertson Stephens was a subsidiary of FleetBoston Financial Corporation ("FleetBoston").

14.    Upon information and belief, effective April 1, 2004, FleetBoston was acquired by merger by Bank of America Corporation.

15.    For work performed by Barr in 2001, his compensation consisted of a base salary and an annual bonus that comprised the great majority of his total compensation.  This 2001 bonus compensation included, among other things, involuntary deferrals of 2001 year end bonus compensation in the Robertson Stephens Group, Inc. 2002 Cash Equivalent Plan and equity in RS Group in the form of Restricted Stock Units.

16.    The deferred compensation awarded to plaintiff under the Robertson Stephens 2002 Cash Equivalent Plan (the "2002 CEP") was $1,299,999.84 (referred to herein as the "Deferred Compensation" or "Award Amount") and the plaintiff was also awarded 165,512 Restricted Stock Units.

17.    Section 7.1 of the 2002 CEP provided that "one-third (1/3) of such Award Amount will vest on January 1, 2003, and two-thirds (2/3) of such Award Amount will vest on January 1, 2004."

FILED: NEW YORK COUNTY CLERK 08/13/2018 01:47 PM
INDEX NO. 159781/2014
NYSCEF DOC. NO.: 139
19-12346-shl    Doc 55-3    Filed 09/05/19    Entered 09/05/19 18:22:01    Exhibit C
RECEIVED NYSCEF: 08/13/2018
Part 1    Pg 14 of 71

18.       Section 7.2 of the 2002 CEP provided that Robertson Stephens was to pay plaintiff's vested Award Amount and any earnings thereon as soon as practicable following the vesting date.

19.       Section 8.1 of the 2002 CEP provided, in relevant part, as follows:

> In the event that, at any time during the six month period immediately following any Participant's Termination Date ..., the Participant ... (ii) publicly disparages any member of the RS Group or Parent or any of their respective officers, directors or senior executive employees or otherwise makes any public statement that is adverse, inimical or otherwise materially detrimental to the interests of such Persons or individuals, or if the Company or the Committee, in its discretion or such officer or officers of the Company as the Company may from time to time designate, determines that the Participant's actions are adverse to the best interests of the RS Group or Parent, the Participant shall immediately forfeit any and all rights in respect of any [Deferred Amount or Award Amount] that is not Vested and the earnings thereon.

20.       On or about July 17, 2002, Barr was notified by Robertson Stephens that the business operations of Robertson Stephens and its subsidiaries were being wound down and that Barr's association with Robertson Stephens was being terminated.

21.       On or about September 18, 2002, Barr was sent a proposed Separation Agreement and Release by Brian Mearns, Director of Human Resources Technology and Shared Services, FleetBoston Human Resources (the "Proposed Separation Agreement").  Among the terms of the Proposed Separation Agreement, Barr would receive the Deferred Compensation from the 2002 CEP, he would forfeit his 165,512 RSUs and he would release FleetBoston, Robertson Stephens and their "past and present parent corporations, divisions, subsidiaries, affiliates and related companies and their respective successors and assigns" from any claims "conserning the terms and conditions of [his] employment with Robertson Stephens, FleetBoston or thir affiliates."

FILED: NEW YORK COUNTY CLERK 08/13/2018 01:47 PM
NYSCEF DOC. NO. 139
19-12346-shl    Doc 55-3    Filed 09/05/19    Entered 09/05/19 18:22:01    Exhibit C
Part 1    Pg 15 of 71

INDEX NO. 159781/2014

RECEIVED NYSCEF: 08/13/2018

22.    Exhibit A to the Proposed Separation Agreement acknowledged, in relevant part, that the "2002 Cash Equivalent Plan Deferred Amount" due to Barr was $1,299,999.84.

23.    Plaintiff did not sign the Proposed Separation Agreement.

### Plaintiff Engages L&R

24.    In November, 2002, Barr, together with other former employees/managing directors of Robertson Stephens, engaged Liddle and L&R to commence an arbitration before the New York Stock Exchange against FleetBoston Financial Corporation, Fleet Securities, Inc. Robertson Stephens, Inc. and Robertson Stephens Group, Inc. for, *inter alia*, damages arising out of the failure to "pay promised and earned bonus compensation for 2001 and 2002."

25.    Because FleetBoston and Robertson Stephens had not challenged the payment of the Deferred Compensation and, as of the date of Liddle and L&R's November, 2002 retention, there was no basis for FleetBoston or Robertson Stephens to renege on the obligation to pay Barr his Deferred Compensation, L&R and Barr agreed that, upon Barr's receipt of payment of his Deferred Compensation, L&R would not receive a fee.

26.    It was further understood between Barr, on the one hand, and L&R and Liddle, on the other hand, that during their representation, L&R and Liddle would not act in a manner that would be detrimental to Barr including, but not limited to, conducting themselves in a manner that would give FleetBoston and Robertson Stephens an excuse or cause it to not to pay Barr all or a portion of the Deferred Compensation.

FILED: NEW YORK COUNTY CLERK 08/13/2018 01:47 PM
NYSCEF DOC. NO. 139

INDEX NO. 159781/2014

RECEIVED NYSCEF: 08/13/2018

19-12346-shl    Doc 55-3    Filed 09/05/19    Entered 09/05/19 18:22:01    Exhibit C
Part 1    Pg 16 of 71

27.    At or about the time Barr retained L&R in November, 2002, L&R and Liddle were in possession of the 2002 CEP and were fully aware of the terms and conditions of 2002 CEP.  In particular, L&R and Liddle were aware of the following:

- That one-third (1/3) of such Award Amount will vest on January 1, 2003

- That two-thirds (2/3) of such Award Amount will vest on January 1, 2004.

- That Robertson Stephens was to pay plaintiff's vested Award Amount and any earnings thereon as soon as practicable following the vesting date.

- In the event that, at any time during the six month period immediately following Barr's termination date, Barr *publicly disparages any member of the RS Group or Parent or any of their respective officers, directors or senior executive employees or otherwise makes any public statement that is adverse, inimical or otherwise materially detrimental to the interests of such Persons or individuals*, or if the Company or the Committee, in its discretion or such officer or officers of the Company as the Company may from time to time designate, determines that the Participant's actions are adverse to the best interests of the RS Group or Parent, the Participant *small immediately forfeit any and all rights in respect of any Deferred Compensation or Award Amount that is not Vested and the earnings thereon.*

28.    L&R and Liddle knew, or should have known, that 1/3 of Barr's Deferred Compensation would not be at risk under paragraph 8.1 of the 2002 CEP if a lawsuit was filed after January 1, 2003.

FILED: NEW YORK COUNTY CLERK 08/13/2018 01:47 PM
INDEX NO. 159781/2014
NYSCEF DOC. NO.: 139

19-12346-shl    Doc 55-3    Filed 09/05/19    Entered 09/05/19 18:22:01    Exhibit C
Part 1    Pg 17 of 71

RECEIVED NYSCEF: 08/13/2018

29.    L&R and Liddle knew, or should have known, that Barr's entire amount of the Deferred Compensation would not be at risk under paragraph 8.1 of the 2002 CEP if Barr and/or his legal representatives did not publically disparage Robertson Stephens or its parent.

30.    L&R and Liddle knew, or should have known, that Barr's entire amount of the Deferred Compensation would not be at risk under paragraph 8.1 of the 2002 CEP if no public statements were made by Barr and/or his legal representatives about Robertson Stephens, its parent, or its officers or executives that were adverse, inimical or otherwise materially detrimental to the interests of such Persons or individuals.

31.    L&R and Liddle knew, or should have known, that restriction on public disparagement and/or the making of public statements about Robertson Stephens that disparage and/or were adverse, inimical or otherwise materially detrimental to the interests of such Persons or individuals expired six (6) months from the date of Barr's termination – or January 17, 2003 – and that, upon such expiration, paragraph 8.1 of the 2002 CEP could no longer be used as an excuse to avoid payment of all or any portion of Barr's Deferred Compensation.

32.    Although L&R and Liddle were, or should have been, fully aware of the Deferred Compensation vesting dates and Deferred Compensation forfeiture clauses, L&R and Liddle not only chose to file the NYSE Arbitration on December 11, 2002 – 22 days before the first vesting of 1/3 of Barr's Deferred Compensation and 37 days before the six (6) month non-disparagement restrictions expired – but, one day later (on December 12, 2002), fatally chose to speak to the Wall Street Journal about this newly filed litigation and about Robertson Stephens and its parent FleetBoston.

FILED: NEW YORK COUNTY CLERK 08/13/2018 01:47 PM
INDEX NO. 159781/2014
NYSCEF DOC. NO. 139
19-12346-shl    Doc 55-3    Filed 09/05/19    Entered 09/05/19 18:22:01    Exhibit C
Part 1    Pg 18 of 71
RECEIVED NYSCEF: 08/13/2018

33.    Barr did not authorize the filing of the NYSE arbitration on December 11, 2002 and certainly did not authorize L&R or Liddle to make any remarks to the press about Robertson Stephens or its parent FirstBoston.

34.    There was no reason for L&R or Liddle to rush to file the Arbitration and they could have waited until January 18, 2003 (the day after the non-disparagement restriction expired) to file the Arbitration, and there was absolutely no reason whatsoever for speaking to the press (if ever) until the non-disparagement provisions expired.

35.    As a direct result of L&R's December 11, 2002 filing of the Arbitration and communication with the Wall Street Journal, on May 2, 2003, Robertson Stephens and its parent FleetBoston Financial Corporation determined that Barr had, among other things, violated section 8.1 of his 2002 CEP and canceled his rights to his Deferred Compensation.

36.    The May 2, 2003 cancellation of the Barr's Deferred Compensation was not in any was related to or caused by any act or omission of Barr.

37.    After the May 2, 2003 cancellation by Robertson Stephens and FleetBoston of Barr's Deferred Compensation, L&R and Liddle included such cancelled Deferred Compensation as a claim in the NYSE Arbitration and asserted a Counterclaim for such cancelled Deferred Compensation in the matter of *FleetBoston Financial Corporation, et. al. v. Alt, et. al.* in the United States District Court, District of Massachusetts (Case No. 03 Civ. 10597) (the "District Court Action").

