Page 1

1

2     SUPREME COURT OF THE STATE OF NEW YORK

3     COUNTY OF NEW YORK

4     ---------------------------------------X

5     MICHAEL BARR,

6

7                         Plaintiff/Petitioner,

8          - against-        Index No. 159781/2014

9     LIDDLE & ROBINSON, L.L.P., and JEFFREY L.

10    LIDDLE,

11

12                        Defendants/Respondents.

13    ---------------------------------------X

14

15                        July 28, 2016

16                        10:22 a.m.

17

18          Deposition of Defendant/Respondent

19      JEFFREY L. LIDDLE, held at the offices of

20      Liddle & Robinson, L.L.P., 800 Third

21      Avenue, New York, New York, pursuant to

22      Notice, before NANCY SORENSEN, a Notary

23      Public of the State of New York.

24

25

19-12346-shl    Doc 55-5    Filed 09/05/19    Entered 09/05/19 18:22:01    Exhibit C
Part 3    Pg 2 of 216

Page 2

1

2       A P P E A R A N C E S:

3

4           GARVEY SCHUBERT BARER

5           Attorneys for Plaintiff/Petitioner

6               Twentieth Floor

7               100 Wall Street

8               New York, New York  10005-3708

9       BY:   ALAN A. HELLER, ESQ.

10              - and -

11              BENJAMIN D. LIEBOWITZ, ESQ.

12

13          BRAFF, HARRIS, SUKONECK & MALOOF

14          Attorneys for Defendants/Respondents

15              305 Broadway

16              New York, New York  10007

17      BY:   BRIAN C. HARRIS, ESQ.

18

19

20      ALSO PRESENT:

21

22          MICHAEL BARR

23

24

25

1

2                    STIPULATIONS

3

4       IT IS HEREBY STIPULATED, by and between the

5    attorneys for the respective parties hereto,

6    that:

7       All rights provided by the C.P.L.R., and

8    Part 221 of the Uniform Rules for the Conduct of

9    Depositions, including the right to object to

10   any question, except as to form, or to move to

11   strike any testimony at this examination is

12   reserved; and in addition, the failure to object

13   to any question or to move to strike any

14   testimony at this examination shall not be a bar

15   or waiver to make such motion at and is reserved

16   to, the trial of this action.

17       This deposition may be sworn to by the

18   witness being examined before a Notary Public

19   other than the Notary Public before whom this

20   examination was begun but the failure to do so

21   or to return the original of this deposition to

22   counsel, shall not be deemed a waiver of the

23   rights provided by Rule 3116, C.P.L.R. and shall

24   be controlled thereby.

25       The filing of the original of this

FILED: NEW YORK COUNTY CLERK 08/13/2018 01:47 PM
INDEX NO. 159781/2014
NYSCEF DOC. NO. 142
RECEIVED NYSCEF: 08/13/2018

1

2     deposition is waived.

3          IT IS FURTHER STIPULATED, a copy of this

4     examination shall be furnished to the attorney

5     for the witness being examined without charge.

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

FILED: NEW YORK COUNTY CLERK 08/13/2018 01:47 PM    INDEX NO. 159781/2014
NYSCEF DOC. NO. 142                                 RECEIVED NYSCEF: 08/13/2018

1

2    J E F F R E Y  L.  L I D D L E,    called as a

3    witness, having been duly sworn by a Notary

4    Public, was examined and testified as follows:

5    EXAMINATION BY

6    MR. HELLER:

7        Q.    Good morning, Mr. Liddle.  My name is

8    Alan Heller.  I'm from the firm of Garvey

9    Schubert Barer, and I represent Michael Barr in

10   connection with the lawsuit against Liddle &

11   Robinson and Jeffrey Liddle.

12            I'm going to ask you some questions

13   today.  Obviously, I assume you know the rules,

14   but I'll just tell you my personal rules that if

15   there's any question that you don't understand,

16   please let me know and I'll be more than happy

17   to rephrase it.

18            I only want you to answer questions

19   that you understand so the record is clear.

20            Also I have a very soft speaking

21   voice and I'm a little -- my throat is bothering

22   me, so if you don't hear me, I'll try to speak

23   up, especially with the background noise that we

24   have.

25            Also, if Brian objects, please allow

FILED: NEW YORK COUNTY CLERK 08/13/2018 01:47 PM

1                    J. L. Liddle

2      him to state his objection for the record and

3      either Brian or I will tell you whether or not

4      to answer the question.

5                    In connection with your preparation

6      for the deposition today, did you review any

7      documents?

8           A.    Yes.

9           Q.    What documents did you review?

10          A.    The initial retainer agreement, I

11     looked at the -- when I say looked at it, I

12     perused the original statement of claim in

13     arbitration and I perused The Wall Street

14     Journal article.

15                   Total document review time was

16     probably under 3 minutes, just so you understand

17     what I mean by peruse.

18          Q.    I fully understand.

19                   So other than those three documents,

20     the initial retainer agreement, the statement of

21     claim and The Wall Street Journal article, did

22     you peruse any other documents in preparation

23     for this deposition?

24          A.    I know there were documents marked in

25     Michael Barr's deposition.  I had a packet of

FILED: NEW YORK COUNTY CLERK 08/13/2018 01:47 PM

Page 7

```
 1                    J. L. Liddle
 2   them.  I literally just flipped through them
 3   with my thumb.  I didn't have the time or
 4   opportunity to read them.
 5        Q.    Did you have an opportunity to peruse
 6   Michael Barr's separation agreement and release
 7   from September of 2002?
 8        A.    That was, I believe, in that packet
 9   and I flipped by it and I saw one or two pages
10   of it.  But, you know, it was, you know, I --
11   I've seen those agreements before.
12        Q.    Do you recall when the first time was
13   that you saw that agreement before?
14             MR. HARRIS:  Which agreement.
15             MR. HELLER:  The one that he just
16        referred to, Michael Barr's separation
17        agreement and release of September 2002.
18        A.    Michael Barr's separation agreement
19   and release, I couldn't tell you whether I saw
20   it at the time or the first time I saw it was
21   when I flipped through the documents.
22             There were many individuals, all of
23   whom I believe received separation agreements,
24   which were, I believe, identical.  And I looked
25   at the ones who were our clients at the time
```

1                      J. L. Liddle

2     that the separation agreements were provided.

3     By the time Michael Barr approached us to

4     represent him, several months had passed.  I

5     don't think it was an issue of reviewing the

6     separation agreements at that point.

7          Q.    But you had seen a form of the

8     separation agreement which you believe were

9     identical prior to the time the statement of

10    claim was filed in this action -- in the action

11    against Robertson Stephens?

12              MR. HARRIS:  Objection to the form of

13         the question.

14         Q.    Do you understand the question?

15         A.    I'm not sure I understand the

16    question.

17         Q.    You had mentioned that you saw

18    separation agreements of some of the other

19    individual plaintiffs in the Robertson Stephens

20    matter awhile ago.

21              I'm not sure when you saw Mr. Barr's

22    separation agreement, but you say other forms

23    that you believe were identical to the one of

24    Mr. Barr's; correct?

25              MR. HARRIS:  Objection to form.

FILED: NEW YORK COUNTY CLERK 08/13/2018 01:47 PM
NYSCEF DOC. NO. 142

INDEX NO. 159781/2014
RECEIVED NYSCEF: 08/13/2018

19-12346-shl   Doc 55-5   Filed 09/05/19   Entered 09/05/19 18:22:01   Exhibit C
Part 3   Pg 9 of 216

Page 9

1                      J. L. Liddle

2       A.    No, that's not what I said.

3       Q.    So please clarify?

4       A.    I don't understand what you mean by

5  me clarifying your question.

6             MR. HARRIS:  You have to ask him a

7       question.

8       Q.    When did you first see a separation

9  agreement of any of the individuals who sued

10 Robertson Stephens in the New York Stock

11 Exchange and arbitration?

12      A.    It's going to be a long day.  It was

13 not a FINRA arbitration.

14      Q.    It was a FINRA decision, I apologize.

15 The New York Stock Exchange arbitration.  And it

16 may be a long day.

17      A.    I first saw one sometime after

18 September 17th or 18th, whenever the day was

19 that was on it.

20            There were never any issues in this

21 case or in the case in any respect because

22 everybody who had come in initially had been

23 terminated on July 17th and taken either notes

24 or had detailed information on what they were --

25 what was being proposed.

FILED: NEW YORK COUNTY CLERK 08/13/2018 01:47 PM
INDEX NO. 159781/2014
NYSCEF DOC. NO. 142
19-12346-shl    Doc 55-5    Filed 09/05/19    Entered 09/05/19 18:22:01    Exhibit C
Part 3    Pg 10 of 216
RECEIVED NYSCEF: 08/13/2018

Page 10

1                        J. L. Liddle

2          Q.    All I'm asking is did you see the

3    separation agreement?

4          A.    I just said I saw it sometime shortly

5    after they received it and that would be

6    obviously before this litigation.

7          Q.    Did you review the Robertson Stephens

8    group cash equivalent deferred compensation

9    plan?

10               MR. HARRIS:   When.

11         A.    I believe --

12               MR. HELLER:   In preparation for this

13         deposition.

14         A.    -- I looked at a couple of paragraphs

15    of, I believe, the 2001 plan.

16         Q.    When did you look at that?

17         A.    This morning.

18         Q.    Do you recall when the first time was

19    --

20         A.    You're talking about for the most

21    recent time?

22         Q.    Yes.

23         A.    This morning.

24         Q.    When was the first time, to the best

25    of your recollection, you saw the 2001 plan?

FILED: NEW YORK COUNTY CLERK 08/13/2018 01:47 PM
INDEX NO. 159781/2014

NYSCEF DOC. NO. 142

19-12346-shl   Doc 55-5   Filed 09/05/19   Entered 09/05/19 18:22:01   Exhibit C
Part 3   Pg 11 of 216

RECEIVED NYSCEF: 08/13/2018

1                              J. L. Liddle

2          A.     I'm not sure.

3          Q.     Do you recall whether it was before

4     or after the arbitration was filed?

5          A.     I believe it was before.

6          Q.     Other than your counsel, did you

7     discuss today's deposition with anyone in

8     connection with your preparation for the

9     deposition?

10         A.     I called Jim Hubbard this morning.

11    He's out of the office.

12         Q.     And what did you discuss with Jim

13    Hubbard?

14         A.     I asked him if he had any

15    recollections of interactions with Mr. Barr, and

16    I asked him if he recalled who among our lawyers

17    was assigned to handle his testimony and work

18    with him, because I wasn't.

19         Q.     And how did he respond?

20         A.     He says he thinks he handled the

21    testimony and that's guessing that one or two of

22    the other people in the office had contact with

23    Mr. Barr from time to time.

24         Q.     Did he mention the names of the

25    others?

FILED: NEW YORK COUNTY CLERK 08/13/2018 01:47 PM
INDEX NO. 159781/2014

19-12346-shl   Doc 55-5   Filed 09/05/19   Entered 09/05/19 18:22:01   Exhibit C
NYSCEF DOC. NO. 142                                                    RECEIVED NYSCEF: 08/13/2018
Part 3   Pg 12 of 216

1                          J. L. Liddle

2          A.     No.

3          Q.     Do you know if David Marek had any

4    contact with Mr. Barr during the course of the

5    arbitration?

6          A.     During the course of the arbitration,

7    Mr. Barr attended several sessions, I believe,

8    that were not sessions where he was testifying

9    or maybe he was about to testify.

10               I think that everybody had contact

11   with him who was on the team.  There were at any

12   time between four and seven lawyers in

13   attendance from our side.

14         Q.     Do you know if David Marek interacted

15   with Mr. Barr in connection with the preparation

16   of Mr. Barr's case against Robertson Stephens?

17         A.     I don't know.

18         Q.     How about Christine Palmieri?

19         A.     I don't -- I don't know if she

20   interacted with him.  I don't think she did.

21   But as I said, I do know that at some point when

22   this started, I had asked her if she had handled

23   his testimony.

24         Q.     And what was her response?

25         A.     No.

FILED: NEW YORK COUNTY CLERK 08/13/2018 01:47 PM
INDEX NO. 159781/2014
NYSCEF DOC. NO. 142
RECEIVED NYSCEF: 08/13/2018

19-12346-shl    Doc 55-5    Filed 09/05/19    Entered 09/05/19 18:22:01    Exhibit C
Part 3    Pg 13 of 216

Page 13

1                          J. L. Liddle

2          Q.      What role did Christine Palmieri play

3     in connection with the Robertson Stephens

4     arbitration?

5          A.      She was one of the team members.

6          Q.      David Marek was also one of the team

7     members?

8          A.      Yes.

9          Q.      And Jim Hubbard was one of the team

10    members?

11         A.      Yes.

12         Q.      Do you recall who else was on the

13    team?

14         A.      I recall some of them.

15         Q.      Please tell me?

16         A.      There were probably as many as 15

17    lawyers were on the case as one time.

18         Q.      Was it every lawyer in your office?

19         A.      No, not at any specific time.

20         Q.      How about Michael Grenert?

21         A.      He worked on the case.

22         Q.      When was Liddle & Robinson formed?

23         A.      The original firm was formed by June

24    4th, 1979.

25         Q.      When it was formed, did it have a

FILED: NEW YORK COUNTY CLERK 08/13/2018 01:47 PM
INDEX NO. 159781/2014
NYSCEF DOC. NO. 142
RECEIVED NYSCEF: 08/13/2018

19-12346-shl   Doc 55-5   Filed 09/05/19   Entered 09/05/19 18:22:01   Exhibit C
Part 3   Pg 14 of 216

Page 14

1                    J. L. Liddle

2    specialty?

3         A.    Yes, we practiced law.

4         Q.    What type of law?

5         A.    Litigation.

6         Q.    Any particular type of litigation?

7         A.    In courts and arbitration.

8         Q.    Is there a particular area of

9    expertise in courts and arbitration?

10        A.    There were several areas of

11   expertise.

12        Q.    What are those areas?

13        A.    Now or then or --

14        Q.    Then.

15        A.    My expertise was in complex

16   corporate, real estate, securities, commodities

17   litigation, where my original partner's

18   expertise was in fair trade, commission

19   litigation, antitrust litigation, and Department

20   of Energy, press control litigation.  My other

21   partner is a tax lawyer.

22        Q.    Did you have a transactional

23   practice?

24        A.    We did for a time period, yeah, for

25   about four years.

FILED: NEW YORK COUNTY CLERK 08/13/2018 01:47 PM
INDEX NO. 159781/2014
NYSCEF DOC. NO. 142
RECEIVED NYSCEF: 08/13/2018

19-12346-shl    Doc 55-5    Filed 09/05/19    Entered 09/05/19 18:22:01    Exhibit C
Part 3    Pg 15 of 216

Page 15

1                          J. L. Liddle

2          Q.      What time period was that?

3          A.      1979 and 1983.

4          Q.      Did there come a time that you

5    started participating in employment litigation?

6          A.      I participated in employment

7    litigation from the beginning of when I started

8    getting clients because I was hired to do that

9    by my clients.

10         Q.      And do you have an expertise in

11   employment litigation, as well?

12         A.      I would say that by now, I'm

13   practicing law enough that I have a specialty in

14   that, yes.

15         Q.      And you had a specialty in that in

16   around 2002, as well; correct?

17         A.      Yes, I handled -- probably 50 percent

18   or more of my time was spent on employment

19   litigation.

20         Q.      Did any of those litigations involve

21   the disputes over deferred compensation?

22         A.      Yes.

23         Q.      And generally, do the disputes over

24   deferred compensation deal with agreements

25   themselves, deferred compensation agreements?

FILED: NEW YORK COUNTY CLERK 08/13/2018 01:47 PM

Page 16

1                    J. L. Liddle

2        A.    I really don't know how to answer

3    your question.

4        Q.    In connection with the dispute over

5    deferred compensation, are there situations

6    where there is an allegation that deferred

7    compensation is due where there's no agreement

8    between parties?

9        A.    There are situations like that, yes.

10       Q.    And there are situations where there

11   are written agreements between partners?

12       A.    There are definitely situations where

13   there are written agreements between parties.  A

14   lot of deferred compensation plans exist, and

15   those are written.

16       Q.    And generally --

17            MR. HELLER:  Strike that.

18       Q.    In your experience as an employment

19   litigator and who did deferred compensation

20   litigation, do some of those agreements have

21   non-disparagement clauses?

22       A.    Perhaps.

23       Q.    Do some not have non-disparagement

24   agreements?

25       A.    Yes.

FILED: NEW YORK COUNTY CLERK 08/13/2018 01:47 PM
INDEX NO. 159781/2014

NYSCEF DOC. NO. 142
RECEIVED NYSCEF: 08/13/2018

19-12346-shl    Doc 55-5    Filed 09/05/19    Entered 09/05/19 18:22:01    Exhibit C
Part 3    Pg 17 of 216

Page 17

1                    J. L. Liddle

2        Q.    Are you familiar with Michael Barr?

3               MR. HARRIS:  Objection to the form of

4        the question.

5               MR. HELLER:  Strike that.

6        Q.    When was the first time you met

7  Michael Barr?

8        A.    Even Michael Barr.  What, pardon?

9        Q.    When was the first time you met

10  Michael Barr?

11        A.    I don't know.

12        Q.    Was it in around 2002?

13        A.    It might have been.

14        Q.    Was it before the statement of claim

15  was filed in the arbitration?

16        A.    I think so, but I'm not sure.

17        Q.    Do you have a recollection of a first

18  meeting with Michael Barr?

19        A.    No.

20        Q.    Did there come a time that your firm

21  was engaged by Michael Barr to represent him?

22               MR. HARRIS:  Objection to the form of

23        the question.

24        A.    The initial retention agreement

25  appears to be dated by Mr. Barr.  I'm assuming

FILED: NEW YORK COUNTY CLERK 08/13/2018 01:47 PM

INDEX NO. 159781/2014

NYSCEF DOC. NO. 142

19-12346-shl   Doc 55-5   Filed 09/05/19   Entered 09/05/19 18:22:01   Exhibit C
Part 3   Pg 18 of 216

RECEIVED NYSCEF: 08/13/2018

1                          J. L. Liddle

2      that's his signature on it in November of 2002.

3          Q.     You have no recollection of speaking

4      to Mr. Barr before November of 2002?

5          A.     I have no recollection of speaking

6      with Mr. Barr in November of 2002 or before,

7      certainly, and I have really only the vaguest

8      recollections of speaking with Mr. Barr

9      since November of 2002.

10         Q.     What was the reason that Mr. Barr

11     engaged Liddle & Robinson to represent him?

12         A.     He wanted to participate in the

13     planned arbitration seeking the contested

14     compensation that he and many others felt they

15     were due upon their termination from Robertson

16     Stephens.

17         Q.     Were there certain --

18         A.     But I didn't have that conversation

19     with him.

20         Q.     Okay, so how did you find out that he

21     wanted to participate in the planned arbitration

22     seeking contested compensation?

23         A.     Somebody told me.

24         Q.     Who told you?

25         A.     I don't remember.

19-12346-shl   Doc 55-5   Filed 09/05/19   Entered 09/05/19 18:22:01   Exhibit C
Part 3   Pg 19 of 216

Page 19

1                    J. L. Liddle

2        Q.     How many other participants were

3    there?

4        A.     Forty-one other participants.

5        Q.     Did you play a role in the engagement

6    by any of those other 41 participants?

7        A.     Yes.

8        Q.     Who of the 41 did you play a role in

9    their engagement of Liddle & Robinson?

10              MR. HARRIS:   I objection to the form.

11       Q.     You can answer.

12       A.     Well, I was contacted by a -- an

13   individual who had been a client of mine in the

14   past named Jonathan Goldman.

15       Q.     Other than Mr. Goldman, did any other

16   individual reach out to you personally to become

17   part of that group?

18       A.     I think there were, but I didn't -- I

19   just don't remember who came to me because of

20   Jonathan Goldman or who came to me because of a

21   reputation in the industry or who might have

22   come for other reasons at that time.

23       Q.     But at some point in time, 41

24   individuals, plus Mr. Barr, engaged Liddle &

25   Robinson to represent them in connection with

FILED: NEW YORK COUNTY CLERK 08/13/2018 01:47 PM
INDEX NO. 159781/2014

NYSCEF DOC. NO. 142

19-12346-shl    Doc 55-5    Filed 09/05/19    Entered 09/05/19 18:22:01    Exhibit C
Part 3    Pg 20 of 216

RECEIVED NYSCEF: 08/13/2018

Page 20

1                    J. L. Liddle

2      the -- I'll call it the RSI arbitration?

3          A.    I think accurately we also had one or

4      two on this, but I think 41 individuals had

5      engaged us, and then Mr. Barr.

6          Q.    Were there any claims that Liddle &

7      Robinson was not engaged to seek on behalf of

8      Mr. Barr?

9          A.    Yes.

10         Q.    What were those claims?

11         A.    They're delineated in the standard

12     retainer agreement that I mentioned earlier that

13     I reviewed.  That retainer agreement was common

14     to everyone.

15             MR. HELLER:  This is Plaintiff's 1.

16             (Plaintiff's Exhibit 1, a copy of the

17         retainer agreement Mr. Barr signed retaining

18         Liddle & Robinson, marked for

19         identification, as of this date.)

20         Q.    Mr. Liddle, placed before you is a

21     document that was marked as Plaintiff's Exhibit

22     1 for identification.  It was previously marked

23     as Defendant's 8 at the deposition of

24     Michael Barr.

25             It's a letter on Liddle & Robinson

FILED: NEW YORK COUNTY CLERK 08/13/2018 01:47 PM
INDEX NO. 159781/2014

NYSCEF DOC. NO. 142
RECEIVED NYSCEF: 08/13/2018

19-12346-shl   Doc 55-5   Filed 09/05/19   Entered 09/05/19 18:22:01   Exhibit C
Part 3   Pg 21 of 216

Page 21

1                          J. L. Liddle

2       letterhead, 3-page document that appears to have

3       been signed on your behalf.

4              Do you recognize this document?

5       A.    This is -- this is the document that

6       I referred to earlier.

7       Q.    And is this a true and accurate copy

8       of the retainer agreement that Mr. Barr signed

9       retaining Liddle & Robinson?

10      A.    I would have to say if it was -- it

11      probably is, but I -- I didn't pull the

12      agreements out.  I'm not the custodian of the

13      agreements.

14      Q.    Now we mentioned that the claims that

15      Liddle & Robinson would not be representing

16      Mr. Barr were identified in this document.

17             Can you tell me where those claims --

18      excluded claims are?

19      A.    Yes, there are nine exclusions on

20      page 2.

21      Q.    Is one of them identified by

22      subparagraph E, the 2002 cash equivalent plan

23      deferred amount?

24      A.    Correct.

25      Q.    Do you have an understanding what the

1                        J. L. Liddle

2       issue was --

3                        MR. HELLER:  Strike that.

4            Q.    Why was the 2002 cash equivalent plan

5       deferred amount excluded from the retainer?

6            A.    Well, all of them were excluded for

7       the same reasons.

8            Q.    And what were they?

9            A.    These were excluded because the

10      individuals who were hiring us had approached us

11      saying that they did not have a concern about

12      recovering these -- these specific items, and

13      they didn't want to pay us a fee for recovering

14      something that they didn't need a lawyer to

15      recover for them.

16           Q.    Did you ask these individuals for

17      details about, and I'll say in particular, the

18      2002 cash equivalent plan deferred amount, and

19      ask to see documents referring to those claims?

20           A.    The people who had the cash

21      equivalent plan amounts for '01 and '02 were

22      adamant that they had been told on -- on or

23      about the July 17th date when they were all told

24      what would happen, that they would get on the

25      vesting dates their cash equivalent plan, plus

FILED: NEW YORK COUNTY CLERK 08/13/2018 01:47 PM
INDEX NO. 159781/2014
NYSCEF DOC. NO. 142
RECEIVED NYSCEF: 08/13/2018

Page 23

J. L. Liddle

1

2    whatever interest rate they were getting on it,

3    whether or not they signed the separation

4    agreement and release.  And, therefore, it was

5    not something that they wanted us to pursue on

6    their behalf.

7        Q.    And isn't it true that the separation

8    agreement and release actually said that?

9        A.    The separation agreement and release

10   had a list later on, I believe so, yeah.  We

11   were not hired by anybody to pursue anything

12   with regard to the cash equivalent plan, prior

13   to the events that took place much later.

14       Q.    Well, did anyone from Liddle &

15   Robinson request that Mr. Barr provide Liddle &

16   Robinson with a copy of the separation agreement

17   and release?

18       A.    I don't know.  I, as I told you, I

19   really had very little contact with Mr. Barr.

20   Somebody might have.

21       Q.    Did Mr. Marek ever tell you that he

22   requested that of Mr. Barr?

23       A.    Did he tell me -- what's the "that"

24   in your question?

25       Q.    I was talking about the separation

FILED: NEW YORK COUNTY CLERK 08/13/2018 01:47 PM    INDEX NO. 159781/2014

NYSCEF DOC. NO: 142    19-12346-shl    Doc 55-5    Filed 09/05/19    Entered 09/05/19 18:22:01    Exhibit C    RECEIVED NYSCEF: 08/13/2018

Part 3    Pg 24 of 216

Page 24

1                         J. L. Liddle

2       agreement and release.

3            A.    Please ask a question with the

4       pronoun that in there.  Ask it with some

5       specificity so I can answer.

6            Q.    I will do my best.  That's why I

7       asked you if you don't understand a question, to

8       mention it to me and I'll do my best --

9            A.    I don't understand the question.

10           Q.    Okay.  Did Mr. Marek tell you that he

11      had asked Mr. Barr to provide him with the

12      separation agreement and release?

13           A.    When?

14           Q.    At the time Mr. Barr engaged Liddle &

15      Robinson.

16           A.    I have no recollection of the

17      conversation, if any, with Mr. Marek at the time

18      Mr. Barr signed his retainer agreement.

19                 MR. HELLER:  Mark this as Plaintiff's

20           Exhibit 2.

21                 (Plaintiff's Exhibit 2, a letter from

22           Michael Barr to David Marek of Liddle &

23           Robinson dated October 2, 2002, marked for

24           identification, as of this date.)

25           Q.    Mr. Liddle, placed before you is a

Page 25

1                    J. L. Liddle

2       document that's marked as Plaintiff's Exhibit 2

3       for identification.

4                It's a letter from Michael Barr to

5       David Marek of Liddle & Robinson dated October

6       2, 2002.

7                Have you ever seen this document

8       before?

9            A.    No.

10                MR. HELLER:  Mark this 3.

11                (Plaintiff's Exhibit 3, a separation

12            agreement and release dated September 18,

13            2002 to Michael Barr, Bates stamped Barr 120

14            through Barr 136, marked for identification,

15            as of this date.)

16            Q.    Mr. Liddle, placed before you is a

17       document marked as Plaintiff's Exhibit 3.  It's

18       a separation agreement and release dated

19       September 18, 2002 to Michael Barr, and it's a

20       document that's Bates stamped Barr 120 through

21       Barr 136.

22                Have you ever seen this document

23       before?

24            A.    This document was one of the

25       documents I perused this morning.

1                         J. L. Liddle

2          Q.      And is this a document -- have you

3     ever seen --

4                 MR. HELLER:  Strike that.

5          Q.      You testified previously that you had

6     seen some of the other plaintiffs' or claimants'

7     separation agreements and release; is that

8     correct?

9          A.      Yes.

10         Q.      And you had seen those prior to the

11    filing of the statement of claim; is that

12    correct?

13         A.      Yes.

14         Q.      Do you have any reason to believe

15    that Mr. Barr's separation agreement and release

16    is different from the separation agreement and

17    releases that you reviewed prior to the filing

18    of the arbitration?

19         A.      I have no reason to believe one way

20    or the other.

21         Q.      I'll direct your attention to

22    paragraph -- to page 4, paragraph B 2, which

23    speaks of the 2002 cash equivalent plan?

24         A.      Um-hmm.

25         Q.      Could you review that paragraph,

FILED: NEW YORK COUNTY CLERK 08/13/2018 01:47 PM   INDEX NO. 159781/2014

19-12346-shl   Doc 55-5   Filed 09/05/19   Entered 09/05/19 18:22:01   Exhibit C
NYSCEF DOC. NO. 142                              RECEIVED NYSCEF: 08/13/2018
                        Part 3   Pg 27 of 216

                                                  Page 27

 1                       J. L. Liddle

 2     please, on page 4 and 5?

 3          A.     (The witness complies with request.)

 4     Okay.

 5          Q.     Do you recall reviewing similar

 6     clauses in the other separation agreements that

 7     you reviewed that say the same thing regarding

 8     the 2002 cash equivalent plan?

 9               MR. HARRIS:  Objection to the form of

10          the question.

11          Q.     You can answer it if you understand.

12          A.     I don't recall reviewing them, but I

13     do recall the gist of what I just read.

14          Q.     The gist was that the offer was that

15     the deferred compensation would be paid in a

16     lump sum amount at the same time the separation

17     payment, that was the offer?

18               MR. HARRIS:  Are you reading from

19          something?

20          Q.     Was it your understanding when the

21     offer was made, pursuant to the separation

22     agreement, to pay the entire of the deferred

23     compensation in a lump sum rather than over

24     time?

25          A.     I didn't have an understanding.  I

FILED: NEW YORK COUNTY CLERK 08/13/2018 01:47 PM
INDEX NO. 159781/2014
NYSCEF DOC. NO. 142
RECEIVED NYSCEF: 08/13/2018

19-12346-shl   Doc 55-5   Filed 09/05/19   Entered 09/05/19 18:22:01   Exhibit C
Part 3   Pg 28 of 216

1                         J. L. Liddle

2     don't have an understanding now.  It was never a

3     relevant consideration because nobody came here

4     to have us review the separation agreement and

5     release.

6                    They all came here with the purpose

7     being that they wanted to pursue litigation for

8     the things that were not excluded on the

9     retainer, period.

10                    Nobody our group signed a separation

11    agreement and release.

12         Q.    True.  But you had an understanding,

13    based on your conversations with the claimants

14    who had deferred compensation, that they weren't

15    concerned about the deferred compensation; is

16    that true?

17         A.    I would not phrase it that way at

18    all, but, you know, so --

19         Q.    You told me that -- that you were

20    informed that they weren't concerned about their

21    deferred compensation and that's why they did

22    not retain you to pursue --

23         A.    I didn't use those words.

24         Q.    What words did you use, please tell

25    me?

FILED: NEW YORK COUNTY CLERK 08/13/2018 01:47 PM

```
                                              Page 29
 1                        J. L. Liddle
 2          A.     The words that I used are in the
 3    record.  The idea is that they had been assured
 4    that they would receive their CEP plan monies
 5    and, therefore, they did not want to hire us to
 6    get their CEP plan monies and have to pay a fee
 7    for something that they were already going to
 8    get.
 9                 Were they concerned, I don't -- you
10    know, that's a more of an emotional psychiatric
11    term as far as I can tell.
12                 But they didn't want us to pursue it
13    because they didn't want to pay a fee to have
14    something occur with our involvement that was
15    going to occur anyway.
16          Q.     Do you recall whose separation
17    agreement and releases you reviewed prior to the
18    arbitration?
19          A.     No.
20          Q.     You reviewed at least one separation
21    agreement and release prior to the arbitration?
22          A.     I think so.  Let me just clarify one
23    thing in your questions, when you say, "you,"
24    you're referring to me personally?
25          Q.     Yes, I'm only referring to you.  And
```

1                    J. L. Liddle

2    if you didn't, please tell me, and I'll ask you

3    if you know anybody else?

4         A.    Okay, because there's two defendants.

5    I presume I'm appearing on behalf of both.

6         Q.    True, but I'm deposing you as you.

7    At the end of page 4 --

8              MR. HARRIS:  What exhibit are you

9         referring to?

10              MR. HELLER:  The one that's right in

11         front of him.

12         A.    Three, for the record?

13         Q.    Yes.

14         A.    I'm a lawyer, I fall into that every

15    now and then.

16         Q.    I'm more than happy for you to help

17    me out.  No problem.

18              The last sentence begins, "Receiving

19    an immediate lump sum payment is not required by

20    the terms of the 2002 cash equivalent plan,

21    which provides that your 2002 award amount would

22    continue to vest, accrue interest and be paid in

23    accordance with the regular vesting schedule

24    under the Plan, subject to your continued

25    compliance with non-solicitation and

19-12346-shl   Doc 55-5   Filed 09/05/19   Entered 09/05/19 18:22:01   Exhibit C
Part 3   Pg 31 of 216

Page 31

1                    J. L. Liddle

2      non-disparagement provisions in such Plan."

3                    Do you recall when you reviewed the

4      separation agreement and release, reading that

5      sentence and in particular, reference to

6      non-solicitation and non-disparagement

7      provisions?

8          A.    There's a lot of questions in there.

9      The overriding question is do I recall reviewing

10     it at the time I read the release, no.

11         Q.    Were you aware at the time you

12     reviewed the separation agreement and release

13     that there were non-solicitation and

14     non-disparagement provisions in the plan?

15         A.    And you're talking about the

16     separation agreement and release that I actually

17     saw as opposed to --

18         Q.    Yes.

19         A.    I'm not sure of the timing of that

20     awareness, but possibly even before, at the time

21     or afterwards.

22         Q.    Were there other lawyers at your firm

23     who were assigned to review the separation

24     agreements and releases of the individual

25     claimants?

FILED: NEW YORK COUNTY CLERK 08/13/2018 01:47 PM
INDEX NO. 159781/2014

NYSCEF DOC. NO. 142
19-12346-shl   Doc 55-5   Filed 09/05/19   Entered 09/05/19 18:22:01   Exhibit C
Part 3   Pg 32 of 216
RECEIVED NYSCEF: 08/13/2018

Page 32

1                      J. L. Liddle

2          A.    I wouldn't put it that way.  A

3     separation agreement and release was not an

4     issue in our case.

5          Q.    But your firm was provided with

6     copies of separation agreements and releases of

7     the various claimants; correct?

8          A.    Sometimes.  I'd say that all of them

9     provided the agreement because as I said, it was

10    not an issue.

11              None of them were going to sign two

12    months before they ever got a piece of paper.

13    RQ          MR. HARRIS:  I demand production of

14         the separation agreement and releases that

15         were provided to Liddle & Robinson.

16              MR. HARRIS:  Taken under advisement.

17         If you make the written request, we'll

18         consider it.

19         Q.    Please turn to page 6 of Plaintiff's

20    Exhibit 3?  And in particular, subparagraph E

21    Non-Disparagement.

22              Do you recall when you reviewed the

23    separation agreement and release of the other

24    individuals that there was a non-disparagement

25    clause in it?

FILED: NEW YORK COUNTY CLERK 08/13/2018 01:47 PM
INDEX NO. 159781/2014
NYSCEF DOC. NO: 142
RECEIVED NYSCEF: 08/13/2018
19-12346-shl    Doc 55-5    Filed 09/05/19    Entered 09/05/19 18:22:01    Exhibit C
Part 3    Pg 33 of 216

Page 33

1                        J. L. Liddle

2          A.    I don't, and none of our clients

3    signed a separation agreement and release.  It

4    was not an issue to have a special

5    non-disparagement provision in the law.

6          Q.    I direct your attention to the last

7    sentence of paragraph E where it says, "In

8    addition, you will continue to be bound by the

9    non-disparagement provisions that are contained

10   in, and in certain instances are a condition to

11   the receipt of benefits under, the Robertson

12   Stephens compensation plans."

13              Do you see that?

14         A.    I see it.

15         Q.    Do you recall reading that when you

16   reviewed the separation agreement?

17         A.    I don't recall reading it.

18         Q.    Turn to Exhibit B in Plaintiff's

19   Exhibit 3?

20         A.    What is Exhibit B?

21         Q.    Threes pages from the back.

22         A.    Okay.

23         Q.    Do you recall whether there was an

24   Exhibit B attached to the separation agreement

25   and release that you read prior to commencement

19-12346-shl   Doc 55-5   Filed 09/05/19   Entered 09/05/19 18:22:01   Exhibit C
Part 3   Pg 34 of 216

Page 34

1                    J. L. Liddle

2    of the arbitration proceeding?

3         A.    I don't, but I have a recollection of

4    seeing this of two things.  One, the Bayview

5    investment, whatever it was, was very briefly

6    discussed.  We were told under no uncertain

7    terms it was unnecessary for us to handle that.

8              And that looking at the exhibit that

9    says -- where it says 2002 cash equivalent plan,

10   I think that other separation agreements may

11   have had an entry for the 2001 cash equivalent

12   plan, as well, or it may have been, the

13   catchline may have been 2001 and 2002.

14              I just -- I'm not sure.  I think it

15   would have been in a separate paragraph.

16        Q.    You have a recollection of a

17   reference to a cash equivalent plan when you

18   reviewed the separation agreement and release?

19        A.    I have a reference to -- I have a

20   recollection of the -- of these things

21   refreshing my recollection as to the -- as to

22   content that was discussed, whether it was on

23   Exhibit B or something else, but I'm refreshed

24   as to that.

25              Perhaps Mr. Barr only had the 2002

FILED: NEW YORK COUNTY CLERK 08/13/2018 01:47 PM
INDEX NO. 159781/2014
NYSCEF DOC. NO. 142
RECEIVED NYSCEF: 08/13/2018

19-12346-shl    Doc 55-5    Filed 09/05/19    Entered 09/05/19 18:22:01    Exhibit C
Part 3    Pg 35 of 216

Page 35

1                    J. L. Liddle

2    plan and some people had both, and some people

3    had one.

4         Q.    And what is your recollection as to

5    what was discussed with regard to the 2001 --

6         A.    Discussed what?

7         Q.    You said you have a recollection that

8    there was -- something was discussed?

9              MR. HARRIS:  Objection.

10        A.    I may have missed --

11             MR. HELLER:  Please read back the

12        question and answer because you referenced a

13        discussion, so that's why I'm asking about

14        it.

15             COURT REPORTER:  Question:  "Do you

16        recall whether there was an Exhibit B

17        attached to the separation agreement and

18        release that you read prior to commencement

19        of the arbitration proceeding?"

20             Answer: "I don't, but I have a

21        recollection of seeing this of two things.

22        One, the Bayview investment, whatever it

23        was, was very briefly discussed.  We were

24        told under no uncertain terms it was

25        unnecessary for us to handle that.

FILED: NEW YORK COUNTY CLERK 08/13/2018 01:47 PM
INDEX NO. 159781/2014

NYSCEF DOC. NO. 142

19-12346-shl   Doc 55-5   Filed 09/05/19   Entered 09/05/19 18:22:01   Exhibit C
Part 3   Pg 36 of 216

RECEIVED NYSCEF: 08/13/2018

Page 36

1                    J. L. Liddle

2                    "And that looking at the exhibit that

3          says -- where it says 2002 cash equivalent

4          plan, I think that other separation

5          agreements may have had an entry for the

6          2001 cash equivalent plan, as well, or it

7          may have been, the catchline may have been

8          2001 and 2002.

9                    "I just -- I'm not sure.  I think it

10         would have been in a separate paragraph."

11                   Question:  "You have a recollection

12         of a reference to a cash equivalent plan

13         when you reviewed the separation agreement

14         and release?"

15                   Answer:  "I have a reference to -- I

16         have a recollection of the -- of these

17         things refreshing my recollection as to the

18         -- as to content that was discussed, whether

19         it was on Exhibit B or something else, but

20         I'm refreshed as to that.

21                   "Perhaps Mr. Barr only had the 2002

22         plan and some people had both, and some

23         people had one."

24         Q.    Okay, so you mentioned that the

25      content was discussed, okay, I was right, so

FILED: NEW YORK COUNTY CLERK 08/13/2018 01:47 PM INDEX NO. 159781/2014

NYSCEF DOC. NO. 142

19-12346-shl    Doc 55-5    Filed 09/05/19    Entered 09/05/19 18:22:01    Exhibit C
Part 3    Pg 37 of 216

RECEIVED NYSCEF: 08/13/2018

Page 37

1                    J. L. Liddle

2      there was a discussion.

3                    Who was the content discussed with?

4          A.      Attorneys within the firm, clients.

5          Q.      Did these discussions take place

6      before the filing of the statement of claim?

7          A.      I'm sure they did.

8          Q.      Do you recall particulars of the

9      discussions?

10         A.      I recall that when we -- by the time

11     we got to actual signing of retainer agreements,

12     that the discussions -- the result of the

13     discussions were that the members of this group

14     did not want us to represent them with regard to

15     the 11 items that are contained on page 2 of

16     Exhibit 8 -- or I'm sorry --

17                 MR. HARRIS:  Defendant's 8.

18         A.      Defendant's 8.  Is that a 2 here?

19                 MR. HARRIS:  Plaintiff's 2.

20         A.      Plaintiff's 2.  So that much --

21         Q.      Plaintiff's 1.

22                 MR. HARRIS:  One?

23         A.      In the retainer agreement?

24         Q.      Yes.

25         A.      One, yes.

FILED: NEW YORK COUNTY CLERK 08/13/2018 01:47 PM
INDEX NO. 159781/2014

19-12346-shl   Doc 55-5   Filed 09/05/19   Entered 09/05/19 18:22:01   Exhibit C

NYSCEF DOC. NO. 142

Part 3   Pg 38 of 216

RECEIVED NYSCEF: 08/13/2018

Page 38

1               J. L. Liddle

2        Q.    And during those discussions, were

3    there any discussions about the fact that the

4    cash equivalent plan was subject to

5    non-solicitation and non-disparagement

6    provisions?

7              MR. HARRIS:  Now once again, object

8         as to the form.  If you put the question in

9         context of time and --

10             MR. HELLER:  He had mentioned

11        discussions that occurred prior to the

12        filing of the statement of claim.

13             MR. HARRIS:  I just think the

14        question could be clearer.

15       A.    I was referring to discussions that

16   occurred prior to the signing of these potential

17   agreements, because all of these things were

18   excluded before we were retained.

19       Q.    So let's go to prior to signing the

20   retention agreement, during those discussions,

21   were there any discussions with the attorneys

22   regarding that the cash equivalent plan was

23   subject to non-solicitation and

24   non-disparagement provisions?

25       A.    Probably.

FILED: NEW YORK COUNTY CLERK 08/13/2018 01:47 PM
INDEX NO. 159781/2014
NYSCEF DOC. NO: 142
RECEIVED NYSCEF: 08/13/2018

```
 1                    J. L. Liddle
 2        Q.    Do you recall asking any of your
 3   colleagues or lawyers to get copies of the
 4   non-solicitation and non-disparagement
 5   provisions during the course of discussions
 6   prior to the signing of the engagement letter?
 7        A.    As stated, I don't recall that.
 8        Q.    Prior to the signing of the
 9   engagement letter, did Mr. -- do you recall
10   Mr. Barr expressing to you that he had concerns
11   about the timing of the filing of the
12   litigation?
13        A.    Prior to him signing the engagement
14   letter?
15        Q.    Yes.
16        A.    Number one, I don't.  Number two, I
17   don't have any recollection of talking to
18   Mr. Barr prior to the engagement letter, so it
19   would be very hard for me to recollect the very
20   specific discussion.
21        Q.    Do you have a recollection discussing
22   with any members in the claimant group about
23   concerns regarding the timing of the filing of
24   the litigation against RSI?
25              MR. HARRIS:  Objection to the form of
```

FILED: NEW YORK COUNTY CLERK 08/13/2018 01:47 PM
INDEX NO. 159781/2014
NYSCEF DOC. NO. 142
RECEIVED NYSCEF: 08/13/2018

19-12346-shl    Doc 55-5    Filed 09/05/19    Entered 09/05/19 18:22:01    Exhibit C
Part 3    Pg 40 of 216

Page 40

```
 1                    J. L. Liddle

 2         the question.

 3         A.    Yes.

 4         Q.    Do you recall who you discussed that

 5    with?

 6         A.    Not specifically.

 7         Q.    Do you recall what the concerns were?

 8         A.    I recall -- well, let me put it this

 9    way.  I'm not sure that I would characterize it

10    as concerns.

11         Q.    Okay.

12         A.    Let me just say that all these people

13    were -- virtually all these people were in the

14    securities business, and most of them had either

15    every day or a very expert understanding of the

16    vagaries of change of control provisions.

17              So I -- I recollect the discussion

18    being more along the lines of, you know, reading

19    this clause, we don't think the six month time

20    period in the clause applies to this situation.

21         Q.    And what clause are you referring to?

22         A.    I believe it's Section 8.1 of the CEP

23    agreements.

24         Q.    And you recall a specific discussion

25    regarding Section 8.1 with members of the group
```

FILED: NEW YORK COUNTY CLERK 08/13/2018 01:47 PM
INDEX NO. 159781/2014

NYSCEF DOC. NO. 142                                                    RECEIVED NYSCEF: 08/13/2018

1                         J. L. Liddle

2      prior to the filing of the statement of claim?

3           A.    Yes.

4           Q.    Did you discuss with any members of

5      the group about waiting until after the first

6      vesting date?

7           A.    Yes.

8           Q.    And what was that discussion, please?

9           A.    It's the same discussion.  It was a

10     steering committee, and there were multiple

11     lawyers in my office, and we reviewed the clause

12     and we determined that that clause did not apply

13     to this situation.

14          Q.    What was the --

15          A.    And this is one of these kinds of

16     open-ended discussions where -- which I have

17     always encouraged in my firm, and we have at

18     least the devil's advocate for every position.

19               So that every nook and cranny of that

20     provision was discussed, and it was ultimately

21     unanimously agreed that the provision didn't

22     apply.

23          Q.    Were there any notes taken by you in

24     that discussion?

25          A.    No.

FILED: NEW YORK COUNTY CLERK 08/13/2018 01:47 PM
INDEX NO. 159781/2014
NYSCEF DOC. NO. 142
RECEIVED NYSCEF: 08/13/2018

19-12346-shl   Doc 55-5   Filed 09/05/19   Entered 09/05/19 18:22:01   Exhibit C
Part 3   Pg 42 of 216

Page 42

1                      J. L. Liddle

2          Q.    Were any memoranda drafted by any of

3     the lawyers in connection with that provision as

4     to whether or not it applied?

5          A.    I don't recollect.

6          Q.    Have any --

7          A.    I don't think so.  I think we would

8     have probably produced it by now.

9                MR. HELLER:  Well, none were.  So if

10         any memoranda exists --

11         A.    Then there were none.

12    RQ          MR. HELLER:  -- well, if any exist,

13         then I demand production of them.

14         Q.    Do you know if any of your colleagues

15    took notes regarding that discussion?

16         A.    I don't.

17    RQ          MR. HELLER:  If any notes exist, I

18         demand production.

19                MR. HARRIS:  Again, write a letter

20         and we'll take it under advisement, if they

21         exist.

22         Q.    You mentioned a steering committee.

23    Who are the members of the steering committee?

24         A.    I'm not sure of every member.  I'm

25    not sure how it evolved, but I believe Jonathan

FILED: NEW YORK COUNTY CLERK 08/13/2018 01:47 PM
INDEX NO. 159781/2014
NYSCEF DOC. NO. 142                                    RECEIVED NYSCEF: 08/13/2018

1                     J. L. Liddle

2    Goldman was one.  I believe Brian Bean was one,

3    possibly Claude Callander, and I'm not sure

4    whether he was an actual member or not, but it

5    could have -- but Chris Greer, and it's possible

6    that Steve Tishman was, but I'm -- I -- I tend

7    to think not.  He may have just made a point of

8    calling from time to time more frequently than

9    others.

10         Q.    What about Clark Callander?

11         A.    Pardon?

12         Q.    Clark Callander?

13         A.    What about him?

14         Q.    Do you recall if he was part of the

15   steering committee?

16              MR. HARRIS:  He just mentioned him.

17         A.    I said Clark Callander.  I said I'm

18   not sure, but he may have been.  There may be

19   others too, I just don't really recollect.

20         Q.    Were members of the steering

21   committee, did they take part in that discussion

22   that you said you had with your attorneys?

23         A.    I'm sure that at least one or two of

24   them were involved in that, but I couldn't tell

25   you which ones.

FILED: NEW YORK COUNTY CLERK 08/13/2018 01:47 PM
INDEX NO. 159781/2014

NYSCEF DOC. NO. 142

RECEIVED NYSCEF: 08/13/2018

19-12346-shl   Doc 55-5   Filed 09/05/19   Entered 09/05/19 18:22:01   Exhibit C
Part 3   Pg 44 of 216

Page 44

1              J. L. Liddle

2        Q.    And it's the conversation where the

3    change of control issue was discussed?

4        A.    The paragraph was discussed as to

5    whether disparagement applied.  The

6    disparagement language dealt with it -- well,

7    the clause had a prohibition against soliciting

8    employees, and it was for a six month time

9    period after you left, except in the case of a

10   change of control.

11             That clause applied to both items.

12   The first item was the non-solicitation

13   provision, the second item was the

14   non-disparagement provision.

15             It ultimately made sense to everybody

16   that the change of control issue, especially in

17   the situation where the company was put out of

18   business, was dispositive of both concerns, as

19   well as the legal language in the clause was --

20   eliminated the time period, and that that was

21   being referenced to both.

22       Q.    Which attorneys participated in this

23   discussion?

24       A.    I don't remember.

25       Q.    Was Mr. Marek part of the discussion?

INDEX NO. 159781/2014

19-12346-shl    Doc 55-5    Filed 09/05/19    Entered 09/05/19 18:22:01    Exhibit C
Part 3    Pg 45 of 216

RECEIVED NYSCEF: 08/13/2018

```
 1                       J. L. Liddle
 2         A.     I don't remember.
 3         Q.     Ms. Palmieri?
 4         A.     I don't remember.
 5         Q.     Do you remember how many attorneys
 6    participated in that discussion?
 7         A.     I don't remember.
 8         Q.     Was it more than one?
 9         A.     Oh, I'm sure it was more than one.
10    My recollection of it is there were a number of
11    people in my office, but I don't remember.
12         Q.     Do those people still work in your
13    office?
14         A.     I don't remember who was there.
15         Q.     Do you recall each of the individuals
16    who worked on the case?
17         A.     Do I recall them without a list of
18    people who worked on the case?  I would recall
19    them, but I wouldn't recall if they worked on
20    the case or not.
21         Q.     I will rephrase the question.
22         A.     All right.
23         Q.     Since the time that the arbitration
24    decision came down, do you know how many
25    attorneys have left your office, your
```

FILED: NEW YORK COUNTY CLERK 08/13/2018 01:47 PM
INDEX NO. 159781/2014

NYSCEF DOC. NO. 142
RECEIVED NYSCEF: 08/13/2018

19-12346-shl    Doc 55-5    Filed 09/05/19    Entered 09/05/19 18:22:01    Exhibit C
Part 3    Pg 46 of 216

Page 46

1                          J. L. Liddle

2       employment?

3            A.    No, but there have been attorneys who

4       left the office.  There's turnover and there

5       have been new lawyers.

6            Q.    Do you recall if at the time this

7       discussion occurred regarding the change of

8       control provision, whether all the attorneys

9       were working on the RSI matter or took part in

10      that discussion?

11              MR. HARRIS:  Objection to the form of

12          the question.  He told you he doesn't

13          remember, how can he answer that question.

14              MR. HELLER:  I'm asking if he has a

15          recollection.

16          A.    I have no idea.

17          Q.    Was there a written document that was

18      prepared for the members of the group, the

19      claimants, to indicate your analysis of Section

20      8.1?

21          A.    I don't recollect whether there was

22      or not.

23          Q.    Do you know if there was a verbal

24      discussion with all of the claimants to disclose

25      your determination with regard to Section 8.1?

FILED: NEW YORK COUNTY CLERK 08/13/2018 01:47 PM
INDEX NO. 159781/2014

NYSCEF DOC. NO. 142

19-12346-shl    Doc 55-5    Filed 09/05/19    Entered 09/05/19 18:22:01    Exhibit C

Part 3    Pg 47 of 216

RECEIVED NYSCEF: 08/13/2018

Page 47

1                        J. L. Liddle

2        A.     No.

3        Q.     Do you know --

4        A.     We had -- we had meetings from time

5     to time where people could call in.  We didn't

6     have a way of monitoring the call-ins.

7              But when we had those kinds of

8     meetings, I couldn't tell when you they were,

9     there were multiple subjects that were

10    discussed.

11       Q.     Were any of the claimants informed of

12    your determination with respect to Section 8.1

13    prior to the filing of the statement of claim?

14       A.     Yes.

15       Q.     Who?

16       A.     Whichever members of the steering

17    committee or other members, other people who had

18    called in or had a question about it, they were

19    all informed.

20       Q.     Verbally or in writing?

21       A.     I'm certain that it was verbally.

22       Q.     It wasn't in writing, as well?

23       A.     I don't recollect.  I just told you I

24    don't recollect.

25       Q.     This is to the members of the

FILED: NEW YORK COUNTY CLERK 08/13/2018 01:47 PM
INDEX NO. 159781/2014
NYSCEF DOC. NO. 142
RECEIVED NYSCEF: 08/13/2018

19-12346-shl   Doc 55-5   Filed 09/05/19   Entered 09/05/19 18:22:01   Exhibit C
Part 3   Pg 48 of 216

Page 48

1                        J. L. Liddle

2       steering committee, I'm asking if it was in

3       writing, as well?

4           A.    I don't recollect if there was a

5       writing that was addressed to any members of the

6       group, which I think was your first question.

7                   MR. HELLER:  Mark this as Exhibit 4.

8                   (Plaintiff's Exhibit 4, a document on

9               Liddle & Robinson letterhead dated December

10              11, 2002 to Mr. Robert S. Clemente of the

11              New York Stock Exchange, Bates stamped Barr

12              2380 through 2398, marked for

13              identification, as of this date.)

14          Q.    Mr. Liddle, placed before you is a

15      document that's on Liddle & Robinson letterhead

16      dated December 11, 2002 to a Mr. Robert S.

17      Clemente of the New York Stock Exchange.  It's

18      Bates stamped Barr 2380 through 2398.

19                  And on the last page, page 19, it

20      appears to be your signature.

21                  Do you recognize this document?

22          A.    I do.

23          Q.    What is it?

24          A.    It's the statement of claim.  It was

25      originally filed -- I believe it was filed the

Page 49

                           J. L. Liddle

1

2    next day, but --

3         Q.    So it wasn't filed on December 11,

4    it was--

5         A.    I'm not sure.  I thought it might

6    have been filed by the 12th, but either way, it

7    was -- this is the statement of claim.  It was

8    either filed on the 11th or filed on the 12th.

9         Q.    Did you draft the statement of claim?

10        A.    No.

11        Q.    Do you know who drafted the statement

12   of claim?

13        A.    A number of people were in

14   collaboration, which included myself, drafted

15   the statement of claim.

16        Q.    Looking at the letterhead that has

17   the names of the attorneys --

18        A.    Yup.

19        Q.    -- would you please go down there and

20   tell me if you recall if any of the names

21   participated in the drafting of the statement of

22   claim?

23        A.    Well, I see my own name that I

24   participated.  I think that Grenert, Moy, and

25   Palmieri may have participated in it.

FILED: NEW YORK COUNTY CLERK 08/13/2018 01:47 PM

NYSCEF DOC. NO. 142

INDEX NO. 159781/2014

RECEIVED NYSCEF: 08/13/2018

```
 1                      J. L. Liddle
 2                 On the right side, there's
 3      David Marek, who was an associate at the time,
 4      and I believe John Karol who was waiting for
 5      admission to the Bar.
 6           Q.    Does Mr. Karol still work for Liddle
 7      & Robinson?
 8           A.    No.
 9           Q.    Do you recall when he stopped working
10      at Liddle & Robinson?
11           A.    Years ago.
12           Q.    How about Mr. Marek, does he still
13      work at Liddle & Robinson?
14           A.    Yes.
15           Q.    Mr. Grenert, is he still working at
16      Liddle & Robinson?
17           A.    No.
18           Q.    When did he leave Liddle & Robinson?
19           A.    Last year.
20           Q.    Do you know where he is now?
21           A.    He opened his own law office.
22           Q.    Is it in New York?
23           A.    I believe so.
24           Q.    Is Mr. Moy still at Liddle &
25      Robinson?
```

1                      J. L. Liddle

2          A.     No.

3          Q.     When did Mr. Moy leave Liddle &

4     Robinson?

5          A.     Years ago.  I don't even -- I think

6     he may have left before we tried the case,

7     but --

8          Q.     What about Ms. Palmieri, is she still

9     part of Liddle & Robinson?

10         A.     Yes.

11         Q.     Mr. Grenert --

12                MR. HELLER:  Strike that.

13         Q.     Look at this list of names on page 1

14    of Plaintiff's Exhibit 4, do you recall if any

15    of the individuals participated in the

16    discussion on Section 8.1?

17         A.     Looking at the list, I don't

18    recollect who was in that meeting, other than

19    myself.

20         Q.     Looking at the list, do you recall if

21    any individuals, other than Moy, Palmieri,

22    Grenert, Marek, and Karol, performed services in

23    connection with the arbitration against RSI?

24         A.     I don't.

25         Q.     I believe I asked this.  Page 19, is

FILED: NEW YORK COUNTY CLERK 08/13/2018 01:47 PM

NYSCEF DOC. NO. 142

INDEX NO. 159781/2014

RECEIVED NYSCEF: 08/13/2018

19-12346-shl   Doc 55-5   Filed 09/05/19   Entered 09/05/19 18:22:01   Exhibit C
Part 3   Pg 52 of 216

Page 52

1                        J. L. Liddle

2     that your signature?

3          A.    Yes.

4          Q.    Prior to your signing this document,

5     did you read it?

6          A.    Yes.

7          Q.    And when you read it, did you believe

8     that the statements made in this document were

9     true?

10         A.    To the best of my knowledge at the

11    time, yes.

12         Q.    I'll direct your attention to page 2?

13              MR. HARRIS:  Of the December 11th,

14         2002 document?

15              MR. HELLER:  Of Plaintiff's Exhibit

16         4.

17         Q.    And in particular, the preliminary

18    statement?

19         A.    Yes.

20         Q.    Now in that first paragraph, the

21    third to last line that begins, Respondents'

22    fraudulent misrepresentations and material

23    omissions concerning Claimants' employment."

24              Were you concerned that making

25    statements or allegations against respondents'

Page 53

1                    J. L. Liddle

2    fraudulent representations and material

3    omissions would violate the non-disparagement

4    provisions of claimant's agreement?

5              MR. HARRIS:  Objection to the form of

6         the question.  You only read part of the

7         sentence.  It continues.

8              MR. HELLER:  Okay, I'll read the

9         whole thing.

10    Q.    "Respondents' fraudulent

11    misrepresentations and material omissions

12    concerning Claimants' employment, compensation

13    and equity interests in Robertson Stephens; and

14    Fleet's breach of its fiduciary duties as

15    majority shareholder of Robertson Stephens."

16              Do you see that sentence?

17    A.    Yes.

18    Q.    Were you concerned that making

19    allegations regarding fraudulent

20    misrepresentations and material omissions, and

21    that references respondents, that references

22    Fleet and Robertson Stephens, were you concerned

23    that these claims would violate the

24    non-disparagement provisions of the parties'

25    deferred compensation plan?

FILED: NEW YORK COUNTY CLERK 08/13/2018 01:47 PM
INDEX NO. 159781/2014

NYSCEF DOC. NO. 142

19-12346-shl   Doc 55-5   Filed 09/05/19   Entered 09/05/19 18:22:01   Exhibit C
Part 3   Pg 54 of 216

RECEIVED NYSCEF: 08/13/2018

Page 54

1              J. L. Liddle

2              MR. HARRIS:   Objection to the form of

3         the question.

4         Q.    If you understand, you can answer it.

5         A.    First, this is a -- and I don't

6    believe that as a matter of law, public policy,

7    that a pleading that is made in good faith,

8    violates a non-disparagement agreement.

9              Second, as I told you, our analysis

10   that the non-disparagement agreement did not

11   apply to this situation because there had been a

12   change of control.

13             So was I, in reviewing this document,

14   concerned it would violate a non-disparagement

15   agreement, the answer was no.

16             And there was -- in my recollection,

17   there was never any response to this document

18   that said that either this sentence or the

19   contents of this document were a violation of

20   the non-disparagement agreement.

21        Q.    Are you referring to like the term

22   absolute privilege, are you familiar with that?

23        A.    Yes, of course I am.

24        Q.    And so if I understand your

25   testimony, as a pleading, there's an absolute

FILED: NEW YORK COUNTY CLERK 08/13/2018 01:47 PM

NYSCEF DOC. NO: 142

INDEX NO. 159781/2014

RECEIVED NYSCEF: 08/13/2018

19-12346-shl    Doc 55-5    Filed 09/05/19    Entered 09/05/19 18:22:01    Exhibit C
Part 3    Pg 55 of 216

Page 55

1               J. L. Liddle

2    privilege with respect to a pleading and the

3    allegations therein?

4         A.    There is.  I put in an additional

5    standard, which is that these allegations were

6    made in good faith.

7         Q.    And the absolute privilege attaches

8    to the pleading when it's filed with the

9    arbitration forum or a court?

10        A.    Correct.

11        Q.    Are familiar with Susanne Craig?

12        A.    Yes.

13        Q.    Who is she?

14        A.    She's a reporter.  She's out with The

15   New York Times.  At this point in time, she was

16   on the investigative reporting team for the

17   securities industry of The Wall Street Journal.

18        Q.    Do you recall the first time you --

19   have you ever met Susanne Craig?

20        A.    Yes.

21        Q.    Do you recall the first time you met

22   her?

23             MR. HARRIS:  Objection to the form of

24        the question.

25        A.    Not precisely.  She was working

FILED: NEW YORK COUNTY CLERK 08/13/2018 01:47 PM

NYSCEF DOC. NO. 142

INDEX NO. 159781/2014

RECEIVED NYSCEF: 08/13/2018

19-12346-shl   Doc 55-5   Filed 09/05/19   Entered 09/05/19 18:22:01   Exhibit C
Part 3   Pg 56 of 216

Page 56

1              J. L. Liddle

2     for -- helping out Charlie Gasparino, writing

3     articles about the analyst scandal, and Charlie

4     Gasparino was covering a wide variety of cases

5     that we had that involved -- involved that

6     scandal.

7          Q.    At the time, was she working for The

8     Wall Street Journal?

9          A.    Yes.

10          Q.    And was that before the statement of

11    claim was filed in about December 11th, December

12    12th, 2002?

13          A.    She was working at The Wall Street

14    Journal at the time the statement of claim was

15    filed and prior to that, yes, yeah.

16          Q.    Had she written other articles prior

17    to the filing of the statement of claim

18    regarding cases you were working on?

19          A.    I don't know whether she had a byline

20    on prior cases, but I think she may have had

21    either a co-byline or written an article or two

22    and, certainly, she wrote articles after this,

23    as well.

24          Q.    Did Ms. Craig write an article about

25    the claimants' arbitration against RSI?

FILED: NEW YORK COUNTY CLERK 08/13/2018 01:47 PM
INDEX NO. 159781/2014
NYSCEF DOC. NO. 142
RECEIVED NYSCEF: 08/13/2018

19-12346-shl   Doc 55-5   Filed 09/05/19   Entered 09/05/19 18:22:01   Exhibit C
Part 3   Pg 57 of 216

```
                                            Page 57
  1                   J. L. Liddle
  2         A.    She, as I understand it, I can only
  3     take this from the actual byline, she coauthored
  4     an article with John Hechinger.
  5         Q.    Do you know when she wrote that
  6     article -- co-wrote that article with
  7     Mr. Hechinger?
  8             MR. HARRIS:  Objection to the form of
  9         the question.  Do you want him to answer
 10         when she actually wrote it?
 11             MR. HELLER:  Strike that.
 12         Q.    Did you speak with Ms. Craig about
 13     the litigation against RSI prior to the filing
 14     of the litigation?
 15         A.    I don't think so.
 16         Q.    Did anyone from your office speak
 17     with Ms. Craig about the litigation prior to the
 18     filing of the litigation?
 19         A.    I don't think so.
 20         Q.    Do you recall instructing anyone from
 21     your office to speak with Ms. Craig about the
 22     litigation, prior to the filing of the
 23     litigation?
 24         A.    I don't think so.
 25         Q.    Do you recall speaking to anyone
```

FILED: NEW YORK COUNTY CLERK 08/13/2018 01:47 PM
INDEX NO. 159781/2014

NYSCEF DOC. NO. 142
RECEIVED NYSCEF: 08/13/2018

19-12346-shl    Doc 55-5    Filed 09/05/19    Entered 09/05/19 18:22:01    Exhibit C
Part 3    Pg 58 of 216

Page 58

1                    J. L. Liddle

2      about contacting The New York Times about the

3      litigation, prior to the filing of the

4      litigation?

5           A.    It's possible, but I don't -- I don't

6      have a recollection specifically of anything

7      with regard to The New York Times with regard to

8      this matter.  But it's possible someone got it

9      over there.

10                    MR. HELLER:  Mark this 5.

11                    (Plaintiff's Exhibit 5, a printout of

12           a Wall Street Journal article, marked for

13           identification, as of this date.)

14           Q.    Mr. Liddle, placed before you is a

15      document that has been marked as Plaintiff's

16      Exhibit 5 for identification.

17           A.    Right.

18           Q.    And it was previously marked as

19      Defendant's 6 at the deposition of Michael Barr.

20                    Do you recognize this document?

21           A.    This is a printout, I believe, of the

22      article that appeared in The Wall Street

23      Journal.

24           Q.    Do you recall when this article was

25      published, did you read it at or around the time

FILED: NEW YORK COUNTY CLERK 08/13/2018 01:47 PM
INDEX NO. 159781/2014
NYSCEF DOC. NO. 142
RECEIVED NYSCEF: 08/13/2018

Page 59

                         J. L. Liddle

1

2    it was published in The Wall Street Journal?

3         A.    Yeah, I'm sure I did.  I don't -- I

4    see here there's an update there on December 12,

5    at 12:28 a.m., I don't know whether or not this

6    was published on their electronic platform or it

7    was published in the paper.

8         Q.    I'll turn your attention to page 2 of

9    Plaintiff's Exhibit 5, the last paragraph?

10        A.    Yes.

11        Q.    And it says and I'll quote, "Jeffrey

12   Liddle, a lawyer in New York who is representing

13   the group, says the executives are seeking

14   damages from FleetBoston, including back pay for

15   2002 and compensation for what he estimates to

16   be their $45.6 million equity interest in

17   Robertson, which was approximately 23%

18   employee-owned.  Mr. Liddle asserts that the

19   bank's actions during the sale process drove

20   down the value of the employees' stake in

21   Robertson and damaged their reputations."

22             Do you see that?

23        A.    I see that, yes.

24        Q.    Now the article, the authors

25   mentioned that you say the executives are

Page 60

1                    J. L. Liddle

2      seeking damages.

3                    Do you recall saying that to the

4      authors?

5           A.    I did not speak to either one to have

6      any substantive comment whatsoever.  I believe

7      that the use of the word "says" there is a

8      reference to the contents as, shall we say,

9      simplifying by the reporter or reporters

10     themselves.

11                   There was a reason -- there was a

12     reason that -- that this was given to Sue Craig.

13          Q.    What was the reason it was given to

14     Sue Craig?

15          A.    Because I had much experience with

16     the press over a long time period, and John

17     Hechinger was not part of the investigative team

18     of The Wall Street Journal.  He was located in

19     Boston.

20                   And he was basically owned by the

21     company's up there.  So he was like an outside

22     version of their press relations department.

23                   And The Wall Street Journal is

24     organized so that if a reporter has jurisdiction

25     and he would have just general jurisdiction of

FILED: NEW YORK COUNTY CLERK 08/13/2018 01:47 PM
INDEX NO. 159781/2014
NYSCEF DOC. NO. 142
RECEIVED NYSCEF: 08/13/2018

1                    J. L. Liddle

2    covering Fleet or what have you, that they get

3    first crack at anything, unless it's already in

4    the house.

5                    And Sue Craig was in the

6    investigative reporting area with somebody who I

7    thought was a very, very straight shooter, and I

8    didn't want to have Fleet give them a press

9    release on this that was going to poison the

10   coverage of the entire thing.

11                   I didn't want to have Fleet do what

12   has been done in numerous prior occasions, not

13   necessarily with Fleet, but to set up a story

14   that then gets attributed to people that is

15   inaccurate.

16                   And I called Sue Craig and I said I

17   want to let you have a copy of the statement of

18   claim when it's filed because I don't trust John

19   Hechinger to write a balanced story on this.

20   That's why it went to her.

21                   And all of these other words in here,

22   I never used the word sabotaged.  I don't know

23   where that came from, but I had -- that was the

24   entirety of my discussion.

25                   And so when I saw that the article

FILED: NEW YORK COUNTY CLERK 08/13/2018 01:47 PM
INDEX NO. 159781/2014

NYSCEF DOC. NO. 142

19-12346-shl    Doc 55-5    Filed 09/05/19    Entered 09/05/19 18:22:01    Exhibit C

RECEIVED NYSCEF: 08/13/2018

Part 3    Pg 62 of 216

Page 62

1                          J. L. Liddle

2    was bylined by both of them, I had a feeling

3    that it was going to have at least a balance to

4    it.

5              And as you see, there are some pretty

6    juicy quotes from Fleet, which I think would

7    have been somewhere, in essence, exactly that.

8    But no other, prior to the article, and it would

9    have happened immediately.  Fleet was always in

10   the press.

11             The people who were involved in this

12   were in the press.  The closing of Robertson

13   Stephens was in the press.  It was an

14   unprecedented situation on how they closed it.

15             And I didn't want to have a situation

16   develop where our clients would be disparaged by

17   a multibillion dollar enterprise, having a vast

18   P.R. network and utilizing a reporter, who's a

19   general reporter who won't get another story if

20   they get criticized.

21        Q.    There's a lot in that answer.

22        A.    Excuse me?

23        Q.    There was a lot in that answer.  I'm

24   going to try to break it down as best as

25   possible.

FILED: NEW YORK COUNTY CLERK 08/13/2018 01:47 PM
INDEX NO. 159781/2014
NYSCEF DOC. NO. 142
19-12346-shl    Doc 55-5    Filed 09/05/19    Entered 09/05/19 18:22:01    Exhibit C
Part 3    Pg 63 of 216
RECEIVED NYSCEF: 08/13/2018

Page 63

1                        J. L. Liddle

2              You mentioned there was a reason why

3       it was given to Susanne Craig.  Who gave it to

4       Susanne Craig?

5          A.     Sent by somebody in our firm to Sue

6       Craig.

7          Q.     And it was sent after it was filed?

8          A.     I believe so, but that was -- that

9       was the expectation.

10         Q.     You mentioned something about a press

11      release.  What do you mean by press release?

12         A.     I think what I said was that I didn't

13      want to have them proceed by a press release,

14      which is they put out, if you look at them on

15      the Internet, at the time they were putting out

16      10 or 15 stories a day.

17              They got sued.  They characterized

18      it.  When they closed Robertson Stephens, they

19      characterized it.  When they would dress

20      themselves up to be acquired, they would

21      characterize what they were doing.

22              They were a press machine because

23      they were almost the equivalent of a rollup of

24      banks seeking to be acquired.

25         Q.     So it was their press release you're

FILED: NEW YORK COUNTY CLERK 08/13/2018 01:47 PM

Page 64

```
 1                    J. L. Liddle

 2   referring to, not a press release from Liddle &

 3   Robinson?

 4        A.    I don't believe there was a press

 5   release, but I'm, you know, I don't know.  There

 6   might have been something, you know, later on

 7   the next day or so.

 8              But when The Wall Street Journal gets

 9   a story, The New York Times is not going to

10   publish it.  I mean unless it's, you know,

11   Hillary Clinton has been elected president.

12              So the concern here was that John

13   Hechinger would write whatever they wanted him

14   to write because that's the history with them,

15   long-standing history with them.

16        Q.    So it's your position that the

17   alleged quotes of you --

18        A.    They're not quotes of me.

19        Q.    The alleged statements made by you

20   did not come from you?

21        A.    I did not say anything more to Sue

22   Craig other than I don't want Hechinger to write

23   an article that Fleet tells him to write.

24        Q.    After you read this article, did you

25   call Susanne Craig to discuss the statements
```

Page 65

1                        J. L. Liddle

2     that were attributed to you?

3          A.    No, because I don't see statements

4     being attributed to me.  I see that being a way

5     a reporter summarizes what's in the statement of

6     claim.  That's what I see.

7          Q.    So you believe they had copies of the

8     statement of claim before they wrote the

9     article?

10         A.    I would think that they did because

11    it starts out with "Now, in an arbitration"...

12         Q.    And do you know how they got the

13    statement of claim?

14         A.    I'm sure that we gave it to them.

15         Q.    After the arbitration was filed?

16         A.    I don't know, okay, and I don't think

17    it makes a big -- a bit of difference because it

18    doesn't become less absolutely privileged

19    because it's 2 minutes later.

20         Q.    How about two days later?

21         A.    I don't think it becomes less

22    absolutely privileged.  The statement of claim,

23    I believe, was filed on or about December 11th

24    and this article was on or about December 12th.

25         Q.    So giving a statement of claim a day

19-12346-shl   Doc 55-5   Filed 09/05/19   Entered 09/05/19 18:22:01   Exhibit C
Part 3   Pg 66 of 216

Page 66

1                        J. L. Liddle

2     or two before the filing of the statement of

3     claim, in your opinion, keeps the privilege of a

4     document?

5                   MR. HELLER:  Strike that.

6          Q.    Giving a statement of claim to the

7     press two days before it's filed does not remove

8     its absolute privilege?

9          A.    I don't understand where you're

10    question is going with regard to the facts here.

11    So I think you're asking me to give you some

12    sort of a legal opinion.

13                   I believe that the filed arbitration

14    demand has an absolute privilege.  I said that

15    this document seemed to me to summarize in short

16    form things that are in the statement of claim,

17    with the exception of the only word that anybody

18    from Fleet ever took exception to, which was

19    during the arbitration hearing, which is the

20    word sabotage, which is clearly not a word that

21    either I used or was in the statement of claim.

22                   And the stuff that you're referring

23    to with regard to my comments, I don't think

24    that attributing this to me as summary of what's

25    in here is in any way even remotely disparaging.

FILED: NEW YORK COUNTY CLERK 08/13/2018 01:47 PM

Page 67

1                    J. L. Liddle

2       And, you know, I don't -- I'm not sure what is

3       meant by the -- by your view of disparagement.

4       It certainly doesn't sound like anything I've

5       ever heard from Fleet.

6            Q.    Does your firm send drafts of

7       pleadings, before they're filed, to the press

8       before they're filed?

9            A.    Excuse me?

10           Q.    Has your firm ever sent drafts of

11      pleadings to the press before they're filed?

12           A.    I don't know how to answer that

13      question because I'm an attorney, and I think

14      you're asking a question about a specific

15      matter; is that correct?

16           Q.    I mean in general, does your firm --

17           A.    In general, I would say that, you

18      know, how we practice law on a general basis may

19      or may not be -- has any relevance.  I can't

20      answer your question.

21           Q.    In this case against Robertson

22      Stephens, did your firm send a draft of the

23      pleadings to the press before they were filed?

24           A.    I don't think so, but you either

25      refresh my recollection, it's been 14 years ago.

FILED: NEW YORK COUNTY CLERK 08/13/2018 01:47 PM

INDEX NO. 159781/2014

NYSCEF DOC. NO. 142

RECEIVED NYSCEF: 08/13/2018

19-12346-shl   Doc 55-5   Filed 09/05/19   Entered 09/05/19 18:22:01   Exhibit C
Part 3   Pg 68 of 216

Page 68

```
 1                         J. L. Liddle

 2         Q.     Whose decision in the firm would it

 3    be to send a draft of a pleading in this case?

 4               MR. HELLER:  Strike that.  We'll show

 5          you the document.

 6               (Plaintiff's Exhibit 6, a document

 7          dated December 10, 202 from

 8          Christine Palmieri to Susanne Craig of The

 9          Wall Street Journal, marked for

10          identification, as of this date.)

11         Q.    Mr. Liddle, placed before you is a

12    document dated December 10, 202 from

13    Christine Palmieri to Susanne Craig of The Wall

14    Street Journal.

15               It was produced by your counsel in

16    response to discovery.  And it appears to have

17    two attachments which were printed out in Word

18    documents, a statement of claim and a press

19    release.

20               Have you ever seen this document

21    before?

22         A.    I'm just taking a look.  As to the

23    cover e-mail, I have no recollection.

24    Obviously, I would have seen every, probably,

25    let's not say every, but many of the iterations
```

Page 69

1              J. L. Liddle

2    of the statement of claim.  I don't know whether

3    this is the final or there's some changes to it.

4    Obviously, it's not signed.

5              As to the press release, I would

6    assume that I've seen it, but I have -- have no

7    recollection of it other than giving it to -- I

8    certainly haven't seen it in years.

9         Q.   Did you instruct Christine Palmieri

10   to send a draft of the statement of claim and

11   press release to Ms. Craig?

12        A.   I think that the letter says that

13   attached is the statement of claim without

14   exhibits, not a draft.

15        Q.   Did you instruct --

16        A.   And I probably said to her, I'd be

17   only guessing, something along the lines of can

18   you send something to -- can you send it to Sue

19   Craig.

20        Q.   When you say, "it," what are you

21   referring to?

22        A.   The statement of claim.

23        Q.   Did you instruct Christine Palmieri

24   to send the attached press release to

25   Susanne Craig?

19-12346-shl    Doc 55-5    Filed 09/05/19    Entered 09/05/19 18:22:01    Exhibit C
Part 3    Pg 70 of 216

Page 70

1                          J. L. Liddle

2          A.     I don't know.  I don't know and I

3     don't remember whether or not the press release

4     -- a press release was ever issued on this.  As

5     you see, I'm not referenced on this, so I don't

6     know.

7          Q.     Now Ms. Palmieri refers it a

8     telephone conversation with Jeffrey Liddle.

9                 Do you recall the conversation that

10    she's referring to that you had with

11    Susanne Craig?

12         A.     Yes.

13         Q.     Please tell me about that?

14         A.     I already did.

15         Q.     So it was a conversation that you had

16    on or prior to December 10, 2002?

17         A.     I only had -- well, it must have been

18    that day.  I only had, I believe, one

19    conversation with her about this matter.  That

20    is Sue Craig.

21         Q.     Did you have any communication with

22    her about this matter other than by telephone?

23         A.     I don't think so.

24                (Plaintiff's Exhibit 7, an e-mail

25         from Susanne Craig to Jeffrey Liddle dated

19-12346-shl   Doc 55-5   Filed 09/05/19   Entered 09/05/19 18:22:01   Exhibit C
Part 3   Pg 71 of 216

Page 71

1           J. L. Liddle

2       December 12, 2002, marked for

3       identification, as of this date.)

4       Q.    Mr. Liddle, placed before you is a

5   document marked as Plaintiff's Exhibit 7 for

6   identification.

7            It appears to be an e-mail from

8   Susanne Craig to Jeffrey Liddle dated December

9   12, 2002.

10           Is that your handwriting in the upper

11  right-hand corner?

12      A.    It is, and it does refresh my

13  recollection that I called her to say that I had

14  seen the article.  I left it as a voice message

15  and then she sent me this e-mail.

16      Q.    Do you recall specifically what you

17  said to her in the Voicemail message?

18      A.    I think I said I thought it was a

19  nice job.  I was a little surprised at the

20  reaction from Fleet that was set forth.

21  Something along those lines.

22           And I took the -- her reference about

23  hubris and delusional hubris being her reference

24  probably to the -- this Mahoney quote, the good

25  faith -- the attempt to strike a good faith deal

19-12346-shl   Doc 55-5   Filed 09/05/19   Entered 09/05/19 18:22:01   Exhibit C
Part 3   Pg 72 of 216

```
                                                    Page 72

 1                        J. L. Liddle

 2    with the management team.

 3         Q.    Let's go back to Plaintiff's Exhibit

 4    6.

 5              Why was the statement of claim and

 6    press release sent to Susanne Craig on December

 7    10th?

 8              MR. HARRIS:  Been asked and answered.

 9              MR. HELLER:  No, it hasn't.

10         A.    I only had a phone conversation with

11    Suzanne Craig on the 10th, at which point she

12    asked when she could get the, you know,

13    statement of claim.

14              And apparently I said it would be

15    filed on the 11th, and I believe she wrote her

16    article on the 12th.  So I think that she wanted

17    to have a chance to read it and certainly wanted

18    to get -- pursuant to my request, that she got

19    ahead of John Hechinger in line to write the

20    article.

21              I told you about Hechinger's, let's

22    say that it's an open secret throughout the

23    entire world of the press.

24         Q.    Was there a strategic purpose in

25    connection with this case against RSI to have
```

FILED: NEW YORK COUNTY CLERK 08/13/2018 01:47 PM
INDEX NO. 159781/2014

NYSCEF DOC. NO. 142
RECEIVED NYSCEF: 08/13/2018

19-12346-shl   Doc 55-5   Filed 09/05/19   Entered 09/05/19 18:22:01   Exhibit C
Part 3   Pg 73 of 216

Page 73

1                         J. L. Liddle

2       the press write an article about it?

3           A.    Was there a strategic purpose?  The

4       press was writing articles, including this guy

5       Hechinger or writing articles that were very

6       negative toward members of the Robertson

7       Stephens group.  Very negative toward what they

8       did, what they performed, how they had

9       contributed, whether they were profitable or

10      not, issues of their performance.

11              Their individual performance was very

12      important as far as a bonus case would be

13      concerned, as these banks like to think that

14      they're paying for performance.

15              And in this case, it was focused

16      primarily on the bonus and on the value of the

17      equity, which we believe very strongly they had

18      destroyed overnight and being literally at the

19      -- on the day that the closing documents would

20      be signed, they pulled the plug on the deal and

21      terminated everybody.

22              Not everybody in our group had been

23      invited to participate in the new firm.

24      Frankly, I don't remember whether Michael Barr

25      was one of the participants, but certainly the

FILED: NEW YORK COUNTY CLERK 08/13/2018 01:47 PM
INDEX NO. 159781/2014
NYSCEF DOC. NO. 142
RECEIVED NYSCEF: 08/13/2018
19-12346-shl   Doc 55-5   Filed 09/05/19   Entered 09/05/19 18:22:01   Exhibit C
Part 3   Pg 74 of 216

Page 74

1          J. L. Liddle

2  vast, vast majority were going to be

3  participants in that, so it came as a shock.

4          They made a lot of claims at the time

5  as to Robertson Stephens that would diminish the

6  value of equity in Robertson Stephens, and

7  definitely diminish the prospect for receiving

8  bonus compensation.  So that had been going on

9  for months.

10          And that if there's a strategic

11  reason, yes, you want to have at least a minimal

12  fair claim out there.

13      Q.    Was that strategic purpose discussed

14  with the members of the claimant group?

15      A.    I'm sure it was discussed with some

16  of them, yes.

17      Q.    How are you sure?

18      A.    Because I know that I had people

19  commenting to me about what was going to happen

20  with John Hechinger just writing an article

21  about that.

22      Q.    Who commented to you?

23      A.    I don't remember specifically.

24      Q.    Were they members of the claimant

25  group?

FILED: NEW YORK COUNTY CLERK 08/13/2018 01:47 PM
NYSCEF DOC. NO. 142

INDEX NO. 159781/2014

RECEIVED NYSCEF: 08/13/2018

19-12346-shl   Doc 55-5   Filed 09/05/19   Entered 09/05/19 18:22:01   Exhibit C
Part 3   Pg 75 of 216

Page 75

1                          J. L. Liddle

2        A.      Yes, I believe so.

3        Q.      Who did you talk to the most out of

4    the members of the claimant group?

5        A.      It was different people at different

6    time periods within the claimants.

7        Q.      You didn't talk to all 41 of them;

8    correct?

9        A.      Well, at sometime or another, I spoke

10   to everyone.  Whether I spoke to them, you know,

11   specifically about their claims or not, that was

12   not feasible in the circumstance.

13       Q.      But you spoke to more of them -- you

14   spoke to some of them more than others; correct?

15       A.      Yes, but we also held these

16   conference calls, etcetera, for anybody who's in

17   the firm is involved in it.

18       Q.      Do you have a recollection of a

19   conference call where the strategic purpose of

20   using the press was discussed?

21       A.      I don't have a recollection of a

22   conference call where that happened.

23       Q.      Do you have a recollection of

24   discussing the use of the press with attorneys

25   in your office in connection with this matter?

FILED: NEW YORK COUNTY CLERK 08/13/2018 01:47 PM INDEX NO. 159781/2014

NYSCEF DOC. NO. 142                                          RECEIVED NYSCEF: 08/13/2018

Page 76

1                      J. L. Liddle

2       A.      In connection with this matter?

3       Q.      Yes.

4       A.      Probably.  I don't have a

5   recollection, per se, but I'm sure there were

6   probably discussions.

7              MR. HELLER:  Let's take a few minute

8         break, about 5 minutes, and we'll get back.

9              (Brief recess taken.)

10  FURTHER EXAMINATION

11  BY MR. HELLER:

12             MR. HELLER:  Read back the last

13         question and answer.

14             COURT REPORTER:  "Do you have a

15         recollection of discussing the use of the

16         press with attorneys in your office in

17         connection with this matter?"

18             Answer: "In connection with this

19         matter?"

20             Question:  "Yes."

21             Answer:  "Probably.  I don't have a

22         recollection, per se, but I'm sure there

23         were probably discussions."

24      Q.    I don't know if I asked this, but do

25  you recall having a discussion with any members

FILED: NEW YORK COUNTY CLERK 08/13/2018 01:47 PM
INDEX NO. 159781/2014
NYSCEF DOC. NO. 142
RECEIVED NYSCEF: 08/13/2018

19-12346-shl    Doc 55-5    Filed 09/05/19    Entered 09/05/19 18:22:01    Exhibit C
Part 3    Pg 77 of 216

Page 77

1                         J. L. Liddle

2     of the claimants group regarding use of the

3     press in connection with this matter?

4          A.    At what time?

5          Q.    Prior to The Wall Street Journal

6     article.

7          A.    Well, I -- I couldn't tell you

8     specifically who it was, but as I described

9     earlier, I believe there were discussions

10    leading up to this that included -- included

11    where they were initiated by me or initiated by

12    people in the group about the kind of -- I don't

13    whether they were initiated by me or initiated

14    by claimant, but there were people who were as

15    concerned as I was about --

16         Q.    Do you know if Mr. Barr took part in

17    those discussions?

18         A.    I don't.

19         Q.    Turning to Plaintiff's Exhibit 6,

20    which is the e-mail from Christine Palmieri to

21    Susanne Craig?

22         A.    Yes.

23         Q.    And the last two pages contain a

24    document that is called a Press Release.

25               Did you draft this press release?

Page 78

1                    J. L. Liddle

2        A.     No, I told you I didn't even really

3    recollect this press release until, you know,

4    you showed it to me today.

5               It makes sense that there was a press

6    release, as the transmittal says, "as well as a

7    press release," but I didn't draft it.

8        Q.     Do you recall authorizing the

9    creation of a press release in connection with

10   this matter?

11       A.     I don't recall that.

12       Q.     Who from the firm, other than you,

13   would have authorized a press release in

14   connection with the Robertson Stephens matter?

15       A.     Authorized a press release?

16       Q.     Yes.

17       A.     It would be unlikely that it would be

18   somebody else.  On the other hand, over many

19   years of protesting that I should coordinate all

20   press contents on every subject, that's one of

21   those rules that's broken more often than not.

22       Q.     We'll take it back to 2002, however.

23               Was there a conflict -- I'm missing a

24   few words --

25       A.     I don't remember any conflict.  I

Page 79

1                    J. L. Liddle

2    just don't remember whether or not this press

3    release -- I didn't recollect it, and I

4    certainly don't recollect whether one was

5    actually sent out.

6         Q.    Okay, but you have no reason to

7    believe that one was not sent to Susanne Craig?

8         A.    I have no reason to believe one way

9    or the other.  All I can do is say is I believe

10   this and it sounds like one was sent.

11        Q.    Did you have any discussions with

12   Christine Palmieri about the e-mail that she

13   sent to Susanne Craig?

14             Do you recall any conversations you

15   had with her?

16        A.    No, and as I told you before, I'm not

17   copied on it so --

18             MR. HELLER:  Mark this 8.

19             (Plaintiff's Exhibit 8, an e-mail

20        from Christine Palmieri to Susanne Craig

21        dated December 10, 2006 at 6:11 p.m. with an

22        attachment, marked for identification, as of

23        this date.)

24        Q.    Mr. Liddle, placed before you is a

25   document that's marked as Plaintiff's Exhibit 8

19-12346-shl   Doc 55-5   Filed 09/05/19   Entered 09/05/19 18:22:01   Exhibit C
Part 3   Pg 80 of 216

Page 80

1                    J. L. Liddle

2    which appears to be an e-mail from

3    Christine Palmieri to Susanne Craig dated

4    December 10, 2006 at 6:11 p.m.

5              And the document attaches a revised

6    press release with the statement, "Please

7    discard the version e-mailed to you earlier."

8              Have you ever seen this document

9    before?

10        A.    I might have, but I have absolutely

11   no recollection of it.

12        Q.    Do you recall any conversations that

13   you had with Ms. Palmieri regarding a revised

14   press release sent to Ms. Craig on December

15   10th?

16        A.    I don't have any recollections of

17   a -- of the original or a revision of this, much

18   less any conversations about it.

19        Q.    Do you recall having discussions

20   prior to December 12, 2002 with any of the

21   members of the claimant group regarding use of

22   press releases in connection with this matter?

23        A.    No, and I don't have any recollection

24   of actually having sent a press release.

25        Q.    Were any copies of the statement of

Page 81

1                       J. L. Liddle

2    claim sent to any other newspapers before it was

3    filed?

4          A.    I don't know.

5                MR. HELLER:  Mark this.

6                (Plaintiff's Exhibit 9, a time

7          sensitive memorandum marked URGENT from to

8          JLL from CAP dated 12/10/2002, marked for

9          identification, as of this date.)

10         Q.    Mr. Liddle, placed before you is a

11   document that's marked as Plaintiff's Exhibit 9

12   for identification.  It's a time sensitive

13   memorandum marked URGENT from to JLL from CAP

14   dated 12/10/2002.

15                Do you recognize the handwriting on

16   this document?

17         A.    I don't recognize URGENT.  I

18   recognize to CAP, that's Christine A. Palmieri.

19   That's my handwriting.  Yes, looks to me to be

20   my handwriting.

21                The circle with the arrow, I have no

22   idea why that's there, "give her background, but

23   no opinion."  Can I read it?

24         Q.    Yes.

25         A.    Okay.

FILED: NEW YORK COUNTY CLERK 08/13/2018 01:47 PM
INDEX NO. 159781/2014

NYSCEF DOC. NO. 142

19-12346-shl    Doc 55-5    Filed 09/05/19    Entered 09/05/19 18:22:01    Exhibit C
Part 3    Pg 82 of 216

RECEIVED NYSCEF: 08/13/2018

Page 82

1                           J. L. Liddle

2          Q.     Do you recall -- do you recognize

3     this document?

4          A.     I don't recognize the document, but I

5     recognize my handwriting in places where it is.

6          Q.     Do you recall receiving a time

7     sensitive memorandum from CAP regarding

8     Robertson Stephens in about December 10, 2002?

9          A.     I just answered that question.

10         Q.     I want to make sure we're clear.

11         A.     You're referring to Exhibit 9 again

12    and the answer is the same as it was a minute

13    ago.

14         Q.     Just making sure I have it right.

15                Do you know why you would tell

16    Ms. Palmieri to give Ms. Craig background and no

17    opinion?

18         A.     Yeah.

19         Q.     Why?

20         A.     Because I wanted the only information

21    that would go out of our office about this case

22    to be consistent, and that would be the contents

23    of the statement of claim.

24         Q.     The document speaks of --

25                MR. HELLER:   Strike that.

Page 83

1                         J. L. Liddle

2           Q.     Was the press release consistent with

3     the statement of claim?

4           A.     I haven't had a chance to read either

5     press release and compare it to the statement of

6     claim.

7           Q.     The memorandum speaks of the fact

8     that Ms. Palmieri did not tell Ms. Craig that

9     you, Jeff Liddle, want to hand deliver a copy to

10    Gretchen Morgenson at The New York Times.

11                 Who is Gretchen Morgenson at The New

12    York Times?

13          A.     She was a financial page reporter who

14    was in the process of covering a number of

15    stories related to cases that we had.

16          Q.     Why were you delivering another copy

17    to Gretchen Morgenson?

18          A.     I would presume because at the time,

19    we had a very strong relationship with her and

20    we wanted to know if they had an interest in

21    covering this.

22          Q.     Did she have any relationship with

23    the co-author of Ms. Craig's article?

24          A.     Not that I know of.  She worked for a

25    different entity.

FILED: NEW YORK COUNTY CLERK 08/13/2018 01:47 PM

INDEX NO. 159781/2014

NYSCEF DOC. NO. 142

RECEIVED NYSCEF: 08/13/2018

19-12346-shl   Doc 55-5   Filed 09/05/19   Entered 09/05/19 18:22:01   Exhibit C
Part 3   Pg 84 of 216

Page 84

1              J. L. Liddle

2         Q.    So delivering the statement of claim

3    to Ms. Morgenson did not have the ability to

4    counteract anything that this Boston-based

5    author was say?

6         A.    It was probably best stated that it

7    was not going to be something interesting to The

8    New York Times because Fleet was in Boston;

9    Robertson Stephens was in San Francisco, you

10   know, it closed down, but that's because we had

11   a very strong relationship with

12   Gretchen Morgenson, as well as many people,

13   journalists.  They were always having issues

14   that they felt one was getting the scoop or not.

15        Q.    Did you tell Ms. Craig that we're

16   also sending the statement of claim to The New

17   York Times?

18        A.    I don't know.  From this memo, it

19   looks like maybe not, but I don't know.

20        Q.    Did Ms. Craig find out after the fact

21   that the statement of claim you also gave to The

22   New York Times?

23        A.    I don't know.  I have no idea.  I

24   don't recollect The New York Times getting

25   anything by way of --

FILED: NEW YORK COUNTY CLERK 08/13/2018 01:47 PM

```
                                            Page 85

 1                      J. L. Liddle

 2        Q.      How do you normally communicate --

 3                MR. HELLER:  Strike that.

 4        Q.      In 2002, how did you communicate with

 5     your colleagues at Robertson Stephens -- at

 6     Liddle & Robinson?

 7                MR. HARRIS:  Objection to the form of

 8          the question.

 9        A.      How did I communicate with them?

10        Q.      Was it memoranda --

11        A.      It was all verbal communication.  And

12     by verbal, I mean in its actual sense.

13        Q.      Did you communicate by e-mail?

14        A.      I guess sometimes.  I'm not a typist.

15     I'm the last -- the last year where not typing

16     was a virtue.  It cost me a lot of money in

17     college, in law school to hire typists.

18                But I don't type very well, as you

19     can see from the Blackberry.  So e-mails are not

20     my thing.

21        Q.      So mostly communications were verbal

22     with your colleagues?

23        A.      Oral.  Verbal would include

24     everything.

25        Q.      Right, so oral communications, were
```

FILED: NEW YORK COUNTY CLERK 08/13/2018 01:47 PM
INDEX NO. 159781/2014
NYSCEF DOC. NO. 142
19-12346-shl    Doc 55-5    Filed 09/05/19    Entered 09/05/19 18:22:01    Exhibit C
RECEIVED NYSCEF: 08/13/2018
Part 3    Pg 86 of 216

Page 86

1                    J. L. Liddle

2    they followed up with memoranda?

3        A.    Written by me?

4        Q.    Yes.

5        A.    Very infrequent.

6        Q.    Did your colleagues follow up with

7    memoranda to you to confirm conversations kind

8    of like what Ms. Palmieri did?

9            MR. HELLER:  Strike that.  She didn't

10        do that in connection with conversations, so

11        bad question.

12        Q.    Did your colleagues follow up with

13    written memoranda to you to set forth the

14    substance of conversations that you two had?

15        A.    You're not referring to 9 now?

16        Q.    I'm not I'm referring to -- I'm

17    referring generally and back in 2002?

18        A.    I guess sometime, but I would say

19    that this is not a -- it's not like a mandated

20    protocol.  It's a relatively small firm.

21        Q.    Prior it the filing of the statement

22    of claim, did anyone from your firm investigate

23    whether all the claimants had the same claims,

24    the same type of claim?

25        A.    Yes.

FILED: NEW YORK COUNTY CLERK 08/13/2018 01:47 PM
INDEX NO. 159781/2014

NYSCEF DOC. NO. 142
19-12346-shl   Doc 55-5   Filed 09/05/19   Entered 09/05/19 18:22:01   Exhibit C
RECEIVED NYSCEF: 08/13/2018
Part 3   Pg 87 of 216

Page 87

1                       J. L. Liddle

2        Q.    Did all of the claimants have the

3    same types of claims?

4        A.    Well, it's a very complicated

5    question.  The answer is that not everybody had

6    every claim, but later on, it became even more

7    diverse than that.

8        Q.    Did you discuss with any members of

9    the claimant group about having conflict waivers

10   executed?

11       A.    I don't remember.  But that issue

12   only arose in the context that was completely

13   dictated by New York's Code of Professional

14   Responsibility at the time, and we observed

15   that.

16       Q.    So is it your belief that at the time

17   this statement of claim was filed, there was no

18   need to get conflict waivers under the New York

19   State Code of Professionalism?

20       A.    None of them were suing each other

21   and none of them had any issue of if this one

22   got such and such, that that was taking it from

23   one of the other claimants.

24             So the answer is no, and there was

25   no -- no conflict as far as I can tell.

Page 88

1                    J. L. Liddle

2         Q.    Did later on during the course of

3    your representation, did a conflict arise among

4    the members of the claimant group?

5         A.    It arose in a way that I had

6    mentioned earlier at the point of the settlement

7    offer.

8         Q.    What was that settlement offer?

9         A.    The settlement offer made by Fleet to

10   then Banc of America to settle the case.

11        Q.    Do you recall when that offer was

12   made?

13        A.    I know it was fairly late into the

14   process.  I'm trying to remember whether it was

15   just before summations or -- but it was fairly

16   late into the process.

17             Because I remember trying to evaluate

18   it and talking to people and I believe, although

19   I don't believe handled the direct

20   communication, I may have, I believe that their

21   client was a person who because of his

22   reluctance to agree to how that should be

23   handled, that we were unable to accept the

24   settlement offer.

25        Q.    Was it only my client that you had

Page 89

1                        J. L. Liddle

2    any problem with how settlement would be

3    handled?

4         A.    No, there were people who had

5    problems with it because of what your client

6    wanted, and they had problems with his claim

7    dictating the result of the settlement because

8    of it.

9         Q.    Were there others whose deferred

10   compensation, who had the same problem in that

11   my client had with regards to the settlement --

12        A.    Not that I'm aware of, but you know,

13   the issue arose in the context of there being,

14   by the time we're getting to that stage, I think

15   as many as 9 different claims that an individual

16   could have.  I'm not sure that anybody had more

17   than 7, but a direct match of this claim and

18   your claimant's claim was almost nonexistent.

19             There were maybe a couple who had

20   just this or that, but then the same -- same

21   claims were held by somebody else.

22             So the Banc of America only wanted to

23   offer a lump sum.  And a conflict waiver that

24   you were talking about earlier would have gotten

25   no bearing whatsoever on issue that arose, so

FILED: NEW YORK COUNTY CLERK 08/13/2018 01:47 PM
NYSCEF DOC. NO. 142

INDEX NO. 159781/2014

RECEIVED NYSCEF: 08/13/2018

19-12346-shl   Doc 55-5   Filed 09/05/19   Entered 09/05/19 18:22:01   Exhibit C
Part 3   Pg 90 of 216

Page 90

1                      J. L. Liddle

2      don't confuse that.

3                      The issue was New York had a very

4      specific rule with regard to multi-client

5      representations as to what the lawyer could do

6      in accepting a general settlement proposal.

7                      The lawyer could not accept the

8      general settlement proposal, and we asked them

9      repeatedly to make individual offers which was

10     what we had to do in New York.

11                     They were under the model code in

12     Massachusetts, and they refused to do it because

13     the model code would allow the acceptance of a

14     general settlement proposal, and then the fun, I

15     guess, would begin between the lawyer for the

16     various claimants and the claimants.  I'm saying

17     that factiously because it's not fun at all.

18                     And so that -- that really is the

19     issue.  Your client wanted to be paid a hundred

20     percent of his CEP, and that would have been --

21     on a pro rata basis, that would have been about,

22     my recollection is maybe two times, something

23     like that, two times what a pro rata share of

24     that number would have been, and others felt

25     that our arbitration, especially with the Boston

FILED: NEW YORK COUNTY CLERK 08/13/2018 01:47 PM
INDEX NO. 159781/2014

19-12346-shl   Doc 55-5   Filed 09/05/19   Entered 09/05/19 18:22:01   Exhibit C

NYSCEF DOC. NO. 142

Part 3   Pg 91 of 216

RECEIVED NYSCEF: 08/13/2018

1                          J. L. Liddle

2      case hanging over us and the unwillingness of

3      Fleet to sign a submission agreement, that this

4      arbitration was probably -- had a heavy risk of

5      not resolving these claims like a CEP claim.

6                  So they wanted to get their very

7      sizable bonus claims considered at the front of

8      the queue, and so there were these groups, and

9      we were unable to do that.

10                 And the result later on was that the

11     total amount, although it was $23 million, was

12     not -- was not as much as the generalized offer

13     that was provided.

14         Q.    Do you have any copies of any

15     documents relating to the generalized offer that

16     was made?

17         A.    I don't know.  I mean I don't -- I

18     don't think that they put a number in writing,

19     but the offer -- they did offer $25 million.

20                 If they had a confidentiality

21     agreement, that definitely is treated as

22     confidential.

23                 MR. HELLER:  I think we have a

24          confidentiality agreement.  If not, we'll

25          look.

FILED: NEW YORK COUNTY CLERK 08/13/2018 01:47 PM
INDEX NO. 159781/2014
NYSCEF DOC. NO. 142                                    RECEIVED NYSCEF: 08/13/2018

1                      J. L. Liddle

2          Q.    Did there come a time that RSI sent a

3     letter to some or all of the claimants canceling

4     the deferred compensation proposal?

5          A.    I have a recollection of that, but I

6     don't think your facts are completely accurate.

7                I think that they sent a letter to,

8     if I remember correctly, 57 people.  42 of whom

9     were our clients and 15 of them were not our

10    clients, canceling deferred compensation.

11         Q.    Do you recall when that letter was

12    sent?

13         A.    I'm thinking in the second quarter of

14    2003 or '04.  And there were, and I'm not sure

15    that this is the first thing because what I'm

16    thinking is, is that prior to that, they tried

17    and they wanted to settle the CEP claims.

18                So chronologically, I feel a little

19    comfortable just taking this letter because we

20    did not receive -- my recollection is that we --

21    oh, okay, this is a letter that I believe had

22    with it some other stuff from the rest of this

23    stuff.

24                MR. HELLER:  Why don't we mark this

25         Exhibit 10.

FILED: NEW YORK COUNTY CLERK 08/13/2018 01:47 PM
INDEX NO. 159781/2014
NYSCEF DOC. NO. 142
RECEIVED NYSCEF: 08/13/2018
19-12346-shl   Doc 55-5   Filed 09/05/19   Entered 09/05/19 18:22:01   Exhibit C
Part 3   Pg 93 of 216

Page 93

1                     J. L. Liddle

2               (Plaintiff's Exhibit 10, a document,

3          marked for identification, as of this

4          date.)

5          A.     The question was did there come a

6     time when --

7          Q.     I'll ask it.

8          A.     No, I don't want to leave a

9     misimpression --

10         Q.     Okay.

11         A.     -- because I'm -- I had in mind

12    something different from this.  This is not a

13    letter that we received.

14         Q.     Okay.

15         A.     It was never sent to us, but this is

16    a letter that was sent out and I believe went to

17    all 57 people.

18         Q.     Right, and I believe that's what

19    you're referring to so I'm glad you clarified,

20    so --

21         A.     And this letter I believe had stuff

22    with it, but I'm not sure.

23         Q.     You mentioned some other documents

24    that -- other than this letter?

25         A.     Right.

FILED: NEW YORK COUNTY CLERK 08/13/2018 01:47 PM
NYSCEF DOC. NO. 142

INDEX NO. 159781/2014

RECEIVED NYSCEF: 08/13/2018

19-12346-shl   Doc 55-5   Filed 09/05/19   Entered 09/05/19 18:22:01   Exhibit C
Part 3   Pg 94 of 216

Page 94

1                    J. L. Liddle

2        Q.     Can you tell me about that document?

3        A.     Well, what I recollect is, is that

4    either somebody got this letter, and I now in

5    Michael's case he got the letter and he made the

6    call, and I'm fairly certain, from what I heard,

7    that he made the call prior to talking to us.

8              He was given an opportunity to get

9    his CEP if he would give them a general release

10   of all of his claims in the arbitration and sign

11   an affidavit that they prepared that, among

12   other things, stated that he had not disparaged

13   Fleet.

14       Q.     How did you find out about that

15   conversation?

16       A.     Well, ultimately, he told us.  And I

17   don't think he told me precisely.  I think he

18   told somebody else in the firm who relayed it to

19   me.

20             I think there were a couple, not very

21   many, who made this call.  I'm not sure that

22   there was anybody else who just called without

23   talking to us first.

24       Q.     Did you have any reaction to the fact

25   that this proposal was made to Mr. Barr?

Page 95

1                    J. L. Liddle

2         A.    I had a reaction to the fact that

3    they would write a letter to somebody they knew

4    who was of an adverse interest, that the letter

5    would be written by and mention their lawyers.

6    Under New York law and under the model code,

7    somebody who himself, a lawyer, who directly or

8    indirectly himself or through another,

9    communicates with one of adverse interest

10   without receiving permission of the existing

11   counsel, has violated a code of professional

12   responsibility.

13        Q.    Did you or anyone else from your firm

14   put Fleet or Robertson Stephens or their counsel

15   on notice of the fact that this was improper?

16        A.    Absolutely.

17        Q.    How were they put on notice?

18        A.    We filed a grievance against them

19   after asking how they -- why they did this.

20   RQ          MR. HELLER:  I want copies of the

21        grievance that was filed against Robertson

22        Stephens, Fleet and/or their counsel.

23        A.    It was against their counsel.  It's

24   not McChesney, it was a guy Joe something or

25   other.

FILED: NEW YORK COUNTY CLERK 08/13/2018 01:47 PM
INDEX NO. 159781/2014

NYSCEF DOC. NO. 142

19-12346-shl    Doc 55-5    Filed 09/05/19    Entered 09/05/19 18:22:01    Exhibit C
Part 3    Pg 96 of 216

RECEIVED NYSCEF: 08/13/2018

Page 96

1                   J. L. Liddle

2          MR. HARRIS:  The letter, we'll take

3      it under advisement.

4          A.    I'm not sure we can just give out a

5      grievance.

6          MR. HELLER:  We'll figure that out.

7      Maybe this is a good time to break, have

8      your lunch and then we'll finish up.

9          (Luncheon recess:  1:01 p.m.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

19-12346-shl    Doc 55-5    Filed 09/05/19    Entered 09/05/19 18:22:01    Exhibit C
Part 3    Pg 97 of 216

                                                    Page 97

1                          J. L. Liddle

2            A F T E R N O O N   S E S S I O N

3                  (Time noted:  1:42 p.m.)

4    J E F F R E Y   L.   L I D D L E,   resumed and

5    testified as follows:

6    CONTINUED EXAMINATION

7    BY MR. HELLER:

8         Q.    Let's go back to Plaintiff's Exhibit

9    10, the May 2, 2003 letter.

10              Have you ever seen a copy of the May

11   2, 2003 letter either to Michael Barr or to

12   another one of the other claimants in the RSI --

13        A.    Have I ever seen it before you gave

14   me --

15        Q.    Yes.

16        A.    Yeah.

17        Q.    When did you first see this document

18   or one similar to the one that I just placed

19   before you?

20        A.    I would say shortly after this.

21        Q.    After you received this --

22              THE WITNESS:  Maybe we should take a

23        very, very quick break here.

24              (Brief recess taken.)

25   FURTHER EXAMINATION

FILED: NEW YORK COUNTY CLERK 08/13/2018 01:47 PM
INDEX NO. 159781/2014
NYSCEF DOC. NO. 142
RECEIVED NYSCEF: 08/13/2018

19-12346-shl   Doc 55-5   Filed 09/05/19   Entered 09/05/19 18:22:01   Exhibit C
Part 3   Pg 98 of 216

Page 98

1                    J. L. Liddle

2      BY MR. HELLER:

3          Q.    So, Mr. Liddle, I direct your

4      attention to the first paragraph where it

5      begins, "Please be advised that Robertson

6      Stephens Group, Inc. ("RSGI") has reviewed the

7      above plans and agreement and has determined

8      that you are due no payments or awards of stock

9      as a result of actions taken in violation of

10     Section 8.1 of the Cash Equivalent Plans,

11     Section 4.6 of the Restricted Unit Plan, and

12     Section 8 of the Restricted Unit

13     Award Agreement."

14              Do you see that?

15         A.    Yes.

16         Q.    Do you know what they were referring

17     to at that time?

18              MR. HARRIS:   In reference to what?

19              MR. HELLER:   In reference to the

20          violation.

21              MR. HARRIS:   It refers to a lot of

22          things here.

23         Q.    It says you're due no payments or

24     awards because of a violation.

25              What violation were they referring

19-12346-shl   Doc 55-5   Filed 09/05/19   Entered 09/05/19 18:22:01   Exhibit C
Part 3   Pg 99 of 216

1                           J. L. Liddle

2       to?

3            A.    Well, as I said before, these weren't

4       sent to us.  I think by the time that I learned

5       about this, it was after somebody, whether it

6       was Michael or somebody else, had called, and as

7       I said before, there's other -- other documents.

8                    There's the affidavit of release and

9       I think there might have been either just before

10      or just after this, some other kind of letter.

11      So it would be a guessing game.

12                   But certainly around the time I first

13      saw this in the context of other things and

14      conversations that everybody had, I became aware

15      that they were talking about this issue of

16      disparagement.

17           Q.    So regarding documents that you

18      believe were exchanged at or about the same

19      time, you mentioned an affidavit and some other

20      documents, I do not believe those were produced

21      to us, so those that I mentioned previously --

22           A.    They weren't produced to us.  They

23      were sent to him after he called them without

24      talking to us.  So he should have them.

25                   MR. HARRIS:  He meaning?

FILED: NEW YORK COUNTY CLERK 08/13/2018 01:47 PM
INDEX NO. 159781/2014
NYSCEF DOC. NO. 142
RECEIVED NYSCEF: 08/13/2018

19-12346-shl    Doc 55-5    Filed 09/05/19    Entered 09/05/19 18:22:01    Exhibit C
Part 3    Pg 100 of 216

Page 100

1                        J. L. Liddle

2                 THE WITNESS:  He meaning Michael

3        Barr.

4            Q.    The documents that were sent to

5        Mr. Barr, have you ever seen a copy of those

6        documents?

7            A.    I'm not sure if it was Mr. Barr's or

8        somebody else's, but he certainly would have had

9        access to them.

10           Q.    Do you know for a fact that he got

11       those documents?

12           A.    I don't know that for a fact.

13   RQ    Q.    So I ask that you produce the

14       documents that were given to you by the others

15       relating to this affidavit and offer --

16           A.    Are you saying that you didn't get

17       it?

18           Q.    I'm not saying anything.  Are you

19       questioning me or am I questioning you?

20           A.    Well, because you're asking me to

21       search a file that's probably literally hundreds

22       of linear feet in length for stuff that was 13

23       years ago that did not become part of our case

24       with people I'm not sure who actually gave me

25       this.

FILED: NEW YORK COUNTY CLERK 08/13/2018 01:47 PM
INDEX NO. 159781/2014
NYSCEF DOC. NO. 142
RECEIVED NYSCEF: 08/13/2018

19-12346-shl   Doc 55-5   Filed 09/05/19   Entered 09/05/19 18:22:01   Exhibit C
Part 3   Pg 101 of 216

Page 101

1                         J. L. Liddle

2                And I'm asking you if you already

3       have them, and why don't we just use yours.  So

4       if you tell me that you -- if you're

5       representing to me that he didn't get these

6       things, then that's --

7                MR. HELLER:  I'm not representing

8            anything.  I make my request, and you're

9            able counsel will determine -- he'll take my

10           request under advisement, just like any

11           other counsel will do, and then when I make

12           the request in writing, we'll have a

13           discussion about it, which we're required to

14           do, and then he will decide whether you have

15           to supply it.

16                And if we have it, then we'll make a

17           determination whether you still have to

18           provide it.

19                MR. HARRIS:  Well, all right, we'll

20           discuss that.  I'm not so sure it's relevant

21           to anything.

22                MR. HELLER:  Whatever, and --

23           Q.    Right, so you had mentioned before

24       this whole discussion about these documents that

25       this is when you found out that an issue of

FILED: NEW YORK COUNTY CLERK 08/13/2018 01:47 PM
INDEX NO. 159781/2014
NYSCEF DOC. NO. 142
19-12346-shl   Doc 55-5   Filed 09/05/19   Entered 09/05/19 18:22:01   Exhibit C
Part 3   Pg 102 of 216
RECEIVED NYSCEF: 08/13/2018

1              J. L. Liddle

2    disparagement came up?

3         A.    I believe so.  I'm not a hundred

4    percent sure.  I have a very, very vague

5    recollection of this, but, yes.

6         Q.    Okay, so please tell me what the

7    issue of disparagement was regarding that, what

8    was the issue?

9         A.    Well, the issue was that they were

10   asserting that I -- I'm not sure this was in a

11   document, but it had been said to somebody that

12   they were asserting that the problem that they

13   thought existed related to the article in The

14   Wall Street Journal.

15           Now I'm not sure whether that was in

16   May or in June or whenever, but it was sometime

17   after these events started, and that would be

18   the first time I ever heard of that.

19        Q.    Were there any other issues of

20   disparagement other than this Wall Street

21   Journal article?

22        A.    I think there might have been.  And

23   now that you asked the question, there might

24   have been issues about what people were saying.

25   I think there were issues -- well, I'm not sure.

19-12346-shl   Doc 55-5   Filed 09/05/19   Entered 09/05/19 18:22:01   Exhibit C
Part 3   Pg 103 of 216

Page 103

1                        J. L. Liddle

2              But I think that now that you ask the

3      question, that there may have been other

4      situations in which they felt they were being

5      disparaged.

6          Q.    As you sit here today, do you have a

7      specific recollection of those other issues of

8      disparagement?

9          A.    I don't.

10         Q.    How did you find out that there was a

11     specific issue with The Wall Street Journal

12     article that caused this claim of disparagement?

13         A.    I'm going to say that the best

14     recollection I have of that was somebody in our

15     firm mentioned it to me.

16         Q.    But you don't recall who?

17         A.    I would be guessing.

18         Q.    After you found out that there was an

19     issue of disparagement relating to The Wall

20     Street Journal, did you have any discussions

21     with the claimant group about that issue?

22         A.    I have a recollection of having had

23     probably one of those calls.

24         Q.    Did you have any discussions with the

25     lawyers in your office about the issue of

FILED: NEW YORK COUNTY CLERK 08/13/2018 01:47 PM
NYSCEF DOC. NO. 142

INDEX NO. 159781/2014

RECEIVED NYSCEF: 08/13/2018

19-12346-shl   Doc 55-5   Filed 09/05/19   Entered 09/05/19 18:22:01   Exhibit C
Part 3   Pg 104 of 216

Page 104

1                          J. L. Liddle

2       disparagement after this May 2 letter was sent?

3            A.    I'm sure we had discussions after May

4       2, 2003.  It's just when and I'm not sure.

5            Q.    Did you believe that there was an

6       issue of disparagement?

7            A.    Well, you've been a lawyer, I guess,

8       for a few years, so you know that anybody can

9       say anything about anything and they can then

10      declare it to be an issue.

11                 But I didn't think that the article,

12      which incidentally, as I recollect it, was the

13      print copy of the article, not the one you gave

14      me earlier -- I didn't think that the article

15      disparaged Fleet or Robertson Stephens.

16           Q.    Did you put that article up on your

17      website, the Liddle & Robinson website?

18           A.    I don't put anything on the website.

19      I don't even know --

20           Q.    I'll re-ask the question since you're

21      such a great typist.

22           A.    If I can't type, I'm not posting

23      things on the website.

24           Q.    Right.

25                 Did anyone on behalf of Liddle &

FILED: NEW YORK COUNTY CLERK 08/13/2018 01:47 PM
INDEX NO. 159781/2014
NYSCEF DOC. NO. 142
RECEIVED NYSCEF: 08/13/2018

19-12346-shl   Doc 55-5   Filed 09/05/19   Entered 09/05/19 18:22:01   Exhibit C
Part 3   Pg 105 of 216

Page 105

1              J. L. Liddle

2    Robinson put the December 12, 2002 Wall Street

3    Journal article regarding Robertson Stephens on

4    the Liddle & Robinson website?

5         A.    I don't know.

6         Q.    Do you know if it was ever on your

7    website?

8         A.    I don't know.

9         Q.    Is there anyone in your office in

10   charge of the website?

11        A.    Well, whomever was in charge of the

12   website then, assuming we had a website then,

13   which is not an assumption that I'm yet ready to

14   make --

15        Q.    You did.

16        A.    -- that the website, you know, person

17   here has changed several times.  And my best

18   recollection would be the person who would have

19   been in the early days of the website left here

20   in 2012.

21        Q.    Who decides what goes on the

22   company's website?

23        A.    I don't think there's any one person

24   who decides what goes on it.  I mean there's

25   certain things that have regularly been put on

Page 106

1                        J. L. Liddle

2     the website, bios of attorneys, case results

3     that are sort of organized in this database of

4     -- by subject matter generally, and then I guess

5     sometimes there have been articles or references

6     to articles, but the website, you know, tended

7     to provide information to people about what we

8     do.

9                  And since what we do, in large part,

10    is become, you know, is very difficult to

11    describe just in the traditional term of using

12    one word for it, the website helps to clarify

13    that.

14                  (Plaintiff's Exhibit 11, a letter

15            from Jeffrey L. Liddle dated May 13, 2003

16            in reference to Alt against FleetBoston,

17            marked for identification, as of this

18            date.)

19            Q.    Mr. Liddle, placed before you is what

20    has been marked as Plaintiff's Exhibit 11 for

21    identification.

22                  It's a letter dated May 13, 2003.

23    The re is Alt against FleetBoston, and it's a

24    letter that appears to be from you to the

25    clients.

1                    J. L. Liddle

2            Do you recognize this document?

3        A.    Let me take a quick look at it here.

4    I don't recognize the letter, but it's pretty

5    consistent with my general recollection that

6    I've just described.

7        Q.    So I'm directing your attention to

8    the second paragraph that says, "We believe the

9    May 2 letter to be unfounded and merely a heavy

10   handed tactic to try to convince you to give up

11   on enforcing your rights."

12           Why did you believe the May 2 letter

13   to be unfounded?

14       A.    Well, because we did not believe that

15   any -- anybody had a will there that violated

16   Section 8.1 of the cash equivalent plan and the

17   other sections, and it was clearly at least from

18   the other information that we received, aimed at

19   trying to pay what they already agreed to pay

20   almost a year earlier so that they could get a

21   release from these people of all their other

22   claims.

23           And they asked two questions to be

24   put to Elaine McChesney, although it says that

25   she's the contact counsel for RSGI, she was the

Page 108

1                        J. L. Liddle

2      number two person and we were told was going to

3      be the trial person representing RSI in the --

4      in the arbitration.

5                   And Lisa Bisaccia was a primary

6      witness because she had at least led the

7      discussion out in California on July 17 or so in

8      which she informed everybody that there was --

9      we were told that she informed everyone that

10     these plans would be paid whether or not they

11     signed a release.

12                  So, of course, their provision in

13     the -- in the separation agreement and general

14     release, that's what they want.

15                  So now months later, they want a

16     release of all these claims after having said

17     that they didn't need one, and having time pass

18     with nothing that appeared to us to violate the

19     section.

20          Q.     Earlier on in your answer, you had

21     mentioned that the claimant had not violated, in

22     your belief, the non-disparagement clauses?

23          A.     Correct.

24          Q.     Are you referring simply to

25     individual claimants making statements or did

FILED: NEW YORK COUNTY CLERK 08/13/2018 01:47 PM
INDEX NO. 159781/2014

NYSCEF DOC. NO. 142

19-12346-shl   Doc 55-5   Filed 09/05/19   Entered 09/05/19 18:22:01   Exhibit C

RECEIVED NYSCEF: 08/13/2018

Part 3   Pg 109 of 216

1                    J. L. Liddle

2    that include your firm on behalf of the

3    claimants?

4         A.    I wasn't a party to any of these

5    grievances, but this was a contractual

6    provision.  And the contractual provision by its

7    own terms was not something that could be

8    violated in these circumstances.  I think I told

9    you that earlier.

10        Q.    I understand.

11        A.    So that's -- that's a good reason

12   right off the bat.

13        Q.    Okay.

14        A.    I don't think that anything that was

15   said was -- at any time was disparaging.

16   Certainly not toward them.

17             But the fact of the matter is that

18   disparagement was no longer an issue because the

19   provision didn't apply in these circumstances.

20        Q.    But that's not answering my question.

21        A.    I'm sorry, I thought that is

22   answering the question.

23        Q.    The question is did it make a

24   difference --

25             MR. HELLER:  Strike that.

FILED: NEW YORK COUNTY CLERK 08/13/2018 01:47 PM
NYSCEF DOC. NO. 142
INDEX NO. 159781/2014
RECEIVED NYSCEF: 08/13/2018

1                    J. L. Liddle

2        Q.    Assume for argument sake that the

3    non-disparagement clause was in effect?

4        A.    I can't assume that it wasn't.

5        Q.    I am for the question.  If you made

6    the remark or if claimants made the remark,

7    would it make a difference?

8             MR. HARRIS:  I'm not going to allow

9        him to answer that.

10       A.    That clause was not in effect.

11            MR. HARRIS:  No, no, no, no.

12       Q.    Did you represent the claimants?

13       A.    You know I represented the claimants.

14   I certainly didn't represent them with regard to

15   any of these documents at this point in time.

16            Each specifically cited an agreement

17   where they had each specifically requested that

18   we not represent them with regard to these

19   provisions.

20       Q.    Did you discuss --

21            MR. HELLER:  Strike that.

22       Q.    At the end of the letter you speak of

23   having a conference call.  Did that conference

24   call occur?

25       A.    I think it did.  I don't remember.  I

FILED: NEW YORK COUNTY CLERK 08/13/2018 01:47 PM
NYSCEF DOC. NO. 142

1                    J. L. Liddle

2       have a vague recollection before, that I

3       described to you, of having had a conference

4       call.

5            Q.    Other than where -- well, do you

6       recall participating in the conference call?

7            A.    I have a vague recollection of

8       participating in a conference call in which this

9       subject was discussed.

10           Q.    Who else --

11           A.    I cannot tell you that this was the

12      only subject because many of these conference

13      calls cover many, many subjects.

14           Q.    I'm not asking whether this was the

15      only subject.

16                 Did any other lawyer from your firm

17      participate in that conference call?

18           A.    I don't recall.

19           Q.    Do you recall which of the claimants

20      participated in the conference call?

21           A.    As I told you before, it would be a

22      call-in, be on a polycom in our old offices, I

23      believe, and I would hear a beep when somebody

24      came on and a beep when they came off.  And as

25      best as I could, I would try to take attendance,

FILED: NEW YORK COUNTY CLERK 08/13/2018 01:47 PM

INDEX NO. 159781/2014

NYSCEF DOC. NO.: 142

RECEIVED NYSCEF: 08/13/2018

19-12346-shl   Doc 55-5   Filed 09/05/19   Entered 09/05/19 18:22:01   Exhibit C
Part 3   Pg 112 of 216

Page 112

```
 1                    J. L. Liddle
 2   but the answer to your question is no.
 3        Q.    I was just going to ask you about
 4   attendance.  Was there an attendance sheet?
 5        A.    From time to time, we write down
 6   notes because we want to make sure everyone was
 7   secure as possible.
 8            And if there's a beep, we ask.  But I
 9   don't think there was anything that was as
10   formal as an attendance sheet.
11        Q.    Did anyone keep copies of those
12   notes?
13        A.    On that kind of thing, I don't know.
14   I doubt it.
15   RQ          MR. HELLER:  I call for production of
16          notes relating to the conference calls that
17          occurred.
18            MR. HARRIS:  Send me a letter.  It's
19          going to be a very long one, and we'll take
20          it under advisement.
21        Q.    Do you know if Michael Barr ever
22   expressed concern after the May 3rd, 2003 letter
23   about forfeiture of his deferred compensation?
24            MR. HARRIS:  To whom?
25            MR. HELLER:  To members of the firm.
```

FILED: NEW YORK COUNTY CLERK 08/13/2018 01:47 PM
INDEX NO. 159781/2014
NYSCEF DOC. NO. 142
RECEIVED NYSCEF: 08/13/2018

19-12346-shl   Doc 55-5   Filed 09/05/19   Entered 09/05/19 18:22:01   Exhibit C
Part 3   Pg 113 of 216

1                        J. L. Liddle

2          A.    I remember a brief meeting with him

3     sometime in 2011, 2012, something like that.

4          Q.    Do you recall receiving a memorandum

5     or receiving a memorandum from JRH relating to

6     Michael Barr and his concern about the deferred

7     compensation?

8          A.    I know who JRH is, and he may have

9     sent me a memo, so show it to me.

10               (Plaintiff's Exhibit 12, a memorandum

11          to file from JRH dated March 4, 2004,

12          marked for identification, as of this

13          date.)

14          Q.    Mr. Liddle --

15          A.    Please let me read this.  (Witness

16     reading to himself.)  Okay.

17          Q.    I've placed before you as Plaintiff's

18     Exhibit 12, which is a memorandum to file from

19     JRH dated March 4, 2004.

20               Do you recognize the handwriting on

21     this document?

22          A.    Yup.

23          Q.    Whose handwriting is it?

24          A.    I believe all of it's mine.

25          Q.    Do you recall receiving a copy of

FILED: NEW YORK COUNTY CLERK 08/13/2018 01:47 PM
INDEX NO. 159781/2014

NYSCEF DOC. NO. 142
RECEIVED NYSCEF: 08/13/2018

19-12346-shl   Doc 55-5   Filed 09/05/19   Entered 09/05/19 18:22:01   Exhibit C
Part 3   Pg 114 of 216

Page 114

1                      J. L. Liddle

2     this memo to file?

3          A.    I would say no, although I do

4     recognize some of the points that are made, not

5     in this format, but as points that were

6     discussed.

7          Q.    On the fourth dot it says, "Says he

8     understood when he agreed to file suit in

9     November of 2002 that the $1.3 million was not

10    at risk, but wrote us a letter in December

11    asking that we defer filing suit until after the

12    first deferred comp. payment under the CEP

13    schedule for January 15, 2003."

14               Do you see that?

15         A.    I see that, yes.

16         Q.    Is that true?

17         A.    Is what true, that he said that?

18         Q.    That he wrote you a letter?

19         A.    Not that I recollect, no.

20         Q.    Do you recall any request that the

21    suite be deferred until after January 15, 2003?

22         A.    I really don't.

23         Q.    Were there any discussions with any

24    of the attorneys in your office, prior to the

25    filing of the suit, about deferring the lawsuit?

FILED: NEW YORK COUNTY CLERK 08/13/2018 01:47 PM
INDEX NO. 159781/2014

19-12346-shl   Doc 55-5   Filed 09/05/19   Entered 09/05/19 18:22:01   Exhibit C
Part 3   Pg 115 of 216

RECEIVED NYSCEF: 08/13/2018

1                    J. L. Liddle

2        A.    Well, I'm not sure I would say

3    deferring the lawsuit, but the timing, I think

4    as discussed this morning, there were

5    discussions prior to filing of the suit.

6        Q.    So in the handwriting, the second

7    handwritten portion on the left side?

8        A.    Yup.

9        Q.    It says, "I don't see how we could

10   have waited and had any leverage."

11            What are you referring to about that?

12       A.    I'm not sure I remember what the

13   specific issue was.

14       Q.    Well, it's applies to the delay in

15   filing suit, so --

16       A.    There was a -- there were a couple of

17   issues that related to what would happen at

18   year-end 2002.  This is a company that was being

19   put out of the business.

20            There was an issue as to the

21   valuation of the equity.  There was an issue as

22   to whether there was a bonus pool.

23            The company continued to, as

24   virtually all security firms, where they closed

25   in the formal sense of stopping doing

FILED: NEW YORK COUNTY CLERK 08/13/2018 01:47 PM
INDEX NO. 159781/2014
NYSCEF DOC. NO. 142    RECEIVED NYSCEF: 08/13/2018

1                    J. L. Liddle

2     essentially new business, terminating all the

3     employees and winding up, it's not that simple.

4              It's, you know, they have securities

5     positions, they have trades out that have, you

6     know, long dated kind of positions, they have

7     relationships with counterparties.  They can't

8     necessarily immediately unwind.

9              They had a retail stock brokerage

10    division that in and of itself cannot be closed

11    without the passage of a three-year time period.

12    You have to file a form called a BDW, which is a

13    broker-dealer request withdrawal form.

14              And I know that there were events

15    that were expected to occur at year-end when

16    they closed the books on this, that we did not

17    want to have written in stone, so that we would

18    have to try to unwind them in addition to doing

19    everything else in this.

20              Plus, we had a number of people in

21    this group who wanted us to go faster rather

22    than slower.

23         Q.    Well, so wasn't there a conflict

24    among the claimants that should have been

25    addressed?

FILED: NEW YORK COUNTY CLERK 08/13/2018 01:47 PM
INDEX NO. 159781/2014
NYSCEF DOC. NO. 142
RECEIVED NYSCEF: 08/13/2018

19-12346-shl    Doc 55-5    Filed 09/05/19    Entered 09/05/19 18:22:01    Exhibit C
Part 3    Pg 117 of 216

Page 117

1                    J. L. Liddle

2        A.    There was no real conflict because

3    there was no -- no issue relating to what you

4    showed me in your May letter at that point in

5    time.

6        Q.    But wasn't there still a risk in

7    terms of the vesting and non-disparagement

8    provisions?

9        A.    I believe not.  You're going to say

10   there's a risk as it regards everything, and as

11   we know as lawyers, no matter how clear-cut

12   something is, there's always a theoretical risk.

13            On the other hand, I'll say it again,

14   we didn't see any violation of that Section 8.1.

15   We didn't think that it applied under these

16   circumstances.  I'd like to finish my answer.

17            THE WITNESS:  Would you read back the

18        question.

19            COURT REPORTER:  "But wasn't there

20        still a risk in terms of the vesting and

21        non-disparagement provisions?"

22        A.    And everybody who had come to us had

23   come to us with the same story that it was not

24   an issue, and that they did not want us to

25   represent them in respect of that because they

Page 118

1                          J. L. Liddle

2    didn't want to pay a fee for something that they

3    were going to get without -- without a problem.

4    So that's --

5          Q.    When analyzing this whole issue, did

6    you calculate an outside date that the

7    non-disparagement clause could have applied to

8    any of the claimants in this case?

9          A.    I'm trying to be respectful here, but

10   as a lawyer, I don't understand what you are

11   even remotely talking about.  You mean some

12   statute of limitations?

13         Q.    There's a six month period from the

14   date of termination that the non-disparagement

15   clause would apply?

16         A.    That's not true.  You can read it

17   yourself.

18         Q.    I read it myself and I disagree with

19   your reading, so I'm asking you this.

20         A.    So there's no way for us to

21   communicate if you're telling me that my reading

22   is wrong when it says in plain language that if

23   there is a --

24         Q.    So the answer is no?

25               MR. HARRIS:  If you'll allow him to

FILED: NEW YORK COUNTY CLERK 08/13/2018 01:47 PM
INDEX NO. 159781/2014

NYSCEF DOC. NO. 142

19-12346-shl   Doc 55-5   Filed 09/05/19   Entered 09/05/19 18:22:01   Exhibit C

RECEIVED NYSCEF: 08/13/2018

Part 3   Pg 119 of 216

Page 119

1                        J. L. Liddle

2          answer the question.  Don't argue with him.

3          Please allow him to answer the question.

4              Q.    Go ahead, so the answer is no, you

5      did not calculate an outside date that --

6              A.    No, that isn't the answer.  The

7      answer to your question doesn't make any sense

8      to me.

9                  If you're talking about the six-month

10     period in the contractual provision, it only

11     applies if there is no change of control.

12             Q.    So you did not calculate an outside

13     date?

14             A.    I didn't have to.  I didn't apply.

15     And I had the advice of numerous investment

16     bankers whose lives are spent dealing with

17     change of control provisions who were in

18     agreement with what I said.

19             Q.    Who were those people?

20             A.    Virtually all of them.

21             Q.    Every single one of the 41 people?

22             A.    I didn't say every single one.  I

23     said virtually all of them.  I don't remember.

24     This was 14 years ago.  But they were the

25     experts on change of control provisions, as is

FILED: NEW YORK COUNTY CLERK 08/13/2018 01:47 PM
INDEX NO. 159781/2014
NYSCEF DOC. NO. 142
RECEIVED NYSCEF: 08/13/2018

19-12346-shl   Doc 55-5   Filed 09/05/19   Entered 09/05/19 18:22:01   Exhibit C
Part 3   Pg 120 of 216

1          J. L. Liddle

2    your client, I'm sure.  Okay, and I don't think

3    that anybody can read that clause differently

4    and read it accurately, So including yourself.

5          Q.    So the decision on change of control

6    was made after discussing the change of control

7    provision with some -- virtually all of the

8    claimants?

9               MR. HARRIS:  Objection.

10         A.    No, I didn't say that.

11              MR. HARRIS:  That's not what he said.

12         Q.    They were the experts.  You just said

13   it.  Tell me --

14              MR. HARRIS:  That's part of what he

15         said.  I objection to the form of the

16         question.

17              Ask a question that's not

18         objectionable, please.

19         Q.    Who did you discuss the change of

20   control provision with?

21         A.    In the broadest possible sense,

22   everybody who was part of the management buyout

23   team because on July 17th, they were told the

24   business was closing, and they were told that

25   they would get their CEP preference without any

Page 121

1                    J. L. Liddle

2    concern about signing a release.  THE company

3    was going out of business.

4                    That was always the premise and that

5    was their premise in asking that we exempt from

6    our retention agreement, our representation of

7    them, and that we not take a fee on something

8    that they were already promised, but they were

9    going to get by Lisa Bisaccia and the company,

10   they had somebody in Boston on the speaker

11   phone, as well.

12                   And that when the -- these separation

13   agreements and releases came out, that indicated

14   the same thing.  So this was an issue that was a

15   very back-burner issue.

16                   We looked, as I said, before we filed

17   at this.  We had a meeting in which we had sort

18   of a devil's advocacy, is there another way to

19   look at this, and our conclusion was no.

20                   And that coincided with virtually

21   everyone else and I would -- I ask a question

22   here, is there anything that indicates that he

23   actually sent such a letter as referred to in

24   Exhibit 12, and I don't -- I don't know of any

25   backup to that, that exists.  If you have it,

19-12346-shl    Doc 55-5    Filed 09/05/19    Entered 09/05/19 18:22:01    Exhibit C
Part 3    Pg 122 of 216

Page 122

1                        J. L. Liddle

2       you show it to me.

3            Q.    The devil's advocacy meeting that you

4       just mentioned, is that the meeting you --

5            A.    That's the meeting that I spoke about

6       that I said we always try to have devil's

7       advocacy for different positions, so that all

8       the positions are out there and somebody isn't

9       just saying let's do it this way.

10           Q.    During this devil's advocacy meeting,

11      were there any of your partners or colleagues in

12      this firm that did not agree with that change of

13      control analysis that you made?

14           A.    During the meeting?

15           Q.    During the advocacy meeting.

16           A.    The nature of a devil's advocacy

17      meeting is that you actually make sure that

18      there's at least one devil's advocate.

19                So at least on the surface of it,

20      more and more people were arguing that the

21      provision did apply, and then we would go

22      through a process of discussing it to determine

23      whether or not that position had any basis.

24           Q.    And that all occurred before the

25      filing of the statement of claim; right?

INDEX NO. 159781/2014
NYSCEF DOC. NO. 142                                              RECEIVED NYSCEF: 08/13/2018

Page 123

1                        J. L. Liddle

2        A.     I thing so, yes.

3        Q.     Now I'm just -- I've asked, but I

4    haven't gotten any names, so I'm assuming you

5    don't know who you spoke to, but I'm going to

6    ask one more time.

7               Do you recall any of the individual

8    claimants who you spoke to about the change of

9    control issue?

10       A.     I think I just answered the question

11   for you.  Virtually everybody from day one was

12   somebody who started out with I was at the

13   meeting or on the phone at the meeting, they're

14   closing the business.

15              We were going to buy it.  I don't

16   know whether Mr. Barr was part of that group.  I

17   think he was not part of the group.  But of the

18   40 or so, they were already of the mind when

19   they walked in the room that they were being

20   terminated, that they were going to be signing,

21   at that moment, they were going to be signing a

22   closing document, and there was going to be a

23   change of control to them.  That's what the

24   closing was about.

25              So the idea that this was anything

FILED: NEW YORK COUNTY CLERK 08/13/2018 01:47 PM
INDEX NO. 159781/2014
NYSCEF DOC. NO. 142
RECEIVED NYSCEF: 08/13/2018

19-12346-shl    Doc 55-5    Filed 09/05/19    Entered 09/05/19 18:22:01    Exhibit C
Part 3    Pg 124 of 216

Page 124

1                      J. L. Liddle

2    but a change of control, closing the business,

3    selling it to them, what have you, is not -- is

4    not something that -- that anybody was -- was

5    raising at the time.  And I don't think

6    Michael Barr ever raised it.

7          Q.    Did there come a time that the

8    pleadings were amended in the action?

9          A.    Yes.

10               (Plaintiff's Exhibit 13, the Amended

11          Statement of Claim, marked for

12          identification, as of this date.)

13          Q.    I have a couple more questions on the

14    prior document.

15               Could you read to me what is

16    handwritten on the bottom right-hand part of the

17    page?

18          A.    Plaintiff's Exhibit 12?

19          Q.    Right.

20          A.    7/28/16, NS.

21          Q.    No, the handwritten portion at the

22    bottom right-hand part of --

23          A.    On the document, okay.  To JRH,

24    please see me to discuss this.  Maybe some form

25    of a motion, and I'm thinking that says for

FILED: NEW YORK COUNTY CLERK 08/13/2018 01:47 PM
INDEX NO. 159781/2014

NYSCEF DOC. NO. 142
RECEIVED NYSCEF: 08/13/2018

19-12346-shl    Doc 55-5    Filed 09/05/19    Entered 09/05/19 18:22:01    Exhibit C
Part 3    Pg 125 of 216

Page 125

1                    J. L. Liddle

2      severing funds.

3           Q.    For summary judgment?

4           A.    It could be.  By us will be

5      available.  Maybe it's summary judgment, yeah.

6           Q.    Did you have ever discuss making a

7      motion for summary judgment on deferred

8      compensation claims?

9           A.    I'm sure that at some point in the

10     course of this case, we discussed making a

11     motion for summary judgment on many things.

12          Q.    Do you recall specifically making a

13     motion for summary judgment or discussing making

14     a motion for summary judgment in connection with

15     this Michael Barr conversation from March of

16     2004?

17          A.    I don't.

18          Q.    Was a motion for summary judgment

19     ever made?

20               MR. HARRIS:  Regarding this issue?

21               MR. HELLER:  Regarding this issue.

22          A.    By us?

23          Q.    Yes.

24          A.    I don't think so.  There's not very

25     many plaintiff summary judgment motions, but

FILED: NEW YORK COUNTY CLERK 08/13/2018 01:47 PM
INDEX NO. 159781/2014
NYSCEF DOC. NO. 142                                    RECEIVED NYSCEF: 08/13/2018

19-12346-shl   Doc 55-5   Filed 09/05/19   Entered 09/05/19 18:22:01   Exhibit C
Part 3   Pg 126 of 216

1                         J. L. Liddle

2       the -- I'm not sure of the exact timing of it,

3       but there's a lot of procedural issues.

4                    For instance, summary judgment in the

5       securities industry, arbitration is not really

6       available.  You don't use the Federal Rules of

7       Civil Procedure.

8                    So I don't remember exactly where the

9       issue was with regard to the case in

10      Massachusetts, the Federal Court case.

11           Q.    So I do not know --

12           A.    I don't remember the timing.  If I

13      knew the context of the timing, I might be able

14      to answer your question more fully, but I don't.

15                   (Plaintiff's Exhibit 14, the First

16           Amended Counterclaim, marked for

17           identification, as of this date.)

18           Q.    Because you're going to need some

19      time doing that, I'm going to take a 2-minute

20      break.

21           A.    I was just going to say that this --

22      you're giving me this to refresh my recollection

23      as to the timing, is that the point?

24           Q.    Yes.

25           A.    Okay.  Yes, then I will have to look

FILED: NEW YORK COUNTY CLERK 08/13/2018 01:47 PM
INDEX NO. 159781/2014
NYSCEF DOC. NO. 142
RECEIVED NYSCEF: 08/13/2018
19-12346-shl   Doc 55-5   Filed 09/05/19   Entered 09/05/19 18:22:01   Exhibit C
Part 3   Pg 127 of 216

Page 127

1          J. L. Liddle

2    through it.

3          (Brief recess taken.)

4    FURTHER EXAMINATION

5    BY MR. HELLER:

6          Q.    So, Mr. Liddle?

7          A.    I reviewed this, and by reviewing it,

8    cleared up my recollection on a couple of prior

9    answers.

10         Q.    Okay, so, and you're referring to --

11         A.    And I would like to do that.

12         Q.    -- Exhibit 14?

13         A.    Yes, I would like to make those

14   references on the record.

15         Q.    Absolutely, please tell me?

16         A.    In relation to Plaintiff's Exhibit 10

17   and Plaintiff's Exhibit 11, you asked me

18   questions about when -- when it was that we

19   learned that The Wall Street Journal article or

20   disparagement was an issue, and in reviewing

21   this first amended counterclaim from the

22   District of Massachusetts, I had my recollection

23   refreshed in that this was in part what you were

24   asking me about before when you showed me the --

25   this was maybe the June 20th document, whatever

FILED: NEW YORK COUNTY CLERK 08/13/2018 01:47 PM
INDEX NO. 159781/2014
NYSCEF DOC. NO. 142
RECEIVED NYSCEF: 08/13/2018

19-12346-shl   Doc 55-5   Filed 09/05/19   Entered 09/05/19 18:22:01   Exhibit C
Part 3   Pg 128 of 216

Page 128

1                      J. L. Liddle

2       the hell the document was.

3                  So pages 15 and 16 refreshed my

4       recollection.  You may remember that earlier I

5       said that there were a number of other people

6       beyond the people in our group who had received

7       those letters.  And, of course, they were not

8       people who were either in our group or shall we

9       say referenced in the -- in The Wall Street

10      Journal article.

11                 And I had forgotten that we had

12      discussed that issue that we weren't clear as to

13      what -- what the -- what the rationale was.

14                 And then in this paragraph 52 and 53,

15      I think, refreshed my recollection that we did

16      not learn that specifically they were referring

17      to The Wall Street Journal, other news outlets,

18      until July 25th, 2003.  Thank you.

19          Q.    Did this refresh your recollection as

20      well as to the reference in the handwritten note

21      as to which case you might make a motion for

22      summary judgment?

23                 And the reason why I ask, the date of

24      this first amended counterclaim is January of

25      2008.

FILED: NEW YORK COUNTY CLERK 08/13/2018 01:47 PM
INDEX NO. 159781/2014

NYSCEF DOC. NO. 142
RECEIVED NYSCEF: 08/13/2018

19-12346-shl   Doc 55-5   Filed 09/05/19   Entered 09/05/19 18:22:01   Exhibit C
Part 3   Pg 129 of 216

Page 129

1                    J. L. Liddle

2           A.     Right, it's -- it's possible that

3      that's what that reference is to, but there's a

4      group of things that took place in this case

5      that I was referring to when I said I have to

6      have my recollection refreshed.

7                    And because I have a -- I have a

8      recollection that between this time --

9           Q.     You're talking about March 2004?

10          A.     -- March 24, 2004 and 2007, I think.

11          Q.     '08, January of 2008?

12          A.     Right, that this case --

13          Q.     You mean the Massachusetts case?

14          A.     -- right, was, in fact, I believe

15     stayed pending the outcome of the arbitration.

16     And there was a reason that we filed this that

17     had to do with the statute of limitations issue,

18     if I recollect.

19                    We asked that this -- I think we

20     asked that the stay be lifted.  We filed this

21     and then I think the stay was actually in

22     effect.  Something along those lines.  I'm not a

23     hundred percent sure, but I believe that between

24     these two time periods that there was a stay

25     that was in effect for at least some relatively

FILED: NEW YORK COUNTY CLERK 08/13/2018 01:47 PM
INDEX NO. 159781/2014

NYSCEF DOC. NO. 142
RECEIVED NYSCEF: 08/13/2018

19-12346-shl   Doc 55-5   Filed 09/05/19   Entered 09/05/19 18:22:01   Exhibit C
Part 3   Pg 130 of 216

Page 130

1              J. L. Liddle

2    significant time period.

3              And we'd have to look at the

4    Massachusetts file.  Most of the Massachusetts

5    actual litigation was something that was handled

6    by Mr. Hubbard.

7        Q.    I'm just trying to nail down a motion

8    for summary judgment?

9        A.    It's possible.  I just said it's

10   possible, but without seeing all this other

11   stuff as to when the stay went into effect,

12   etcetera, I couldn't tell you for sure.

13       Q.    While you have Plaintiff's Exhibit 14

14   in front you, is this a true and accurate copy

15   of the first counterclaim that was filed in the

16   Massachusetts action to the best of your

17   knowledge?

18              MR. HARRIS:  First amended

19         counterclaim.

20              MR. HELLER:  First amended

21         counterclaim.

22       A.    I don't think I can really answer

23   that question.  I have to see what's in the

24   court file.

25       Q.    Not a problem.  Back to Plaintiff's

FILED: NEW YORK COUNTY CLERK 08/13/2018 01:47 PM
INDEX NO. 159781/2014

NYSCEF DOC. NO. 142

19-12346-shl   Doc 55-5   Filed 09/05/19   Entered 09/05/19 18:22:01   Exhibit C
Part 3   Pg 131 of 216

RECEIVED NYSCEF: 08/13/2018

Page 131

1                          J. L. Liddle

2      Exhibit 13, which is the amended statement of

3      claim.

4                          On the last page, page 29, did you

5      authorize somebody to sign this document on your

6      behalf?

7              A.      Apparently so.

8              Q.      What does LSM stand for?

9              A.      Larry Moy.

10             Q.      Do you know whether you reviewed the

11     amended statement of claim before it was filed?

12             A.      Let me take a quick look.  I would

13     say yes.

14                     (Plaintiff's Exhibit 15, a document,

15             marked for identification, as of this

16             date.)

17             Q.      How long were the arbitration

18     proceedings in the -- (inaudible).

19                     How long, how many years did the

20     arbitration take?  That's a better asked

21     question.

22             A.      A lot longer than was anticipated by

23     the (inaudible) of arbitration, I can tell you

24     that.  It says the first scheduled hearing was

25     November 1st of 2004.  The date it was filed was

FILED: NEW YORK COUNTY CLERK 08/13/2018 01:47 PM
INDEX NO. 159781/2014

NYSCEF DOC. NO. 142

RECEIVED NYSCEF: 08/13/2018

19-12346-shl   Doc 55-5   Filed 09/05/19   Entered 09/05/19 18:22:01   Exhibit C
Part 3   Pg 132 of 216

Page 132

1                    J. L. Liddle

2     in December of 2002, and the date decided was

3     September 12, 2007, so it was long.

4          Q.    What I've placed before you is

5     Plaintiff's Exhibit 15, what appears to be the

6     award of the arbitrators.

7          A.    I'm going to take a quick look at

8     that because --

9          Q.    The amended award, I apologize.

10         A.    Corrected award would be the accurate

11    term, I think.

12         Q.    Correct.

13         A.    Okay.

14         Q.    Do you recognize that document?

15         A.    I'd say yes.  I probably haven't read

16    it through in many years, though.

17         Q.    Do you know whether there was any

18    deferred compensation under the 2002 cash

19    equivalent plan awarded in this arbitration?

20         A.    I know that there was not.

21         Q.    Are you aware that there was a

22    dissent in this award?

23         A.    Absolutely.

24         Q.    I'll ask you to turn to page ADD 20.

25         A.    Yup, I have it.

FILED: NEW YORK COUNTY CLERK 08/13/2018 01:47 PM

1                           J. L. Liddle

2          Q.      Mr. Daly dissented?

3          A.      Yes.

4          Q.      Did you have an understanding of why

5    he dissented?

6          A.      Yes.

7          Q.      What was his -- why did he dissent?

8          A.      Because he wanted to award them

9    monetary damages representing the value of the

10   deferred compensation plan.

11              And they, meaning two, did not agree

12   with him that the panel had the authority to

13   render such an award because it would have been

14   rendered against a party that had refused to

15   sign a submission agreement.

16         Q.      So that was the only reason, in your

17   view, why the deferred compensation was not

18   awarded, because the party against whom the

19   damage claim was made was not a party to the

20   arbitration agreement?

21         A.      That's a very big reason.  If the

22   panel felt, as I believe they did, and I think

23   Mr. Daly's dissent indicates that they didn't

24   have jurisdiction to do this, that would be one

25   basis upon which their award could be vacated.

Page 134

1                          J. L. Liddle

2              So the answer is I'm highly confident

3        that that's the reason.  And I'm also highly

4        confident because of something that

5        Mr. Gandolfo, who is the chairman, said during

6        the course of the arbitration, that they would

7        hear all of this, but they would have to decide

8        at some point whether or not the submission

9        agreements were necessary, whether or not they

10       had the authority to award against RSGI.

11             And I remember the phrase that he

12       used there was, and if we decide not to, then up

13       to Boston you go, meaning a reference to the

14       then, I believe, stayed Federal Court case that

15       had been brought originally by them and then we

16       had those kind of --

17           Q.    Was it your understanding also that

18       the panel believed that no deferred compensation

19       was due because of the disparagement?

20           A.    Absolutely not.  They tried

21       everything in the sense of hearing all the

22       evidence.  There was very little that they kept

23       out.

24             They followed the rules of evidence.

25       But they made no -- no such findings.  And I'm

1                         J. L. Liddle

2      very sure that that was not something that if

3      they had made such a finding, that they would

4      have -- wouldn't have stated it here, especially

5      when there's a dissent.

6                In the security industry's

7      arbitration, there's a heavy, heavy, heavy

8      emphasis put on coming up with a unanimous

9      decision.  The administrator is required to try

10     to get the decision to be unanimous.

11               They're disinclined to put out awards

12     especially in a large case like this that has

13     dissents in them.

14               And so I believe that Mr. Daly made a

15     decision that references exactly why this was

16     not -- this issue was not breached.

17          Q.    You mentioned something about someone

18     sent off to Massachusetts?

19          A.    No, and then up to Boston you go.

20          Q.    Up to Boston you go, yes.

21          A.    It wasn't someone, it was the

22     chairman of the arbitration panel, and it was in

23     reference to the fact that they were

24     uncomfortable whether they had jurisdiction over

25     the Robertson Stephens Group, Inc.

FILED: NEW YORK COUNTY CLERK 08/13/2018 01:47 PM
INDEX NO. 159781/2014
NYSCEF DOC. NO. 142
RECEIVED NYSCEF: 08/13/2018

19-12346-shl   Doc 55-5   Filed 09/05/19   Entered 09/05/19 18:22:01   Exhibit C
Part 3   Pg 136 of 216

1                    J. L. Liddle

2          Q.    So is the Boston matter that he's

3    referring to, the document or the case that's

4    reflected by Plaintiff's Exhibit 14?

5          A.    Yes, because they came in at the

6    outset of the very first time we had any kind of

7    actual hearing, saying that they had filed --

8    they had filed that case and they were not going

9    to sign any submission agreement on behalf of

10   the non-broker-dealer parties.

11         Q.    Was the matter litigated up in

12   Boston?

13         A.    In the broadest sense of the term

14   litigated, yes.

15         Q.    What happened?

16         A.    There's a question for you.  After

17   the arbitration, we went up to Boston.  We

18   sought to reinstate the case.

19              And the other side made a motion, I

20   believe, for summary judgment.  I'm trying to

21   remember whether it was for summary judgment,

22   but I think for summary judgment, which they

23   took the diametrically opposite viewpoint that

24   they had taken in the arbitration, and now

25   stated that of course the arbitration panel had

FILED: NEW YORK COUNTY CLERK 08/13/2018 01:47 PM

INDEX NO. 159781/2014

NYSCEF DOC. NO. 142

19-12346-shl   Doc 55-5   Filed 09/05/19   Entered 09/05/19 18:22:01   Exhibit C

RECEIVED NYSCEF: 08/13/2018

Part 3   Pg 137 of 216

Page 137

1                          J. L. Liddle

2      dealt with the claims that were in that case,

3      rather than as they had said in their summation

4      over a 3-hour period probably 75 times that they

5      were not before the arbitration panel speaks,

6      the arbitration panel themselves.

7                  And, you know, the case had gone on

8      for not just several years, but close to 60 days

9      of hearings.

10                 So the judge who was a senior judge,

11     accepted their motion, which we argued for the

12     better part of a full day on a -- I'll just say

13     it's sort of an off beat nouveau theory of race

14     judicata.

15                 And when we made all of the arguments

16     and we had tried to get even more detail than

17     had been had been -- (inaudible) -- you want to

18     get the panel to say that they had not decided

19     those things, and he was basically completely

20     uninterested.

21                 I mean from the first question, it

22     was 8 hours of everybody, the litigators had

23     been there about 8 hours, and it had been

24     decided before we got that.

25                 We took it up to the First Circuit.

19-12346-shl   Doc 55-5   Filed 09/05/19   Entered 09/05/19 18:22:01   Exhibit C
Part 3   Pg 138 of 216

Page 138

1              J. L. Liddle

2    We hired an extremely prominent expert on civil

3    procedure and co-author of Wright and Miller,

4    Arthur Miller, who turns out had been the -- I

5    believe the civil procedure professor for each

6    of the three panel members and whose book

7    contained both in the pocket part and the

8    regular text, references to this oddball theory

9    of race judicata, and then we argued and we did

10   not prevail.

11        Q.    Throughout the District Court case

12   and the First Circuit's argument, you had still

13   represented Mr. Barr and the defendants in the

14   Massachusetts case?

15        A.    It's --

16        Q.    When I say, "you," I mean Liddle &

17   Robinson.

18        A.    Yeah, I'm -- I'm trying to remember

19   what -- exactly how that worked.  But the answer

20   is yes, and there were -- I don't remember

21   whether there were actual retention agreements

22   or the agreements were related to advancing some

23   of the expenses that would be associated with

24   hiring the -- Arthur Miller and preparing, you

25   know, the briefing and I don't mean hourly

FILED: NEW YORK COUNTY CLERK 08/13/2018 01:47 PM
INDEX NO. 159781/2014

NYSCEF DOC. NO. 142
RECEIVED NYSCEF: 08/13/2018

19-12346-shl    Doc 55-5    Filed 09/05/19    Entered 09/05/19 18:22:01    Exhibit C
Part 3    Pg 139 of 216

Page 139

1                      J. L. Liddle

2      rates, I mean the basic costs of the expenses of

3      the agreement.

4              And I believe everybody to varying

5      degrees complied with whatever that, you know,

6      request was.

7          Q.    And was a motion made?

8          A.    I have a recollection that we did,

9      but it's just a vague recollection.  I don't

10     think that there was any -- any to be his

11     candidate, it's possible, I don't think there

12     was any basis to the get the Supreme Court to

13     hear a case where there was no split in the

14     circuits.  There was no anything.  It certainly

15     wasn't Constitutional.

16         Q.    But Liddle & Robinson represented the

17     defendants in connection with the cert petition?

18         A.    If there was cert petition, I would

19     think we did, but I'd be happy to take a look at

20     it.

21              (Plaintiff's Exhibit 16, the Petition

22         for Writ of Certiorari for the Supreme

23         Court for the United States in the matter

24         of Alt against Robertson Stephens, marked

25         for identification, as of this date.)

FILED: NEW YORK COUNTY CLERK 08/13/2018 01:47 PM

INDEX NO. 159781/2014
NYSCEF DOC. NO. 142                                    RECEIVED NYSCEF: 08/13/2018

```
 1                      J. L. Liddle
 2         Q.    Mr. Liddle, placed before you is a
 3    document marked as Plaintiff's Exhibit 16.  It's
 4    the Petition For Writ of Certiorari for the
 5    Supreme Court for the United States in the
 6    matter of Alt against Robertson Stephens.
 7               Does this refresh your recollection
 8    as to whether or not the Liddle & Robinson firm
 9    represented Mr. Barr and Mr. Alt in the
10    applicants for petitioners in connection with
11    the petition for a writ of certiorari?
12         A.    It does, yes.
13         Q.    And did Liddle & Robinson represent
14    those individuals?
15         A.    It looks to me like, again, in the
16    United States, that they're all listed in the
17    petitioners for the court section.
18               (Continued on the following
19          to allow for signature line and
20          jurat.)
21
22
23
24
25
```

FILED: NEW YORK COUNTY CLERK 08/13/2018 01:47 PM
INDEX NO. 159781/2014
NYSCEF DOC. NO. 142
RECEIVED NYSCEF: 08/13/2018

19-12346-shl    Doc 55-5    Filed 09/05/19    Entered 09/05/19 18:22:01    Exhibit C
Part 3    Pg 141 of 216

Page 141

1                        J. L. Liddle

2              MR. HELLER:  I'm going to just take a

3         few minutes and see if I have any other

4         questions.

5                   (Brief recess taken.)

6              MR. HELLER:  I have no further

7         questions.

8                   (Time noted:  3:08 p.m.)

9

10

11                        JEFFREY L. LIDDLE

12

13    Subscribed and sworn to before me

14    this      day of              , 2016.

15

16

17

18

19

20

21

22

23

24

25

FILED: NEW YORK COUNTY CLERK 08/13/2018 01:47 PM INDEX NO. 159781/2014
NYSCEF DOC. NO. 142                                                    RECEIVED NYSCEF: 08/13/2018

1

2                    C E R T I F I C A T E

3

4    STATE OF NEW YORK      )

5                              : ss.

6    COUNTY OF NEW YORK     )

7

8            I, NANCY SORENSEN, Notary Public

9        within and for the State of New York, do

10       hereby certify:

11            That JEFFREY L. LIDDLE, the witness

12       whose deposition is hereinbefore set forth,

13       was duly sworn by me and that such

14       deposition is a true record of the

15       testimony given by the witness.

16            I further certify that I am not

17       related to any of the parties to this

18       action by blood or marriage, and that I am

19       in no way interested in the outcome of this

20       matter.

21            IN WITNESS WHEREOF, I have hereunto

22       set my hand this 16th day of August, 2016.

23

24

                    NANCY SORENSEN

25

FILED: NEW YORK COUNTY CLERK 08/13/2018 01:47 PM
INDEX NO. 159781/2014
NYSCEF DOC. NO.: 142
RECEIVED NYSCEF: 08/13/2018

19-12346-shl    Doc 55-5    Filed 09/05/19    Entered 09/05/19 18:22:01    Exhibit C
Part 3    Pg 143 of 216

Page 143

1

2    ------------------ I N D E X ------------------

3    WITNESS                  EXAMINATION BY           PAGE

4    JEFFREY L. LIDDLE   MR. HELLER                    5

5

6    ----------- INFORMATION REQUESTS --------------

7    DIRECTIONS:

8    RULINGS:

9    TO BE FURNISHED:

10   REQUESTS:  32, 42, 95, 100, 112

11   MOTIONS:

12

13   ------------------ EXHIBITS -------------------

14   PLAINTIFF'S                              FOR ID.

15

16   Plaintiff's Exhibit 1, a copy of the        20

17   retainer agreement Mr. Barr signed retaining

18   Liddle & Robinson

19

20   Plaintiff's Exhibit 2, a letter from        24

21   Michael Barr to David Marek of Liddle & Robinson

22   dated October 2, 2002

23

24

25

1

2    E X H I B I T S:    (Cont'd)

3

4    Plaintiff's Exhibit 3, a separation agreement

5    and release dated September 18, 2002 to

6    Michael Barr, Bates stamped Barr 120 through

7    Barr 136

8

9    Plaintiff's Exhibit 4, a document on          48

10   Liddle & Robinson letterhead dated

11   December 11, 2002 to Mr. Robert S.

12   Clemente of the New York Stock Exchange,

13   Bates stamped Barr 2380 through 2398

14

15   Plaintiff's Exhibit 5, a printout of a         58

16   Wall Street Journal article

17

18   Plaintiff's Exhibit 6, a document dated        68

19   December 10, 202 from Christine Palmieri

20   to Susanne Craig of The Wall Street Journal

21

22   Plaintiff's Exhibit 7, an e-mail from          70

23   Susanne Craig to Jeffrey Liddle dated

24   December 12, 2002

25

FILED: NEW YORK COUNTY CLERK 08/13/2018 01:47 PM
INDEX NO. 159781/2014

19-12346-shl    Doc 55-5    Filed 09/05/19    Entered 09/05/19 18:22:01    Exhibit C

NYSCEF DOC. NO. 142

Part 3    Pg 145 of 216

RECEIVED NYSCEF: 08/13/2018

Page 145

1

2    E X H I B I T S:    (Cont'd)

3

4    Plaintiff's Exhibit 8, an e-mail from        79

5    Christine Palmieri to Susanne Craig dated

6    December 10, 2006 at 6:11 p.m. with an

7    attachment

8

9    Plaintiff's Exhibit 9, a time sensitive      81

10    memorandum marked URGENT from to JLL from

11    CAP dated 12/10/2002

12

13    Plaintiff's Exhibit 10, a document          93

14

15    Plaintiff's Exhibit 11, a letter from       106

16    Jeffrey L. Liddle dated May 13, 2003

17    In reference to Alt against FleetBoston

18

19    Plaintiff's Exhibit 12, a memorandum        113

20    to file from JRH dated March 4, 2004

21

22    Plaintiff's Exhibit 13, the Amended         124

23    Statement of Claim

24

25

FILED: NEW YORK COUNTY CLERK 08/13/2018 01:47 PM
INDEX NO. 159781/2014
NYSCEF DOC. NO.: 142
RECEIVED NYSCEF: 08/13/2018

19-12346-shl    Doc 55-5    Filed 09/05/19    Entered 09/05/19 18:22:01    Exhibit C
Part 3    Pg 146 of 216

Page 146

1

2      E X H I B I T S:    (Cont'd)

3

4      Plaintiff's Exhibit 14, the First           126

5      Amended Counterclaim

6

7      Plaintiff's Exhibit 15, a document          131

8

9      Plaintiff's Exhibit 16, the Petition        139

10     for Writ of Certiorari for the Supreme

11     Court for the United States in the matter

12     of Alt against Robertson Stephens

13

14

15

16

17

18

19

20

21

22

23

24

25

FILED: NEW YORK COUNTY CLERK 08/13/2018 01:47 PM

NYSCEF DOC. NO. 142

INDEX NO. 159781/2014

RECEIVED NYSCEF: 08/13/2018

19-12346-shl   Doc 55-5   Filed 09/05/19   Entered 09/05/19 18:22:01   Exhibit C
Part 3   Pg 147 of 216

Page 147

1

2                    ERRATA SHEET
            VERITEXT LEGAL SOLUTIONS

3

4    CASE:  Barr v. Liddle & Robinson

5    DEPOSITION DATE:  July 28, 2016

6    DEPONENT:  Jeffrey Liddle

7    PAGE/LINE(S)/     CHANGE           REASON

8    ____/_____/_____/_____

9    ____/_____/_____/_____

10   ____/_____/_____/_____

11   ____/_____/_____/_____

12   ____/_____/_____/_____

13   ____/_____/_____/_____

14   ____/_____/_____/_____

15   ____/_____/_____/_____

16   ____/_____/_____/_____

17   ____/_____/_____/_____

18   ____/_____/_____/_____

19   ____/_____/_____/_____

20

                   _____

21                       JEFFREY LIDDLE

22   SUBSCRIBED AND SWORN TO BEFORE ME

     THIS_____DAY OF_____, 20  .

23

24

     _____  _____

25      NOTARY PUBLIC        DATE COMMISSION EXPIRES

[& - 7]                                                                                    Page 1

**&**

**&**  1:9,20 2:13 5:10
  13:22 18:11 19:9,24
  20:6,18,25 21:9,15
  23:14,15 24:14,22
  25:5 32:15 48:9,15
  50:7,10,13,16,18,24
  51:3,9 64:2 85:6
  104:17,25 105:4
  138:16 139:16
  140:8,13 143:18,21
  144:10 147:4

**0**

**01**  22:21
**02**  22:21
**04**  92:14
**08**  129:11

**1**

**1**  20:15,16,22 37:21
  51:13 143:16
**1.3**  114:9
**10**  63:16 68:7,12
  70:16 79:21 80:4
  82:8 92:25 93:2
  97:9 127:16 144:19
  145:6,13
**100**  2:7 143:10
**10005-3708**  2:8
**10007**  2:16
**106**  145:15
**10:22**  1:16
**10th**  72:7,11 80:15
**11**  37:15 48:10,16
  49:3 106:14,20
  127:17 144:11
  145:15
**112**  143:10
**113**  145:19
**11th**  49:8 52:13
  56:11 65:23 72:15
**12**  59:4 71:2,9 80:20
  105:2 113:10,18
  121:24 124:18

132:3 144:24
  145:19
**12/10/2002**  81:8,14
  145:11
**120**  25:13,20 144:6
**124**  145:22
**126**  146:4
**12:28**  59:5
**12th**  49:6,8 56:12
  65:24 72:16
**13**  100:22 106:15,22
  124:10 131:2
  145:16,22
**131**  146:7
**136**  25:14,21 144:7
**139**  146:9
**14**  67:25 119:24
  126:15 127:12
  130:13 136:4 146:4
**15**  13:16 63:16 92:9
  114:13,21 128:3
  131:14 132:5 146:7
**159781/2014**  1:8
**16**  128:3 139:21
  140:3 146:9
**16th**  142:22
**17**  108:7
**17th**  9:18,23 22:23
  120:23
**18**  25:12,19 144:5
**18th**  9:18
**19**  48:19 51:25
**1979**  13:24 15:3
**1983**  15:3
**1:01**  96:9
**1:42**  97:3
**1st**  131:25

**2**

**2**  21:20 24:20,21,23
  25:2,6 26:22 37:15
  37:18,19,20 52:12
  59:8 65:19 97:9,11
  104:2,4 107:9,12
  126:19 143:20,22

**20**  132:24 143:16
  147:22
**2001**  10:15,25 34:11
  34:13 35:5 36:6,8
**2002**  7:7,17 15:16
  17:12 18:2,4,6,9
  21:22 22:4,18 24:23
  25:6,13,19 26:23
  27:8 30:20,21 34:9
  34:13,25 36:3,8,21
  48:10,16 52:14
  56:12 59:15 70:16
  71:2,9 78:22 80:20
  82:8 85:4 86:17
  105:2 114:9 115:18
  132:2,18 143:22
  144:5,11,24
**2003**  92:14 97:9,11
  104:4 106:15,22
  112:22 114:13,21
  128:18 145:16
**2004**  113:11,19
  125:16 129:9,10
  131:25 145:20
**2006**  79:21 80:4
  145:6
**2007**  129:10 132:3
**2008**  128:25 129:11
**2011**  113:3
**2012**  105:20 113:3
**2016**  1:15 141:14
  142:22 147:5
**202**  68:7,12 144:19
**20th**  127:25
**221**  3:8
**23**  59:17 91:11
**2380**  48:12,18
  144:13
**2398**  48:12,18
  144:13
**24**  129:10 143:20
**25**  91:19
**25th**  128:18
**28**  1:15 147:5

**20**  131:4

**3**

**3**  6:16 21:2 25:10,11
  25:17 32:20 33:19
  137:4 144:4
**305**  2:15
**3116**  3:23
**32**  143:10
**3:08**  141:8
**3rd**  112:22

**4**

**4**  26:22 27:2 30:7
  48:7,8 51:14 52:16
  113:11,19 144:9
  145:20
**4.6**  98:11
**40**  123:18
**41**  19:6,8,23 20:4
  75:7 119:21
**42**  92:8 143:10
**45.6**  59:16
**48**  144:9
**4th**  13:24

**5**

**5**  27:2 58:10,11,16
  59:9 76:8 143:4
  144:15
**50**  15:17
**52**  128:14
**53**  128:14
**57**  92:8 93:17
**58**  144:15

**6**

**6**  32:19 58:19 68:6
  72:4 77:19 144:18
**60**  137:8
**68**  144:18
**6:11**  79:21 80:4
  145:6

**7**

**7**  70:24 71:5 89:17
  144:22

[7/28/16 - arbitration]                                                      Page 2

**7/28/16** 124:20
**70** 144:22
**75** 137:4
**79** 145:4

**8**

**8** 20:23 37:16,17,18
79:18,19,25 98:12
137:22,23 145:4
**8.1** 40:22,25 46:20
46:25 47:12 51:16
98:10 107:16
**8.1.** 117:14
**800** 1:20
**81** 145:9

**9**

**9** 81:6,11 82:11
86:15 89:15 145:9
**93** 145:13
**95** 143:10

**a**

**a.m.** 1:16 59:5
**ability** 84:3
**able** 101:9 126:13
**absolute** 54:22,25
55:7 66:8,14
**absolutely** 65:18,22
80:10 95:16 127:15
132:23 134:20
**accept** 88:23 90:7
**acceptance** 90:13
**accepted** 137:11
**accepting** 90:6
**access** 100:9
**accrue** 30:22
**accurate** 21:7 92:6
130:14 132:10
**accurately** 20:3
120:4
**acquired** 63:20,24
**action** 3:16 8:10,10
124:8 130:16
142:18

**actions** 59:19 98:9
**actual** 37:11 43:4
57:3 85:12 130:5
136:7 138:21
**adamant** 22:22
**add** 132:24
**addition** 3:12 33:8
116:18
**additional** 55:4
**addressed** 48:5
116:25
**administrator** 135:9
**admission** 50:5
**advancing** 138:22
**adverse** 95:4,9
**advice** 119:15
**advised** 98:5
**advisement** 32:16
42:20 96:3 101:10
112:20
**advocacy** 121:18
122:3,7,10,15,16
**advocate** 41:18
122:18
**affidavit** 94:11 99:8
99:19 100:15
**ago** 8:20 50:11 51:5
67:25 82:13 100:23
119:24
**agree** 88:22 122:12
133:11
**agreed** 41:21 107:19
114:8
**agreement** 6:10,20
7:6,13,14,17,18 8:8
8:22 9:9 10:3 16:7
17:24 20:12,13,17
21:8 23:4,8,9,16
24:2,12,18 25:12,18
26:15,16 27:22 28:4
28:11 29:17,21 31:4
31:12,16 32:3,9,14
32:23 33:3,16,24
34:18 35:17 36:13
37:23 38:20 53:4

54:8,10,15,20 91:3
91:21,24 98:7,13
108:13 110:16
119:18 121:6
133:15,20 136:9
139:3 143:17 144:4
**agreements** 7:11,23
8:2,6,18 15:24,25
16:11,13,20,24
21:12,13 26:7 27:6
31:24 32:6 34:10
36:5 37:11 38:17
40:23 121:13 134:9
138:21,22
**ahead** 72:19 119:4
**aimed** 107:18
**alan** 2:9 5:8
**allegation** 16:6
**allegations** 52:25
53:19 55:3,5
**alleged** 64:17,19
**allow** 5:25 90:13
110:8 118:25 119:3
140:19
**alt** 106:16,23 139:24
140:6,9 145:17
146:12
**amended** 124:8,10
126:16 127:21
128:24 130:18,20
131:2,11 132:9
145:22 146:5
**america** 88:10 89:22
**amount** 21:23 22:5
22:18 27:16 30:21
91:11
**amounts** 22:21
**analysis** 46:19 54:9
122:13
**analyst** 56:3
**analyzing** 118:5
**answer** 5:18 6:4
16:2 19:11 24:5
27:11 35:12,20
36:15 46:13 54:4,15

57:9 62:21,23 67:12
67:20 76:13,18,21
82:12 87:5,24
108:20 110:9 112:2
117:16 118:24
119:2,3,4,6,7
126:14 130:22
134:2 138:19
**answered** 72:8 82:9
123:10
**answering** 109:20
109:22
**answers** 127:9
**anticipated** 131:22
**antitrust** 14:19
**anybody** 23:11 30:3
66:17 75:16 89:16
94:22 104:8 107:15
120:3 124:4
**anyway** 29:15
**apologize** 9:14
132:9
**apparently** 72:14
131:7
**appeared** 58:22
108:18
**appearing** 30:5
**appears** 17:25 21:2
48:20 68:16 71:7
80:2 106:24 132:5
**applicants** 140:10
**applied** 42:4 44:5,11
117:15 118:7
**applies** 40:20
115:14 119:11
**apply** 41:12,22
54:11 109:19
118:15 119:14
122:21
**approached** 8:3
22:10
**approximately**
59:17
**arbitration** 6:13
9:11,13,15 11:4

[arbitration - believe]

12:5,6 13:4 14:7,9 17:15 18:13,21 20:2 26:18 29:18,21 34:2 35:19 45:23 51:23 55:9 56:25 65:11,15 66:13,19 90:25 91:4 94:10 108:4 126:5 129:15 131:17,20 131:23 132:19 133:20 134:6 135:7 135:22 136:17,24 136:25 137:5,6

**arbitrators** 132:6

**area** 14:8 61:6

**areas** 14:10,12

**argue** 119:2

**argued** 137:11 138:9

**arguing** 122:20

**argument** 110:2 138:12

**arguments** 137:15

**arose** 87:12 88:5 89:13,25

**arrow** 81:21

**arthur** 138:4,24

**article** 6:14,21 56:21 56:24 57:4,6,6 58:12,22,24 59:24 61:25 62:8 64:23,24 65:9,24 71:14 72:16 72:20 73:2 74:20 77:6 83:23 102:13 102:21 103:12 104:11,13,14,16 105:3 127:19 128:10 144:16

**articles** 56:3,16,22 73:4,5 106:5,6

**asked** 11:14,16 12:22 24:7,11 51:25 72:8,12 76:24 90:8 102:23 107:23 123:3 127:17 129:19,20 131:20

**asking** 10:2 35:13 39:2 46:14 48:2 66:11 67:14 95:19 100:20 101:2 111:14 114:11 118:19 121:5 127:24

**asserting** 102:10,12

**asserts** 59:18

**assigned** 11:17 31:23

**associate** 50:3

**associated** 138:23

**assume** 5:13 69:6 110:2,4

**assuming** 17:25 105:12 123:4

**assumption** 105:13

**assured** 29:3

**attached** 33:24 35:17 69:13,24

**attaches** 55:7 80:5

**attachment** 79:22 145:7

**attachments** 68:17

**attempt** 71:25

**attendance** 12:13 111:25 112:4,4,10

**attended** 12:7

**attention** 26:21 33:6 52:12 59:8 98:4 107:7

**attorney** 4:4 67:13

**attorneys** 2:5,14 3:5 37:4 38:21 43:22 44:22 45:5,25 46:3 46:8 49:17 75:24 76:16 106:2 114:24

**attributed** 61:14 65:2,4

**attributing** 66:24

**august** 142:22

**author** 83:23 84:5 138:3

**authority** 133:12 134:10

**authorize** 131:5

**authorized** 78:13,15

**authorizing** 78:8

**authors** 59:24 60:4

**available** 125:5 126:6

**avenue** 1:21

**award** 30:21 98:13 132:6,9,10,22 133:8 133:13,25 134:10

**awarded** 132:19 133:18

**awards** 98:8,24 135:11

**aware** 31:11 89:12 99:14 132:21

**awareness** 31:20

**awhile** 8:20

**b**

**b** 26:22 33:18,20,24 34:23 35:16 36:19 144:2 145:2 146:2

**back** 33:21 35:11 59:14 72:3 76:8,12 78:22 86:17 97:8 117:17 121:15 130:25

**background** 5:23 81:22 82:16

**backup** 121:25

**bad** 86:11

**balance** 62:3

**balanced** 61:19

**banc** 88:10 89:22

**bank's** 59:19

**bankers** 119:16

**banks** 63:24 73:13

**bar** 3:14 50:5

**barer** 2:4 5:9

**barr** 1:5 2:22 5:9 8:3 11:15,23 12:4,7 12:15 17:2,7,8,10

17:18,21,25 18:4,6 18:8,10 19:24 20:5 20:8,17,24 21:8,16 23:15,19,22 24:11 24:14,18,22 25:4,13 25:13,14,19,20,21 34:25 36:21 39:10 39:18 48:11,18 58:19 73:24 77:16 94:25 97:11 100:3,5 112:21 113:6 123:16 124:6 125:15 138:13 140:9 143:17,21 144:6,6,7,13 147:4

**barr's** 6:25 7:6,16 7:18 8:21,24 12:16 26:15 100:7

**based** 28:13 84:4

**basic** 139:2

**basically** 60:20 137:19

**basis** 67:18 90:21 122:23 133:25 139:12

**bat** 109:12

**bates** 25:13,20 48:11 48:18 144:6,13

**bayview** 34:4 35:22

**bdw** 116:12

**bean** 43:2

**bearing** 89:25

**beat** 137:13

**beep** 111:23,24 112:8

**beginning** 15:7

**begins** 30:18 52:21 98:5

**begun** 3:20

**behalf** 20:7 21:3 23:6 30:5 104:25 109:2 131:6 136:9

**belief** 87:16 108:22

**believe** 7:8,23,24 8:8 8:23 10:11,15 11:5

FILED: NEW YORK COUNTY CLERK 08/13/2018 01:47 PM
INDEX NO. 159781/2014
NYSCEF DOC. NO. 142
19-12346-shl    Doc 55-5    Filed 09/05/19    Entered 09/05/19 18:22:01    Exhibit C
RECEIVED NYSCEF: 08/13/2018
Part 3    Pg 151 of 216

[believe - claim]                                                                                    Page 4

12:7 23:10 26:14,19 40:22 42:25 43:2 48:25 50:4,23 51:25 52:7 54:6 58:21 60:6 63:8 64:4 65:7 65:23 66:13 70:18 72:15 73:17 75:2 77:9 79:7,8,9 88:18 88:19,20 92:21 93:16,18,21 99:18 99:20 102:3 104:5 107:8,12,14 111:23 113:24 117:9 129:14,23 133:22 134:14 135:14 136:20 138:5 139:4
**believed** 134:18
**benefits** 33:11
**benjamin** 2:11
**best** 10:24 24:6,8 52:10 62:24 84:6 103:13 105:17 111:25 130:16
**better** 131:20 137:12
**beyond** 128:6
**big** 65:17 133:21
**bios** 106:2
**bisaccia** 108:5 121:9
**bit** 65:17
**blackberry** 85:19
**blood** 142:18
**bonus** 73:12,16 74:8 91:7 115:22
**book** 138:6
**books** 116:16
**boston** 60:19 84:4,8 90:25 121:10 134:13 135:19,20 136:2,12,17
**bothering** 5:21
**bottom** 124:16,22
**bound** 33:8
**braff** 2:13

**breach** 53:14
**breached** 135:16
**break** 62:24 76:8 96:7 97:23 126:20
**brian** 2:17 5:25 6:3 43:2
**brief** 76:9 97:24 113:2 127:3 141:5
**briefing** 138:25
**briefly** 34:5 35:23
**broadest** 120:21 136:13
**broadway** 2:15
**broken** 78:21
**broker** 116:13 136:10
**brokerage** 116:9
**brought** 134:15
**burner** 121:15
**business** 40:14 44:18 115:19 116:2 120:24 121:3 123:14 124:2
**buy** 123:15
**buyout** 120:22
**byline** 56:19,21 57:3
**bylined** 62:2

**c**

**c** 2:2,17 142:2,2
**c.p.l.r.** 3:7,23
**calculate** 118:6 119:5,12
**california** 108:7
**call** 20:2 47:5,6 64:25 75:19,22 94:6 94:7,21 110:23,24 111:4,6,8,17,20,22 112:15
**callander** 43:3,10,12 43:17
**called** 5:2 11:10 47:18 61:16 71:13 77:24 94:22 99:6,23 116:12

**calling** 43:8
**calls** 75:16 103:23 111:13 112:16
**canceling** 92:3,10
**candidate** 139:11
**cap** 81:8,13,18 82:7 145:11
**case** 9:21,21 12:16 13:17,21 32:4 44:9 45:16,18,20 51:6 67:21 68:3 72:25 73:12,15 82:21 88:10 91:2 94:5 100:23 106:2 118:8 125:10 126:9,10 128:21 129:4,12,13 134:14 135:12 136:3,8,18 137:2,7 138:11,14 139:13 147:4
**cases** 56:4,18,20 83:15
**cash** 10:8 21:22 22:4 22:18,20,25 23:12 26:23 27:8 30:20 34:9,11,17 36:3,6 36:12 38:4,22 98:10 107:16 132:18
**catchline** 34:13 36:7
**caused** 103:12
**cep** 29:4,6 40:22 90:20 91:5 92:17 94:9 114:12 120:25
**cert** 139:17,18
**certain** 18:17 33:10 47:21 94:6 105:25
**certainly** 18:7 56:22 67:4 69:8 72:17 73:25 79:4 99:12 100:8 109:16 110:14 139:14
**certify** 142:10,16
**certiorari** 139:22 140:4,11 146:10

**chairman** 134:5 135:22
**chance** 72:17 83:4
**change** 40:16 44:3 44:10,16 46:7 54:12 119:11,17,25 120:5 120:6,19 122:12 123:8,23 124:2 147:7
**changed** 105:17
**changes** 69:3
**characterize** 40:9 63:21
**characterized** 63:17 63:19
**charge** 4:5 105:10 105:11
**charlie** 56:2,3
**chris** 43:5
**christine** 12:18 13:2 68:8,13 69:9,23 77:20 79:12,20 80:3 81:18 144:19 145:5
**chronologically** 92:18
**circle** 81:21
**circuit** 137:25
**circuit's** 138:12
**circuits** 139:14
**circumstance** 75:12
**circumstances** 109:8,19 117:16
**cited** 110:16
**civil** 126:7 138:2,5
**claim** 6:12,21 8:10 17:14 26:11 37:6 38:12 41:2 47:13 48:24 49:7,9,12,15 49:22 56:11,14,17 61:18 65:6,8,13,22 65:25 66:3,6,16,21 68:18 69:2,10,13,22 72:5,13 74:12 81:2 82:23 83:3,6 84:2 84:16,21 86:22,24

FILED: NEW YORK COUNTY CLERK 08/13/2018 01:47 PM
INDEX NO. 159781/2014
NYSCEF DOC. NO. 142
19-12346-shl    Doc 55-5    Filed 09/05/19    Entered 09/05/19 18:22:01    Exhibit C
RECEIVED NYSCEF: 08/13/2018
Part 3   Pg 152 of 216

[claim - continued]

87:6,17 89:6,17,18
91:5 103:12 122:25
124:11 131:3,11
133:19 145:23
**claimant** 39:22
74:14,24 75:4 77:14
80:21 87:9 88:4
103:21 108:21
**claimant's** 53:4
89:18
**claimants** 26:6
28:13 31:25 32:7
46:19,24 47:11
52:23 53:12 56:25
75:6 77:2 86:23
87:2,23 90:16,16
92:3 97:12 108:25
109:3 110:6,12,13
111:19 116:24
118:8 120:8 123:8
**claims** 20:6,10 21:14
21:17,18 22:19
53:23 74:4 75:11
86:23 87:3 89:15,21
91:5,7 92:17 94:10
107:22 108:16
125:8 137:2
**clarified** 93:19
**clarify** 9:3 29:22
106:12
**clarifying** 9:5
**clark** 43:10,12,17
**claude** 43:3
**clause** 32:25 40:19
40:20,21 41:11,12
44:7,11,19 110:3,10
118:7,15 120:3
**clauses** 16:21 27:6
108:22
**clear** 5:19 82:10
117:11 128:12
**cleared** 127:8
**clearer** 38:14
**clearly** 66:20 107:17

**clemente** 48:10,17
144:12
**client** 19:13 88:21
88:25 89:5,11 90:4
90:19 120:2
**clients** 7:25 15:8,9
33:2 37:4 62:16
92:9,10 106:25
**clinton** 64:11
**close** 137:8
**closed** 62:14 63:18
84:10 115:24
116:10,16
**closing** 62:12 73:19
120:24 123:14,22
123:24 124:2
**coauthored** 57:3
**code** 87:13,19 90:11
90:13 95:6,11
**coincided** 121:20
**collaboration** 49:14
**colleagues** 39:3
42:14 85:5,22 86:6
86:12 122:11
**college** 85:17
**come** 9:22 15:4
17:20 19:22 64:20
92:2 93:5 117:22,23
124:7
**comfortable** 92:19
**coming** 135:8
**commencement**
33:25 35:18
**comment** 60:6
**commented** 74:22
**commenting** 74:19
**comments** 66:23
**commission** 14:18
147:25
**committee** 41:10
42:22,23 43:15,21
47:17 48:2
**commodities** 14:16
**common** 20:13

**communicate** 85:2,4
85:9,13 118:21
**communicates** 95:9
**communication**
70:21 85:11 88:20
**communications**
85:21,25
**comp** 114:12
**company** 44:17
115:18,23 121:2,9
**company's** 60:21
105:22
**compare** 83:5
**compensation** 10:8
15:21,24,25 16:5,7
16:14,19 18:14,22
27:15,23 28:14,15
28:21 33:12 53:12
53:25 59:15 74:8
89:10 92:4,10
112:23 113:7 125:8
132:18 133:10,17
134:18
**completely** 87:12
92:6 137:19
**complex** 14:15
**compliance** 30:25
**complicated** 87:4
**complied** 139:5
**complies** 27:3
**concern** 22:11 64:12
112:22 113:6 121:2
**concerned** 28:15,20
29:9 52:24 53:18,22
54:14 73:13 77:15
**concerning** 52:23
53:12
**concerns** 39:10,23
40:7,10 44:18
**conclusion** 121:19
**condition** 33:10
**conduct** 3:8
**conference** 75:16,19
75:22 110:23,23
111:3,6,8,12,17,20

112:16
**confident** 134:2,4
**confidential** 91:22
**confidentiality**
91:20,24
**confirm** 86:7
**conflict** 78:23,25
87:9,18,25 88:3
89:23 116:23 117:2
**confuse** 90:2
**connection** 5:10 6:5
11:8 12:15 13:3
16:4 19:25 42:3
51:23 72:25 75:25
76:2,17,18 77:3
78:9,14 80:22 86:10
125:14 139:17
140:10
**consider** 32:18
**consideration** 28:3
**considered** 91:7
**consistent** 82:22
83:2 107:5
**constitutional**
139:15
**cont'd** 144:2 145:2
146:2
**contact** 11:22 12:4
12:10 23:19 107:25
**contacted** 19:12
**contacting** 58:2
**contain** 77:23
**contained** 33:9
37:15 138:7
**content** 34:22 36:18
36:25 37:3
**contents** 54:19 60:8
78:20 82:22
**contested** 18:13,22
**context** 38:9 87:12
89:13 99:13 126:13
**continue** 30:22 33:8
**continued** 30:24
97:6 115:23 140:18

FILED: NEW YORK COUNTY CLERK 08/13/2018 01:47 PM
INDEX NO. 159781/2014
NYSCEF DOC. NO. 142
19-12346-shl    Doc 55-5    Filed 09/05/19    Entered 09/05/19 18:22:01    Exhibit C
RECEIVED NYSCEF: 08/13/2018
Part 3    Pg 153 of 216

[continues - delivering]                                                                    Page 6

**continues** 53:7
**contractual** 109:5,6
  119:10
**contributed** 73:9
**control** 14:20 40:16
  44:3,10,16 46:8
  54:12 119:11,17,25
  120:5,6,20 122:13
  123:9,23 124:2
**controlled** 3:24
**conversation** 18:18
  24:17 44:2 70:8,9
  70:15,19 72:10
  94:15 125:15
**conversations** 28:13
  79:14 80:12,18 86:7
  86:10,14 99:14
**convince** 107:10
**coordinate** 78:19
**copied** 79:17
**copies** 32:6 39:3
  65:7 80:25 91:14
  95:20 112:11
**copy** 4:3 20:16 21:7
  23:16 61:17 83:9,16
  97:10 100:5 104:13
  113:25 130:14
  143:16
**corner** 71:11
**corporate** 14:16
**correct** 8:24 15:16
  21:24 26:8,12 32:7
  55:10 67:15 75:8,14
  108:23 132:12
**corrected** 132:10
**correctly** 92:8
**cost** 85:16
**costs** 139:2
**counsel** 3:22 11:6
  68:15 95:11,14,22
  95:23 101:9,11
  107:25
**counteract** 84:4
**counterclaim**
  126:16 127:21

**128:24 130:15,19
  130:21 146:5
**counterparties**
  116:7
**county** 1:3 142:6
**couple** 10:14 89:19
  94:20 115:16
  124:13 127:8
**course** 12:4,6 39:5
  54:23 88:2 108:12
  125:10 128:7 134:6
  136:25
**court** 1:2 35:15 55:9
  76:14 117:19
  126:10 130:24
  134:14 138:11
  139:12,23 140:5,17
  146:11
**courts** 14:7,9
**cover** 68:23 111:13
**coverage** 61:10
**covering** 56:4 61:2
  83:14,21
**crack** 61:3
**craig** 55:11,19 56:24
  57:12,17,21 60:12
  60:14 61:5,16 63:3
  63:4,6 64:22,25
  68:8,13 69:11,19,25
  70:11,20,25 71:8
  72:6,11 77:21 79:7
  79:13,20 80:3,14
  82:16 83:8 84:15,20
  144:20,23 145:5
**craig's** 83:23
**cranny** 41:19
**creation** 78:9
**criticized** 62:20
**custodian** 21:12
**cut** 117:11

**d**

**d** 2:11 5:2,2 97:4,4
  143:2

**daly** 133:2 135:14
**daly's** 133:23
**damage** 133:19
**damaged** 59:21
**damages** 59:14 60:2
  133:9
**database** 106:3
**date** 20:19 22:23
  24:24 25:15 41:6
  48:13 58:13 68:10
  71:3 79:23 81:9
  93:4 106:18 113:13
  118:6,14 119:5,13
  124:12 126:17
  128:23 131:16,25
  132:2 139:25 147:5
  147:25
**dated** 17:25 24:23
  25:5,12,18 48:9,16
  68:7,12 70:25 71:8
  79:21 80:3 81:8,14
  106:15,22 113:11
  113:19 116:6
  143:22 144:5,10,18
  144:23 145:5,11,16
  145:20
**dates** 22:25
**david** 12:3,14 13:6
  24:22 25:5 50:3
  143:21
**day** 9:12,16,18
  40:15 49:2 63:16
  64:7 65:25 70:18
  73:19 123:11
  137:12 141:14
  142:22 147:22
**days** 65:20 66:7
  105:19 137:8
**deal** 15:24 71:25
  73:20
**dealer** 116:13
  136:10
**dealing** 119:16
**dealt** 44:6 137:2

**daly** 133:2 135:14
**december** 48:9,16
  49:3 52:13 56:11,11
  59:4 65:23,24 68:7
  68:12 70:16 71:2,8
  72:6 79:21 80:4,14
  80:20 82:8 105:2
  114:10 132:2
  144:11,19,24 145:6
**decide** 101:14 134:7
  134:12
**decided** 132:2
  137:18,24
**decides** 105:21,24
**decision** 9:14 45:24
  68:2 120:5 135:9,10
  135:15
**declare** 104:10
**deemed** 3:22
**defendant** 1:18
**defendant's** 20:23
  37:17,18 58:19
**defendants** 1:12
  2:14 30:4 138:13
  139:17
**defer** 114:11
**deferred** 10:8 15:21
  15:24,25 16:5,6,14
  16:19 21:23 22:5,18
  27:15,22 28:14,15
  28:21 53:25 89:9
  92:4,10 112:23
  113:6 114:12,21
  125:7 132:18
  133:10,17 134:18
**deferring** 114:25
  115:3
**definitely** 16:12
  74:7 91:21
**degrees** 139:5
**delay** 115:14
**delineated** 20:11
**deliver** 83:9
**delivering** 83:16
  84:2

FILED: NEW YORK COUNTY CLERK 08/13/2018 01:47 PM
INDEX NO. 159781/2014
NYSCEF DOC. NO. 142
RECEIVED NYSCEF: 08/13/2018

19-12346-shl    Doc 55-5    Filed 09/05/19    Entered 09/05/19 18:22:01    Exhibit C
Part 3    Pg 154 of 216

**delusional** 71:23
**demand** 32:13 42:13
  42:18 66:14
**department** 14:19
  60:22
**deponent** 147:6
**deposing** 30:6
**deposition** 1:18 3:17
  3:21 4:2 6:6,23,25
  10:13 11:7,9 20:23
  58:19 142:12,14
  147:5
**depositions** 3:9
**describe** 106:11
**described** 77:8
  107:6 111:3
**destroyed** 73:18
**detail** 137:16
**detailed** 9:24
**details** 22:17
**determination**
  46:25 47:12 101:17
**determine** 101:9
  122:22
**determined** 41:12
  98:7
**develop** 62:16
**devil's** 41:18 121:18
  122:3,6,10,16,18
**diametrically**
  136:23
**dictated** 87:13
**dictating** 89:7
**difference** 65:17
  109:24 110:7
**different** 26:16 75:5
  75:5 83:25 89:15
  93:12 122:7
**differently** 120:3
**difficult** 106:10
**diminish** 74:5,7
**direct** 26:21 33:6
  52:12 88:19 89:17
  98:3

**directing** 107:7
**directions** 143:7
**directly** 95:7
**disagree** 118:18
**discard** 80:7
**disclose** 46:24
**discovery** 68:16
**discuss** 11:7,12 41:4
  64:25 87:8 101:20
  110:20 120:19
  124:24 125:6
**discussed** 34:6,22
  35:5,6,8,23 36:18
  36:25 37:3 40:4
  41:20 44:3,4 47:10
  74:13,15 75:20
  111:9 114:6 115:4
  125:10 128:12
**discussing** 39:21
  75:24 76:15 120:6
  122:22 125:13
**discussion** 35:13
  37:2 39:20 40:17,24
  41:8,9,24 42:15
  43:21 44:23,25 45:6
  46:7,10,24 51:16
  61:24 76:25 101:13
  101:24 108:7
**discussions** 37:5,9
  37:12,13 38:2,3,11
  38:15,20,21 39:5
  41:16 76:6,23 77:9
  77:17 79:11 80:19
  103:20,24 104:3
  114:23 115:5
**disinclined** 135:11
**disparaged** 62:16
  94:12 103:5 104:15
**disparagement**
  16:21,23 31:2,6,14
  32:21,24 33:5,9
  38:5,24 39:4 44:5,6
  44:14 53:3,24 54:8
  54:10,14,20 67:3
  99:16 102:2,7,20

103:8,12,19 104:2,6
108:22 109:18
110:3 117:7,21
118:7,14 127:20
134:19
**disparaging** 66:25
  109:15
**dispositive** 44:18
**dispute** 16:4
**disputes** 15:21,23
**dissent** 132:22 133:7
  133:23 135:5
**dissented** 133:2,5
**dissents** 135:13
**district** 127:22
  138:11
**diverse** 87:7
**division** 116:10
**document** 6:15
  20:21 21:2,4,5,16
  25:2,7,17,20,22,24
  26:2 46:17 48:8,15
  48:21 52:4,8,14
  54:13,17,19 58:15
  58:20 66:4,15 68:5
  68:6,12,20 71:5
  77:24 79:25 80:5,8
  81:11,16 82:3,4,24
  93:2 94:2 97:17
  102:11 107:2
  113:21 123:22
  124:14,23 127:25
  128:2 131:5,14
  132:14 136:3 140:3
  144:9,18 145:13
  146:7
**documents** 6:7,9,19
  6:22,24 7:21 22:19
  25:25 68:18 73:19
  91:15 93:23 99:7,17
  99:20 100:4,6,11,14
  101:24 110:15
**doing** 63:21 115:25
  116:18 126:19

**dollar** 62:17
**dot** 114:7
**doubt** 112:14
**draft** 49:9 67:22
  68:3 69:10,14 77:25
  78:7
**drafted** 42:2 49:11
  49:14
**drafting** 49:21
**drafts** 67:6,10
**dress** 63:19
**drove** 59:19
**due** 16:7 18:15 98:8
  98:23 134:19
**duly** 5:3 142:13
**duties** 53:14

**e**

**e** 2:2,2 5:2,2,2 21:22
  32:20 33:7 68:23
  70:24 71:7,15 77:20
  79:12,19 80:2,7
  85:13,19 97:2,2,4,4
  97:4 142:2,2 143:2
  144:2,22 145:2,4
  146:2
**earlier** 20:12 21:6
  77:9 80:7 88:6
  89:24 104:14
  107:20 108:20
  109:9 128:4
**early** 105:19
**effect** 110:3,10
  129:22,25 130:11
**either** 6:3 9:23
  40:14 49:6,8 54:18
  56:21 60:5 66:21
  67:24 83:4 94:4
  97:11 99:9 128:8
**elaine** 107:24
**elected** 64:11
**electronic** 59:6
**eliminated** 44:20
**else's** 100:8

[emotional - firm]    Page 8

**emotional** 29:10
**emphasis** 135:8
**employee** 59:18
**employees** 44:8
  59:20 116:3
**employment** 15:5,6
  15:11,18 16:18 46:2
  52:23 53:12
**encouraged** 41:17
**ended** 41:16
**energy** 14:20
**enforcing** 107:11
**engaged** 17:21
  18:11 19:24 20:5,7
  24:14
**engagement** 19:5,9
  39:6,9,13,18
**enterprise** 62:17
**entire** 27:22 61:10
  72:23
**entirety** 61:24
**entity** 83:25
**entry** 34:11 36:5
**equity** 53:13 59:16
  73:17 74:6 115:21
**equivalent** 10:8
  21:22 22:4,18,21,25
  23:12 26:23 27:8
  30:20 34:9,11,17
  36:3,6,12 38:4,22
  63:23 98:10 107:16
  132:19
**errata** 147:2
**especially** 5:23
  44:16 90:25 135:4
  135:12
**esq** 2:9,11,17
**essence** 62:7
**essentially** 116:2
**estate** 14:16
**estimates** 59:15
**etcetera** 75:16
  130:12
**evaluate** 88:17

**events** 23:13 102:17
  116:14
**everybody** 9:22
  12:10 44:15 73:21
  73:22 87:5 99:14
  108:8 117:22
  120:22 123:11
  137:22 139:4
**evidence** 134:22,24
**evolved** 42:25
**exact** 126:2
**exactly** 62:7 126:8
  135:15 138:19
**examination** 3:11
  3:14,20 4:4 5:5
  76:10 97:6,25 127:4
  143:3
**examined** 3:18 4:5
  5:4
**exception** 66:17,18
**exchange** 9:11,15
  48:11,17 144:12
**exchanged** 99:18
**excluded** 21:18 22:5
  22:6,9 28:8 38:18
**exclusions** 21:19
**excuse** 62:22 67:9
**executed** 87:10
**executives** 59:13,25
**exempt** 121:5
**exhibit** 20:16,21
  24:20,21 25:2,11,17
  30:8 32:20 33:18,19
  33:20,24 34:8,23
  35:16 36:2,19 37:16
  48:7,8 51:14 52:15
  58:11,16 59:9 68:6
  70:24 71:5 72:3
  77:19 79:19,25 81:6
  81:11 82:11 92:25
  93:2 97:8 106:14,20
  113:10,18 121:24
  124:10,18 126:15
  127:12,16,17
  130:13 131:2,14

132:5 136:4 139:21
  140:3 143:16,20
  144:4,9,15,18,22
  145:4,9,13,15,19,22
  146:4,7,9
**exhibits** 69:14
  143:13
**exist** 16:14 42:12,17
  42:21
**existed** 102:13
**existing** 95:10
**exists** 42:10 121:25
**expectation** 63:9
**expected** 116:15
**expenses** 138:23
  139:2
**experience** 16:18
  60:15
**expert** 40:15 138:2
**expertise** 14:9,11,15
  14:18 15:10
**experts** 119:25
  120:12
**expires** 147:25
**expressed** 112:22
**expressing** 39:10
**extremely** 138:2

**f**

**f** 5:2,2 97:2,4,4
  142:2
**fact** 38:3 83:7 84:20
  94:24 95:2,15
  100:10,12 109:17
  129:14 135:23
**factiously** 90:17
**facts** 66:10 92:6
**failure** 3:12,20
**fair** 14:18 74:12
**fairly** 88:13,15 94:6
**faith** 54:7 55:6
  71:25,25
**fall** 30:14
**familiar** 17:2 54:22
  55:11

**far** 29:11 73:12
  87:25
**faster** 116:21
**feasible** 75:12
**federal** 126:6,10
  134:14
**fee** 22:13 29:6,13
  118:2 121:7
**feel** 92:18
**feeling** 62:2
**feet** 100:22
**felt** 18:14 84:14
  90:24 103:4 133:22
**fiduciary** 53:14
**figure** 96:6
**file** 100:21 113:11
  113:18 114:2,8
  116:12 130:4,24
  145:20
**filed** 8:10 11:4 17:15
  48:25,25 49:3,6,8,8
  55:8 56:11,15 61:18
  63:7 65:15,23 66:7
  66:13 67:7,8,11,23
  72:15 81:3 87:17
  95:18,21 121:16
  129:16,20 130:15
  131:11,25 136:7,8
**filing** 3:25 26:11,17
  37:6 38:12 39:11,23
  41:2 47:13 56:17
  57:13,18,22 58:3
  66:2 86:21 114:11
  114:25 115:5,15
  122:25
**final** 69:3
**financial** 83:13
**find** 18:20 84:20
  94:14 103:10
**finding** 135:3
**findings** 134:25
**finish** 96:8 117:16
**finra** 9:13,14
**firm** 5:8 13:23 17:20
  31:22 32:5 37:4

[firm - harris]                                                                                          Page 9

41:17 63:5 67:6,10
67:16,22 68:2 73:23
75:17 78:12 86:20
86:22 94:18 95:13
103:15 109:2
111:16 112:25
122:12 140:8

**firms** 115:24

**first** 7:12,20 9:8,17
10:18,24 17:6,9,17
41:5 44:12 48:6
52:20 54:5 55:18,21
61:3 92:15 94:23
97:17 98:4 99:12
102:18 114:12
126:15 127:21
128:24 130:15,18
130:20 131:24
136:6 137:21,25
138:12 146:4

**fleet** 53:22 61:2,8,11
61:13 62:6,9 64:23
66:18 67:5 71:20
84:8 88:9 91:3
94:13 95:14,22
104:15

**fleet's** 53:14

**fleetboston** 59:14
106:16,23 145:17

**flipped** 7:2,9,21

**floor** 2:6

**focused** 73:15

**follow** 86:6,12

**followed** 86:2
134:24

**following** 140:18

**follows** 5:4 97:5

**forfeiture** 112:23

**forgotten** 128:11

**form** 3:10 8:7,12,25
17:3,22 19:10 27:9
38:8 39:25 46:11
53:5 54:2 55:23
57:8 66:16 85:7
116:12,13 120:15

124:24

**formal** 112:10
115:25

**format** 114:5

**formed** 13:22,23,25

**forms** 8:22

**forth** 71:20 86:13
142:12

**forty** 19:4

**forum** 55:9

**found** 101:25
103:18

**four** 12:12 14:25

**fourth** 114:7

**francisco** 84:9

**frankly** 73:24

**fraudulent** 52:22
53:2,10,19

**frequently** 43:8

**front** 30:11 91:7
130:14

**full** 137:12

**fully** 6:18 126:14

**fun** 90:14,17

**funds** 125:2

**furnished** 4:4 143:9

**further** 4:3 76:10
97:25 127:4 141:6
142:16

**g**

**game** 99:11

**gandolfo** 134:5

**garvey** 2:4 5:8

**gasparino** 56:2,4

**general** 60:25 62:19
67:16,17,18 90:6,8
90:14 94:9 107:5
108:13

**generalized** 91:12
91:15

**generally** 15:23
16:16 86:17 106:4

**getting** 15:8 23:2
84:14,24 89:14

**gist** 27:13,14

**give** 61:8 66:11
81:22 82:16 94:9
96:4 107:10

**given** 60:12,13 63:3
94:8 100:14 142:15

**giving** 65:25 66:6
69:7 126:22

**glad** 93:19

**go** 38:19 49:19 72:3
82:21 97:8 116:21
119:4 122:21
134:13 135:19,20

**goes** 105:21,24

**going** 5:12 9:12 29:7
29:15 32:11 61:9
62:3,24 64:9 66:10
74:2,8,19 84:7
103:13 108:2 110:8
112:3,19 117:9
118:3 121:3,9 123:5
123:15,20,21,22
126:18,19,21 132:7
136:8 141:2

**goldman** 19:14,15
19:20 43:2

**good** 5:7 54:7 55:6
71:24,25 96:7
109:11

**gotten** 89:24 123:4

**great** 104:21

**greer** 43:5

**grenert** 13:20 49:24
50:15 51:11,22

**gretchen** 83:10,11
83:17 84:12

**grievance** 95:18,21
96:5

**grievances** 109:5

**group** 10:8 19:17
28:10 37:13 39:22
40:25 41:5 46:18
48:6 59:13 73:7,22
74:14,25 75:4 77:2
77:12 80:21 87:9

88:4 98:6 103:21
116:21 123:16,17
128:6,8 129:4
135:25

**groups** 91:8

**guess** 85:14 86:18
90:15 104:7 106:4

**guessing** 11:21
69:17 99:11 103:17

**guy** 73:4 95:24

**h**

**h** 144:2 145:2 146:2

**hand** 71:11 78:18
83:9 117:13 124:16
124:22 142:22

**handed** 107:10

**handle** 11:17 34:7
35:25

**handled** 11:20 12:22
15:17 88:19,23 89:3
130:5

**handwriting** 71:10
81:15,19,20 82:5
113:20,23 115:6

**handwritten** 115:7
124:16,21 128:20

**hanging** 91:2

**happen** 22:24 74:19
115:17

**happened** 62:9
75:22 136:15

**happy** 5:16 30:16
139:19

**hard** 39:19

**harris** 2:13,17 7:14
8:12,25 9:6 10:10
17:3,22 19:10 27:9
27:18 30:8 32:13,16
35:9 37:17,19,22
38:7,13 39:25 42:19
43:16 46:11 52:13
53:5 54:2 55:23
57:8 72:8 85:7 96:2
98:18,21 99:25

FILED: NEW YORK COUNTY CLERK 08/13/2018 01:47 PM
INDEX NO. 159781/2014
NYSCEF DOC. NO. 142
19-12346-shl    Doc 55-5    Filed 09/05/19    Entered 09/05/19 18:22:01    Exhibit C
RECEIVED NYSCEF: 08/13/2018
Part 3    Pg 157 of 216

101:19 110:8,11
112:18,24 118:25
120:9,11,14 125:20
130:18
**he'll**  101:9
**hear**  5:22 111:23
134:7 139:13
**heard**  67:5 94:6
102:18
**hearing**  66:19
131:24 134:21
136:7
**hearings**  137:9
**heavy**  91:4 107:9
135:7,7,7
**hechinger**  57:4,7
60:17 61:19 64:13
64:22 72:19 73:5
74:20
**hechinger's**  72:21
**held**  1:19 75:15
89:21
**hell**  128:2
**heller**  2:9 5:6,8 7:15
10:12 16:17 17:5
20:15 22:3 24:19
25:10 26:4 30:10
35:11 38:10 42:9,12
42:17 46:14 48:7
51:12 52:15 53:8
57:11 58:10 66:5
68:4 72:9 76:7,11
76:12 79:18 81:5
82:25 85:3 86:9
91:23 92:24 95:20
96:6 97:7 98:2,19
101:7,22 109:25
110:21 112:15,25
125:21 127:5
130:20 141:2,6
143:4
**help**  30:16
**helping**  56:2
**helps**  106:12

**hereinbefore**  142:12
**hereto**  3:5
**hereunto**  142:21
**highly**  134:2,3
**hillary**  64:11
**hire**  29:5 85:17
**hired**  15:8 23:11
138:2
**hiring**  22:10 138:24
**history**  64:14,15
**hmm**  26:24
**hour**  137:4
**hourly**  138:25
**hours**  137:22,23
**house**  61:4
**hubbard**  11:10,13
13:9 130:6
**hubris**  71:23,23
**hundred**  90:19
102:3 129:23
**hundreds**  100:21

**i**

**idea**  29:3 46:16
81:22 84:23 123:25
**identical**  7:24 8:9,23
**identification**  20:19
20:22 24:24 25:3,14
48:13 58:13,16
68:10 71:3,6 79:22
81:9,12 93:3 106:17
106:21 113:12
124:12 126:17
131:15 139:25
**identified**  21:16,21
**immediate**  30:19
**immediately**  62:9
116:8
**important**  73:12
**improper**  95:15
**inaccurate**  61:15
**inaudible**  131:18,23
137:17
**incidentally**  104:12

**include**  85:23 109:2
**included**  49:14
77:10,10
**including**  3:9 59:14
73:4 120:4
**index**  1:8
**indicate**  46:19
**indicated**  121:13
**indicates**  121:22
133:23
**indirectly**  95:8
**individual**  8:19
19:13,16 31:24
73:11 89:15 90:9
108:25 123:7
**individuals**  7:22 9:9
19:24 20:4 22:10,16
32:24 45:15 51:15
51:21 140:14
**industry**  19:21
55:17 126:5
**industry's**  135:6
**information**  9:24
82:20 106:7 107:18
143:6
**informed**  28:20
47:11,19 108:8,9
**infrequent**  86:5
**initial**  6:10,20 17:24
**initially**  9:22
**initiated**  77:11,11
77:13,13
**ins**  47:6
**instance**  126:4
**instances**  33:10
**instruct**  69:9,15,23
**instructing**  57:20
**interacted**  12:14,20
**interactions**  11:15
**interest**  23:2 30:22
59:16 83:20 95:4,9
**interested**  142:19
**interesting**  84:7
**interests**  53:13

**internet**  63:15
**investigate**  86:22
**investigative**  55:16
60:17 61:6
**investment**  34:5
35:22 119:15
**invited**  73:23
**involve**  15:20
**involved**  43:24 56:5
56:5 62:11 75:17
**involvement**  29:14
**issue**  8:5 22:2 32:4
32:10 33:4 44:3,16
87:11,21 89:13,25
90:3,19 99:15
101:25 102:7,8,9
103:11,19,21,25
104:6,10 109:18
115:13,20,21 117:3
117:24 118:5
121:14,15 123:9
125:20,21 126:9
127:20 128:12
129:17 135:16
**issued**  70:4
**issues**  9:20 73:10
84:13 102:19,24,25
103:7 115:17 126:3
**item**  44:12,13
**items**  22:12 37:15
44:11
**iterations**  68:25

**j**

**j**  5:2 6:1 7:1 8:1 9:1
10:1 11:1 12:1 13:1
14:1 15:1 16:1 17:1
18:1 19:1 20:1 21:1
22:1 23:1 24:1 25:1
26:1 27:1 28:1 29:1
30:1 31:1 32:1 33:1
34:1 35:1 36:1 37:1
38:1 39:1 40:1 41:1
42:1 43:1 44:1 45:1
46:1 47:1 48:1 49:1

FILED: NEW YORK COUNTY CLERK 08/13/2018 01:47 PM
INDEX NO. 159781/2014
NYSCEF DOC. NO. 142
RECEIVED NYSCEF: 08/13/2018

19-12346-shl    Doc 55-5    Filed 09/05/19    Entered 09/05/19 18:22:01    Exhibit C
Part 3    Pg 158 of 216

50:1 51:1 52:1 53:1
54:1 55:1 56:1 57:1
58:1 59:1 60:1 61:1
62:1 63:1 64:1 65:1
66:1 67:1 68:1 69:1
70:1 71:1 72:1 73:1
74:1 75:1 76:1 77:1
78:1 79:1 80:1 81:1
82:1 83:1 84:1 85:1
86:1 87:1 88:1 89:1
90:1 91:1 92:1 93:1
94:1 95:1 96:1 97:1
97:4 98:1 99:1
100:1 101:1 102:1
103:1 104:1 105:1
106:1 107:1 108:1
109:1 110:1 111:1
112:1 113:1 114:1
115:1 116:1 117:1
118:1 119:1 120:1
121:1 122:1 123:1
124:1 125:1 126:1
127:1 128:1 129:1
130:1 131:1 132:1
133:1 134:1 135:1
136:1 137:1 138:1
139:1 140:1 141:1
**january**  114:13,21
128:24 129:11
**jeff**  83:9
**jeffrey**  1:9,19 5:11
59:11 70:8,25 71:8
106:15 141:11
142:11 143:4
144:23 145:16
147:6,21
**jim**  11:10,12 13:9
**jll**  81:8,13 145:10
**job**  71:19
**joe**  95:24
**john**  50:4 57:4
60:16 61:18 64:12
72:19 74:20
**jonathan**  19:14,20
42:25

**journal**  6:14,21
55:17 56:8,14 58:12
58:23 59:2 60:18,23
64:8 68:9,14 77:5
102:14,21 103:11
103:20 105:3
127:19 128:10,17
144:16,20
**journalists**  84:13
**jrh**  113:5,8,11,19
124:23 145:20
**judge**  137:10,10
**judgment**  125:3,5,7
125:11,13,14,18,25
126:4 128:22 130:8
136:20,21,22
**judicata**  137:14
138:9
**juicy**  62:6
**july**  1:15 9:23 22:23
108:7 120:23
128:18 147:5
**june**  13:23 102:16
127:25
**jurat**  140:20
**jurisdiction**  60:24
60:25 133:24
135:24

**k**

**karol**  50:4,6 51:22
**keep**  112:11
**keeps**  66:3
**kept**  134:22
**kind**  77:12 86:7
99:10 112:13 116:6
134:16 136:6
**kinds**  41:15 47:7
**knew**  95:3 126:13
**know**  5:13,16 6:24
7:10,10 12:3,14,17
12:19,21 16:2 17:11
23:18 28:18 29:10
30:3 40:18 42:14
45:24 46:23 47:3

49:11 50:20 56:19
57:5 59:5 61:22
64:5,5,6,10 65:12
65:16 67:2,12,18
69:2 70:2,2,6 72:12
74:18 75:10 76:24
77:16 78:3 81:4
82:15 83:20,24
84:10,18,19,23
88:13 89:12 91:17
98:16 100:10,12
104:8,19 105:5,6,8
105:16 106:6,10
110:13 112:13,21
113:8 116:4,6,14
117:11 121:24
123:5,16 126:11
131:10 132:17,20
137:7 138:25 139:5
**knowledge**  52:10
130:17

**l**

**l**  1:9,19 5:2,2,2 6:1
7:1 8:1 9:1 10:1
11:1 12:1 13:1 14:1
15:1 16:1 17:1 18:1
19:1 20:1 21:1 22:1
23:1 24:1 25:1 26:1
27:1 28:1 29:1 30:1
31:1 32:1 33:1 34:1
35:1 36:1 37:1 38:1
39:1 40:1 41:1 42:1
43:1 44:1 45:1 46:1
47:1 48:1 49:1 50:1
51:1 52:1 53:1 54:1
55:1 56:1 57:1 58:1
59:1 60:1 61:1 62:1
63:1 64:1 65:1 66:1
67:1 68:1 69:1 70:1
71:1 72:1 73:1 74:1
75:1 76:1 77:1 78:1
79:1 80:1 81:1 82:1
83:1 84:1 85:1 86:1
87:1 88:1 89:1 90:1

91:1 92:1 93:1 94:1
95:1 96:1 97:1,4,4,4
98:1 99:1 100:1
101:1 102:1 103:1
104:1 105:1 106:1
106:15 107:1 108:1
109:1 110:1 111:1
112:1 113:1 114:1
115:1 116:1 117:1
118:1 119:1 120:1
121:1 122:1 123:1
124:1 125:1 126:1
127:1 128:1 129:1
130:1 131:1 132:1
133:1 134:1 135:1
136:1 137:1 138:1
139:1 140:1 141:1
141:11 142:11
143:4 145:16
**l.l.p.**  1:9,20
**language**  44:6,19
118:22
**large**  106:9 135:12
**larry**  131:9
**late**  88:13,16
**law**  14:3,4 15:13
33:5 50:21 54:6
67:18 85:17 95:6
**lawsuit**  5:10 114:25
115:3
**lawyer**  13:18 14:21
22:14 30:14 59:12
90:5,7,15 95:7
104:7 111:16
118:10
**lawyers**  11:16 12:12
13:17 31:22 39:3
41:11 42:3 46:5
95:5 103:25 117:11
**leading**  77:10
**learn**  128:16
**learned**  99:4 127:19
**leave**  50:18 51:3
93:8

FILED: NEW YORK COUNTY CLERK 08/13/2018 01:47 PM
INDEX NO. 159781/2014
NYSCEF DOC. NO. 142
19-12346-shl   Doc 55-5   Filed 09/05/19   Entered 09/05/19 18:22:01   Exhibit C
RECEIVED NYSCEF: 08/13/2018
Part 3   Pg 159 of 216

**[led - massachusetts]**

**led** 108:6

**left** 44:9 45:25 46:4 51:6 71:14 105:19 115:7

**legal** 44:19 66:12 147:2

**length** 100:22

**letter** 20:25 24:21 25:4 39:6,9,14,18 42:19 69:12 92:3,7 92:11,19,21 93:13 93:16,21,24 94:4,5 95:3,4 96:2 97:9,11 99:10 104:2 106:14 106:22,24 107:4,9 107:12 110:22 112:18,22 114:10 114:18 117:4 121:23 143:20 145:15

**letterhead** 21:2 48:9 48:15 49:16 144:10

**letters** 128:7

**leverage** 115:10

**liddle** 1:9,10,19,20 5:7,10,11 6:1 7:1 8:1 9:1 10:1 11:1 12:1 13:1,22 14:1 15:1 16:1 17:1 18:1 18:11 19:1,9,24 20:1,6,18,20,25 21:1,9,15 22:1 23:1 23:14,15 24:1,14,22 24:25 25:1,5,16 26:1 27:1 28:1 29:1 30:1 31:1 32:1,15 33:1 34:1 35:1 36:1 37:1 38:1 39:1 40:1 41:1 42:1 43:1 44:1 45:1 46:1 47:1 48:1 48:9,14,15 49:1 50:1,6,10,13,16,18 50:24 51:1,3,9 52:1 53:1 54:1 55:1 56:1 57:1 58:1,14 59:1

59:12,18 60:1 61:1 62:1 63:1 64:1,2 65:1 66:1 67:1 68:1 68:11 69:1 70:1,8 70:25 71:1,4,8 72:1 73:1 74:1 75:1 76:1 77:1 78:1 79:1,24 80:1 81:1,10 82:1 83:1,9 84:1 85:1,6 86:1 87:1 88:1 89:1 90:1 91:1 92:1 93:1 94:1 95:1 96:1 97:1 98:1,3 99:1 100:1 101:1 102:1 103:1 104:1,17,25 105:1,4 106:1,15,19 107:1 108:1 109:1 110:1 111:1 112:1 113:1 113:14 114:1 115:1 116:1 117:1 118:1 119:1 120:1 121:1 122:1 123:1 124:1 125:1 126:1 127:1,6 128:1 129:1 130:1 131:1 132:1 133:1 134:1 135:1 136:1 137:1 138:1,16 139:1,16 140:1,2,8 140:13 141:1,11 142:11 143:4,18,21 144:10,23 145:16 147:4,6,21

**liebowitz** 2:11

**lifted** 129:20

**limitations** 118:12 129:17

**line** 52:21 72:19 140:19 147:7

**linear** 100:22

**lines** 40:18 69:17 71:21 129:22

**lisa** 108:5 121:9

**list** 23:10 45:17 51:13,17,20

**listed** 140:16

**literally** 7:2 73:18 100:21

**litigated** 136:11,14

**litigation** 10:6 14:5 14:6,17,19,19,20 15:5,7,11,19 16:20 28:7 39:12,24 57:13 57:14,17,18,22,23 58:3,4 130:5

**litigations** 15:20

**litigator** 16:19

**litigators** 137:22

**little** 5:21 23:19 71:19 92:18 134:22

**lives** 119:16

**located** 60:18

**long** 9:12,16 60:16 64:15 112:19 116:6 131:17,19 132:3

**longer** 109:18 131:22

**look** 10:16 51:13 63:14 68:22 91:25 107:3 121:19 126:25 130:3 131:12 132:7 139:19

**looked** 6:11,11 7:24 10:14 121:16

**looking** 34:8 36:2 49:16 51:17,20

**looks** 81:19 84:19 140:15

**lot** 16:14 31:8 62:21 62:23 74:4 85:16 98:21 126:3 131:22

**lsm** 131:8

**lump** 27:16,23 30:19 89:23

**lunch** 96:8

**luncheon** 96:9

**m**

**machine** 63:22

**mahoney** 71:24

**mail** 68:23 70:24 71:7,15 77:20 79:12 79:19 80:2 85:13 144:22 145:4

**mailed** 80:7

**mails** 85:19

**majority** 53:15 74:2

**making** 52:24 53:18 82:14 108:25 125:6 125:10,12,13

**maloof** 2:13

**management** 72:2 120:22

**mandated** 86:19

**march** 113:11,19 125:15 129:9,10 145:20

**marek** 12:3,14 13:6 23:21 24:10,17,22 25:5 44:25 50:3,12 51:22 143:21

**mark** 24:19 25:10 48:7 58:10 79:18 81:5 92:24

**marked** 6:24 20:18 20:21,22 24:23 25:2 25:14,17 48:12 58:12,15,18 68:9 71:2,5 79:22,25 81:7,8,11,13 93:3 106:17,20 113:12 124:11 126:16 131:15 139:24 140:3 145:10

**marriage** 142:18

**massachusetts** 90:12 126:10 127:22 129:13 130:4,4,16 135:18 138:14

**match** 89:17
**material** 52:22 53:2
53:11,20
**matter** 8:20 46:9
54:6 58:8 67:15
70:19,22 75:25 76:2
76:17,19 77:3 78:10
78:14 80:22 106:4
109:17 117:11
136:2,11 139:23
140:6 142:20
146:11
**mcchesney** 95:24
107:24
**mean** 6:17 9:4 63:11
64:10 67:16 85:12
91:17 105:24
118:11 129:13
137:21 138:16,25
139:2
**meaning** 99:25
100:2 133:11
134:13
**meant** 67:3
**meeting** 17:18 51:18
113:2 121:17 122:3
122:4,5,10,14,15,17
123:13,13
**meetings** 47:4,8
**member** 42:24 43:4
**members** 13:5,7,10
37:13 39:22 40:25
41:4 42:23 43:20
46:18 47:16,17,25
48:5 73:6 74:14,24
75:4 76:25 80:21
87:8 88:4 112:25
138:6
**memo** 84:18 113:9
114:2
**memoranda** 42:2,10
85:10 86:2,7,13
**memorandum** 81:7
81:13 82:7 83:7
113:4,5,10,18

145:10,19
**mention** 11:24 24:8
95:5
**mentioned** 8:17
20:12 21:14 36:24
38:10 42:22 43:16
59:25 63:2,10 88:6
93:23 99:19,21
101:23 103:15
108:21 122:4
135:17
**merely** 107:9
**message** 71:14,17
**met** 17:6,9 55:19,21
**michael** 1:5 2:22 5:9
6:25 7:6,16,18 8:3
13:20 17:2,7,8,10
17:18,21 20:24
24:22 25:4,13,19
58:19 73:24 97:1
99:6 100:2 112:21
113:6 124:6 125:15
143:21 144:6
**michael's** 94:5
**miller** 138:3,4,24
**million** 59:16 91:11
91:19 114:9
**mind** 93:11 123:18
**mine** 19:13 113:24
**minimal** 74:11
**minute** 76:7 82:12
126:19
**minutes** 6:16 65:19
76:8 141:3
**misimpression** 93:9
**misrepresentations**
52:22 53:11,20
**missed** 35:10
**missing** 78:23
**model** 90:11,13 95:6
**moment** 123:21
**monetary** 133:9
**money** 85:16
**monies** 29:4,6

**monitoring** 47:6
**month** 40:19 44:8
118:13 119:9
**months** 8:4 32:12
74:9 108:15
**morgenson** 83:10,11
83:17 84:3,12
**morning** 5:7 10:17
10:23 11:10 25:25
115:4
**motion** 3:15 124:25
125:7,11,13,14,18
128:21 130:7
136:19 137:11
139:7
**motions** 125:25
143:11
**move** 3:10,13
**moy** 49:24 50:24
51:3,21 131:9
**multi** 90:4
**multibillion** 62:17
**multiple** 41:10 47:9

**n**

**n** 2:2 97:2,2,2 143:2
**nail** 130:7
**name** 5:7 49:23
**named** 19:14
**names** 11:24 49:17
49:20 51:13 123:4
**nancy** 1:22 142:8,24
**nature** 122:16
**necessarily** 61:13
116:8
**necessary** 134:9
**need** 22:14 87:18
108:17 126:18
**negative** 73:6,7
**network** 62:18
**never** 9:20 28:2
54:17 61:22 93:15
**new** 1:2,3,21,21,23
2:8,8,16,16 9:10,15
46:5 48:11,17 50:22

55:15 58:2,7 59:12
64:9 73:23 83:10,11
84:8,16,22,24 87:13
87:18 90:3,10 95:6
116:2 142:4,6,9
144:12
**news** 128:17
**newspapers** 81:2
**nice** 71:19
**nine** 21:19
**noise** 5:23
**non** 16:21,23 30:25
31:2,6,6,13,14
32:21,24 33:5,9
38:5,5,23,24 39:4,4
44:12,14 53:3,24
54:8,10,14,20
108:22 110:3 117:7
117:21 118:7,14
136:10
**nonexistent** 89:18
**nook** 41:19
**normally** 85:2
**notary** 1:22 3:18,19
5:3 142:8 147:25
**note** 128:20
**noted** 97:3 141:8
**notes** 9:23 41:23
42:15,17 112:6,12
112:16
**notice** 1:22 95:15,17
**nouveau** 137:13
**november** 18:2,4,6
18:9 114:9 131:25
**ns** 124:20
**number** 39:16,16
45:10 49:13 83:14
90:24 91:18 108:2
116:20 128:5
**numerous** 61:12
119:15

**o**

**o** 97:2,2,2

FILED: NEW YORK COUNTY CLERK 08/13/2018 01:47 PM
INDEX NO. 159781/2014

NYSCEF DOC. NO. 142
19-12346-shl    Doc 55-5    Filed 09/05/19    Entered 09/05/19 18:22:01    Exhibit C
Part 3    Pg 161 of 216
RECEIVED NYSCEF: 08/13/2018

**object**  3:9,12 38:7
**objection**  6:2 8:12
  8:25 17:3,22 19:10
  27:9 35:9 39:25
  46:11 53:5 54:2
  55:23 57:8 85:7
  120:9,15
**objectionable**
  120:18
**objects**  5:25
**observed**  87:14
**obviously**  5:13 10:6
  68:24 69:4
**occasions**  61:12
**occur**  29:14,15
  110:24 116:15
**occurred**  38:11,16
  46:7 112:17 122:24
**october**  24:23 25:5
  143:22
**oddball**  138:8
**offer**  27:14,17,21
  88:7,8,9,11,24
  89:23 91:12,15,19
  91:19 100:15
**offers**  90:9
**office**  11:11,22
  13:18 41:11 45:11
  45:13,25 46:4 50:21
  57:16,21 75:25
  76:16 82:21 103:25
  105:9 114:24
**offices**  1:19 111:22
**oh**  45:9 92:21
**okay**  18:20 24:10
  27:4 30:4 33:22
  36:24,25 40:11 53:8
  65:16 79:6 81:25
  92:21 93:10,14
  102:6 109:13
  113:16 120:2
  124:23 126:25
  127:10 132:13
**old**  111:22

**omissions**  52:23
  53:3,11,20
**once**  38:7
**ones**  7:25 43:25
**open**  41:16 72:22
**opened**  50:21
**opinion**  66:3,12
  81:23 82:17
**opportunity**  7:4,5
  94:8
**opposed**  31:17
**opposite**  136:23
**oral**  85:23,25
**organized**  60:24
  106:3
**original**  3:21,25
  6:12 13:23 14:17
  80:17
**originally**  48:25
  134:15
**outcome**  129:15
  142:19
**outlets**  128:17
**outset**  53:6
**outside**  60:21 118:6
  119:5,12
**overnight**  73:18
**overriding**  31:9
**owned**  59:18 60:20

**p**

**p**  2:2,2
**p.m.**  79:21 80:4 96:9
  97:3 141:8 145:6
**p.r.**  62:18
**packet**  6:25 7:8
**page**  21:2,20 26:22
  27:2 30:7 32:19
  37:15 48:19,19
  51:13,25 52:12 59:8
  83:13 124:17 131:4
  131:4 132:24 143:3
  147:7
**pages**  7:9 33:21
  77:23 128:3

**paid**  27:15 30:22
  90:19 108:10
**palmieri**  12:18 13:2
  45:3 49:25 51:8,21
  68:8,13 69:9,23
  70:7 77:20 79:12,20
  80:3,13 81:18 82:16
  83:8 86:8 144:19
  145:5
**panel**  133:12,22
  134:18 135:22
  136:25 137:5,6,18
  138:6
**paper**  32:12 59:7
**paragraph**  26:22,22
  26:25 33:7 34:15
  36:10 44:4 52:20
  59:9 98:4 107:8
  128:14
**paragraphs**  10:14
**pardon**  17:8 43:11
**part**  3:8 19:17 43:14
  43:21 44:25 46:9
  51:9 53:6 60:17
  77:16 100:23 106:9
  120:14,22 123:16
  123:17 124:16,22
  127:23 137:12
  138:7
**participants**  19:2,4
  19:6 73:25 74:3
**participate**  18:12,21
  73:23 111:17
**participated**  15:6
  44:22 45:6 49:21,24
  49:25 51:15 111:20
**participating**  15:5
  111:6,8
**particular**  14:6,8
  22:17 31:5 32:20
  52:17
**particulars**  37:8
**parties**  3:5 16:8,13
  53:24 136:10
  142:17

**partner**  14:21
**partner's**  14:17
**partners**  16:11
  122:11
**party**  109:4 133:14
  133:18,19
**pass**  108:17
**passage**  116:11
**passed**  8:4
**pay**  22:13 27:22
  29:6,13 59:14
  107:19,19 118:2
**paying**  73:14
**payment**  27:17
  30:19 114:12
**payments**  98:8,23
**pending**  129:15
**people**  11:22 22:20
  35:2,2 36:22,23
  40:12,13 45:11,12
  45:18 47:5,17 49:13
  61:14 62:11 74:18
  75:5 77:12,14 84:12
  88:18 89:4 92:8
  93:17 100:24
  102:24 106:7
  107:21 116:20
  119:19,21 122:20
  128:5,6,8
**percent**  15:17 90:20
  102:4 129:23
**performance**  73:10
  73:11,14
**performed**  51:22
  73:8
**period**  14:24 15:2
  28:9 40:20 44:9,20
  60:16 116:11
  118:13 119:10
  130:2 137:4
**periods**  75:6 129:24
**permission**  95:10
**person**  88:21 105:16
  105:18,23 108:2,3

[personal - professional]                                           Page 15

**personal** 5:14
**personally** 19:16
  29:24
**peruse** 6:17,22 7:5
**perused** 6:12,13
  25:25
**petition** 139:17,18
  139:21 140:4,11
  146:9
**petitioner** 1:7 2:5
**petitioners** 140:10
  140:17
**phone** 72:10 121:11
  123:13
**phrase** 28:17 134:11
**piece** 32:12
**place** 23:13 37:5
  129:4
**placed** 20:20 24:25
  25:16 48:14 58:14
  68:11 71:4 79:24
  81:10 97:18 106:19
  113:17 132:4 140:2
**places** 82:5
**plain** 118:22
**plaintiff** 1:7 2:5
  125:25
**plaintiff's** 20:15,16
  20:21 24:19,21 25:2
  25:11,17 32:19
  33:18 37:19,20,21
  48:8 51:14 52:15
  58:11,15 59:9 68:6
  70:24 71:5 72:3
  77:19 79:19,25 81:6
  81:11 93:2 97:8
  106:14,20 113:10
  113:17 124:10,18
  126:15 127:16,17
  130:13,25 131:14
  132:5 136:4 139:21
  140:3 143:14,16,20
  144:4,9,15,18,22
  145:4,9,13,15,19,22
  146:4,7,9

**plaintiffs** 8:19 26:6
**plan** 10:9,15,25
  21:22 22:4,18,21,25
  23:12 26:23 27:8
  29:4,6 30:20,24
  31:2,14 34:9,12,17
  35:2 36:4,6,12,22
  38:4,22 53:25 98:11
  107:16 132:19
  133:10
**planned** 18:13,21
**plans** 16:14 33:12
  98:7,10 108:10
**platform** 59:6
**play** 13:2 19:5,8
**pleading** 54:7,25
  55:2,8 68:3
**pleadings** 67:7,11
  67:23 124:8
**please** 5:16,25 9:3
  13:15 24:3 27:2
  28:24 30:2 32:19
  35:11 41:8 49:19
  70:13 80:6 98:5
  102:6 113:15 119:3
  120:18 124:24
  127:15
**plug** 73:20
**plus** 19:24 22:25
  116:20
**pocket** 138:7
**point** 8:6 12:21
  19:23 43:7 55:15
  72:11 88:6 110:15
  117:4 125:9 126:23
  134:8
**points** 114:4,5
**poison** 61:9
**policy** 54:6
**polycom** 111:22
**pool** 115:22
**portion** 115:7
  124:21
**position** 41:18 64:16
  122:23

**positions** 116:5,6
  122:7,8
**possible** 43:5 58:5,8
  62:25 112:7 120:21
  129:2 130:9,10
  139:11
**possibly** 31:20 43:3
**posting** 104:22
**potential** 38:16
**practice** 14:23 67:18
**practiced** 14:3
**practicing** 15:13
**precisely** 55:25
  94:17
**preference** 120:25
**preliminary** 52:17
**premise** 121:4,5
**preparation** 6:5,22
  10:12 11:8 12:15
**prepared** 46:18
  94:11
**preparing** 138:24
**present** 2:20
**president** 64:11
**press** 14:20 60:16,22
  61:8 62:10,12,13
  63:10,11,13,22,25
  64:2,4 66:7 67:7,11
  67:23 68:18 69:5,11
  69:24 70:3,4 72:6
  72:23 73:2,4 75:20
  75:24 76:16 77:3,24
  77:25 78:3,5,7,9,13
  78:15,20 79:2 80:6
  80:14,22,24 83:2,5
**presume** 30:5 83:18
**pretty** 62:5 107:4
**prevail** 138:10
**previously** 20:22
  26:5 58:18 99:21
**primarily** 73:16
**primary** 108:5
**print** 104:13
**printed** 68:17

**printout** 58:11,21
  144:15
**prior** 8:9 23:12
  26:10,17 29:17,21
  33:25 35:18 38:11
  38:16,19 39:6,8,13
  39:18 41:2 47:13
  52:4 56:15,16,20
  57:13,17,22 58:3
  61:12 62:8 70:16
  77:5 80:20 86:21
  92:16 94:7 114:24
  115:5 124:14 127:8
**privilege** 54:22 55:2
  55:7 66:3,8,14
**privileged** 65:18,22
**pro** 90:21,23
**probably** 6:16 13:16
  15:17 21:11 38:25
  42:8 68:24 69:16
  71:24 76:4,6,21,23
  84:6 91:4 100:21
  103:23 132:15
  137:4
**problem** 30:17 89:2
  89:10 102:12 118:3
  130:25
**problems** 89:5,6
**procedural** 126:3
**procedure** 126:7
  138:3,5
**proceed** 63:13
**proceeding** 34:2
  35:19
**proceedings** 131:18
**process** 59:19 83:14
  88:14,16 122:22
**produce** 100:13
**produced** 42:8
  68:15 99:20,22
**production** 32:13
  42:13,18 112:15
**professional** 87:13
  95:11

19-12346-shl    Doc 55-5    Filed 09/05/19    Entered 09/05/19 18:22:01    Exhibit C
Part 3    Pg 163 of 216

**professionalism** 87:19
**professor** 138:5
**profitable** 73:9
**prohibition** 44:7
**prominent** 138:2
**promised** 121:8
**pronoun** 24:4
**proposal** 90:6,8,14 92:4 94:25
**proposed** 9:25
**prospect** 74:7
**protesting** 78:19
**protocol** 86:20
**provide** 23:15 24:11 101:18 106:7
**provided** 3:7,23 8:2 32:5,9,15 91:13
**provides** 30:21
**provision** 33:5 41:20,21 42:3 44:13 44:14 46:8 108:12 109:6,6,19 119:10 120:7,20 122:21
**provisions** 31:2,7,14 33:9 38:6,24 39:5 40:16 53:4,24 110:19 117:8,21 119:17,25
**psychiatric** 29:10
**public** 1:23 3:18,19 5:4 54:6 142:8 147:25
**publish** 64:10
**published** 58:25 59:2,6,7
**pull** 21:11
**pulled** 73:20
**purpose** 28:6 72:24 73:3 74:13 75:19
**pursuant** 1:21 27:21 72:18
**pursue** 23:5,11 28:7 28:22 29:12

**put** 32:2 38:8 40:8 44:17 55:4 63:14 91:18 95:14,17 104:16,18 105:2,25 107:24 115:19 135:8,11
**putting** 63:15

**q**

**quarter** 92:13
**question** 3:10,13 5:15 6:4 8:13,14,16 9:5,7 16:3 17:4,23 23:24 24:3,7,9 27:10 31:9 35:12,15 36:11 38:8,14 40:2 45:21 46:12,13 47:18 48:6 53:6 54:3 55:24 57:9 66:10 67:13,14,20 76:13,20 82:9 85:8 86:11 87:5 93:5 102:23 103:3 104:20 109:20,22 109:23 110:5 112:2 117:18 119:2,3,7 120:16,17 121:21 123:10 126:14 130:23 131:21 136:16 137:21
**questioning** 100:19 100:19
**questions** 5:12,18 29:23 31:8 107:23 124:13 127:18 141:4,7
**queue** 91:8
**quick** 97:23 107:3 131:12 132:7
**quote** 59:11 71:24
**quotes** 62:6 64:17 64:18

**r**

**r** 2:2 5:2 97:2,4 142:2
**race** 137:13 138:9
**raised** 124:6
**raising** 124:5
**rata** 90:21,23
**rate** 23:2
**rates** 139:2
**rationale** 128:13
**reach** 19:16
**reaction** 71:20 94:24 95:2
**read** 7:4 27:13 31:10 33:25 35:11,18 52:5 52:7 53:6,8 58:25 64:24 72:17 76:12 81:23 83:4 113:15 117:17 118:16,18 120:3,4 124:15 132:15
**reading** 27:18 31:4 33:15,17 40:18 113:16 118:19,21
**ready** 105:13
**real** 14:16 117:2
**really** 16:2 18:7 23:19 43:19 78:2 90:18 114:22 126:5 130:22
**reason** 18:10 26:14 26:19 60:11,12,13 63:2 74:11 79:6,8 109:11 128:23 129:16 133:16,21 134:3 147:7
**reasons** 19:22 22:7
**recall** 7:12 10:18 11:3 13:12,14 27:5 27:12,13 29:16 31:3 31:9 32:22 33:15,17 33:23 35:16 37:8,10 39:2,7,9 40:4,7,8,24 43:14 45:15,17,18

45:19 46:6 49:20 50:9 51:14,20 55:18 55:21 57:20,25 58:24 60:3 70:9 71:16 76:25 78:8,11 79:14 80:12,19 82:2 82:6 88:11 92:11 103:16 111:6,18,19 113:4,25 114:20 123:7 125:12
**recalled** 11:16
**receipt** 33:11
**receive** 29:4 92:20
**received** 7:23 10:5 93:13 97:21 107:18 128:6
**receiving** 30:18 74:7 82:6 95:10 113:4,5 113:25
**recess** 76:9 96:9 97:24 127:3 141:5
**recognize** 21:4 48:21 58:20 81:15 81:17,18 82:2,4,5 107:2,4 113:20 114:4 132:14
**recollect** 39:19 40:17 42:5 43:19 46:21 47:23,24 48:4 51:18 78:3 79:3,4 84:24 94:3 104:12 114:19 129:18
**recollection** 10:25 17:17 18:3,5 24:16 34:3,16,20,21 35:4 35:7,21 36:11,16,17 39:17,21 45:10 46:15 54:16 58:6 67:25 68:23 69:7 71:13 75:18,21,23 76:5,15,22 80:11,23 90:22 92:5,20 102:5 103:7,14,22 105:18 107:5 111:2,7 126:22 127:8,22

[recollection - retaining]                                                                     Page 17

128:4,15,19 129:6,8
139:8,9 140:7
**recollections** 11:15
18:8 80:16
**record** 5:19 6:2 29:3
30:12 127:14
142:14
**recover** 22:15
**recovering** 22:12,13
**reference** 31:5
34:17,19 36:12,15
60:8 71:22,23 98:18
98:19 106:16
128:20 129:3
134:13 135:23
145:17
**referenced** 35:12
44:21 70:5 128:9
**references** 53:21,21
106:5 127:14
135:15 138:8
**referred** 7:16 21:6
121:23
**referring** 22:19
29:24,25 30:9 38:15
40:21 54:21 64:2
66:22 69:21 70:10
82:11 86:15,16,17
93:19 98:16,25
108:24 115:11
127:10 128:16
129:5 136:3
**refers** 70:7 98:21
**reflected** 136:4
**refresh** 67:25 71:12
126:22 128:19
140:7
**refreshed** 34:23
36:20 127:23 128:3
128:15 129:6
**refreshing** 34:21
36:17
**refused** 90:12
133:14

**regard** 23:12 35:5
37:14 46:25 58:7,7
66:10,23 90:4
110:14,18 126:9
**regarding** 27:7
38:22 39:23 40:25
42:15 46:7 53:19
56:18 77:2 80:13,21
82:7 99:17 102:7
105:3 125:20,21
**regards** 89:11
117:10
**regular** 30:23 138:8
**regularly** 105:25
**reinstate** 136:18
**related** 83:15
102:13 115:17
138:22 142:17
**relating** 91:15
100:15 103:19
112:16 113:5 117:3
**relation** 127:16
**relations** 60:22
**relationship** 83:19
83:22 84:11
**relationships** 116:7
**relatively** 86:20
129:25
**relayed** 94:18
**release** 7:6,17,19
23:4,8,9,17 24:2,12
25:12,18 26:7,15
28:5,11 29:21 31:4
31:10,12,16 32:3,23
33:3,25 34:18 35:18
36:14 61:9 63:11,11
63:13,25 64:2,5
68:19 69:5,11,24
70:3,4 72:6 77:24
77:25 78:3,6,7,9,13
78:15 79:3 80:6,14
80:24 83:2,5 94:9
99:8 107:21 108:11
108:14,16 121:2
144:5

**releases** 26:17 29:17
31:24 32:6,14 80:22
121:13
**relevance** 67:19
**relevant** 28:3
101:20
**reluctance** 88:22
**remark** 110:6,6
**remember** 18:25
19:19 44:24 45:2,4
45:5,7,11,14 46:13
70:3 73:24 74:23
78:25 79:2 87:11
88:14,17 92:8
110:25 113:2
115:12 119:23
126:8,12 128:4
134:11 136:21
138:18,20
**remotely** 66:25
118:11
**remove** 66:7
**render** 133:13
**rendered** 133:14
**repeatedly** 90:9
**rephrase** 5:17 45:21
**reporter** 35:15
55:14 60:9,24 62:18
62:19 65:5 76:14
83:13 117:19
**reporters** 60:9
**reporting** 55:16
61:6
**represent** 5:9 8:4
17:21 18:11 19:25
37:14 110:12,14,18
117:25 140:13
**representation** 88:3
121:6
**representations**
53:2 90:5
**represented** 110:13
138:13 139:16
140:9

**representing** 21:15
59:12 101:5,7 108:3
133:9
**reputation** 19:21
**reputations** 59:21
**request** 23:15 27:3
32:17 72:18 101:8
101:10,12 114:20
116:13 139:6
**requested** 23:22
110:17
**requests** 143:6,10
**required** 30:19
101:13 135:9
**reserved** 3:12,15
**resolving** 91:5
**respect** 9:21 47:12
55:2 117:25
**respectful** 118:9
**respective** 3:5
**respond** 11:19
**respondent** 1:18
**respondents** 1:12
2:14 52:21,25 53:10
53:21
**response** 12:24
54:17 68:16
**responsibility** 87:14
95:12
**rest** 92:22
**restricted** 98:11,12
**result** 37:12 89:7
91:10 98:9
**results** 106:2
**resumed** 97:4
**retail** 116:9
**retain** 28:22
**retained** 38:18
**retainer** 6:10,20
20:12,13,17 21:8
22:5 24:18 28:9
37:11,23 143:17
**retaining** 20:17 21:9
143:17

**retention** 17:24
    38:20 121:6 138:21
**return** 3:21
**review** 6:6,9,15 10:7
    26:25 28:4 31:23
**reviewed** 20:13
    26:17 27:7 29:17,20
    31:3,12 32:22 33:16
    34:18 36:13 41:11
    98:6 127:7 131:10
**reviewing** 8:5 27:5
    27:12 31:9 54:13
    127:7,20
**revised** 80:5,13
**revision** 80:17
**right** 3:9 30:10
    36:25 45:22 50:2
    58:17 71:11 82:14
    85:25 93:18,25
    101:19,23 104:24
    109:12 122:25
    124:16,19,22 129:2
    129:12,14
**rights** 3:7,23 107:11
**risk** 91:4 114:10
    117:6,10,12,20
**robert** 48:10,16
    144:11
**robertson** 8:11,19
    9:10 10:7 12:16
    13:3 18:15 33:11
    53:13,15,22 59:17
    59:21 62:12 63:18
    67:21 73:6 74:5,6
    78:14 82:8 84:9
    85:5 95:14,21 98:5
    104:15 105:3
    135:25 139:24
    140:6 146:12
**robinson** 1:9,20
    5:11 13:22 18:11
    19:9,25 20:7,18,25
    21:9,15 23:15,16
    24:15,23 25:5 32:15
    48:9,15 50:7,10,13

50:16,18,25 51:4,9
    64:3 85:6 104:17
    105:2,4 138:17
    139:16 140:8,13
    143:18,21 144:10
    147:4
**role** 13:2 19:5,8
**rollup** 63:23
**room** 123:19
**rq** 32:13 42:12,17
    95:20 100:13
    112:15
**rsgi** 98:6 107:25
    134:10
**rsi** 20:2 39:24 46:9
    51:23 56:25 57:13
    72:25 92:2 97:12
    108:3
**rule** 3:23 90:4
**rules** 3:8 5:13,14
    78:21 126:6 134:24
**rulings** 143:8

**s**

**s** 2:2 48:10,16 97:2,2
    97:2 144:2,11 145:2
    146:2 147:7
**sabotage** 66:20
**sabotaged** 61:22
**sake** 110:2
**sale** 59:19
**san** 84:9
**saw** 7:9,13,19,20
    8:17,21 9:17 10:4
    10:25 31:17 61:25
    99:13
**saying** 22:11 60:3
    90:16 100:16,18
    102:24 122:9 136:7
**says** 11:20 33:7 34:9
    34:9 36:3,3 59:11
    59:13 60:7 69:12
    78:6 98:23 107:8,24
    114:7,7 115:9
    118:22 124:25

131:24
**scandal** 56:3,6
**schedule** 30:23
    114:13
**scheduled** 131:24
**school** 85:17
**schubert** 2:4 5:9
**scoop** 84:14
**se** 76:5,22
**search** 100:21
**second** 44:13 54:9
    92:13 107:8 115:6
**secret** 72:22
**section** 40:22,25
    46:19,25 47:12
    51:16 98:10,11,12
    107:16 108:19
    117:14 140:17
**sections** 107:17
**secure** 112:7
**securities** 14:16
    40:14 55:17 116:4
    126:5
**security** 115:24
    135:6
**see** 9:8 10:2 22:19
    33:13,14 49:23
    53:16 59:4,22,23
    62:5 65:3,4,6 70:5
    85:19 97:17 98:14
    114:14,15 115:9
    117:14 124:24
    130:23 141:3
**seeing** 34:4 35:21
    130:10
**seek** 20:7
**seeking** 18:13,22
    59:13 60:2 63:24
**seen** 7:11 8:7 25:7
    25:22 26:3,6,10
    68:20,24 69:6,8
    71:14 80:8 97:10,13
    100:5
**selling** 124:3

**send** 67:6,22 68:3
    69:10,18,18,24
    112:18
**sending** 84:16
**senior** 137:10
**sense** 44:15 78:5
    85:12 115:25 119:7
    120:21 134:21
    136:13
**sensitive** 81:7,12
    82:7 145:9
**sent** 63:5,7 67:10
    71:15 72:6 79:5,7
    79:10,13 80:14,24
    81:2 92:2,7,12
    93:15,16 99:4,23
    100:4 104:2 113:9
    121:23 135:18
**sentence** 30:18 31:5
    33:7 53:7,16 54:18
**separate** 34:15
    36:10
**separation** 7:6,16,18
    7:23 8:2,6,8,18,22
    9:8 10:3 23:3,7,9,16
    23:25 24:12 25:11
    25:18 26:7,15,16
    27:6,16,21 28:4,10
    29:16,20 31:4,12,16
    31:23 32:3,6,14,23
    33:3,16,24 34:10,18
    35:17 36:4,13
    108:13 121:12
    144:4
**september** 7:7,17
    9:18 25:12,19 132:3
    144:5
**services** 51:22
**sessions** 12:7,8
**set** 61:13 71:20
    86:13 142:12,22
**settle** 88:10 92:17
**settlement** 88:6,8,9
    88:24 89:2,7,11
    90:6,8,14

FILED: NEW YORK COUNTY CLERK 08/13/2018 01:47 PM
INDEX NO. 159781/2014
NYSCEF DOC. NO. 142
RECEIVED NYSCEF: 08/13/2018

19-12346-shl    Doc 55-5    Filed 09/05/19    Entered 09/05/19 18:22:01    Exhibit C
Part 3    Pg 166 of 216

**seven** 12:12
**severing** 125:2
**share** 90:23
**shareholder** 53:15
**sheet** 112:4,10 147:2
**shock** 74:3
**shooter** 61:7
**short** 66:15
**shortly** 10:4 97:20
**show** 68:4 113:9
   122:2
**showed** 78:4 117:4
   127:24
**side** 12:13 50:2
   115:7 136:19
**sign** 32:11 91:3
   94:10 131:5 133:15
   136:9
**signature** 18:2
   48:20 52:2 140:19
   142:23
**signed** 20:17 21:3,8
   23:3 24:18 28:10
   33:3 69:4 73:20
   108:11 143:17
**significant** 130:2
**signing** 37:11 38:16
   38:19 39:6,8,13
   52:4 121:2 123:20
   123:21
**similar** 27:5 97:18
**simple** 116:3
**simplifying** 60:9
**simply** 108:24
**single** 119:21,22
**sit** 103:6
**situation** 40:20
   41:13 44:17 54:11
   62:14,15
**situations** 16:5,9,10
   16:12 103:4
**six** 40:19 44:8
   118:13 119:9
**sizable** 91:7

**slower** 116:22
**small** 86:20
**soft** 5:20
**solicitation** 30:25
   31:6,13 38:5,23
   39:4 44:12
**soliciting** 44:7
**solutions** 147:2
**somebody** 18:23
   23:20 61:6 63:5
   78:18 89:21 94:4,18
   95:3,7 99:5,6 100:8
   102:11 103:14
   111:23 121:10
   122:8 123:12 131:5
**sorensen** 1:22 142:8
   142:24
**sorry** 37:16 109:21
**sort** 66:12 106:3
   121:17 137:13
**sought** 136:18
**sound** 67:4
**sounds** 79:10
**speak** 5:22 57:12,16
   57:21 60:5 110:22
**speaker** 121:10
**speaking** 5:20 18:3
   18:5,8 57:25
**speaks** 26:23 82:24
   83:7 137:5
**special** 33:4
**specialty** 14:2 15:13
   15:15
**specific** 13:19 22:12
   39:20 40:24 67:14
   90:4 103:7,11
   115:13
**specifically** 40:6
   58:6 71:16 74:23
   75:11 77:8 110:16
   110:17 125:12
   128:16
**specificity** 24:5
**spent** 15:18 119:16

**split** 139:13
**spoke** 75:9,10,13,14
   122:5 123:5,8
**ss** 142:5
**stage** 89:14
**stake** 59:20
**stamped** 25:13,20
   48:11,18 144:6,13
**stand** 131:8
**standard** 20:11 55:5
**standing** 64:15
**started** 12:22 15:5,7
   102:17 123:12
**starts** 65:11
**state** 1:2,23 6:2
   87:19 142:4,9
**stated** 39:7 84:6
   94:12 135:4 136:25
**statement** 6:12,20
   8:9 17:14 26:11
   37:6 38:12 41:2
   47:13 48:24 49:7,9
   49:11,15,21 52:18
   56:10,14,17 61:17
   65:5,8,13,22,25
   66:2,6,16,21 68:18
   69:2,10,13,22 72:5
   72:13 80:6,25 82:23
   83:3,5 84:2,16,21
   86:21 87:17 122:25
   124:11 131:2,11
   145:23
**statements** 52:8,25
   64:19,25 65:3
   108:25
**states** 139:23 140:5
   140:16 146:11
**statute** 118:12
   129:17
**stay** 129:20,21,24
   130:11
**stayed** 129:15
   134:14
**steering** 41:10 42:22
   42:23 43:15,20

47:16 48:2
**stephens** 8:11,19
   9:10 10:7 12:16
   13:3 18:16 33:12
   53:13,15,22 62:13
   63:18 67:22 73:7
   74:5,6 78:14 82:8
   84:9 85:5 95:14,22
   98:6 104:15 105:3
   135:25 139:24
   140:6 146:12
**steve** 43:6
**stipulated** 3:4 4:3
**stipulations** 3:2
**stock** 9:10,15 48:11
   48:17 98:8 116:9
   144:12
**stone** 116:17
**stopped** 50:9
**stopping** 115:25
**stories** 63:16 83:15
**story** 61:13,19 62:19
   64:9 117:23
**straight** 61:7
**strategic** 72:24 73:3
   74:10,13 75:19
**street** 2:7 6:13,21
   55:17 56:8,13 58:12
   58:22 59:2 60:18,23
   64:8 68:9,14 77:5
   102:14,20 103:11
   103:20 105:2
   127:19 128:9,17
   144:16,20
**strike** 3:11,13 16:17
   17:5 22:3 26:4
   51:12 57:11 66:5
   68:4 71:25 82:25
   85:3 86:9 109:25
   110:21
**strong** 83:19 84:11
**strongly** 73:17
**stuff** 66:22 92:22,23
   93:21 100:22
   130:11

FILED: NEW YORK COUNTY CLERK 08/13/2018 01:47 PM
INDEX NO. 159781/2014

19-12346-shl    Doc 55-5    Filed 09/05/19    Entered 09/05/19 18:22:01    Exhibit C

NYSCEF DOC. NO. 142

Part 3    Pg 167 of 216

RECEIVED NYSCEF: 08/13/2018

subject  30:24 38:4
  38:23 78:20 106:4
  111:9,12,15
subjects  47:9 111:13
submission  91:3
  133:15 134:8 136:9
subparagraph
  21:22 32:20
subscribed  141:13
  147:22
substance  86:14
substantive  60:6
sue  60:12,14 61:5,16
  63:5 64:21 69:18
  70:20
sued  9:9 63:17
suing  87:20
suit  114:8,11,25
  115:5,15
suite  114:21
sukoneck  2:13
sum  27:16,23 30:19
  89:23
summarize  66:15
summarizes  65:5
summary  66:24
  125:3,5,7,11,13,14
  125:18,25 126:4
  128:22 130:8
  136:20,21,22
summation  137:3
summations  88:15
supply  101:15
supreme  1:2 139:12
  139:22 140:5
  146:10
sure  8:15,21 11:2
  17:16 31:19 34:14
  36:9 37:7 40:9
  42:24,25 43:3,18,23
  45:9 49:5 59:3
  65:14 67:2 74:15,17
  76:5,22 82:10,14
  89:16 92:14 93:22
  94:21 96:4 100:7,24

101:20 102:4,10,15
  102:25 104:3,4
  112:6 115:2,12
  120:2 122:17 125:9
  126:2 129:23
  130:12 135:2
surface  122:19
surprised  71:19
susanne  55:11,19
  63:3,4 64:25 68:8
  68:13 69:25 70:11
  70:25 71:8 72:6
  77:21 79:7,13,20
  80:3 144:20,23
  145:5
suzanne  72:11
sworn  3:17 5:3
  141:13 142:13
  147:22

**t**

t  97:2 142:2,2 144:2
  145:2 146:2
tactic  107:10
take  37:5 42:20
  43:21 57:3 76:7
  78:22 96:2 97:22
  101:9 107:3 111:25
  112:19 121:7
  126:19 131:12,20
  132:7 139:19 141:2
taken  9:23 32:16
  41:23 76:9 97:24
  98:9 127:3 136:24
  141:5
talk  75:3,7
talking  10:20 23:25
  31:15 39:17 88:18
  89:24 94:7,23 99:15
  99:24 118:11 119:9
  129:9
tax  14:21
team  12:11 13:5,6,9
  13:13 55:16 60:17
  72:2 120:23

telephone  70:8,22
tell  5:14 6:3 7:19
  13:15 21:17 23:21
  23:23 24:10 28:24
  29:11 30:2 43:24
  47:8 49:20 70:13
  77:7 82:15 83:8
  84:15 87:25 94:2
  101:4 102:6 111:11
  120:13 127:15
  130:12 131:23
telling  118:21
tells  64:23
tend  43:6
tended  106:6
term  29:11 54:21
  106:11 132:11
  136:13
terminated  9:23
  73:21 123:20
terminating  116:2
termination  18:15
  118:14
terms  30:20 34:7
  35:24 109:7 117:7
  117:20
testified  5:4 26:5
  97:5
testify  12:9
testifying  12:8
testimony  3:11,14
  11:17,21 12:23
  54:25 142:15
text  138:8
thank  128:18
theoretical  117:12
theory  137:13 138:8
thing  27:7 29:23
  53:9 61:10 85:20
  92:15 112:13
  121:14 123:2
things  28:8 34:4,20
  35:21 36:17 38:17
  66:16 94:12 98:22
  99:13 101:6 104:23

105:25 125:11
  129:4 137:19
think  8:5 12:10,20
  17:16 19:18 20:3,4
  29:22 34:10,14 36:4
  36:9 38:13 40:19
  42:7,7 43:7 48:6
  49:24 51:5 56:20
  57:15,19,24 62:6
  63:12 65:10,16,21
  66:11,23 67:13,24
  69:12 70:23 71:18
  72:16 73:13 89:14
  91:18,23 92:6,7
  94:17,17,20 99:4,9
  102:22,25 103:2
  104:11,14 105:23
  109:8,14 110:25
  112:9 115:3 117:15
  120:2 123:10,17
  124:5 125:24
  128:15 129:10,19
  129:21 130:22
  132:11 133:22
  136:22 139:10,11
  139:19
thinking  92:13,16
  124:25
thinks  11:20
third  1:20 52:21
thought  49:5 61:7
  71:18 102:13
  109:21
three  6:19 30:12
  116:11 138:6
threes  33:21
throat  5:21
thumb  7:3
time  6:15 7:3,12,20
  7:20,25 8:3,9 10:18
  10:21,24 11:23,23
  12:12 13:17,19
  14:24 15:2,4,18
  17:6,9,20 19:22,23
  24:14,17 27:16,24

FILED: NEW YORK COUNTY CLERK 08/13/2018 01:47 PM
NYSCEF DOC. NO. 142
INDEX NO. 159781/2014
RECEIVED NYSCEF: 08/13/2018

31:10,11,20 37:10
38:9 40:19 43:8,8
44:8,20 45:23 46:6
47:4,5 50:3 52:11
55:15,18,21 56:7,14
58:25 60:16 63:15
74:4 75:6 77:4 81:6
81:12 82:6 83:18
87:14,16 89:14 92:2
93:6 96:7 97:3
98:17 99:4,12,19
102:18 108:17
109:15 110:15
112:5,5 116:11
117:5 123:6 124:5,7
126:19 129:8,24
130:2 136:6 141:8
145:9
**times** 55:15 58:2,7
64:9 83:10,12 84:8
84:17,22,24 90:22
90:23 105:17 137:4
**timing** 31:19 39:11
39:23 115:3 126:2
126:12,13,23
**tishman** 43:6
**today** 5:13 6:6 78:4
103:6
**today's** 11:7
**told** 18:23,24 22:22
22:23 23:18 28:19
34:6 35:24 46:12
47:23 54:9 72:21
78:2 79:16 94:16,17
94:18 108:2,9 109:8
111:21 120:23,24
**total** 6:15 91:11
**trade** 14:18
**trades** 116:5
**traditional** 106:11
**transactional** 14:22
**transmittal** 78:6
**treated** 91:21
**trial** 3:16 108:3

**tried** 51:6 92:16
134:20 137:16
**true** 21:7 23:7 28:12
28:16 30:6 52:9
114:16,17 118:16
130:14 142:14
**trust** 61:18
**try** 5:22 62:24
107:10 111:25
116:18 122:6 135:9
**trying** 88:14,17
107:19 118:9 130:7
136:20 138:18
**turn** 32:19 33:18
59:8 132:24
**turning** 77:19
**turnover** 46:4
**turns** 138:4
**twentieth** 2:6
**two** 7:9 11:21 20:4
30:4 32:11 34:4
35:21 39:16 43:23
56:21 65:20 66:2,7
68:17 77:23 86:14
90:22,23 107:23
108:2 129:24
133:11
**type** 14:4,6 85:18
86:24 104:22
**types** 87:3
**typing** 85:15
**typist** 85:14 104:21
**typists** 85:17

**u**

**ultimately** 41:20
44:15 94:16
**um** 26:24
**unable** 88:23 91:9
**unanimous** 135:8,10
**unanimously** 41:21
**uncertain** 34:6
35:24
**uncomfortable**
135:24

**understand** 5:15,19
6:16,18 8:14,15 9:4
24:7,9 27:11 54:4
54:24 57:2 66:9
109:10 118:10
**understanding**
21:25 27:20,25 28:2
28:12 40:15 133:4
134:17
**understood** 114:8
**unfounded** 107:9,13
**uniform** 3:8
**uninterested** 137:20
**unit** 98:11,12
**united** 139:23 140:5
140:16 146:11
**unnecessary** 34:7
35:25
**unprecedented**
62:14
**unwillingness** 91:2
**unwind** 116:8,18
**update** 59:4
**upper** 71:10
**urgent** 81:7,13,17
145:10
**use** 28:23,24 60:7
75:24 76:15 77:2
80:21 101:3 126:6
**utilizing** 62:18

**v**

**v** 147:4
**vacated** 133:25
**vagaries** 40:16
**vague** 102:4 111:2,7
139:9
**vaguest** 18:7
**valuation** 115:21
**value** 59:20 73:16
74:6 133:9
**variety** 56:4
**various** 32:7 90:16
**varying** 139:4

**vast** 62:17 74:2,2
**verbal** 46:23 85:11
85:12,21,23
**verbally** 47:20,21
**veritext** 147:2
**version** 60:22 80:7
**vest** 30:22
**vesting** 22:25 30:23
41:6 117:7,20
**view** 67:3 133:17
**viewpoint** 136:23
**violate** 53:3,23
54:14 108:18
**violated** 95:11
107:15 108:21
109:8
**violates** 54:8
**violation** 54:19 98:9
98:20,24,25 117:14
**virtually** 40:13
115:24 119:20,23
120:7 121:20
123:11
**virtue** 85:16
**voice** 5:21 71:14
**voicemail** 71:17

**w**

**waited** 115:10
**waiting** 41:5 50:4
**waived** 4:2
**waiver** 3:15,22
89:23
**waivers** 87:9,18
**walked** 123:19
**wall** 2:7 6:13,21
55:17 56:8,13 58:12
58:22 59:2 60:18,23
64:8 68:9,13 77:5
102:14,20 103:11
103:19 105:2
127:19 128:9,17
144:16,20
**want** 5:18 22:13
29:5,12,13 37:14

FILED: NEW YORK COUNTY CLERK 08/13/2018 01:47 PM
NYSCEF DOC. NO. 142

INDEX NO. 159781/2014

RECEIVED NYSCEF: 08/13/2018

19-12346-shl    Doc 55-5    Filed 09/05/19    Entered 09/05/19 18:22:01    Exhibit C
Part 3    Pg 169 of 216

57:9 61:8,11,17
62:15 63:13 64:22
74:11 82:10 83:9
93:8 95:20 108:14
108:15 112:6
116:17 117:24
118:2 137:17
**wanted**  18:12,21
23:5 28:7 64:13
72:16,17 82:20
83:20 89:6,22 90:19
91:6 92:17 116:21
133:8
**way**  26:19 28:17
32:2 40:9 47:6 49:6
65:4 66:25 79:8
84:25 88:5 118:20
121:18 122:9
142:19
**website**  104:17,17
104:18,23 105:4,7
105:10,12,12,16,19
105:22 106:2,6,12
**went**  61:20 93:16
130:11 136:17
**whatsoever**  60:6
89:25
**whereof**  142:21
**whichever**  47:16
**wide**  56:4
**winding**  116:3
**withdrawal**  116:13
**witness**  3:18 4:5 5:3
27:3 97:22 100:2
108:6 113:15
117:17 142:11,15
142:21 143:3
**word**  60:7 61:22
66:17,20,20 68:17
106:12
**words**  28:23,24 29:2
61:21 78:24
**work**  11:17 45:12
50:6,13

**worked**  13:21 45:16
45:18,19 83:24
138:19
**working**  46:9 50:9
50:15 55:25 56:7,13
56:18
**world**  72:23
**wright**  138:3
**writ**  139:22 140:4
140:11 146:10
**write**  42:19 56:24
61:19 64:13,14,22
64:23 72:19 73:2
95:3 112:5
**writing**  47:20,22
48:3,5 56:2 73:4,5
74:20 91:18 101:12
**written**  16:11,13,15
32:17 46:17 56:16
56:21 86:3,13 95:5
116:17
**wrong**  118:22
**wrote**  56:22 57:5,6
57:10 65:8 72:15
114:10,18

| x |
| :---: |

**x**  1:4,13 143:2 144:2
145:2 146:2

| y |
| :---: |

**y**  5:2 97:4
**yeah**  14:24 23:10
56:15 59:3 82:18
97:16 125:5 138:18
**year**  50:19 85:15
107:20 115:18
116:11,15
**years**  14:25 50:11
51:5 67:25 69:8
78:19 100:23 104:8
119:24 131:19
132:16 137:8
**york**  1:2,3,21,21,23
2:8,8,16,16 9:10,15
48:11,17 50:22

55:15 58:2,7 59:12
64:9 83:10,12 84:8
84:17,22,24 87:18
90:3,10 95:6 142:4
142:6,9 144:12
**york's**  87:13
**yup**  49:18 113:22
115:8 132:25

New York Code

Civil Practice Law and Rules

Article 31 Disclosure, Section 3116

(a) Signing. The deposition shall be submitted to
the witness for examination and shall be read to or
by him or her, and any changes in form or substance
which the witness desires to make shall be entered
at the end of the deposition with a statement of
the reasons given by the witness for making them.
The deposition shall then be signed by the witness
before any officer authorized to administer an
oath. If the witness fails to sign and return the
deposition within sixty days, it may be used as
fully as though signed. No changes to the
transcript may be made by the witness more than
sixty days after submission to the witness for
examination.

DISCLAIMER:  THE FOREGOING CIVIL PROCEDURE RULES
ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY.
THE ABOVE RULES ARE CURRENT AS OF SEPTEMBER 1,
2014.  PLEASE REFER TO THE APPLICABLE STATE RULES
OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

FILED: NEW YORK COUNTY CLERK 08/13/2018 01:47 PM
INDEX NO. 159781/2014

NYSCEF DOC. NO. 142
RECEIVED NYSCEF: 08/13/2018

19-12346-shl   Doc 55-5   Filed 09/05/19   Entered 09/05/19 18:22:01   Exhibit C
Part 3   Pg 171 of 216

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted
fashion to authenticated parties who are permitted to
access the material. Our data is hosted in a Tier 4
SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and
State regulations with respect to the provision of
court reporting services, and maintains its neutrality
and independence regardless of relationship or the
financial outcome of any litigation. Veritext requires
adherence to the foregoing professional and ethical
standards from all of its subcontractors in their
independent contractor agreements.

Inquiries about Veritext Legal Solutions'
confidentiality and security policies and practices
should be directed to Veritext's Client Services
Associates indicated on the cover of this document or
at www.veritext.com.

FILED: NEW YORK COUNTY CLERK 08/13/2018 01:47 PM

NYSCEF DOC. NO. 143

INDEX NO. 159781/2014

RECEIVED NYSCEF: 08/13/2018

19-12346-shl    Doc 55-5    Filed 09/05/19    Entered 09/05/19 18:22:01    Exhibit C
Part 3    Pg 172 of 216

# EXHIBIT E

FILED: NEW YORK COUNTY CLERK 08/13/2018 01:47 PM
NYSCEF DOC. NO. 143

INDEX NO. 159781/2014
RECEIVED NYSCEF: 08/13/2018

19-12346-shl    Doc 55-5    Filed 09/05/19    Entered 09/05/19 18:22:01    Exhibit C
Part 3    Pg 173 of 216

**FOR MORE INFORMATION CONTACT JEFFREY L. LIDDLE AT 212-687-8500**

December 11, 2002

## PRESS RELEASE

### *FORMER ROBERTSON STEPHENS MANAGING DIRECTORS AND PRINCIPALS SUE FLEET AND ROBERTSON STEPHENS FOR OVER $140 MILLION IN DAMAGES.*

(New York, NY)  Today, 34 former Managing Directors and 8 former Principals of Robertson Stephens Group, Inc., sued FleetBoston Financial Corporation, Fleet Securities, Inc., Robertson Stephens, Inc. and Robertson Stephens Group, Inc. for unpaid compensation and other damages emanating from the fraudulent cancellation last summer of a management buyout of the Robertson Stephens operation.

Jeffrey L. Liddle, Esq. of Liddle & Robinson, L.L.P. in New York City represents the former Robertson Stephens employees, who were employed in the cities of New York, Atlanta, Boston and Chicago, the state of California and the country of Israel.

The 42 former Robertson Stephens employees (hereinafter "Claimants") filed an arbitration demand with the New York Stock Exchange, Inc. today seeking over $140 million in damages, plus punitive damages, attorneys' fees, interest and costs.  These damages are based on, among other things, Fleet's and Robertson Stephens's failure to pay promised and earned bonus compensation to Claimants for 2001 and 2002 and to provide proper notice pay under the Worker Adjustment and Retraining Notification ("WARN") Act, 29 U.S.C. § 2101 et seq.  In

FILED: NEW YORK COUNTY CLERK 08/13/2018 01:47 PM
NYSCEF DOC. NO. 143

INDEX NO. 159781/2014

RECEIVED NYSCEF: 08/13/2018

19-12346-shl    Doc 55-5    Filed 09/05/19    Entered 09/05/19 18:22:01    Exhibit C
Part 3    Pg 174 of 216

addition, Fleet made fraudulent misrepresentations and material omissions concerning Claimants' employment, compensation and equity interests in Robertson Stephens, and breached its fiduciary duties as majority shareholder of Robertson Stephens by acting in the interests of its own shareholders in first announcing the sale of, and then shutting down, Robertson Stephens.

On April 16, 2002 Fleet abruptly announced that it was putting Robertson Stephens up for sale, even though Fleet had no buyer in place. Worse still, Fleet advertised its reasons for the sale, stating that Robertson Stephens's strong operating performance during 1999 and 2000 was "aberrational" and that the future of investment banking business rested with larger platform firms and "not boutiques like Robbie Stephens." Not surprisingly after this announcement, Fleet was unable to obtain a buyer, and instead began negotiating a management buyout of the firm. On July 12, 2002, after more than 250 hours of negotiations, more than 12 hours of presentations and more than 1,000 pages of fully drafted legal agreements – and on the very day that the buyout agreements were to be distributed for signature – Fleet announced instead that it was shutting Robertson Stephens down, thereby terminating Claimants' employment.

Upon the termination of their employment, Claimants were not offered any bonus compensation for 2002, nor were they provided proper notice pay under the WARN Act. Furthermore, Claimants forfeited substantial amounts of non-cash deferred compensation, including Robertson Stephens Restricted Units, which had previously been valued by Fleet at no less than $7 per share, but accorded a zero value by the separation agreements offered to Claimants.

*Attached is a copy of the Statement of Claim filed with the NYSE in Alt, et al. v. FleetBoston Financial Corporation, et al.*

FILED: NEW YORK COUNTY CLERK 08/13/2018 01:47 PM
INDEX NO. 159781/2014

NYSCEF DOC. NO. 144
RECEIVED NYSCEF: 08/13/2018

19-12346-shl    Doc 55-5    Filed 09/05/19    Entered 09/05/19 18:22:01    Exhibit C
Part 3    Pg 175 of 216

# EXHIBIT F

FILED: NEW YORK COUNTY CLERK 08/13/2018 01:47 PM
INDEX NO. 159781/2014
NYSCEF DOC. NO. 144
RECEIVED NYSCEF: 08/13/2018

19-12346-shl   Doc 55-5   Filed 09/05/19   Entered 09/05/19 18:22:01   Exhibit C
Part 3   Pg 176 of 216

FOR MORE INFORMATION CONTACT JEFFREY L. LIDDLE AT 212-687-8500

December 11, 2002

## PRESS RELEASE

### FORMER ROBERTSON STEPHENS MANAGING DIRECTORS AND PRINCIPALS SUE FLEET AND ROBERTSON STEPHENS FOR OVER $140 MILLION IN DAMAGES.

(New York, NY)  Today, 34 former Managing Directors and 8 former Principals of Robertson Stephens Group, Inc., sued FleetBoston Financial Corporation, Fleet Securities, Inc., Robertson Stephens, Inc. and Robertson Stephens Group, Inc. for unpaid compensation and other damages emanating from the fraudulent cancellation last summer of a management buyout of the Robertson Stephens operation.

Jeffrey L. Liddle, Esq. of Liddle & Robinson, L.L.P. in New York City represents the former Robertson Stephens employees, who were employed in the cities of New York, Atlanta, Boston and Chicago, the state of California and the country of Israel.

The 42 former Robertson Stephens employees (hereinafter "Claimants") filed an arbitration demand with the New York Stock Exchange, Inc. today seeking over $140 million in damages, plus punitive damages, attorneys' fees, interest and costs.  These damages are based on, among other things, Fleet's and Robertson Stephens's failure to pay promised and earned bonus compensation to Claimants for 2001 and 2002 and to provide proper notice pay under the Worker Adjustment and Retraining Notification ("WARN") Act, 29 U.S.C. § 2101 et seq.  In

FILED: NEW YORK COUNTY CLERK 08/13/2018 01:47 PM
NYSCEF DOC. NO. 144
19-12346-shl    Doc 55-5    Filed 09/05/19    Entered 09/05/19 18:22:01    Exhibit C
Part 3    Pg 177 of 216
INDEX NO. 159781/2014
RECEIVED NYSCEF: 08/13/2018

addition, Fleet made fraudulent misrepresentations and material omissions concerning Claimants' employment, compensation and equity interests in Robertson Stephens, and breached its fiduciary duties as majority shareholder of Robertson Stephens by acting in the interests of its own shareholders in first announcing the sale of, and then shutting down, Robertson Stephens, according to Claimants.

On April 16, 2002 Fleet abruptly announced that it was putting Robertson Stephens up for sale, <u>even though Fleet had no buyer in place</u>. Worse still, Fleet advertised its reasons for the sale, stating that Robertson Stephens's strong operating performance during 1999 and 2000 was "aberrational" and that the future of investment banking business rested with larger platform firms and "not boutiques like Robbie Stephens." Not surprisingly after this announcement, Fleet was unable to obtain a buyer, and instead began negotiating a management buyout of the firm. On July 12, 2002, after more than 250 hours of negotiations, more than 12 hours of presentations and more than 1,000 pages of fully drafted legal agreements – and on the very day that the buyout agreements were to be distributed for signature – Fleet announced instead that it was shutting Robertson Stephens down, thereby terminating Claimants' employment.

Upon the termination of their employment, Claimants were not offered any bonus compensation for 2002, nor were they provided proper notice pay under the WARN Act. Furthermore, Claimants forfeited substantial amounts of non-cash deferred compensation, including Robertson Stephens Restricted Units, which had previously been valued by Fleet at no less than $7 per share, but accorded a zero value by the separation agreements offered to Claimants.

*Attached is a copy of the Statement of Claim filed with the NYSE in <u>Alt, et al. v. FleetBoston Financial Corporation, et al.</u>*

FILED: NEW YORK COUNTY CLERK 08/13/2018 01:47 PM
INDEX NO. 159781/2014

NYSCEF DOC. NO. 145

19-12346-shl    Doc 55-5    Filed 09/05/19    Entered 09/05/19 18:22:01    Exhibit C

RECEIVED NYSCEF: 08/13/2018

Part 3    Pg 178 of 216

# EXHIBIT G

FILED: NEW YORK COUNTY CLERK 08/13/2018 01:47 PM    INDEX NO. 159781/2014
NYSCEF DOC. NO. 145    RECEIVED NYSCEF: 08/13/2018

## Sherry Shore

| | |
|---|---|
| **From:** | Christine Palmieri |
| **Sent:** | Tuesday, December 10, 2002 5:46 PM |
| **To:** | 'susanne.craig@wsj.com' |
| **Subject:** | Robertson Stephens |

Further to your telephone conversation with Jeffrey Liddle, attached is the Statement of Claim to be filed tomorrow (without exhibits), as well as a press release, also dated tomorrow.

BECAUSE THE CLAIM WILL NOT BE FILED UNTIL TOMORROW, THIS MATTER IS NOT TO BE PUBLISHED IN TOMORROW'S PAPER.

  

Statement of    press release.doc
Claim.doc

Christine A. Palmieri
Liddle & Robinson, L.L.P.
685 Third Avenue
New York, N.Y. 10017
(212) 687-8500 Ext 238
Fax (212) 687-1505
www.liddlerobinson.com

The information contained in this e-mail message, and any attachments, may be confidential and legally privileged, and is intended only for use by the individual(s) or entity named above. If the reader of this message is not the intended recipient, or the employee or agent responsible to deliver it to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please immediately notify us by telephone (212-687-8500), and destroy the original message. Thank you.

E-MAIL: jliddle@liddlerobinson.com

December 11, 2002

BY HAND

Mr. Robert S. Clemente
Director of Arbitration
New York Stock Exchange, Inc.
20 Broad Street, 5th Floor
New York, New York 10005

> Re:    Eric E. Alt, Michael Barr, J.J. Beaghan, Brian S. Bean, Charles Bolton,
> Vincent Bowen III, Richard A. Brand, Clark Callander, Georgene Carambat,
> Michael Casey, Jeffrey W. Colin, Alex Dean, Christopher Dodge, David
> Fullerton, Philip Gardner, Jonathan Goldman, Christopher W. Greer, Tony
> Haertl, Gregory C. Holmes, Frederick M. Hughes, Daniel Hurwitz, Andrew
> Kaye, Maureen McCarthy, Kevin McGinty, Todd H. McWilliams, Samuel
> A. Morse, Agnes Murphy, Diane P. Murphy, David O'Brian, Joseph Piazza,
> Michael P. Perrella, Larry Rehmer, David Reilly, John T. Rossi, Mark J.
> Salter, Scott Scharfman, Allen Smith, Scott Sullivan, Steven Tishman, Ted
> E. Tobiason, Daniel P. White III and Jeff Winaker v. FleetBoston Financial
> Corporation, Fleet Securities, Inc., Robertson Stephens, Inc., and Robertson
> Stephens Group, Inc.

Dear Mr. Clemente:

We represent the Claimants in the above-referenced matter and submit this
Statement of Claim against Respondents, FleetBoston Financial Corporation, Fleet Securities, Inc.,
Robertson Stephens, Inc., and Robertson Stephens Group, Inc.[1]

---

[1] Respondents FleetBoston Financial Corporation and Fleet Securities, Inc. shall be referred to collectively as
"Fleet." Respondents Robertson Stephens, Inc. and Robertson Stephens Group, Inc. shall be referred to collectively
as "Robertson Stephens."

**Preliminary Statement**

The Claimants, all former executives of Robertson Stephens, seek over $140 million in damages in this arbitration, plus punitive damages, attorneys' fees, interest and costs, based on, inter alia: Respondents' failure to pay promised and earned bonus compensation for 2001 and 2002; Respondents' failure, in violation of the Worker Adjustment and Retraining Notification ("WARN") Act, 29 U.S.C. §§ 2101-2109, to make proper notice pay payments to Claimants; Respondents' fraudulent misrepresentations and material omissions concerning Claimants' employment, compensation and equity interests in Robertson Stephens; and Fleet's breach of its fiduciary duties as majority shareholder of Robertson Stephens.

In addition to seeking earned compensation and other payments in connection with their employment and the ultimate termination of that employment, Claimants seek damages for Fleet's actions in encouraging Claimants to remain at Robertson Stephens until it abruptly decided to close Robertson Stephens's business on July 12, 2002, misrepresenting the "non-cash" compensation earned by the Claimants, misrepresenting and concealing its intention to shut down Robertson Stephens irrespective of its ability to sell Robertson Stephens either to outside buyers or to Robertson Stephens' management, exercising control over Robertson Stephens purely for Fleet's benefit, and otherwise conducting itself in a fraudulent and deceitful manner to Claimants' detriment. Fleet's conduct, beginning with the termination of Robertson Stephens' successful CEO and continuing through numerous stages of layoffs and a negative announcement concerning Fleet's desire to sell Robertson Stephens, resulted in the complete elimination of the Robertson Stephens firm, which had generated significant revenues and earnings for Fleet and its predecessor BankBoston, which Fleet acquired in October 1999. As a result, Claimants' careers and reputations were damaged, their earned compensation (largely invested in non-cash compensation) was deemed "forfeited," and they suffered the loss of prospective compensation, both from other employers and from the continuation of Robertson Stephens's operations through a management buy-out.

**Background**

Robertson Stephens is an investment banking firm that had been in existence for 24 years before Fleet announced, on July 12, 2002, that it was ceasing Robertson Stephens's operations. Claimants were Managing Directors and Principals of Robertson Stephens. and among the most senior and most productive individuals within the firm. Claimants were employed in the cities of New York, Atlanta, Boston and Chicago, the state of California and the country of Israel.

Robertson Stephens was founded in 1978 and was acquired by Bank of America in 1997. Bank of America sold Robertson Stephens to BankBoston in 1998. In October 1999, Fleet merged with BankBoston and, as a result, acquired Robertson Stephens.[2] Thus, from October 1999 to date, Fleet has controlled the operations of Robertson Stephens. Indeed, as detailed below, at

[2] The current Chairman and CEO of FleetBoston Financial Corporation, Chad Gifford, consummated BankBoston's acquisition of Robertson Stephens in his capacity as CEO of BankBoston.

FILED: NEW YORK COUNTY CLERK 08/13/2018 01:47 PM
NYSCEF DOC. NO. 145

INDEX NO. 159781/2014
RECEIVED NYSCEF: 08/13/2018

19-12346-shl    Doc 55-5    Filed 09/05/19    Entered 09/05/19 18:22:01    Exhibit C
Part 3    Pg 182 of 216

Mr. Robert S. Clemente                    -3-                    December 11, 2002

times Fleet exercised its control over the business of Robertson Stephens without first informing the management of Robertson Stephens of its true intentions.

Since Fleet's acquisition of the firm, Robertson Stephens generated billions of dollars of revenue for Fleet. By 2000, Robertson Stephens was a leading underwriter for all equity issues, including the number one "lead underwriter" for initial public offerings in the technology sector. Moreover, the firm was a leading adviser in mergers and acquisitions transactions and a top market maker of publicly-traded securities, and it consistently generated millions of dollars in profits through the efforts of each of its departments: sales and trading, investment banking, money management, and research. In 2000, Robertson Stephens Group generated revenues of $1.55 billion and net income of $250 million. On a cumulative GAAP basis since its acquisition in 1999, Robertson Stephens has contributed nearly $3.5 billion in revenue to Fleet.

Respondents Promise Claimants
Valuable Equity in Robertson Stephens

In December 2000, at the conclusion of a very successful year for Robertson Stephens, Fleet advised Robertson Stephens that Robertson Stephens employees would be granted equity in the firm, and that a Board of Directors would be established – consisting of two members each from Fleet and Robertson Stephens – to protect the interests of Robertson Stephens's minority shareholders, including Claimants. Of 100 million "Robertson Stephens Restricted Units" (at the time valued by Lazard Freres at $1 billion, or $10 per unit), Robertson Stephens employees were to receive 30 percent (30 million units), with 22.5 percent to be granted initially and the remaining 7.5 percent to be retained for future allocations to existing and future Robertson Stephens employees. These measures were considered necessary to retain key employees, since Robertson Stephens had lost more than 10 principals to competitors in the prior 18-month period.

Rather than creating support from Fleet for Robertson Stephens, Robertson Stephens's $1.55 billion revenue year for 2000 ultimately resulted in hostility by Fleet's top management towards Robertson Stephens and its employees. Terrance Murray, ("Murray"), FleetBoston's CEO, and Bob Emery ("Emery"),[3] the CEO of Robertson Stephens, were involved in a very public dispute over how Robertson Stephens employees were to be compensated for the banner year achieved in 2000. Under compensation agreements entered into as part of BankBoston's acquisition of Robertson Stephens in 1998 (which were assumed by Fleet when it acquired BankBoston in 1999), Robertson Stephens was to receive 55 percent of the net revenues generated by the firm to distribute as compensation to its employees for each year through 2001. The dispute concerned whether the 55 percent threshold applied to cash compensation only, or to both cash and non-cash compensation. Believing the dispute had been resolved in its favor and that it had an additional $70 million in compensation to distribute for the year 2000, Robertson

---

[3] Emery, named one of the top 50 people in the technology community worldwide in 2001, had delivered two record years of performance at Robertson Stephens to Fleet.

Mr. Robert S. Clemente                    -4-                    December 11, 2002

Stephens's management distributed such amount.[4]  Following the $70 million distribution, Jay Sarles ("Sarles") (Head of Wholesale Banking for FleetBoston) fired Emery, at Murray's direction, and appointed John Conlin ("Conlin") (then President of Robertson Stephens) to head the firm going forward.  Following these events, Fleet failed to honor its obligations regarding the distribution of Robertston Stephens Restricted Units, stalling such distribution until May 2001.  At that time, moreover, only 20 percent of the firm's equity (and not the 22.5 percent that had been promised) was distributed to Robertson Stephens employees.  (In addition, Respondents ultimately failed to distribute the full 30 percent, or 30 million units, that had previously been agreed upon.)

Respondents Direct the Reduction of
Robertson Stephens's Workforce in a
Manner Designed to Further Their Own Goals

            Throughout 2001, difficult market conditions prevailed, including an industry-wide decline in technology sector investment banking activity, as well as lower volumes in overall investment banking transactions and other industries in which Robertson Stephens engaged.  The managements of Fleet and Robertson Stephens concluded that Robertson Stephens needed to reduce the number of its employees in order to remain profitable.  As a result, Fleet directed Robertson Stephens to reduce Robertson Stephens's workforce by a staggering 50 percent, from approximately 2,000 to approximately 1,000 employees.  Robertson Stephens's management suggested that if such a massive reduction in force was necessary, Robertson Stephens would benefit most by doing so in one downsizing, so as to achieve the benefits of reduced compensation expense immediately.

Fleet, however, insisted that Robertson Stephens take these staffing cuts over time given Fleet's financial concerns.  Fleet's own corporate lending and banking business had suffered massive losses in its operations relating to Brazil and Argentina and through its exposure to various large corporate credit failures, including Enron, Kmart and Global Crossing.  Fleet also suffered large write-downs in its investment portfolio, which were primarily attributable to technology and telecommunications investments wholly unrelated to Robertson Stephens.  By the fourth quarter of 2001, Fleet reflected write-downs, charges and other extraordinary losses relating to its own corporate lending and banking businesses exceeding $2 billion for the year, and year-over-year comparable net income for FleetBoston fell by $3 billion in 2001.  Upon information and belief, even these sizeable losses were understated, since Fleet failed to reflect the full extent of its losses until the second quarter of 2002.  Moreover, Fleet's losses in Latin America may still not be fully recognized.[5]

            In light of these staggering losses within its own businesses, Fleet decided against reducing Robertson Stephens's staff all at once.  Instead, Fleet dictated that Robertson Stephens

---

[4] Emery and the other five members of the Robertson Stephens Executive Committee received the bulk of the $70 million.

[5] Based on the criminal indictments of Fleet officers in Argentina and civil cases pending concerning Fleet's premature freezing of customer assets in Argentina, Fleet's losses in Argentina alone could rise dramatically from the current $2.3 billion in aggregate losses to date.

Mr. Robert S. Clemente                    -5-                    December 11, 2002

reduce its personnel in four stages so that Fleet would not need to reflect a write-down for severance and other charges relating to the downsizing of Robertson Stephens in one massive charge. Fleet's decision in this context, as well as its "staging" of losses and charges in South America and in its investment portfolio, was indicative of Fleet's practice of "earnings smoothing" for the purpose of artificially supporting Fleet's stock price.[6] In addition, Fleet's decision was consistent with Fleet's pattern of making decisions regarding Robertson Stephens for the benefit of Fleet and Fleet's shareholders rather than for the benefit of Robertson Stephens and Robertson Stephens's minority shareholders and employees, such as Claimants.

From approximately March through November 2001, Fleet and Robertson Stephens executed Fleet's plan of staged personnel layoffs. By the end of 2001, Fleet and Robertson Stephens's management had reduced the size of Robertson Stephens by half, to approximately 1,000 employees. Although Robertson Stephens Group's revenues declined to $466 million for 2001, resulting in a $98 million net loss,[7] the massive cuts in staffing put the firm in a position to regain its profitability in 2002. By November 2001, Robertson Stephens Group was once again generating a positive cash flow, and during the first quarter of 2002, the firm generated $2.4 million in normalized cash earnings.

Respondents Promise Claimants
Market Compensation for 2001

Throughout 2001, Respondents told Claimants that Respondents intended to pay Claimants "market compensation" for their efforts in 2001. Specifically, Sarles promised on innumerable occasions (nearly every two or three weeks) that despite the difficult and extraordinary circumstances faced in 2001 (including Emery's termination, the 9/11 disaster and the ongoing layoffs), key Robertson Stephens employees (retained Managing Directors and Principals) would receive "market compensation," sentiments that were frequently echoed by Conlin and Todd Carter, Robertson Stephens's CEO and President, respectively. These promises reflected Fleet's apparent effort to retain top talent among the Robertson Stephens employees despite the massive ongoing personnel cuts at Robertson Stephens.

Respondents made clear that "market compensation" would be determined by the employee's revenue production and the compensation paid by comparable Wall Street firms. In addition, the historical compensation payout formula (approximately 55 percent of revenue) was reaffirmed to promote ongoing production from Robertson Stephens employees. In order to establish appropriate pay levels for Principals, Managing Directors and other Robertson Stephens executives, Fleet subscribed to compensation surveys from McLagan Partners and Greenwich Associates that set forth pay at comparable firms for similar levels of responsibility and revenue generation.

---

[6] Another reason for Fleet to shift its 2001 losses to the following year was to pave the way for a smooth retirement for Murray, who retired at the end of 2001.

[7] The loss Robertson Stephens incurred in 2001 represented the first loss for any year in the history of the firm.

Mr. Robert S. Clemente                    -6-                    December 11, 2002

Despite Respondents' promises, Respondents failed to pay Claimants market compensation for 2001, but instead paid on average half that amount. Claimants received on average five percent or less of the revenues they generated as compensation (when the Wall Street benchmark is at least 10 percent).[8] Upon information and belief, Claimants' compensation for 2001 also fell substantially below the compensation of their peers as indicated in the McLagan and other surveys.

Respondents Issue Restricted Units and
Other Non-Cash Deferred Compensation to
Claimants In Order to Retain Top Employees

Claimants' 2001 bonuses, moreover, were comprised largely of deferred non-cash compensation,[9] including Fleet options, "money market" funds vesting over the course of 2002 and 2003, and equity in Robertson Stephens in the form of one million Robertson Stephens Restricted Units. Whereas the convention on Wall Street is to pay 20 to 33 percent of bonus compensation in the form of deferred compensation, and in the history of Robertson Stephens no more than 20 percent of bonus compensation had been deferred, Claimants received as much as 100 percent of their 2001 compensation in the form of deferred compensation.

Respondents told Claimants that, for each Restricted Unit granted to Claimants, they would receive one share of Robertson Stephens common stock upon the earliest of: (a) the termination of their employment, (b) the liquidation of Robertson Stephens, or (c) the expiration of the restricted period[10] of such units. These same terms applied to the 20 million Restricted Units distributed in May 2001. The remaining Restricted Units earmarked for Robertson Stephen employees (i.e., the balance of the 30 million units Respondents had agreed to distribute, plus Restricted Units forfeited by employees who voluntarily resigned or were terminated for cause) were never allocated.

Through March 2002, Respondents represented to Claimants that each Restricted Unit had a value of at least $7. Indeed, in written confirmations of Claimants' compensation for 2001, which were distributed and orally confirmed in March 2002, Respondents stated that "the units are exchangeable, under certain circumstances, for shares of Robertson Stephens common stock," and that such common stock "has an estimated market value of $7 per share, consistent with an analysis performed by Lazard Freres during 2001," which valued the firm's aggregate

---

[8] Respondents also paid 2001 bonuses later than usual in a further effort to keep employees from leaving for competitors.

[9] Such deferred non-cash compensation is not uncommon on Wall Street. Ostensibly, the purpose behind a non-cash deferral is to retain employees by providing an incentive for them to stay with the firm and not defect to a competitor in order to reap long-term benefits from the increased value of the company in the future.

[10] Five years for restricted units awarded as part of Claimants' incentive compensation, and seven years for restricted units granted as "service awards."

Mr. Robert S. Clemente        -7-        December 11, 2002

equity in excess of $700 million. This value was consistent with the $6.75 book value per share of Robertson Stephens Group as of March 31, 2002 (prior to the fateful April 16 announcement).

Claimants relied to their detriment upon Respondents' representations regarding the "market compensation" they were to receive for 2001, the value of the non-cash deferred compensation they received in 2001 and prior years, and the amounts and value of the equity they expected to receive in the future, by, among other things, declining alternative employment opportunities, remaining at Robertson Stephens, and accepting long-term deferred compensation comprised of the Restricted Units and other non-cash compensation. In addition, Respondents concealed from Claimants Fleet's plan to sell the Robertson Stephens firm. Instead, Respondents misrepresented that Fleet had no intention of selling Robertson Stephens because Fleet understood the "strategic" importance of Robertson Stephens to Fleet.

In fact, upon the expiration of the BankBoston contracts in February 2002, which provided for the distribution of 55 percent of revenues as bonus compensation, Fleet entered into a new long-term compensation arrangement with Robertson Stephens, which provided for varied aggregate compensation payout ratios between 48 and 65 percent of revenues, depending on whether annual revenues were less than $500 million, greater than $500 million but less than $1.5 billion, or greater than $1.5 billion. (Upon information and belief, however, Fleet knew, by as early as late 2001, that Fleet secretly intended to seek to sell or close Robertson Stephens. Thus, Fleet's negotiation of long-term compensation arrangements concerning Robertson Stephens was tainted by bad faith.) The BankBoston contracts, however, provided for payment of a year's compensation to Robertson Stephens employees whose employment was terminated prior to February 28, 2002. For this reason, Fleet delayed its plans to sell or close Robertson Stephens until the expiration of those contracts. In addition, Respondents hid from Claimants Fleet's intention to sell or shut down the Robertson Stephens firm.

Fleet's Premature Announcement
Of the Sale of Robertson Stephens
Damages the Firm and Its Professionals

On April 16, 2002, Fleet suddenly announced that it was putting Robertson Stephens up for sale. In a highly unusual step, **Fleet made this announcement without any buyer in place.** By doing so, Fleet essentially advertised that it had not found a buyer for Robertson Stephens, thereby reducing the value of the Robertson Stephens concern. Worse still, Fleet released to the media – and discussed with institutional investors and Wall Street research analysts in its quarterly earnings call – its reasons for ridding itself of Robertson Stephens, including dissatisfaction with volatility in Robertson Stephens's earnings performance. Fleet also stated that Robertson Stephens's strong operating performance during 1999 and 2000 was "aberrational" and "would not return in our collective lifetimes," and expressed its belief that future benefits of the investment banking business would accrue to more diversified, larger platform firms and "not boutiques like Robbie Stephens." This language was especially disparaging given that Robertson Stephens had been a leading underwriter of public offerings since 2000, was a top market maker of NASDAQ securities, and managed billions in institutional

Mr. Robert S. Clemente                    -8-                    December 11, 2002

and high net worth assets.

The timing of this announcement, in connection with the announcement of other "clean-up" measures,[11] was designed to serve Fleet and to bolster Fleet's stock price without regard to Robertson Stephens or Claimants. In fact, Fleet's stock increased by over $2 billion in the aggregate after its April 16 announcement.

Immediately, Fleet's rash announcement cast Robertson Stephens in a negative light, and generated speculation that Robertson Stephens's value had dropped precipitously from the $800 million BankBoston had paid for the firm in 1998. In addition, the announcement hurt Claimants' ability to bring in business, maintain existing clients, and otherwise generate revenues for Robertson Stephens. This harm spread across all departments at Robertson Stephens – new investment banking clients shied away, institutional investors reduced their commission flow, high net worth individuals transferred their assets to other institutions, and all clients expressed concern regarding the future of the firm, a subject that was speculated upon in numerous press articles.

Despite the potential impact of Fleet's announcement on every employee within the Robertson Stephens firm, Fleet failed to notify Robertson Stephens's management of the planned announcement until April 15, 2002, just one day prior to the actual announcement. (The announcement was reported in a lengthy Wall Street Journal article, a copy of which is attached hereto as Exhibit A, indicating that Fleet had probably made its intentions known to the media several days prior to when Fleet informed the management of Robertson Stephens.) Fleet concealed its announcement from Robertson Stephens's management and Claimants despite the fact that Fleet representatives sat on the Board of Directors of Robertson Stephens.

Fleet Negotiated in Bad Faith a Proposed
Management Buy-Out of Robertson Stephens

Even after its April 16, 2002 announcement, Fleet continued to make material misrepresentations to Robertson Stephens employees concerning their future employment. On April 26, 2002, Sarles declared that Fleet had no intention of liquidating Robertson Stephens.

Fleet engaged Goldman Sachs, which, after interviewing the Robertson Stephens Executive Management team, put together a summary information statement outlining the opportunity to acquire Robertson Stephens. The statement was circulated to 72 prospective purchasers, signaling an auction of the firm. Not surprisingly, given Fleet's disastrous April 16 announcement and comments concerning the undesirability of Robertson Stephens, none of the prospective purchasers sustained interest in Robertson Stephens. By June 2002, after Fleet was unable to locate a buyer, Fleet and Robertson Stephens's management had begun discussions concerning management's potential purchase of Robertson Stephens. Robertson Stephens

---

[11] Fleet's other announcements included a reduction in its exposure to non-strategic areas of corporate lending, the scaling back of investments in its Principal Investing business, the sale of AFSA (Fleet's outsourcing and education services business), and strategic decisions concerning its Global Banking operations.

Mr. Robert S. Clemente                    -9-                    December 11, 2002

representatives conducted more than 250 hours of negotiations with Fleet and more than 12 hours of presentations to the entire group of Robertson Stephens professionals outlining the terms of the planned management buy-out ("MBO"), and more than 1,000 pages of legal agreements were fully drafted and awaiting execution. Moreover, Robertson Stephens's management (and, upon information and belief, Fleet's management), confirmed to clients and the media that the MBO was being negotiated and that an agreement in principle had been reached to continue the operations of Robertson Stephens.

Also in connection with the MBO, Terrence Laughlin, Fleet's head of Corporate Strategy and Development, advised that Robertson Stephens would need to endure further cuts in personnel to enable an MBO. In a good faith effort to effect the MBO, Robertson Stephens cut personnel further – to approximately 500 employees by July 12, 2002.[12]    Each Managing Director who was to remain with the newly-constituted MBO firm was given a pro forma allocation of equity and a draft term sheet. Fleet concealed from Robertson Stephens and Claimants, however, that Fleet never intended to complete the MBO transaction.

Fleet Closes Robertson Stephens

At Fleet's insistence, and based upon the apparent willingness of Fleet to sell Robertson Stephens to its management, Robertson Stephens had taken the drastic step of reducing its staff from 2000 to 500 employees in just over one year. Despite having imposed such requirements as a condition of enabling an MBO, and having negotiated the MBO to near-completion, on July 12, 2002 – the very day that the MBO agreements were to be distributed for signature – Fleet informed Robertson Stephens that it had "run out of time" and discontinued all efforts to negotiate an MBO.[13]    Three days later, Fleet announced the liquidation of Robertson Stephens. Eugene McQuade ("McQuade"), a Fleet Vice Chairman and Fleet's Chief Financial Officer, stated "we have decided a wind-down is in the best interest of **our** shareholders." (emphasis added)

On August 6, 2002, Fleet scheduled an extraordinary intra-quarter conference call with the Wall Street analyst community to calm rumors and concerns over the soundness of Fleet – rumors that began circulating after further sizeable write-downs in Latin America and other areas of the bank had been disclosed in the prior month's quarterly earnings call and Fleet's stock price decreased by 50 percent. On the call, to alleviate concerns over future dividend cuts, McQuade stated that Fleet would be able to continue to pay the current quarterly dividend rate to its shareholders, in large part because the liquidation of Robertson Stephens provided sufficient cash and freed-up capital to meet certain "liquidity tests" set forth in relevant dividend covenants.

---

[12] The Claimants in this arbitration (with few exceptions) were Robertson Stephens employees through at least July 12, 2002.

[13] Documents from Fleet rejecting the MBO were dated two weeks earlier than the date on which they were received by Robertson Stephens.

Mr. Robert S. Clemente                    -10-                    December 11, 2002

Fleet's decision to close Robertson Stephens resulted in the termination of Claimants' employment. Respondents offered Claimants severance packages that required Claimants to sign a release of all claims in order to receive "supplemental incentive bonus" amounts, which represented earned bonus compensation for prior years that had been paid in the form of Fleet stock and options. Moreover, the severance packages included "WARN Period Salary" which Respondents (a) improperly calculated based only on base salary, and (b) improperly deducted from severance due Claimants based on their tenure with the firm.

Claimants were offered no bonus compensation for the services they provided and the revenue they produced under extremely difficult conditions in 2002. In addition, although acknowledging that Claimants would be entitled to shares of Robertson Stephens common stock equivalent to the number of all of their Robertson Stephens Restricted Units, Respondents' severance proposals to Claimants attributed a **zero** value to the Restricted Units and common stock. Only weeks earlier, Respondents had reassured Claimants of the at least $7 per share value of the Restricted Units and had described Robertson Stephens as a viable ongoing firm valued at over $700 million, rendering it unbelievable that "neither the restricted units under the Restricted Unit Plan, nor the underlying shares of Robertson Stephens common stock, have a positive value," as stated in the severance proposals. Moreover, Fleet paid $5 per Restricted Unit to Robertson Stephens employees terminated in November 2001 and in Europe in mid-2002.

## CLAIMS

### WARN Act Claims

In the separation packages offered to Claimants, Respondents acknowledge that the WARN Act governs their decision to close the Robertson Stephens firm. The WARN Act provides, in pertinent part:

> An employer shall not order a plant closing or mass layoff until the end of a 60-day period after the employer serves written notice of such an order --
>
> (1) to each representative of the affected employees as of the time of the notice or, if there is no such representative at that time, to each affected employee.

29 U.S.C. § 2102(a).

The WARN Act was "designed to give workers and their families some transition time to adjust to the prospective loss of employment, to seek and obtain alternative jobs and ... to enter skill training ... that will allow these workers to successfully compete in the job market." Martin v. AMR Services, 877 F. Supp. 108, 113 (E.D.N.Y. 1995) (internal citations omitted).

Mr. Robert S. Clemente                    -11-                    December 11, 2002

Respondents violated the WARN Act by failing to provide the requisite 60-day notice prior to closing Robertson Stephens' operations (or, alternatively, to pay 60 days of notice pay). Failure to give written notice of termination within the 60 days prescribed constitutes a violation of the WARN Act. See, e.g., Finnan v. L.F. Rothschild & Co., Inc., 726 F. Supp. 460 (S.D.N.Y. 1989); New Orleans & Vicinity v. Dillard Department Stores, 15 F.3d 1275 (5th Cir. 1994).

When proper notice is not provided, employees are entitled to back pay damages of up to 60 days of notice pay. The notice pay offered to Claimants in lieu of Respondents' providing 60-days' notice of the closing of Robertson Stephens violates the WARN Act in two respects. First, the payment should have been calculated on a total compensation basis. Respondents instead offered notice pay based only on base salary. The WARN Act describes the extent of an employer's liability for failure to provide the required notice as:

> "back pay for each day of violation at a rate of compensation not less than the higher of –
>
> (i)    the average regular rate received by such employee during the last 3 years of the employee's employment; or
>
> (ii)    the final regular rate received by such employee...."

29 U.S.C. § 2104(a)(1). The WARN Act back pay remedy must be calculated to reflect the amount an "employee actually would have earned" and not merely an employee's base salary. Local Joint Exec. Bd. of Culinary/Bartender Trust Fund v. Las Vegas Sands, Inc., 244 F.3d 1152 (9th Cir. 2001).

Second, Respondents deducted the WARN notice pay offered to Claimants from severance due Claimants pursuant to an entirely separate obligation, namely, Respondents' severance plans and ERISA. This deduction is not permitted by the WARN Act. 29 U.S.C. § 2104(a)(2) provides in pertinent part:

The amount for which an employer is liable under paragraph (1) shall be reduced by

(A) any wages paid by the employer to the employee of the period of the violation;

(B) any voluntary and unconditional payment by the employer to the employee that is not required by any legal obligation; and

(C) any payment by the employer to a third party or trustee (such as premiums for health benefits or payments to a defined contribution pension plan) on behalf of and attributable to the employee for the period of the violation.

FILED: NEW YORK COUNTY CLERK 08/13/2018 01:47 PM
INDEX NO. 159781/2014
NYSCEF DOC. NO. 145
19-12346-shl    Doc 55-5    Filed 09/05/19    Entered 09/05/19 18:22:01    Exhibit C
RECEIVED NYSCEF: 08/13/2018
Part 3    Pg 191 of 216

Mr. Robert S. Clemente                    -12-                    December 11, 2002

Severance payments, however,

> are not "wages" as contemplated by 29 U.S.C. § 2104(a)(2)(A), but rather
> ERISA payments that the company was already legally obligated to make
> regardless of the work the [claimants] performed. The fact that these
> payments happened to be labeled ["WARN Period Salary Offset"], and
> that they happened to be set at the level of the [claimants'] wages, is
> irrelevant. The payments were not made in exchange for work that
> the[claimants] would have performed during the period of the violation.
> Accordingly, they are not "wages" according to 29 U.S.C.
> § 2104(a)(2)(A).

Ciarlante v. Brown & Williamson Tobacco Corp., 143 F3d 139, 152 (3rd Cir. 1998). See also
Tobin v. Ravenswood Aluminum Corp., 838 F. Supp 262, 273 (S.D.W.Va. 1993) ("The court
notes that severance pay under ERISA does not constitute wage compensation."); 29 U.S.C.
§ 2104(a)(1)(B) (providing that damages for failure to provide proper notice under the WARN
Act include payment of benefits under an employee benefit plan in addition to backpay). Here,
where the severance package attempts to deduct WARN Act back pay damages from an already
present legal obligation under ERISA, the deduction is improper, and Claimants should receive
the full value of both the WARN and ERISA payments.

Based on Respondents' violation of the WARN Act, Claimants each should be
awarded damages based on their individual rates of compensation, in accordance with 29 U.S.C.
§ 2104, together with their attorneys' fees and costs.

**Bonus Claims**

Claimants were employed in the following divisions: investment banking, sales and
trading, research, and retail brokerage. Except for retail salespeople, all of the Claimants were
compensated in similar fashion – in addition to base salary, they earned year-end bonuses, which
accounted for the bulk of their total compensation. Claimants understood that their bonus was a
function of the firm's performance, their department's performance and their individual
performance. Not only was this manner of calculating bonuses Respondents' practice and policy
for several years, but Respondents made express representations to many of the Claimants that this
is precisely how their bonuses would be determined.

For 2001, moreover, Respondents expressly promised Claimants that they would
receive "market compensation" based on their performance and the compensation paid by
comparable Wall Street firms. Respondents failed to fulfill this promise, paying bonuses that were
well below market and overwhelmingly comprised of deferred compensation. Respondents also
failed to fulfill their promise that Robertson Stephens employees would receive 30 percent of the
firm's equity in the form of Restricted Units.

Mr. Robert S. Clemente        -13-        December 11, 2002

        In addition, **Respondents repeatedly advised Claimants throughout their employment during 2002 that Respondents had been accruing a 2002 bonus pool that totaled approximately $40 million**. Upon the termination of Claimants' employment, however, Respondents told Claimants that Claimants would receive no bonus compensation for 2002. Claimants are nonetheless entitled to such earned compensation.

        Courts recognize implied, as well as express, contracts. The bonus compensation Claimants should have been paid for 2001 and 2002 was owed to them under an implied contractual promise. "[A]n implied-in-fact contract … [is] based on the conduct of the parties, from which … [they] fairly infer the existence and terms of a contract." Radio Today, Inc. v. Westwood One, Inc., 684 F. Supp. 68, 71 (S.D.N.Y. 1988).[14] see also Division of Labor Law Enforcement v. Transpacific Transportation Co., 69 Cal.App.3d 268, 275, 137 Cal.Rptr.855 (1977) ("As to the basic elements, there is no difference between an express and implied contract. While an express contract is defined as one, the terms of which are stated in words, an implied contract is an agreement, the existence and terms of which are manifested by conduct."); LiDonni, Inc. v. Hart, 355 Mass. 580, 583, 246 N.E.2d 446, 449 (1969) ("In the absence of an express agreement, a contract implied in fact may be found to exist from the conduct and relations of the parties"); Century 21 Castles By King, LTD. v. First National Bank of Western Springs, 170 Ill.App.3d 544, 548, 524 N.E.2d 1222 (1988) ("a contract implied in fact arises not by express agreement but, rather, by a promissory expression which may be inferred from the facts and circumstances which show an intent to be bound"); Fortner v. McCorkle, 78 Ga.App. 76, 80, 50 S.E.2d 250, 253 (1st Div. 1948) ("In the absence of an express contract between the parties for the payment of such services, there may arise an implied contract by which the person to whom the services are rendered shall pay the other for the services, where from all the facts and circumstances it can reasonably be inferred that it is in the contemplation of the parties.").

        Here, an implied contract for the payment of bonuses is established between Respondents and Claimants because (1) Respondents had a long-standing policy and practice of paying bonuses as part of annual compensation; (2) Claimants received bonuses in the past based

---

[14] The practice of paying bonuses makes bonus compensation an implied part of any employment agreement. See, e.g., Credit Suisse First Boston v. Crisanti, 734 N.Y.S.2d 150, 151 (1st Dep't 2001) ("We find no basis for judicial disturbance of the arbitrators' primarily factual conclusion that the bonus sought by respondent was an essential component of his compensation and that the parties' course of dealing and the industry practice gave rise to an implied right to a bonus."); Mirchel v. RMJ Securities Corp., 613 N.Y.S.2d 876, 878-79 (1st Dep't 1994) ("The course of dealing between the parties evinces an implied promise that annual or semi-annual bonus payments constitute a part of plaintiff's compensation."); Guintoli v. Garvin Guybutler Corp., 726 F. Supp. 494, 507-08 (S.D.N.Y. 1989) (an implied promise that bonus payments constitute a term of employment can be shown through a course of dealing between employer and employee). Numerous bonus cases have been brought in arbitration and won by the claimants. See Randall Smith, "Losing a Job on Wall Street These Days Often Doesn't Mean Losing a Bonus, Too," Wall Street Journal, July 19, 2000, at C1 (attached hereto as Exhibit B); Marais v. Barclays De Zoete Wedd, Inc. and Barclays Capital, NASD Case No. 00-02520 (panel awarded bonus compensation totaling $417,500 plus interest); Brown, et al. v. ING Baring Furman Selz, NYSE Docket No. 2000-8755 (panel awarded bonus of $206,750 plus interest); Alban-Davies v. Credit Lyonnais Securities (USA) Inc.; NYSE Docket No. 2000-8631 (panel awarded bonus of $650,000 plus interest); Halpern, et al. v. ING Baring (U.S.) Securities Inc., NYSE Docket No. 1998-7179 (panel awarded bonuses totaling $298,154.76, including interest).

FILED: NEW YORK COUNTY CLERK 08/13/2018 01:47 PM
NYSCEF DOC. NO. 145

INDEX NO. 159781/2014

RECEIVED NYSCEF: 08/13/2018

19-12346-shl    Doc 55-5    Filed 09/05/19    Entered 09/05/19 18:22:01    Exhibit C
Part 3    Pg 193 of 216

Mr. Robert S. Clemente        -14-        December 11, 2002

upon this long-standing practice; (3) bonuses constituted a substantial portion of Claimant's annual compensation packages; and (4) Claimants were aware of Respondents' long-standing bonus practice and relied upon it in rendering services their employment.

In Hall v. United Parcel Service, 76 N.Y.2d 27, 556 N.Y.S.2d 21 (1990), the court determined that "[a]n employee's entitlement to a bonus is governed by the terms of the employer's bonus plan." Although the plaintiff in Hall did not qualify for his employer's bonus plan, there is no question that Claimants qualified for Respondents' bonus plan. The Claimants all performed their jobs during 2002 based upon the understanding that their year-end bonus would be determined by their individual performance, their department's performance, and the performance of the firm. Since Robertson Stephens' practices, policies and verbal assurances constitute a "bonus plan," Claimants are entitled to bonus compensation for 2002 in accordance with that plan.

Respondents are also liable to Claimants for their unpaid bonus compensation under the doctrine of quantum meruit. Under this theory, one who accepts and benefits from the services of another who expects to be paid must pay the individual the reasonable value of those services. See Martin H. Bauman Assoc. v. H&M International Transport, 171 A.D.2d 479, 567 N.Y.S.2d 404, 408 (1st Dep't 1991); Griner v. Foskey, 158 Ga.App.769, 771, 282 S.E.2d 150, 152 (1981); J. A. Sullivan Corp. v. Commonwealth, 397 Mass. 789, 792-98, 494 N.E.2d 374, 376-79 (1986); Earhart v. William Low Company, 25 Cal.3d 503, 600 P.2d 1344 (1979); First National Bank of Springfield v. Malpractice Research, Inc., 179 Ill.2d 353, 688 N.E.2d 1179 (1997). Claimants provided substantial services to Respondents in 2002, and should be compensated accordingly.

In prior years, Claimants received substantial bonuses based on their performance, as shown by the chart below. In most instances, Claimants earned bonuses over the course of the last three years averaging from $1 million to $4 million as compared to annual base salaries of no more than $200,000 (except for one Claimant who earned a $250,000 annual base salary). Respondents' refusal to pay Claimants their earned bonuses is improper. Instead, Respondents should be compelled to pay Claimants their earned and promised 2001 and 2002 bonus compensation, plus interest.

**Claim For Severance Pay**

Claimants were dismissed without receiving any severance pay. Respondents offered to pay Claimants severance only if they agreed to release Respondents from "any claim, demand or cause of action of any kind" they may have against Respondents. Claimants were entitled, however, to receive severance pay from Respondents under Respondents' severance plans, policies and practices, and Claimants ask that they be awarded all amounts, as of yet undetermined, to which they are entitled as former executives of the firm.

Severance plans are "employee welfare benefit plans" within the meaning of the federal Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1001 et seq. ("ERISA"); see Gilbert v. Burlington Industries, Inc., 765 F.2d 320, 325 (2d Cir. 1985). As a result, each of Respondents' severance plans, practices and policies constitutes an employee benefit plan under

Mr. Robert S. Clemente         -15-         December 11, 2002

ERISA. Respondents' failure to pay severance benefits to Claimants under the most favorable severance arrangement applicable to them constitutes a violation of ERISA. Claimants are therefore entitled to the severance payments they should have received, as well as recovery of their reasonable attorneys' fees expended in obtaining those payments. See ERISA, 29 U.S.C. § 1132(g)(1). Claimants ask the Panel to award them the unpaid severance to which they are entitled, plus their attorneys' fees and liquidated damages in recovering such benefits.

## Fraud, Negligent Misrepresentation and Breach of Fiduciary Duty Claims

An action for fraud can be shown by proof that Respondents made a false, material misrepresentation of an existing fact with knowledge that it was false (or reckless disregard as to whether it was true or false), with the intent that Claimants rely on such misrepresentations, and upon which Claimants reasonably relied to their detriment. Higginbottom v. Thiele Kaolin Co., 251 Ga. 148, 152, 304 S.E.2d 365 (1983); see also Werner v. American Int'l Group, Inc., 201 F.3d 446 (9th Cir. 1999) ("[T]he elements of a fraudulent inducement claim are: (a) misrepresentation; (b) scienter; (c) intent to defraud; (d) justifiable reliance; and (e) resulting damage."); Northeastern Univ. v. Deutsch, 2002 WL 968857, at *3 (Mass.Super. March 21, 2002) ("To state a claim for fraudulent misrepresentation, the plaintiff 'must show a false statement of material fact made to induce the plaintiff to act, together with reliance on the false statement by the plaintiff to the plaintiff's detriment."); Bd. of Educ. of City of Chicago v. A, C and S, Inc., 131 Ill.2d 428, 546 N.E.2d 580 (1989) (elements in a fraudulent misrepresentation are "(1) a false statement of material fact, (2) knowledge or belief of the falsity by the party making it, (3) intention to induce the other party to act, (4) action by the other party in reliance on the truth of the statements, and (5) damage to the other party resulting from such reliance"). Alternatively, Claimants can show that the Respondents, instead of misrepresenting an existing fact, made promises with the present intention not to perform "or with knowledge that the future event would not occur." Higginbottom, 251 Ga. at 152.

The elements of a claim for negligent misrepresentation are the same as those for a fraudulent misrepresentation claim, except that Claimants need not show that Respondents knew their statement was false at the time it was made. Respondents' carelessness or negligence in ascertaining the truth of their statement is sufficient. Bd. of Educ., 131 Ill. 2d at 453.

The elements of a fraudulent concealment claim are: (1) a relationship between parties that creates a duty to disclose; (2) knowledge of material facts by a party bound to make such disclosures; (3) non-disclosure; (4) scienter; (5) reliance by the injured party, and (6) damages. Zackiva Communications Corp. v. Horowitz, 826 F. Supp. 86 (S.D.N.Y. 1993); see also Brass v. American Film Technologies, Inc., 987 F.2d 142 (2d Cir. 1993); Mosier v. Southern California Physicians Insurance Exchange, 63 Cal.App.4[th] 1022, 74 Cal.Rptr.2d 550 (1998); Tigner v. Shearson-Lehman Hutton, Inc., 201 Ga.App. 713, 411 S.E.2d 800 (1991). A duty to disclose arises when one party has superior knowledge not readily available to the other party, or where the parties stand in fiduciary or confidential relationship to one another. Ceribelli v. Elghanayan, 990 F.2d 62 (2d Cir. 1993).

FILED: NEW YORK COUNTY CLERK 08/13/2018 01:47 PM    INDEX NO. 159781/2014
NYSCEF DOC. NO. 145    19-12346-shl    Doc 55-5    Filed 09/05/19    Entered 09/05/19 18:22:01    Exhibit C    RECEIVED NYSCEF: 08/13/2018
Part 3    Pg 195 of 216

Respondents' fraudulent statements and concealments, including misrepresentations regarding Fleet's intent to sell and/or liquidate Robertson Stephens, misrepresentations concerning the value of Robertson Stephens Restricted Units, and Fleet's lack of intent to complete the MBO, form the basis for Respondents' liability for fraudulent misrepresentation, fraudulent concealment, and negligent misrepresentation. Moreover, Respondents' misrepresentations regarding the value of Claimants' Robertson Stephens restricted units, and Fleet's intentions regarding the sale of Robertson Stephens and the MBO constitute additional bases for fraud and negligent misrepresentation claims. Claimants' reliance included accepting Robertson Stephens restricted units, declining other employment, and continuing to perform services yielding substantial revenues to Respondents.

Respondents, by virtue of their superior knowledge of the facts at issue, owed a duty to Claimants. Respondents also owed a duty to Claimants by virtue of Respondents' status as majority shareholders of Robertson Stephens common stock. As courts in California and New York have recognized, "'[w]hen a number of stockholders combine to constitute themselves a majority in order to control the corporation as they see fit, they become for all practical purposes the corporation itself, and assume the trust relation occupied by the corporation towards its stockholders.'" Jones v. H.F. Ahmanson & Co., 1 Cal.3d 93, 111, 460 P.2d 464 (1969) (quoting Ervin v. Oregon Ry. & Nav. Co., 27 F. 625, 631 (C.C.S.D.N.Y. 1886)). Thus, the majority shareholders stand in a position of fiduciaries to the minority shareholders, and a parent company cannot "operate the subsidiary for the benefit of the group as a whole [rather than] for the benefit of that particular subsidiary." Id.; Robb v. Eastgate Hotel, 347 Ill. App. 261, 106 N.E.2d 848 (1952) ("The majority shareholders do not by the mere reason of their holdings thereby become trustees for the minority stockholder in voting on a sale of assets. However, equity will impose upon them the obligation of trustees if in forcing disposition of assets they overreach the minority stockholders and reap benefits in which the minority does not share."). "Where, as here, it is sufficiently alleged that the effect of the controlling stockholders self-serving manipulation of corporate affairs causes a singular economic injury to minority interests alone, the minority have stated a cause of action for 'special' injury." Grace Brothers, Ltd. v. Farley Industries Inc., 264 Ga. 817, 819, 450 S.E.2d 814, 816 (1995) (quoting In re Tri-Star Pictures, Inc. Litigation, 634 A.2d 319, 330 (Del. 1993)) (recognizing cause of action for minority shareholders where majority shareholders breached a fiduciary duty when they caused a merger where minority stock holders suffered from depressed price).

Respondents violated their fiduciary duty to Claimants by engineering the failed sale and failed MBO of the Robertson Stephens firm, depriving Claimants of all of the value of their Robertson Stephens restricted units, concealing and misrepresenting material facts relating to such sale, the MBO and the value of the restricted units, and other conduct reflecting Respondents' campaign to place the interests of Fleet ahead of those of the Claimants and Robertson Stephens.

FILED: NEW YORK COUNTY CLERK 08/13/2018 01:47 PM
NYSCEF DOC. NO. 145

INDEX NO. 159781/2014
RECEIVED NYSCEF: 08/13/2018

19-12346-shl    Doc 55-5    Filed 09/05/19    Entered 09/05/19 18:22:01    Exhibit C
Part 3    Pg 196 of 216

Mr. Robert S. Clemente                    -17-                    December 11, 2002

## Statutory Claims

In addition, Respondents' willful failure to pay Claimants amounts due them also entitles Claimants to statutory relief under their respective State's laws. (See relevant sections of state statutes attached hereto as Exhibit C.) Pursuant to these "wage statutes," Claimants seek all unpaid wages, including all bonus and severance pay, liquidated damages, and costs and attorneys' fees.

## Individual Claims

As stated earlier, each Claimant's bonus was primarily a function of performance. The following table will provide a breakdown of each Claimant's bonus compensation paid to Claimants for the years 1999, 2000 and 2001.[15]  This illustrates the simple fact that bonuses comprised a significant portion of each Claimant's total annual compensation, and also provides a backdrop against which the Panel can determine the amounts Claimants should have received in WARN Act notice pay and bonus compensation for 2002.

The chart is not in alphabetical order (the order in the caption) but has been coded to maintain the confidentiality of each Claimant's specific compensation information. Claimants' names, job titles and any additional identifying information will be submitted as soon as the parties agree to a suitable confidentiality agreement and/or the Arbitrators provide for such confidentiality.

| Name | 2002 Base Salary | 2001 Bonus Compensation | 2000 Bonus Compensation | 1999 Bonus Compensation | RS Restricted Units[16] | WARN Damages[17] |
|------|------|------|------|------|------|------|
| 1 | $200,000 | $2,576,000 | $2,320,000 | $687,000 | $438,382 | $309,277 |
| 2 | $200,000 | $350,000 | $600,000[18] | N/A | $469,693 | $128,000 |
| 3 | $200,000 | $750,000 | $6,851,917 | $3,500,000 | $2,436,917 | $650,106 |
| 4 | $200,000 | $390,000 | $3,800,000 | $1,700,000 | $1,409,086 | $360,000 |
| 5 | $150,000 | $200,000 | $1,000,000 | N/A | $72,023 | $133,333 |
| 6 | $200,000 | $450,000 | $3,000,000 | $1,500,000 | $1,452,780 | $266,388 |
| 7 | $150,000 | $200,000 | $1,250,000 | $575,000 | $484,400 | $136,111 |
| 8 | $200,000 | $700,000 | $7,000,000 | $4,424,998 | $2,505,048 | $695,000 |
| 9 | $200,000 | $1,300,000 | $3,900,000 | N/A | $1,158,584 | $466,666 |

[15] Claimants' compensation figures are based on the best information available to Claimants and are subject to revision upon the receipt of official compensation records from Respondents.

[16] For the purposes of this chart, the RS Restricted Units have been valued at $7 per unit. These amounts do not include Restricted Units earmarked for Robertson Stephens employees but not allocated.

[17] Pursuant to the statute, the WARN damages were calculated using the average total compensation for the past three years. Where an employee had not been employed at Robertson Stephens for three years, the damages were calculated using the average total compensation for all years worked at Robertson Stephens.

[18] This employee began working at Robertson Stephens in April 2000; this bonus reflects 8 months of work.

FILED: NEW YORK COUNTY CLERK 08/13/2018 01:47 PM INDEX NO. 159781/2014

NYSCEF DOC. NO. 145    19-12346-shl    Doc 55-5    Filed 09/05/19    Entered 09/05/19 18:22:01    Exhibit C    RECEIVED NYSCEF: 08/13/2018

Part 3    Pg 197 of 216

Mr. Robert S. Clemente      -18-      December 11, 2002

| Name | 2002 Base Salary | 2001 Bonus Compensation | 2000 Bonus Compensation | 1999 Bonus Compensation | RS Restricted Units[16] | WARN Damages[17] |
|------|------|------|------|------|------|------|
| 10 | $150,000 | $1,300,000 | $2,150,000 | $1,010,000 | $1,459,395 | $266,388 |
| 11 | $200,000 | $750,000 | $3,400,000 | $2,200,000 | $1,722,217 | $386,111 |
| 12 | $200,000 | $450,000 | $2,500,000 | $1,900,000 | $438,382 | $302,777 |
| 13 | $200,000 | $650,000 | $4,482,500 | $2,800,000 | $1,252,524 | $474,027 |
| 14 | $200,000 | $1,300,000 | $5,200,000 | $4,800,000 | $1,929,088 | $661,111 |
| 15 | $200,000 | $1,300,000 | $4,247,535 | N/A | $1,158,584 | $364,794 |
| 16 | $200,000 | $745,000 | $2,205,923 | $1,453,484 | $671,349 | $278,000 |
| 17 | $125,000 | $650,000 | $675,000 | $435,000[19] | $100,205 | $115,227 |
| 18 | $150,000 | $1,200,000 | $1,650,000 | $1,050,000 | $580,860 | $241,388 |
| 19 | $200,000 | $1,300,000 | N/A | N/A | $866,117 | $250,000 |
| 20 | $200,000 | $1,300,000 | N/A | N/A | $350,000 | $250,000 |
| 21 | $150,000 | $1,000,000 | N/A | N/A | $322,000 | $191,000 |
| 22 | $200,000 | $2,410,000 | $950,000 | $325,000 | $876,764 | $237,944 |
| 23 | $150,000 | $300,000 | $1,500,000 | $1,100,000 | $288,708 | $188,000 |
| 24 | $150,000 | $1,000,000 | N/A | N/A | $329,000 | $167,000 |
| 25 | $150,000 | $450,000 | $850,000 | $600,000 | $866,117 | $200,000 |
| 26 | $150,000 | $1,300,000 | $1,000,000 | $850,000 | $288,708 | $201,000 |
| 27 | $200,000 | $600,000 | $7,300,000 | $2,300,000 | $3,131,310 | $600,000 |
| 28 | $200,000 | $1,500,000 | $1,300,000 | N/A | $866,117 | $200,000 |
| 29 | $200,000 | $1,000,000 | $525,000[20] | N/A | $866,117 | $200,000 |
| 30 | $200,000 | $1,300,000 | $2,200,000 | $850,000 | $782,824 | $280,000 |
| 31 | $200,000 | $1,500,000 | $4,300,000 | $2,050,000 | $2,478,784 | $470,000 |
| 32 | $150,000 | $1,350,000 | $1,350,000 | N/A | $626,262 | $250,000 |
| 33 | $200,000 | $1,600,000 | $2,900,000 | $1,800,000 | $1,904,777 | $383,333 |
| 34 | $200,000 | $475,000 | $2,850,000 | $1,950,000 | $822,906 | $326,000 |
| 35 | $200,000 | $1,300,000 | $800,000 | N/A | $876,764 | $208,333 |
| 36 | $300,000 | $600,000 | $6,900,000 | $4,400,000 | $2,245,348 | $711,000 |
| 37 | $200,000 | $300,000 | $1,625,000 | $1,025,000 | $876,764 | $192,000 |
| 38 | $200,000 | $400,000 | $4,000,000 | $3,500,000 | $1,252,524 | $472,222 |
| 39 | $200,000 | $1,000,000 | $4,970,000 | $3,850,000 | $1,781,269 | $523,416 |
| 40 | $200,000 | $100,000 | $3,040,000 | $2,850,000 | $866,117 | $366,000 |
| 41 | $150,000 | $200,000 | $2,800,000 | $1,100,000 | $871,290 | $257,756 |
| 42 | $200,000 | $2,300,000 | $5,400,000 | $1,250,000[21] | $1,409,086 | $650,000 |

---

[19] This employee began working at Robertson Stephens in April 1999; this bonus reflects 8 months of work.

[20] The employee began working at Robertson Stephens in July 2000; this bonus reflects six months of work.

[21] This employee began working at Robertson Stephens in November 1999; this bonus reflects one month of work.

FILED: NEW YORK COUNTY CLERK 08/13/2018 01:47 PM
INDEX NO. 159781/2014

NYSCEF DOC. NO. 145
RECEIVED NYSCEF: 08/13/2018

19-12346-shl   Doc 55-5   Filed 09/05/19   Entered 09/05/19 18:22:01   Exhibit C
Part 3   Pg 198 of 216

Mr. Robert S. Clemente                    -19-                    December 11, 2002

**Conclusion**

       For the reasons stated herein, Claimants seek relief, including their costs and attorneys' fees, on their claims of breach of contract, <u>quantum</u> <u>meruit</u>, fraud, negligent misrepresentation, breach of fiduciary duty, violation of ERISA, violation of the WARN Act, violations of state labor law statutes, unpaid bonus compensation and severance, all in amounts to be determined at trial, as well as such other relief as the Panel may deem appropriate.

       Respectfully submitted,

       LIDDLE & ROBINSON


       By:_____
           Jeffrey L. Liddle
           Attorneys for Claimants
           685 Third Avenue
           New York, New York 10017
           (212) 687-8500

FILED: NEW YORK COUNTY CLERK 08/13/2018 01:47 PM
NYSCEF DOC. NO. 145
INDEX NO. 159781/2014
RECEIVED NYSCEF: 08/13/2018

19-12346-shl   Doc 55-5   Filed 09/05/19   Entered 09/05/19 18:22:01   Exhibit C
Part 3   Pg 199 of 216

FOR MORE INFORMATION CONTACT JEFFREY L. LIDDLE AT 212-687-8500

December 11, 2002

## PRESS RELEASE

## *FORMER ROBERTSON STEPHENS MANAGING DIRECTORS AND PRINCIPALS SUE FLEET AND ROBERTSON STEPHENS FOR OVER $140 MILLION IN DAMAGES.*

(New York, NY) Today, 34 former Managing Directors and 8 former Principals of Robertson Stephens Group, Inc., sued FleetBoston Financial Corporation, Fleet Securities, Inc., Robertson Stephens, Inc. and Robertson Stephens Group, Inc. for unpaid compensation and other damages emanating from the fraudulent cancellation last summer of a management buyout of the Robertson Stephens operation.

Jeffrey L. Liddle, Esq. of Liddle & Robinson, L.L.P. in New York City represents the former Robertson Stephens employees, who were employed in the cities of New York, Atlanta, Boston and Chicago, the state of California and the country of Israel.

The 42 former Robertson Stephens employees (hereinafter "Claimants") filed an arbitration demand with the New York Stock Exchange, Inc. today seeking over $140 million in damages, plus punitive damages, attorneys' fees, interest and costs. These damages are based on, among other things, Fleet's and Robertson Stephens's failure to pay promised and earned bonus compensation to Claimants for 2001 and 2002 and to provide proper notice pay under the Worker Adjustment and Retraining Notification ("WARN") Act, 29 U.S.C. § 2101 et seq. In

FILED: NEW YORK COUNTY CLERK 08/13/2018 01:47 PM
NYSCEF DOC. NO. 145

INDEX NO. 159781/2014

RECEIVED NYSCEF: 08/13/2018

19-12346-shl    Doc 55-5    Filed 09/05/19    Entered 09/05/19 18:22:01    Exhibit C
Part 3    Pg 200 of 216

addition, Fleet made fraudulent misrepresentations and material omissions concerning Claimants' employment, compensation and equity interests in Robertson Stephens, and breached its fiduciary duties as majority shareholder of Robertson Stephens by acting in the interests of its own shareholders in first announcing the sale of, and then shutting down, Robertson Stephens.

On April 16, 2002 Fleet abruptly announced that it was putting Robertson Stephens up for sale, even though Fleet had no buyer in place. Worse still, Fleet advertised its reasons for the sale, stating that Robertson Stephens's strong operating performance during 1999 and 2000 was "aberrational" and that the future of investment banking business rested with larger platform firms and "not boutiques like Robbie Stephens." Not surprisingly after this announcement, Fleet was unable to obtain a buyer, and instead began negotiating a management buyout of the firm. On July 12, 2002, after more than 250 hours of negotiations, more than 12 hours of presentations and more than 1,000 pages of fully drafted legal agreements – and on the very day that the buyout agreements were to be distributed for signature – Fleet announced instead that it was shutting Robertson Stephens down, thereby terminating Claimants' employment.

Upon the termination of their employment, Claimants were not offered any bonus compensation for 2002, nor were they provided proper notice pay under the WARN Act. Furthermore, Claimants forfeited substantial amounts of non-cash deferred compensation, including Robertson Stephens Restricted Units, which had previously been valued by Fleet at no less than $7 per share, but accorded a zero value by the separation agreements offered to Claimants.

*Attached is a copy of the Statement of Claim filed with the NYSE in Alt, et al. v. FleetBoston Financial Corporation, et al.*

FILED: NEW YORK COUNTY CLERK 08/13/2018 01:47 PM
NYSCEF DOC. NO. 145
19-12346-shl    Doc 55-5    Filed 09/05/19    Entered 09/05/19 18:22:01    Exhibit C
Part 3    Pg 201 of 216
INDEX NO. 159781/2014
RECEIVED NYSCEF: 08/13/2018

**Sherry Shore**

| | |
|---|---|
| **From:** | Christine Palmieri |
| **Sent:** | Tuesday, December 10, 2002 6:11 PM |
| **To:** | 'susanne.craig@wsj.com' |
| **Subject:** | Robertson Stephens |

Attached is a revised press release.  Please discard the version e-mailed to you earlier.  Thank you.



press release.doc

Christine A. Palmieri
Liddle & Robinson, L.L.P.
685 Third Avenue
New York, N.Y. 10017
(212) 687-8500 Ext 238
Fax (212) 687-1505
www.liddlerobinson.com

The information contained in this e-mail message, and any attachments, may be confidential and legally privileged, and is intended only for use by the individual(s) or entity named above. If the reader of this message is not the intended recipient, or the employee or agent responsible to deliver it to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please immediately notify us by telephone (212-687-8500), and destroy the original message. Thank you.

FILED: NEW YORK COUNTY CLERK 08/13/2018 01:47 PM
INDEX NO. 159781/2014

NYSCEF DOC. NO. 145

RECEIVED NYSCEF: 08/13/2018

19-12346-shl    Doc 55-5    Filed 09/05/19    Entered 09/05/19 18:22:01    Exhibit C
Part 3    Pg 202 of 216

FOR MORE INFORMATION CONTACT JEFFREY L. LIDDLE AT 212-687-8500

December 11, 2002

## PRESS RELEASE

### *FORMER ROBERTSON STEPHENS MANAGING DIRECTORS AND PRINCIPALS SUE FLEET AND ROBERTSON STEPHENS FOR OVER $140 MILLION IN DAMAGES.*

(New York, NY)  Today, 34 former Managing Directors and 8 former Principals of Robertson Stephens Group, Inc., sued FleetBoston Financial Corporation, Fleet Securities, Inc., Robertson Stephens, Inc. and Robertson Stephens Group, Inc. for unpaid compensation and other damages emanating from the fraudulent cancellation last summer of a management buyout of the Robertson Stephens operation.

Jeffrey L. Liddle, Esq. of Liddle & Robinson, L.L.P. in New York City represents the former Robertson Stephens employees, who were employed in the cities of New York, Atlanta, Boston and Chicago, the state of California and the country of Israel.

The 42 former Robertson Stephens employees (hereinafter "Claimants") filed an arbitration demand with the New York Stock Exchange, Inc. today seeking over $140 million in damages, plus punitive damages, attorneys' fees, interest and costs.  These damages are based on, among other things, Fleet's and Robertson Stephens's failure to pay promised and earned bonus compensation to Claimants for 2001 and 2002 and to provide proper notice pay under the Worker Adjustment and Retraining Notification ("WARN") Act, 29 U.S.C. § 2101 et seq.  In

addition, Fleet made fraudulent misrepresentations and material omissions concerning Claimants' employment, compensation and equity interests in Robertson Stephens, and breached its fiduciary duties as majority shareholder of Robertson Stephens by acting in the interests of its own shareholders in first announcing the sale of, and then shutting down, Robertson Stephens, according to Claimants.

On April 16, 2002 Fleet abruptly announced that it was putting Robertson Stephens up for sale, <u>even though Fleet had no buyer in place</u>. Worse still, Fleet advertised its reasons for the sale, stating that Robertson Stephens's strong operating performance during 1999 and 2000 was "aberrational" and that the future of investment banking business rested with larger platform firms and "not boutiques like Robbie Stephens." Not surprisingly after this announcement, Fleet was unable to obtain a buyer, and instead began negotiating a management buyout of the firm. On July 12, 2002, after more than 250 hours of negotiations, more than 12 hours of presentations and more than 1,000 pages of fully drafted legal agreements – and on the very day that the buyout agreements were to be distributed for signature – Fleet announced instead that it was shutting Robertson Stephens down, thereby terminating Claimants' employment.

Upon the termination of their employment, Claimants were not offered any bonus compensation for 2002, nor were they provided proper notice pay under the WARN Act. Furthermore, Claimants forfeited substantial amounts of non-cash deferred compensation, including Robertson Stephens Restricted Units, which had previously been valued by Fleet at no less than $7 per share, but accorded a zero value by the separation agreements offered to Claimants.

*Attached is a copy of the Statement of Claim filed with the NYSE in <u>Alt, et al. v. FleetBoston Financial Corporation, et al.</u>*

## Sherry Shore

| | |
|---|---|
| **From:** | Craig, Susanne <Susanne.Craig@wsj.com> |
| **Sent:** | Tuesday, December 10, 2002 6:40 PM |
| **To:** | Christine Palmieri |
| **Subject:** | RE: Robertson Stephens |

Christine,

How many of the total principals and MDs did you sign up, as a percentage of total?

-----Original Message-----
From: Christine Palmieri [mailto:cpalmieri@liddlerobinson.com]
Sent: Tuesday, December 10, 2002 6:11 PM
To: Craig, Susanne
Subject: Robertson Stephens


Attached is a revised press release.  Please discard the version e-mailed to you earlier.  Thank you.

<<press release.doc>>

Christine A. Palmieri
Liddle & Robinson, L.L.P.
685 Third Avenue
New York, N.Y. 10017
(212) 687-8500 Ext 238
Fax (212) 687-1505
www.liddlerobinson.com


The information contained in this e-mail message, and any attachments, may be confidential and legally privileged, and is intended only for use by the individual(s) or entity named above. If the reader of this message is not the intended recipient, or the employee or agent responsible to deliver it to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please immediately notify us by telephone (212-687-8500), and destroy the original message. Thank you.

## Sherry Shore

| | |
|---|---|
| **From:** | Craig, Susanne <Susanne.Craig@wsj.com> |
| **Sent:** | Wednesday, December 11, 2002 1:08 PM |
| **To:** | Christine Palmieri |
| **Subject:** | RE: Robertson Stephens |

Christine,

jeff wanted to know if you have a stamped copy of the suit, or if you have a messenger receipt demonstrating the suit has been dropped off at the
Exchange.  We need to send the suit to fleet at some point and just want to
make sure it has been handed over.... Sue

-----Original Message-----
From: Christine Palmieri [mailto:cpalmieri@liddlerobinson.com]
Sent: Tuesday, December 10, 2002 6:11 PM
To: Craig, Susanne
Subject: Robertson Stephens


Attached is a revised press release.  Please discard the version e-mailed to you earlier.  Thank you.

<<press release.doc>>

Christine A. Palmieri
Liddle & Robinson, L.L.P.
685 Third Avenue
New York, N.Y. 10017
(212) 687-8500 Ext 238
Fax (212) 687-1505
www.liddlerobinson.com


The information contained in this e-mail message, and any attachments, may be confidential and legally privileged, and is intended only for use by the individual(s) or entity named above. If the reader of this message is not the intended recipient, or the employee or agent responsible to deliver it to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please immediately notify us by telephone (212-687-8500), and destroy the original message. Thank you.

FILED: NEW YORK COUNTY CLERK 08/13/2018 01:47 PM
NYSCEF DOC. NO. 145
INDEX NO. 159781/2014
RECEIVED NYSCEF: 08/13/2018

19-12346-shl    Doc 55-5    Filed 09/05/19    Entered 09/05/19 18:22:01    Exhibit C
Part 3    Pg 206 of 216

## Sherry Shore

| | |
|---|---|
| **From:** | Christine Palmieri |
| **Sent:** | Wednesday, December 11, 2002 1:10 PM |
| **To:** | 'Craig, Susanne' |
| **Subject:** | RE: Robertson Stephens |

Our messenger has left to file the claim but has not yet returned. I'll let you know as soon as he has.

-----Original Message-----
From: Craig, Susanne [mailto:Susanne.Craig@wsj.com]
Sent: Wednesday, December 11, 2002 1:08 PM
To: Christine Palmieri
Subject: RE: Robertson Stephens

Christine,

jeff wanted to know if you have a stamped copy of the suit, or if you have a messenger receipt demonstrating the suit has been dropped off at the
Exchange. We need to send the suit to fleet at some point and just want to
make sure it has been handed over.... Sue

-----Original Message-----
From: Christine Palmieri [mailto:cpalmieri@liddlerobinson.com]
Sent: Tuesday, December 10, 2002 6:11 PM
To: Craig, Susanne
Subject: Robertson Stephens

Attached is a revised press release. Please discard the version e-mailed to you earlier. Thank you.

<<press release.doc>>

Christine A. Palmieri
Liddle & Robinson, L.L.P.
685 Third Avenue
New York, N.Y. 10017
(212) 687-8500 Ext 238
Fax (212) 687-1505
www.liddlerobinson.com

The information contained in this e-mail message, and any attachments, may be confidential and legally privileged, and is intended only for use by the individual(s) or entity named above. If the reader of this message is not the intended recipient, or the employee or agent responsible to deliver it to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please immediately notify us by telephone (212-687-8500), and destroy the original message. Thank you.

**Sherry Shore**

| | |
|---|---|
| **From:** | Craig, Susanne <Susanne.Craig@wsj.com> |
| **Sent:** | Wednesday, December 11, 2002 1:17 PM |
| **To:** | Christine Palmieri |
| **Subject:** | RE: Robertson Stephens |

awesome. thanks.

-----Original Message-----
From: Christine Palmieri [mailto:cpalmieri@liddlerobinson.com]
Sent: Wednesday, December 11, 2002 1:10 PM
To: Craig, Susanne
Subject: RE: Robertson Stephens

Our messenger has left to file the claim but has not yet returned.  I'll let you know as soon as he has.

-----Original Message-----
From: Craig, Susanne [mailto:Susanne.Craig@wsj.com]
Sent: Wednesday, December 11, 2002 1:08 PM
To: Christine Palmieri
Subject: RE: Robertson Stephens


Christine,

jeff wanted to know if you have a stamped copy of the suit, or if you have a messenger receipt demonstrating the suit has been dropped off at the
Exchange.  We need to send the suit to fleet at some point and just want to
make sure it has been handed over.... Sue

-----Original Message-----
From: Christine Palmieri [mailto:cpalmieri@liddlerobinson.com]
Sent: Tuesday, December 10, 2002 6:11 PM
To: Craig, Susanne
Subject: Robertson Stephens


Attached is a revised press release.  Please discard the version e-mailed to you earlier.  Thank you.

 <<press release.doc>>

Christine A. Palmieri
Liddle & Robinson, L.L.P.
685 Third Avenue
New York, N.Y. 10017
(212) 687-8500 Ext 238
Fax (212) 687-1505
www.liddlerobinson.com

The information contained in this e-mail message, and any attachments, may be confidential and legally privileged, and is intended only for use by the individual(s) or entity named above. If the reader of this message is not the intended recipient, or the employee or agent responsible to deliver it to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please immediately notify us by telephone (212-687-8500), and destroy the original message. Thank you.

FILED: NEW YORK COUNTY CLERK 08/13/2018 01:47 PM
INDEX NO. 159781/2014
NYSCEF DOC. NO. 145
19-12346-shl    Doc 55-5    Filed 09/05/19    Entered 09/05/19 18:22:01    Exhibit C
Part 3    Pg 209 of 216
RECEIVED NYSCEF: 08/13/2018

**Sherry Shore**

| | |
|---|---|
| From: | Christine Palmieri |
| Sent: | Wednesday, December 11, 2002 1:45 PM |
| To: | 'Craig, Susanne' |
| Subject: | RE: Robertson Stephens |

The claim has been filed.

-----Original Message-----
From: Craig, Susanne [mailto:Susanne.Craig@wsj.com]
Sent: Wednesday, December 11, 2002 1:17 PM
To: Christine Palmieri
Subject: RE: Robertson Stephens

awesome. thanks.

-----Original Message-----
From: Christine Palmieri [mailto:cpalmieri@liddlerobinson.com]
Sent: Wednesday, December 11, 2002 1:10 PM
To: Craig, Susanne
Subject: RE: Robertson Stephens

Our messenger has left to file the claim but has not yet returned.  I'll let you know as soon as he has.

-----Original Message-----
From: Craig, Susanne [mailto:Susanne.Craig@wsj.com]
Sent: Wednesday, December 11, 2002 1:08 PM
To: Christine Palmieri
Subject: RE: Robertson Stephens

Christine,

jeff wanted to know if you have a stamped copy of the suit, or if you have a messenger receipt demonstrating the suit has been dropped off at the
Exchange.  We need to send the suit to fleet at some point and just want to
make sure it has been handed over.... Sue

-----Original Message-----
From: Christine Palmieri [mailto:cpalmieri@liddlerobinson.com]
Sent: Tuesday, December 10, 2002 6:11 PM
To: Craig, Susanne
Subject: Robertson Stephens

Attached is a revised press release.  Please discard the version e-mailed to you earlier.  Thank you.

<<press release.doc>>

FILED: NEW YORK COUNTY CLERK 08/13/2018 01:47 PM
INDEX NO. 159781/2014

NYSCEF DOC. NO. 145
RECEIVED NYSCEF: 08/13/2018

19-12346-shl    Doc 55-5    Filed 09/05/19    Entered 09/05/19 18:22:01    Exhibit C
Part 3    Pg 210 of 216

Christine A. Palmieri
Liddle & Robinson, L.L.P.
685 Third Avenue
New York, N.Y. 10017
(212) 687-8500 Ext 238
Fax (212) 687-1505
www.liddlerobinson.com

      The information contained in this e-mail message, and any attachments, may be confidential and legally privileged, and is intended only for use by the individual(s) or entity named above. If the reader of this message is not the intended recipient, or the employee or agent responsible to deliver it to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please immediately notify us by telephone (212-687-8500), and destroy the original message. Thank you.

FILED: NEW YORK COUNTY CLERK 08/13/2018 01:47 PM
NYSCEF DOC. NO. 145

INDEX NO. 159781/2014

RECEIVED NYSCEF: 08/13/2018

19-12346-shl   Doc 55-5   Filed 09/05/19   Entered 09/05/19 18:22:01   Exhibit C
Part 3   Pg 211 of 216

**Sherry Shore**

| | |
|---|---|
| From: | Craig, Susanne <Susanne.Craig@wsj.com> |
| Sent: | Wednesday, December 11, 2002 1:55 PM |
| To: | Christine Palmieri |
| Subject: | RE: Robertson Stephens |

is it possible to e-mail a copy of the complaint withthe stamp on it?

-----Original Message-----
From: Christine Palmieri [mailto:cpalmieri@liddlerobinson.com]
Sent: Wednesday, December 11, 2002 1:45 PM
To: Craig, Susanne
Subject: RE: Robertson Stephens

The claim has been filed.

-----Original Message-----
From: Craig, Susanne [mailto:Susanne.Craig@wsj.com]
Sent: Wednesday, December 11, 2002 1:17 PM
To: Christine Palmieri
Subject: RE: Robertson Stephens

awesome. thanks.

-----Original Message-----
From: Christine Palmieri [mailto:cpalmieri@liddlerobinson.com]
Sent: Wednesday, December 11, 2002 1:10 PM
To: Craig, Susanne
Subject: RE: Robertson Stephens

Our messenger has left to file the claim but has not yet returned.  I'll let you know as soon as he has.

-----Original Message-----
From: Craig, Susanne [mailto:Susanne.Craig@wsj.com]
Sent: Wednesday, December 11, 2002 1:08 PM
To: Christine Palmieri
Subject: RE: Robertson Stephens

Christine,

jeff wanted to know if you have a stamped copy of the suit, or if you have a messenger receipt demonstrating the suit has been dropped off at the
Exchange.   We need to send the suit to fleet at some point and just want to
make sure it has been handed over....  Sue

-----Original Message-----
From: Christine Palmieri [mailto:cpalmieri@liddlerobinson.com]

FILED: NEW YORK COUNTY CLERK 08/13/2018 01:47 PM

NYSCEF DOC. NO. 145

INDEX NO. 159781/2014

RECEIVED NYSCEF: 08/13/2018

19-12346-shl    Doc 55-5    Filed 09/05/19    Entered 09/05/19 18:22:01    Exhibit C

Part 3    Pg 212 of 216

Sent: Tuesday, December 10, 2002 6:11 PM
To: Craig, Susanne
Subject: Robertson Stephens


Attached is a revised press release.  Please discard the version e-mailed to you earlier.  Thank you.

<<press release.doc>>

Christine A. Palmieri
Liddle & Robinson, L.L.P.
685 Third Avenue
New York, N.Y. 10017
(212) 687-8500 Ext 238
Fax (212) 687-1505
www.liddlerobinson.com


        The information contained in this e-mail message, and any attachments, may be confidential and legally privileged, and is intended only for use by the individual(s) or entity named above. If the reader of this message is not the intended recipient, or the employee or agent responsible to deliver it to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please immediately notify us by telephone (212-687-8500), and destroy the original message. Thank you.

FILED: NEW YORK COUNTY CLERK 08/13/2018 01:47 PM

NYSCEF DOC. NO. 145

INDEX NO. 159781/2014

RECEIVED NYSCEF: 08/13/2018

19-12346-shl    Doc 55-5    Filed 09/05/19    Entered 09/05/19 18:22:01    Exhibit C

Part 3    Pg 213 of 216

## Sherry Shore

**From:**     Craig, Susanne <Susanne.Craig@wsj.com>
**Sent:**     Wednesday, December 11, 2002 4:05 PM
**To:**       Christine Palmieri
**Subject:**  RE: Robertson Stephens

Any chance of getting a stamped copy of the claim?

-----Original Message-----
From: Christine Palmieri [mailto:cpalmieri@liddlerobinson.com]
Sent: Tuesday, December 10, 2002 6:11 PM
To: Craig, Susanne
Subject: Robertson Stephens

Attached is a revised press release. Please discard the version e-mailed to you earlier. Thank you.

<<press release.doc>>

Christine A. Palmieri
Liddle & Robinson, L.L.P.
685 Third Avenue
New York, N.Y. 10017
(212) 687-8500 Ext 238
Fax (212) 687-1505
www.liddlerobinson.com

        The information contained in this e-mail message, and any attachments, may be confidential and legally privileged, and is intended only for use by the individual(s) or entity named above. If the reader of this message is not the intended recipient, or the employee or agent responsible to deliver it to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please immediately notify us by telephone (212-687-8500), and destroy the original message. Thank you.

FILED: NEW YORK COUNTY CLERK 08/13/2018 01:47 PM
NYSCEF DOC. NO. 145

INDEX NO. 159781/2014
RECEIVED NYSCEF: 08/13/2018

19-12346-shl    Doc 55-5    Filed 09/05/19    Entered 09/05/19 18:22:01    Exhibit C
Part 3    Pg 214 of 216

**Sherry Shore**

| | |
|---|---|
| **From:** | Christine Palmieri |
| **Sent:** | Wednesday, December 11, 2002 4:19 PM |
| **To:** | 'Craig, Susanne' |
| **Subject:** | RE: Robertson Stephens |

Sure. Do you want it by fax or by hand?

-----Original Message-----
From: Craig, Susanne [mailto:Susanne.Craig@wsj.com]
Sent: Wednesday, December 11, 2002 4:05 PM
To: Christine Palmieri
Subject: RE: Robertson Stephens

Any chance of getting a stamped copy of the claim?

-----Original Message-----
From: Christine Palmieri [mailto:cpalmieri@liddlerobinson.com]
Sent: Tuesday, December 10, 2002 6:11 PM
To: Craig, Susanne
Subject: Robertson Stephens

Attached is a revised press release. Please discard the version e-mailed to you earlier. Thank you.

<<press release.doc>>

Christine A. Palmieri
Liddle & Robinson, L.L.P.
685 Third Avenue
New York, N.Y. 10017
(212) 687-8500 Ext 238
Fax (212) 687-1505
www.liddlerobinson.com

The information contained in this e-mail message, and any attachments, may be confidential and legally privileged, and is intended only for use by the individual(s) or entity named above. If the reader of this message is not the intended recipient, or the employee or agent responsible to deliver it to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please immediately notify us by telephone (212-687-8500), and destroy the original message. Thank you.

bonuses after shutting Robertson down.

In addition, the executives say they were entitled to tens of millions of dollars worth of Robertson stock because of their 23 million shares, or 23% ownership interest. In 2001, an investment bank said Robertson was worth $700 million, according to the complaint, and earlier in 2002, FleetBoston had valued each share at $7. But after shutting Robertson down, FleetBoston declared the shares to be worthless.

**Write to** Susanne Craig at susanne.craig@wsj.com[3] and John Hechinger at john.hechinger@wsj.com[4]

**URL for this article:**
http://online.wsj.com/article/0,,SB1039653877219369953,00.html

**Hyperlinks in this Article:**
(1) http://online.wsj.com/article/0,,SB1037401510961923948,00.html
(2) http://online.wsj.com/article/0,,SB1026507500537669840,00.html
(3) mailto:susanne.craig@wsj.com
(4) mailto:john.hechinger@wsj.com

*Updated December 12, 2002 12:28 a.m. EST*

Copyright 2003 Dow Jones & Company, Inc. All Rights Reserved

Printing, distribution, and use of this material is governed by your Subscription agreement and Copyright laws.

For information about subscribing go to http://www.wsj.com

FILED: NEW YORK COUNTY CLERK 08/13/2018 01:47 PM

NYSCEF DOC. NO.: 145

INDEX NO. 159781/2014

RECEIVED NYSCEF: 08/13/2018

19-12346-shl    Doc 55-5    Filed 09/05/19    Entered 09/05/19 18:22:01    Exhibit C
Part 3    Pg 216 of 216

```
*********************
***   TX REPORT   ***
*********************

TRANSMISSION OK

TX/RX NO            4738
CONNECTION TEL              94162350#
CONNECTION ID
ST. TIME           12/11 16:40
USAGE T            11'22
PGS. SENT          56
RESULT             OK
```

# LIDDLE & ROBINSON, L.L.P.

685 THIRD AVENUE
NEW YORK, N.Y. 10017

(212) 687-8500
FACSIMILE: (212) 687-1505

SAMUEL FINKELSTEIN (1906-1998)

JAMES A. BATSON
BLAINE H. BORTNICK
ETHAN A. BRECHER
SUSAN POTTER ELLIS
MICHAEL E. GRENERT
JEFFREY L. LIDDLE
LAURENCE S. MOY
CHRISTINE A. PALMIERI
MARC A. SUSSWEIN

MIRIAM M. ROBINSON
SENIOR COUNSEL

DAVID I. GREENBERGER
DAVID MAREK
JAMES C. MALLIOS
CANDACE M. ADIUTORI
LEILA I. NOOR
CHRISTINA J. KANG
JEFFREY ZIMMERMAN*
TED J. SWIECICHOWSKI*
JOHN A. KAROL*

*AWAITING ADMISSION
TO THE BAR

## FACSIMILE

TO: _Sue Craig_

FROM: _Christine Palmieri_

DATE: _12/11/02_

FACSIMILE NUMBER: _(212) 416-2350_

OUR FACSIMILE NUMBER: (212) 687-1505

NUMBER OF PAGES TO FOLLOW: _55_