FILED: NEW YORK COUNTY CLERK 08/13/2018 01:47 PM    INDEX NO. 159781/2014

NYSCEF DOC. NO. 146    19-12346-shl    Doc 55-6    Filed 09/05/19    Entered 09/05/19 18:22:01    Exhibit C    RECEIVED NYSCEF: 08/13/2018

Part 4    Pg 1 of 102

# EXHIBIT H

FILED: NEW YORK COUNTY CLERK 08/13/2018 01:47 PM
NYSCEF DOC. NO. 146

INDEX NO. 159781/2014

RECEIVED NYSCEF: 08/13/2018

19-12346-shl    Doc 55-6    Filed 09/05/19    Entered 09/05/19 18:22:01    Exhibit C
Part 4    Pg 2 of 102

URGENT

## TIME SENSITIVE

MEMORANDUM

TO: JLL
FROM: CAP
DATE: 12/10/02

*TO CAP*

RE:   Robertson Stephens

After I e-mailed the SOC and press release to Sue Craig at the WSJ, she called me to ask why the press release was dated tomorrow if she is getting a scoop. I told her that it was my understanding that the press releases were being mailed out tomorrow after the SOC is filed. I did not tell her that you want to hand deliver a copy to Gretchen Morgenson at the NYT, so Craig is under the impression that she has an exclusive for Thursday. Craig also told me that she thought the article would be a "hard sell" because "Robbie Stephens is out," but that she would do her best to get others at the WSJ interested in the article. Given Craig's understanding that the WSJ has an exclusive, do you still want us to hand-deliver the SOC and press release to Morgenson tomorrow?   *(YES)*

Craig then sent me an e-mail asking what percentage of the MDs and Principals signed up with us. She also left me a voicemail asking me to call her in the morning. How do you want me to handle her follow-up questions in your absence, if at all?

*give her background.
but no numbers*

FILED: NEW YORK COUNTY CLERK 08/13/2018 01:47 PM          INDEX NO. 159781/2014

NYSCEF DOC. NO. 147          19-12346-shl    Doc 55-6    Filed 09/05/19    Entered 09/05/19 18:22:01    Exhibit C          RECEIVED NYSCEF: 08/13/2018

Part 4    Pg 3 of 102

# EXHIBIT I

FILED: NEW YORK COUNTY CLERK 08/13/2018 01:47 PM        INDEX NO. 159781/2014

NYSEF DOC. NO. 147                                       RECEIVED NYSCEF: 08/13/2018

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| FLEETBOSTON FINANCIAL CORPORATION, n/k/a BANK OF AMERICA CORP., and ROBERTSON STEPHENS GROUP, INC., <br><br> Plaintiffs/Counterdefendants, <br><br> v. <br><br> ERIC E. ALT, MICHAEL BARR, J.J. BEAGHAN, BRIAN S. BEAN, CHARLES G. BOLTON, VINCENT E. BOWEN III, RICHARD A. BRAND, CLARK N. CALLANDER, GEORGENE R. CARAMBAT, MICHAEL CASEY, JEFFREY W. COLIN, ALEX DEAN, CHRISTOPHER R. DODGE, DAVID J. FULLERTON, PHILIP C. GARDNER, JONATHAN D. GOLDMAN, CHRISTOPHER W. GREER, TONY M. HAERTL, GREGORY C. HOLMES, FREDERICK M. HUGHES, DANIEL J. HURWITZ, ANDREW KAYE, MAUREEN McCARTHY, KEVIN P. McGINTY, TODD H. McWILLIAMS, SAMUEL A. MORSE, AGNES M. MURPHY, DIANE P. MURPHY, DAVID O'BRIAN, JOSEPH J. PIAZZA, MICHAEL P. PERRELLA, LARRY E. REHMER, DAVID C. REILLY, JOHN T. ROSSI, MARK J. SALTER, SCOTT P. SCHARFMAN, ALLEN H. SMITH, SCOTT M. SULLIVAN, STEVEN H. TISHMAN, TED E. TOBIASON, DANIEL P. WHITE III, and JEFFREY S. WINAKER, <br><br> Defendants/Counterplaintiffs. | Civil Action No. 03-10597-EFH |

## FIRST AMENDED COUNTERCLAIM

Defendants/Counterplaintiffs Eric E. Alt, Michael Barr, J.J. Beaghan, Brian S. Bean, Charles G. Bolton, Vincent E. Bowen III, Richard A. Brand, Clark N. Callander, Georgene R. Carambat, Michael Casey, Jeffrey W. Colin, Alex Dean, Christopher R. Dodge, David J. Fullerton, Philip C. Gardner, Jonathan D. Goldman, Christopher W. Greer, Tony M. Haertl,

Gregory C. Holmes, Frederick M. Hughes, Daniel J. Hurwitz, Andrew Kaye, Maureen McCarthy, Kevin P. McGinty, Todd H. McWilliams, Samuel A. Morse, Agnes M. Murphy, Diane P. Murphy, David O'Brian, Joseph J. Piazza, Michael P. Perrella, Larry E. Rehmer, David C. Reilly, John T. Rossi, Mark J. Salter, Scott P. Scharfman, Allen H. Smith, Scott M. Sullivan, Steven H. Tishman, Ted E. Tobiason, Daniel P. White III, and Jeffrey S. Winaker (hereinafter collectively "Employee Group" or "Counterplaintiffs"), pursuant to the provisions of Rule 15, Federal Rules of Civil Procedure, for their counterclaims against Plaintiffs/Counterdefendants FleetBoston Financial Corp., n/k/a Bank of America Corporation ("Fleet"), and Robertson Stephens Group, Inc. ("RS Group"), allege:

## THE PARTIES

1.    Counterplaintiffs are 42 former Managing Directors and Principals of Robertson Stephens, Inc. ("RSI"), an investment banking firm organized under the laws of Massachusetts, with headquarters in San Francisco, California. Its operations were closed by Counterdefendant Fleet, its corporate parent, in July 2002, at which time all RSI employees, including Counterplaintiffs, were terminated. Prior to their termination, Counterplaintiffs were employed by RSI in offices in San Francisco, New York, Atlanta, Chicago, Boston, and Tel Aviv.

2.    The Robertson Stephens investment banking firm was founded as a California partnership in 1978, became a leading underwriter of equity issues, and ultimately the number one "lead underwriter" for initial public offerings in the technology sector. In 1997, Robertson Stephens was acquired by Bank of America Corporation, then headquartered in San Francisco. After Bank of America and Nationsbanc merged, Robertson Stephens was sold to BankBoston Corporation in 1998.  It was then reorganized under Massachusetts law and was known as BancBoston Robertson Stephens, Inc.

FILED: NEW YORK COUNTY CLERK 08/13/2018 02:47 PM    INDEX NO. 159781/2014
NYSCEF DOC. NO. 147                                               RECEIVED NYSCEF: 08/13/2018

3.     In October 1999, Fleet Bank merged with BankBoston Corporation (which included BankBoston Robertson Stephens, Inc.), forming FleetBoston Financial Corporation (or Fleet). Fleet was organized under the laws of Rhode Island, with headquarters in Boston, Massachusetts. As a byproduct of this merger, the name of BankBoston Robertson Stephens, Inc. was changed to FleetBoston Robertson Stephens, Inc., and then to Robertson Stephens, Inc. (or RSI) on September 13, 2000.

4.     In or around the summer of 2000, Fleet organized Counterdefendant RS Group as a holding company. RS Group, a wholly-owned subsidiary of Fleet, was organized under the laws of Delaware and headquartered in the offices of Fleet in Boston, Massachusetts. RS Group was the direct parent of several Fleet subsidiaries whose operations were related to RSI.[1] These included Robertson Stephens U.S. Holdings, Inc. (RS U.S.), through which RS Group owned 100% of the stock of RSI, and Robertson Stephens International Holdings, Inc. ("RS International"), which in turn owned 100% of Robertson Stephens Israel, Ltd. ("RS Israel"). At the time of its organization, 100 million shares of RS Group were authorized, of which Fleet retained 70 million (valued by Goldman Sachs, the investment bank and Fleet's advisor in connection with the organization of RS Group, at $10 per share). The remaining 30 million shares were reserved for equity ownership by employees of RS Group's subsidiaries (including Counterplaintiffs).

5.     Effective April 1, 2004, Fleet was acquired by merger by Bank of America Corporation, headquartered in Charlotte, North Carolina, and ceased to exist. Accordingly, the

---

[1] RS Group held 100% of RS US, which held 100% of RSI, Robertson Stephens Asset Management, Inc., Robertson Stephens Credit Corporation, Robertson Stephens Ventures, Inc., and Robertson Stephens Services, LLC. RS Group also held 100% of RS International, which held 100% of Robertson Stephens International, Ltd., Robertson Stephens International (Nominees) Limited, Robertson Stephens Capital Markets Holding, Ltd., and RS Israel.

FILED: NEW YORK COUNTY CLERK 08/13/2018 02:47 PM    INDEX NO. 159781/2014
NYSCEF DOC. NO. 147                                    RECEIVED NYSCEF: 08/13/2018

caption reflects that Fleet is now known as Bank of America Corporation, which is responsible by operation of law for all of Fleet's liabilities, including those of RS Group.

## FACTUAL BACKGROUND

6.      For work performed in 2000 and 2001, Counterplaintiffs' compensation consisted of a base salary, and an annual bonus that comprised the great majority of their total compensation.  This bonus compensation included voluntary deferrals of year end 2000 bonus compensation in the form of participation in the Robertson Stephens Group, Inc. Cash Equivalent Deferred Compensation Plan (referred to as "CEP 1 – Voluntary"), involuntary deferrals of year end 2001 bonus compensation in the Robertson Stephens Group, Inc. 2002 Cash Equivalent Plan ("CEP 2 – Involuntary"), and equity in RS Group in the form of Restricted Stock Units ("RSUs").

7.      RSI distributed Award Letters to its employees annually, which set forth the amount and form of their bonus compensation.  These letters were distributed in the beginning of the year following the year in which the compensation was earned.  Award Letters for 2000 were delivered in February 2001 (the "2000 Award Letters"), and Award Letters for 2001 compensation were delivered in February 2002 (the "2001 Award Letters").

### Deferred Compensation

8.      2000 was a record year for RS Group and its subsidiaries, including RSI. At the end of the year, RSI permitted certain employees, including Counterplaintiffs, to elect to defer a portion of their annual bonus in the form of voluntary deferrals under CEP 1 – Voluntary. Under CEP 1 – Voluntary, RSI's parent, RS Group, agreed to pay deferred compensation as "Deferred Amounts."

4

FILED: NEW YORK COUNTY CLERK 08/13/2018 02:47 PM    INDEX NO. 159781/2014
NYSCEF DOC. NO. 147                                    RECEIVED NYSCEF: 08/13/2018

9.     Section 7.1 of CEP 1 – Voluntary provided that "Deferred Amounts will vest and become nonforfeitable in three equal annual installments commencing on the applicable Deferral Date and ending on the third anniversary thereof (each of the first, second and third anniversaries of the applicable Deferral Date, a "Vesting Date", so for 2001 Deferred Amounts the Vesting Dates are January 1, 2002, 2003, and 2004), subject to the continued employment of the Participant on each such Vesting Date . . . ."

10.     On January 1, 2002, one-third of the 2001 Deferred Amounts awarded under CEP 1 – Voluntary vested and became nonforfeitable.  On January 1, 2003, an additional one-third of the Deferred Amount vested and became nonforfeitable.  On January 1, 2004, the final one-third of the 2001 Deferred Amounts vested and became nonforfeitable.

11.     Section 7.2 of CEP 1 – Voluntary requires that "[a]s soon as reasonably practicable following a Vesting Date, each Participant shall receive a payment equal to the amount of such Participant's Vested Deferred Amount and any earnings on (i) the portion of the Participant's Deferred Amount that Vested on such Vesting Date and (ii) any unvested Deferred Amount."

12.     In compliance with this provision, RS Group paid Counterplaintiffs the first one-third of the 2001 Deferred Amounts, which vested on January 1, 2002, on or about that date.  For many employees of RSI, including certain – but not all – Counterplaintiffs, RS Group accelerated the vesting of the remainder of the 2001 Deferred Amounts, and paid those amounts in full in or around February 2002.

13.     However, RS Group failed and refused to make the payments of the 2001 Deferred Amounts that vested and became nonforfeitable on January 1, 2003, and vested on

FILED: NEW YORK COUNTY CLERK 08/13/2018 02:47 PM          INDEX NO. 159781/2014
NYSCEF DOC. NO. 147                                        RECEIVED NYSCEF: 08/13/2018

January 1, 2004, for Counterplaintiffs Casey, Goldman, Hurwitz, Tishman, and Tobiason, notwithstanding its obligations under CEP 1 – Voluntary.

14.    2001 was a difficult year for securities industry firms, and particularly for firms like RSI that concentrated upon the technology sector, which resulted in reduced profits in the industry. In part for this reason, many employees of RSI, including certain Counterplaintiffs, received their annual bonus almost entirely in deferrals under CEP 2 – Involuntary.  Fleet and RS Group have asserted that the Robertson Stephens Group, Inc. 2002 Cash Equivalent Plan governs the payment of this deferral (known as the "Award Amount") and have applied its provisions – though CEP 2 – Involuntary was never distributed to Counterplaintiffs.

15.    Section 7.1 of CEP 2 – Involuntary provided for a two-year vesting schedule -- "one-third (1/3) of such Award Amount will vest on January 1, 2003, and two-thirds (2/3) of such Award Amount will vest on January 1, 2004."

16.    Accordingly, on January 1, 2003, one-third of the Award Amount awarded Counterplaintiffs under CEP 2 – Involuntary vested and became nonforfeitable.  On January 1, 2004, the additional two-thirds of the Award Amount vested.

17.    Notwithstanding these obligations, RS Group failed and refused to make pay the Award Amounts under CEP 2 – Involuntary, and despite repeated demand, continues to wrongfully withhold Counterplaintiffs' earned compensation some five years later.

18.    Under Section 7.2 of CEP 2 – Involuntary, RS Group was required to pay each Participant's Vested Award Amount and any earnings thereon as soon as practicable following the Vesting Date. RS Group thus was obligated to pay Counterplaintiffs Alt, Barr, Beaghan, Bean, Bolton, Bowen, Brand, Callander, Carambat, Dodge, Fullerton, Gardner, Greer, Haertl, Holmes, Hughes, Hurwitz, McCarthy, McGinty, McWilliams, Morse, A. Murphy, D. Murphy,

FILED: NEW YORK COUNTY CLERK 08/13/2018 09:02:47 PM    INDEX NO. 159781/2014

NYSCEF DOC. NO. 147                                              RECEIVED NYSCEF: 08/13/2018

O'Brian, Piazza, Perrella, Rehmer, Reilly, Rossi, Salter, Scharfman, Smith, Sullivan, Tobiason, White, and Winaker one-third of their Award Amount under CEP 2 – Involuntary on or about January 1, 2003, and two-thirds of their Award Amount under CEP 2 – Involuntary on or about January 1, 2004.

**Equity in RS Group**

19.    In early 2001, Fleet and RS Group announced that certain RSI employees, including Counterplaintiffs, would be awarded equity in RS Group in the form of RSUs. An RSU represented the right to receive one share of the common stock of RS Group. In their 2000 Award Letters, Counterplaintiffs were informed that they had "been awarded an equity grant in Robertson Stephens. This grant makes you an owner of Robertson Stephens . . . ."

20.    The first award of the RSUs occurred in May 2001, and was known as the "Retention Grant." Although 30,000,000 units were originally slated to be awarded to employees of RS Group's subsidiaries in May 2001, only 22,500,000 units were awarded at that time. Counterplaintiffs were awarded a total of 6,042,858 of these units. The remaining 7,500,000 units remained in the reserve for future use, including the retention and recruitment of employees.

21.    Counterplaintiffs Alt, Callander, Greer, Piazza, Reilly, Sullivan, and White were awarded additional RSUs as part of their 2001 bonus compensation. These awards, totaling 378,535 units, were set out in the 2001 Award Letters. According to the 2001 Award Letters, the RSUs had a value of $7.00 per unit on or about February 21, 2002.

22.    These equity awards were documented by a Restricted Unit Award Agreement (the "RSU Agreement"), which had an effective date of July 1, 2001, and a "Robertson Stephens Restricted Unit Plan" (the "RSU Plan"). When the RS Group Board of Directors adopted the

FILED: NEW YORK COUNTY CLERK 08/13/2018 04:47 PM                    INDEX NO. 159781/2014
NYSCEF DOC. NO. 147                                                 RECEIVED NYSCEF: 08/13/2018

RSU Agreement pursuant to the December 17, 2001 Unanimous Written Consent of the Board of

Directors in Lieu of Meeting of Robertson Stephens Group, Inc. (the "November 17 Consent"),

the RS Group Board also "authorize[d] the establishment of guidelines and rules under the

Board's future determinations of the Fair Market Value of a share of Common Stock under the

Plan and adopts the basis and methodology used by [Lazard Freres & Co. ("Lazard"), an

investment advisory group retained by Fleet to represent RS Group] in the Lazard Report for

purposes of the initial valuation as the current methodology for future valuations." Around this

time, Goldman Sachs, who represented Fleet in connection with the valuation of RS Group,

valued the firm at $100,000,000 (or $10.00 per share).

23.     The RSU Agreement provided for awards of "Service Units," which vested over

three years, and "Performance Units" that vested over five years. The first portion of

Counterplaintiffs' Retention Grant RSU's, in the total amount of 1,306,189 units, became fully

vested on July 1, 2002.

24.     Section 4(b) of the RSU Agreement provides that if an employee of RSI was

terminated, RS Group was required to convert all such employee's vested units into shares of

the common stock of RS Group as soon as reasonably practicable. It further provides that RS

Group will provide each individual with "a stock certificate ...[or] ... shall record the Grantee as

the record holder of such number of Vested shares of Common Stock in the records . . .."

**Fleet Orders RS Group Closed and All of Its Employees Terminated**

25.     In April 2002, Fleet publicly announced its "plan to put its Robertson Stephens

investment bank up for sale . . .." Fleet retained Goldman Sachs, the investment bank, to advise

it "in connection with the possible sale of all or a portion" of RS Group.

8

26.     By June 2002, Fleet had abandoned its efforts to sell RS Group, and, instead,
focused on consummating a management buyout (the "MBO") with senior officers of RSI (the
"MBO Group"), including some Counterplaintiffs.   In early July 2002, the MBO Group had
offered to purchase RS Group from Fleet.

27.     The Board of Directors of RS Group, comprised of H. Jay Sarles, Fleet's Vice
Chairman and Chief Administrative Officer; Eugene M. McQuade, Fleet's President and Chief
Operating Officer; Peter J. Manning, head of acquisitions for BancBoston; John R. Bahnken,
Chief Financial Officer for the Fleet-owned Quick & Reilly Group; and Glenn A. Peterson, an
executive at the Fleet-owned Fleet Securities, Inc., executed an Action of Directors in Lieu of a
Meeting, dated July 10, 2002 (the "July 10 Action").   This Board action, ordered by Fleet,
resolved that the value of the RSU Plan had been determined in good faith by the Board of
Directors to be equal to zero dollars ($0).

28.     According to the July 10 Board Action, the Board of Directors considered
"numerous factors in determining the value of the Plan and the Corporation," including a draft
valuation of RS Group prepared for Fleet by Goldman Sachs; "an assessment of certain litigation
exposure" of RS Group "determined by FleetBoston in-house counsel;" and "experiences in
connection with efforts" to sell RS Group (including the proposed MBO).   Counterplaintiffs
were not made aware of this valuation at the time of this Board Action.

29.     This "zero dollars" valuation was manufactured by Fleet and RS Group.
According to Fleet and the advisors it had retained (including Goldman Sachs and Lazard), RS
Group had a minimum value of $7.00 per share (or a total value of $700,000,000) on or around
February 21 2002.   Indeed, in 2001, RS Group had revenues approaching $500,000,000.   In

addition, this "zero dollar" valuation was not made in accordance with the Lazard methodology that was adopted by the RS Group Board of Directors in its December 17 Consent.

30. Two days after the RS Group Board's July 10 Action, Fleet informed the MBO Group that it would not close the transaction to sell RS Group to them, allegedly because of an unsubstantiated rumor of an SEC investigation involving RSI. Instead, Fleet ordered the operations of RS Group and its subsidiaries (including RSI) – "shut down." Shortly thereafter, Fleet caused the filing of a Form BDW (or Broker Dealer Withdrawal Form) on behalf of RSI with the United States Securities Exchange Commission.

31. The employees of RSI were terminated effective July 12, 2002 (the "Termination Date"), and the operations of the firm closed.

32. The closing of the operations of RS Group and its subsidiaries, including RSI, substantially diminished the value of RS Group and the Fair Market Value of the equity owned by Counterplaintiffs.

33. These actions by Fleet and RS Group were undertaken solely for the benefit of Fleet, RS Group's majority shareholder, which was experiencing billions of dollars of financial losses as result of ill-advised loans to South American interests. One goal was to secure for Fleet a several hundred million dollar tax advantage associated with closing RS Group and writing off its goodwill. These actions of Fleet and RS Group were undertaken without regard for the welfare of Counterplaintiffs and other minority shareholders of RS Group.

34. In July and August 2002, Lisa Bisaccia, Fleet's Global Head of Compensation, had meetings attended by Counterplaintiffs to address the terms of their separation from RSI. Bisaccia told Counterplaintiffs that they would receive a Separation Agreement and Release but

10

19-12346-shl    Doc 55-6    Filed 09/05/19    Entered 09/05/19 18:22:01    Exhibit C
Part 4    Pg 14 of 102

— regardless of whether or not they signed it — they would not forfeit monies under CEP 1 —

Voluntary or CEP 2 – Involuntary.

35.     From late August through early September 2002, Fleet's Director of Human

Resources, Brian Mearns, caused letters entitled "Separation Agreement and Release" (the

"Release") to be mailed to Counterplaintiffs at their home addresses. The Release notified

Counterplaintiffs of a "Separation Date," most often given as July 15 or July 17, and

characterized this date as the date on which "active employment with Robertson Stephens

ended." It contained a full release of claims for Fleet and its affiliates, including RS Group,

which the employee was required to execute to receive any separation benefit described in the

Release.