38.    On September 12, 2007, after two years of testimony, the NYSE arbitrators rejected Barr's claim to Deferred Compensation. The sole basis for such rejection was the fact that the arbitrators ruled that the Deferred Compensation had been "forfeited by the terms of the letter dated

FILED: NEW YORK COUNTY CLERK 08/13/2018 01:47 PM
NYSCEF DOC. NO. 139

INDEX NO. 159781/2014

RECEIVED NYSCEF: 08/13/2018

19-12346-shl    Doc 55-3    Filed 09/05/19    Entered 09/05/19 18:22:01    Exhibit C
Part 1    Pg 19 of 71

May 2, 2003" – to wit: that on December 12, 2002, 22 days before the first vesting of 1/3 of Barr's Deferred Compensation and 37 days before the non-disparagement restriction expired in their entirety, Liddle made public statements to the press that Robertson Stephens and FleetBoston deemed to be disparaging, inimical and/or otherwise materially detrimental to the interests of Robertson Stephens and FleetBoston.

39.    Liddle knew and/or should have known that he should not make any public remarks about Robertson Stephens and/or FleetBoston until the non-disparagement restriction expired on January 17, 2003 – or, at the very least, until after the first vesting of Deferred Compensation on January 1, 2003.

40.    Liddle knew and/or should have known that any public statement to the press could put his client's Deferred Compensation at risk.

41.    Lidlle knew and/or should have known that his clients would have been guaranteed their entire Deferred Compensation  had he waited a mere 37 days to file the Arbitration and speak publically about Robertson Stephens and FleetBoston.

42.    Notwithstanding the rejection by the NYSE panel of arbitrators of Barr's Deferred Compensation claims, L&R and Liddle continued to pursue those claims in the District Court Action.

43.    By decisions dated December 1, 2009 (by the United States District Court) and March 23, 2011 (by the United States Court of Appeals, First Circuit), plaintiff's Deferred Compensation counterclaims were dismissed as barred by the doctrine of Res Judicata (to wit: the September 12,

FILED: NEW YORK COUNTY CLERK 08/13/2018 01:47 PM
INDEX NO. 159781/2014
NYSCEF DOC. NO. 139
RECEIVED NYSCEF: 08/13/2018

19-12346-shl   Doc 55-3   Filed 09/05/19   Entered 09/05/19 18:22:01   Exhibit C
Part 1   Pg 20 of 71

2007 arbitration award definitively determined that Barr was not entitled to his Deferred Compensation).

44.     On October 11, 2011, the Supreme Court of the United States in the matter of *Alt v. Robertson Stephens Group, Inc.*, 132 S. Ct. 414 (2011), denied the petition filed by L&R and Liddle for writ of certiorari.

### AS AND FOR A FIRST CAUSE OF ACTION
**(Legal Malpractice/Negligence)**

45.     Repeats and realleges each and every allegation in paragraphs "1" through "44" with the same force and effect as though more fully alleged herein.

46.     In accepting their retention as Barr's attorneys to prosecute Barr's claims against Robertson Stephens and FleetBoston, L&R and Liddle held themselves out as possessing the ability to provide competent legal representation and promised that they would provide such competent representation to Barr.

47.     In performing legal services for Barr, L&R and Liddle failed to exercise the care, skill and diligence commonly possessed and exercised by those in the legal profession by, among other things, speaking to the Wall Street Journal about their newly filed litigation and, during such conversation, speaking about Robertson Stephens and its parent FleetBoston in such a manner that allowed Robertson Stephens to cancel the Deferred Compensation.

48.     L&R and Liddle's speaking to the Wall Street Journal about their newly filed litigation and, during such conversation, speaking about Robertson Stephens and its parent FleetBoston in such a manner that allowed Robertson Stephens to cancel the Deferred Compensation

FILED: NEW YORK COUNTY CLERK 08/13/2018 01:47 PM

NYSCEF DOC. NO. 139

INDEX NO. 159781/2014

RECEIVED NYSCEF: 08/13/2018

19-12346-shl    Doc 55-3    Filed 09/05/19    Entered 09/05/19 18:22:01    Exhibit C
Part 1    Pg 21 of 71

was a proximate cause of Barr's loss of $1,299,999.84 in Deferred Compensation because section

8.1 of the 2002 CEP provided, in relevant part, that in the event that, at any time during the six

month period immediately following Barr's termination date, Barr *publicly disparages any member*

*of the RS Group or Parent or any of their respective officers, directors or senior executive employees*

*or otherwise makes any public statement that is adverse, inimical or otherwise materially*

*detrimental to the interests of such Persons or individuals,* or if the Company or the Committee, in

its discretion or such officer or officers of the Company as the Company may from time to time

designate, determines that the Participant's actions are adverse to the best interests of the RS Group

or Parent, the Participant *shall immediately forfeit any and all rights in respect of any Deferred*

*Compensation or Award Amount that is not Vested and the earnings thereon.*

49.     At the time L&R and Liddle spoke to the Wall Street Journal about Robertson

Stephens and FleetBoston, it was in possession of the 2002 CEP and, in particular, section 8.1

thereof, and knew or should have known with ordinary care and diligence, that speaking to the press

about Robertson Stephens would risk Barr's unvested Deferred Compensation.

50.     At the time L&R and Liddle spoke to the Wall Street Journal about Robertson

Stephens and FleetBoston, they knew or should have known with ordinary care and diligence, that

none of Barr's deferred compensation had yet to be vested.

51.     Communicating with the Wall Street Journal in December, 2002 was a proximate

cause of Barr's loss of $1,299,999.84 in Deferred Compensation because had L&R and Liddle not

communicated with the Wall Street Journal, Robertson Stephens and FleetBoston would have had no

excuse to cancel and avoid payment of $1,299,999.84 in Deferred Compensation to Barr.

19-12346-shl    Doc 55-3    Filed 09/05/19    Entered 09/05/19 18:22:01    Exhibit C
Part 1    Pg 22 of 71

52. As a direct result of L&R and Liddle's communication with the Wall Street Journal in December 2002 about Robertson Stephens and its parent FleetBoston, Barr has suffered damages.

53. But for the negligence of L&R and Liddle, Robertson Stephens and FleetBoston would have had no basis to cancel $1,299,999.84 in Deferred Compensation and Barr would have prevailed on his claims for such amount.

54. As a result of the negligence of L&R and Liddle, Barr has been damaged in the amount of $1,299,999.84 with interest thereon (i) from January 1, 2003 on $433,333.28 of such amount and (ii) from January 1, 2004 on $866,666.58 of such amount.

**AS AND FOR A SECOND CAUSE OF ACTION**
**(Legal Malpractice/Negligence)**

55. Repeats and realleges each and every allegation in paragraphs "1" through "54" with the same force and effect as though more fully alleged herein.

56. The failure to wait until January 18, 2003, the day after the non-disparagement restriction expired, to file the Arbitration and make public statements before January 18, 2003 about Robertson Stephens and/or FleetBoston, was the proximate cause of Barr's loss of $1,299,999.84 in Deferred Compensation.

57. As a direct result of L&R and Liddle's failure to wait until January 18, 2013 to file the Arbitration and speak with the press, Barr has suffered damages.

58. But for the negligence of L&R and Liddle, Robertson Stephens and FleetBoston would have had no basis to cancel $1,299,999.84 in Deferred Compensation and Barr would have prevailed on his claims for such amount.

FILED: NEW YORK COUNTY CLERK 08/13/2018 01:47 PM
NYSCEF DOC. NO. 139
19-12346-shl    Doc 55-3    Filed 09/05/19    Entered 09/05/19 18:22:01    Exhibit C
Part 1    Pg 23 of 71
INDEX NO. 159781/2014
RECEIVED NYSCEF: 08/13/2018

59.     As a result of the negligence of L&R and Liddle, Barr has been damaged in the amount of $1,299,999.84 with interest thereon (i) from January 1, 2003 on $433,333.28 of such amount and (ii) from January 1, 2004 on $866,666.58 of such amount.

## AS AND FOR A THIRD CAUSE OF ACTION
### (Legal Malpractice/Negligence)

60.     Repeats and realleges each and every allegation in paragraphs "1" through "59" with the same force and effect as though more fully alleged herein.

61.     As hereinabove alleged, In accepting their retention as Barr's attorneys to prosecute Barr's claims against Robertson Stephens and FleetBoston, L&R and Liddle held themselves out as possessing the ability to provide competent legal representation and promised that they would provide such competent representation to Barr.

62.     In performing legal services for Barr, L&R and Liddle failed to exercise the care, skill and diligence commonly possessed and exercised by those in the legal profession by, among other things, failing to wait until January 2, 2003 to file the NYSE Arbitration so that the first vesting of 1/3 of Barr's Deferred Compensation could occur and, thus, any defenses to the payment of such amount would be precluded as a matter of law.

63.     The failure to wait until the January 2, 2003 first vesting of Barr's Deferred Compensation was a proximate cause of Barr's loss of $433,333.28 in Deferred Compensation because such 1/3 of Barr's Deferred Compensation would have vested January 1, 2003 and, even if L&R and Liddle decided, after such vesting, and with Barr's consent, to disparage Robertson Stephens or its parent or make a public statement about Robertson Stephens and FleetBoston that

FILED: NEW YORK COUNTY CLERK 08/13/2018 01:47 PM
NYSCEF DOC. NO: 139
19-12346-shl    Doc 55-3    Filed 09/05/19    Entered 09/05/19 18:22:01    Exhibit C
Part 1    Pg 24 of 71
INDEX NO. 159781/2014
RECEIVED NYSCEF: 08/13/2018

was adverse, inimical or otherwise materially detrimental to the interests of Robertson Stephens and FleetBoston, Robertson Stephens and FleetBoston would not have been permitted to use such as a basis to cancel or avoid payment of $433,333.28 in Deferred Compensation to Barr.

64.    As a direct result of L&R and Liddle's failure to wait until the first vesting of Barr's first 1/3 in Deferred Compensation, Barr has suffered damages.

65.    But for the negligence of L&R and Liddle, Robertson Stephens and FleetBoston would have had no basis to cancel $433,333.28 in Deferred Compensation and Barr would have prevailed on his claims for such amount.

66.    As a result of the negligence of L&R and Liddle, Barr has been damaged in the amount of $433,333.28 with interest thereon from January 1, 2003.