36.     Under the RSU Agreement, CEP 1 – Voluntary, and CEP 2 – Involuntary, the

"Termination Date" is defined as the earlier of the last date of "active employment" or the date

the employer (RSI) delivers a notice of termination of "Grantee's employment." Accordingly,

the Termination Date for Counterplaintiffs falls between July 12 and July 17, 2002. The

Termination Date triggers the obligation of RS Group to deliver the common stock to employees

or record their ownership.

37.     Exhibit B to the Release provided the rights of individuals who did not sign the

Release. It declared that Counterplaintiffs would be paid the fair market value for the shares of

common stock of RS Group underlying the restricted units that had vested by that time. The

Release also informed Counterplaintiffs, for the first time, that the Board of Directors of

"Robertson Stephens" had "determined that neither the restricted units under the Restricted Unit

Plan, nor the underlying shares of Robertson Stephens common stock," have any value – and

thus that no value would be paid. The Release also provided that the recipient' "unvested

restricted units will be forfeited and cancelled" as a result of the termination of their employment.

### The Closing of RS Group Resulted in a Change of Control of RS Group And Full Vesting of Counterplaintiffs' RSUs

38.     Counterdefendants closing of RS Group's operations, including the operations of RSI, and the termination of Counterplaintiffs' employment triggered the immediate accelerated vesting of all of Counterplaintiffs' unvested RSU's and RS Group's obligation to deliver the common stock underlying the RSUs to Counterplaintiffs forthwith.  This acceleration resulted because the closing of the operations of RS Group constituted a Change of Control of RS Group.

39.     Under the RSU Agreement and RSU Plan, a Company Change in Control is defined, in relevant part, as "the liquidation or dissolution of the Company"; "the sale, transfer or other disposition of all or substantially all of the assets of the Company"; and "the sale, transfer or other disposition of all or substantially all of the assets of the Broker/Dealer Operations or of the equity securities of Robertson Stephens, Inc."

40.     A Company Change in Control occurred under several sections of this provision. RS Group was liquidated and dissolved and substantially all of its assets or RSI's assets were sold, transferred, or otherwise disposed of.

41.     Under Section 3 (d) of the Restricted Unit Award Agreement, entitled "Change in Control," all unvested units become vested immediately in the event an employee is terminated within 18 months following a Change in Control.

### Counterplaintiffs File an Arbitration Claim Against Fleet, RS Group, and RSI

42.     On December 11, 2002, Counterplaintiffs commenced an arbitration at the New York Stock Exchange in New York City (the "NYSE Arbitration") against Fleet, RS Group, and RSI alleging claims arising from the their employment by RSI, including compensation claims.

43.     On December 12, 2002, the <u>Wall Street Journal</u> published an article reporting on the allegations of the Statement of Claim filed by Counterplaintiffs in the NYSE Arbitration. While Counterdefendants were aware of this article even before it was published (and actually issued a comment for the article through a Fleet spokesman, James Mahoney), at no time did Fleet or any of its subsidiaries or representatives demand a retraction or revision of the <u>Wall Street Journal</u> article. Moreover, neither Fleet nor any of its subsidiaries or representatives ever commenced a claim for defamation against Counterplaintiffs.

44.     In January 2003 -- after the first portion of both the Deferred Amount and the Award Amount vested and became nonforfeitable -- certain Counterplaintiffs called Lisa Bisaccia, Fleet's Global Head of Compensation, or other representatives of Fleet or RS Group to demand payment under the plans. No Counterplaintiff was told that they had disparaged Fleet at any time, and none were told that they had forfeited their Deferred Amounts, Award Amounts or RSUs.

45.     On March 24, 2003, RSI filed its Answer to the Statement of Claim. On the same day, Fleet, RS Group, and RSI commenced this action in the Superior Court of Suffolk County by filing a Complaint and an Emergency Motion for Stay of Arbitration or, In the Alternative, For Preliminary Injunction. Fleet and RS Group sought to stay the NYSE Arbitration as to them on the ground that neither party had entered into an arbitration agreement with Counterplaintiffs. RSI, as a member firm of the NYSE, was subject to the provisions of the NYSE Constitution requiring submission to arbitration by member-firms at the request of associated members, such as Counterplaintiffs.

46.     Neither the Answer, the Complaint, nor the Emergency Motion asserted that Counterplaintiffs had forfeited their Deferred Amounts, Award Amounts or RSUs, and none of

13

19-12346-shl    Doc 55-6    Filed 09/05/19    Entered 09/05/19 18:22:01    Exhibit C
Part 4    Pg 17 of 102

NYSCEF DOC. NO. 147

RECEIVED NYSCEF: 08/13/2018

these pleadings asserted that Counterplaintiffs had acted in violation of the forfeiture provisions of any of the relevant plans.

47.    On April 1, 2003, Counterplaintiffs removed the Fleet suit, and on April 8, 2003, filed a motion to transfer this action to the Southern District of New York, where the NYSE Arbitration was pending.  Fleet and RS Group sought to remand this action back to Superior Court.

48.    On April 22, 2003, the District Court denied both motions, and stayed this action without granting the application by Fleet to enjoin the NYSE arbitration in which it is named as a Respondent.  Thereafter, Fleet and RS Group refused to appear in the NYSE Arbitration, and the Arbitration against RSI continued.  The claims resulted in an Award against RSI amounting to approximately $23,000,000 (including interest) for 27 of the 42 Counterplaintiffs.

**Fleet and RS Group Forfeit Counterplaintiffs' Deferred Compensation**

49.    Within days of the filing of the District Court's order staying this action, Fleet and RS Group, having lost their effort to stay the NYSE Arbitration, sought to induce Counterplaintiffs to release their claims against Fleet, RS Group, and RSI.  By an April 28, 2003 Action of the RS Group Board of Directors, the Fleet-controlled RS Group Board – made up of Sarles, McQuade, and Lauren Mogensen, Fleet's Head of Mergers & Acquisitions – resolved to cancel the rights under CEP 1 – Voluntary, CEP 2 – Involuntary, the RSU Agreement, and the RSU Plan of all former RSI employees who had not signed a Release, including all Counterplaintiffs.

50.    As a result of the April 28 Action, the RS Group Board sent a letter, through the U.S. mail, to Counterplaintiffs' home addresses – and to all other former RSI employees who had not signed a release of claims in favor of Fleet and its affiliates – declaring the forfeiture of

14

their Deferred Amounts, Award Amounts, and RSUs. These letters, dated May 2, 2003 (the "May 2 letter"), stated that "Robertson Stephens Group, Inc. ... has determined that you are due no payments or awards of stock as a result of actions taken in violation of Section 8.1 of the Cash Equivalent Plans, Section 4.6 of the Restricted Unit Plan, and Section 8 of the Restricted Unit Award Agreement." The May 2 letter does not identify the actions upon which the forfeiture was based.

51.    As a result of Counterdefendants' declaration of forfeiture, Counterplaintiffs filed an Amended Statement of Claim dated June 20, 2003 to include claims for the Deferred Amounts under CEP 1 – Voluntary and the Award Amounts under CEP 2 – Involuntary.

52.    On July 25, 2003, RSI – represented by the same counsel that represents Counterdefendants – filed its Answer to the Amended Statement of Claim. This was the first time Counterdefendants attempted to articulate to Counterplaintiffs their reason for declaring the May 2 forfeiture. In this document, Counterdefendants claimed that Counterplaintiffs "engaged in actions adverse and inimical to RSI, thereby triggering the forfeiture provisions of the Cash Equivalent Plan. Among such acts, prior to serving RSI with their original Statement of Claim (which includes false and disparaging allegations concerning RSI, RSGI, FBF and FSI and their officers, directors and senior executive employees) to certain news outlets, including the Wall Street Journal. Moreover, Claimants caused/permitted their attorney to disseminate false and disparaging allegations as to RSI, RSGI, FBF and FSI to third parties, including through interviews with newspaper reporters."

53.    In the course of the NYSE Arbitration, Counterdefendants' representatives identified the December 12, 2002 Wall Street Journal article as the source of the allegedly disparaging comments. Yet, at no time – not in their Answer to the Amended Statement of

15

Claim or as part of the NYSE Arbitration hearings — did representatives of Fleet or RS Group identify any language contained in the article, attributed to Counterplaintiffs or Counterplaintiffs' attorneys, that they found disparaging or inimical to the interests of Fleet or its subsidiaries.

54.    The May 2 letter was actually sent to all former RSI employees who did not sign the Release — whether or not they were participants in the NYSE Arbitration. Yet, Fleet and RS Group failed to identify the conduct taken by these individuals who were not participants in the NYSE Arbitration that triggered the forfeiture provisions.

**The Disparagement Provisions Contained in CEP 1 – Voluntary, CEP 2 – Involuntary, the RSU Agreement, and the RSU Plan Are Not Applicable**

55.    Section 8.1 of the Cash Equivalent Plans provides that: "In the event that, at any time during the six month period immediately following any Participant's Termination Date (other than any such Termination Date occurring due to a termination of employment within eighteen months following a Change in Control ...), the Participant ... (ii) publicly disparages any member of the RS Group or Parent or any of their respective officers, directors or senior executive employees or otherwise makes any public statement that is adverse, inimical or otherwise materially detrimental to the interests of such Persons or individuals, or if the Company or the Committee, in its discretion or such officer or officers of the Company as the Company may from time to time designate, determines that the Participant's actions are adverse to the best interests of the RS Group or Parent, the Participant shall immediately forfeit any and all rights in respect of any [Deferred Amount or Award Amount] that is not Vested and the earnings thereon."

56.    Section 8 of the RSU Agreement provides that: "In the event that, at any time during the six month period immediately following the Termination Date (other than in connection with any termination of the Grantee's employment with the Company Group within

16

eighteen months following a Change in Control ...) the Grantee ... (ii) publicly disparages any member of the Company Group or Parent or any of their respective officers, directors or senior executive employees or otherwise make any public statement that is adverse, inimical or otherwise materially detrimental to the interests of such Persons or individuals, or if the Company or the Committee, in its discretion, or such officer or officers of the Company as the Company may from time to time designate, determines that the Grantee's actions are adverse to the best interests of the Company Group or Parent ... the Grantee shall immediately forfeit any and all rights in respect of the Awards, whether or not Vested . . . ."

57.     Section 8(a) of the RSU Agreement and Section 8.1 of the Cash Equivalent Plans, each provides that none of these forfeiture provisions are applicable if, as occurred here, a termination of employment occurs within 18 months following a "change in control." Section 4.6 of the RSU Plan mirrors section 8(a) of the RSU Agreement.

58.     The disparagement allegation by Fleet and RS Group was a subterfuge designed to force former employees of RSI, including Counterplaintiffs, to release Fleet, RS Group, and it subsidiaries from the liability asserted by these employees in the NYSE arbitration or elsewhere.

59.     No Counterplaintiff disparaged Fleet or RS Group or any parent or affiliate. Moreover, the disparagement provisions of the relevant plans were inapplicable because a Change in Control of RS Group had occurred before the alleged disparagement took place.

60.     After receipt of the May 2, 2003 letter, Counterplaintiff Barr called Bisaccia to protest the forfeiture. He complained that neither Fleet nor RS Group had a right to withhold his earned compensation.  Bisaccia told Barr that the alleged forfeiture would be waived if he withdrew from the NYSE Arbitration and executed a release of all claims against Fleet and its affiliates.  Barr refused to withdraw his claims or to execute the Release.

## FIRST CLAIM FOR RELIEF
### (RS Group – Breach of Contract – CEP 1 – Voluntary)

61.     Counterplaintiffs reallege and incorporate herein the allegations of Paragraphs 1 through 60 above.

62.     Counterplaintiffs were awarded Deferred Amounts under CEP 1 – Voluntary for their work in 2000.

63.     Under CEP 1 – Voluntary, RS Group was obligated to pay Counterplaintiffs as soon as reasonably practicable after the vesting date of the Deferred Amounts.

64.     On January 1, 2003, the following Deferred Amounts under CEP 1 – Voluntary vested and became nonforfeitable:

| | |
|---|---|
| Casey: | $19,787.50, plus earnings |
| Goldman: | $134,769, plus earnings |
| Hurwitz: | $30,000, plus earnings |
| Tishman: | $260,000, plus earnings |
| Tobiason: | $85,000, plus earnings |
| **TOTAL**: | **$529,556.50, plus earnings** |

65.     In violation of CEP 1 – Voluntary, RS Group failed and refused to make these payments.

66.     In addition, on January 1, 2004, the following Deferred Amounts under CEP 1 – Voluntary vested and became nonforfeitable:

| | |
|---|---|
| Casey: | $19,787.50, plus earnings |
| Goldman: | $134,769, plus earnings |
| Hurwitz: | $30,000, plus earnings |
| Tishman: | $260,000, plus earnings |
| Tobiason: | $85,000, plus earnings |
| **TOTAL**: | **$529,556.50, plus earnings** |

18

67.     The forfeiture provision was inapplicable because a Change of Control had occurred on July 12, 2002. Furthermore, Counterplaintiffs did not disparage Fleet or any of its subsidiaries.

68.     Accordingly, RS Group's failure to pay the Deferred Amounts referenced above in compliance with the payment obligations under CEP 1 – Voluntary is a breach of that agreement, which has caused damage and injury to Counterplaintiffs Casey, Goldman, Hurwitz, Tishman, and Tobiason as set forth above.

**SECOND CLAIM FOR RELIEF**
**(RS Group – Violation of ERISA § 502(a)(1)(B) – CEP 1 – Voluntary,**
**as an alternative to the Breach of Contract Claim)**

69.     Counterplaintiffs reallege and incorporate herein the allegations of Paragraphs 1 through 68 above.

70.     Article I of CEP 1 – Voluntary states that, "The Plan is intend to be 'a plan which is unfunded and is maintained by an employer primarily for the purpose of providing deferred compensation to a select group of management or highly compensated employees' within the meaning of sections 201(2), 301(a)(3) and 401(a)(1) of ERISA, and shall be administered in a manner consistent with that intent."

71.     In the event it is determined that claims for the violation of CEP 1 – Voluntary are preempted by ERISA, RS Group, by its conduct described above, violated § 502(a)(1)(B) of ERISA. (29 U.S.C. § 1132(a)(1)(B))

72.     Section 502(a)(1)(B) of ERISA provides for a civil action by a participant or beneficiary of an ERISA plan to recovery benefits due to him or to enforce his rights under the terms of the plan.

19

73.     As alleged herein, RS Group failed and refused to make payments of the Deferred

Amounts that vested on January 1, 2003 and January 1, 2004 that were owed under CEP 1 –

Voluntary.

74.     Accordingly, RS Group has is in breach of the payment provisions of CEP 2 –

Involuntary, and Counterplaintiffs Casey, Goldman, Hurwitz, Tishman, and Tobiason are

entitled under ERISA § 502(a)(1)(B) to damages equal to their Deferred Amounts, plus interest,

attorneys' fees and costs.

**THIRD CLAIM FOR RELIEF**
**(RS Group – Breach of Contract – CEP 2 – Involuntary)**

75.     Counterplaintiffs reallege and incorporate herein the allegations of Paragraphs 1

through 74 above.

76.     Counterplaintiffs were awarded Award Amounts under CEP 2 – Involuntary for

their work in 2001.

77.     Under CEP 2 – Involuntary, RS Group was obligated to pay Counterplaintiffs as

soon as reasonably practicable after the vesting date of the Award Amounts.

78.     On January 1, 2003, the following Award Amounts under CEP 2 – Involuntary

vested and became nonforfeitable:

| | |
|---|---|
| Alt: | $259,999, plus earnings |
| Barr: | $433,333, plus earnings |
| Beaghan: | $50,000, plus earnings |
| Bean: | $151,667, plus earnings |
| Bolton: | $61,228, plus earnings |
| Bowen: | $4,167, plus earnings |
| Brand: | $130,000, plus earnings |
| Callander: | $151,667, plus earnings |
| Carambat: | $75,000, plus earnings |
| Dodge: | $42,565, plus earnings |
| Fullerton: | $123,686, plus earnings |
| Gardner: | $26,695, plus earnings |
| Greer: | $259,999, plus earnings |

20

| Haertl: | $140,833, plus earnings |
| Holmes: | $93,750, plus earnings |
| Hughes: | $162,500, plus earnings |
| Hurwitz: | $105,000, plus earnings |
| McCarthy: | $130,000, plus earnings |
| McGinty: | $87,500, plus earnings |
| McWilliams: | $90,000, plus earnings |
| Morse: | $50,000, plus earnings |
| A. Murphy: | $75,000, plus earnings |
| D. Murphy: | $100,000, plus earnings |
| O'Brian: | $50,000, plus earnings |
| Perrella: | $75,000, plus earnings |
| Piazza: | $130,000, plus earnings |
| Rehmer: | $130,000, plus earnings |
| Reilly: | $186,090, plus earnings |
| Rossi: | $26,667, plus earnings |
| Salter: | $50,000, plus earnings |
| Scharfman: | $133,859, plus earnings |
| Smith: | $37,616, plus earnings |
| Sullivan: | $113,016, plus earnings |
| Tobiason: | $135,000, plus earnings |
| White: | $300,001, plus earnings |
| Winaker: | $310,000, plus earnings |
| **TOTAL:** | **$4,611,839, plus earnings** |

79.    In violation of CEP 2 – Involuntary, RS Group failed and refused to make these

payments.

80.    In addition, on January 1, 2004, the following Award Amounts under CEP 2 –

Involuntary vested and became nonforfeitable:

| Alt: | $519,999, plus earnings |
| Barr: | $866,667, plus earnings |
| Beaghan: | $100,000, plus earnings |
| Bean: | $303,333, plus earnings |
| Bolton: | $122,456, plus earnings |
| Bowen: | $8,333, plus earnings |
| Brand: | $260,000, plus earnings |
| Callander: | $303,333, plus earnings |
| Carambat: | $150,000, plus earnings |
| Dodge: | $85,130, plus earnings |
| Fullerton: | $247,372, plus earnings |
| Gardner: | $53,391, plus earnings |
| Greer: | $519,999, plus earnings |

FILED: NEW YORK COUNTY CLERK 08/13/2018 01:47 PM    INDEX NO. 159781/2014
NYSCEF DOC. NO. 147                                    RECEIVED NYSCEF: 08/13/2018

| | |
|---|---|
| Haertl: | $281,667, plus earnings |
| Holmes: | $187,500, plus earnings |
| Hughes: | $325,000, plus earnings |
| Hurwitz: | $210,000, plus earnings |
| McCarthy: | $260,000, plus earnings |
| McGinty: | $175,000, plus earnings |
| McWilliams: | $180,000, plus earnings |
| Morse: | $100,000, plus earnings |
| A. Murphy: | $150,000, plus earnings |
| D. Murphy: | $200,000, plus earnings |
| O'Brian: | $100,000, plus earnings |
| Perrella: | $150,000, plus earnings |
| Piazza: | $260,000, plus earnings |
| Rehmer: | $260,000, plus earnings |
| Reilly: | $372,180, plus earnings |
| Rossi: | $53,333, plus earnings |
| Salter: | $100,000, plus earnings |
| Scharfman: | $267,718, plus earnings |
| Smith: | $75,232, plus earnings |
| Sullivan: | $226,033, plus earnings |
| Tobiason: | $270,000, plus earnings |
| White: | $600,000, plus earnings |
| Winaker: | $620,000, plus earnings |
| **TOTAL:** | **$9,223,677, plus earnings** |

81.     The forfeiture provision was inapplicable because a Change of Control had

occurred on July 12, 2002. Furthermore, Counterplaintiffs did not disparage Fleet or any of its

subsidiaries.

82.     Accordingly, RS Group's failure to pay the Award Amounts referenced above in

compliance with the payment obligations under CEP 2 – Involuntary is a breach of that

agreement, which has caused damage and injury to Counterplaintiffs Alt, Barr, Beaghan, Bean,

Bolton, Bowen, Brand, Callander, Carambat, Dodge, Fullerton, Gardner, Greer, Haertl, Holmes,

Hughes, Hurwitz, McCarthy, McGinty, McWilliams, Morse, A. Murphy, D. Murphy, O'Brian,

Piazza, Perrella, Rehmer, Reilly, Rossi, Salter, Scharfman, Smith, Sullivan, Tobiason, White,

and Winaker as set forth above.

22

FILED: NEW YORK COUNTY CLERK 08/13/2018 01:47 PM
NYSCEF DOC. NO. 147

19-12346-shl   Doc 55-6   Filed 09/05/19   Entered 09/05/19 18:22:01   Exhibit C
Part 4   Pg 26 of 102

INDEX NO. 659781/2014

RECEIVED NYSCEF: 08/13/2018

## FOURTH CLAIM FOR RELIEF
### (RS Group – Violation of ERISA § 502(a)(1)(B) – CEP 2 – Involuntary, as an alternative to the Breach of Contract Claim)

83.     Counterplaintiffs reallege and incorporate herein the allegations of Paragraphs 1 through 82 above.

84.     In the event it is determined that claims for the violation of CEP 2 – Involuntary are preempted by ERISA, Counterplaintiffs assert that the conduct described herein violated § 502(a)(1)(B) of ERISA. (29 U.S.C. § 1132(a)(1)(B))

85.     Section 502(a)(1)(B) of ERISA provides for a civil action by a participant or beneficiary of an ERISA plan to recovery benefits due to him or to enforce his rights under the terms of the plan.

86.     As alleged herein, RS Group failed and refused to make payments of the Award Amounts that vested on January 1, 2003 and January 1, 2004 that were owed under CEP 2 – Involuntary.   Although RS Group declared in the May 2 Letter that these benefits had been forfeited, no such forfeiture occurred for two reasons:  because a change of control had occurred rendering the forfeiture provisions inapplicable, and Counterplaintiffs did not disparage Fleet or any of its subsidiaries.