**WHEREFORE**, plaintiffs demand judgment against defendants as follows:

a.    On his First and Second Causes of Action, damages in the amount of $1,299,999.84, with interest thereon (i) from January 1, 2003 on $433,333.28 of such amount and (ii) from January 1, 2004 on $866,666.58 of such amount;

b.    On his Third Cause of Action, damages in the amount of $433,333.28, with interest thereon from January 1, 2003; and

c.    Such other and further relief as to this Court may seem just and proper.

19-12346-shl    Doc 55-3    Filed 09/05/19    Entered 09/05/19 18:22:01    Exhibit C
Part 1    Pg 25 of 71

Dated:      New York, New York
            October 6, 2014

                                        **GARVEY SCHUBERT BARER**

                                        By: _____
                                             Alan A. Heller
                                        *Attorneys for Plaintiff*
                                        100 Wall Street, 20th Floor
                                        New York, New York 10005
                                        (212) 965-4526

NY_DOCS:621631.3 [50744.00100]

NY_DOCS:621631.1 [50744.00100]                    17

FILED: NEW YORK COUNTY CLERK 08/13/2018 01:47 PM
INDEX NO. 159781/2014

NYSCEF DOC. NO. 140
RECEIVED NYSCEF: 08/13/2018

19-12346-shl    Doc 55-3    Filed 09/05/19    Entered 09/05/19 18:22:01    Exhibit C
Part 1    Pg 26 of 71

# EXHIBIT B

FILED: NEW YORK COUNTY CLERK 08/08/2016 01:44 PM    INDEX NO. 159781/2014
NYSCEF DOC. NO. 640    19-12346-shl    Doc 55-3    Filed 09/05/19    Entered 09/05/19 18:22:01    Exhibit C    RECEIVED NYSCEF: 08/08/2016

Part 1    Pg 27 of 71

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

---

**MICHAEL BARR,**

    **Plaintiff,**

-against-

**LIDDLE & ROBINSON, LLP and JEFFREY L. LIDDLE,**

    **Defendants.**

**INDEX NO. 159781/14**

**ANSWER TO COMPLAINT AND AFFIRMATIVE DEFENSES**

---

Defendants, Liddle & Robinson and Jeffrey L. Liddle, as and for their Answer to the Complaint, upon information and belief, respectfully allege:

## INTRODUCTION

1.    Admit as it pertains to these answering defendants those allegations of the Complaint set forth in paragraph numbered 2.

2.    Deny each and every allegation of the Complaint contained in paragraphs numbered 5, 7, 8, 9, 10, and 11.

3.    Deny having knowledge or information sufficient to form a belief as to the truth of the allegations of the Complaint set forth in paragraph numbered 1.

4.    These answering defendants lack sufficient knowledge or information at this time to either admit or deny the allegations of the Complaint set forth in paragraphs numbered 3, 4, and 6.

FILED: NEW YORK COUNTY CLERK 08/13/2018 01:47 PM
NYSCEF DOC. NO. 140
19-12346-shl    Doc 55-3    Filed 09/05/19    Entered 09/05/19 18:22:01    Exhibit C
Part 1    Pg 28 of 71
INDEX NO. 159781/2014
RECEIVED NYSCEF: 08/13/2018

## BACKGROUND

5.     Deny each and every allegation of the Complaint contained in paragraphs numbered 21 and 22.

6.     These answering defendants lack sufficient knowledge or information at this time to either admit or deny the allegations of the Complaint set forth in paragraphs numbered 12, 13, 14, 15, 16, 17, 18, 19, 20, and 23.

## PLAINTIFF ENGAGES L&R

7.     Deny each and every allegation of the Complaint contained in paragraphs numbered 25, 26, 27, 28, 29, 30, 31, 32, 33, 34, 35, 36, 37, 38, 39, 40, 41, 42, and 43.

8.     These answering defendants lack sufficient knowledge or information at this time to either admit or deny the allegations of the Complaint set forth in paragraphs numbered 24 and 44.

## ANSWERING AS AND FOR A FIRST CAUSE OF ACTION
### (LEGAL MALPRACTICE/NEGLIGENCE)

9.     As to paragraph 45, defendants repeat their denials to the allegations of the Complaint contained in paragraphs numbered one through forty-four.

10.     Deny each and every allegation of the Complaint contained in paragraphs numbered 46, 47, 48, 49, 50, 51, 52, 53, and 54.

## ANSWERING AS AND FOR A SECOND CAUSE OF ACTION
### (LEGAL MALPRACTICE/NEGLIGENCE)

11.     As to paragraph 55, defendants repeat their denials to the allegations of the Complaint contained in paragraphs numbered one through fifty-four.

12.     Deny each and every allegation of the Complaint contained in paragraphs numbered 56, 57, 58, and 59.

FILED: NEW YORK COUNTY CLERK 08/13/2018 01:47 PM
INDEX NO. 159781/2014
NYSCEF DOC. NO.: 140
RECEIVED NYSCEF: 08/13/2018

19-12346-shl    Doc 55-3    Filed 09/05/19    Entered 09/05/19 18:22:01    Exhibit C
Part 1    Pg 29 of 71

## ANSWERING AS AND FOR A THIRD CAUSE OF ACTION
### (LEGAL MALPRACTICE/NEGLIGENCE)

13.     As to paragraph 60, defendants repeat their denials to the allegations of the Complaint contained in paragraphs numbered one through fifty-nine.

14.     Deny each and every allegation of the Complaint contained in paragraphs numbered 61, 62, 63, 64, 65, and 66.

## AS AND FOR AFFIRMATIVE DEFENSES

### FIRST AFFIRMATIVE DEFENSE

Whatever injuries were sustained by the plaintiff or whatever damages were sustained by said plaintiff at the time of the incident involved herein were the result of the culpable conduct of the plaintiff, or the codefendants and/or of third persons, without any culpable conduct on the part of the Defendants, Liddle & Robinson, L.L.P. and Jeffrey L. Liddle or its agents, servants and/or employees contributing thereto.

### SECOND AFFIRMATIVE DEFENSE

Any injuries and/or damages sustained by the plaintiff were not as a result of any culpable conduct of the defendants herein, or in the alternative, the amount of damages otherwise recoverable shall be diminished in the proportion to which the culpable conduct attributable to the plaintiff bears to the culpable conduct which caused the damages.

### THIRD AFFIRMATIVE DEFENSE

Plaintiff has recovered the cost of medical care, custodial care, rehabilitation services, loss of earnings and other economic loss and any other such future loss or expense will, with reasonable certainty, be replaced or indemnified in whole or in part from collateral sources.  Any award made to plaintiff shall be reduced in accordance with the applicable provisions of C.P. L. R. §4545.

FILED: NEW YORK COUNTY CLERK 08/13/2018 01:47 PM
NYSCEF DOC. NO. 140

INDEX NO. 159781/2014
RECEIVED NYSCEF: 08/13/2018

19-12346-shl    Doc 55-3    Filed 09/05/19    Entered 09/05/19 18:22:01    Exhibit C
Part 1    Pg 30 of 71

## FOURTH AFFIRMATIVE DEFENSE

Plaintiff's Complaint should be dismissed as to these answering defendants for failure to state a cause of action.

## FIFTH AFFIRMATIVE DEFENSE

Plaintiff's method of service and manner of commencing this action was improper and this Court does not have jurisdiction over the defendants.

## SIXTH AFFIRMATIVE DEFENSE

The applicable Statute of Limitations has expired with respect to plaintiff's claims.

## SEVENTH AFFIRMATIVE DEFENSE

If plaintiff sustained injury or damage as alleged, such injury or damage was exacerbated by plaintiff's failure to mitigate such injury or damage.

## EIGHTH AFFIRMATIVE DEFENSE

If plaintiff has settled with and/or released other defendants and/or entities who are tortfeasors, defendants are entitled to a reduction of any judgment either in total of all of the settlement amounts or the pro-rata share of fault of said tortfeasors, whichever is greater.

## NINTH AFFIRMATIVE DEFENSE

That if it be determined hereafter that plaintiff or any party to this lawsuit has proceeded to arbitration with respect to any issue relevant to this action which results in an adverse ruling to said plaintiff or party, then and in that event, the answering defendants hereby plead said adverse ruling or award on the theory of collateral estoppel under the authority of MATTER OF AMERICAN INSURANCE CO. (MESSENGER-AETNA CAS. & SUR. CO.), 43 N.Y. 2d 184, 401 N.Y.S. 2d 36; ALTMAN v. QUEENS TR. CORP., 94, Misc. 2d 549, 405 N.Y.S. 2d 212; DERMATOSSIAN v. NEW YORK CITY TRANSIT AUTHORITY, 67 N.Y. 2d 219, 501 N.Y. S. 2d 784; c.f. BALDWIN v.

FILED: NEW YORK COUNTY CLERK 08/13/2018 01:47 PM

NYSCEF DOC. NO. 140

INDEX NO. 159781/2014

RECEIVED NYSCEF: 08/13/2018

19-12346-shl    Doc 55-3    Filed 09/05/19    Entered 09/05/19 18:22:01    Exhibit C

Part 1    Pg 31 of 71

BROOKS, 83 A.D. 2d 85, 443 N.Y.S. 2d 906; CLEMMENS v. APPLE, 65 N.Y. 2d 746 and SCHULTZ v. BOY SCOUTS OF AMERICA , 65 N.Y. 2d 189.

### TENTH AFFIRMATIVE DEFENSE

This Court does not have personal jurisdiction over these defendants.

### ELEVENTH AFFIRMATIVE DEFENSE

The Court does not have subject matter jurisdiction over these defendants.

### TWELFTH AFFIRMATIVE DEFENSE

That the damages of which the plaintiff complains and alleges were proximately caused by the failure of the plaintiff and other persons, firms or corporations, including other defendants in this case, to follow directions, for which actions these defendants are neither liable or responsible.

### THIRTEENTH AFFIRMATIVE DEFENSE

Alleges that all risks and dangers connected with this action were known to and assumed by the plaintiff herein, were open, obvious, notorious and apparent and the plaintiff, in undertaking such activity, assumed the risk thereof.

### FOURTEENTH AFFIRMATIVE DEFENSE

The answering defendants deny the plaintiff's allegations in their entirety.