87.     Accordingly, Counterdefendant RS Group is in breach of the payment provisions of CEP 2 – Involuntary, and Counterplaintiffs Alt, Barr, Beaghan, Bean, Bolton, Bowen, Brand, Callander, Carambat, Dodge, Fullerton, Gardner, Greer, Haertl, Holmes, Hughes, Hurwitz, McCarthy, McGinty, McWilliams, Morse, A. Murphy, D. Murphy, O'Brian, Piazza, Perrella, Rehmer, Reilly, Rossi, Salter, Scharfman, Smith, Sullivan, Tobiason, White, and Winaker are entitled under ERISA § 502(a)(1)(B) to damages equal to their Award Amounts, plus interest, attorneys' fees and costs.

23

## FIFTH CLAIM FOR RELIEF
### (RS Group – Breach of Contract – Counterplaintiff Beaghan's CEP 2 - Involuntary)

88.    Counterplaintiff Beaghan realleges and incorporates herein the allegations of Paragraphs 1 through 87 above.

89.    Counterplaintiff Beaghan was awarded Award Amounts under CEP 2 – Involuntary in the amount of $150,000 for his work in 2001.  Under CEP 2 – Involuntary, RS Group was obligated to pay Counterplaintiff Beaghan as soon as reasonably practicable after the vesting date of the Award Amounts.

90.    On April 1, 2002, Counterplaintiff Beaghan's employment with RSI was terminated without cause.  Beaghan did not engage in any conduct in the six months following that termination date that triggered the forfeiture provision of CEP 2 – Involuntary.

91.    On January 1, 2003, $50,000 of his Award Amount vested and became nonforfeitable.  On January 1, 2004, $100,000 of his Award Amount vested and became nonforfeitable.

92.    RS Group's refusal and failure to pay Beaghan's vested and nonforfeited Award Amounts is a breach of the terms of CEP 2 – Involuntary and has caused Beaghan damages in the amount of $150,000, plus interest.

## SIXTH CLAIM FOR RELIEF
### (RS Group – Breach of Contract – RSU Agreement)

93.    Counterplaintiffs reallege and incorporate herein the allegations of Paragraphs 1 through 92 above.

94.    On or around July 1, 2002, the first portion of the RSUs vested.  In addition, because Counterplaintiffs were terminated within 18 months following a Change in Control of RS Group, all of their RSUs vested on the Termination Date.

24

95.     Under the terms of the RSU Agreement, on or around July 12, 2002, RS Group was obligated to convert each vested unit into a share of common stock in RS Group or record the grantee as the record holder of Common Stock in the records of the Company.

96.     The forfeiture provision of the RSU Agreement is inapplicable because no Counterplaintiff disparaged Fleet or its subsidiaries, and Counterplaintiffs' termination occurred within 18 months following a Change in Control rendering the forfeiture provision inapplicable.

97.     Accordingly, Counterdefendant RS Group breached the RSU Agreement, and that breach caused Counterplaintiffs damages in the amount to be determined at trial.

## SEVENTH CLAIM FOR RELIEF
### (Fleet – Breach of Fiduciary Duty)

98.     Counterplaintiffs reallege and incorporate herein the allegations of Paragraphs 1 through 97 above.

99.     Counterplaintiffs were minority owners and minority shareholders of RS Group.

100.    Fleet was the majority owner and majority shareholder of RS Group, owning 70% of the authorized shares (and a higher percentage of the issued shares) of RS Group.

101.    Fleet, and its officers and directors, owed a fiduciary duty of utmost loyalty and care to Counterplaintiffs as minority owners and minority shareholders of RS Group.

102.    Fleet breached this fiduciary duty to Counterplaintiffs by placing its own economic interests over the welfare of Counterplaintiffs, including in part by taking actions that substantially diminished the value of RS Group; and declaring Counterplaintiffs' RSUs and equity interest in the company valueless; and liquidating, dissolving, or disposing of the assets of RS Group in a manner that caused substantial economic injury to the Counterplaintiffs while solely benefiting RS Group and Fleet.

103.   Fleet's breach of fiduciary duty was the proximate cause of damage and injury to Counterplaintiffs, in an amount to be determined at trial.

### EIGHTH CLAIM FOR RELIEF
(Fleet & RS Group – Violation of Massachusetts Regulation
of Business Practice and Consumer Protection Act)

104.   Counterplaintiffs reallege and incorporate herein the allegations of Paragraphs 1 through 103 above.

105.   M.G.L. c. 93A § 2 (the Massachusetts Regulation of Business Practices and Consumer Protection Act) makes it unlawful to engage in "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce . . . ."

106.   Counterdefendants were engaged in the conduct of "trade or commerce" as those terms are defined in M.G.L. c. 93A § 1.

107.   The conduct of Counterdefendants set forth above – including the (1) valuation of the RSU Plan and RSUs as $0; (2) classification of the Change in Control of RS Group as a "wind down" to deny Counterplaintiffs the benefits derived under the relevant plans in the event of a Change in Control; (3) intentional breach of CEP 1 – Voluntary, CEP 2 – Involuntary, and the RSU Agreement for the benefit of Counterdefendants; (4) RS Group's declaration that Counterplaintiffs' forfeited their Deferred Amounts, Award Amounts, and RSUs in an attempt to coerce a release of claims and interfere with a pending litigation between the parties – constitutes the use and employment of unfair methods of competition and unfair and deceptive acts and practices, in violation of M.G.L. c. 93A § 2.

108.   Counterdefendants' unfair and deceptive acts or practices in the conduct of trade or commerce, as described herein, caused loss of money and property to Counterplaintiffs, in an amount to be determined at trial.

109.    By the conduct described herein, Counterdefendants have committed a willful or knowing violation of M.G.L c. 93A § 2.   Accordingly, in addition to actual damages and attorneys' fees and costs in an amount to be determined at trial, Counterplaintiffs are also entitled to treble damages under M.G.L. c. 93A § 11.

## ELEVENTH CLAIM FOR RELIEF
### (Fleet – Violation of Racketeer Influenced and Corrupt Organizations Act ("RICO"))

110.    Counterplaintiffs reallege and incorporate herein the allegations of Paragraphs 1 through 109 above.

111.    Under the provisions of RICO, 18 U.S.C. § 1961 et seq., it is unlawful for "any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate . . . commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity . . ." 18 U.S.C. § 1962(c).

112.    RS Group constitutes an "enterprise" under 18 U.S.C. § 1961(4).

113.    By the conduct described herein, Fleet conducted or participated in the conduct of RS Group's affairs by engaging in a pattern of racketeering activity, to wit Fleet created, perpetuated, and continues to this day a scheme or artifice designed to defraud Counterplaintiffs out of property and to extort a general release from Counterplaintiffs for inadequate consideration, all of which has caused injuries to Counterplaintiffs, including the destruction of value of their equity interest in RS Group and alleged forfeiture of their Deferred Amounts and Award Amounts.

114.    Said scheme or artifice has been advanced and perpetrated by violations of the mail fraud (18 U.S.C. § 1341), wire fraud (18 U.S.C. § 1343), and Hobbs Act (18 U.S.C. § 1951).   Numerous predicate acts as that term is understood to be used for RICO purposes are

included in these acts.  In furtherance of its scheme or artifice, Fleet's conduct has included

causing RS Group to commit the following acts:

(A)     avoiding the operation of the Change of Control provisions in the relevant plans –
        including the immediate, accelerated vesting of all of the RSUs – by charactering
        the liquidation of RS Group as a "wind down";

(B)     mailing or causing to be mailed or delivered, through the U.S. Postal Service, or a
        similar private or commercial interstate carrier, the Release, which stated falsely
        and fraudulently that the value of the RSUs was $0 in an effort to coerce
        Counterplaintiffs to forfeit all of their RSUs and release Fleet from all claims;

(C)     informing, falsely and fraudulently, certain Counterplaintiffs over the telephone
        wires in or around January 2003 that the Deferred Amounts and Award Amounts
        that had vested and become nonforfeitable on or around January 1, 2003 would be
        paid;

(D)     mailing or causing to be mailed or delivered, through the U.S. Postal Service, or a
        similar private or commercial interstate carrier, the May 2, 2003 Letter – signed
        by an employee of Fleet and sent after RSI had filed its Answer in the NYSE
        Arbitration and Counterdefendants had  filed their Complaint and Emergency
        Motion all without alleging that a forfeiture event had been triggered as a defense
        to Counterplaintiffs' claim for the RSUs – that declared, falsely and fraudulently,
        that Counterplaintiffs (and all other former RSI employees who had not signed a
        release as to Fleet) had forfeited their RSUs under Section 8 of the RSU
        Agreement and Section 4.6 of the RSU Plan, Deferred Amounts under Section 8.1
        of CEP 1 - Voluntary, and Award Amounts under Section 8.1 of CEP 2 -

FILED: NEW YORK COUNTY CLERK 08/13/2018 04:47 PM

NYSCEF DOC. NO. 147

19-12346-shl    Doc 55-6    Filed 09/05/19    Entered 09/05/19 18:22:01    Exhibit C
Part 4 - Pg 32 of 102

INDEX NO. 159781/2014

RECEIVED NYSCEF: 08/13/2018

Involuntary and used the telephone wires to further this scheme by instructing recipients of the letter to call Elaine McChesney, Counterdefendants' counsel, or Lisa Bisaccia, Fleet's Global Head of Compensation and Benefits, in an effort to extort a release from Counterplaintiffs, which would have included a forfeiture of their RSUs; and

(E)     contacting through the U.S. Postal Service, or a similar private or commercial interstate carrier, individuals known to be represented by counsel and engaged in an active litigation against Fleet.

115.    Fleet's actions, as described above, constitute a violation of 18 U.S.C. § 1962, et seq., and were the proximate cause of damage and injury to Counterplaintiffs, in an amount to be determined at trial.

116.    Counterplaintiffs are entitled under the provisions of 18 U.S.C. § 1964(c) to an award of treble damages, attorneys' fees and costs.

## PRAYER FOR RELIEF

WHEREFORE,

- Counterplaintiff Alt prays for judgment against Counterdefendants in the amount of $779,990, plus earnings, for Counterdefendants' violation of CEP 2 – Involuntary; an amount not less than $1,459,395 for the value of his 208,485 RSUs; double or treble damages under the Massachusetts Regulation of Business Practice and Consumer Protection Act; treble damages under RICO; interest; attorneys' fees and costs; and such other and further relief as the Court may deem just and proper;

- Counterplaintiff Barr prays for judgment against Counterdefendants in the amount of $1,300,000, plus earnings, for Counterdefendants' violation of CEP 2 – Involuntary; an

amount not less than $1,158,584 for the value of his 165,512 RSUs; double or treble damages under the Massachusetts Regulation of Business Practice and Consumer Protection Act; treble damages under RICO; interest; attorneys' fees and costs; and such other and further relief as the Court may deem just and proper;

- Counterplaintiff Beaghan prays for judgment against Counterdefendants in the amount of $150,000, plus earnings, for Counterdefendants' violation of CEP 2 – Involuntary; an amount not less than $433,370 for the value of his 61,910 RSUs; double or treble damages under the Massachusetts Regulation of Business Practice and Consumer Protection Act; treble damages under RICO; interest; attorneys' fees and costs; and such other and further relief as the Court may deem just and proper;

- Counterplaintiff Bean prays for judgment against Counterdefendants in the amount of $455,000, plus earnings, for Counterdefendants' violation of CEP 2 – Involuntary; an amount not less than $2,505,048 for the value of his 357,864 RSUs; double or treble damages under the Massachusetts Regulation of Business Practice and Consumer Protection Act; treble damages under RICO; interest; attorneys' fees and costs; and such other and further relief as the Court may deem just and proper;

- Counterplaintiff Bolton prays for judgment against Counterdefendants in the amount of $183,683, plus earnings, for Counterdefendants' violation of CEP 2 – Involuntary; an amount not less than $1,452,780 for the value of his 207,540 RSUs; double or treble damages under the Massachusetts Regulation of Business Practice and Consumer Protection Act; treble damages under RICO; interest; attorneys' fees and costs; and such other and further relief as the Court may deem just and proper;

- Counterplaintiff Bowen prays for judgment against Counterdefendants in the amount of $12,500, plus earnings, for Counterdefendants' violation of CEP 2 – Involuntary; an amount not less than $72,023 for the value of his 10,289 RSUs; double or treble damages under the Massachusetts Regulation of Business Practice and Consumer Protection Act; treble damages under RICO; interest; attorneys' fees and costs; and such other and further relief as the Court may deem just and proper;

- Counterplaintiff Brand prays for judgment against Counterdefendants in the amount of $390,000, plus earnings, for Counterdefendants' violation of CEP 2 – Involuntary; an amount not less than $1,409,086 for the value of his 201,298 RSUs; double or treble damages under the Massachusetts Regulation of Business Practice and Consumer Protection Act; treble damages under RICO; interest; attorneys' fees and costs; and such other and further relief as the Court may deem just and proper;

- Counterplaintiff Callander prays for judgment against Counterdefendants in the amount of $455,000, plus earnings, for Counterdefendants' violation of CEP 2 – Involuntary; an amount not less than $2,436,917 for the value of his 348,131 RSUs; double or treble damages under the Massachusetts Regulation of Business Practice and Consumer Protection Act; treble damages under RICO; interest; attorneys' fees and costs; and such other and further relief as the Court may deem just and proper;

- Counterplaintiff Carambat prays for judgment against Counterdefendants in the amount of $225,000, plus earnings, for Counterdefendants' violation of CEP 2 – Involuntary; an amount not less than $438,382 for the value of her 62,626 RSUs; double or treble damages under the Massachusetts Regulation of Business Practice and Consumer Protection Act;

31

FILED: NEW YORK COUNTY CLERK 08/13/2018 04:47 PM    INDEX NO. 159781/2014
NYSCEF DOC. NO. 147                                         RECEIVED NYSCEF: 08/13/2018

treble damages under RICO; interest; attorneys' fees and costs; and such other and further

relief as the Court may deem just and proper;

- Counterplaintiff Casey prays for judgment against Counterdefendants in the amount of $39,375, plus earnings, for Counterdefendants' violation of CEP 1 – Voluntary; an amount not less than $469,693 for the value of his 67,099 RSUs; double or treble damages under the Massachusetts Regulation of Business Practice and Consumer Protection Act; treble damages under RICO; interest; attorneys' fees and costs; and such other and further relief as the Court may deem just and proper;

- Counterplaintiff Colin prays for judgment against Counterdefendants in the amount of $350,000, plus earnings, for the value of his 50,000 RSUs; double or treble damages under the Massachusetts Regulation of Business Practice and Consumer Protection Act; treble damages under RICO; interest; attorneys' fees and costs; and such other and further relief as the Court may deem just and proper;

- Counterplaintiff Dean prays for judgment against Counterdefendants in an amount not less than $866,117 for the value of his 123,731 RSUs; double or treble damages under the Massachusetts Regulation of Business Practice and Consumer Protection Act; treble damages under RICO; interest; attorneys' fees and costs; and such other and further relief as the Court may deem just and proper;

- Counterplaintiff Dodge prays for judgment against Counterdefendants in the amount of $127,696, plus earnings, for Counterdefendants' violation of CEP 2 – Involuntary; an amount not less than $580,860 for the value of his 82,980 RSUs; double or treble damages under the Massachusetts Regulation of Business Practice and Consumer Protection Act;

treble damages under RICO; interest; attorneys' fees and costs; and such other and further relief as the Court may deem just and proper;

- Counterplaintiff Fullerton prays for judgment against Counterdefendants in the amount of $371,058, plus earnings, for Counterdefendants' violation of CEP 2 – Involuntary; an amount not less than $100,205 for the value of his 14,315 RSUs; double or treble damages under the Massachusetts Regulation of Business Practice and Consumer Protection Act; treble damages under RICO; interest; attorneys' fees and costs; and such other and further relief as the Court may deem just and proper;

- Counterplaintiff Gardner prays for judgment against Counterdefendants in the amount of $80,086, plus earnings, for Counterdefendants' violation of CEP 2 – Involuntary; an amount not less than $671,349 for the value of his 95,907 RSUs; double or treble damages under the Massachusetts Regulation of Business Practice and Consumer Protection Act; treble damages under RICO; interest; attorneys' fees and costs; and such other and further relief as the Court may deem just and proper;

- Counterplaintiff Goldman prays for judgment against Counterdefendants in the amount of $269,538, plus earnings, for Counterdefendants' violation of CEP 1 – Voluntary; an amount not less than $1,158,584 for the value of his 165,512 RSUs; double or treble damages under the Massachusetts Regulation of Business Practice and Consumer Protection Act; treble damages under RICO; interest; attorneys' fees and costs; and such other and further relief as the Court may deem just and proper;

- Counterplaintiff Greer prays for judgment against Counterdefendants in the amount of $779,998, plus earnings, for Counterdefendants' violation of CEP 2 – Involuntary; an amount not less than $1,929,088 for the value of his 275,584 RSUs; double or treble

19-12346-shl Doc 55-6 Filed 09/05/19 Entered 09/05/19 18:22:01 Exhibit C Part 4 Pg 37 of 102

damages under the Massachusetts Regulation of Business Practice and Consumer Protection Act; treble damages under RICO; interest; attorneys' fees and costs; and such other and further relief as the Court may deem just and proper;

- Counterplaintiff Haertl prays for judgment against Counterdefendants in the amount of $422,500, plus earnings, for Counterdefendants' violation of CEP 2 – Involuntary; an amount not less than $1,252,524 for the value of his 178,932 RSUs; double or treble damages under the Massachusetts Regulation of Business Practice and Consumer Protection Act; treble damages under RICO; interest; attorneys' fees and costs; and such other and further relief as the Court may deem just and proper;

- Counterplaintiff Holmes prays for judgment against Counterdefendants in the amount of $281,250, plus earnings, for Counterdefendants' violation of CEP 2 – Involuntary; an amount not less than $438,382 for the value of his 62,626 RSUs; double or treble damages under the Massachusetts Regulation of Business Practice and Consumer Protection Act; treble damages under RICO; interest; attorneys' fees and costs; and such other and further relief as the Court may deem just and proper;

- Counterplaintiff Hughes prays for judgment against Counterdefendants in the amount of $487,500, plus earnings, for Counterdefendants' violation of CEP 2 – Involuntary; an amount not less than $1,722,217 for the value of his 246,031 RSUs; double or treble damages under the Massachusetts Regulation of Business Practice and Consumer Protection Act; treble damages under RICO; interest; attorneys' fees and costs; and such other and further relief as the Court may deem just and proper;

- Counterplaintiff Hurwitz prays for judgment against Counterdefendants in the amount of $60,000, plus earnings, for Counterdefendants' violation of CEP 1 – Voluntary; $315,000,

34

FILED: NEW YORK COUNTY CLERK 08/13/2018 04:47 PM
19-12346-shl    Doc 55-6    Filed 09/05/19    Entered 09/05/19 18:22:01    Exhibit C
Part 4    Pg 38 of 102
NYSCEF DOC. NO. 147

INDEX NO. 159781/2014

RECEIVED NYSCEF: 08/13/2018

plus earnings, for Counterdefendants' violation of CEP 2 – Involuntary; an amount not less than $866,117 for the value of his 123,731 RSUs; double or treble damages under the Massachusetts Regulation of Business Practice and Consumer Protection Act; treble damages under RICO; interest; attorneys' fees and costs; and such other and further relief as the Court may deem just and proper;

- Counterplaintiff Kaye prays for judgment against Counterdefendants in an amount not less than $866,117 for the value of his 123,731 RSUs; double or treble damages under the Massachusetts Regulation of Business Practice and Consumer Protection Act; treble damages under RICO; interest; attorneys' fees and costs; and such other and further relief as the Court may deem just and proper;

- Counterplaintiff McCarthy prays for judgment against Counterdefendants in the amount of $390,000, plus earnings, for Counterdefendants' violation of CEP 2 – Involuntary; an amount not less than $3,131,310 for the value of her 447,330 RSUs; double or treble damages under the Massachusetts Regulation of Business Practice and Consumer Protection Act; treble damages under RICO; interest; attorneys' fees and costs; and such other and further relief as the Court may deem just and proper;

- Counterplaintiff McGinty prays for judgment against Counterdefendants in the amount of $262,500, plus earnings, for Counterdefendants' violation of CEP 2 – Involuntary; an amount not less than $288,708 for the value of his 41,244 RSUs; double or treble damages under the Massachusetts Regulation of Business Practice and Consumer Protection Act; treble damages under RICO; interest; attorneys' fees and costs; and such other and further relief as the Court may deem just and proper;

35

- Counterplaintiff McWilliams prays for judgment against Counterdefendants in the amount of $270,000, plus earnings, for Counterdefendants' violation of CEP 2 – Involuntary; an amount not less than $288,708 for the value of his 41,244 RSUs; double or treble damages under the Massachusetts Regulation of Business Practice and Consumer Protection Act; treble damages under RICO; interest; attorneys' fees and costs; and such other and further relief as the Court may deem just and proper;

- Counterplaintiff Morse prays for judgment against Counterdefendants in the amount of $150,000, plus earnings, for Counterdefendants' violation of CEP 2 – Involuntary; an amount not less than $322,000 for the value of his 46,000 RSUs; double or treble damages under the Massachusetts Regulation of Business Practice and Consumer Protection Act; treble damages under RICO; interest; attorneys' fees and costs; and such other and further relief as the Court may deem just and proper;

- Counterplaintiff Agnes Murphy prays for judgment against Counterdefendants in the amount of $225,000, plus earnings, for Counterdefendants' violation of CEP 2 – Involuntary; an amount not less than $288,708 for the value of her 41,244 RSUs; double or treble damages under the Massachusetts Regulation of Business Practice and Consumer Protection Act; treble damages under RICO; interest; attorneys' fees and costs; and such other and further relief as the Court may deem just and proper;

- Counterplaintiff Diane Murphy prays for judgment against Counterdefendants in the amount of $300,000, plus earnings, for Counterdefendants' violation of CEP 2 – Involuntary; an amount not less than $876,764 for the value of her 125,252 RSUs; double or treble damages under the Massachusetts Regulation of Business Practice and Consumer Protection Act;

19-12346-shl    Doc 55-6    Filed 09/05/19    Entered 09/05/19 18:22:01    Exhibit C
Part 4    Pg 40 of 102

treble damages under RICO; interest; attorneys' fees and costs; and such other and further relief as the Court may deem just and proper;