### FIFTEENTH AFFIRMATIVE DEFENSE

The answering defendants deny directly or proximately causing any damage to the plaintiff.

### SIXTEENTH AFFIRMATIVE DEFENSE

The answering defendants deny breach of any duty owed to the plaintiff.

### SEVENTEENTH AFFIRMATIVE DEFENSE

The answering defendants deny breach of any applicable standard of care.

FILED: NEW YORK COUNTY CLERK 08/13/2018 01:47 PM
NYSCEF DOC. NO. 140

INDEX NO. 159781/2014
RECEIVED NYSCEF: 08/13/2018

19-12346-shl    Doc 55-3    Filed 09/05/19    Entered 09/05/19 18:22:01    Exhibit C
Part 1    Pg 32 of 71

## EIGHTEENTH AFFIRMATIVE DEFENSE

The answering defendants deny any purposeful or intentional misconduct.

## NINETEENTH AFFIRMATIVE DEFENSE

The answering defendants deny malpractice, carelessness or negligence.

## TWENTIETH AFFIRMATIVE DEFENSE

The answering defendants' conduct was privileged and/or subject to the Professional Judgment Rule.

## TWENTY-FIRST AFFIRMATIVE DEFENSE

No act or omission by the answering defendants caused damage of any type or kind to the plaintiff.

## TWENTY-SECOND AFFIRMATIVE DEFENSE

Plaintiff's claims are barred by the equitable defenses of unclean hands, laches and waiver.

## TWENTY-THIRD AFFIRMATIVE DEFENSE

The plaintiff's comparative fault and/or negligence acts as a bar to recovery.

## TWENTY-FOURTH AFFIRMATIVE DEFENSE

The plaintiff's claims are barred by virtue of the doctrine of collateral estoppel.

## TWENTY-FIFTH AFFIRMATIVE DEFENSE

The plaintiff's remedies are limited by contract.

## TWENTY-SIXTH AFFIRMATIVE DEFENSE

The acts and/or omissions of the defendants were ratified by the plaintiff.

WHEREFORE, defendants demand judgment dismissing plaintiff's Complaint with prejudice and awarding them attorneys' fees, costs of suit and such other and further relief as this Court may deem just and proper.

## ANSWER TO CROSSCLAIMS

These defendants deny the allegations of any and all cross-claims filed or which may be filed against these defendants in this matter.

Dated:      New York, New York
            May 8, 2015

                             Yours, etc.

                             BRIAN C. HARRIS
                             Attorneys for Defendants
                             Liddle & Robinson and Jeffrey L. Liddle
                             BRAFF, HARRIS, SUKONECK & MALOOF
                             570 W. Mt. Pleasant Ave.
                             Suite 200
                             Livingston, New Jersey 07039
                             (212) 599-2085
                             Our File No. 675.20236

TO:    Alan A. Heller, Esq.
       Garvey, Schubert & Barer
       Attorneys for Plaintiff
       MICHAEL BARR
       100 Wall Street, 20th Floor
       New York, NY 10005

## ATTORNEY'S VERIFICATION

The undersigned, an attorney, admitted to practice law in the State of New York, affirms under penalty of perjury as follows:

That affirmant is a partner in the firm of Braff, Harris, Sukoneck & Maloof, attorneys for Defendants, Liddle & Robinson and Jeffrey L. Liddle, in the within action; that affirmant has read the foregoing Answer to Verified Complaint knows the contents thereof; that the same is true to affirmant's knowledge; except as to the matters stated to be alleged on information and belief and that as to those matters, affirmant believes them to be true.

Affirmant further states that the reason this Verification is made by affirmant and not by the Defendants is that the Defendants either does not reside or maintain offices in the County in which affirmant maintains his office.

The undersigned affirms that the foregoing statements are true under the penalties of perjury.

Dated:    Livingston, New Jersey
          May 8, 2015

BRIAN C. HARRIS

19-12346-shl    Doc 55-3    Filed 09/05/19    Entered 09/05/19 18:22:01    Exhibit C
Part 1    Pg 35 of 71

## AFFIDAVIT OF SERVICE BY MAIL

STATE OF NEW JERSEY    )
                       )SS.:
COUNTY OF ESSEX        )

MARY SZTYK, being duly sworn, deposes and says:

I am not a party to this action, am over 18 years of age and reside in New Jersey.  On the 8th day

of May, 2015, I served a true copy of the foregoing Answer to the Complaint, via Electronic Filing and

Regular Mail by mailing same in a sealed envelope, with postage prepaid thereon, in official depository

of the U.S. Postal Service mailed in the NY area, addressed to the last known address of the addressee(s)

as indicated below.

**TO:**    Alan A. Heller, Esq.
           Garvey, Schubert & Barer
           Attorneys for Plaintiff
           MICHAEL BARR
           100 Wall Street, 20th Floor
           New York, NY 10005

MARY SZTYK

Subscribed and sworn to before
on this _____ 8th _____ day of
_____ May _____, 2015.

Witness my hand and official seal.

Notary Public

KERRY MACKEY
Commission # 50007819
Notary Public, State of New Jersey
My Commission Expires
December 31, 2019

FILED: NEW YORK COUNTY CLERK 08/13/2018 01:47 PM
INDEX NO. 159781/2014
NYSCEF DOC. NO. 141
RECEIVED NYSCEF: 08/13/2018

19-12346-shl    Doc 55-3    Filed 09/05/19    Entered 09/05/19 18:22:01    Exhibit C
Part 1    Pg 36 of 71

# EXHIBIT C

FILED: NEW YORK COUNTY CLERK 08/13/2018 01:47 PM
INDEX NO. 159781/2014

NYSCEF DOC. NO. 141

19-12346-shl    Doc 55-3    Filed 09/05/19    Entered 09/05/19 18:22:01    Exhibit C
Part 1    Pg 37 of 71

RECEIVED NYSCEF: 08/13/2018

## In The Matter Of:

*Barr vs*

*Liddle & Robinson, L.L.P.*

*Lisa Bisaccia*

*September 28, 2017*



**ALLIED**

**COURT REPORTERS, INC.**
— *and* —

**VIDEO CONFERENCE CENTERS**

Phone:   401-946-5500          Toll Free: 888-443-3767
www.alliedcourtreporters.com    info@alliedcourtreporters.com



COURT ORIGINAL

*Min-U-Script® with Word Index*

1

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK


MICHAEL BARR                        Index No 159781/14

        -against-

LIDDLE & ROBINSON, L.L.P.,
and JEFFREY L. LIDDLE


COURT ORIGINAL


            DEPOSITION OF LISA BISACCI, a Witness in the
        above entitled cause, taken on behalf of the
        Plaintiff, before Linda L. Guglielmo, RPR-RMR, a
        Notary Public in and for the State of Rhode Island,
        at the offices of Pierce Atwood, LLP, 72 Pine
        Street, Providence, Rhode Island, on September 29,
        2017 at 11:00 A.M.




APPEARANCES:
FOR THE PLAINTIFF......GARVEY SCHUBERT BARER
                    BY:  ALAN A. HELLER, ESQ.
                    100 WALL STREET
                    NEW YORK NY 10005-3708

FOR THE DEFENDANTS.....BRAFF HARRIS SUKONECK & MALOOF
                    BY: BRIAN C. HARRIS, ESQ.
                    305 BROADWAY
                    NEW YORK, NY 10007

FOR THE WITNESS........MORGAN LEWIS
                    BY: S. ELAINE McCHESEY, ESQ.
                    ONE FEDERAL STREET
                    BOSTON, MA  02110


ALSO PRESENT: Michael Barr

2

1                          I N D E X

2    WITNESS                                        PAGE
         LISA BISACCIA
3            EXAMINATION BY MR. HELLER....................3
             EXAMINATION BY MR. HARRIS...................26
4            FURTHER EXAMINATION BY MR. HELLER..........67
             FURTHER EXAMINATION BY MR. HARRIS..........67
5

6

7                          EXHIBITS
                          (PLAINTIFF'S)
8
     NO.        DESCRIPTION                           PAGE
9    EXHIBIT 1  ROBERTSON 2002 CASH EQUIVALENT PLAN,
                11 PGS....................................3
10   EXHIBIT 2  LETTER TO BARR FROM ROBERTSON STEPHENS,
                5-2-03....................................3
11   EXHIBIT 3  3-9-05 ARBITRATION TRANSCRIPT, 160 PGS...3
     EXHIBIT 4  WALL STREET JOURNAL ARTICLE, 3 PGS.......3
12   EXHIBIT 5  3-10-05 ARBITRATION TRANSCRIPT, 336 PGS..3
     EXHIBIT 6  4-14-05 ARBITRATION TRANSCRIPT, 301 PGS..3
13

14

15

16

17

18

19

20

21

22

23

24

25

FILED: NEW YORK COUNTY CLERK 08/13/2018 01:47 PM

INDEX NO. 159781/2014

NYSCEF DOC. NO. 141

19-12346-shl    Doc 55-3    Filed 09/05/19    Entered 09/05/19 18:22:01    Exhibit C

RECEIVED NYSCEF: 08/13/2018

Part 1    Pg 40 of 71

Lisa Bisaccia - September 28, 2017

3

1          (DEPOSITION COMMENCED AT 11:00 A.M.)

2                    LISA BISACCIA

3      Being duly sworn, deposes and testifies as follows:

4                    THE REPORTER:  Would you state

5      your name for the record, please.