- Counterplaintiff O'Brian prays for judgment against Counterdefendants in the amount of $150,000, plus earnings, for Counterdefendants' violation of CEP 2 – Involuntary; an amount not less than $322,000 for the value of his 46,000 RSUs; double or treble damages under the Massachusetts Regulation of Business Practice and Consumer Protection Act; treble damages under RICO; interest; attorneys' fees and costs; and such other and further relief as the Court may deem just and proper;

- Counterplaintiff Perrella prays for judgment against Counterdefendants in the amount of $225,000, plus earnings, for Counterdefendants' violation of CEP 2 – Involuntary; an amount not less than $876,764 for the value of his 125,252 RSUs; double or treble damages under the Massachusetts Regulation of Business Practice and Consumer Protection Act; treble damages under RICO; interest; attorneys' fees and costs; and such other and further relief as the Court may deem just and proper;

- Counterplaintiff Piazza prays for judgment against Counterdefendants in the amount of $390,000, plus earnings, for Counterdefendants' violation of CEP 2 – Involuntary; an amount not less than $2,245,348 for the value of his 320,764 RSUs; double or treble damages under the Massachusetts Regulation of Business Practice and Consumer Protection Act; treble damages under RICO; interest; attorneys' fees and costs; and such other and further relief as the Court may deem just and proper;

- Counterplaintiff Rehmer prays for judgment against Counterdefendants in the amount of $390,000, plus earnings, for Counterdefendants' violation of CEP 2 – Involuntary; an amount not less than $1,252,524 for the value of his 178,932 RSUs; double or treble

19-12346-shl   Doc 55-6   Filed 09/05/19   Entered 09/05/19 18:22:01   Exhibit C
Part 4   Pg 41 of 102

damages under the Massachusetts Regulation of Business Practice and Consumer Protection Act; treble damages under RICO; interest; attorneys' fees and costs; and such other and further relief as the Court may deem just and proper;

- Counterplaintiff Reilly prays for judgment against Counterdefendants in the amount of $558,270, plus earnings, for Counterdefendants' violation of CEP 2 – Involuntary; an amount not less than $1,781,269 for the value of his 254,467 RSUs; double or treble damages under the Massachusetts Regulation of Business Practice and Consumer Protection Act; treble damages under RICO; interest; attorneys' fees and costs; and such other and further relief as the Court may deem just and proper;

- Counterplaintiff Rossi prays for judgment against Counterdefendants in the amount of $80,000, plus earnings, for Counterdefendants' violation of CEP 2 – Involuntary; an amount not less than $866,117 for the value of his 123,731 RSUs; double or treble damages under the Massachusetts Regulation of Business Practice and Consumer Protection Act; treble damages under RICO; interest; attorneys' fees and costs; and such other and further relief as the Court may deem just and proper;

- Counterplaintiff Salter prays for judgment against Counterdefendants in the amount of $150,000, plus earnings, for Counterdefendants' violation of CEP 2 – Involuntary; an amount not less than $871,290 for the value of his 124,470 RSUs; double or treble damages under the Massachusetts Regulation of Business Practice and Consumer Protection Act; treble damages under RICO; interest; attorneys' fees and costs; and such other and further relief as the Court may deem just and proper;

- Counterplaintiff Scharfman prays for judgment against Counterdefendants in the amount of $401,577, plus earnings, for Counterdefendants' violation of CEP 2 – Involuntary; an

FILED: NEW YORK COUNTY CLERK 08/13/2018 01:47 PM          INDEX NO. 159781/2014
NYSCEF DOC. NO. 147                                        RECEIVED NYSCEF: 08/13/2018

amount not less than $876,764 for the value of his 125,252 RSUs; double or treble damages under the Massachusetts Regulation of Business Practice and Consumer Protection Act; treble damages under RICO; interest; attorneys' fees and costs; and such other and further relief as the Court may deem just and proper;

- Counterplaintiff Smith prays for judgment against Counterdefendants in the amount of $112,848, plus earnings, for Counterdefendants' violation of CEP 2 – Involuntary; an amount not less than $822,906 for the value of his 117,558 RSUs; double or treble damages under the Massachusetts Regulation of Business Practice and Consumer Protection Act; treble damages under RICO; interest; attorneys' fees and costs; and such other and further relief as the Court may deem just and proper;

- Counterplaintiff Sullivan prays for judgment against Counterdefendants in the amount of $339,049, plus earnings, for Counterdefendants' violation of CEP 2 – Involuntary; an amount not less than $1,904,777 for the value of his 272,111 RSUs; double or treble damages under the Massachusetts Regulation of Business Practice and Consumer Protection Act; treble damages under RICO; interest; attorneys' fees and costs; and such other and further relief as the Court may deem just and proper;

- Counterplaintiff Tishman prays for judgment against Counterdefendants in the amount of $520,000, plus earnings, for Counterdefendants' violation of CEP 1 – Voluntary; an amount not less than $1,409,086 for the value of his 201,298 RSUs; double or treble damages under the Massachusetts Regulation of Business Practice and Consumer Protection Act; treble damages under RICO; interest; attorneys' fees and costs; and such other and further relief as the Court may deem just and proper;

39

FILED: NEW YORK COUNTY CLERK 08/13/2018 01:47 PM
NYSCEF DOC. NO. 147

INDEX NO. 159781/2014

RECEIVED NYSCEF: 08/13/2018

- Counterplaintiff Tobiason prays for judgment against Counterdefendants in the amount of $170,000, plus earnings, for Counterdefendants' violation of CEP 1 – Voluntary; $405,000, plus earnings, for Counterdefendants' violation of CEP 2 – Involuntary; an amount not less than $626,262 for the value of his 89,466 RSUs; double or treble damages under the Massachusetts Regulation of Business Practice and Consumer Protection Act; treble damages under RICO; interest; attorneys' fees and costs; and such other and further relief as the Court may deem just and proper;

- Counterplaintiff White prays for judgment against Counterdefendants in the amount of $900,002, plus earnings, for Counterdefendants' violation of CEP 2 – Involuntary; an amount not less than $2,478,784 for the value of his 354,112 RSUs; double or treble damages under the Massachusetts Regulation of Business Practice and Consumer Protection Act; treble damages under RICO; interest; attorneys' fees and costs; and such other and further relief as the Court may deem just and proper; and

- Counterplaintiff Winaker prays for judgment against Counterdefendants in the amount of $930,000, plus earnings, for Counterdefendants' violation of CEP 2 – Involuntary; an amount not less than $782,824 for the value of his 111,832 RSUs; double or treble damages under the Massachusetts Regulation of Business Practice and Consumer Protection Act; treble damages under RICO; interest; attorneys' fees and costs; and such other and further relief as the Court may deem just and proper.

FILED: NEW YORK COUNTY CLERK 08/13/2018 01:47 PM          INDEX NO. 159781/2014
NYSCEF DOC. NO. 147                                        RECEIVED NYSCEF: 08/13/2018

### JURY DEMAND

Counterplaintiffs demand trial by jury on all issues triable by jury as a matter of right.

Respectfully submitted, this 30th day of January, 2008.

Respectfully submitted,

FOR COUNTERPLAINTIFFS

/s/ Jeffrey L. Liddle
Jeffrey L. Liddle (admitted *pro hac vice*)
jliddle@liddlerobinson.com
James R. Hubbard (admitted *pro hac vice*)
jhubbard@liddlerobinson.com
LIDDLE & ROBINSON, L.L.P.
800 Third Avenue
New York, New York 10022
(212) 687-8500

J. Owen Todd, BBO #499480
jotodd@toddweld.com
Kevin T. Peters, BBO #550522
kpeters@toddweld.com
TODD & WELD LLP
28 State Street
Boston, MA 02109
(617) 720-2626

### CERTIFICATE OF SERVICE

I hereby certify that this First Amended Counterclaim filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on January 30, 2008.

/s/Jeffrey L. Liddle

FILED: NEW YORK COUNTY CLERK 08/13/2018 01:47 PM

INDEX NO. 159781/2014

NYSCEF DOC. NO. 148

19-12346-shl    Doc 55-6    Filed 09/05/19    Entered 09/05/19 18:22:01    Exhibit C

RECEIVED NYSCEF: 08/13/2018

Part 4    Pg 45 of 102

# EXHIBIT J

# LIDDLE & ROBINSON, L.L.P.

about
practice
attorneys
contact
news
settlements
case database
careers
what's new
home

## In The News

2002 Articles · · · · · · · · · · · · · · · · · · · · · · ·

Date: 12/13/2002
THE BOSTON GLOBE
Former Executives Hit Fleet with $140M Claim
· · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · ·

Date: 12/12/2002
The Wall Street Journal
Robertson Band Claims Fleet Owes Bonuses
· · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · ·

Date: 11/11/2002
USNEWS.COM
Lukewarm Reform
· · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · ·

Date: 10/10/2002
THE NEW YORK LAW JOURNAL
WorldCom Executives Sue: Lawsuits Claim Salomon Mishandled Stock Options
· · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · ·

Date: 10/1/2002
THE NEW YORK TIMES
Spitzer Sues Executives of Telecom Companies
· · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · ·

Date: 9/30/2002
THE WALL STREET JOURNAL
Barclays Trader Wins Arbitration
• Read more about this case
· · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · ·

Date: 9/24/2002
REGISTERED REP.
Former Brokers Sue SSB, Grubman, Even Sandy Weill
· · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · ·

Date: 9/22/2002
THE NEW YORK TIMES
In A Broker's Notes, Trouble For Salomon
· · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · ·

Date: 9/21/2002
THE NEW YORK POST
Grubman May Sing
· · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · ·

Date: 8/28/2002
THE NEW YORK TIMES
Ebbers Got Million Shares In Hot Deals
· · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · ·

Date: 8/28/2002
THESTREET.COM
Spinning Salomon Reaps The Whirlwind
· · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · ·

Date: 8/16/2002
THE NEW YORK TIMES

FILED: NEW YORK COUNTY CLERK 08/13/2018 01:47 PM    INDEX NO. 159781/2014

1/23/2015    19-12346-shl    Doc 55-6    Filed 08/06/19    Entered 08/06/19 18:22:01    Exhibit C
NYSCEF DOC. NO. 148                                                        RECEIVED NYSCEF: 08/13/2018
                        Part 4    Pg 47 of 102

After Criticism, A Top Analyst Quits Salomon

Date: 8/13/2002
THE NEW YORK POST
Brokerage Accused of Anti-Semitism
...............................................................

Date: 8/11/2002
THE NEW YORK TIMES
Pressuring Analysts: Hard Habit to Break
...............................................................

Date: 8/5/2002
THE NEW YORK LAW JOURNAL
Author Overreacted To Arbitration Decision
...............................................................

Date: 8/4/2002
THE NEW YORK TIMES
I.P.O. Plums for Titans of Telecom
...............................................................

Date: 8/4/2002
WALL STREET LETTER
Dismissed Pru Broker Served The Stars
...............................................................

Date: 7/19/2002
THE WALL STREET JOURNAL
Salomon IPO Suit Claims Special Accounts Were Used
...............................................................

Date: 7/18/2002
THE NEW YORK TIMES
Lawsuit Says Salomon Gave Special Deals To Rich Clients
...............................................................

Date: 7/18/2002
REGISTERED REP.
The Smoking Gun?
...............................................................

Date: 7/1/2002
REGISTERED REP.
Spartis Dropped From Two Suits
...............................................................

Date: 6/30/2002
WALL STREET LETTER
Top Brokers Ready $60 Million Wrongful Dismissal Claim Against Pru
...............................................................

Date: 6/20/2002
THE NEW YORK TIMES
The Enforcers Of Wall St.? Then Again Maybe Not.
...............................................................

Date: 6/18/2002
REGISTERED REP.
Spartis Cleared In Two WCOM Cases; Attorney Seeks Dismissal of Others
...............................................................

Date: 6/16/2002
BONDWEEK.COM
Veteran BMO Junk Analyst Claims Bankers Interfered With His Research
...............................................................

Date: 6/10/2002
THE WALL STREET JOURNAL
Waddell & Reed Ordered To Pay Most Of Damages

• Read more about this case
...............................................................

Date: 6/8/2002
THE KANSAS CITY STAR
Waddell & Reed loses early challenge of huge punitive award.
• Read more about this case
...............................................................

Date: 6/7/2002
BLOOMBERG
Waddell & Reed to Appeal $26.8 Million Damages Award
• Read more about this case
...............................................................

Date: 5/21/2002
REUTERS.COM
BNP Paribas Fired Ex-Analyst Seeks $100 Mln Damages
...............................................................

Date: 5/19/2002
BONDWEEK.COM
Former BNP Research Head Seeks $100M From BNP Paribas
...............................................................

Date: 4/19/2002
THE NEW YORK LAW JOURNAL
Brokerages Deal With Question of 'Unclean Hands' -By Ethan A. Brecher
...............................................................

Date: 3/1/2002
REGISTERED REP.
Betrayed?
...............................................................

Date: 2/27/2002
THE NEW YORK TIMES
Salomon Analyst Is Sued By Brokers Over Bullish Ratings
• Read more about this case
...............................................................

Date: 2/26/2002
THE WALL STREET JOURNAL
Analysts' Picks of Enron Stock Face Scrutiny
...............................................................

Date: 2/25/2002
REGISTERED REP.
Brokers Sue Salomon Smith Barney and Analyst Jack Grubman
...............................................................

Date: 2/25/2002
REUTERS.COM
Two Former Brokers Sue Salomon, Analyst Grubman
...............................................................

...............................................................
Article Archive: 2005 | 2004 | 2003 | 2002 | 2001 | older than 2001

disclaimer    |    log in

Liddle & Robinson, L.L.P. 800 Third Avenue, 8th Floor New York, N.Y. 10022 Tel: (212) 687-8500 Fax: (212) 687-1505
©2001-2015, Liddle & Robinson, L.L.P. All Rights reserved.

website: Media Focus Associates, Inc., NYC

This is Attorney Advertising. This web site is designed for general information only. The information presented at this site should not be construed to be
formal legal advice nor the formation of a lawyer/client relationship. [ Site Map ] [ Bookmark Us ]

FILED: NEW YORK COUNTY CLERK 08/13/2018 01:47 PM
NYSCEF DOC. NO. 149

INDEX NO. 159781/2014

RECEIVED NYSCEF: 08/13/2018

19-12346-shl    Doc 55-6    Filed 09/05/19    Entered 09/05/19 18:22:01    Exhibit C
Part 4    Pg 50 of 102

# EXHIBIT K

## Jeffrey Liddle

| | |
|---|---|
| **From:** | Craig, Susanne [Susanne.Craig@wsj.com] |
| **Sent:** | Thursday, December 12, 2002 11:42 AM |
| **To:** | Jeffrey Liddle |
| **Subject:** | Delusional Hubris |

Jeff,

Enjoyed your voice mail this morning.  I knew you would like the hubris
comment.  Delusional hubris no less.  Thanks again for the head's up
on
the claim.  Call me when you get a chance,  hearing some rumblings
about
John Conlin, Robbie's ex CEO, that I wanted to run by you.   And I hope
you
are surviving Pittsburgh... Regards, Sue

Susanne Craig
Staff Reporter
The Wall Street journal
200 Liberty Street
New York, NY  10281
212.416.3795

# EXHIBIT L

FILED: NEW YORK COUNTY CLERK 08/13/2018 01:47 PM
NYSCEF DOC. NO. 150
19-12346-shl    Doc 55-6    Filed 09/05/19    Entered 09/05/19 18:22:01    Exhibit C
Part 4    Pg 53 of 102
INDEX NO. 159781/2014
RECEIVED NYSCEF: 08/13/2018

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

MICHAEL BARR,

<em>Plaintiff,</em>

-against-

LIDDLE & ROBINSON, L.L.P. and
JEFFREY L. LIDDLE,

<em>Defendants.</em>

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

Index No. 159781/2014

**EXPERT DISCLOSURE OF
PLAINTIFF PURSUANT TO
CPLR 3101(d)**

   Plaintiff, by and through his attorneys, Garvey Schubert Barer, as for his expert disclosure

pursuant to CPLR § 3101(d), hereby states as follows:

   1.  Plaintiff intends to call Hal R. Lieberman as an expert witness at the time of trial.

   2.  Mr. Lieberman has worked as, among other thi]ngs, a law partner with a practice

focusing on ethics, professional discipline, and legal malpractice and as an adjunct law professor

or visiting lecturer teaching legal ethics at Harvard Law School, Brooklyn Law School, Cardozo

Law School, Fordham Law School and Hofstra Law School. Mr. Lieberman has also served as

the Chair of the New York City Bar Association Committee on Professional Discipline from

2001-2004 and as a member of the New York City Bar Association Committee on Professional

and Judicial Ethics, the Boston Bar Association Ethics Committee, the New York State Bar

Association Committee on Professional Discipline, and the South Brooklyn Legal Services, Inc.

Board of Directors. Mr. Lieberman was also a member of the New York State Commission on

Statewide Attorney Discipline. A true and correct copy of Mr. Lieberman's curriculum vitae is

attached hereto.

FILED: NEW YORK COUNTY CLERK 08/13/2018 01:47 PM
NYSCEF DOC. NO. 150
INDEX NO. 159781/2014
RECEIVED NYSCEF: 08/13/2018
19-12346-shl    Doc 55-6    Filed 09/05/19    Entered 09/05/19 18:22:01    Exhibit C
Part 4    Pg 54 of 102

3.    Mr. Lieberman is expected to testify with a reasonable degree of certainty as to the standard of care applicable to the factors in this case, whether the conduct of defendants deviated from that standard of care, and whether defendants' deviation from the applicable standard of care was the proximate cause of plaintiff's damages.

5.    The substance of the facts and opinions upon which Mr. Lieberman's testimony will be based includes, without limitation, any and all documents produced in this action; the deposition testimony of witnesses in this action; the applicable Rules of Professional Conduct; and his experience as a lawyer, law professor, and member of numerous bar committees and professional organizations concerned with ethics and attorney discipline as detailed in his curriculum vitae.

6.    Plaintiff hereby reserves the right to provide Defendants with subsequently obtained relevant information, and plaintiff hereby further reserves the right to amend or supplement this notice up to and including trial in this matter.

Dated: New York, New York
        July 27, 2018

                                        **GARVEY SCHUBERT BARER**

                                        By: _____
                                             Alan A. Heller, Esq.
                                             *Attorneys for Plaintiff*
                                             100 Wall Street, 20th Floor
                                             New York, New York 10005
                                             (212) 965-4526
                                             aheller@gsblaw.com

TO:    **BRAFF, HARRIS, SUKONECK & MALOOF**
       Attorneys for Defendants
       Michael S. Goldenberg, Esq.
       570 W. Mt. Pleasant Ave.
       Suite 200
       Livingston, New Jersey 07039

FILED: NEW YORK COUNTY CLERK 08/13/2018 01:47 PM

NYSCEF DOC. NO. 150

INDEX NO. 159781/2014

RECEIVED NYSCEF: 08/13/2018

19-12346-shl    Doc 55-6    Filed 09/05/19    Entered 09/05/19 18:22:01    Exhibit C

Part 4    Pg 55 of 102

FILED: NEW YORK COUNTY CLERK 08/13/2018 01:47 PM
INDEX NO. 159781/2014
NYSCEF DOC. NO. 150
RECEIVED NYSCEF: 08/13/2018
19-12346-shl    Doc 55-6    Filed 09/05/19    Entered 09/05/19 18:22:01    Exhibit C
Part 4    Pg 56 of 102

**HAL R. LIEBERMAN**
**35 Prospect Park West, Apt. 10A**
**Brooklyn, NY 11215**

## EDUCATION

J.D.  Harvard Law School, 1967
Editorial Board, *Harvard Civil Rights-Civil Liberties Law Review*, 1966-67

A.B. *cum laude*  University of Chicago, 1964

## BAR ADMISSIONS

New York
Massachusetts
United States Supreme Court
Federal Appeals and District Courts in the First and Second Circuits
Israel Chamber of Advocates

## PROFESSIONAL EXPERIENCE

### *Current Position*

*Partner, 2014 – Present*
Emery Celli Brinckerhoff & Abady LLP
600 Fifth Avenue, 10th Floor
New York, New York 10020
212-763-5031
Website:  hlieberman@ecbalaw.com
Blog:  NYLegalEthics.attorney

Practice focuses on legal ethics, professional discipline, ethics expert witness testimony, malpractice, disqualification motions, sanctions, and law firm disputes

AV rated

### *Previous Positions*

*Partner, 2004 – 2014*
*(Managing Partner of New York Office, 2004 – 2012)*
Hinshaw & Culbertson LLP
New York, NY 10022

*Partner, 2000 - 2004*
Edwards & Angell, LLP
New York, New York

197612

FILED: NEW YORK COUNTY CLERK 08/13/2018 01:47 PM
INDEX NO. 159781/2014
NYSCEF DOC. NO. 150
RECEIVED NYSCEF: 08/13/2018

19-12346-shl    Doc 55-6    Filed 09/05/19    Entered 09/05/19 18:22:01    Exhibit C
Part 4    Pg 57 of 102

*__Previous Positions (cont'd)__*

*Counsel to the Firm,* 1998-2000
Beldock Levine & Hoffman, LLP
New York, New York

*Chief Counsel,* 1989-98
*Principal Trial Attorney,* 1987-89
Departmental Disciplinary Committee
New York Supreme Court, Appellate Division
First Judicial Department

*Assistant Bar Counsel,* 1983-87
Litigation Section, Office of the Bar Counsel
Board of Bar Overseers of the Supreme Judicial Court of Massachusetts

*Litigation Associate,* 1982-83
Cope & Wilson, P.C.
Worcester, Massachusetts

*Executive Director,* 1977-82
Central Massachusetts Legal Services, Inc.
Worcester, Massachusetts

*Associate Appellate Counsel,* 1974-77
Criminal Appeals Bureau
Legal Aid Society of New York City

Various staff positions involving civil legal services to the poor, 1970-74

*__Faculty Positions__*

*Adjunct Professor of Law, 2007, 2014 (Spring semester)*
Columbia University School of Law
    Co-teaching course on *The Legal Profession*

*Adjunct Professor of Law,* 1989-2001
Brooklyn Law School
    *The Legal Profession*   Required course for third year law students

*Visiting Lecturer,* legal ethics and professional discipline, 1983-97
Harvard Law School, Fordham Law School, Hofstra Law School,
Cardozo Law School, New York Law School

*Assistant Professor and Pre-Law Advisor,* 1968-70
North Carolina Central University
Durham, North Carolina

FILED: NEW YORK COUNTY CLERK 08/13/2018 01:47 PM
INDEX NO. 159781/2014
NYSCEF DOC. NO. 150
19-12346-shl    Doc 55-6    Filed 09/05/19    Entered 09/05/19 18:22:01    Exhibit C
RECEIVED NYSCEF: 08/13/2018
Part 4    Pg 58 of 102

*Lecturer on Law* 1968-70
University of North Carolina Graduate School of Social Work
Chapel Hill, North Carolina

## PROFESSIONAL AFFILIATIONS AND *PRO BONO* ACTIVITIES

New York City Bar Association
  Chair, Committee on Professional Discipline (2001 – 2004)
  Member, Committee on Professional and Judicial Ethics (2013 – Present)
Boston Bar Association
  Ethics Committee (2000 – 2004)
New York State Bar Association
  Committee on Professional Discipline (1989-Present)
South Brooklyn Legal Services, Inc.
  Board of Directors (1989 – 2012)
Fellow, The New York Bar Foundation
Federal Bar Council
U.S. District Court, E.D.N.Y.
  Grievance Panel
American Law Institute (elected in 1996)
American Civil Liberties Union
Association of Professional Responsibility Attorneys (APRL)

## ADDITIONAL PROFESSIONAL ACTIVITIES

### *Commission on Statewide Attorney Discipline*

*Appointed a member by Chief Judge Jonathan Lippman, March 2015 - present*
  Commission is conducting a top-to-bottom review of the attorney discipline system
  throughout the state and issuing recommendations on how to reshape attorney discipline
  in New York to ensure fairness, efficiency and effectiveness.