6                    THE WITNESS: Lisa Bisaccia,

7      B-i-s-a-c-c-i-a.

8                    (PLAINTIFF'S EXHIBITS 1 THROUGH 6

9                    MARKED FOR IDENTIFICATION)

10                    EXAMINATION BY MR. HELLER

11   Q.   Ms. Bisaccia, my name is Alan Heller, I'm from the

12        law firm of Garvey Schubert Barer, and I represent

13        Michael Barr in the lawsuit against Jeffrey Liddle

14        and Liddle & Robinson.  Thank you for coming

15        today, I appreciate it.  I'm going to ask you a

16        number of questions.  If you don't understand the

17        question, please tell me you don't understand,

18        I'll be more than happy to rephrase to help you

19        understand.  If at any time you hear an objection,

20        please wait for the objection to be stated on the

21        record, and then I'll let you know whether or not

22        you should answer the question, or whether I'll

23        rephrase it, or something else.  Please try to

24        make verbal responses because the court reporter

25        is taking down words and not nods or grunts.  So

FILED: NEW YORK COUNTY CLERK 08/13/2018 01:47 PM
INDEX NO. 159781/2014
NYSCEF DOC. NO. 141
19-12346-shl   Doc 55-3   Filed 09/05/19   Entered 09/05/19 18:22:01   Exhibit C
Part 1   Pg 41 of 71
RECEIVED NYSCEF: 08/13/2018
Lisa Bisaccia - September 28, 2017

4

1        if the answer calls for a yes, please say yes as

2        opposed to nodding yes. And also, you may know

3        the answer to the question before I finish it, but

4        so the record is complete, please wait for me to

5        finish the question instead of jumping ahead and

6        answering the question before it's done, so the

7        court reporter can take down the answer with the

8        question before it, as opposed to there being a

9        jumble of question and answer.

10           Also, if you need to take a break at any

11        time, please let me know. It's not an endurance

12        contest, so just tell me and go out, no problem.

13        Were you employed in 2001 and 2002?

14        A.   Yes, I was.

15   Q.   Where were you employed?

16        A.   Fleet Boston Financial in Boston.

17   Q.   What was your role during that time for Fleet

18        Boston Financial?

19        A.   Director of corporate compensation, meaning,

20        I was responsible for oversight of all the

21        compensation programs for our wholesale bank, our

22        corporate bank and our investment management

23        division.

24   Q.   How long were you employed at Fleet Boston?

25        A.   I started at BankBoston, a predecessor

5

1          entity, in January of 1998, and I left -- Fleet

2          acquired BankBoston, I left Fleet in May of '04.

3    Q.    Are you familiar with an entity by the name of

4          Robertson Stephens?

5    A.    I am.

6    Q.    How are you familiar?

7    A.    BankBoston acquired Robertson in '98, I think

8          before the acquisition by Fleet.

9    Q.    During your time at Bank of Boston did you play a

10         role with respect to Robinson Stephens?

11   A.    Yes.

12   Q.    What was that role?

13   A.    I was responsible for oversight of their

14         compensation programs.

15   Q.    When you say oversight of the compensation

16         programs, what did that entail?

17   A.    The design of the compensation programs,

18         market pricing, working with the management

19         committee or leadership of Robertson on how the

20         programs were going to be administered, not the

21         actual payroll.

22   Q.    Did you hold a title with respect to Robertson

23         Stephens, were you director of compensation and

24         benefits?

25   A.    No, I was not.  My title was with BankBoston,

FILED: NEW YORK COUNTY CLERK 08/13/2018 01:47 PM
NYSCEF DOC. NO. 141
INDEX NO. 159781/2014
RECEIVED NYSCEF: 08/13/2018

19-12346-shl   Doc 55-3   Filed 09/05/19   Entered 09/05/19 18:22:01   Exhibit C
Part 1   Pg 43 of 71

Lisa Bisaccia - September 28, 2017

6

1              and then with Fleet.

2      Q.   Did you have any other duties with respect to

3              Robertson Stephens?

4              A.   It was all their compensation.

5                        MR. HARRIS: What was your answer?

6                        THE WITNESS: All their compensation.

7      Q.   For the years 2001, 2002, did certain Robertson

8              Stephens employees have compensation deferred?

9              A.   Yes, they did.

10     Q.   Was deferred compensation governed by a document?

11             A.   Yes.

12     Q.   So, Exhibit 1 -- Ms. Bisaccia, I placed before you

13             Bisaccia Exhibit 1, it's is a document Bates

14             stamped Barr 002319 through Barr 002329 and it's

15             titled Robertson Stephens Group, 2002 cash

16             Equivalent Plan.  Do you recognize that document?

17             A.   Yes.

18     Q.   What is it?

19             A.   This is the plan document that governed one

20             of the cash deferral options for the Robertson

21             executives.

22     Q.   When you say one of the cash deferral options,

23             what cash deferral options were there?

24             A.   Well, they had the ability to defer a portion

25             of their bonuses into Fleet stock or into this

FILED: NEW YORK COUNTY CLERK 08/13/2018 01:47 PM INDEX NO. 159781/2014
NYSCEF DOC. NO. 141   19-12346-shl   Doc 55-3   Filed 09/05/19   Entered 09/05/19 18:22:01   Exhibit C   RECEIVED NYSCEF: 08/13/2018
Part 1   Pg 44 of 71

Lisa Bisaccia - September 28, 2017

7

1          plan.

2    Q.    Okay.  And what did they defer their cash into in

3          connection with this plan, how did it work?

4    A.    They were paid bonus year-end, and Fleet

5          required that all of them defer a certain amount

6          of their bonus, not take it in cash, and we gave

7          them the choice, you could defer it to Fleet stock

8          or defer it into this plan.

9    Q.    Is this document a true and accurate copy of the

10         Robertson Stephens Group 2002 cash equivalent

11         plan?

12   A.    It appears to be.

13   Q.    And is this the Robertson Stephens document that

14         governed Robertson Stephens 2002 deferred

15         compensation?

16   A.    Yes.

17               MR. HARRIS: Object to the form of

18         that question; but you've answered it.

19   A.    Yes.

20   Q.    Was it in the regular course of Robertson

21         Stephens's business to prepare this document of

22         document?

23   A.    No.

24   Q.    Are you familiar with an individual by the name of

25         Michael Barr?

FILED: NEW YORK COUNTY CLERK 08/13/2018 01:47 PM
INDEX NO. 159781/2014
NYSCEF DOC. NO. 141
RECEIVED NYSCEF: 08/13/2018

19-12346-shl   Doc 55-3   Filed 09/05/19   Entered 09/05/19 18:22:01   Exhibit C
Part 1   Pg 45 of 71

Lisa Bisaccia - September 28, 2017

8

```
 1          A.   Yes.

 2    Q.   How are you familiar with Mr. Barr?

 3          A.   So I knew Mr. Barr as part of a group of

 4    Robertson executives that put in a claim against

 5    Fleet after we shut down Robertson Stephens in

 6    2002.

 7    Q.   Do you know if Mr. Barr had deferred compensation

 8    in 2002?

 9          A.   I understand that he did, yes.

10    Q.   Do you recall how much?

11          A.   A million and change, a million two, three.

12                    MR. HARRIS: Are you guessing, or do

13    you know?

14                    THE WITNESS: I think it was in that

15    area.  I don't remember the exact amount.  I know

16    it wasn't much more than that.

17                    MR. HARRIS: Try not to guess,

18    please.

19                    THE WITNESS: I wasn't guessing, I

20    was estimating.

21    Q.   Is the document that is marked as Bisaccia 1 the

22    document that governed the payment of Mr. Barr's

23    deferred compensation?

24          A.   Yes.

25    Q.   Are you familiar the term bad boy provision?
```

9

1      A.   Yes.

2   Q.   What is a bad boy provision?

3      A.   Bad boy provisions were some conditions that

4      we put into a number of Robertson plans that were

5      intended to lay out certain conditions under which

6      payments would or would not be made, and

7      specifically, the bad boy provisions for this had

8      to do with behaviors on the part of Robertson

9      executives that would put into jeopardy or cause

10     them to forfeit their payments.

11  Q.   Did this 2002 cash equivalent plan that's

12     represented by Plaintiff's Exhibit 1 contain a bad

13     boy provision?

14     A.   Yes.

15  Q.   Do you know which section contained the bad boy

16     provision?

17     A.   It's Article 8.1.

18         MR. HELLER: Just let the record

19     reflect that's Article 8.1 that's on pages 8 and 9

20     of plaintiff's exhibit -- Bisaccia Exhibit 1.

21  Q.   In 2002 were you -- in 2003 were you in charge of

22     making payments to former Robertson Stephens

23     employees pursuant to the Robertson Stephens cash

24     equivalent plans?

25     A.   Yes.

FILED: NEW YORK COUNTY CLERK 08/13/2018 01:47 PM INDEX NO. 159781/2014

NYSCEF DOC. NO. 141   19-12346-shl   Doc 55-3   Filed 09/05/19   Entered 09/05/19 18:22:01   Exhibit C   RECEIVED NYSCEF: 08/13/2018

Part 1   Pg 47 of 71

Lisa Bisaccia - September 28, 2017

10

1   Q.   Did Bisaccia 1 provide when the deferred

2        compensation would vest?

3        A.   Yes, it did.

4   Q.   Can you direct me to where it provided in this

5        document?

6        A.   Article 7 on Page 7.

7   Q.   Is that Article 7.1?

8        A.   Yes, Article 7.1.

9   Q.   In connection with your duties for Robertson

10       Stephens, was it your responsibilities to make

11       payment to award December under the 2002 deferred

12       compensation plan?

13       A.   It was my responsibility to oversee those

14       payments.  I didn't actually oversee their

15       payroll.

16   Q.   At that time did you plan on paying Michael Barr

17       his deferred compensation under the 2002 deferred

18       compensation plan?

19            THE WITNESS:  At what time?

20            MR. HELLER: At the time of the

21       creation of the 2002 cash equivalent plan.

22       A.   Yes; subject to the terms and conditions of

23       the plan.

24   Q.   Did there come a time that Robertson Stephens

25       canceled the 2002 deferred compensation for

FILED: NEW YORK COUNTY CLERK 08/13/2018 01:47 PM
NYSCEF DOC. NO. 141

INDEX NO. 159781/2014

RECEIVED NYSCEF: 08/13/2018

19-12346-shl    Doc 55-3    Filed 09/05/19    Entered 09/05/19 18:22:01    Exhibit C
Part 1    Pg 48 of 71

Lisa Bisaccia - September 28, 2017

11

1      certain former Robertson Stephens employees?

2                THE WITNESS:  That Robertson

3      Stephens canceled it?

4                Mr. KELLER:  Yes, that Robertson

5      Stephens canceled it.

6      A.    I don't know if Robertson Stephens canceled

7      it.  My understanding was that Fleet made the

8      decision to withhold payments to certain

9      executives.

10  Q.    I'll rephrase the question.  Did there come a time

11      that Fleet canceled the 2002 deferred compensation

12      for certain former Robertson Stephens employees?