### *Continuing Legal Education*

*Accredited Provider*, 1999 - 2004
Continuing Legal Education Board of New York

Lawline.com, Faculty

### *Alternative Dispute Resolution*

*Founder, Coordinator, Trainer*, 1989 - 1998
Complaint Mediation Panel
Departmental Disciplinary Committee
  The country's first lawyer-client dispute resolution program serving as an adjunct to the
  professional disciplinary system.

*Special Mediator*, 1999 - Present
Complaint Mediation Panel
Departmental Disciplinary Committee

197612

FILED: NEW YORK COUNTY CLERK 08/13/2018 01:47 PM
INDEX NO. 159781/2014

NYSCEF DOC. NO. 150

19-12346-shl    Doc 55-6    Filed 09/05/19    Entered 09/05/19 18:22:01    Exhibit C

RECEIVED NYSCEF: 08/13/2018

Part 4    Pg 59 of 102

## *Expert Testimony and Opinions: Legal Ethics and Professional Responsibility Law*

Provided expert opinions, in the form of live testimony, or testimony by affidavit or declaration, in approximately 45 cases since 1998, including proceedings pending before the Federal courts in New York (S.D.N.Y. and E.D.N.Y.), Florida (M.D. and S.D. of Fla.), the New York State Supreme Court (New York, Queens, Kings, Bronx, Westchester, Rockland, Nassau and Suffolk Cnty.), the Delaware Court of Chancery, and the District Court for the 15th Cir., Florida.

Principal author of N.Y.C. Formal Op. 2000-1.

Within the last four years, I have testified as an expert in five matters:

*Wittels v. Sanford, et al.*, JAMS Arbitration No. 1410006306. In May 2014, I testified as an expert witness for the plaintiff, an attorney. The case is subject to a confidentiality agreement.

*Korff v. Corbett, et al.*, Index No. 601425/03 (Sup. Ct. N.Y. Cnty.). In August 2014, I was deposed as an expert witness for the defendant.

*Cohen v. Cohen, et al.*, Case No.: 09C10230 (LAP) (S.D.N.Y.). In May 2015, I was deposed as an expert witness for the plaintiff.

AAA Case No. 13-194-Y-00669-14. AAA arbitration. In October 2015, I testified as an expert witness for the defendant law firm. The case is under seal.

*Sisca, et al. v. Gizzi, et al.*, Index No. 64451/2014 (Sup. Ct. Westchester Cnty.). In March 2017, I testified as an expert witness for the plaintiffs.

## *Publications*

**NEW YORK ATTORNEY DISCIPLINE: PRACTICE AND PROCEDURE 2014 (New York Law Journal Books/ALM Media 2014); book co-authored with Richard J. Supple and Harvey Prager (updated for 2018)**

"The First Department's New Rules for Attorney Discipline," New York Law Journal, July 28, 2017

"New Rules for Attorney Disciplinary Matters: 'Related Proceedings,'" New York Law Journal, March 20, 2017

"New Rules for Attorney Disciplinary Matters: Informal Proceedings," New York Law Journal, September 29, 2016

"New Rules for Attorney Disciplinary Matters; Formal Proceedings," New York Law Journal, April 1, 2016

"Fostering Efficiency in the Attorney Disciplinary Process," New York Law Journal, January 21, 2016

"New 2016 Edition, New York Attorney Discipline Practice and Procedure," New York Law Journal, November 13, 2015

FILED: NEW YORK COUNTY CLERK 08/13/2018 01:47 PM
INDEX NO. 159781/2014
NYSCEF DOC. NO. 150
19-12346-shl    Doc 55-6    Filed 09/05/19    Entered 09/05/19 18:22:01    Exhibit C
RECEIVED NYSCEF: 08/13/2018
Part 4    Pg 60 of 102

"New York's Catch-All Rule: Is It Needed? Part 2," New York Legal Ethics Reporter, November 2, 2015

"Report on Statewide Attorney Discipline: Uniformity and Fairness," New York Law Journal, October 23, 2015

"New York's Catch-All Rule: Is It Needed? Part 1," New York Legal Ethics Reporter, October 1, 2015

"'Dunn': Collateral Estoppel and Attorney Discipline," New York Law Journal, June 16, 2015

"'Law Firm' Discipline and other Noteworthy Cases," New York Law Journal, February 4, 2015

"Recent Developments in Disciplinary Case Law," New York Law Journal, November 10, 2014

"Is New York's Disciplinary System Truly Broken?" New York Law Journal, July 16, 2014

"Should Disqualification Lead to Discipline?" New York Law Journal, April 4, 2014

"How Do I Get Back My Law License?" New York Law Journal, November 29, 2013

"Lawyers Who Commit Crimes: Disciplinary Consequences," New York Law Journal, August 22, 2013

"Appellate Review of Disciplinary Decisions," New York Law Journal, May 29, 2013

"Discipline for 'Private Conduct': Rationale and Recent Trends," New York Law Journal, Feb. 19, 2013

"New York's Attorney Discipline System: Does It Meet 'Due Process' Requirements?" New York Law Journal, December 28, 2012

"Attorney Discipline System: Does It Meet 'Due Process' Requirements?" New York Law Journal, August 31, 2012

"The 'Galasso' Case and the Duty of Supervision," co-authored with Katie Lachter, New York Law Journal, May 30, 2012

"New York's Attorney Discipline System: How Much 'Process' Is 'Due'?" New York Law Journal, April 4, 2012

"Q&A With Hal R. Lieberman," New York Law Journal, March 25, 2011

"New York's Lawyer Disciplinary System – Is it Fair?" Professional Responsibility column, New York Law Journal, March 1, 2010.

"Working Knowledge of Conflict of Interest Rules is Essential," New York Law Journal, special supplement, p. S7, col. 1, September 27, 2004

"Challenges in Handling Other People's Money," New York Law Journal, special supplement, p. S6, col. 1, November 10, 2003

FILED: NEW YORK COUNTY CLERK 08/13/2018 01:47 PM

NYSCEF DOC. NO. 150

INDEX NO. 159781/2014

19-12346-shl    Doc 55-6    Filed 09/05/19    Entered 09/05/19 18:22:01    Exhibit C

Part 4    Pg 61 of 102

RECEIVED NYSCEF: 08/13/2018

"How to Avoid Common Ethics Problems," New York Law Journal, special supplement, p. S4, col. 1, October 28, 2002

"Private Conduct and Professional Discipline," co-authored with Richard Supple, New York Law Journal, p. 4, col. 3, July 23, 2002

"Six Clients in Search of a Lawyer: Or, Don't Take the Case," The New York Professional Responsibility Report, May, 2002

"Disqualification Denied Again: The Amazonas Case," The New York Professional Responsibility Report, July, 2001

"Prospective Client Perjury: A Lawyer's Dilemma," The New York Professional Responsibility Report, December, 2000

"Do Disbarred Lawyers Have Constitutional Rights?" The New York Professional Responsibility Report, October, 2000

"Be Aware of Ethical Witness Preparation Rules," New York Law Journal, p. 1 col. 1, May 25, 2000

"Gidatex v. Campaniello, The Anti-Contact Rule and Subordinate Employees," The New York Professional Responsibility Report, January, 2000

"Lawyer Incivility Provokes Three-Month Suspension," The New York Professional Responsibility Report, July, 1999

"The Future of Attorney Discipline in New York's First Judicial Department," The New York Professional Responsibility Report, February, 1999

"Does Your Client Have Insurance Coverage?" Liability Update, Winter, 1999

"If William Jefferson Clinton Were Admitted in New York,: "The New York Professional Responsibility Report, November, 1998

"Federal Judicial Conference Considers New Rules of Attorney Conduct," co-authored with Ronald C. Minkoff, New York Law Journal, p. 1, col. 1, October 14, 1998

"Use of Collateral Estoppel in Attorney Disciplinary Proceedings," New York Law Journal, p. 1, col. 1, July 27, 1998

"Lawyer Incivility is Also Unethical," New York Law Journal, p. 1, col. 1, November 15, 1993

"Informal Discipline in the First Department: 1991 Update (Letters of Caution--Part II)," New York Law Journal, p. 1, col. 1, November 27, 1992

"Informal Discipline in the First Department: 1991 Update (Letters of Admonition--Part I)," New York Law Journal, p. 1, col. 1, October 19, 1992

197612

FILED: NEW YORK COUNTY CLERK 08/13/2018 01:47 PM
INDEX NO. 159781/2014

19-12346-shl    Doc 55-6    Filed 09/05/19    Entered 09/05/19 18:22:01    Exhibit C
NYSCEF DOC. NO. 150                                                        RECEIVED NYSCEF: 08/13/2018
Part 4    Pg 62 of 102

"Ethics, Lawyer Misconduct and Sanctions: The Disciplinary Committee Perspective," ALI-ABA Materials for October 17-19, 1991 Course of Study, Hilton Head, South Carolina

"Informal Discipline: Tool to Upgrade Ethics; Part II: Letters of Caution," New York Law Journal, p. 1, col. 1, May 20, 1991

"Informal Discipline: Tool to Upgrade Ethics; Part I: Admonitions," New York Law Journal, p. 1, col. 1, March 22, 1991

"A Lawyer's Duty to Report Misconduct Under DR 1-103(A)," New York Law Journal, p. 1, col. 1, August 21, 1990

"Mandatory *Pro Bono*: Non-Remedy for a Critical Problem," New York Law Journal, p. 1, col.1, January 13, 1989

"Ethical Considerations for Municipal Counsel Representing Multiple Defendants in Section 1983 Litigation," Suffolk University Law School Center for Continuing Professional Development, 1985

"China's Legal System After the Cultural Revolution: Impressions from a Recent Visit," Legal Lines (publication of the Worcester County Bar Association), November, 1981, February, 1982

"Israel's Legal Aid Law: Remedy for Injustice?" A Blueprint for Legal Services in Israel, 9 Israel Law Review 413, #3, July, 1974

"The Legal Significance of the Mental Illness" Criterion in the Civil Commitment Process," 2 NCCU Law Journal 55, 1970

"Recruitment and Training of Minority Students: Challenge for the Legal Profession," Harvard Law School Alumni Bulletin, Summer 1969

"Teachers and the 14th Amendment: The Role of the Faculty in the Desegregation Process," 46 North Carolina Review 313, 1968

### *Production*

*Co-Producer*
Mediation Training Videotape
   Alternative dispute resolution techniques for lawyer/client disputes

### *Media Appearances*

Occasional guest on "Law Lines," a cable television program concerned with all aspects of the judiciary and the legal profession.

### *Panels/Lectures*

*Anatomy of a Disciplinary Hearing*
New York State Bar Association
December 2014

### *Panels/Lectures* (*cont'd*)

*Common Disciplinary Problems and How to Prevent Them*
New York City Bar Association
October, 2014

*Answers to Everyday Ethical Questions*
New York City Bar Center for CLE
June 2014

*Ethics Discipline & Real World Obligations*
New York City Center for CLE
March 2014

*Annual Seminar on Criminal Law and Ethics*
Brooklyn Law School
December, 2010

*Conflicts - - and Beyond!*
Greenberg Traurig/Hoffman Professionalism Center
May, 2010

*Ethical Immigration Strategies in the New Legal Environment*
PLI – 43rd Annual Immigration and Naturalization Institute
April, 2010

*The Future of Attorney Discipline*
Association of Professional Responsibility Lawyers
April, 2010

*Consider Yourself – New York's New Ethics Rules – What You Don't Know Can Hurt You*
American Immigration Lawyers Association – New York Chapter
December, 2009

*You Be The Legal Ethicist*
Federal Bar Council – Fall Bench and Bar Retreat
October, 2009

*Ethics, Discipline and Real World Obligations*
New York City Bar Association
October, 2009

*Ethics: Conflicts, Tripartite Relationships, and New Rules*
Defense Association of New York
June, 2009

*Character and Fitness Panel*
ABA National Conference on Professional Responsibility
May, 2009

FILED: NEW YORK COUNTY CLERK 08/13/2018 01:47 PM
INDEX NO. 159781/2014
NYSCEF DOC. NO. 150
RECEIVED NYSCEF: 08/13/2018
19-12346-shl    Doc 55-6    Filed 09/05/19    Entered 09/05/19 18:22:01    Exhibit C
Part 4    Pg 64 of 102

*Panels/Lectures (cont'd)*

*Introductory Lessons On Ethics and Civility*
New York State Bar Association
April, 2009

*The Ethics of Dealing With Clients' Demands and Demanding Clients*
New York City Bar Association
February, 2009

*Ethics Updates and Disciplinary Issues*
Bronx County Bar Association
January, 2009

*Ethics and Professionalism: Ethical and Unethical Behavior On The Big Screen*
New York State Bar Association
December, 2008

*Staying Out Of Trouble: What Every Attorney Must Know About Ethics*
PLI
December, 2008

*The Disciplinary Process: How It Works*
New York City Bar Association
November, 2008

*Confronting Ethical Issues Arising During Litigation*
New York County Lawyers' Association
October, 2008

*Complying With Ethical Obligations/Dealing With Fraud In The Client Context*
PLI – 41st Annual Immigration and Naturalization Institute
October, 2008

*Ethics, Discipline and Real World Obligations*
New York City Bar Association
April, 2008

*Introductory Strategies On Ethics and Civility In Everyday Lawyering*
New York State Bar Association
April, 2008

*Problems At The "Top" – Who Manages Risk For The Leaders?*
Hinshaw's 2008 Legal Malpractice and Risk Management Conference
February, 2008

*Disciplinary Ethics Update*
Bronx County Bar Association
January, 2008

197612

FILED: NEW YORK COUNTY CLERK 08/13/2018 01:47 PM
NYSCEF DOC. NO. 150
19-12346-shl    Doc 55-6    Filed 09/05/19    Entered 09/05/19 18:22:01    Exhibit C
Part 4    Pg 65 of 102
INDEX NO. 159781/2014
RECEIVED NYSCEF: 08/13/2018

### *Panels/Lectures (cont'd)*

*Ethics and Professionalism*
New York State Bar Association
November, 2007

*Practical Solutions to Routine Ethical Issues*
New York City Bar Association
November, 2007

*Practical Strategies for Avoiding Conflicts*
New York City Bar Association and Suffolk University Law School
June, 2007

*Witness Preparation: Effective Advocacy Consistent With The Obligations of Professional Responsibility*

Federal Bar Council
June, 2007

*Everyday Lessons on Ethics and Civility in Everyday Lawyering*
New York State Bar Association April, 2007

*They're Here!  Are You In Compliance With The New Attorney Advertising Rules?*
*Practical and Ethical Insights*
New York City Bar Association
March, 2007

*Risk Management Employment Considerations in Lawyer Terminations*
Hinshaw's 2007 Legal Malpractice and Risk Management Conference
March, 2007

*Common Ethical Problems*
Queens County Women's Bar Association
January, 2007

*Ethics and the Disciplinary Process: Current Trends in Ethics*
Bronx County Bar Association
January 2007

*IP and Ethics – Recent Developments*
New York State Bar Association – Intellectual Property Law Section
January, 2007

*Ethics and Professionalism*
New York State Bar Association
December, 2006

*Everyday Ethical Challenges in the Practice of Law*
New York City Bar Association
November, 2006

FILED: NEW YORK COUNTY CLERK 08/13/2018 01:47 PM
NYSCEF DOC. NO. 150
INDEX NO. 159781/2014
RECEIVED NYSCEF: 08/13/2018
19-12346-shl    Doc 55-6    Filed 09/05/19    Entered 09/05/19 18:22:01    Exhibit C
Part 4    Pg 66 of 102

### *Panels/Lectures (cont'd)*

*Timely Ethical Issues*
Federal Bar Council Fall Retreat
October, 2006

*The COSAC Report*
Hinshaw's Professional Responsibility and Risk Management Forum
October, 2006

*Renaissance Litigators: Criminal Advocates in Civil Cases*
New York City Bar Association
September, 2006

*Law Firm Discipline: An Assessment of the Threat"*
Hinshaw & Culbertson LLP Roundtable Presentation, June 2006

*Hot Issues in Ethics for the Aviation Practitioner*
ABA Section on Litigation, Aviation Litigation Committee
June, 2006

*Ethics Update for Criminal Defense Lawyers*

New York Criminal Bar Association
May, 2006

*The Disclosure Obligations of Attorneys: The New Frontiers*
Federal Bar Council
May, 2006

*Hot Topics in Legal Ethics: Recent Developments*
New York County Lawyers' Association
May, 2006

*Legal Ethics: The Departmental Disciplinary Committee Process*
7th Civil Affairs Regiment – New York Guard
April, 2006

*Ethics and Civility in Litigation: Introductory Lessons for 21st County Litigators*
New York State Bar Association
April, 2006

*Professional Responsibility – Litigation Ethics*
Hinshaw University
April, 2006

FILED: NEW YORK COUNTY CLERK 08/13/2018 01:47 PM
INDEX NO. 159781/2014
NYSCEF DOC. NO. 150
RECEIVED NYSCEF: 08/13/2018
19-12346-shl    Doc 55-6    Filed 09/05/19    Entered 09/05/19 18:22:01    Exhibit C
Part 4    Pg 67 of 102

### *Panels/Lectures (cont'd)*

*Ethics for Immigration Lawyers*
AILA – New York Chapter
February, 2006

*Ethics, Discipline and Real World Obligations in Law Firm Practice*
New York City Bar Association
January, 2006

*Ethics Overview*
Bronx County Bar Association
January, 2006

*Ethical Issues in Employment and Family-Based Immigration Practice*
American Immigration Lawyers Association
December, 2005

*Dodging the Bullets: Understanding and Voicing the New Threats to Lawyers and Law Firms*
Hinshaw's New York Professional Responsibility and Risk Management seminar
October, 2005

*Things I wish I'd Known When I Became Bar Counsel*
American Bar Association 2005 National Conference on Professional Responsibility,
June, 2005

*Ethics for the Immigration Lawyer*
New York City Bar Association,
March, 2005

*Law Firm Discipline: Vicarious and Supervisory Liability for Disciplinary Violations and White Collar Crime*
Hinshaw's National Legal Malpractice and Risk Management Conference, Chicago, Illinois
February, 2005

*Ethics Overview*
Bronx County Bar Association
January, 2005

*MCLE Marathon – 2004*
Practicing Law Institute
December, 2004

*Experts on Ethics*
The New York Law Journal
December, 2004

*Ethics and Professionalism*
New York State Bar Association
November, 2004

197612

FILED: NEW YORK COUNTY CLERK 08/13/2018 01:47 PM
NYSCEF DOC. NO. 150

INDEX NO. 159781/2014
RECEIVED NYSCEF: 08/13/2018

19-12346-shl    Doc 55-6    Filed 09/05/19    Entered 09/05/19 18:22:01    Exhibit C
Part 4    Pg 68 of 102

*__Panels/Lectures__ (cont'd)*

*Timely Ethical Issues*
Federal Bar Council
November, 2004

*Legal Malpractice, Ethics and Risk Management Seminar*
The Florida Bar Practice Management and Development Section
October, 2004

*Conflicts, Waivers and Billings*
Association of Corporate Counsel of America (Westchester/So. Connecticut Chapter)
September, 2004

*Everyday Ethical Challenges in the Practice of Law*
New York City Bar Association
September, 2004

*What Every Attorney Must Know About Professional Liability Insurance*
New Jersey Institute for Continuing Legal Education
August, 2004

*Ethics for Immigration Lawyers 2004*
Practicing Law Institute
August, 2004

*Bridge The Gap*
New York City Bar Association
June, 2004

*Introduction to Ethics and Civility in Litigation:  What Every Lawyer Must Know*
New York State Bar Association
April, 2004

*Hot Topics in Legal Ethics: Recent Developments*
New York County Lawyers' Association
April, 2004

*Ethics for the Immigration Lawyer*
New York City Bar Association
March, 2004

*Conflicts of Interest*
Fleet Bank – Professional Services Customer Base
March, 2004

*How Solo and Small Firm Lawyers Can Effectively Avoid  Malpractice*
New York County Lawyers' Association
February, 2004

FILED: NEW YORK COUNTY CLERK 08/13/2018 01:47 PM
INDEX NO. 159781/2014
NYSCEF DOC. NO. 150
19-12346-shl    Doc 55-6    Filed 09/05/19    Entered 09/05/19 18:22:01    Exhibit C
RECEIVED NYSCEF: 08/13/2018
Part 4    Pg 69 of 102