13  A.    Yes.

14  Q.    Was Michael Barr one of those employees?

15  A.    Yes.

16  Q.    Ms. Bisaccia, I've placed before you a document

17      that's marked as Bisaccia Exhibit 2 for

18      identification.  Do you recognize this document?

19  A.    Yes.

20  Q.    What is it?

21  A.    This is a letter that we sent out to the

22      people who were in the claimant group, advising

23      them that they were not going to get paid out of

24      the cash equivalent plans.

25  Q.    Is this a letter that was sent to Michael Barr?

FILED: NEW YORK COUNTY CLERK 08/13/2018 01:47 PM
INDEX NO. 159781/2014
NYSCEF DOC. NO. 141
19-12346-shl    Doc 55-3    Filed 09/05/19    Entered 09/05/19 18:22:01    Exhibit C
Part 1    Pg 49 of 71
RECEIVED NYSCEF: 08/13/2018
Lisa Bisaccia - September 28, 2017

12

1       A.   Yes.

2  Q.   Is this a true and accurate copy of the letter

3       dated May 2, 2003 sent to Michael Barr canceling

4       his deferred compensation?

5       A.   Yes.

6  Q.   Now, this letter, Bisaccia 2, references Section

7       8.1 of the cash equivalent plans.  Is that the bad

8       boy clause you previously pointed out in Bisaccia

9       1?

10      A.   Yes.

11 Q.   Ms. Bisaccia, do you recall an arbitration that

12      was commenced in December of 2002 between certain

13      former Robertson Stephens employees and Fleet

14      Boston?

15      A.   Yes.

16 Q.   Was one of the issues in that arbitration the

17      cancellation of Michael Barr's deferred

18      compensation?

19      A.   It was -- one of the issues was the

20      cancellation of numerous claimants, so Michael

21      Barr was part of that.

22 Q.   Do you recall being a witness at that arbitration?

23      A.   Yes.

24 Q.   Do you recall when you were a witness?

25      A.   I was a witness several times over the period

FILED: NEW YORK COUNTY CLERK 08/13/2018 01:47 PM
INDEX NO. 159781/2014
NYSCEF DOC. NO. 141
19-12346-shl   Doc 55-3   Filed 09/05/19   Entered 09/05/19 18:22:01   Exhibit C
Part 1   Pg 50 of 71
RECEIVED NYSCEF: 08/13/2018
Lisa Bisaccia - September 28, 2017

13

1           of 2006 and 2007, I believe.

2      Q.   Do you recall where that arbitration was?

3      A.   In New York, down near the Stock Exchange.

4      Q.   And you gave testimony during that arbitration?

5      A.   I did.

6      Q.   Did you tell the truth at the time you gave

7           testimony during the arbitration?

8      A.   I did.

9      Q.   Has anything occurred between the time you gave

10          testimony and today that would cause you to change

11          your sworn testimony?

12     A.   No.

13     Q.   To the best of your knowledge, as you sit here

14          today, was the testimony you gave at the

15          arbitration truthful?

16     A.   Yes.

17     Q.   To the best of your knowledge, is your testimony

18          truthful now?

19     A.   Yes.

20     Q.   Ms. Bisaccia, I placed before you a document

21          that's been marked as Bisaccia Exhibit 3, it's

22          dated March 9, 2005, and it's 10:00 A.M. -- at

23          10:00 A.M., at 20 Broad Street and beginning at

24          Page 84 where it says, Direct Examination by

25          Mr. Liddle, appears to be your testimony given

14

1          that day.  First of all, does this document

2          refresh your recollection that the testimony was

3          actually in 2005?

4          A.    Yes, it does.  Thank you.

5    Q.    No problem.  Now, does this transcript accurately

6          reflect the testimony you gave at the arbitration

7          hearing on that day?

8                    MR. HARRIS:  Can you answer that

9          question, unless you've reviewed it.  Did you

10         review it?

11                   THE WITNESS:  I have not read my

12         whole transcript, no.

13   Q.    I'm going to read portions of the transcript and

14         I'll ask you whether that accurately reflects your

15         testimony.  I direct your attention to Page 126,

16         Line 8.  These are questions being asked by

17         Jeffrey Liddle to you.  Question, "At the time

18         that the claimants or some of them plan balances

19         were forfeited in May or so of 2003, did you have

20         documents about the decisions that led up to that

21         process?"  Answer, "I had spreadsheets showing how

22         much each person had on account, and I had a copy

23         of the final plan documents."  Question, "Did you

24         have any discussions about the forfeiture with

25         anybody?"  Answer, "Yes."  Question, "Who did you

FILED: NEW YORK COUNTY CLERK 08/13/2018 01:47 PM
INDEX NO. 159781/2014
NYSCEF DOC. NO. 141
19-12346-shl    Doc 55-3    Filed 09/05/19    Entered 09/05/19 18:22:01    Exhibit C
Part 1    Pg 52 of 71
RECEIVED NYSCEF: 08/13/2018

Lisa Bisaccia - September 28, 2017

15

1          have discussions with?"  Answer, "Ms. Litsey and

2          Ms. McChesney."  Did I pronounce it right?

3                    MS. McCHESNEY: Yes.

4    Q.    Question, "Anyone else?" Answer, "Ms. Mogenson."

5          Question, "What was her job?"  Answer, "At the

6          time she was the general counsel for the wealth

7          investment management businesses."  Question, "Did

8          she have any role with regard to the Robertson

9          Stephens entity, a formal role?"  Answer, "Yes."

10         Question, "What was that?"  Answer, "She was one

11         of the leaders of the wind-down effort and my

12         legal resource."  Question, "Who was it who made

13         the decision to forfeit the plan balances of those

14         of the claimants who had participated in the" --

15         Answer, "The legal department of Fleet."

16         Question, "Ms. Litsey?"  Answer, "Someone in the

17         legal department in Fleet."  Question, "You said

18         you had a meeting with Ms. McChesney, Ms. Litsey

19         and Ms. Mogenson, was that all at the same time?"

20         Answer, "No.  I had a meeting with Ms. Mogenson

21         and a subsequent meeting with Ms. McChesney and

22         Ms. Litsey, and that there had been a violation of

23         the bad boy provisions, and they made the legal

24         decision as to whether or not they happened."

25         Question, "You are getting ahead of me.  I just

FILED: NEW YORK COUNTY CLERK 08/13/2018 01:47 PM

INDEX NO. 159781/2014

NYSCEF DOC. NO. 141

19-12346-shl    Doc 55-3    Filed 09/05/19    Entered 09/05/19 18:22:01    Exhibit C
Part 1    Pg 53 of 71

RECEIVED NYSCEF: 08/13/2018

Lisa Bisaccia - September 28, 2017

16

1      want to know prior to the announcement by letter

2      or whatever that these plan balances were being

3      forwarded, who you had meetings with on the

4      subject of forfeiture?  Mogenson and another one

5      with Litsey and McChesney together?"  Answer,

6      "That is right."  Question, "Was anybody else in

7      attendance at either of those meetings?"  Answer,

8      "No."  Question, "Prior to your talking to Ms.

9      Mogenson, did you know that these balances would

10     be forfeited?"  Answer, "No."  Question, "You said

11     that somebody in the legal department made the

12     decision to have the balances forfeited, but you

13     don't know who that is?"  Answer, "Someone in the

14     legal department made the decision that there had

15     been a violation of the plan provisions resulting

16     in forfeiture."  Question, "You don't know who

17     that is?"  Answer, in parentheses it says,

18     "(Witness nods)."  Question, "Was it Ms. Mogenson?"

19     Answer, "I just said I didn't know who it was."

20     Question, "Did Ms. Mogenson transmit this message

21     to you?"  Answer, "Ms. Litsey transmitted the

22     message to me."  Question, "Before you spoke to

23     Ms. Mogenson, you didn't know there would be a

24     forfeiture.  After you spoke to Ms. Mogenson, you

25     didn't know there would be a forfeiture; is that

FILED: NEW YORK COUNTY CLERK 08/13/2018 01:47 PM
NYSCEF DOC. NO. 141

INDEX NO. 159781/2014
RECEIVED NYSCEF: 08/13/2018

19-12346-shl   Doc 55-3   Filed 09/05/19   Entered 09/05/19 18:22:01   Exhibit C
Part 1   Pg 54 of 71

Lisa Bisaccia - September 28, 2017

17

 1          right?" Answer --

 2                    MR. HARRIS: Excuse me, counsel, are

 3          you going to read the whole deposition?

 4                    MR. HELLER: No.  This is the longest

 5          part I'm going to read.  It's the easiest way to

 6          make sure it's accurate.

 7                    MR. HARRIS: Well, unless you have a

 8          specific question you want to pose to the witness,

 9          I think that what you're doing is objectionable.

10          You're reading a transcript --

11                    MR. HELLER: State your objection for

12          the record.

13                    MR. HARRIS: I have.

14                    MR. HELLER: May I continue?

15                    MR. HARRIS: I can't stop you.

16                    MR. HELLER: Thank you.  Where was I?

17                    MS. McCHESNEY: Line 8 on Page 129.

18     Q.   Answer, "Before I had the meeting?"  Question,

19          "Yes."  Answer, "No."  Question, "after you had

20          the meeting, after you had the meeting when you

21          walked out of the meeting, did you know there was

22          going to be a forfeiture?"  Answer, "No."

23          Question, "When did you find out that there would

24          be a forfeiture?"  Answer, "Some time later I

25          heard from Ms. Litsey that the legal department

FILED: NEW YORK COUNTY CLERK 08/13/2018 01:47 PM
INDEX NO. 159781/2014
NYSCEF DOC. NO. 141
19-12346-shl    Doc 55-3    Filed 09/05/19    Entered 09/05/19 18:22:01    Exhibit C
Part 1    Pg 55 of 71
RECEIVED NYSCEF: 08/13/2018

Lisa Bisaccia - September 28, 2017

18

1    had made a call." Question, "What do you mean

2    made a call?" Answer, "Made a decision."

3    Question, "Not a telephone call?" Answer,

4    (Witness nods)." Question, "Would it be accurate

5    to say, at least from your interactions, and I'm

6    not asking you to give me the specifics of it,

7    that you were not involved in making that

8    decision?" Answer, "My involvement was to call it

9    to the lawyer's attention, which I did. After

10    that it was a legal decision." Question, "When

11    you say call it, that is the violation of the

12    so-called violation of the bad boy clause?"