*Panels/Lectures (cont'd)*

*Ethics Overview*
Bronx County Bar Association
January, 2004

*Ethics for Business Attorneys*
Practicing Law Institute
December, 2003

*Ethics in Context*
Practicing Law Institute
December, 2003

*Ethics and Professionalism*
New York State Bar Association
December, 2003

*Ethics for Securities Regulators*
Securities & Exchange Commission, Northeast Region
November, 2003

*Ethical Pitfalls for Criminal Lawyers*
New York State Bar Association, October, 2003

*Ethics in a Criminal Case*
Brooklyn Law School, Annual Seminar
October, 2003

*Thorny Ethical Issues in Litigation*
Federal Bar Council
October, 2003

*Defending Disciplinary Proceedings for Attorneys
With Psychological Difficulties*
New York City Bar Association
September, 2003

*Blueprint for Building Your Practice: A Conference
for Solo and Small Firm Practitioners*
New York County Lawyers Association
June, 2003

*Ethics for Litigators*
New York County Lawyers Association
March, 2003

*Ethics and Professionalism on the Big Screen*
New York State Bar Association
January, 2003

197612

**Panels/Lectures (cont'd)**

*Electronic Discovery and Document Retention*
Edwards & Angell, LLP in-house CLE (N.Y., N.J., FL.)
January, February, 2003

*Ethics Overview*
Bronx County Bar Association
January, 2003

*New Developments in Ethical Considerations for the Business Attorney*
Practicing Law Institute
December, 2002

*Legal Ethics: What Every Practicing Lawyer Must Know*
New York City Bar Association
December, 2002

*Hot Topics in Ethics: Recent Developments in New York Ethics Law*
New York County Lawyer's Association
December, 2002

*Introduction to Civility and Ethics in Civil Litigation: What Every Lawyer Should Know*
New York State Bar Association
November, 2002

*Ethical Issues in Legal Services Practice*
Legal Services of New York
November, 2002

*Ethics and Professionalism*
New York State Bar Association
November, 2002

*Ethics for Criminal Lawyers*
Annual Seminar, Brooklyn Law School
October, 2002

*Ethical Challenges in Employment Law*
New York City Bar Association
October, 2002

*Bridge the Gap II for Newly Admitted Attorneys*
Practicing Law Institute
August, 2002

*Handling Client's Money and the Bank*
Asian American Bar Association of New York
July, 2002

197612

FILED: NEW YORK COUNTY CLERK 08/13/2018 01:47 PM
INDEX NO. 159781/2014
NYSCEF DOC. NO. 150
19-12346-shl    Doc 55-6    Filed 09/05/19    Entered 09/05/19 18:22:01    Exhibit C
RECEIVED NYSCEF: 08/13/2018
Part 4    Pg 71 of 102

### *Panels/Lectures (cont'd)*

*Ethics Roundtable*
New York City Bar Association
June, 2002

*The Impact of Enron: Regulatory, Ethical and Practical Issues for Counsel to Insurers, Underwriters, and Financial Institutions*
Practicing Law Institute
April, 2002

*Moderator – The Disciplinary Process (a hypothetical case presentation)*
New York City Bar Association
April, 2002

*Ethics Issues in Intellectual Property Law Practice*

Fordham Law School – 10th Annual Conference on International Intellectual Property Law and Policy
April, 2002

*Symposium on Legal Ethics and Large Law Firms*
Georgetown University Law Center
February, 2002

*Selected Ethical Issues for Commercial Financial Lawyers*
Association of Commercial Financial Attorneys, Inc. (ACFA)
February, 2002

*Ethics Overview*
Bronx County Bar Association
January, 2002

*Bridge the Gap II – What Every New Attorney Must Know About Ethics*
Practicing Law Institute
January, 2002

*Practical Lessons on Ethics for Transactional Attorneys*
New York City Bar Association
December, 2001

*Selected Ethical Issues for Criminal Defense Lawyers*
New York State Association of Criminal Defense Lawyers
Poughkeepsie, New York
November, 2001

*Litigating a Commercial Case-Advanced Issues (Ethics presentation)*
New York State Bar Association
November, 2001

197612

### *Panels/Lectures (cont'd)*

*Current Ethical Issues for Insurance Practitioners*
New York City Bar Association
November, 2001

*Ethics in Insurance Practice for In-House and Outside Counsel*
Practicing Law Institute (PLI)
August, 2001

*Ethics Seminar*
Securities and Exchange Commission – N.E. Regional Office
July, 2001

*Bridge the Gap*
New York City Bar Association
June, 2001

*Annual Corporate & Securities Law Update (Ethics for Transactional Lawyers)*
New York City Bar Association
May, 2001

*Ethics for the Litigator*
New York County Lawyers' Association
April, 2001

*Ethical Issues Facing Young (and not so young) Associates*
New York State Bar Association Committee on Legal Education and Bar Admissions
January, 2001

*Ethics Overview*
Bronx County Bar Association
January, 1999; January, 2000; January, 2001

*Covenants Not To Compete in New York*
Lorman Educational Services
December, 2000

*Ethics and Professionalism*
New York State Bar Association
December, 2000

*Bridge The Gap*
Practicing Law Institute
October and November, 2000; May, 2001; August 2001

*Ethics for Criminal Advocates*
Fordham Law School
November, 2000

197612

FILED: NEW YORK COUNTY CLERK 08/13/2018 01:47 PM
INDEX NO. 159781/2014
NYSCEF DOC. NO. 150
RECEIVED NYSCEF: 08/13/2018
19-12346-shl    Doc 55-6    Filed 09/05/19    Entered 09/05/19 18:22:01    Exhibit C
Part 4    Pg 73 of 102

### *Panels/Lectures (cont'd)*

*Ethical Considerations for Transactional Attorneys*
New York County Lawyers' Association
October, 2000

*Annual Forum on Criminal Law (Ethics Component)*
Brooklyn Law School
October, 1999; October, 2000

*Avoiding Malpractice and Client Grievances*
New York State Bar Association
October, 2000

*ABCs of Civil Litigation*
New York City Bar Association
September, 2000

*Ethics*
10th, 11th, 12th, and 13th Appellate Terms' Educational Seminar, St. Johns University School of
Law 1996-99

*Getting Wired: Practicing Law in the Internet Age*
Ethics Panel, Association of the Bar of the City of New York
October, 1999

*Trademark Law: Ethics Panel Discussion*
The New York Intellectual Property Law Association
September, 1999

*The Ethics Challenge: Issues in Professional Responsibility*
New York County Lawyers' Association
September, 1999

*After Starr Wars, Part II: Lawyers' Roles and Responsibilities in Private Practice and Public
Office*
25th ABA National Conference on Professional Responsibility, La Jolla, California
June, 1999

*Ethics Œ99: An Update on Recent Developments and Guide to Safe Navigation*
Corporate Counsel Section Meeting of the New York State Bar Association, Manchester,
Vermont
May, 1999

*Avoiding Ethical Pitfalls Facing Experienced Practitioners*
Law Journal Seminars
May, 1999

*Real World Ethics and Professionalism*
Practicing Law Institute
February, August, October, November, 1999

197612

FILED: NEW YORK COUNTY CLERK 08/13/2018 01:47 PM
INDEX NO. 159781/2014
NYSCEF DOC. NO. 150
RECEIVED NYSCEF: 08/13/2018

19-12346-shl    Doc 55-6    Filed 09/05/19    Entered 09/05/19 18:22:01    Exhibit C
Part 4    Pg 74 of 102

### *Panels/Lectures (cont'd)*

*Practical Ethics Information and How to Navigate the Disciplinary System*
New York County Lawyers' Association
January, 1999

*Civility and Ethics in Civil Litigation: What Every Lawyer Should Know*
New York State Bar Association
November, 1998; November, 1999

*Serving Clients Well: Avoiding Malpractice and Ethical Pitfalls in the Practice of Law*
Seminar for practicing lawyers in New York's First Judicial Department
Fordham University School of Law
May, 1995; May, 1996; May, 1997; June, 1998

*The Discipline of Law Firms*
ABA Workshop, Chicago, Illinois
May, 1996

*To Be or Not To Be Uncivil*
New York City Bar Association, Small Firm/Solo Practitioner Section
April 1996

*Handling Attorney Escrow Accounts in Real Property Transactions*
New York State Bar Association
November 1995

*Hot Topics in Ethics*
New York Women's Bar Association
March 1995

*New York's First Judicial Department: Intake and Referral of Disciplinary Complaints
Collateral Estoppel*
National Organization of Bar Counsel, Baltimore, Maryland
January 1995

*Trial Publicity and DR 7-107*
The Theodore Roosevelt American Inn of Court
Hofstra Law School, Mineola, New York
March 1993

*Implementing McKay: Mediation as an Alternative to Minor Discipline--New York's Experience*
National Organization of Bar Counsel, meeting in Boston, Massachusetts
February 1993

*In the Clients' Best Interest: Cooperation Among Disciplinary Agencies, Client Protection Funds
and Lawyer Assistance Programs*
ABA Workshop, Palm Beach, Florida
June 1992

FILED: NEW YORK COUNTY CLERK 08/13/2018 01:47 PM
NYSCEF DOC. NO. 150
INDEX NO. 159781/2014
RECEIVED NYSCEF: 08/13/2018
19-12346-shl    Doc 55-6    Filed 09/05/19    Entered 09/05/19 18:22:01    Exhibit C
Part 4    Pg 75 of 102

### *Panels/Lectures (cont'd)*

*Safeguarding Your Practice: Everything You Always Wanted to Know But Were Afraid to Ask About the Disciplinary System*
New York Court Lawyers' Association
April 1992

*Judges and the Disciplinary System*
Address to Supreme Court Justices, Bronx County, New York
April 1992

*Ethics for Corporate Counsel*
Address to Corporate Counsel Section of the Kentucky State Bar, Louisville, Kentucky
March 1992

*Misery, Malpractice and Mail Fraud: Lawyers' Professional Liability in the 1990s*
ALI-ABA Course of Study, Hilton Head Island, South Carolina
October 1991

*Gentile v. Nevada State Bar, Ethical Perspectives*
ABA Workshop, Scottsdale, Arizona
May 1991

*Forum on United States Justice Department's "Thornburgh Memo"*
New York City Bar Association
March 1991

*Legal Ethics Training for Massachusetts Poverty Law Advocates*
Workshop sponsored by Massachusetts Law Reform Institute, Boston, Massachusetts
February 1991

*Ethical Problems Confronting Mental Hygiene Legal Services*
Mental Hygiene Legal Services, Appellate Division, First Department, New York
January 1991

*Legal Ethics: What Every Lawyer Needs to Know*
Practicing Law Institute, New York
October 1990

*Reporting Misconduct*
ABA Workshop, New Orleans, Louisiana
June 1990

*Prosecuting Prosecutors*
ABA Workshop, New Orleans, Louisiana
February 1987

*Prosecutorial Misconduct and Bar Discipline*
Boston University Law School Seminar on the Prosecution Function
Boston, Massachusetts
April 1986

*Panels/Lectures (cont'd)*

*Ethical Considerations for Municipal Counsel Representing Multiple Defendants in Section 1983 Litigation*
Suffolk Law School Symposium, Boston, Massachusetts
April 1986

*Ethics and Government Lawyers*
Symposium sponsored by the MBA Government Lawyers Section
Boston, Massachusetts
March 1986

*How the Bar Discipline System Works in Massachusetts*
Guest lecture, Harvard Law School, Cambridge, Massachusetts
December 1985 and December 1986

*The Proper Disposition of Clients' Funds*
Worcester County Bar Association Symposium, Worcester, Massachusetts
January 1984

*Fair Trial--Free Press*
Staff Symposium, Massachusetts Attorney General's Office, Boston, Massachusetts
August 1983

FILED: NEW YORK COUNTY CLERK 08/13/2018 01:47 PM
NYSCEF DOC. NO. 150

INDEX NO. 159781/2014
RECEIVED NYSCEF: 08/13/2018

19-12346-shl    Doc 55-6    Filed 09/05/19    Entered 09/05/19 18:22:01    Exhibit C
Part 4    Pg 77 of 102

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

MICHAEL BARR,

Index No. 159781/2014

*Plaintiff,*

AFFIDAVIT OF SERVICE

-against-

LIDDLE & ROBINSON, L.L.P. and JEFFREY
L. LIDDLE,

*Defendant.*

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

STATE OF NEW YORK        )
                                             )ss.:
COUNTY OF NEW YORK    )

JENNIFER SY LOPEZ, being duly sworn, deposes and says:

I am employed by the firm of GARVEY SCHUBERT BARER, attorneys for *Plaintiff.* I am not a party to the above action; I am over 18 years of age and reside at Richmond County, New York. On July 27, 2018, I cause to be served the within **EXPERT DISCLOSURE OF PLAINTIFF PURSUANT TO CPLR 3101(d)** by sending a copy by the method indicated below to:

Michael Goldenberg, Esq.                    [X] via First Class Mail
BRAFF HARRIS SUKONECK & MELOOF    [X] via Email
*Attorneys for Defendants*                       [] via Federal Express
570 W. Mt. Pleasant Avenue, Suite 200    [] via USPS Priority Mail
Livingston, New Jersey  07039-0657

Jennifer Sy Lopez

Sworn to before me this
2 7 day of July 2018

Notary Public

ALAN A. HELLER
Notary Public, State of New York
No. 02HE5026529
Qualified in Nassau County
Commission Expires April 18, 20 22

GSB:7371288.3

FILED: NEW YORK COUNTY CLERK 08/13/2018 01:47 PM
NYSCEF DOC. NO. 151

INDEX NO. 159781/2014
RECEIVED NYSCEF: 08/13/2018

19-12346-shl   Doc 55-6   Filed 09/05/19   Entered 09/05/19 18:22:01   Exhibit C
Part 4   Pg 78 of 102

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

MICHAEL BARR,

                          *Plaintiff,*

          -against-

LIDDLE & ROBINSON, L.L.P. and JEFFREY
L. LIDDLE,

                          *Defendants.*

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

**Index No. 159781/2014**

**AFFIDAVIT OF
<u>MICHAEL BARR</u>**

| | |
|---|---|
| **STATE OF NEW YORK** | ) |
| | ) |
| **COUNTY OF NEW YORK** | ) |

      **MICHAEL BARR**, being duly sworn, deposes and says:

      1.      I am the plaintiff in this action and the former Managing Director of Robertson Stephens. I make this Affidavit in support of my cross-motion for summary judgment and in opposition to defendants' motion for summary judgment.

      2.      Unless otherwise stated, I am fully familiar with the facts and circumstances set forth herein.

      3.      On March 13, 2000, I became Managing Director of the mergers and acquisitions group of Robertson Stephens. A copy of my March 2000 employment letter is attached here as **<u>Exhibit A</u>**. The parent company for Robertson Stephens was FleetBoston. For my position as Managing Director, I received an annualized base salary of $200,000. I received a $500,000 bonus, payable in cash as follows: $250,000, payable February 1, 2001; $225,000, payable February 2002; and $125,000 payable in February 2003. In the year 2000, I received a total bonus of approximately $3.9 million.

1

4.       On February 21, 2002, I received a copy of the RSI 2002 Cash Equivalent Plan (the

"CEP"), which set forth that I had earned $1,299,999.84 ("Deferred Compensation"). A copy of

the Cash Equivalent Plan and the February 21, 2002 award is annexed hereto as **Exhibit B**. The

Deferred Compensation was earned by me during 2001 and was guaranteed income to be paid

according to a predetermined vesting schedule

5.       The CEP provided that I would be entitled to the Deferred Compensation plus

interest, calculated applicable to the money market rate. This amount represented my bonus for

2001. This amount vested in two stages – the first vesting, the vesting of the first one-third of the

total amount or $433,333.28, was scheduled to occur on January 1, 2003 and the second vesting,

the vesting of the second two-thirds of the total amount was on January 1, 2004. Subject to Section

7.2 of CEP, Robertson Stephens was to pay my Deferred Compensation as soon as practicable

following the vesting dates. See **Exhibit B**.

6.       The CEP also included a non-disparagement provision in Section 8.1 which stated:

> In the event that, at any time during the six month period
> immediately following any Participant's Termination Date…, the
> Participant…(ii) publicly disparages any member of the RS Group
> or Parent or any of their respective officers, directors, or senior
> executive employees or otherwise makes any public statement that
> is adverse inimical or otherwise materially detrimental to the
> interests of such Persons or individuals, or if the Company or the
> Committee, in its discretion or such officer or officers of the
> Company as the Company may from time to time designate,
> determines that the Participant's actions are adverse to the best
> interests of RS Group or Parent, the Participant shall immediately
> forfeit any rights in respect of any [Deferred Amount or Award
> Amount] that is not Vested and the earnings thereon.

This non-disparagement provision meant that so long as I did not disparage RSI and its Parent

(FleetBoston) or make any public statement that is adverse inimical or otherwise materially

detrimental to the interests of RSI or its Parent for a period of six (6) months following my

Termination Date (which, based on my termination date of July 18, 2002, was January 18, 2003), my Deferred Compensation cannot be forfeited under that provision. This clause also meant that, once vested, the vested portion of my Deferred Compensation could never be forfeited for a violation of Section 8.1 of the CEP. So, for example, once January 1, 2003 passed, no matter what I said about RSI or its Parent after that date, my first vested amount of $433,333.28 could not be lost under that provision.

7.      In July 2002, FleetBoston announced it was closing Robertson Stephens.

8.      On September 18, 2002, FleetBoston sent me a proposed Separation Agreement and Release. In this letter, FleetBoston confirmed that under the 2002 Cash Equivalent Plan $1,299,999.84 was due to me and that, if I signed the proposed release, the entire amount would be paid to me in a lump sum. See **Exhibit C** at page 4 paragraph (B)(2). If I chose not to sign the release, FleetBoston advised in the letter that the Deferred Compensation would still be paid but in accordance with the CEP vesting schedule of one-third on January 1, 2003 and 2/3 on January 1, 2004, "subject to [my] continued compliance with the non-solicitation and non-disparagement provisions of Section 8.1" of the CEP. See **Exhibit C** hereto at p. B-1. I chose not to sign the release because I was to receive my $1,299,999.84 anyway (in accordance with the vesting schedule) and did not want to release other claims I believed I had at that time against RSI.[1]

9.      It was my understanding that the money to be used to pay the Deferred Compensation was segregated and sitting in a separate money market account waiting to be used to pay us. So there was no question that at the end of the day, upon vesting, we would get every

---

[1]      Prior to December 10, 2002, this proposed Separation Agreement and Release was given to Defendants as part of the package of materials I gave them for their review at and around the time Defendants' were engaged to represent me against RSI and FleetBoston.

3

penny. Put another way, I had guaranteed cash sitting in a money market fund waiting for a date to be paid.

10.     In fall 2002, I was part of a group of former employees of Robertson Stephens who consulted with Liddle & Robinson, LLP ("L&R") regarding potential legal action against Robertson Stephens arising from the failure to pay promised and earned bonus compensation from 2001 and 2002. We did not include our Deferred Compensation in this consultation because this compensation was, not contested by RSI or FleetBoston (see Exhibit B and C hereto) and was scheduled for a first vesting on January 1 of the next year.

11.     However, in order for L&R to perform due diligence on its clients, on or about October 2, 2002, I sent L&R a copy of the Separation Agreement and Release, which showed my Deferred Compensation was guaranteed. A copy of the information I forwarded to L&R on October 2, 2002 is attached hereto as **Exhibit D**.

12.     In November 2002, I signed a retainer agreement with L&R. The retainer agreement retained L&R to prosecute claims for "unpaid severance, bonus, deferred compensation, WARN Act notice pay and other compensation and/or employment-related issues". L& R was to be paid a retainer amount plus a percentage of the recovery. The Deferred Compensation under the CEP was not included in the recovery amount in the retainer agreement because it had been guaranteed by FleetBoston and FleetBoston confirmed in writing that it would pay the Deferred Compensation in accordance with the vesting schedule.[2] A copy of the November 2002 retainer agreement is attached here as **Exhibit E**. In fact, when my association with RSI terminated in July, 2002, I was told by FleetBoston human resources that the Deferred Compensation would be paid according to the vesting dates in the CEP. Jeffrey Liddle ("Liddle") was aware that the Deferred

---

[2] See **Exhibit C** hereto.

4

Compensation had been guaranteed by FleetBoston and there was no need to assert a claim for these guaranteed obligations at the time he was engaged.

13.    I have been advised that, in November 2002, Liddle testified that defendants reviewed the CEP, including the non-disparagement clause and vesting provisions.

14.    A statement of claim was filed by L&R on my behalf on December 11, 2002. A copy of the statement of claim is attached here as **Exhibit F**.

15.    On December 12, 2002, an article appeared in the Wall Street Journal regarding our claims against Robertson Stephens entitled "Robertson Band Claims Fleet Owes Some Bonuses". A copy of the Wall Street Journal Article is attached here as **Exhibit G**. The article referenced statements made by Liddle related to the claim. I was extremely surprised when the article was published. At no point in time, was I consulted by defendants about potential press for the claim and at no point in time did I authorize defendants to engage in press related to the claim. Since I had not spoken to anyone at L&R about press coverage, my immediate thought was that the Wall Street Journal had retrieved a copy of the claim from FINRA and published an article after reading the actual filed document. As set forth below, I was wrong. As it turns out, the story was planted by L&R with the Wall Street Journal before the action was filed and, as a result, RSI and FleetBoston invoked section 8.1 of my CEP and canceled my guaranteed Deferred Compensation.

16.    On January 1, 2003, the first one-third of my Deferred Compensation was due to vest. To my surprise, I did not receive my Deferred Compensation.