13    Answer, "Yes." Question, "When did you do that;

14    when did you call that some to someone's

15    attention?" Answer, "Early 2003." Question, "It

16    took about three and a half, four months for the

17    implementation of forfeiture to occur?" Answer,

18    "Yes." Question, "During that time period were

19    you aware what was going on in litigation to my

20    clients and their Fleet" -- Answer, "I knew there

21    was a claim, I didn't know specifics." Question,

22    "Did you know that there was a court case, a

23    decision that came down from the court just before

24    the announcement that the plan balances had been

25    forfeited?" Answer, "No." Question, "When you say

FILED: NEW YORK COUNTY CLERK 08/13/2018 01:47 PM
NYSCEF DOC. NO: 141

INDEX NO. 159781/2014
RECEIVED NYSCEF: 08/13/2018

19-12346-shl   Doc 55-3   Filed 09/05/19   Entered 09/05/19 18:22:01   Exhibit C
Part 1   Pg 56 of 71

Lisa Bisaccia - September 28, 2017

19

1   that you brought it to their attention, have you

2   made a determination yourself that there had been

3   a violation of what you called the bad boy

4   clause?" Answer, "I thought there had been what

5   appeared to be a disparagement, and there had been

6   a breach of confidentiality. I knew the plan

7   provisions, so I referred it to our lawyers."

8   Question, "This plan that you are working on

9   forfeiture, was the 2002 plan?" Answer, "Both

10   years, 2001, 2002 and also applies to the

11   restricted unit plan." Question, "As part of any

12   of your discussions about this forfeiture breach

13   of the bad boy clause, did you happen to notice

14   that there was no plan document for the 2002

15   plan?" Answer, "There are plan documents for both

16   years." Question, "A plan document for 2002 was

17   not prepared until some time after forfeiture?"

18   Answer, "No. The plan documents were prepared

19   prior to the wind-down." Question, "Were they

20   ever given to anybody?" Answer, "The plan

21   document for 2001?" Question, "2002. We are

22   talking about the 2002, the one missing document."

23   Answer, "It is not missing, it exists, I don't

24   know who received it. Provisions are identical to

25   the '01."

Lisa Bisaccia - September 28, 2017

20

1              Does this testimony accurately reflect the

2      testimony you gave at the arbitration hearing of

3      March 9, 2005?

4      A.   Yes.

5   Q.  I also direct your attention to Page 143, Line 23

6      of the transcript.

7                    MS. McCHESNEY: 143, Line 3?

8                    MR. HELLER: Line 23 of Bisaccia 3.

9   Q.  I'm going to read the questions and answer and

10     then I'm going to ask you if it accurately

11     reflects the testimony that you gave on March 9.

12     Question, "In early" --

13                   MR. HARRIS: Let me get this

14     straight.  The question you've just posed is

15     whether or not the witness agrees that what's in

16     this transcript and the answers are accurate?

17     That's the extent of the question?

18                   MR. HELLER: Off the record.

19                   (OFF THE RECORD)

20  Q.  Question, "In early 2000 to late 2002 when you

21     have this bad boy clause discussion, the first one

22     was with Ms. Mogenson, right?"  Answer, "Yes."

23     Question, "It was then some time after that that

24     you had the meeting with Ms. Litsey and Ms.

25     McChesney?"  Answer, "Yes, Ms. Mogenson was one of

Lisa Bisaccia - September 28, 2017

21

1    the five officers of Robertson Stephens at that

2    time; is that right, along with yourself, Ms.

3    Mulcahy, Robert Clavin and Drew Ferbin

4    (phonetic)." It says phonetic. Answer, "Yes."

5    Question, "She was not functioning as a lawyer at

6    the time, she was functioning as the vice

7    president of Robertson Stephens, correct?"

8    Answer, "She was the general counsel for the

9    wealth and investment management businesses for

10    Fleet." Question, "She was a member of the

11    executive committee of Robertson Stephens, Inc.?"

12    Answer, "I don't know." Question, "I have a

13    document here which is an action of the board of

14    directors appointing you, Ms. Mogenson Mr. Bankin,

15    Mr. Mulcahy and Pamela Gormley (phonetic), as

16    executive committee of Robertson Stephens; do you

17    remember that?" Answer, "Now that you refreshed

18    my memory, yes." Question, "She was functioning

19    and you talked to her in late 2000, 2003 about the

20    violation of the bad boy provision about the prior

21    cash equivalency plan as an officer and member of

22    the executive committee of Robertson Stephens,

23    Inc.; is that correct?" Answer, "I went to her in

24    my role as my legal resource for matters about the

25    wind-down." Question, "You told her that in your

Lisa Bisaccia - September 28, 2017

22

1    opinion there had been a violation of that clause,

2    right?"  Answer, "Yes."  Question, "When had you

3    most recently looked at the bad boy clause prior

4    to that conversation?"  Answer, "I was aware of it

5    from assisting."  Question, "I asked you when you

6    looked at it most recently in comparison to

7    your" -- Answer, "Before I spoke to her."

8    Question, "Did you have a clause in your

9    possession during the meeting with her?  Answer,

10   "I don't remember."

11        I'm going to skip to Page 146, line 22.  "My

12   question asks you, as you told her" -- "My

13   question asks you what as you told her the

14   violation was?"  Answer, "I told her I had read

15   the newspaper articles about what some members of

16   the group or their attorney had said about Fleet

17   and did she think that constituted a violation of

18   the bad boy provision."  Question, "Which

19   newspaper articles were you referring to?"

20   Answer, "The Wall Street Journal."  Question, "Any

21   others?"  Answer, "That was the one I had seen."

22   Question, "In any of your other conversations,

23   were there any other articles that were

24   discussed?"  Answer, "That would be it."

25        Does this accurately reflect the testimony

Lisa Bisaccia - September 28, 2017

23

 1          that you gave on March 9, 2005, what I just read

 2          into the record?

 3          A.   Yes.

 4     Q.   Ms. Bisaccia, I'm placing before you a document

 5          that's been marked as Bisaccia Exhibit 4 for

 6          identification.  Do you recognize this document?

 7          A.   Yes.

 8     Q.   What is this document?

 9          A.   This is an article -- it's a copy of an

10          article that was published in the Wall Street

11          Journal in December of '02.

12     Q.   And is this the Wall Street article that you

13          referenced in your testimony of March 9, 2005?

14          A.   Yes, it is.

15     Q.   Ms. Bisaccia, I'm placing before you a document

16          that was marked as Bisaccia 5, and it's a

17          transcript of testimony that was given on March

18          10, 2005 beginning at 9:30 A.M., at 20 Broad

19          Street in the matter of Alt against Fleet Boston

20          Financial Corp. The testimony begins on Page 8,

21          and these are questions by Mr. Liddle.  And in

22          particular, I'm going to direct your attention to

23          Page 81, Line 25.  The Chairman:  "Let me ask you

24          a question that has been on my mind since you

25          began testifying.  From the period of the May 2003

Lisa Bisaccia - September 28, 2017

24

1    letter up until your reading of The Wall Street

2    Journal article, did you ever have any

3    instructions or conversations with other people,

4    business people at your firm not to pay the

5    restricted unit or cash compensation awards to

6    anybody at the firm?"  The Witness, "The article

7    came first.  The article came in December '02 and

8    the letter followed in May of '03.  I was fully

9    intending to pay the deferred comp., in early

10   January, February of '03 when it vested, when it

11   was due.  When I saw the article, I thought there

12   was a connection between what the article said and

13   the provisions of the plan that could influence

14   whether or not we should pay, and that is when I

15   gave it to legal to see whether in fact there had

16   been a violation of the plan provisions.  The

17   Chairman:  "Did you have instructions, standing or

18   otherwise to find a way out of these plans to save

19   money for the firm?"  The Witness:  "No, I did

20   not."

21        Does what I just read accurately reflect the

22   testimony that you gave on March 10, 2005?

23   A.   Yes.

24   Q.   Ms. Bisaccia, I placed before you a document

25   that's marked as Bisaccia 6, and it's a transcript

Lisa Bisaccia - September 28, 2017

25

1     of the hearing from April 14, 2005, beginning at

2     9:35 A.M., which took place at 20 Broad Street in

3     the matter of Eric Alt against Fleet Boston

4     Financial Corp., et al.  The testimony begins on

5     Page 6, which is cross-examination by Ms.

6     McChesney.  I'm going to direct your attention to

7     Page 101 of that transcript, Line 12.  The

8     Chairman:  "Before going to Mr. Casey let me ask

9     you about Mr. Barr.  Were any monies or stock, or

10    anything else of Mr. Barr's, forfeited at any

11    time, to your knowledge?"  The Witness: "Vested

12    amounts?"  The Chairman:  "Any, anything."  The

13    Witness, "He would have forfeited this award on --

14    where is it, 1,063 the noncash award, the million

15    three, roughly, that was awarded in February of

16    '02 and was designed to be paid out February '03,

17    or January '03, rather, and January '04."  The

18    Chairman:  "Was that the forfeiture as a result of

19    this arbitration issue?"  The Witness:  "The bad

20    boy provision?"  The Chairman:  "Bad boy

21    provision."  The Witness:  "Yes."  The Chairman:

22    "Okay.  Anything else?"  The Witness:  "I'm not

23    aware of anything else."  The Chairman:  "Thank

24    you."

25    Does this testimony accurately reflect the

26

1          testimony that you gave on April 14, 2005?

2          A.    Yes.

3                    MR. KELLER: I have no further

4          questions.

5                    EXAMINATION BY MR. HARRIS

6     Q.   Ms. Bisaccia, as you know, I'm Brian Harris, and I

7          represent the defendant Liddle & Robert, the law

8          firm, and Jeffrey Liddle individually.  By way of

9          background, would you tell me your education?

10                   THE WITNESS:  From college on?

11                   MR. HARRIS: Yes, please.

12    A.   I went to Trinity College in Hartford,

13         Connecticut, graduated in 1978.  Then I

14         subsequently got my MBA from the University of

15         Connecticut.

16    Q.   Your MBA was in what area?

17    A.    Concentration was in human resources.

18    Q.   And as I understand your testimony, you were not

19         working in human resources at the time these

20         events unfolded, correct?