17.    On May 2, 2003, I received a letter from Robertson Stephens Group, Inc. stating that my Deferred Compensation was canceled "as a result of actions taken in violation of Section 8.1 of the Cash Equivalent Plans, Section 4.6 of the Restricted Unit Plan, and Section 8 of the Restricted Unit Award Agreement". A copy of the May 2, 2003 letter is attached here as **Exhibit**

FILED: NEW YORK COUNTY CLERK 08/13/2018 01:47 PM
NYSCEF DOC. NO. 151

INDEX NO. 159781/2014
RECEIVED NYSCEF: 08/13/2018

19-12346-shl    Doc 55-6    Filed 09/05/19    Entered 09/05/19 18:22:01    Exhibit C
Part 4    Pg 83 of 102

**H**. I had never disparaged Robertson Stephens or its parent company. As it turns out, the alleged disparagement came from L&R when it contacted the Wall Street Journal prior to the filing of the Statement of Claim and delivered a draft copy of the Statement of Claim and two draft press releases containing allegations of "fraud", "omissions", and "breach of fiduciary duty."

18.    On May 13, 2003, I received an update from defendants referencing the May 2, 2003 letter and stating that L&R would be "amending our Statement of Claim in the NYSE arbitration case to add claims based on this most recent effort to deprive our clients of amounts due them". A copy of the May 13, 2003 letter from L&R is attached here as **Exhibit I**. The reason for this amendment to the Statement of Claim was for L&R to recover the Deferred Compensation which was forfeited due to Defendants' unilateral decision to make disparaging statements to the press prior to the filing of the initial Statement of Claim. Had this not happened, my Deferred Compensation would not have been forfeited and an amendment to the Statement of Claim, and subsequent litigation over the forfeited Deferred Compensation, would not have been necessary.

19.    On June 20, 2003, defendants amended the statement of claim to include claims to recover the Deferred Compensation that was forfeited due to Defendants' unilateral conduct. A copy of the amended statement of claim is attached here as **Exhibit J**.

20.    By decision dated September 12, 2007, the NYSE arbitration award was issued. A copy of the FINRA NYSE arbitration award is attached here as **Exhibit K**. It did not include the Deferred Compensation. Arbitrator John Daly dissented in part stating "that he would award Claimants monetary damages representing the value of the deferred compensation plans purportedly forfeited by terms of the letter dated May 2, 2003".

21.    I later learned that defendants had reviewed my CEP prior to December 2002 including the non-disparagement provision and the vesting provisions and had discussed the non-

FILED: NEW YORK COUNTY CLERK 08/13/2018 01:47 PM INDEX NO. 159781/2014

NYSCEF DOC. NO. 151          19-12346-shl   Doc 55-6   Filed 09/05/19   Entered 09/05/19 18:22:01   Exhibit C   RECEIVED NYSCEF: 08/13/2018
Part 4   Pg 84 of 102

disparagement provisions and vesting provisions among themselves when allegedly evaluating their "strategy" for our claims against Robertson Stephens.

22.    I also later learned that defendants had communicated with both the Wall Street Journal and the New York Times about our claims in the NYSE arbitration in advance of filing the Statement of Claim on December 11, 2002 and that these communications included the sending of two press releases; the sending of a draft of the statement of claim; and an invitation to members of the press to discuss the claims personally with Liddle. In the press releases, Defendants disparaged RSI and FleetBoston by claiming that they made "fraudulent representations" and "material omissions" and "breached their fiduciary duties as major shareholders of Robertson Stephens." Again, I was never informed of defendants' plans to communicate with the press; nor was I ever informed in advance or otherwise of the contents of those communications (which was discovered for the first time during this litigation).

23.    I was also never consulted about the potential consequences of such communications given the non-disparagement clause in the CEP and the vesting provisions in the CEP. Had I been informed of these consequences by defendants, I would never have given defendants the authority to speak to the press as I would have never endangered the nearly $1,300,000 in compensation that had been guaranteed by Robertson Stephens.

24.    My attorney in this matter informs me that the draft statement of claim was attorney work product and was therefore confidential. I was never asked if defendants could share this draft pleading with the press or any other third party. I never authorized or gave consent to have the draft pleading shared with the press or any third party.

25.    I also learned after the filing of this lawsuit that even though the Wall Street Journal indicated in December 2002 that there was likely no interest at the Wall Street Journal in publishing

7

an article on the then defunct Robertson Stephens, defendants created the illusion that it would be a Wall Street Journal exclusive in order to push WSJ reporter, Susanne Craig, to publish something.

26.     Lisa Bisaccia was the FleetBoston employee tasked with paying my Deferred Compensation after it vested. I later learned from testimony given by Lisa Bisaccia at both the NYSE arbitration and in this matter that she determined that the Wall Street Journal article and, specifically, Liddle speaking to the press, were the actions that violated the non-disparagement clause in the CEP. Lisa Bisaccia also testified that the reference in the May 2, 2003 letter to a violation of Section 8.1 was a reference to Liddle speaking to the press and the Wall Street Journal article that resulted therefrom and that she was unaware of any other disparagement by me or by someone on my behalf that would have resulted in the forfeiture of my Deferred Compensation.

27.     Like Bisaccia, I know of no disparagement made by me or on my behalf other than the communications by defendants with the press that resulted in the Wall Street Journal article. I am advised that defendants have never provided evidence of disparagement outside of the Wall Street Journal article and the communications by defendants that preceded it.

28.     Following the decision in the arbitration that my Deferred Compensation would not be awarded, defendants attempted to pursue on my behalf and on behalf of the other former Robertson Stephens employees who failed to recover their Deferred Compensation our Deferred Compensation. This pursuit was made in a district court action in Massachusetts and in appeals all the way to a denial of certiorari by the Supreme Court. There is no doubt in my mind that these attempts were merely an attempt for defendants to correct the mistakes they knew they had made so that any recovery I would get would be an offset to the damages sustained as a result of their legal malpractice.

8

29.    To date, I have not received any of my $1,299,999.84 in Deferred Compensation.

WHEREFORE, for the foregoing reasons, it is respectfully requested that defendants"

motion for summary judgment be denied in all respects and that plaintiff's cross-motion for

summary judgment be granted.

MICHAEL BARR

Sworn to before me this
_13_ day of August, 2018

Notary Public

ALAN A. HELLER
Notary Public, State of New York
No. 02HE5026529
Qualified in Nassau County
Commission Expires April 18, 20 22

GSB:9631146.2

9

19-12346-shl    Doc 55-6    Filed 09/05/19    Entered 09/05/19 18:22:01    Exhibit C
Part 4    Pg 87 of 102

# EXHIBIT A



Δ π EXHIBIT 17
Deponent Michael Barr
Date 7/26/16 Rptr CW
WWW.DEPOBOOK.COM

# ROBERTSON
# STEPHENS

March 9, 2000                                          $ P ?

Mr. Michael Barr
190 E. 72nd Street, #23C
New York, NY 10021

Dear Michael:

We are pleased that you have decided to join FleetBoston Robertson Stephens, Inc., ("Robertson
Stephens"). This letter is to confirm the proposed terms of your employment.

For your records, listed below are the highlights of our agreement:

- You will enter the firm as a Managing Director in our Investment Banking Department (Mergers and
  Acquisitions) in our San Francisco or New York office.

- You will begin employment with Robertson Stephens on a mutually agreed upon date. *March 13*

- Robertson Stephens will compensate you at an annualized base salary of $200,000.00, payable
  semimonthly, as well as a $1,800,000.00 cash bonus for the stub period ending December 31, 2000,
  subject to all withholding and employment taxes provided you are employed at the time the bonus is
  paid out in February 2001.

- You will also receive an additional $500,000.00 bonus, payable in cash at the time bonuses are paid
  out as follows: $250,000.00 payable February 2001; $125,000.00 payable February 2002; and
  $125,000.00 payable February 2003. The bonus payouts are subject to all withholding and
  employment taxes provided you are employed at the time the bonus amounts are paid. These
  payments shall not be included in the calculation of your gross compensation and shall not be subject
  to Robertson Stephens' deferment plans.

- For Calendar Year 2000, you will be granted the greater of 0.50 of an Equity Participation Point or
  $1,500,000.00 at the time the payments are made in February 2001.

- You will be entitled to receive the promised total compensation should you be employed at the time
  the bonuses are paid out in February 2001. In the event of a change of control, your 0.50 Equity
  Participation Points will represent 0.50% ownership in the Robertson Stephens Managing Directors'
  Pool.

- In the event your gross compensation from Robertson Stephens for Calendar Year 2000, including
  amounts relating to deferred compensation, does not exceed $5,000,000.00, Robertson Stephens
  shall compensate you at a minimum of $1,500,000.00 for the period ending December 31, 2001,
  including amounts relating to salary, incentive compensation, Equity Participation Points and deferred
  compensation in line with firm policy at the time.

- A portion of your gross compensation for the stub period ending December 31, 2000, which includes
  salary, incentive compensation and Equity Partnership Points shall be deferred based on the greater
  of (i) $875,000, (ii) 25% of your gross compensation or (iii) firm policy.

ENT'D MAR 23 2000

555 CALIFORNIA STREET  SUITE 2600  SAN FRANCISCO  CALIFORNIA  94104  415-781-9700
INVESTMENT BANKERS   MEMBER OF ALL MAJOR EXCHANGES
BANCBOSTON ROBERTSON STEPHENS INC.

RSI00216
CONFIDENTIAL

FILED: NEW YORK COUNTY CLERK 08/13/2018 01:47 PM    INDEX NO. 159781/2014

NYSCEF DOC. NO. 132    19-12346-shl    Doc 55-6    Filed 09/05/19    Entered 09/05/19 18:22:01    Exhibit C    RECEIVED NYSCEF: 08/13/2018

Part 4    Pg 89 of 102

You will be paid the above-described amounts for 2000 even if no longer employed except in the following circumstances: (i) you voluntarily resign or (ii) Robertson Stephens terminates you for cause. For these purposes, cause is defined as (x) gross misconduct in the execution of your professional duties, (y) a willful violation of the securities laws, or (z) conviction of a felony that results in damage to Robertson Stephens' reputation or business.

A relocation package designed to fit your specific needs will be arranged with Lynda Johnson of our Relocation department. Please contact Lynda at 617-526-7403.

Robertson Stephens has a very comprehensive benefits package. Our Human Resources Department will provide you with details upon commencement of your employment. After completing one year of employment, a portion of your compensation will be deferred on a pre-tax basis and contributed directly to your account in the Robertson Stephens Retirement and Savings Plan.

This offer is contingent upon a satisfactory background and reference check which may be conducted in whole or in part by a consumer reporting agency; including but not limited to, education and employment verification. We will need proof of eligibility for employment which complies with the Immigration Reform and Control Act. You are required to present these documents within your first three days of employment. When you join us, you will be required to execute the customary documents acknowledging firm policies, and practices and procedures, including employment "at-will" and arbitration, to the extent permitted by applicable law.

This offer is also contingent upon a favorable report from the NASD regarding any disciplinary actions on record. In compliance with the NASD, all persons engaged in investment banking or securities business are required to be registered with S7 and S63 licenses. If you are not currently registered, you will be required to take and pass the Series 7 and Series 63 Exams (you will be given two opportunities to pass these exams) within three months of your employment. If you fail to obtain these licenses within the given grace period, your employment with Robertson Stephens will be terminated.

Kindly acknowledge your understanding of the above terms by signing and returning the original letter to me. We look forward to your favorable response.

All of us in the Investment Banking Department look forward to working with you and believe that you will find Robertson Stephens to be a challenging and stimulating environment in which to work.

Sincerely,

Eric A. Kaye
Managing Director
Co-Head Mergers and Acquisitions

Accepted on: _3/13_ , 2000    Social Security #: ▮▮▮▮▮

By: _William Bauer_    Driver's License #: ▮▮▮▮▮

Full Name: _Michael Bauer_
(Please print, include middle initial)

FILED: NEW YORK COUNTY CLERK 08/13/2018 01:47 PM
NYSCEF DOC. NO: 153

INDEX NO. 159781/2014

RECEIVED NYSCEF: 08/13/2018

19-12346-shl    Doc 55-6    Filed 09/05/19    Entered 09/05/19 18:22:01    Exhibit C
Part 4    Pg 90 of 102

# EXHIBIT B

FILED: NEW YORK COUNTY CLERK 08/13/2018 01:47 PM    INDEX NO. 159781/2014
NYSCEF DOC. NO. 153    19-12346-shl    Doc 55-6    Filed 09/05/19    Entered 09/05/19 18:22:01    Exhibit C    RECEIVED NYSCEF: 08/13/2018
Part 4    Pg 91 of 102

Case 1:03-cv-10597-EFH    Document 119-4    Filed 06/09/08    Page 1 of 11

CL. Exhibit 94A

)

### ROBERTSON STEPHENS GROUP, INC.
### CASH EQUIVALENT
### DEFERRED COMPENSATION PLAN

**ARTICLE 1.    INTRODUCTION**

Robertson Stephens Group, Inc. hereby establishes the Robertson Stephens Group, Inc. Cash Equivalent Deferred Compensation Plan. The purpose of the Plan is to provide the Company with a method of attracting, retaining and rewarding certain of its key employees, as well as those of its Subsidiaries, by providing them with a vehicle to accumulate capital (on a tax-deferred basis) on the contingent portion of their annual incentive compensation. The Plan is intended to be "a plan which is unfunded and is maintained by an employer primarily for the purpose of providing deferred compensation to a select group of management or highly compensated employees" within the meaning of sections 201(2), 301(a)(3) and 401(a)(1) of ERISA, and shall be administered in a manner consistent with that intent.

**ARTICLE 2.    DEFINITIONS**

As used herein, the masculine pronoun shall include the feminine gender, and the singular shall include the plural, and the plural, the singular, and the following terms shall have the following meanings unless a different meaning is clearly required by the context.

"**Account Record**" means the separate account record for a Participant established pursuant to Section 9.1, which may pass to a Beneficiary pursuant to Article 10.

"**Affiliate**" means, with respect to any person or entity, any other person or entity controlled by, controlling or under common control with such first person or entity.

"**Beneficiary**" means a beneficiary designated in accordance with Article 10.

"**Board**" means the Board of Directors of the Company.

"**Broker/Dealer Operations**" means the assets and equity interests comprising the broker/dealer operations of the Company as of July 1, 2001, together with any assets and equity interests acquired, directly or indirectly, by the Company after July 1, 2001 that are used in or dedicated to such operations.

"**Cause**" means:

(i)    the Participant's dishonesty or fraudulent conduct;

(ii)    the continued failure by the Participant to substantially perform his duties for the member of the RS Group that employs the Participant for more than 30 days after written notice of such failure has been delivered to the Participant by an authorized representative of the Company or such member of the RS Group;

(iii)    the Participant's violation of the material rules or material procedures (including material regulatory policies) of the RS Group or of Parent that have been previ-

REQ: 20
RSI 01577
CONFIDENTIAL

W/598404v7

FILED: NEW YORK COUNTY CLERK 08/13/2018 01:47 PM
NYSCEF DOC. NO. 153
INDEX NO. 159781/2014
RECEIVED NYSCEF: 08/13/2018

19-12346-shl   Doc 55-6   Filed 09/05/19   Entered 09/05/19 18:22:01   Exhibit C
Part 4   Pg 92 of 102

Case 1:03-cv-10597-EFH   Document 119-4   Filed 06/09/08   Page 2 of 11

CL. Exhibit 94A

ously made available to such Participant in writing or on the RS Group intranet that re-sults or is reasonably expected by the Company to result in injury, monetary or otherwise, to the RS Group;

(iv)     material misconduct by the Participant in the performance of his duties for the member of the RS Group that employs the Participant that is or is reasonably ex-pected by the Company to be injurious, monetarily or otherwise, to the RS Group; or

(v)     the Participant's conviction of, or entering a plea of guilty or nolo conten-dere to, a crime of moral turpitude which has caused or is reasonably expected by the Company to result in direct or indirect injury to the RS Group or a crime that constitutes a felony or involves fraud.

Notwithstanding the foregoing, if, as of the Effective Date, the Participant is party to an effective employment agreement that contains a different definition of the term "Cause," the definition in such agreement shall control until such time as the employment agreement expires or is of no further force and effect; thereafter, the definition of "Cause" set forth above will control.

"Change in Control" means a Company Change in Control or a Parent Change in Control, as the case may be. Notwithstanding the foregoing, if, as of the Effective Date, the Participant is party to an effective employment agreement that contains a different definition of the term "Change in Control," the definition in such agreement shall control until such time as the employment agreement expires or is of no further force and effect; thereafter, the definition of "Change in Control" set forth above will control.

"Committee" means the committee designated by the Board to administer the Plan, which, prior to an Initial Public Offering or a Company Change in Control, shall be com-prised of not less than three members of the Board, at least a majority of whom are designated by Parent, or, if there is no such committee, the Board.

"Company" means Robertson Stephens Group, Inc., a Delaware corporation, or any successor thereto.

"Company Change in Control" means the consummation of the first to occur of any of the following events after the Effective Date:

(i)     the merger or consolidation of the Company with or into another entity as a result of which persons or entities that were stockholders of the Company immediately prior to such merger or consolidation do not, immediately thereafter, own, directly or in-directly, equity securities representing more than 50% of the total number of votes that may be cast for the election of directors of the Company;

(ii)     the liquidation or dissolution of the Company, other than a liquidation or dissolution in connection with a Permitted Reorganization;

(iii)     the sale, transfer or other disposition of all or substantially all of the assets of the Company, through one transaction or a series of related transactions, other than any such sale, transfer or other disposition in connection with a Permitted Reorganization;

-2-

REQ: 20
RSI 01578
CONFIDENTIAL

FILED: NEW YORK COUNTY CLERK 08/13/2018 01:47 PM
NYSCEF DOC. NO. 153

INDEX NO. 159781/2014

RECEIVED NYSCEF: 08/13/2018

19-12346-shl    Doc 55-6    Filed 09/05/19    Entered 09/05/19 18:22:01    Exhibit C
Part 4    Pg 93 of 102

Case 1:03-cv-10597-EFH   Document 119-4   Filed 06/09/08   Page 3 of 11

CL. Exhibit 94A

(iv)    the acquisition by any person, entity or "group" (as defined in section 13(d) of the Securities Exchange Act of 1934, as amended) (other than (x) the Company or any of its Subsidiaries, (y) any employee benefit plan of the Company, Parent or any of their respective Subsidiaries or Affiliates or (z) in connection with a Permitted Reorganization) through one transaction or a series of related transactions of beneficial ownership of equity securities of the Company representing the power to vote (A) prior to an Initial Public Offering, 50% or more of the total number of votes that may be cast for the election of directors of the Company or (B) following an Initial Public Offering, 30% or more of the total number of votes that may be cast for the election of directors of the Company; or

(v)    the sale, transfer or other disposition of all or substantially all of the assets of the Broker/Dealer Operations or of the equity securities of Robertson Stephens, Inc. (or any successor thereto), through one transaction or a series of related transactions, to one or more persons or entities that are not Subsidiaries of the Company, including, without limitation, any merger or consolidation of the Broker/Dealer Operations or of Robertson Stephens, Inc. (or any successor thereto) with or into one or more persons or entities that are not Subsidiaries of the Company.

"Contingent Bonus Award" means the portion of a Participant's annual incentive compensation that is not immediately paid and is subject to forfeiture.

"Deferral Date" means the date on which a Deferred Amount for a particular fiscal year is credited to a Participant's Account Record as determined by the Committee, provided that, with respect to 2001 Deferred Amounts, the Deferral Date shall be deemed to be January 1, 2001.

"Deferred Amount" means the portion of a Participant's Contingent Bonus Award that is credited to a Participant's Account Record during a fiscal year as a result of a Participant's election pursuant to Section 5.2, plus, except where the context otherwise requires, amounts attributable (i.e., credited interest or earnings) to amounts deferred under the Plan during such fiscal year. Depending upon the context, "Deferred Amount" may mean the Deferred Amount for a single fiscal year or for two or more fiscal years.

"Effective Date" means the date upon which contributions of Deferred Bonus Awards are first credited to Participants' Account Record under the Plan (as determined by the Committee in its sole discretion).

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended.

"FICA Taxes" means Federal Insurance Contribution Act taxes.

"Good Reason" means, with respect to a Participant, the occurrence of any of the following events during the eighteen-month period following a Change in Control, without the Participant's prior written consent:

REQ: 20
RSI 01579
CONFIDENTIAL

-3-

FILED: NEW YORK COUNTY CLERK 08/13/2018 01:47 PM
NYSCEF DOC. NO. 153

INDEX NO. 159781/2014
RECEIVED NYSCEF: 08/13/2018

19-12346-shl    Doc 55-6    Filed 09/05/19    Entered 09/05/19 18:22:01    Exhibit C
Part 4    Pg 94 of 102

Case 1:03-cv-10597-EFH    Document 119-4    Filed 06/09/08    Page 4 of 11

CL. Exhibit 94A

     (i)    any material adverse change in the Participant's title (except as provided in the parenthetical below) or material adverse change in the Participant's responsibilities from such Participant's title or responsibilities, as the case may be, immediately prior to the Change in Control or immediately prior to such change if more favorable to the Participant, including, but not limited to, the assignment to the Participant of a "co" title or the requirement that the Participant share his responsibilities with another (in each case, only if the Participant had such title or such responsibilities individually prior to such change);

     (ii)    a reduction in the Participant's annual base salary or commission rate or a material reduction in the Participant's annual bonus or long-term incentive compensation opportunities (excluding the opportunity to participate in a leveraged or unleveraged fund or an equity incentive plan to the extent such plan provides for awards of common stock of the Company), in each case, other than any such reduction that is consistent with reductions implemented by the Company with respect to similarly situated employees of the Company or its Subsidiaries to meet the business or competitive needs of the Company and its Subsidiaries;

     (iii)    the relocation of the Participant's workplace to a location that is more than 40 miles from the location of such workplace prior to such relocation;

     (iv)    any material adverse change in the aggregate employee benefits or perquisites available to the Participant, including, without limitation, any material increase in the costs of such benefits to the Participant, other than any such reduction or cost increase that is consistent with reductions or cost increases implemented by the Company with respect to similarly situated employees of the Company or its Subsidiaries meet the business or competitive needs of the Company and its Subsidiaries; or

     (v)    the failure of Parent or the Company to obtain the written agreement of any successor to Parent or the Company to assume and agree to perform the obligations of the Company under the Plan.