21    A.    Yes, I was.

22    Q.   Your title was, exactly?

23    A.    In 2002 my title was director of corporate

24         compensation for Fleet Boston Financial.  By 2003

25         I had been promoted to director of compensation

FILED: NEW YORK COUNTY CLERK 08/13/2018 01:47 PM INDEX NO. 159781/2014

NYSCEF DOC. NO. 141    19-12346-shl   Doc 55-3   Filed 09/05/19   Entered 09/05/19 18:22:01   Exhibit C   RECEIVED NYSCEF: 08/13/2018

Part 1    Pg 64 of 71

Lisa Bisaccia - September 28, 2017

27

1       and benefits.

2    Q.    And who was your employer?

3       A.    Fleet Boston Financial.

4    Q.    At any time were you employed by Robertson

5       Stephens?

6       A.    No.

7    Q.    Were they two separate companies?

8       A.    Robertson Stephens was a subsidiary of Fleet

9       Boston Financial.

10   Q.    They had separate management?

11      A.    The Robertson Stephens leaders reported to

12      somebody in Fleet.

13   Q.    Did they have differing businesses?

14      A.    There was some overlap in the business.

15      Robertson Stephens was an investment bank

16      specializing in M&As and IPOs. Fleet was a full

17      service bank with a corporate bank, a retail bank,

18      an investment management arm, as well as overseas

19      business.

20   Q.    As far as you know, when did Fleet Boston acquire

21      Robertson Stephens?

22      A.    Fleet acquired Robertson Stephens when they

23      acquired BankBoston some time in 1999.

24   Q.    At that time you were an employee of Fleet

25      Boston --

FILED: NEW YORK COUNTY CLERK 08/13/2018 01:47 PM
INDEX NO. 159781/2014

NYSCEF DOC. NO. 141
19-12346-shl    Doc 55-3    Filed 09/05/19    Entered 09/05/19 18:22:01    Exhibit C
Part 1    Pg 65 of 71
RECEIVED NYSCEF: 08/13/2018

Lisa Bisaccia - September 28, 2017

28

1          A.    I was.

2    Q.    -- or a predecessor?

3          A.    BankBoston, that got acquired by Fleet.

4    Q.    What was your title with that predecessor?

5          A.    Director of compensation for the wholesale

6          bank.

7    Q.    And your title, I take it, never changed until

8          ultimately you left the company in 2004?

9          A.    No.   As I said, I was promoted in '03 to run

10         compensation and benefits for the entire

11         enterprise.

12   Q.    Did the enterprise at that time include Robertson

13         Stephens?

14         A.    Robertson Stephens was shut down in late '02.

15         I was promoted in early '03.

16   Q.    When did it shut down?

17         A.    Robertson Stephens was shut down in late '02;

18         in other words, we let everybody go in '02.

19   Q.    By late '02, do you mean December?

20         A.    We started the wind-down in June.   I don't

21         know when you'd say the actual closing of the

22         business.   We started laying people off in June.

23   Q.    And that's what you mean by wind down?

24         A.    Uh-huh.

25   Q.    Do you know why the company was being wound down?

FILED: NEW YORK COUNTY CLERK 08/13/2018 01:47 PM
INDEX NO. 159781/2014
NYSCEF DOC. NO. 141
19-12346-shl   Doc 55-3   Filed 09/05/19   Entered 09/05/19 18:22:01   Exhibit C
Part 1   Pg 66 of 71
RECEIVED NYSCEF: 08/13/2018

Lisa Bisaccia - September 28, 2017

29

1      A.    Yes.

2   Q.   Tell me why.

3      A.    Fleet had tried to sell Robertson, there were

4   no takers.  Then Fleet in conjunction with a group

5   of Robertson Stephens leaders, tried to work out a

6   management buyout where they own the firm again

7   themselves as they had previously, and that didn't

8   work out, either.

9   Q.   Do you know the reasons why it didn't work out?

10     A.    Yes.

11  Q.   Tell me what those reasons were, as far as you

12  know?

13     A.    I believe there were two reasons, one was

14  Robertson within itself was unable to agree on how

15  the company would be structured, and in addition,

16  two of the key members of the management team had

17  regulatory issues that would have made their

18  ability to lead the company problematic.

19  Q.   On which side of the equation, Robertson Stephens

20  side, these people had regulatory issues; is that

21  what you're saying?

22     A.    Yes.

23  Q.   Why would that matter to you on behalf of Fleet

24  Boston?

25     A.    They weren't able to stand up to a management

30

1          buyout of the company.

2     Q.   Who were those individuals?

3     A.   Ken Fitzsimmons and Mitch Whiteford.

4     Q.   Were they ever deemed to be people who did violate

5          some regulatory issues that affected their

6          employment or their licensing?

7     A.   I do not know.

8     Q.   In that regard are you licensed to buy or sell

9          stock?

10    A.   No.

11    Q.   With respect to the documents that you've

12         identified, specifically regarding the bad boy

13         provisions that you identified in your prior

14         testimony, did you draft that paragraph?

15    A.   No, I did not.

16    Q.   8.1?

17              THE WITNESS:  Did I write it?

18              MR. HARRIS: Yes.

19    A.   No, I did not.

20    Q.   Did anyone ever interpret it for you --

21    A.   Yes.

22    Q.   -- before the events that we're talking about

23         today occurred?

24    A.   Yes.

25    Q.   Who did that?

FILED: NEW YORK COUNTY CLERK 08/13/2018 01:47 PM
INDEX NO. 159781/2014
NYSCEF DOC. NO. 141
19-12346-shl    Doc 55-3    Filed 09/05/19    Entered 09/05/19 18:22:01    Exhibit C
RECEIVED NYSCEF: 08/13/2018
Part 1    Pg 68 of 71

Lisa Bisaccia - September 28, 2017

31

1          A.    Dana Welch, who was the general counsel of

2      Robertson Stephens.  It was at her advice we put

3      the bad boy provisions in.

4  Q.   What was that advice, and why was it put in?

5                  MS. McCHESNEY: I'm going to instruct

6      the witness that she can give a general answer

7      based on HR practices, but she's not to disclose

8      the terms of the communication with the attorney.

9  Q.   What's that person's name?

10         A.    Dana Welch.

11 Q.   Was Dana Welch an attorney that was employed by

12     Fleet Boston?

13         A.    No.  She was a general counsel of Robertson

14     Stephens.

15 Q.   So she was advising you regarding legal issues

16     when you had this conversation?

17         A.    Yes.

18 Q.   It was at her recommendation that the bad boy

19     provision be included in the compensation --

20     deferred compensation package?

21         A.    Yes.

22 Q.   Did you have an understanding as to why that

23     provision was included?

24         A.    Yes.  The idea was that if there was any

25     behavior that would be detrimental to the firm,

Lisa Bisaccia - September 28, 2017

32

1          that it would be appropriate to withhold the

2          compensation.

3    Q.    Was this applicable only to Robertson Stephens

4          employees, the bad boy provision?

5    A.    Only Robertson Stephens employees

6          participated in these plans.

7    Q.    So that the bad boy provision or a similar one was

8          not included in compensation plans for the bank?

9    A.    I don't remember.  I don't remember.

10   Q.    Regarding the bad boy provision, that we'll get

11         into, did anyone provide you with a written

12         document explaining the impact of that particular

13         provision?

14   A.    I'm not sure what you mean.

15   Q.    Did you receive from your employer an explanation

16         as to what, or exemplars what would be violative

17         of the bad boy provision?

18   A.    No.

19   Q.    Were you provided any time with a document from

20         your employer explaining what disparagement meant?

21   A.    No.

22   Q.    Was there a document provided to you which would

23         give you guidelines to determine what, if

24         anything, was detrimental to the company?

25   A.    No.

FILED: NEW YORK COUNTY CLERK 08/13/2018 01:47 PM
NYSCEF DOC. NO. 141
19-12346-shl    Doc 55-3    Filed 09/05/19    Entered 09/05/19 18:22:01    Exhibit C
Part 1    Pg 70 of 71

INDEX NO. 159781/2014
RECEIVED NYSCEF: 08/13/2018

Lisa Bisaccia - September 28, 2017

33

 1    Q.    Did they provide you with any written document

 2          which would give you guidance as to what in your

 3          judgment would or would not be disparagement?

 4          A.    No.

 5    Q.    Other than this case, and the claimants that

 6          brought an action against Fleet Boston, was this

 7          provision ever invoked by Fleet Boston against any

 8          other former employee?

 9          A.    Not to my knowledge.

10    Q.    Was it not in Fleet Boston's financial interest to

11          call a forfeiture of these deferred compensation

12          payments to people who otherwise would be entitled

13          to it under the bad boy provision?

14          A.    I don't know whether it was in their

15          financial interest or not.

16    Q.    Well, if they withhold payments of millions of

17          dollars in bonuses, doesn't that go right to their

18          bottom line?

19          A.    Oh, I don't know what would have happened to

20          the money.

21    Q.    Okay.  Was the bad boy provision only in the

22          deferred compensation document?

23          A.    No.

24    Q.    Where else was it?

25          A.    There were two deferred compensation plans,

34

1           one for 2001 awards, and one for 2002 awards, so

2           it was in both, and then there was another

3           compensation plan called the restricted unit plan,

4           and it was in that plan document as well.

5    Q.    Were the claimants in this case seeking benefits

6           under the last plan you mentioned?

7                        THE WITNESS:   The restricted unit

8           plan?

9                        MR. HARRIS: Yes.

10   A.    Yes.   By this case you mean Alt?

11                       MR. HARRIS: Yes.

12   A.    Yes.

13   Q.    Tell me what compensation is covered by the

14          restricted unit?

15   A.     So the restricted unit plan was a plan that

16          gave certain Robertson Stephens employees an

17          interest in the firm, gave them an ownership,

18          equity interest in Robertson Stephens through I

19          think they were phantom stock units, because

20          obviously Robertson Stephens didn't have a full

21          equity because it was a subsidiary of Fleet.   But

22          it was a plan by which they would get awards that

23          would give them an ownership interest in Robertson

24          Stephens subject to certain conditions and subject

25          to the passage of time.