Notwithstanding the foregoing, if, as of the Effective Date, the Participant in question is party to an effective employment agreement that contains a different definition of the term "Good Reason," the definition in such agreement shall control until such time as the employment agreement expires or is of no further force and effect; thereafter, the definition of "Good Reason" set forth above shall control.

     "Initial Public Offering" means the consummation of an underwritten public offering of shares of Company common stock, par value $.01 per share, pursuant to an effective registration statement under the Securities Act of 1933, as amended (other than a registration statement on Form S-4 or S-8, or any successor form), following which 10% or more of the issued and outstanding shares of Company common stock are publicly held.

     "Parent" means FleetBoston Financial Corporation, a Rhode Island corporation, or any successor thereto.

REQ: 20
RSI 01580
CONFIDENTIAL

FILED: NEW YORK COUNTY CLERK 08/13/2018 01:47 PM INDEX NO. 159781/2014
NYSCEF DOC. NO. 153    19-12346-shl    Doc 55-6    Filed 09/05/19    Entered 09/05/19 18:22:01    Exhibit C   RECEIVED NYSCEF: 08/13/2018
Part 4    Pg 95 of 102

Case 1:03-cv-10597-EFH    Document 119-4    Filed 06/09/08    Page 5 of 11

CL. Exhibit 94A

"**Parent Change in Control**" means a "Change in Control" of Parent, as such term is defined in the FleetBoston 1996 Long-Term Incentive Plan (as amended), as in effect from time to time, or any successor plan.

"**Participant**" means a key employee who is awarded a Contingent Bonus Award, is selected by the Board as eligible to participate in the Plan with respect to such Contingent Bonus Award and elects to defer all or a portion of such Contingent Bonus Award under the Plan pursuant to Section 5.2.

"**Permanent Disability**" means, with respect to a Participant, a physical or mental condition entitling such Participant to benefits under the long term disability plan of the member of the RS Group that employs the Participant. The Participant's employment shall be deemed to have terminated as a result of Permanent Disability on the date as of which the Participant is first entitled to receive disability benefits under such plan. Notwithstanding the foregoing, if, as of the Effective Date, the Participant is party to an effective employment agreement that contains a different definition of the term "Permanent Disability" (or any derivation of such term), the definition in such agreement shall control until such time as the employment agreement expires or is of no further force and effect; thereafter, the definition of Permanent Disability set forth above will control.

"**Permitted Reorganization**" means a reorganization of the Company with any Subsidiary or Affiliate of Parent, including without limitation, any merger or consolidation of the Company with or into, any sale, transfer or other disposition of all or substantially all of the assets of the Company to, or the consummation of any other similar business combination or transaction with, any such Subsidiary or Affiliate, that (i) is effected solely to change the state of incorporation of the Company, to impose one or more additional holding companies or achieve similar legitimate business objectives of Parent, including, without limitation, to achieve tax or accounting advantages or operating efficiencies, and (ii) does not affect the management or control of the Company or any of its Subsidiaries, the lines of reporting responsibilities or the day-to-day operations of the Company or any of its Subsidiaries.

"**Person**" means any natural person, firm, partnership, limited liability company, association, corporation, company, trust, business trust, governmental authority or other entity.

"**Plan**" means the Robertson Stephens Group, Inc. Cash Equivalent Deferred Compensation Plan as set forth herein and in all subsequent amendments hereto.

"**RIF Termination**" has the meaning set forth in Section 7.3(vii).

"**Retirement**" means, with respect to a Participant, such Participant's retirement from employment with the RS Group at or after (i) the age of 55 and completion of ten years of continuous service or (ii) the age of 62 and completion of five years of continuous service. Notwithstanding the foregoing, if, as of the Effective Date, the Participant is party to an effective employment agreement that contains a different definition of the term "Retirement," the definition in such agreement shall control until such time as the employment agreement expires or is of no further force and effect; thereafter, the definition of Retirement set forth above will control.

"**RS Group**" means collectively the Company and its Subsidiaries.

REQ: 20
RSI 01581
CONFIDENTIAL

FILED: NEW YORK COUNTY CLERK 08/13/2018 01:47 PM
NYSCEF DOC. NO. 153

INDEX NO. 159781/2014

19-12346-shl    Doc 55-6    Filed 09/05/19    Entered 09/05/19 18:22:01    Exhibit C

RECEIVED NYSCEF: 08/13/2018

Part 4    Pg 96 of 102

Case 1:03-cv-10597-EFH    Document 119-4    Filed 06/09/08    Page 6 of 11

CL. Exhibit 94A

"**2001 Deferred Amount**" means a Participant's Deferred Amount with respect to his Contingent Bonus Award awarded in fiscal year 2001 with respect to services performed in fiscal year 2000.

"**Subsidiary**" means, with respect to any Person, each other Person in which the first Person owns or controls, directly or indirectly, capital stock or other ownership interests representing 50% or more of the combined voting power of the outstanding voting stock or other ownership interests of such other Person.

"**Termination Date**" with respect to a Participant, the earlier of (i) the last day of such Participant's active employment with the RS Group for any reason and (ii) the date the member of the RS Group that employs the Participant delivers a notice of the termination of such Participant's employment with the RS Group by such member for any reason.

"**Vested**" means with, respect to a Deferred Amount, that the Participant's rights in respect of all or a portion of such Deferred Amount are no longer subject to forfeiture pursuant to the Plan.

"**Vesting Date**" has the meaning set forth in Section 7.1.

## ARTICLE 3.    ADMINISTRATION

3.1    Committee. The Plan shall be administered by the Committee. The Committee shall have full discretionary authority to interpret the provisions of the Plan and decide all questions and settle all disputes which may arise in connection with the Plan, and may establish its own operative and administrative rules and procedures in connection therewith, provided that such procedures are consistent with the requirements of Section 503 of ERISA and the regulations thereunder. The Committee's authority shall include, without limitation, the exclusive authority to select Participants in the Plan, to determine and establish any limitations or maximum or minimum amounts that a Participant may elect to defer under the Plan and to accelerate the vesting and/or time of payment of any Participant's Deferred Amount. If a provision of the Plan provides that a condition in respect of a Participant's employment or employment agreement must be prevailing as of the Effective Date, the Committee may waive such provision or condition in its discretion with respect to an individual Participant. In no event shall any act of the Committee that is taken with respect to one Participant create any rights or obligations with respect to any other Participant. All interpretations, decisions and determinations made by the Committee shall be binding on all persons concerned. Except as provided in Articles 7 and 8, no action of the Committee may reduce the amount of a Participant's Account Record below the amount of such Account Record immediately before such action. No member of the Committee who is a Participant in the Plan may vote or otherwise participate in any decision or act with respect to a matter relating solely to himself (or to his Beneficiaries). Any authority granted to the Committee may also be exercised by the full Board.

3.2    Indemnification. The Company agrees to indemnify and to defend to the fullest possible extent permitted by law any member of the Committee (including any person who formerly served as a member of the Committee) against all liabilities, damages, costs and expenses (including attorneys' fees and amounts paid in settlement of any claims approved by

REQ: 20
RSI 01582
CONFIDENTIAL

FILED: NEW YORK COUNTY CLERK 08/13/2018 01:47 PM
INDEX NO. 159781/2014
NYSCEF DOC. NO. 153
RECEIVED NYSCEF: 08/13/2018

19-12346-shl    Doc 55-6    Filed 09/05/19    Entered 09/05/19 18:22:01    Exhibit C
Part 4    Pg 97 of 102

Case 1:03-cv-10597-EFH    Document 119-4    Filed 06/09/08    Page 7 of 11

CL. Exhibit 94A

the Company) occasioned by any act or omission to act in connection with the Plan, if such act or omission is in good faith.

## ARTICLE 4.    PARTICIPANTS

The Committee shall select, or shall establish the applicable criteria for determining, the key employees of the RS Group who are eligible to participate in the Plan. When a key employee has been awarded a Contingent Bonus Award in accordance with the bonus award policies and procedures of the Company as established by the Board from time to time and is selected by the Committee as eligible to participate in the Plan with respect to such Contingent Bonus Award, he will be notified by the Committee and given the opportunity to defer all or a portion of such Contingent Bonus Award under the Plan. Eligibility to participate in the Plan with respect to a Contingent Bonus Award awarded in respect of one fiscal year shall not result in or create the implication that a Participant shall be eligible to participate in the Plan with respect to any future Contingent Bonus Awards.

## ARTICLE 5.    DEFERRAL OF COMPENSATION

5.1    Deferral Opportunity. From time to time the Committee shall establish if or to what extent Contingent Bonus Awards under one or more annual incentive bonus programs may be deferred under the Plan.

5.2    Deferral Elections. For each fiscal year in which the Committee determines that Contingent Bonus Awards may be deferred under the Plan, a Participant may irrevocably elect, in accordance with this Article, to defer all or part of his Contingent Bonus Award for the year in which such Contingent Bonus Award is to be awarded. A Participant's election to defer all or part of his Contingent Bonus Award under the Plan must be made prior to the deadline prescribed by the Committee and in accordance with the administrative guidelines established by the Committee.

## ARTICLE 6.    INTEREST OR EARNINGS EQUIVALENT FACTOR

From time to time, the Committee shall determine the interest or earnings equivalent factor that applies to Deferred Amounts made in each fiscal year. The Committee may determine different interest or earnings equivalent factors for Deferred Amounts made in different fiscal years. The earnings equivalent factor for 2001 Deferred Amounts shall be the rate of return equal to the amount that would be received if the 2001 Deferred Amount had been invested in the Alliance Money Reserves, a money market mutual fund that fluctuates, beginning on January 1, 2001 (the Deferral Date for 2001 Deferred Amounts). The RS Group is not required to make corresponding investments in order to fund the payment of Deferred Amounts under the Plan.

## ARTICLE 7.    VESTING; DISTRIBUTION; EFFECT OF TERMINATION OF EMPLOYMENT

7.1    Vesting. Deferred Amounts will vest and become nonforfeitable in three equal annual installments commencing on the applicable Deferral Date and ending on the third anniversary thereof (each of the first, second and third anniversaries of the applicable Deferral

REQ: 20
RSI 01583
CONFIDENTIAL

FILED: NEW YORK COUNTY CLERK 08/13/2018 01:47 PM
NYSCEF DOC. NO. 153

INDEX NO. 159781/2014
RECEIVED NYSCEF: 08/13/2018

19-12346-shl   Doc 55-6   Filed 09/05/19   Entered 09/05/19 18:22:01   Exhibit C
Part 4   Pg 98 of 102

Case 1:03-cv-10597-EFH   Document 119-4   Filed 06/09/08   Page 8 of 11

CL. Exhibit 94A

Date, a "Vesting Date", so for 2001 Deferred Amounts the Vesting Dates are January 1, 2002, 2003 and 2004), subject to the continued employment of the Participant on each such Vesting Date, except as otherwise provided in Section 7.3 hereof. The portion of a Participant's Deferred Amount that Vests as of any Vesting Date shall be nonforfeitable.

7.2   Distributions. As soon as reasonably practicable following a Vesting Date, each Participant shall receive a payment equal to the amount of such Participant's Vested Deferred Amount and any earnings on (i) the portion of the Participant's Deferred Amount that Vested on such Vesting Date and (ii) any unvested Deferred Amount.

7.3   Effect of Termination of Employment.

(i)   *By the Participant Voluntarily.* If a Participant terminates his employment with RS Group voluntarily, the Participant will forfeit all Deferred Amounts that are not Vested and earnings thereon that are not payable, in each case as of the Participant's Termination Date.

(ii)   *By the Participant for Good Reason.* If a Participant terminates his employment with RS Group for Good Reason, the Participant's Deferred Amount will continue to vest and earnings thereon will continue to be paid following a Participant's Termination Date, in accordance with the vesting schedule set forth in Section 7.1 above.

(iii)   *By the Participant due to Permanent Disability or Retirement.* If a Participant's employment is terminated due to the Participant's Permanent Disability or Retirement, the Participant's Deferred Amount will continue to vest and earnings thereon will continue to be paid following a Participant's Termination Date, in accordance with the vesting schedule set forth in Section 7.1 above, subject to the Participant's continued compliance with the "Post-Termination Forfeiture Provisions" described in Article 8 below.

(iv)   *Due to the Participant's Death.* If a Participant's employment is terminated due to the Participant's death, the Participant's Deferred Amount will become fully Vested and earnings thereon will become fully payable as of the date of the Participant's death and be distributed in accordance with Article 10 hereof.

(v)   *By the RS Group with Cause.* If a Participant's employment is terminated by the RS Group for Cause, the Participant will forfeit all Deferred Amounts that are not Vested and earnings thereon that are not payable, in each case as of the Participant's Termination Date.

(vi)   *By the RS Group without Cause within Eighteen Months after a Change in Control.* If a Participant's employment is terminated by the RS Group without Cause and the Participant's Termination Date occurs during the eighteen month period after a Change in Control, the Participant's Deferred Amount will continue to vest and earnings thereon will continue to be paid following the Participant's Termination Date, in accordance with the vesting schedule set forth in Section 7.1 above.

REQ: 20
RSI 01584
CONFIDENTIAL

-8-

FILED: NEW YORK COUNTY CLERK 08/13/2018 01:47 PM    INDEX NO. 159781/2014
NYSCEF DOC. NO. 153    19-12346-shl    Doc 55-6    Filed 09/05/19    Entered 09/05/19 18:22:01    Exhibit C    RECEIVED NYSCEF: 08/13/2018
Part 4    Pg 99 of 102

Case 1:03-cv-10597-EFH    Document 119-4    Filed 06/09/08    Page 9 of 11

CL. Exhibit 94A

(vii)    *By the RS Group without Cause in a Reduction in Force.* If a Participant's employment has been terminated by the RS Group due solely to a determination by the RS Group to reduce the size of its workforce generally or specifically in respect of any line of business and not due to any cause relating to the performance of the Participant (a "RIF Termination"), the Participant's Deferred Amount will continue to vest and earnings thereon will continue to be paid following a Participant's Termination Date, in accordance with the vesting schedule set forth in Section 7.1 above, subject to the Participant's continued compliance with the "Post-Termination Forfeiture Provisions" described in Article 8.

## ARTICLE 8.    POST-TERMINATION FORFEITURE PROVISIONS

8.1    Restrictions and Forfeiture. In the event that, at any time during the six month period immediately following any Participant's Termination Date (other than any such Termination Date occurring due to a termination of employment within eighteen months following a Change in Control by the Participant for Good Reason or by the RS Group without Cause), the Participant (i) solicits for employment, employs or otherwise retains the professional services of any individual who is then employed by or otherwise engaged to perform services (other than a person performing secretarial or similar services) for any member of the RS Group or who, to the Participant's knowledge, was so employed or retained at any time during the six month period preceding such solicitation, employment or retention or (ii) publicly disparages any member of the RS Group or Parent or any of their respective officers, directors or senior executive employees or otherwise makes any public statement that is adverse, inimical or otherwise materially detrimental to the interests of such Persons or individuals, or if the Company or the Committee, in its discretion, or such officer or officers of the Company as the Company may from time to time designate, determines that the Participant's actions are adverse to the best interests of the RS Group or Parent, the Participant shall immediately forfeit any and all rights in respect of any Deferred Amount that are not Vested and the earnings thereon.

8.2    Remedies Not Exclusive; Blue Pencil. The remedies set forth above shall not serve to limit or preclude any other remedies that the Company or Parent may seek, whether in law or equity, including without limitation injunctive relief, in the event of a breach or threatened breach of the restrictions in Section 8.1, and the Participant acknowledges that damages would be inadequate and insufficient. With respect to any provision of Section 8.1 finally determined by a court of competent jurisdiction or arbitration panel to be unenforceable, the Participant, the Company and Parent hereby agree that a court or an arbitration panel shall have jurisdiction to reform any provision of Section 8.1 so that it is enforceable to the maximum extent permitted by law, and the Participant, the Company and Parent agree to abide by court's or arbitration panel's determination. If any of the covenants of Section 8.1 are determined to be wholly or partially unenforceable in any jurisdiction, such determination shall not be a bar to or in any way diminish the rights of the Company or Parent to enforce any such covenant in any other jurisdiction.

## ARTICLE 9.    PARTICIPANT ACCOUNTS

9.1    Establishment of Account Records. The Committee shall establish a separate Account Record for each Participant reflecting the amounts due the Participant under the

REQ: 20
RSI 01585
CONFIDENTIAL

FILED: NEW YORK COUNTY CLERK 08/13/2018 01:47 PM
NYSCEF DOC. NO. 153

INDEX NO. 159781/2014

19-12346-shl   Doc 55-6   Filed 09/05/19   Entered 09/05/19 18:22:01   Exhibit C
Part 4   Pg 100 of 102

RECEIVED NYSCEF: 08/13/2018

Case 1:03-cv-10597-EFH   Document 119-4   Filed 06/09/08   Page 10 of 11

CL. Exhibit 94A

Plan and shall cause the Company to establish on its books Account Records reflecting the Company's obligation to pay Participants the amounts due under the Plan.

9.2   Adjustments to Account Records. From time to time the Committee shall adjust each Participant's Account Record to credit (i) a Participant's Deferred Amount as elected under Article 5 and (ii) amounts based on the applicable interest or earnings equivalent factor determined under Article 6. A Participant's Account Record shall continue to be adjusted under this Article 9 until the entire amount credited to the Account Record has been paid to the Participant or his Beneficiary.

ARTICLE 10.   BENEFICIARY BENEFITS

A Participant, on a form approved by the Committee, may designate a Beneficiary, or change any prior designation, to receive the remaining balance of his Account Record upon his death. Payments to a Beneficiary under this Article 10 shall be made in a lump sum, commencing as soon as reasonably practicable following the Participant's death. If no Beneficiary is designated (or if a designated Beneficiary does not survive the Participant), the balance credited to the Participant's Account Record shall be paid to the Participant's estate in a lump sum as soon as reasonably practicable following receipt of notice of the Participant's death.

ARTICLE 11.   NATURE OF CLAIM FOR PAYMENTS

The right of the Participant to receive payments under the Plan shall be only that of an unsecured creditor against the assets of the Company and payments under the Plan shall be made solely from the assets of the Company. The Participant shall not have any right to any specific assets of the RS Group or Parent by virtue of the Plan.

ARTICLE 12.   ASSIGNMENT OR ALIENATION

The interest hereunder of any Participant or Beneficiary shall not be alienable, without the prior consent of the Committee, by the Participant or Beneficiary by assignment or any other method and will not be subject to being taken by his creditors by any process whatsoever, and any attempt to cause such interest to be so subjected shall not be recognized.

ARTICLE 13.   NO CONTRACT OF EMPLOYMENT

The Plan shall not be deemed to constitute a contract of employment between the RS Group and any Participant or to be consideration for the employment of any Participant.

ARTICLE 14.   AMENDMENT OR TERMINATION OF PLAN

The Plan may be amended or terminated in writing by the Committee in any manner at any time. Notwithstanding the previous sentence, no such amendment or termination shall reduce the amount of a Participant's Account Record or his distribution rights related thereto as determined under the provisions of the Plan in effect immediately prior to such amendment or termination.

REQ: 20
RSI 01586
CONFIDENTIAL

-10-

FILED: NEW YORK COUNTY CLERK 08/13/2018 01:47 PM          INDEX NO. 159781/2014
NYSCEF DOC. NO. 153    19-12346-shl   Doc 55-6   Filed 09/05/19   Entered 09/05/19 18:22:01   Exhibit C   RECEIVED NYSCEF: 08/13/2018
Part 4   Pg 101 of 102

Case 1:03-cv-10597-EFH   Document 119-4   Filed 06/09/08   Page 11 of 11

CL. Exhibit 94A

### ARTICLE 15.   GOVERNING LAW

This Plan shall be governed and construed in accordance with the laws of the State of Delaware, without regard to any applicable conflicts of law.

### ARTICLE 16.   TAX WITHHOLDING

16.1   Generally.  The Company may withhold from any amounts payable under this Plan such Federal, state, local or foreign taxes as shall be required to be withheld pursuant to any applicable law or regulation.

16.2   Social Security Tax.  Subject to the requirements of section 3121(v)(2) of the Internal Revenue Code of 1986, as amended, and the regulations thereunder, the Committee has the full discretion and authority to determine when FICA Taxes on a Participant's Plan benefits are paid and whether any portion of such FICA Taxes shall be withheld from the Participant's wages or deducted from the Participant's Account Record.

### ARTICLE 17.   MISCELLANEOUS

17.1   Notices.  Each Participant shall be responsible for furnishing the Company with the current and proper address for the mailing of notices and payments under the Plan. Any notices required or permitted to be given shall be deemed given if directed to the person to whom addressed at such address (and if no address is furnished by the Participant, at the last known address of such Participant as reflected in the Company's records) and mailed by regular United States mail, first-class and prepaid. If any item mailed to such address is returned as undeliverable to the addressee, mailing will be suspended until the Participant furnishes the proper address.

17.2   Severability of Provisions.  If any provision of this Plan shall be held invalid or unenforceable, such invalidity or unenforceability shall not affect any other provisions hereof, and this Plan shall be construed and enforced as if such provision had not been included.

17.3   Headings and Captions.  Headings and captions in this Plan are inserted for convenience of reference only and the Plan is not to be construed by the interpretation thereof.

REQ: 20
RSI 01587
CONFIDENTIAL

-11-

 **Robertson Stephens**

February 21, 2002

Michael Barr
Investment Banking
New York, NY

You have been awarded the following:

## CASH AWARD

A cash bonus of $125,000.00 to be paid by check on February 28, 2002.

## MONEY MARKET ACCELERATION

An accelerated vesting of your remaining interest in the 2000 Cash Equivalent Plan, in the amount of $626,773.26 (plus accrued interest from January 1, 2002, through February 28, 2002) to be distributed by check on February 28, 2002.

In addition, you will receive:

## NON-CASH AWARD

A $1,299,999.84 interest in the Robertson Stephens, Inc. 2002 Cash Equivalent Plan. Subject to your continued employment with Robertson Stephens on the applicable vesting dates, one-third of the award will vest on January 1, 2003, and two-thirds will vest on January 1, 2004. The terms of the award will be governed by a plan document to be provided shortly. A beneficiary designation form will accompany the plan documentation. Please complete the beneficiary designation form and return it to Human Resources.

Barr-001636