19-12346-shl    Doc 55-7    Filed 09/05/19    Entered 09/05/19 18:22:01    Exhibit C
Part 5    Pg 1 of 99

# EXHIBIT C

FILED: NEW YORK COUNTY CLERK 08/13/2018 01:47 PM
NYSCEF DOC. NO. 154

19-12346-shl    Doc 55-7    Filed 09/05/19    Entered 09/05/19 18:22:01    Exhibit C
Part 5    Pg 2 of 99

INDEX NO. 159781/2014

RECEIVED NYSCEF: 08/13/2018

**Separation Agreement and Release**
**Personal and Confidential**

**September 18, 2002**

**Michael Barr**
**P.O. Box 626**
**Water Mill, New York  11976**

Dear Michael Barr:

As you were formally notified on July 17, 2002, the business operations of Robertson Stephens Group, Inc. and its subsidiaries ("Robertson Stephens") are being wound down, and you are included in the resulting reduction in staff.

In accordance with the provisions of the federal Worker Adjustment and Retraining Notification Act ("WARN") and any applicable state or local laws dealing with plant closings, work location closings, and/or mass layoffs, you were informed that your separation from Robertson Stephens you were informed that your separation from Robertson Stephens was part of a plant closing at your Robertson Stephens work location at 1633 Broadway, New York, New York 10019.  This is a "plant closing" as defined by WARN.  The permanent closing of this entire work location began on July 12, 2002 and is expected to continue until December 31, 2002  There are no bumping rights with this reduction in force.

On that same day, July 17, 2002 (your "Separation Date"), your active employment with Robertson Stephens ended, your sixty-day notice period as provided for by WARN commenced and, unless otherwise notified by Robertson Stephens, you are not required to perform any active duties of employment or report to work during this sixty-day period.

As you were further informed, at the end of your sixty-day notice period, your employment with Robertson Stephens will immediately terminate, and, subject to your signing this letter agreement, you will be eligible to receive a special payment of $16,500 (the "Special Payment") and the other benefits in accordance with the terms described in Section II of this letter agreement.  Since you are a party to an employment letter dated March 9, 2000 (the "Employment Letter") that provides for one additional guaranteed payment of $125,000 (the "Guarantee"), you are not eligible to receive separation benefits under the Amended and Restated Separation Pay Plan for Robertson Stephens (the "Separation Plan").  You are entitled to the Guarantee under your Employment Letter, whether or not you sign this letter agreement.

Section I of this letter agreement outlines what will occur with respect to your salary and benefits continuation during the sixty-day notice period.  You are entitled to receive the salary and benefits continuation described in Section I of this letter agreement whether or not you sign and return this letter agreement.

Section II of this letter agreement outlines the terms of the Special Payment and the terms of certain other benefits that you will be entitled to if you agree to the terms and conditions of this letter agreement, including your agreement to be bound by the release of claims in favor of Robertson Stephens, FleetBoston Financial Corporation ("FleetBoston") and their respective affiliates, subsidiaries, predecessors, successors and assigns as set forth in Section II(G) of this letter agreement. You have fourteen (14) days to consider Robertson Stephens' offer under this letter agreement and to return a signed copy of this letter agreement to Robertson Stephens Human Resources, Attn: Laura Kraus, 555 California Street Suite 2600, San Francisco, CA 94104.

Exhibit A to this letter agreement sets forth your Special Payment, the Guarantee under your Employment Letter and the other benefits that you may have as a participant in certain Robertson Stephens and FleetBoston plans.

Exhibit B to this letter agreement generally describes your rights and obligations under the compensation and benefit plans that were generally available to active employees of Robertson Stephens, as they exist if you do not sign this letter agreement.

In order to receive the Special Payment and benefits in accordance with the terms of Section II below, you must sign and return this letter agreement to Robertson Stephens, pursuant to which you are agreeing to release the "Released Parties" (as defined in Section II(G)(1) below) from any claims that you have or think you may have in connection with your employment with Robertson Stephens and its affiliates and under the Employment Letter and compensation and benefit plans in which you were eligible to participate as an active employee of Robertson Stephens. By signing this letter agreement, you are also agreeing (1) that the amounts and benefits set forth on Exhibit A hereto are correct and acknowledge that you are not entitled to, and will not receive, anything more than those amounts and benefits, (2) to the payment of such amounts and treatment of such benefits as described on and in accordance with Exhibit A hereto, and (3) all amounts and benefits to which you are entitled under your Employment Letter have been satisfied in full.

**Section I.     Information Regarding Sixty-Day Notice Period**

Please note, the information provided in Section I of this letter agreement relates to the sixty-day notice period and is applicable regardless of whether you sign and return this letter agreement.

**(A)     Salary Continuation:**

As noted above, your sixty-day notice period will be a non-working period, during which time you will continue to receive your base salary (excluding any other form of compensation other than shift differential pay), but, unless otherwise notified by Robertson Stephens, you will not be required to report to work or perform any active duties of employment. During this sixty-day notice period your base salary will be paid in accordance with the regular payroll practices of Robertson Stephens, and it will be subject to regular payroll tax withholdings for local, state, federal and FICA taxes and for authorized deductions for benefit coverage as set forth below in

Barr-000121

18-12346-shl    Doc 55-7    Filed 09/05/19    Entered 09/05/19 18:22:01    Exhibit C
Part 5    Pg 4 of 99

Sections I(B) through I(D). You will not earn any salary increases, bonus, commissions or other incentive compensation, during this sixty-day notice period.

**(B)    Group Insurance Continuation:**

If you participated in the Robertson Stephens group healthcare, life or long-term disability plans prior to your Separation Date, then during your sixty-day notice period Robertson Stephens shall provide you with continued coverage under Robertson Stephens' medical, dental, vision, life and long-term disability insurance benefit plans or any successor insurance benefit plans, on the terms available to active employees generally as in effect from time to time and in accordance with the applicable plan documents.

On the last day of the month in which your sixty-day notice period expires, your group healthcare benefit coverage will terminate. You may elect to extend coverage of healthcare benefits for an additional eighteen (18) months in accordance with the provisions of COBRA by paying 102% of the applicable group rate for coverage. Prior to or shortly after the expiration of your sixty-day notice period, you will be sent the information and enrollment materials necessary for you to continue your healthcare under COBRA.

**(C)    Healthcare and Dependent Day Care Reimbursement Accounts:**

Your participation in the Robertson Stephens Healthcare and Dependent Day Care Reimbursement Account programs will continue during your sixty-day notice period, on the terms available to active employees generally as in effect from time to time and in accordance with the applicable plan documents.

At the end of your sixty-day notice period, your participation in the Robertson Stephens Healthcare and Dependent Day Care Reimbursement Account programs will cease. Thereafter, you may continue to participate in the Healthcare Reimbursement Account program, as provided under COBRA, by continuing to make your contributions with after-tax money. Prior to or shortly after the expiration of your sixty-day notice period, you will be sent the information and enrollment materials necessary for you to continue your healthcare spending account under COBRA.

**(D)    Robertson Stephens Retirement and Savings Plan:**

Your participation in the Robertson Stephens Retirement and Savings Plan (the "Retirement and Savings Plan"), or any successor plan thereto, will continue during your sixty-day notice period in accordance with the terms of the Retirement and Savings Plan generally applicable to active employees. As such, subject to the terms of the Retirement and Savings Plan, your contributions to the Retirement and Savings Plan will continue to be deducted from your paychecks during the sixty-day notice period. You may not elect a distribution of your Retirement and Savings Plan account until the end of your sixty-day notice period.

Barr-000122

(E)    **Vacation**:

You will continue to accrue vacation time during your sixty-day notice period in accordance with the current vacation policy. You will receive payment for any accrued but unused vacation time at the end of your sixty-day notice period.

(F)    **Your Obligations During the 60-Day Notice Period**:

Although you are not actively at work at Robertson Stephens during the 60-day notice period, you will continue to be bound by the Robertson Stephens and FleetBoston policies and procedures that applied to you as an active employee, including Robertson Stephens' document retention guidelines.

**Section II.    Special Payment and Other Benefits**

Section II of this letter agreement contains the terms applicable to your receipt of the Special Payment and certain other benefits. In order for you to receive the Special Payment described in Section II(A) and the benefits described in Section II(B), you must sign and return this letter agreement to Laura Kraus at the address and by the deadline set forth in the last paragraph of this letter agreement (a stamped and addressed envelope has been included for this purpose).

(A)    **Special Payment**:

Subject to your execution and compliance with the terms of this letter agreement, you will receive the Special Payment, less the reductions and offsets described below in this Section II(A). The Special Payment will be offset by any advances, expenses, imputed income on forgiven loans, unforgiven loans, tax withholding on deferred amounts and unvested investment interests, claims for damages or other monies that you owe to Robertson Stephens, which amounts, if any, are set forth on Exhibit A hereto and called "Offsets." In the event, following the date hereof, Robertson Stephens becomes aware of additional amounts owed by you to Robertson Stephens, such amounts will be offset from your Special Payment and will be deemed to be "Offsets." You hereby consent to the Offsets described herein. Applicable payroll deductions, such as deductions for local, state, federal and FICA taxes will also be withheld from your Special Payment.

(B)    **Other Benefits**:

(1)    Outplacement Services. Robertson Stephens will provide you with outplacement services in accordance with the applicable policy, as detailed on the information sheet attached to this letter agreement. All questions on outplacement services should be directed to Laura Kraus.

(2)    2002 Cash Equivalent Plan: Your unpaid and unvested "Award Amount" under the 2002 Cash Equivalent Plan is set forth on Exhibit A attached hereto (the "2002 Award Amount"). Your 2002 Award Amount with calculated interest through the expiration of your sixty-day notice period will be paid in a lump sum at the same time as your Separation Payment is paid. Receiving an immediate lump sum payment is not required by the terms of the 2002

Barr-000123

19-12346-shl    Doc 55-7    Filed 09/05/19    Entered 09/05/19 18:22:01    Exhibit G
Part 5 / Pg 6 of 99

Cash Equivalent Plan, which provides that your 2002 Award Amount would continue to vest, accrue interest and be paid in accordance with the regular vesting schedule under such Plan, subject to your continued compliance with the non-solicitation and non-disparagement provisions in such Plan. As such, your receipt of a lump sum payment constitutes an additional benefit to you. See Exhibit B for a description of the terms of payment of your 2002 Award Amount if you decide not to enter into this letter agreement.

(3)    Other Compensation and Benefit Plans: If you accept (x) the Special Payment, the outplacement services and the immediate payment of the 2002 Award Amount, and (y) agree to the release of claims set forth in Section II(G) of this letter agreement, you will also be agreeing to the amounts and terms of payment (or other treatment) described on Exhibit A with respect to any amounts due under your Employment Letter and participation in other Robertson Stephens and FleetBoston compensation and benefit plans. In addition, subject to entering into this letter agreement, if the necessary preapproval for any course covered under the Educational Assistance Policy was approved prior to the commencement of your sixty-day notice period and subject to satisfaction of the other terms and conditions of the Policy, you will have until October 31, 2002 to complete the course and test, if applicable, and submit the required paperwork for tuition reimbursement. See Exhibit B for a description of the terms of payment under the Educational Assistance Policy if you decide not to enter into this letter agreement.

**(C)    Confidentiality:**

It is the desire and intent of all parties affected by this letter agreement that the existence of this letter agreement, and the terms herein, be maintained in the strictest confidence; to that end, you agree to hold each and every term of this letter agreement in strictest confidence and neither to release nor to divulge, either orally or in writing, any term or condition hereto to any person, firm, or entity except as may be required by law, regulation or by order of any court or agency or to your counsel, spouse, and or tax/financial advisor, each of whom shall be instructed by you to hold the existence of this letter agreement, and the terms herein, in the strictest confidence in accordance with the terms hereof. Before any disclosure required by law, regulation or order of any court or agency, you will give Robertson Stephens and FleetBoston a reasonable opportunity to oppose such disclosure by giving advance written notice of such proposed disclosure to FleetBoston through its General Counsel, 100 Federal Street, Boston, Massachusetts, 02110.

**(D)    Confidential Information/Cooperation With Litigation:**

You agree that you will continue to be bound by the terms (including those related to dispute resolution, remedies and enforcement) of any proprietary information and inventions agreement, confidentiality agreement, nondisclosure agreement or similar agreement to which you and Robertson Stephens are a party, including but not limited to, the Robertson Stephens Employee Confidentiality Agreement and the Robertson Stephens Employee Proprietary Information and Inventions Agreement.

You also agree that you will cooperate fully with Robertson Stephens, FleetBoston and their respective affiliates in connection with any existing or future litigation against Robertson

- 5 -

Barr-000124

Stephens or FleetBoston, whether administrative, civil, or criminal in nature, and to the extent Robertson Stephens or FleetBoston deems your cooperation necessary. You will be paid in accordance with the applicable policy for any reasonable out of pocket expenses (excluding personal attorneys' fees, legal costs and your lost time or opportunity) incurred by you in connection with providing such cooperation.

### (E)     Non-Disparagement:

You agree that you, your spouse, and any family members will not, at any time, disparage Robertson Stephens, FleetBoston and their past and present parent corporations, divisions, subsidiaries, affiliates and related companies and their respective successors and assigns and their past and present directors, officers, employees and agents. You also agree that you will not engage in any conduct that is harmful or contrary to the interest of Robertson Stephens or FleetBoston and their respective affiliates, successors and predecessors. In addition, you will continue to be bound by the non-disparagement provisions that are contained in, and in certain instances are a condition to the receipt of benefits under, the Robertson Stephens compensation plans.

### (F)     Return of Property/Document Retention Guidelines:

You hereby acknowledge that you have returned to Robertson Stephens any and all Robertson Stephens' property in your possession or under your control, including without limitation, credit cards, computer hardware and software, pagers, hand-held devices (including wireless e-mail devices and personal digital assistants), other electronic equipment, records, data, notes, reports, correspondence, financial information, customer files and information and other documents or information (including any and all copies of such property) written or created by, for or on behalf of Robertson Stephens or any of its affiliates, whether or not by or at your request. Robertson Stephens is permitting you to keep your company-provided cellular phone. You hereby acknowledge that you have received a copy of, have been and are in compliance with, and are bound by Robertson Stephens' document retention guidelines, which are attached to this letter agreement.

### (G)     Release:

(1)     Release of Claims. For and in consideration of the Special Payment and benefits provided under Section II of this letter agreement, to which you are not otherwise entitled, you hereby agree not to make or file any claim, demand or cause of action of any kind, whether known or unknown, suspected or unsuspected, or actual or contingent (a "Claim") against FleetBoston or Robertson Stephens and their past and present parent corporations, divisions, subsidiaries, affiliates and related companies and their respective successors and assigns and all past and present shareholders, directors, officers, employees and agents of these entities, personally, and as directors, officers, employees, and agents and all employee benefit plans of Robertson Stephens and FleetBoston (the "Benefit Plans") and all trustees, fiduciaries, representatives, and administrators of the Benefit Plans (hereinafter referred to collectively as the "Released Parties") before any agency, court or other forum, and you further hereby agree to release fully and forever the Released Parties from any Claims you, your heirs, executors and

Barr-000125

19-12346-shl    Doc 55-7    Filed 09/05/19    Entered 09/05/19 18:22:01    Exhibit G
Part 5    Pg 8 of 99

family members and their respective successors and assigns (hereinafter referred to collectively as the "Releasing Parties") may have against the Released Parties, whether arising from or in connection with, any agreements or understandings, whether written or oral, or omissions, acts, failure to act, facts or events that have occurred, through the date on which you sign this agreement, including without limitation:

(i)     any Claims concerning the terms and conditions of your employment with Robertson Stephens, FleetBoston or their affiliates, anything that happened to you in connection with such employment or arose while an employee of Robertson Stephens, FleetBoston or their affiliates, your termination of employment and any and all matters relating to your compensation and benefits, including without limitation, any related Claims arising under the Employment Letter and any loan or compensation advance, or compensation guarantee or understanding, whether written or oral, by and between you and Robertson Stephens, FleetBoston or their affiliates, or any Benefit Plan, which shall include any Claim relating to the change in control provisions of any such agreements or Benefits Plans, other than those rights expressly set forth in Section II(G)(2) below;

(ii)     any Claims under the compensation and benefit plans listed in Exhibit B, other than the right to receive the payments and benefits under such plans as set forth in Exhibit A;

(iii)     any Claims relating to, or arising from, (a) the management of any of the Bayview investment entities and funds by Robertson Stephens or its affiliates; (b) the cancellation of your vested and unvested restricted units under the Robertson Stephens Restricted Unit Plan (the "Restricted Unit Plan") and your participation in such Plan, including without limitation, any rights to receive shares of Robertson Stephens common stock or any payment, including dividends, in respect thereof, any claim to an ownership interest in Robertson Stephens and any other rights under the Restricted Unit Plan and any award agreement thereunder; and (c) the Separation Pay and Benefits Plan of FleetBoston Financial Corporation and Participating Subsidiaries, the Separation Plan and any other FleetBoston and/or Robertson Stephens plan or program related to severance or separation pay following termination of employment;

(iv)     any Claims for wrongful discharge of employment; termination in violation of public policy; discrimination; breach of contract, both express and implied; breach of covenant of good faith and fair dealing, both express and implied; fraud or misrepresentation; breach of fiduciary duty; promissory estoppel; negligent or intentional infliction of emotional distress; negligent or intentional misrepresentation; negligent or intentional interference with contract or prospective economic advantage; unfair business practices; defamation; libel; slander; negligence; personal injury; assault; battery; invasion of privacy; false imprisonment; and conversion;

(v)     any common law Claims or any Claims for violation of any federal, state or municipal discrimination, labor and wage and hour laws or statute, including, but not limited to, the Age Discrimination in Employment Act, Title VII of the Civil Rights Act of 1964, the Civil Rights Act of 1991, as amended, the Rehabilitation Act of 1973, the

Barr-000126

18-12346-shl    Doc 55-7    Filed 09/05/19    Entered 09/05/19 18:22:01    Exhibit C
Part 5    Pg 9 of 99

Americans with Disabilities Act, the Older Workers Benefit Protection Act, the Worker Adjustment and Retraining Notification Act, the Employee Retirement Income Security Act of 1974, the California Fair Employment and Housing Act, and the California Labor Code, the Massachusetts Fair Employment Practices Act, Civil Rights Act, Equal Rights Act, and Equal Pay Act, the Illinois Human Rights Act, the City of Chicago's Human Rights Ordinance, the New York Executive Law, The New York Labor Law, the New York City Human Rights Law, Title 34 of the Georgia Code, and the Georgia Equal Employment for Persons with Disabilities Code, and any other federal, state or local statutes or regulations, presently or hereafter enacted, or any Claims for monetary or equitable relief, including back pay, front pay, reinstatement, compensatory, punitive damages, attorneys' fees, expenses and cost of litigation;

(vi)   any Claims for violation of the Federal, or any state, constitution; and

(vii)   any and all Claims for attorneys' fees and costs.

(2)   <u>Limitations of Release</u>.  Notwithstanding anything to the contrary contained herein, the release set forth in Section II(G)(1) shall not apply to any (i)  routine welfare benefit claims incurred on or prior to the last day of the month in which your 60-day notice period expires and thereafter your rights pursuant to COBRA; (ii) any right to indemnification for your actions and inactions while serving as an employee of Robertson Stephens to the extent provided under the policies or agreements applicable to you prior to the Separation Date; (iii) rights to accrued and vested benefits, if any, under the Retirement and Savings Plan; (iv) Claims by the Releasing Parties for failure to satisfy the obligations set forth on <u>Exhibit A</u> of this letter agreement, and (v) Claims arising out of your status as a FleetBoston credit card holder or depositor.  In addition, nothing in the release set forth in Section II(G)(1) will be construed to prevent you from filing a charge with or assisting in any investigation or proceeding conducted by or through a federal, state, or local court or agency, or from challenging the validity of this release; however, you agree to waive the right to recover any damages or other relief in any claim or suit brought by or through any federal, state, or local court or agency.

(3)   <u>Representations</u>.  You hereby represent that you have not filed any Claim that is the subject of the release set forth in Section II(G)(1) above in any forum up to the date of this letter agreement.

(4)   <u>Covenant Not to Challenge Enforceability; Complete Bar</u>.  You understand and agree that the release contained in Section II(G)(1) is final and binding when executed by you and delivered to FleetBoston, and you agree not to challenge its enforceability thereafter.  You acknowledge and agree that if you (or any other Releasing Party) should hereafter make any Claim or demand or commence or threaten to commence any action, claim or proceeding against the Released Parties with respect to any Claim that is the subject of Section II(G)(1), the release contained in Section II(G)(1) may be raised as a complete bar to any such action, claim or proceeding, and the applicable Released Party may recover from you, any other Releasing Party or the person or entity acting on your behalf, all costs incurred in connection with such action, claim or proceeding, including attorneys fees.  Notwithstanding anything contained herein to the

- 8 -

FILED: NEW YORK COUNTY CLERK 08/13/2018 01:47 PM     INDEX NO. 159781/2014
NYSCEF DOC. NO. 154                                   RECEIVED NYSCEF: 08/13/2018

contrary, the covenant not to challenge the enforceability of this release or to sue the Released Parties shall not apply to any claims under the Age Discrimination in Employment Act.

(5)    Waiver.  You acknowledge and agree that you on behalf of yourself and the Releasing Parties are knowingly waiving all rights and protections under Section 1542 of the Civil Code of the State of California or any similar law of any state or territory of the United States or any other country with respect to the Released Parties.  Section 1542 of the Civil Code of the State of California provides as follows:

> **"A general release does not extend to claims which the creditor does not know or suspect to exist in his favor at the time of executing the release, which known by him must have materially affected his settlement with the debtor."**

Notwithstanding the provisions of Section 1542 and such similar laws, and for the purpose of implementing a full and complete release, you understand and agree that the release in this Section II(G) is intended to include all claims, if any, which you may have and which you do not now know or suspect to exist in your favor against the Released Parties, subject to Section II(G)(2) hereof, and that the release in this Section II(G) extinguishes those claims.

(6)    No Admission of Liability.  No action taken by Robertson Stephens, FleetBoston or their respective affiliates, either previously or in connection with the release in this Section II(G) shall be deemed or construed to be an acknowledgment or admission by Robertson Stephens, FleetBoston or their respective affiliates or you of any fault or liability whatsoever by Robertson Stephens, FleetBoston and their affiliates or to you or to any third party.

(7)    Voluntary Execution of Agreement.  This letter agreement, including the release contained in this Section II(G), is executed voluntarily and without any duress or undue influence on the part or behalf of the parties hereto, with it being your intent and full understanding that you are releasing all Claims.  You acknowledge and agree that:

(i)    you have been given a reasonable period of time within which to consider this letter agreement;

(ii)    if you fail to return this letter agreement by the deadline set forth in the last paragraph of this letter agreement, Robertson Stephens will consider you to have rejected its offer of the Special Payment and benefits provided herein;

(iii)    you have read carefully and fully understand the terms of this letter agreement, and you have had the opportunity to consult with an attorney and have been advised by Robertson Stephens and FleetBoston to consult with an attorney, prior to signing this letter agreement;

(iv)    any changes to this letter agreement, material or otherwise, will not restart your review period; and

(v)    you are executing this letter agreement voluntarily and knowingly.

Barr-000128

19-12346-shl    Doc 55-7    Filed 09/05/19    Entered 09/05/19 18:22:01    Exhibit C
Part 5    Pg 11 of 99

**Section III.**    <u>**Miscellaneous.**</u>

**(A)**    <u>**Entire Agreement**</u>:

This letter constitutes the entire agreement between you and Robertson Stephens, FleetBoston and their affiliates and supersedes any other communications, written or oral, with respect to your employment by and termination of employment from Robertson Stephens, FleetBoston and their affiliates, and all matters pertaining thereto, but nothing contained in this letter agreement will modify or supersede any prior agreements relating to the arbitration of disputes, the use of confidential information, document retention, non-disparagement or non-solicitation.  This letter agreement shall supersede any and all other employment, severance or other agreements between the parties (and their predecessors or successors) with respect to the subject matter hereof, including the Employment Letter.  You hereby agree that, following the termination of your employment at the conclusion of your sixty-day notice period under WARN, you will have no rights to any salary, severance, benefits, bonuses, commissions, stock options, stock grants or other form of compensation from Robertson Stephens, FleetBoston and their affiliates, other than as explicitly set forth in this letter agreement or as expressly required by law.

**(B)**    <u>**Severability**</u>:

The provisions of this letter agreement are severable.  In other words, if any provision of this letter agreement, except the release contained in Section II(G), is held invalid, the invalidity of such provision shall not affect any other provisions of this letter agreement.  In the event the release contained in Section II(G) is invalid, this letter agreement shall be invalid.

**(C)**    <u>**Special Payment and Other Benefits Conditioned on Signing this Letter Agreement**</u>:

You should be aware that you are not entitled to the Special Payment and other benefits described in Section II of this letter agreement, if you do not execute this letter agreement.  Accordingly, if you do not return this letter agreement to us within fourteen (14) days, we will assume you decided not to accept your Special Payment and other benefits.

**(D)**    <u>**Voluntary Agreement**</u>:

You acknowledge that you have entered into this letter agreement voluntarily and knowingly and have discussed this letter agreement with counsel and understand its terms.

**(E)**    <u>**Binding Agreement/Successors**</u>:

This letter agreement is personal to you and without the prior written consent of Robertson Stephens or FleetBoston will not be assignable by you other than by the laws of descent and distribution.  This letter agreement will inure to the benefit of and be binding upon Robertson Stephens and FleetBoston and their respective successors and assigns.

Barr-000129

**(F)**    **Governing Law:**

This letter agreement will be governed by, and construed in accordance with, the laws of the State of New York, without regard to its conflict of laws principles which would result in the application of the laws of another jurisdiction.

**(G)**    **Remedies for Breach of Covenants:**

If you commit any breach of the covenants contained in Sections II(C) through II(F) of this letter agreement or threaten to commit any such breach, Robertson Stephens and/or FleetBoston will have the right (in addition to, and not in lieu of, any other right or remedy that may be available to them) to temporary and permanent injunctive relief from a court of competent jurisdiction. Except as set forth in the preceding sentence, any disputes arising under this letter agreement or otherwise in connection with your employment or termination of employment will be resolved by arbitration on the terms and conditions set forth in the Robertson Stephens employment policy as in effect immediately prior to your termination of employment with Robertson Stephens.

**(H)**    **Withholding:**

You agree and understand that Robertson Stephens will deduct all applicable employment and withholding taxes from any payments made or benefits provided to you under this letter agreement or otherwise.

If you have questions about this letter agreement, including Exhibit A, please call Frances Hochschild at (415) 623-7799, as soon as possible.

Barr-000130

If the foregoing is in accordance with your understanding, please sign and return this letter agreement by October 2, 2002, to Robertson Stephens Human Resources, Attn: Laura Kraus, 555 California Street Suite 2600, San Francisco, CA 94104, whereupon this letter agreement shall constitute a binding agreement between you and Robertson Stephens on the terms set forth herein. In extraordinary circumstances, on a case by case basis in Robertson Stephens' sole discretion, the foregoing deadline may be extended.

Sincerely,

*Brian Mearns*

Brian Mearns
Director of Human Resources
Technology and Shared Services
FleetBoston Human Resources

Agreed to and acknowledged on
the ___ day of _____, 2002:

_____
Michael Barr

Barr-000131

FILED: NEW YORK COUNTY CLERK 08/13/2018 05:47 PM   INDEX NO. 159781/2014
NYSCEF DOC. NO. 154                                  RECEIVED NYSCEF: 08/13/2018

## Exhibit A

If you accept (1) the Special Payment provided in Section II(A) and other benefits provided in Section II(B) of this letter agreement, and (2) agree to the release of claims set forth in Section II(G) of this letter agreement, you will also be agreeing to the amounts and terms or satisfaction of payment described in this Exhibit A with respect to any amounts due under your Employment Letter and participation in the other Robertson Stephens and FleetBoston compensation and benefit plans listed herein.

| Compensation Plan | Payment/Treatment |
|---|---|
| Special Payment less Offsets | $16,500 payable within 30 days of the effectiveness of the letter agreement. |
| Guarantee (to the extent unpaid) | $125,000, paid on September 13, 2002. |
| Accrued and Unpaid Vacation Pay (to the extent unpaid) | $12,051.85, paid on September 13, 2002. |
| 2002 Cash Equivalent Plan Deferred Amount | $1,299,999.84, plus interest calculated at the applicable money market rate, payable at the same time as your Special Payment. |
| Robertson Stephens Restricted Units | 165,512 restricted units are forfeited. |
| Educational Assistance Policy | If the necessary preapproval for any course covered under the Educational Assistance Policy was approved prior to the commencement of your sixty-day notice period, and subject to satisfaction of the terms and conditions of the Policy, you have until October 31, 2002 to complete the course and test, if applicable, and submit the required paperwork for tuition reimbursement. |
| • Bayview Retained Interests<br>• Group Healthcare Benefits<br>• Life Insurance, LTD and AD&D<br>• Retirement and Savings Plan<br>• Reimbursement Accounts<br>• Employee Assistance Plan<br>• Hyatt Legal Plan<br>• MetLife Auto & Home Insurance | As set forth in Exhibit B. |

**Notes on Withholding and Other Offsets:**

A-1

Barr-000132

FILED: NEW YORK COUNTY CLERK 08/13/2018 01:47 PM    INDEX NO. 159781/2014
NYSCEF DOC. NO. 154                                    RECEIVED NYSCEF: 08/13/2018

Exhibit A (continued)

- Lump sum payments are withheld at a 27% Federal tax rate plus other applicable taxes.  Federal and state taxes may be withheld at a higher rate than you are currently withholding.

Barr-000133

FILED: NEW YORK COUNTY CLERK 08/13/2018 01:47 PM          INDEX NO. 159781/2014
NYSCEF DOC. NO. 154                                        RECEIVED NYSCEF: 08/13/2018

Exhibit B

## Compensation Plans

Bayview Retained Interests:  The "Bayview Retained Interests" are the interests in any Bayview fund (other than the Phantom Bayview Plans), including Bayview 2000, LP and the FleetBoston Robertson Stephens Inc. 2000 Investment Plan, and including any vested distributions held in any suspense account thereunder, that have either been (1) purchased with non-contingent after-tax compensation, (2) purchased with contingent pre-tax compensation but that have subsequently vested, or (3) funded by Robertson Stephens on your behalf and that are vested as of the expiration of your sixty-day notice period.  Your termination of employment from Robertson Stephens will have no effect on your continued rights in respect of the Bayview Retained Interests, which will continue to be governed by the terms of the applicable limited partnership document, and you will still be responsible for any unfunded after-tax commitments to any Bayview partnership.  Current mailing address and any future address changes should be emailed to bayview@rsco.com.

2002 Cash Equivalent Plan:  Your unpaid and unvested "Award Amount" (if any) under the 2002 Cash Equivalent Plan is set forth on Exhibit A attached hereto (the "2002 Award Amount").  Pursuant to Section 7.3(vii) of the 2002 Cash Equivalent Plan, following your Separation Date, your 2002 Award Amount will continue to vest and interest thereon will continue to accrue and be paid in accordance with the regular vesting schedule under such Plan.  This means that one-third (1/3) of your 2002 Award Amount and any accrued earnings on the 2002 Award Amount will vest on (and be paid as soon as reasonably practicable after) January 1, 2003, and the remaining two-thirds (2/3) of your 2002 Award Amount and any accrued earnings thereon will vest on (and be paid as soon as reasonably practicable after) January 1, 2004, subject to your continued compliance with the non-solicitation and non-disparagement provisions of Section 8.1 of the 2002 Cash Equivalent Plan.  Upon your termination of employment, the 2002 Deferred Amount will become subject to Social Security and Medicare (FICA) taxes, which we currently expect to withhold from the other amounts payable to you upon your termination.  To the extent the amount of any such tax withholding is not known at the time you receive your final payment or such final payment is insufficient to satisfy all withholding requirements, the withholding will be deducted from your 2002 Deferred Amount.

Robertson Stephens Restricted Units:  Your vested and unvested restricted stock units granted under the Restricted Unit Plan are set forth on Exhibit A attached hereto.  In connection with your termination of employment with Robertson Stephens, all of your unvested restricted units will be forfeited and cancelled in accordance with the terms of the Restricted Unit Plan and the award agreements thereunder. Pursuant to the Restricted Unit Plan and the award agreements thereunder, upon a termination of employment (other than a termination for "Cause"), you have the right to receive (or be recorded as the record holder) the shares of Robertson Stephens common stock underlying your vested restricted units, and, upon delivery (or you becoming the record holder) of such shares, you will have ordinary income equal to the "Fair Market Value" of such shares.  The terms of the Restricted Unit Plan and the award agreements thereunder provide that, during the forty-five (45) day period following the six (6) month anniversary of your receipt of the shares of common stock, you have the right to require Robertson Stephens to repurchase, and Robertson Stephens has the right to require you to sell to Robertson Stephens, any such shares of common stock at Fair Market Value.  The Board of Directors of Robertson

Barr-000134

FILED: NEW YORK COUNTY CLERK 08/13/2018 01:47 PM    INDEX NO. 159781/2014
NYSCEF DOC. NO. 154                                  RECEIVED NYSCEF: 08/13/2018

Exhibit B (continued)

Stephens has recently determined that neither the restricted units under the Restricted Unit Plan, nor the underlying shares of Robertson Stephens common stock, have a positive value.

**Benefit Plans**

Vacation: You will receive payment for any accrued unused vacation days.  You will not accrue vacation time after the expiration of the sixty-day notice period.

Group Healthcare Benefits:  If you participated in the Robertson Stephens group healthcare plans (medical, dental and vision) prior to your Separation Date, then the benefits provided to you by Robertson Stephens under such plans, or any successor insurance benefit plans thereto, will cease on the last day of the month in which your sixty-day notice period expires.  Following the termination of your employment with Robertson Stephens, you may elect to extend coverage of healthcare benefits for an additional eighteen (18) months, in accordance with the provisions of COBRA by paying 102% of the applicable group rate for coverage.  Refer to the Exit Information Booklet for additional details about the submission of eligible expenses incurred prior to your termination date and COBRA.

Life Insurance, Long-Term Disability and Accidental Death & Dismemberment. Your life insurance coverage and your dependent life insurance coverage will cease on your termination date.  However, there is a provision within the policy which states that if you should die within 31 days of termination, your beneficiary(ies) is (are) entitled to receive a benefit.  Refer to the Exit Information Booklet for details about converting your group coverage to an individual policy.  Your long-term disability and accidental death & dismemberment coverage will cease on your termination date.  There is no provision for converting either of these benefits to an individual plan.

Healthcare and Dependent Day Care Reimbursement Accounts:  Your participation in the Robertson Stephens Healthcare and Dependent Day Care Reimbursement Account programs will cease at the expiration of your sixty-day notice period.  Thereafter, you may continue to participate in the Healthcare Reimbursement Account program, in accordance with the provisions of COBRA, by continuing to make your contributions with after-tax money.  Refer to the Exit Information Booklet for additional details about the submission of eligible expenses incurred prior to your termination date and COBRA.

Robertson Stephens Retirement and Savings Plan:  Your participation in the Retirement and Savings Plan, or any successor plan thereto, will cease at the expiration of your sixty-day notice period.  At that time, you may elect distribution of your Retirement and Savings Plan account, in accordance with the terms of the Retirement and Savings Plan.  Refer to the Exit Information Booklet for additional details about your options under the Retirement and Savings Plan.

Employee Assistance Plan:  Upon the expiration of your sixty-day notice period, your eligibility to receive benefits under the Employee Assistance Plan will cease.

Hyatt Legal Plan:  Upon the expiration of your sixty-day notice period, your participation in the Legal Plan will cease, although  you will have the option of continuing your enrollment for 12 months at the same group rate.  If you choose to continue your coverage under the Legal Plan, you must enroll within 30 days of your termination date.  Contact Hyatt Client Service Center at 800-821-6400 for more information.

Barr-000135

FILED: NEW YORK COUNTY CLERK 08/13/2018 06:47 PM          INDEX NO. 159781/2014
NYSCEF DOC. NO. 154                                        RECEIVED NYSCEF: 08/13/2018

Exhibit B (continued)

Educational Assistance Policy:  Upon the expiration of your sixty-day notice period, your eligibility to receive benefits under the Educational Assistance Policy will cease.  You will receive reimbursement, if prior to the expiration of your sixty-day notice period, you successfully complete a course that satisfies the requirements for reimbursement under the Policy and submit the required paper work to Laura Kraus for reimbursement.

Metlife Auto & Home Insurance
If you are currently having a payroll deduction for auto or home owners insurance, you may continue your coverage with MetLife.  Please contact MetLife at 1-800-438-6388 to arrange for an optional payment method.

This Exhibit B is a summary of the terms of the plans described herein.  In the event of a conflict between the information on this Exhibit B and the plan document, the terms of the applicable plan document governs and controls your rights thereunder.  Robertson Stephens will deduct all applicable withholding taxes from any payments made or benefits provided to you in connection with your termination of employment.

Barr-000136

# EXHIBIT D

Michael Barr
1164 Deerfield Road
Water Mill, NY  11976
(631) 287-7866 Tel
(917) 224-2277 Mobile

David Marek
Liddle & Robinson
685 3rd Avenue
New York, NY  10017
(212) 687-8500 x227

October 2, 2002

Dear David:

1. Enclosed is a copy of my Separation Agreement and Release.

2. My date of birth is ███████████████

3. Contact Information:

   *My address for U.S. Mail is:*

   ███████████████

   *For overnight mail (FedEx), please use*

   ███████████████

4. Total Compensation for each fiscal year was:
   2000, base salary $200,000, bonus approximately $3.9 million
   2001, base salary $200,000, bonus approximately $1.3 million

5. I will be providing to you in the next week:
   a. A copy of my employment agreement with Robertson Stephens from March of 2000
   b. A statement of my view on performance for 2002
   c. Confirmation of the payments received by me form Robertson Stephens

Please do not hesitate to call me with any questions.

Very truly yours,


Michael Barr

FILED: NEW YORK COUNTY CLERK 08/13/2018 01:47 PM    INDEX NO. 159781/2014

NYSCEF DOC. NO. 156    19-12346-shl    Doc 55-7    Filed 09/05/19    Entered 09/05/19 18:22:01    Exhibit C    RECEIVED NYSCEF: 08/13/2018
Part 5    Pg 21 of 99

# EXHIBIT E

**FILED: NEW YORK COUNTY CLERK 08/13/2018 01:47 PM** INDEX NO. 159781/2014

NYSCEF DOC. NO. 156    19-12346-shl    Doc 55-7    Filed 09/05/19    Entered 09/05/19 18:22:01    Exhibit C    RECEIVED NYSCEF: 08/13/2018

Part 5    Pg 22 of 99

# LIDDLE & ROBINSON, L.L.P.

685 THIRD AVENUE

NEW YORK, N.Y. 10017

(212) 687-8500

FACSIMILE: (212) 687-1505

SAMUEL FINKELSTEIN (1906-1996)

JAMES A. BATSON
BLAINE H. BORTNICK
ETHAN A. BRECHER
SUSAN POTTER ELLIS
MICHAEL E. GRENERT
JEFFREY L. LIDDLE
LAURENCE S. MOY
CHRISTINE A. PALMIERI
MARC A. SUSSWEIN

MIRIAM M. ROBINSON
SENIOR COUNSEL

DAVID I. GREENBERGER
DAVID MAREK
JAMES C. MALLIOS
CANDACE M. ADIUTORI
LEILA I. NOOR
CHRISTINA J. KANG
JEFFREY ZIMMERMAN*
TED J. SWIECICHOWSKI*

*AWAITING ADMISSION
TO THE BAR

## RETAINER AGREEMENT

1.     You hereby retain the firm of Liddle & Robinson, L. L. P. ("L&R") to prosecute your claims against Robertson Stephens and FleetBoston for unpaid severance, bonus, deferred compensation, WARN Act notice pay and other compensation and/or employment-related issues. The scope of the legal services to be provided will include negotiation and, if necessary, commencement of an arbitration case before a self-regulatory organization (the NASD or the NYSE) and all work involved in prosecution of such an arbitration case through and including a hearing or trial. The legal services to be provided may also include a mediation of your claims.

2.     You agree to pay to L&R a fee retainer in the amount of $5,000 which is enclosed with this Agreement.

3.     You also agree to pay to L&R a disbursement retainer of $1,000 (also enclosed) for disbursements -- such as filing fees, transcription costs, photocopying, telephone charges, postage and the like -- incurred on your behalf in negotiating and/or prosecuting your claims against Robertson Stephens and FleetBoston. You understand that you will be billed monthly for disbursements as they are incurred and that these disbursements will be deducted from the $1,000 disbursement retainer enclosed herewith. You further understand that if this amount is depleted, you will be asked to supplement it as needed, and that any remainder will be returned to you at the conclusion of this matter.

4.     In addition to the above, if L&R recovers any amount (whether by settlement, arbitration, litigation or otherwise), you agree to pay L&R a percentage of all recovery, (inclusive of all awards, judgments or settlement amounts for damages, fees, interest and costs) pursuant to the schedule below. You further agree to pay this amount in a lump sum.

- 12-1/2 % of all recovery obtained from the date you sign this Retainer Agreement through the date a hearing or trial commences, except that

Barr-001808

LIDDLE & ROBINSON, L.L.P.

> 15% of the recovery will be due in the event settlement is achieved through a mediation;
>
> - 17-1/2% of all recovery obtained after a hearing or trial is commenced but prior to completion of the hearing or trial; and
> - 22-1/2% of all recover obtained at any time after completion of a hearing or trial.

Amounts due pursuant to the above percentages will be reduced by the $5,000 retainer to be applied towards attorneys' fees.

To the extent that Robertson Stephens and/or FleetBoston agree in a settlement to pay you the following items, and to the extent that you have not already received the items listed below, for purposes of the above percentages, the term "recovery" shall not include:

> A. The "Net Payment Before Tax Withholding Applicable to the Separation Payment" reflected on Exhibit A of the Separation Agreement and Release I received from FleetBoston ("Exhibit A");
> B. the "Interests in Bayview 2000, L.P." reflected on Exhibit A;
> C. the "Interests in FleetBoston Robertson Stephens Inc. 2000 Investment Plan" reflected on Exhibit A;
> D. the "2001 Cash Equivalent Plan Deferred Amount" reflected on Exhibit A;
> E. the "2002 Cash Equivalent Plan Deferred Amount" reflected on Exhibit A;
> F. the "Supplemental Incentive Bonus" reflected on Exhibit A;
> G. the "Imputed income from the forgiveness of a forgivable loan" reflected on Exhibit A;
> H. the "Accrued and Unpaid Vacation Pay" reflected on Exhibit A; and
> I. the reimbursement of business expenses submitted to, and approved by, Robertson Stephens.

Our understanding is that, except for item A and item F, Robertson Stephens and FleetBoston have indicated that you will be paid the items listed in A through I above. In the event Robertson Stephens and/or FleetBoston contend, however, that you are not entitled to any of the items listed in A through I above, then such contested items will be included within the term "recovery" for the purposes of the above percentages. Recovery of some or all of the items listed in A through I above may permit the recovery of attorneys' fees and disbursements under federal statutes[1] or under state wage statutes.[2] In the event it is possible to seek attorneys' fees or disbursements, you agree to cooperate, as set forth in paragraph 8 below, in doing so.

6.    In the event you decide to discontinue L&R's representation of your claims, you will pay L&R the greater of (i) fees calculated at L&R's prevailing hourly rates (see attached schedule) or (ii) 17-1/2% of the most recent settlement offer proposed to you by Robertson Stephens and/or FleetBoston. For the purposes of this paragraph 6, "settlement offer" will not include the items listed as A through I in paragraph 4 above, to the extent that Robertson Stephens and/or FleetBoston agree in a settlement to pay you such items.

---

[1] An example of such a federal statute is the Employment Retirement Income Security Act of 1974 ("ERISA").
[2] Please note that wage statutes are not available in every state, and that not every wage statute provides for the recovery of attorneys' fees and disbursements.

Barr-001809

FILED: NEW YORK COUNTY CLERK 08/13/2018 01:47 PM INDEX NO. 159781/2014

NYSCEF DOC. NO. 156    19-12346-shl    Doc 55-7    Filed 09/05/19    Entered 09/05/19 18:22:01    Exhibit C    RECEIVED NYSCEF: 08/13/2018
Part 5    Pg 24 of 99

LIDDLE & ROBINSON, L.L.P.

       7.     It is anticipated, but not assured, that L&R will handle your case along with that of other former Robertson Stephens and FleetBoston executives.

       8.     You recognize that the recovery of attorneys' fees will increase the total recovery, and thus the net recovery to you. In the event that an arbitration panel or a court renders an award of attorneys' fees upon your claims that exceeds the amounts to be paid pursuant to the arrangement set forth above, we will receive the difference between such award and the amounts to be paid under the arrangement after crediting any fee award against your obligations herein. We have learned from experience that a common tactic in the late stages of negotiation is for employers to seek to undermine the relationship between an employee and his counsel. This tactic includes situations where it is prudent for the employee to seek the recovery of fees. By signing below, you agree to cooperate fully with any effort to recover attorneys' fees from Robertson Stephens and Fleet, whether through an application for an award of attorneys' fees or through negotiations.

       9.     We seek to avoid fee disputes with our clients, and rarely have such disputes. In the event that such a dispute should arise, however, we advise you that you may have the right, at your election, to seek arbitration to resolve a fee dispute under applicable court rules.[3]

ACCEPTED AND AGREED:

_____

sign name

_____

Jeffrey L. Liddle

_____

print name

_____

date

---

[3] As one example, under Part 137 of the Rules of the Chief Administrator of the New York state courts, a client has the right to elect arbitration to resolve a dispute of $1,000 to $50,000.

Barr-001810

FILED: NEW YORK COUNTY CLERK 08/13/2018 01:47 PM
INDEX NO. 159781/2014
NYSCEF DOC. NO. 156
19-12346-shl Doc 55-7 Filed 09/05/19 Entered 09/05/19 18:22:01 Exhibit C
RECEIVED NYSCEF: 08/13/2018
Part 5 Pg 25 of 99

# LIDDLE & ROBINSON, L.L.P.

685 THIRD AVENUE
NEW YORK, N.Y. 10017

(212) 687-8500
FACSIMILE: (212) 687-1505

SAMUEL FINKELSTEIN (1906-1996)

JAMES A. BATSON
BLAINE H. BORTNICK
ETHAN A. BRECHER
SUSAN POTTER ELLIS
MICHAEL E. GRENERT
JEFFREY L. LIDDLE
LAURENCE S. MOY
CHRISTINE A. PALMIERI
MARC A. SUSSWEIN

MIRIAM M. ROBINSON
SENIOR COUNSEL

DAVID I. GREENBERGER
DAVID MAREK
JAMES C. MALLIOS
CANDACE M. ADIUTORI
LEILA I. NOOR
CHRISTINA J. KANG
JEFFREY ZIMMERMAN*
TED J. SWIECICHOWSKI*

*AWAITING ADMISSION
TO THE BAR

## MANDATORY FEE DISCLOSURE AND ENGAGEMENT LETTER

Welcome to Liddle & Robinson, L.L.P. We look forward to a successful relationship with you.

Organized in 1979, the firm now known as Liddle & Robinson represents individuals, corporations and other organizations in litigation, arbitration and negotiations of all types. We are proud of our accomplishments and our strengths. For more information about the firm and our attorneys, please visit our website, www.liddlerobinson.com. This letter introduces you to our billing arrangements, as required by the rules governing the legal profession.

Some of the rules governing the attorney-client relationship are found in Part 1215 of the N.Y. Comp. Codes R. & Regs, Title 22, and require us to provide you with this engagement letter. A copy of the applicable rule is attached for your reference. Before our initial consultation can begin, you must read and sign this letter.

This letter sets forth your initial fee arrangement with our firm. Accompanying this letter, you will find attached an initial retainer agreement for your review and signature. By signing the initial retainer agreement, you are agreeing to pay for legal services, including, but not limited to, time spent during your initial consultation.

Since you have contacted us, you obviously already believe that you would benefit from receiving legal advice from our firm. The initial consultation is extremely important. It is the first opportunity for both you and us to evaluate your matter. It

FILED: NEW YORK COUNTY CLERK 08/13/2018 01:47 PM          INDEX NO. 159781/2014

NYSCEF DOC. NO. 156          19-12346-shl    Doc 55-7    Filed 09/05/19    Entered 09/05/19 18:22:01    Exhibit C          RECEIVED NYSCEF: 08/13/2018

Part 5    Pg 26 of 99

LIDDLE & ROBINSON, L.L.P.

2

may entail our obtaining facts from you, addressing your questions, and explaining relevant legal principles. Your consultation will involve one of our firm's more experienced lawyers, with expertise in the law and procedures relevant to your matter. Your consultation may also involve a more junior attorney, who might be involved in any work that may follow concerning your matter.

We understand that some law firms conduct free consultations. Given our expertise and our high level of activity within that expertise, we do not do so. Regardless of whether or not our involvement in your matter proceeds beyond the initial consultation, you are responsible for our fees calculated on an hourly basis in accordance with our regular hourly rates, including - but not limited to - any time devoted to the initial consultation, which usually takes at least one hour. Time devoted to preparation for the initial consultation, including the review of documents provided by you to our attorneys, will also be billed on an hourly basis. Hourly fees charged, including those for any initial consultation, will be based on (a) the actual time devoted to the matter (i.e., they will not be limited to one hour), and (b) the hourly rates of each of the attorneys involved with your matter. Our minimum billing unit is 15 minutes. (Should more than one attorney be present for your initial consultation, you will not be billed for the more junior attorney's time during the initial consultation. You will otherwise be charged for all time devoted to your matter.)

## Possibility of Superseding Fee Arrangements

If it is decided that your matter will require negotiation, litigation and/or arbitration, various fee arrangements may then be proposed. In those instances, a superseding written retainer agreement _may_ replace the attached initial fee agreement. Otherwise, you will continue to be bound by the attached initial fee agreement, which will apply unless you and a partner of this firm sign a superseding written retainer agreement.

## Fee-shifting Statutes

Depending upon the nature of your claim, and whether certain federal or state statutes apply, it may be possible to seek to obtain all or a portion of your attorneys' fees from another party involved in your dispute. That is more likely to occur in matters that are tried to a conclusion, as opposed to settlements. We will advise you if we believe that such a fee-shifting may apply. Nevertheless, you will be responsible for your attorneys' fees, except to the extent that payment is made by another party pursuant to a fee-shifting statute.

## Schedule of Hourly Rates

In the event that your matter reaches litigation, we naturally wish to present your case in the best possible light. This could entail discovery, document review, legal

Barr-001812

FILED: NEW YORK COUNTY CLERK 08/13/2018 01:47 PM
INDEX NO. 159781/2014

NYSCEF DOC. NO. 156
19-12346-shl    Doc 55-7    Filed 09/05/19    Entered 09/05/19 18:22:01    Exhibit C
RECEIVED NYSCEF: 08/13/2018
Part 5    Pg 27 of 99

LIDDLE & ROBINSON, L.L.P.

3

research, motion practice, preparation of affidavits and memoranda of law, participation in mediation, preparation of the case for trial and trying your case. Our hourly rates will apply to all time expended relative to your matter, including office meetings and conferences, telephone conversations (whether placed by or to you, or otherwise made or had on your behalf), attorney conferences in furtherance of your matter (internally or outside of the firm), preparation, review and revision of correspondence or any other documents relative to your matter, legal research, file review and other preparation, time utilized to travel to court and other locations in connection with your matter, trial and other court time, and any other time expended on your behalf in connection with your matter. A copy of our fee schedule for individual attorneys is attached.

Generally, hourly rates are reviewed and revised annually. New fee schedules are usually sent out with the January or February bills. Rates for partners' services range from $300 to $525 per hour, and for associate attorneys' services from $110 to $200 per hour. Rates for law clerks and paralegals range from $55 to $125 per hour. Should you have a question regarding fees, please call us.

You will also be responsible for any disbursements incurred or advanced on your behalf, either within the firm or to an outside vendor. These disbursements include copying costs, postage, facsimile charges, subscription database searches for which we are charged on a usage basis (e.g., Securities Arbitration Commentator searches or Westlaw legal research), long distance telephone charges, messenger services, deposition and court transcript fees, travel expenses, filing fees, court costs or forum fees, and other expenses incurred on your behalf. Certain expenses will require you to make payment directly to third party providers.

You will be billed monthly, and agree to pay our fees and to reimburse us for disbursements advanced on your behalf not later than 10 days from the date of receipt of our bills or statements. In the event that any bill or statement remains unpaid beyond a 60-day period, you agree that our firm may withdraw its representation of you at the firm's sole option. When any fees remains unpaid for the period set forth above, you acknowledge that in connection with any such withdrawal, the account delinquency shall be good cause.

### Dispute Resolution

We seek to avoid fee disputes with our clients, and rarely have such disputes. In the event that such a dispute should arise, however, we advise you that you have the right, at your election, to seek arbitration to resolve a dispute of $1,000 to $50,000, under Part 137 of the Rules of the Chief Administrator Attorney-Client Fee Dispute Resolution Program.

*          *          *

Barr-001813

FILED: NEW YORK COUNTY CLERK 08/13/2018 01:47 PM
NYSCEF DOC. NO. 156
INDEX NO. 159781/2014
RECEIVED NYSCEF: 08/13/2018

19-12346-shl    Doc 55-7    Filed 09/05/19    Entered 09/05/19 18:22:01    Exhibit C
Part 5    Pg 28 of 99

LIDDLE & ROBINSON, L.L.P.

4

We look forward to representing you, and hope that this letter clarifies any questions you may have. Kindly indicate your receipt of this letter by signing where indicated below.

*RECEIVED AND READ:*

------------------------     -------------
Signature                         Date

Enclosures:  (1)   Initial retainer agreement
             (2)   Applicable Rule
             (3)   Schedule of hourly rates for individual attorneys
             (4)   Statement of client's rights

Barr-001814

FILED: NEW YORK COUNTY CLERK 08/13/2018 01:47 PM
NYSCEF DOC. NO. 156
INDEX NO. 159781/2014
RECEIVED NYSCEF: 08/13/2018

19-12346-shl    Doc 55-7    Filed 09/05/19    Entered 09/05/19 18:22:01    Exhibit C
Part 5    Pg 29 of 99

LIDDLE & ROBINSON, L.L.P.

The following hourly billing rates are effective as of January 1, 2002:

### Partners

| | |
|---|---|
| Jeffrey L. Liddle | $525 |
| Miriam M. Robinson | $500 |
| Laurence S. Moy | $440 |
| James A. Batson | $400 |
| Ethan A. Brecher | $400 |
| Blaine H. Bortnick | $400 |
| Marc A. Susswein | $350 |
| Michael E. Grenert | $350 |
| Susan P. Ellis | $350 |
| Christine A. Palmieri | $300 |

### Associates

| | |
|---|---|
| David I. Greenberger | $200 |
| David M. Marek | $185 |
| James A. Mallios | $155 |
| Candace M. Adiutori | $155 |
| Leila I. Noor | $155 |
| Christina J. Kang | $150 |
| Jeff Zimmerman | $150 |
| Ted J. Swiecichowski | $150 |
| John A. Karol | $145 |

Barr-001815

FILED: NEW YORK COUNTY CLERK 08/13/2018 01:47 PM    INDEX NO. 159781/2014

NYSCEF DOC. NO. 157    19-12346-shl    Doc 55-7    Filed 09/05/19    Entered 09/05/19 18:22:01    Exhibit C    RECEIVED NYSCEF: 08/13/2018

Part 5    Pg 30 of 99

# EXHIBIT F

FILED: NEW YORK COUNTY CLERK 08/13/2018 09:47 PM    INDEX NO. 159781/2014
NYSCEF DOC. NO. 157                                              RECEIVED NYSCEF: 08/13/2018

# LIDDLE & ROBINSON, L.L.P.

685 THIRD AVENUE

NEW YORK, N.Y. 10017

(212) 687-8500

FACSIMILE: (212) 687-1505
E-MAIL: jliddle@liddlerobinson.com

SAMUEL FINKELSTEIN (1906-1996)

JAMES A. BATSON
BLAINE H. BORTNICK
ETHAN A. BRECHER
SUSAN POTTER ELLIS
MICHAEL E. GRENERT
JEFFREY L. LIDDLE
LAURENCE S. MOY
CHRISTINE A. PALMIERI
MARC A. SUSSWEIN

MIRIAM M. ROBINSON
SENIOR COUNSEL

DAVID I. GREENBERGER
DAVID MAREK
JAMES C. MALLIOS
CANDACE M. ADIUTORI
LEILA I. NOOR
CHRISTINA J. KANG
JEFFREY ZIMMERMAN*
TED J. SWIECICHOWSKI*
JOHN A. KAROL*

*AWAITING ADMISSION
TO THE BAR

December 11, 2002

**BY HAND**

Mr. Robert S. Clemente
Director of Arbitration
New York Stock Exchange, Inc.
20 Broad Street, 5th Floor
New York, New York 10005

Re: Eric E. Alt, Michael Barr, J.J. Beaghan, Brian S. Bean, Charles Bolton, Vincent Bowen III, Richard A. Brand, Clark Callander, Georgene Carambat, Michael Casey, Jeffrey W. Colin, Alex Dean, Christopher Dodge, David Fullerton, Philip Gardner, Jonathan Goldman, Christopher W. Greer, Tony Haertl, Gregory C. Holmes, Frederick M. Hughes, Daniel Hurwitz, Andrew Kaye, Maureen McCarthy, Kevin McGinty, Todd H. McWilliams, Samuel A. Morse, Agnes Murphy, Diane P. Murphy, David O'Brian, Joseph Piazza, Michael P. Perrella, Larry Rehmer, David Reilly, John T. Rossi, Mark J. Salter, Scott Scharfman, Allen Smith, Scott Sullivan, Steven Tishman, Ted E. Tobiason, Daniel P. White III and Jeff Winaker v. FleetBoston Financial Corporation, Fleet Securities, Inc., Robertson Stephens, Inc., and Robertson Stephens Group, Inc.

Dear Mr. Clemente:

We represent the Claimants in the above-referenced matter and submit this Statement of Claim against Respondents, FleetBoston Financial Corporation, Fleet Securities, Inc., Robertson Stephens, Inc., and Robertson Stephens Group, Inc.[1]

---

[1] Respondents FleetBoston Financial Corporation and Fleet Securities, Inc. shall be referred to collectively as "Fleet." Respondents Robertson Stephens, Inc. and Robertson Stephens Group, Inc. shall be referred to collectively as "Robertson Stephens."

FILED: NEW YORK COUNTY CLERK 08/13/2018 09:47 PM INDEX NO. 159781/2014
NYSCEF DOC. NO. 157                                                                           RECEIVED NYSCEF: 08/13/2018

LIDDLE & ROBINSON, L.L.P.

Mr. Robert S. Clemente                              -2-                              December 11, 2002

## Preliminary Statement

The Claimants, all former executives of Robertson Stephens, seek over $140 million in damages in this arbitration, plus punitive damages, attorneys' fees, interest and costs, based on, inter alia:  Respondents' failure to pay promised and earned bonus compensation for 2001 and 2002; Respondents' failure, in violation of the Worker Adjustment and Retraining Notification ("WARN") Act, 29 U.S.C. §§ 2101-2109, to make proper notice pay payments to Claimants; Respondents' fraudulent misrepresentations and material omissions concerning Claimants' employment, compensation and equity interests in Robertson Stephens; and Fleet's breach of its fiduciary duties as majority shareholder of Robertson Stephens.

In addition to seeking earned compensation and other payments in connection with their employment and the ultimate termination of that employment, Claimants seek damages for Fleet's actions in encouraging Claimants to remain at Robertson Stephens until it abruptly decided to close Robertson Stephens's business on July 12, 2002, misrepresenting the "non-cash" compensation earned by the Claimants, misrepresenting and concealing its intention to shut down Robertson Stephens irrespective of its ability to sell Robertson Stephens either to outside buyers or to Robertson Stephens' management, exercising control over Robertson Stephens purely for Fleet's benefit, and otherwise conducting itself in a fraudulent and deceitful manner to Claimants' detriment. Fleet's conduct, beginning with the termination of Robertson Stephens' successful CEO and continuing through numerous stages of layoffs and a negative announcement concerning Fleet's desire to sell Robertson Stephens, resulted in the complete elimination of the Robertson Stephens firm, which had generated significant revenues and earnings for Fleet and its predecessor BankBoston, which Fleet acquired in October 1999. As a result, Claimants' careers and reputations were damaged, their earned compensation (largely invested in non-cash compensation) was deemed "forfeited," and they suffered the loss of prospective compensation, both from other employers and from the continuation of Robertson Stephens's operations through a management buy-out.

## Background

Robertson Stephens is an investment banking firm that had been in existence for 24 years before Fleet announced, on July 12, 2002, that it was ceasing Robertson Stephens's operations. Claimants were Managing Directors and Principals of Robertson Stephens. and among the most senior and most productive individuals within the firm. Claimants were employed in the cities of New York, Atlanta, Boston and Chicago, the state of California and the country of Israel.

Robertson Stephens was founded in 1978 and was acquired by Bank of America in 1997. Bank of America sold Robertson Stephens to BankBoston in 1998. In October 1999, Fleet merged with BankBoston and, as a result, acquired Robertson Stephens.[2] Thus, from October 1999

---

"Fleet." Respondents Robertson Stephens, Inc. and Robertson Stephens Group, Inc. shall be referred to collectively as "Robertson Stephens."

[2] The current Chairman and CEO of FleetBoston Financial Corporation, Chad Gifford, consummated BankBoston's acquisition of Robertson Stephens in his capacity as CEO of BankBoston.

FILED: NEW YORK COUNTY CLERK 08/13/2018 01:47 PM    INDEX NO. 159781/2014
NYSCEF DOC. NO. 157                                                  RECEIVED NYSCEF: 08/13/2018

LIDDLE & ROBINSON, L.L.P.

Mr. Robert S. Clemente                    -3-                    December 11, 2002

to date, Fleet has controlled the operations of Robertson Stephens. Indeed, as detailed below, at times Fleet exercised its control over the business of Robertson Stephens without first informing the management of Robertson Stephens of its true intentions.

Since Fleet's acquisition of the firm, Robertson Stephens generated billions of dollars of revenue for Fleet. By 2000, Robertson Stephens was a leading underwriter for all equity issues, including the number one "lead underwriter" for initial public offerings in the technology sector. Moreover, the firm was a leading adviser in mergers and acquisitions transactions and a top market maker of publicly-traded securities, and it consistently generated millions of dollars in profits through the efforts of each of its departments: sales and trading, investment banking, money management, and research. In 2000, Robertson Stephens Group generated revenues of $1.55 billion and net income of $250 million. On a cumulative GAAP basis since its acquisition in 1999, Robertson Stephens has contributed nearly $3.5 billion in revenue to Fleet.

Respondents Promise Claimants
Valuable Equity in Robertson Stephens

In December 2000, at the conclusion of a very successful year for Robertson Stephens, Fleet advised Robertson Stephens that Robertson Stephens employees would be granted equity in the firm, and that a Board of Directors would be established – consisting of two members each from Fleet and Robertson Stephens – to protect the interests of Robertson Stephens's minority shareholders, including Claimants. Of 100 million "Robertson Stephens Restricted Units" (at the time valued by Lazard Freres at $1 billion, or $10 per unit), Robertson Stephens employees were to receive 30 percent (30 million units), with 22.5 percent to be granted initially and the remaining 7.5 percent to be retained for future allocations to existing and future Robertson Stephens employees. These measures were considered necessary to retain key employees, since Robertson Stephens had lost more than 10 principals to competitors in the prior 18-month period.

Rather than creating support from Fleet for Robertson Stephens, Robertson Stephens's $1.55 billion revenue year for 2000 ultimately resulted in hostility by Fleet's top management towards Robertson Stephens and its employees. Terrance Murray, ("Murray"), FleetBoston's CEO, and Bob Emery ("Emery"),[3] the CEO of Robertson Stephens, were involved in a very public dispute over how Robertson Stephens employees were to be compensated for the banner year achieved in 2000. Under compensation agreements entered into as part of BankBoston's acquisition of Robertson Stephens in 1998 (which were assumed by Fleet when it acquired BankBoston in 1999), Robertson Stephens was to receive 55 percent of the net revenues generated by the firm to distribute as compensation to its employees for each year through 2001. The dispute concerned whether the 55 percent threshold applied to cash compensation only, or to both cash and non-cash compensation. Believing the dispute had been resolved in its favor and that

---

[3] Emery, named one of the top 50 people in the technology community worldwide in 2001, had delivered two record years of performance at Robertson Stephens to Fleet.

FILED: NEW YORK COUNTY CLERK 08/13/2018 01:47 PM
INDEX NO. 159781/2014
NYSCEF DOC. NO. 157
RECEIVED NYSCEF: 08/13/2018

LIDDLE & ROBINSON, L.L.P.

Mr. Robert S. Clemente                    -4-                    December 11, 2002

it had an additional $70 million in compensation to distribute for the year 2000, Robertson Stephens's management distributed such amount.[4]  Following the $70 million distribution, Jay Sarles ("Sarles") (Head of Wholesale Banking for FleetBoston) fired Emery, at Murray's direction, and appointed John Conlin ("Conlin") (then President of Robertson Stephens) to head the firm going forward.   Following these events, Fleet failed to honor its obligations regarding the distribution of Robertston Stephens Restricted Units, stalling such distribution until May 2001.  At that time, moreover, only 20 percent of the firm's equity (and not the 22.5 percent that had been promised) was distributed to Robertson Stephens employees.  (In addition, Respondents ultimately failed to distribute the full 30 percent, or 30 million units, that had previously been agreed upon.)

Respondents Direct the Reduction of
Robertson Stephens's Workforce in a
<u>Manner Designed to Further Their Own Goals</u>

Throughout 2001, difficult market conditions prevailed, including an industry-wide decline in technology sector investment banking activity, as well as lower volumes in overall investment banking transactions and other industries in which Robertson Stephens engaged.  The managements of Fleet and Robertson Stephens concluded that Robertson Stephens needed to reduce the number of its employees in order to remain profitable.  As a result, Fleet directed Robertson Stephens to reduce Robertson Stephens's workforce by a staggering 50 percent, from approximately 2,000 to approximately 1,000 employees.  Robertson Stephens's management suggested that if such a massive reduction in force was necessary, Robertson Stephens would benefit most by doing so in one downsizing, so as to achieve the benefits of reduced compensation expense immediately.

Fleet, however, insisted that Robertson Stephens take these staffing cuts over time given <u>Fleet's</u> financial concerns.  Fleet's own corporate lending and banking business had suffered massive losses in its operations relating to Brazil and Argentina and through its exposure to various large corporate credit failures, including Enron, Kmart and Global Crossing.  Fleet also suffered large write-downs in its investment portfolio, which were primarily attributable to technology and telecommunications investments wholly unrelated to Robertson Stephens.  By the fourth quarter of 2001, Fleet reflected write-downs, charges and other extraordinary losses relating to its own corporate lending and banking businesses exceeding <u>$2 billion</u> for the year, and year-over-year comparable net income for FleetBoston fell by <u>$3 billion</u> in 2001.  Upon information and belief, even these sizeable losses were understated, since Fleet failed to reflect the full extent of its losses until the second quarter of 2002.  Moreover, Fleet's losses in Latin America may still not be fully recognized.[5]

---

[4] Emery and the other five members of the Robertson Stephens Executive Committee received the bulk of the $70 million.

[5] Based on the criminal indictments of Fleet officers in Argentina and civil cases pending concerning Fleet's premature freezing of customer assets in Argentina, Fleet's losses in Argentina alone could rise dramatically from the current $2.3 billion in aggregate losses to date.

FILED: NEW YORK COUNTY CLERK 08/13/2018 01:47 PM
INDEX NO. 159781/2014

NYSCEF DOC. NO. 157

RECEIVED NYSCEF: 08/13/2018

19-12346-shl    Doc 55-7    Filed 09/05/19    Entered 09/05/19 18:22:01    Exhibit C
Part 5    Pg 35 of 99

LIDDLE & ROBINSON, L.L.P.

Mr. Robert S. Clemente        -5-        December 11, 2002

In light of these staggering losses within its own businesses, Fleet decided against reducing Robertson Stephens's staff all at once. Instead, Fleet dictated that Robertson Stephens reduce its personnel in four stages so that Fleet would not need to reflect a write-down for severance and other charges relating to the downsizing of Robertson Stephens in one massive charge. Fleet's decision in this context, as well as its "staging" of losses and charges in South America and in its investment portfolio, was indicative of Fleet's practice of "earnings smoothing" for the purpose of artificially supporting Fleet's stock price.[6] In addition, Fleet's decision was consistent with Fleet's pattern of making decisions regarding Robertson Stephens for the benefit of Fleet and Fleet's shareholders rather than for the benefit of Robertson Stephens and Robertson Stephens's minority shareholders and employees, such as Claimants.

From approximately March through November 2001, Fleet and Robertson Stephens executed Fleet's plan of staged personnel layoffs. By the end of 2001, Fleet and Robertson Stephens's management had reduced the size of Robertson Stephens by half, to approximately 1,000 employees. Although Robertson Stephens Group's revenues declined to $466 million for 2001, resulting in a $98 million net loss,[7] the massive cuts in staffing put the firm in a position to regain its profitability in 2002. By November 2001, Robertson Stephens Group was once again generating a positive cash flow, and during the first quarter of 2002, the firm generated $2.4 million in normalized cash earnings.

Respondents Promise Claimants
Market Compensation for 2001

Throughout 2001, Respondents told Claimants that Respondents intended to pay Claimants "market compensation" for their efforts in 2001. Specifically, Sarles promised on innumerable occasions (nearly every two or three weeks) that despite the difficult and extraordinary circumstances faced in 2001 (including Emery's termination, the 9/11 disaster and the ongoing layoffs), key Robertson Stephens employees (retained Managing Directors and Principals) would receive "market compensation," sentiments that were frequently echoed by Conlin and Todd Carter, Robertson Stephens's CEO and President, respectively. These promises reflected Fleet's apparent effort to retain top talent among the Robertson Stephens employees despite the massive ongoing personnel cuts at Robertson Stephens.

Respondents made clear that "market compensation" would be determined by the employee's revenue production and the compensation paid by comparable Wall Street firms. In addition, the historical compensation payout formula (approximately 55 percent of revenue) was reaffirmed to promote ongoing production from Robertson Stephens employees. In order to establish appropriate pay levels for Principals, Managing Directors and other Robertson Stephens executives, Fleet subscribed to compensation surveys from McLagan Partners and Greenwich

---

[6] Another reason for Fleet to shift its 2001 losses to the following year was to pave the way for a smooth retirement for Murray, who retired at the end of 2001.

[7] The loss Robertson Stephens incurred in 2001 represented the first loss for any year in the history of the firm.

FILED: NEW YORK COUNTY CLERK 08/13/2018 01:47 PM
INDEX NO. 159781/2014

19-12346-shl    Doc 55-7    Filed 09/05/19    Entered 09/05/19 18:22:01    Exhibit G
Part 5    Pg 36 of 99

NYSCEF DOC. NO. 157
RECEIVED NYSCEF: 08/13/2018

LIDDLE & ROBINSON, L.L.P.

Mr. Robert S. Clemente                          -6-                          December 11, 2002

Associates that set forth pay at comparable firms for similar levels of responsibility and revenue generation.

Despite Respondents' promises, Respondents failed to pay Claimants market compensation for 2001, but instead paid on average half that amount. Claimants received on average five percent or less of the revenues they generated as compensation (when the Wall Street benchmark is at least 10 percent).[8] Upon information and belief, Claimants' compensation for 2001 also fell substantially below the compensation of their peers as indicated in the McLagan and other surveys.

Respondents Issue Restricted Units and
Other Non-Cash Deferred Compensation to
Claimants In Order to Retain Top Employees

Claimants' 2001 bonuses, moreover, were comprised largely of deferred non-cash compensation,[9] including Fleet options, "money market" funds vesting over the course of 2002 and 2003, and equity in Robertson Stephens in the form of one million Robertson Stephens Restricted Units. Whereas the convention on Wall Street is to pay 20 to 33 percent of bonus compensation in the form of deferred compensation, and in the history of Robertson Stephens no more than 20 percent of bonus compensation had been deferred, Claimants received as much as 100 percent of their 2001 compensation in the form of deferred compensation.

Respondents told Claimants that, for each Restricted Unit granted to Claimants, they would receive one share of Robertson Stephens common stock upon the earliest of: (a) the termination of their employment, (b) the liquidation of Robertson Stephens, or (c) the expiration of the restricted period[10] of such units. These same terms applied to the 20 million Restricted Units distributed in May 2001. The remaining Restricted Units earmarked for Robertson Stephen employees (i.e., the balance of the 30 million units Respondents had agreed to distribute, plus Restricted Units forfeited by employees who voluntarily resigned or were terminated for cause) were never allocated.

Through March 2002, Respondents represented to Claimants that each Restricted Unit had a value of at least $7. Indeed, in written confirmations of Claimants' compensation for 2001, which were distributed and orally confirmed in March 2002, Respondents stated that "the units are exchangeable, under certain circumstances, for shares of Robertson Stephens common stock," and that such common stock "has an estimated market value of $7 per share, consistent

---

[8] Respondents also paid 2001 bonuses later than usual in a further effort to keep employees from leaving for competitors.

[9] Such deferred non-cash compensation is not uncommon on Wall Street. Ostensibly, the purpose behind a non-cash deferral is to retain employees by providing an incentive for them to stay with the firm and not defect to a competitor in order to reap long-term benefits from the increased value of the company in the future.

[10] Five years for restricted units awarded as part of Claimants' incentive compensation, and seven years for restricted units granted as "service awards."

LIDDLE & ROBINSON, L.L.P.

Mr. Robert S. Clemente          -7-          December 11, 2002

with an analysis performed by Lazard Freres during 2001," which valued the firm's aggregate equity in excess of $700 million. This value was consistent with the $6.75 book value per share of Robertson Stephens Group as of March 31, 2002 (prior to the fateful April 16 announcement).

Claimants relied to their detriment upon Respondents' representations regarding the "market compensation" they were to receive for 2001, the value of the non-cash deferred compensation they received in 2001 and prior years, and the amounts and value of the equity they expected to receive in the future, by, among other things, declining alternative employment opportunities, remaining at Robertson Stephens, and accepting long-term deferred compensation comprised of the Restricted Units and other non-cash compensation. In addition, Respondents concealed from Claimants Fleet's plan to sell the Robertson Stephens firm. Instead, Respondents misrepresented that Fleet had no intention of selling Robertson Stephens because Fleet understood the "strategic" importance of Robertson Stephens to Fleet.

In fact, upon the expiration of the BankBoston contracts in February 2002, which provided for the distribution of 55 percent of revenues as bonus compensation, Fleet entered into a new long-term compensation arrangement with Robertson Stephens, which provided for varied aggregate compensation payout ratios between 48 and 65 percent of revenues, depending on whether annual revenues were less than $500 million, greater than $500 million but less than $1.5 billion, or greater than $1.5 billion. (Upon information and belief, however, Fleet knew, by as early as late 2001, that Fleet secretly intended to seek to sell or close Robertson Stephens. Thus, Fleet's negotiation of long-term compensation arrangements concerning Robertson Stephens was tainted by bad faith.) The BankBoston contracts, however, provided for payment of a year's compensation to Robertson Stephens employees whose employment was terminated prior to February 28, 2002. For this reason, Fleet delayed its plans to sell or close Robertson Stephens until the expiration of those contracts. In addition, Respondents hid from Claimants Fleet's intention to sell or shut down the Robertson Stephens firm.

Fleet's Premature Announcement
Of the Sale of Robertson Stephens
Damages the Firm and Its Professionals

On April 16, 2002, Fleet suddenly announced that it was putting Robertson Stephens up for sale. In a highly unusual step, **Fleet made this announcement without any buyer in place.** By doing so, Fleet essentially advertised that it had not found a buyer for Robertson Stephens, thereby reducing the value of the Robertson Stephens concern. Worse still, Fleet released to the media – and discussed with institutional investors and Wall Street research analysts in its quarterly earnings call – its reasons for ridding itself of Robertson Stephens, including dissatisfaction with volatility in Robertson Stephens's earnings performance. Fleet also stated that Robertson Stephens's strong operating performance during 1999 and 2000 was "aberrational" and "would not return in our collective lifetimes," and expressed its belief that future benefits of the investment banking business would accrue to more diversified, larger platform firms and "not boutiques like Robbie Stephens." This language was especially disparaging given that Robertson Stephens had been a leading underwriter of public offerings

LIDDLE & ROBINSON, L.L.P.

Mr. Robert S. Clemente                    -8-                    December 11, 2002

since 2000, was a top market maker of NASDAQ securities, and managed billions in institutional
and high net worth assets.

  The timing of this announcement, in connection with the announcement of other
"clean-up" measures,[11] was designed to serve Fleet and to bolster Fleet's stock price without
regard to Robertson Stephens or Claimants. In fact, Fleet's stock increased by over $2 billion in
the aggregate after its April 16 announcement.

  Immediately, Fleet's rash announcement cast Robertson Stephens in a negative
light, and generated speculation that Robertson Stephens's value had dropped precipitously from
the $800 million BankBoston had paid for the firm in 1998. In addition, the announcement hurt
Claimants' ability to bring in business, maintain existing clients, and otherwise generate
revenues for Robertson Stephens. This harm spread across all departments at Robertson
Stephens – new investment banking clients shied away, institutional investors reduced their
commission flow, high net worth individuals transferred their assets to other institutions, and all
clients expressed concern regarding the future of the firm, a subject that was speculated upon in
numerous press articles.

  Despite the potential impact of Fleet's announcement on every employee within
the Robertson Stephens firm, Fleet failed to notify Robertson Stephens's management of the
planned announcement until April 15, 2002, just one day prior to the actual announcement. (The
announcement was reported in a lengthy Wall Street Journal article, a copy of which is attached
hereto as Exhibit A, indicating that Fleet had probably made its intentions known to the media
several days prior to when Fleet informed the management of Robertson Stephens.) Fleet
concealed its announcement from Robertson Stephens's management and Claimants despite the
fact that Fleet representatives sat on the Board of Directors of Robertson Stephens.

Fleet Negotiated in Bad Faith a Proposed
Management Buy-Out of Robertson Stephens

  Even after its April 16, 2002 announcement, Fleet continued to make material
misrepresentations to Robertson Stephens employees concerning their future employment. On
April 26, 2002, Sarles declared that Fleet had no intention of liquidating Robertson Stephens.

  Fleet engaged Goldman Sachs, which, after interviewing the Robertson Stephens
Executive Management team, put together a summary information statement outlining the
opportunity to acquire Robertson Stephens. The statement was circulated to 72 prospective
purchasers, signaling an auction of the firm. Not surprisingly, given Fleet's disastrous April 16
announcement and comments concerning the undesirability of Robertson Stephens, none of the
prospective purchasers sustained interest in Robertson Stephens. By June 2002, after Fleet was
unable to locate a buyer, Fleet and Robertson Stephens's management had begun discussions

---

[11] Fleet's other announcements included a reduction in its exposure to non-strategic areas of corporate lending, the
scaling back of investments in its Principal Investing business, the sale of AFSA (Fleet's outsourcing and education
services business), and strategic decisions concerning its Global Banking operations.

LIDDLE & ROBINSON, L.L.P.

Mr. Robert S. Clemente                    -9-                    December 11, 2002

concerning management's potential purchase of Robertson Stephens. Robertson Stephens representatives conducted more than 250 hours of negotiations with Fleet and more than 12 hours of presentations to the entire group of Robertson Stephens professionals outlining the terms of the planned management buy-out ("MBO"), and more than 1,000 pages of legal agreements were fully drafted and awaiting execution. Moreover, Robertson Stephens's management (and, upon information and belief, Fleet's management), confirmed to clients and the media that the MBO was being negotiated and that an agreement in principle had been reached to continue the operations of Robertson Stephens.

Also in connection with the MBO, Terrence Laughlin, Fleet's head of Corporate Strategy and Development, advised that Robertson Stephens would need to endure further cuts in personnel to enable an MBO. In a good faith effort to effect the MBO, Robertson Stephens cut personnel further – to approximately 500 employees by July 12, 2002.[12] Each Managing Director who was to remain with the newly-constituted MBO firm was given a pro forma allocation of equity and a draft term sheet. Fleet concealed from Robertson Stephens and Claimants, however, that Fleet never intended to complete the MBO transaction.

Fleet Closes Robertson Stephens

At Fleet's insistence, and based upon the apparent willingness of Fleet to sell Robertson Stephens to its management, Robertson Stephens had taken the drastic step of reducing its staff from 2000 to 500 employees in just over one year. Despite having imposed such requirements as a condition of enabling an MBO, and having negotiated the MBO to near-completion, on July 12, 2002 – the very day that the MBO agreements were to be distributed for signature – Fleet informed Robertson Stephens that it had "run out of time" and discontinued all efforts to negotiate an MBO.[13] Three days later, Fleet announced the liquidation of Robertson Stephens. Eugene McQuade ("McQuade"), a Fleet Vice Chairman and Fleet's Chief Financial Officer, stated "we have decided a wind-down is in the best interest of our shareholders." (emphasis added)

On August 6, 2002, Fleet scheduled an extraordinary intra-quarter conference call with the Wall Street analyst community to calm rumors and concerns over the soundness of Fleet – rumors that began circulating after further sizeable write-downs in Latin America and other areas of the bank had been disclosed in the prior month's quarterly earnings call and Fleet's stock price decreased by 50 percent. On the call, to alleviate concerns over future dividend cuts, McQuade stated that Fleet would be able to continue to pay the current quarterly dividend rate to its shareholders, in large part because the liquidation of Robertson Stephens provided sufficient cash and freed-up capital to meet certain "liquidity tests" set forth in relevant dividend covenants.

---

[12] The Claimants in this arbitration (with few exceptions) were Robertson Stephens employees through at least July 12, 2002.

[13] Documents from Fleet rejecting the MBO were dated two weeks earlier than the date on which they were received by Robertson Stephens.

FILED: NEW YORK COUNTY CLERK 08/13/2018 01:47 PM

NYSCEF DOC. NO. 157

19-12346-shl    Doc 55-7    Filed 09/05/19    Entered 09/05/19 18:22:01    Exhibit C
Part 5    Pg 40 of 99

INDEX NO. 159781/2014

RECEIVED NYSCEF: 08/13/2018

LIDDLE & ROBINSON, L.L.P.

Mr. Robert S. Clemente                      -10-                      December 11, 2002

Fleet's decision to close Robertson Stephens resulted in the termination of Claimants' employment. Respondents offered Claimants severance packages that required Claimants to sign a release of all claims in order to receive "supplemental incentive bonus" amounts, which represented earned bonus compensation for prior years that had been paid in the form of Fleet stock and options. Moreover, the severance packages included "WARN Period Salary" which Respondents (a) improperly calculated based only on base salary, and (b) improperly deducted from severance due Claimants based on their tenure with the firm.

Claimants were offered no bonus compensation for the services they provided and the revenue they produced under extremely difficult conditions in 2002. In addition, although acknowledging that Claimants would be entitled to shares of Robertson Stephens common stock equivalent to the number of all of their Robertson Stephens Restricted Units, Respondents' severance proposals to Claimants attributed a zero value to the Restricted Units and common stock. Only weeks earlier, Respondents had reassured Claimants of the at least $7 per share value of the Restricted Units and had described Robertson Stephens as a viable ongoing firm valued at over $700 million, rendering it unbelievable that "neither the restricted units under the Restricted Unit Plan, nor the underlying shares of Robertson Stephens common stock, have a positive value," as stated in the severance proposals. Moreover, Fleet paid $5 per Restricted Unit to Robertson Stephens employees terminated in November 2001 and in Europe in mid-2002.

## CLAIMS

### WARN Act Claims

In the separation packages offered to Claimants, Respondents acknowledge that the WARN Act governs their decision to close the Robertson Stephens firm. The WARN Act provides, in pertinent part:

> An employer shall not order a plant closing or mass layoff until the end of a 60-day period after the employer serves written notice of such an order --
>
> (1) to each representative of the affected employees as of the time of the notice or, if there is no such representative at that time, to each affected employee.

29 U.S.C. § 2102(a).

The WARN Act was "designed to give workers and their families some transition time to adjust to the prospective loss of employment, to seek and obtain alternative jobs and ... to enter skill training ... that will allow these workers to successfully compete in the job market." Martin v. AMR Services, 877 F. Supp. 108, 113 (E.D.N.Y. 1995) (internal citations omitted).

19-12346-shl    Doc 55-7    Filed 09/05/19    Entered 09/05/19 18:22:01    Exhibit G
Part 5 / Pg 41 of 99

LIDDLE & ROBINSON, L.L.P.

Mr. Robert S. Clemente                -11-                December 11, 2002

Respondents violated the WARN Act by failing to provide the requisite 60-day notice prior to closing Robertson Stephens' operations (or, alternatively, to pay 60 days of notice pay). Failure to give written notice of termination within the 60 days prescribed constitutes a violation of the WARN Act. See, e.g., Finnan v. L.F. Rothschild & Co., Inc., 726 F. Supp. 460 (S.D.N.Y. 1989); New Orleans & Vicinity v. Dillard Department Stores, 15 F.3d 1275 (5th Cir. 1994).

When proper notice is not provided, employees are entitled to back pay damages of up to 60 days of notice pay. The notice pay offered to Claimants in lieu of Respondents' providing 60-days' notice of the closing of Robertson Stephens violates the WARN Act in two respects. First, the payment should have been calculated on a total compensation basis. Respondents instead offered notice pay based only on base salary. The WARN Act describes the extent of an employer's liability for failure to provide the required notice as:

"back pay for each day of violation at a rate of compensation not less than the higher of –

(i)   the average regular rate received by such employee during the last 3 years of the employee's employment; or

(ii)  the final regular rate received by such employee...."

29 U.S.C. § 2104(a)(1). The WARN Act back pay remedy must be calculated to reflect the amount an "employee actually would have earned" and not merely an employee's base salary. Local Joint Exec. Bd. of Culinary/Bartender Trust Fund v. Las Vegas Sands, Inc., 244 F.3d 1152 (9th Cir. 2001).

Second, Respondents deducted the WARN notice pay offered to Claimants from severance due Claimants pursuant to an entirely separate obligation, namely, Respondents' severance plans and ERISA. This deduction is not permitted by the WARN Act. 29 U.S.C. § 2104(a)(2) provides in pertinent part:

The amount for which an employer is liable under paragraph (1) shall be reduced by

(A) any wages paid by the employer to the employee of the period of the violation;

(B) any voluntary and unconditional payment by the employer to the employee that is not required by any legal obligation; and

(C) any payment by the employer to a third party or trustee (such as premiums for health benefits or payments to a defined contribution pension plan) on behalf of and attributable to the employee for the period of the violation.

19-12346-shl    Doc 55-7    Filed 09/05/19    Entered 09/05/19 18:22:01    Exhibit C
Part 3 Pg 42 of 99

LIDDLE & ROBINSON, L.L.P.

Mr. Robert S. Clemente                    -12-                    December 11, 2002

Severance payments, however,

> are not "wages" as contemplated by 29 U.S.C. § 2104(a)(2)(A), but rather
> ERISA payments that the company was already legally obligated to make
> regardless of the work the [claimants] performed. The fact that these
> payments happened to be labeled ["WARN Period Salary Offset"], and
> that they happened to be set at the level of the [claimants'] wages, is
> irrelevant. The payments were not made in exchange for work that
> the[claimants] would have performed during the period of the violation.
> Accordingly, they are not "wages" according to 29 U.S.C.
> § 2104(a)(2)(A).

Ciarlante v. Brown & Williamson Tobacco Corp., 143 F3d 139, 152 (3rd Cir. 1998). See also Tobin v. Ravenswood Aluminum Corp., 838 F. Supp 262, 273 (S.D.W.Va. 1993) ("The court notes that severance pay under ERISA does not constitute wage compensation."); 29 U.S.C. § 2104(a)(1)(B) (providing that damages for failure to provide proper notice under the WARN Act include payment of benefits under an employee benefit plan in addition to backpay). Here, where the severance package attempts to deduct WARN Act back pay damages from an already present legal obligation under ERISA, the deduction is improper, and Claimants should receive the full value of both the WARN and ERISA payments.

Based on Respondents' violation of the WARN Act, Claimants each should be awarded damages based on their individual rates of compensation, in accordance with 29 U.S.C. § 2104, together with their attorneys' fees and costs.

**Bonus Claims**

Claimants were employed in the following divisions: investment banking, sales and trading, research, and retail brokerage. Except for retail salespeople, all of the Claimants were compensated in similar fashion – in addition to base salary, they earned year-end bonuses, which accounted for the bulk of their total compensation. Claimants understood that their bonus was a function of the firm's performance, their department's performance and their individual performance. Not only was this manner of calculating bonuses Respondents' practice and policy for several years, but Respondents made express representations to many of the Claimants that this is precisely how their bonuses would be determined.

For 2001, moreover, Respondents expressly promised Claimants that they would receive "market compensation" based on their performance and the compensation paid by comparable Wall Street firms. Respondents failed to fulfill this promise, paying bonuses that were well below market and overwhelmingly comprised of deferred compensation. Respondents also failed to fulfill their promise that Robertson Stephens employees would receive 30 percent of the firm's equity in the form of Restricted Units.

LIDDLE & ROBINSON, L.L.P.

Mr. Robert S. Clemente                    -13-                    December 11, 2002

In addition, **Respondents repeatedly advised Claimants throughout their
employment during 2002 that Respondents had been accruing a 2002 bonus pool that totaled
approximately $40 million**. Upon the termination of Claimants' employment, however,
Respondents told Claimants that Claimants would receive no bonus compensation for 2002.
Claimants are nonetheless entitled to such earned compensation.

Courts recognize implied, as well as express, contracts. The bonus compensation
Claimants should have been paid for both 2001 and 2002 was owed to them under an implied
contractual promise. "[A]n implied-in-fact contract … [is] based on the conduct of the parties, from
which … [they] fairly infer the existence and terms of a contract." Radio Today, Inc. v. Westwood
One, Inc., 684 F. Supp. 68, 71 (S.D.N.Y. 1988).[14] see also Division of Labor Law Enforcement v.
Transpacific Transportation Co., 69 Cal.App.3d 268, 275, 137 Cal.Rptr.855 (1977) ("As to the basic
elements, there is no difference between an express and implied contract. While an express contract
is defined as one, the terms of which are stated in words, an implied contract is an agreement, the
existence and terms of which are manifested by conduct."); LiDonni, Inc. v. Hart, 355 Mass. 580,
583, 246 N.E.2d 446, 449 (1969) ("In the absence of an express agreement, a contract implied in
fact may be found to exist from the conduct and relations of the parties"); Century 21 Castles By
King, LTD. v. First National Bank of Western Springs, 170 Ill.App.3d 544, 548, 524 N.E.2d 1222
(1988) ("a contract implied in fact arises not by express agreement but, rather, by a promissory
expression which may be inferred from the facts and circumstances which show an intent to be
bound"); Fortner v. McCorkle, 78 Ga.App. 76, 80, 50 S.E.2d 250, 253 (1st Div. 1948) ("In the
absence of an express contract between the parties for the payment of such services, there may arise
an implied contract by which the person to whom the services are rendered shall pay the other for
the services, where from all the facts and circumstances it can reasonably be inferred that it is in the
contemplation of the parties.").

Here, an implied contract for the payment of bonuses is established between
Respondents and Claimants because (1) Respondents had a long-standing policy and practice of
paying bonuses as part of annual compensation; (2) Claimants received bonuses in the past based

---

[14]  The practice of paying bonuses makes bonus compensation an implied part of any employment agreement. See, e.g.,
Credit Suisse First Boston v. Crisanti, 734 N.Y.S.2d 150, 151 (1st Dep't 2001) ("We find no basis for judicial
disturbance of the arbitrators' primarily factual conclusion that the bonus sought by respondent was an essential
component of his compensation and that the parties' course of dealing and the industry practice gave rise to an
implied right to a bonus."); Mirchel v. RMJ Securities Corp., 613 N.Y.S.2d 876, 878-79 (1st Dep't 1994) ("The course
of dealing between the parties evinces an implied promise that annual or semi-annual bonus payments constitute a part of
plaintiff's compensation."); Guintoli v. Garvin Guybutler Corp., 726 F. Supp. 494, 507-08 (S.D.N.Y. 1989) (an implied
promise that bonus payments constitute a term of employment can be shown through a course of dealing between
employer and employee). Numerous bonus cases have been brought in arbitration and won by the claimants. See
Randall Smith, "Losing a Job on Wall Street These Days Often Doesn't Mean Losing a Bonus, Too," Wall Street
Journal, July 19, 2000, at C1 (attached hereto as Exhibit B); Marais v. Barclays De Zoete Wedd, Inc. and Barclays
Capital, NASD Case No. 00-02520 (panel awarded bonus compensation totaling $417,500 plus interest); Brown, et al. v.
ING Baring Furman Selz, NYSE Docket No. 2000-8755 (panel awarded bonus of $206,750 plus interest); Alban-Davies
v. Credit Lyonnais Securities (USA) Inc.; NYSE Docket No. 2000-8631 (panel awarded bonus of $650,000 plus
interest); Halpern, et al. v. ING Baring (U.S.) Securities Inc., NYSE Docket No. 1998-7179 (panel awarded bonuses
totaling $298,154.76, including interest).

FILED: NEW YORK COUNTY CLERK 08/13/2018 01:47 PM

NYSCEF DOC. NO. 157

19-12346-shl    Doc 55-7    Filed 09/05/19    Entered 09/05/19 18:22:01    Exhibit C
Part 5    Pg 44 of 99

INDEX NO. 159781/2014

RECEIVED NYSCEF: 08/13/2018

LIDDLE & ROBINSON, L.L.P.

Mr. Robert S. Clemente                    -14-                    December 11, 2002

upon this long-standing practice; (3) bonuses constituted a substantial portion of Claimant's annual compensation packages; and (4) Claimants were aware of Respondents' long-standing bonus practice and relied upon it in rendering services their employment.

In Hall v. United Parcel Service, 76 N.Y.2d 27, 556 N.Y.S.2d 21 (1990), the court determined that "[a]n employee's entitlement to a bonus is governed by the terms of the employer's bonus plan." Although the plaintiff in Hall did not qualify for his employer's bonus plan, there is no question that Claimants qualified for Respondents' bonus plan. The Claimants all performed their jobs during 2002 based upon the understanding that their year-end bonus would be determined by their individual performance, their department's performance, and the performance of the firm. Since Robertson Stephens' practices, policies and verbal assurances constitute a "bonus plan," Claimants are entitled to bonus compensation for 2002 in accordance with that plan.

Respondents are also liable to Claimants for their unpaid bonus compensation under the doctrine of quantum meruit. Under this theory, one who accepts and benefits from the services of another who expects to be paid must pay the individual the reasonable value of those services. See Martin H. Bauman Assoc. v. H&M International Transport, 171 A.D.2d 479, 567 N.Y.S.2d 404, 408 (1st Dep't 1991); Griner v. Foskey, 158 Ga.App.769, 771, 282 S.E.2d 150, 152 (1981); J. A. Sullivan Corp. v. Commonwealth, 397 Mass. 789, 792-98, 494 N.E.2d 374, 376-79 (1986); Earhart v. William Low Company, 25 Cal.3d 503, 600 P.2d 1344 (1979); First National Bank of Springfield v. Malpractice Research, Inc., 179 Ill.2d 353, 688 N.E.2d 1179 (1997). Claimants provided substantial services to Respondents in 2002, and should be compensated accordingly.

In prior years, Claimants received substantial bonuses based on their performance, as shown by the chart below. In most instances, Claimants earned bonuses over the course of the last three years averaging from $1 million to $4 million as compared to annual base salaries of no more than $200,000 (except for one Claimant who earned a $250,000 annual base salary). Respondents' refusal to pay Claimants their earned bonuses is improper. Instead, Respondents should be compelled to pay Claimants their earned and promised 2001 and 2002 bonus compensation, plus interest.

**Claim For Severance Pay**

Claimants were dismissed without receiving any severance pay. Respondents offered to pay Claimants severance only if they agreed to release Respondents from "any claim, demand or cause of action of any kind" they may have against Respondents. Claimants were entitled, however, to receive severance pay from Respondents under Respondents' severance plans, policies and practices, and Claimants ask that they be awarded all amounts, as of yet undetermined, to which they are entitled as former executives of the firm.

Severance plans are "employee welfare benefit plans" within the meaning of the federal Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1001 et seq. ("ERISA"); see Gilbert v. Burlington Industries, Inc., 765 F.2d 320, 325 (2d Cir. 1985). As a result, each of Respondents' severance plans, practices and policies constitutes an employee benefit plan under

LIDDLE & ROBINSON, L.L.P.

Mr. Robert S. Clemente                    -15-                    December 11, 2002

ERISA. Respondents' failure to pay severance benefits to Claimants under the most favorable severance arrangement applicable to them constitutes a violation of ERISA. Claimants are therefore entitled to the severance payments they should have received, as well as recovery of their reasonable attorneys' fees expended in obtaining those payments. See ERISA, 29 U.S.C. § 1132(g)(1). Claimants ask the Panel to award them the unpaid severance to which they are entitled, plus their attorneys' fees and liquidated damages in recovering such benefits.

## Fraud, Negligent Misrepresentation and Breach of Fiduciary Duty Claims

An action for fraud can be shown by proof that Respondents made a false, material misrepresentation of an existing fact with knowledge that it was false (or reckless disregard as to whether it was true or false), with the intent that Claimants rely on such misrepresentations, and upon which Claimants reasonably relied to their detriment. Higginbottom v. Thiele Kaolin Co., 251 Ga. 148, 152, 304 S.E.2d 365 (1983); see also Werner v. American Int'l Group, Inc., 201 F.3d 446 (9th Cir. 1999) ("[T]he elements of a fraudulent inducement claim are: (a) misrepresentation; (b) scienter; (c) intent to defraud; (d) justifiable reliance; and (e) resulting damage."); Northeastern Univ. v. Deutsch, 2002 WL 968857, at *3 (Mass.Super. March 21, 2002) ("To state a claim for fraudulent misrepresentation, the plaintiff 'must show a false statement of material fact made to induce the plaintiff to act, together with reliance on the false statement by the plaintiff to the plaintiff's detriment."); Bd. of Educ. of City of Chicago v. A, C and S, Inc., 131 Ill.2d 428, 546 N.E.2d 580 (1989) (elements in a fraudulent misrepresentation are "(1) a false statement of material fact, (2) knowledge or belief of the falsity by the party making it, (3) intention to induce the other party to act, (4) action by the other party in reliance on the truth of the statements, and (5) damage to the other party resulting from such reliance"). Alternatively, Claimants can show that the Respondents, instead of misrepresenting an existing fact, made promises with the present intention not to perform "or with knowledge that the future event would not occur." Higginbottom, 251 Ga. at 152.

The elements of a claim for negligent misrepresentation are the same as those for a fraudulent misrepresentation claim, except that Claimants need not show that Respondents knew their statement was false at the time it was made. Respondents' carelessness or negligence in ascertaining the truth of their statement is sufficient. Bd. of Educ., 131 Ill. 2d at 453.

The elements of a fraudulent concealment claim are: (1) a relationship between parties that creates a duty to disclose; (2) knowledge of material facts by a party bound to make such disclosures; (3) non-disclosure; (4) scienter; (5) reliance by the injured party, and (6) damages. Zackiva Communications Corp. v. Horowitz, 826 F. Supp. 86 (S.D.N.Y. 1993); see also Brass v. American Film Technologies, Inc., 987 F.2d 142 (2d Cir. 1993); Mosier v. Southern California Physicians Insurance Exchange, 63 Cal.App.4th 1022, 74 Cal.Rptr.2d 550 (1998); Tigner v. Shearson-Lehman Hutton, Inc., 201 Ga.App. 713, 411 S.E.2d 800 (1991). A duty to disclose arises when one party has superior knowledge not readily available to the other party, or where the parties stand in fiduciary or confidential relationship to one another. Ceribelli v. Elghanayan, 990 F.2d 62 (2d Cir. 1993).

19-12346-shl    Doc 55-7    Filed 09/05/19    Entered 09/05/19 18:22:01    Exhibit C
Part 5    Pg 46 of 99

LIDDLE & ROBINSON, L.L.P.

Mr. Robert S. Clemente                    -16-                    December 11, 2002

Respondents' fraudulent statements and concealments, including misrepresentations regarding Fleet's intent to sell and/or liquidate Robertson Stephens, misrepresentations concerning the value of Robertson Stephens Restricted Units, and Fleet's lack of intent to complete the MBO, form the basis for Respondents' liability for fraudulent misrepresentation, fraudulent concealment, and negligent misrepresentation. Moreover, Respondents' misrepresentations regarding the value of Claimants' Robertson Stephens restricted units, and Fleet's intentions regarding the sale of Robertson Stephens and the MBO constitute additional bases for fraud and negligent misrepresentation claims. Claimants' reliance included accepting Robertson Stephens restricted units, declining other employment, and continuing to perform services yielding substantial revenues to Respondents.

Respondents, by virtue of their superior knowledge of the facts at issue, owed a duty to Claimants. Respondents also owed a duty to Claimants by virtue of Respondents' status as majority shareholders of Robertson Stephens common stock. As courts in California and New York have recognized, "'[w]hen a number of stockholders combine to constitute themselves a majority in order to control the corporation as they see fit, they become for all practical purposes the corporation itself, and assume the trust relation occupied by the corporation towards its stockholders.'" Jones v. H.F. Ahmanson & Co., 1 Cal.3d 93, 111, 460 P.2d 464 (1969) (quoting Ervin v. Oregon Ry. & Nav. Co., 27 F. 625, 631 (C.C.S.D.N.Y. 1886)). Thus, the majority shareholders stand in a position of fiduciaries to the minority shareholders, and a parent company cannot "operate the subsidiary for the benefit of the group as a whole [rather than] for the benefit of that particular subsidiary." Id.; Robb v. Eastgate Hotel, 347 Ill. App. 261, 106 N.E.2d 848 (1952) ("The majority shareholders do not by the mere reason of their holdings thereby become trustees for the minority stockholder in voting on a sale of assets. However, equity will impose upon them the obligation of trustees if in forcing disposition of assets they overreach the minority stockholders and reap benefits in which the minority does not share."). "Where, as here, it is sufficiently alleged that the effect of the controlling stockholders self-serving manipulation of corporate affairs causes a singular economic injury to minority interests alone, the minority have stated a cause of action for 'special' injury." Grace Brothers, Ltd. v. Farley Industries Inc., 264 Ga. 817, 819, 450 S.E.2d 814, 816 (1995) (quoting In re Tri-Star Pictures, Inc. Litigation, 634 A.2d 319, 330 (Del. 1993)) (recognizing cause of action for minority shareholders where majority shareholders breached a fiduciary duty when they caused a merger where minority stock holders suffered from depressed price).

Respondents violated their fiduciary duty to Claimants by engineering the failed sale and failed MBO of the Robertson Stephens firm, depriving Claimants of all of the value of their Robertson Stephens restricted units, concealing and misrepresenting material facts relating to such sale, the MBO and the value of the restricted units, and other conduct reflecting Respondents' campaign to place the interests of Fleet ahead of those of the Claimants and Robertson Stephens.

19-12346-shl    Doc 55-7    Filed 09/05/19    Entered 09/05/19 18:22:01    Exhibit C
Part 5 / Pg 47 of 99

LIDDLE & ROBINSON, L.L.P.

Mr. Robert S. Clemente                    -17-                    December 11, 2002

## Statutory Claims

In addition, Respondents' willful failure to pay Claimants amounts due them also entitles Claimants to statutory relief under their respective State's laws. (See relevant sections of state statutes attached hereto as Exhibit C.) Pursuant to these "wage statutes," Claimants seek all unpaid wages, including all bonus and severance pay, liquidated damages, and costs and attorneys' fees.

## Individual Claims

As stated earlier, each Claimant's bonus was primarily a function of performance. The following table will provide a breakdown of each Claimant's bonus compensation paid to Claimants for the years 1999, 2000 and 2001.[15] This illustrates the simple fact that bonuses comprised a significant portion of each Claimant's total annual compensation, and also provides a backdrop against which the Panel can determine the amounts Claimants should have received in WARN Act notice pay and bonus compensation for 2002.

The chart is not in alphabetical order (the order in the caption) but has been coded to maintain the confidentiality of each Claimant's specific compensation information. Claimants' names, job titles and any additional identifying information will be submitted as soon as the parties agree to a suitable confidentiality agreement and/or the Arbitrators provide for such confidentiality.

| Name | 2002 Base Salary | 2001 Bonus Compensation | 2000 Bonus Compensation | 1999 Bonus Compensation | RS Restricted Units[16] | WARN Damages[17] |
|---|---|---|---|---|---|---|
| 1 | $200,000 | $2,576,000 | $2,320,000 | $687,000 | $438,382 | $309,277 |
| 2 | $200,000 | $350,000 | $600,000[18] | N/A | $469,693 | $128,000 |
| 3 | $200,000 | $750,000 | $6,851,917 | $3,500,000 | $2,436,917 | $650,106 |
| 4 | $200,000 | $390,000 | $3,800,000 | $1,700,000 | $1,409,086 | $360,000 |
| 5 | $150,000 | $200,000 | $1,000,000 | N/A | $72,023 | $133,333 |
| 6 | $200,000 | $450,000 | $3,000,000 | $1,500,000 | $1,452,780 | $266,388 |
| 7 | $150,000 | $200,000 | $1,250,000 | $575,000 | $484,400 | $136,111 |
| 8 | $200,000 | $700,000 | $7,000,000 | $4,424,998 | $2,505,048 | $695,000 |
| 9 | $200,000 | $1,300,000 | $3,900,000 | N/A | $1,158,584 | $466,666 |

---

[15] Claimants' compensation figures are based on the best information available to Claimants and are subject to revision upon the receipt of official compensation records from Respondents.

[16] For the purposes of this chart, the RS Restricted Units have been valued at $7 per unit. These amounts do not include Restricted Units earmarked for Robertson Stephens employees but not allocated.

[17] Pursuant to the statute, the WARN damages were calculated using the average total compensation for the past three years. Where an employee had not been employed at Robertson Stephens for three years, the damages were calculated using the average total compensation for all years worked at Robertson Stephens.

[18] This employee began working at Robertson Stephens in April 2000; this bonus reflects 8 months of work.

FILED: NEW YORK COUNTY CLERK 08/13/2018 06:47 PM    INDEX NO. 159781/2014
NYSCEF DOC. NO. 157                                          RECEIVED NYSCEF: 08/13/2018

LIDDLE & ROBINSON, L.L.P.

Mr. Robert S. Clemente    -18-    December 11, 2002

| Name | 2002 Base Salary | 2001 Bonus Compensation | 2000 Bonus Compensation | 1999 Bonus Compensation | RS Restricted Units[16] | WARN Damages[17] |
|---|---|---|---|---|---|---|
| 10 | $150,000 | $1,300,000 | $2,150,000 | $1,010,000 | $1,459,395 | $266,388 |
| 11 | $200,000 | $750,000 | $3,400,000 | $2,200,000 | $1,722,217 | $386,111 |
| 12 | $200,000 | $450,000 | $2,500,000 | $1,900,000 | $438,382 | $302,777 |
| 13 | $200,000 | $650,000 | $4,482,500 | $2,800,000 | $1,252,524 | $474,027 |
| 14 | $200,000 | $1,300,000 | $5,200,000 | $4,800,000 | $1,929,088 | $661,111 |
| 15 | $200,000 | $1,300,000 | $4,247,535 | N/A | $1,158,584 | $364,794 |
| 16 | $200,000 | $745,000 | $2,205,923 | $1,453,484 | $671,349 | $278,000 |
| 17 | $125,000 | $650,000 | $675,000 | $435,000[19] | $100,205 | $115,227 |
| 18 | $150,000 | $1,200,000 | $1,650,000 | $1,050,000 | $580,860 | $241,388 |
| 19 | $200,000 | $1,300,000 | N/A | N/A | $866,117 | $250,000 |
| 20 | $200,000 | $1,300,000 | N/A | N/A | $350,000 | $250,000 |
| 21 | $150,000 | $1,000,000 | N/A | N/A | $322,000 | $191,000 |
| 22 | $200,000 | $2,410,000 | $950,000 | $325,000 | $876,764 | $237,944 |
| 23 | $150,000 | $300,000 | $1,500,000 | $1,100,000 | $288,708 | $188,000 |
| 24 | $150,000 | $1,000,000 | N/A | N/A | $329,000 | $167,000 |
| 25 | $150,000 | $450,000 | $850,000 | $600,000 | $866,117 | $200,000 |
| 26 | $150,000 | $1,300,000 | $1,000,000 | $850,000 | $288,708 | $201,000 |
| 27 | $200,000 | $600,000 | $7,300,000 | $2,300,000 | $3,131,310 | $600,000 |
| 28 | $200,000 | $1,500,000 | $1,300,000 | N/A | $866,117 | $200,000 |
| 29 | $200,000 | $1,000,000 | $525,000[20] | N/A | $866,117 | $200,000 |
| 30 | $200,000 | $1,300,000 | $2,200,000 | $850,000 | $782,824 | $280,000 |
| 31 | $200,000 | $1,500,000 | $4,300,000 | $2,050,000 | $2,478,784 | $470,000 |
| 32 | $150,000 | $1,350,000 | $1,350,000 | N/A | $626,262 | $250,000 |
| 33 | $200,000 | $1,600,000 | $2,900,000 | $1,800,000 | $1,904,777 | $383,333 |
| 34 | $200,000 | $475,000 | $2,850,000 | $1,950,000 | $822,906 | $326,000 |
| 35 | $200,000 | $1,300,000 | $800,000 | N/A | $876,764 | $208,333 |
| 36 | $300,000 | $600,000 | $6,900,000 | $4,400,000 | $2,245,348 | $711,000 |
| 37 | $200,000 | $300,000 | $1,625,000 | $1,025,000 | $876,764 | $192,000 |
| 38 | $200,000 | $400,000 | $4,000,000 | $3,500,000 | $1,252,524 | $472,222 |
| 39 | $200,000 | $1,000,000 | $4,970,000 | $3,850,000 | $1,781,269 | $523,416 |
| 40 | $200,000 | $100,000 | $3,040,000 | $2,850,000 | $866,117 | $366,000 |
| 41 | $150,000 | $200,000 | $2,800,000 | $1,100,000 | $871,290 | $257,756 |
| 42 | $200,000 | $2,300,000 | $5,400,000 | $1,250,000[21] | $1,409,086 | $650,000 |

---

[19] This employee began working at Robertson Stephens in April 1999; this bonus reflects 8 months of work.

[20] The employee began working at Robertson Stephens in July 2000; this bonus reflects six months of work.

[21] This employee began working at Robertson Stephens in November 1999; this bonus reflects one month of work.

FILED: NEW YORK COUNTY CLERK 08/13/2018 01:47 PM          INDEX NO. 159781/2014
NYSCEF DOC. NO. 157                                          RECEIVED NYSCEF: 08/13/2018

LIDDLE & ROBINSON, L.L.P.

Mr. Robert S. Clemente                    -19-                    December 11, 2002

## Conclusion

  For the reasons stated herein, Claimants seek relief, including their costs and attorneys' fees, on their claims of breach of contract, quantum meruit, fraud, negligent misrepresentation, breach of fiduciary duty, violation of ERISA, violation of the WARN Act, violations of state labor law statutes, unpaid bonus compensation and severance, all in amounts to be determined at trial, as well as such other relief as the Panel may deem appropriate.

  Respectfully submitted,

  LIDDLE & ROBINSON

  By:

  Jeffrey L. Liddle
  Attorneys for Claimants
  685 Third Avenue
  New York, New York 10017
  (212) 687-8500

FILED: NEW YORK COUNTY CLERK 08/13/2018 01:47 PM
NYSCEF DOC. NO. 158

INDEX NO. 159781/2014
RECEIVED NYSCEF: 08/13/2018

# EXHIBIT G

Robertson Band Claims Fleet Owes Some Bonuses - WSJ                      Page 1 of 6



Δ Ж EXHIBIT 6
Deponent Michael Barr
Date 1/26/11 Rptr CW
WWW.DEPOBOOK.COM

# THE WALL STREET JOURNAL.

This copy is for your personal, non-commercial use only. To order presentation-ready copies for distribution to your colleagues, clients or customers visit http://www.djreprints.com.

http://www.wsj.com/articles/SB1039653877219369953

MARKETS

# Robertson Band Claims Fleet Owes Some Bonuses

By SUSANNE CRAIG and
JOHN HECHINGER Staff Reporters of The Wall Street Journal
Updated Dec. 12, 2002 12:28 a.m. ET

Robertson Stephens, once a swaggering Silicon Valley securities firm, died along with many of the Internet stocks it once touted. But one legacy lives on: bickering over bonuses.

A group of senior executives from the now-defunct Robertson Stephens is seeking $140 million in pay they say they are owed by parent FleetBoston Financial Corp., the seventh-largest U.S. bank. In July, FleetBoston shut down Robertson after failing to find a buyer and ending talks for a management-led buyout.

Now, in an arbitration claim filed Wednesday, 34 former managing directors of Robertson and eight principals allege that FleetBoston deliberately sabotaged the sale to get out of paying these bankers the bonuses. The executives assert in the claim, filed with the New York Stock Exchange, that the bank made compensation promises to many senior managers at Robertson, knowing it would never have to make good on these pledges, because it was secretly planning to pull the plug on the firm.

FleetBoston spokesman James Mahoney says the bank owes nothing to the former executives. He says that FleetBoston, as it shut down Robertson, paid out bonuses in 2002 for 2001 performance that exceeded the amount earlier approved by Robertson management. He declines to disclose the amounts.

Robertson executives claim that FleetBoston owes them money in part because they own valuable shares in Robertson. But Mr. Mahoney adds that FleetBoston tried hard to sell the firm and couldn't, so the bank correctly valued employees' ownership stake at zero.



PLAINTIFF'S
EXHIBIT
5
6-28-17 NS

19-12346-shl    Doc 55-7    Filed 09/05/19    Entered 09/05/19 18:22:01    Exhibit C
Part 5    Pg 52 of 99

"There is a delusional hubris underlying the claim," Mr. Mahoney says. "In fact, we had a very aggressive sales effort. We hired Goldman Sachs, and there were no buyers, which speaks to the value of the firm."

The battle between FleetBoston and Robertson underscores the culture clash that can occur when highly paid investment bankers work for a more cost-conscious commercial bank. It also provides a behind-the-scenes glimpse into one of the largest failed auctions of a securities firm, and the battle that ensued as Robertson management struggled to keep the brokerage firm alive.

"It was a very, very stormy relationship, and they had a very difficult time communicating at almost every level," says Sandy Robertson, who co-founded Robertson in 1969 but left the firm in 1998 and now runs Francisco Partners, a private-equity firm.

At its peak, Robertson took some of the nation's best-known technology firms public, including Sun Microsystems Inc. It was one of four investment boutiques in the so-called HARM group that dominated tech underwriting: Hambrecht & Quist Inc., Alex. Brown & Sons Inc., Robertson and Montgomery Securities Inc. All four ultimately were sold to commercial banks.

The complaint provides fresh detail about just how widely the riches of the Internet boom reached into Robertson. The 42 executives listed in the complaint say they received a total of $130 million in bonuses alone over a three-year period, with the largest single annual bonus totaling $7.3 million.

Robertson became part of FleetBoston after that bank's 1999 takeover of BankBoston, which had bought Robertson the year before. The investment bank posted stellar results in the bull market, with profits of $216 million in the peak year of 2000. But in 2001, Robertson's revenue dropped 71% and it had a loss of $61 million. Robertson executives often complained FleetBoston didn't have the stomach for the ups and downs of the investment-banking business, and as a result was keen to rid itself of the division.

Jeffrey Liddle, a lawyer in New York who is representing the group, says the executives are seeking damages from FleetBoston, including back pay for 2002 and compensation for what he estimates to be their $45.6 million equity interest in Robertson, which was approximately 23% employee-owned. Mr. Liddle asserts that the bank's actions during the sale process drove down the value of the employees' stake in Robertson and damaged their reputations.

19-12346-shl   Doc 55-7   Filed 09/05/19   Entered 09/05/19 18:22:01   Exhibit C
Part 5   Pg 53 of 99

FleetBoston, saying it wanted to focus on its core commercial-banking businesses, in April announced its intention to sell Robertson without a potential suitor in mind. Robertson executives believe this move, combined with what they consider disparaging statements made by Fleet management about Robertson's prospects, drove down the value of the Robertson franchise and made it difficult to attract suitors.

In June, after failing to find a buyer for Robertson, Fleet began discussions to sell the investment bank to a Robertson-led management buyout group. By early July, according to the claim, the two sides reached a tentative agreement, but on July 12, the day the terms of that deal were to be handed out to Robertson staffers, Fleet told Robertson it had "run out of time" and abruptly ended the negotiations. On July 12, Fleet announced plans to shut the division, leaving 900 people out of work.

"We made a good-faith effort to strike a deal with the management team," FleetBoston's Mr. Mahoney says. "We were unable to come to terms."

The complaint isn't the first time FleetBoston and Robertson clashed over paychecks. Executives at Robertson received $70 million more in 2000 compensation than FleetBoston believed the two sides had agreed upon. Robertson's chief executive, Robert Emery, resigned under pressure in 2001 because of the flap. To recoup the money, FleetBoston cut back the size of the stake in Robertson it planned to distribute to employees -- to 23% from 30% originally.

As Robertson laid off hundreds of employees to cut costs over the last year, FleetBoston executives repeatedly promised to reward key executives who stayed, according to the complaint. The investment bankers said FleetBoston repeatedly said the 2002 bonus pool amounted to $40 million, but then paid no bonuses after shutting Robertson down.

In addition, the executives say they were entitled to tens of millions of dollars worth of Robertson stock because of their 23 million shares, or 23% ownership interest. In 2001, an investment bank said Robertson was worth $700 million, according to the complaint, and earlier in 2002, FleetBoston had valued each share at $7. But after shutting Robertson down, FleetBoston declared the shares to be worthless.

Write to Susanne Craig at susanne.craig@wsj.com and John Hechinger at john.hechinger@wsj.com

FILED: NEW YORK COUNTY CLERK 08/13/2018 01:47 PM

NYSCEF DOC. NO. 159

INDEX NO. 159781/2014

RECEIVED NYSCEF: 08/13/2018

19-12346-shl    Doc 55-7    Filed 09/05/19    Entered 09/05/19 18:22:01    Exhibit C
Part 5    Pg 54 of 99

# EXHIBIT H

19-12346-shl    Doc 55-7    Filed 09/05/19    Entered 09/05/19 18:22:01    Exhibit G
Part 5    Pg 55 of 99

## *Robertson Stephens*

*A FleetBoston Financial Company*

May 2, 2003

*VIA CERTIFIED MAIL  (7002 2030 0002 9554 0528)*
*RETURN RECEIPT REQUESTED*

Michael Barr
P.O. Box 626
Water Mill, NY  11976

Re:     **Robertson Stephens Group, Inc. 2002 Cash Equivalent Plan; Robertson
        Stephens Group, Inc. Cash Equivalent Deferred Compensation Plan for
        2001; Robertson Stephens Restricted Unit Plan; and Restricted Unit Award
        Agreement**

Dear Mr. Barr:

    Please be advised that Robertson Stephens Group, Inc. ("RSGI") has reviewed the
above plans and agreement and has determined that you are due no payments or awards
of stock as a result of actions taken in violation of Section 8.1 of the Cash Equivalent
Plans, Section 4.6 of the Restricted Unit Plan, and Section 8 of the Restricted Unit Award
Agreement.   As you are aware, actions and conduct following your termination of
employment have violated one or more of these provisions of the plans and the agreement
and constitute a basis for cancellation.

    Should you have questions concerning the foregoing, your legal counsel is
directed to contact counsel for RSGI, Elaine McChesney, Esq. at Bingham McCutchen
LLP, 150 Federal Street, Boston, Massachusetts 02110, (617) 951-8000.  If you are not
represented by counsel and have questions, you may contact Lisa Bisaccia, Director of
Compensation & Benefits, at One Federal Street, Boston, Massachusetts 02110,
(617) 346-0047.

                    Sincerely,

                    *Robertson Stephens Group, Inc.*



                                                                    Barr-000140

FILED: NEW YORK COUNTY CLERK 08/13/2018 01:47 PM    INDEX NO. 159781/2014
NYSCEF DOC. NO. 160                                    RECEIVED NYSCEF: 08/13/2018

# EXHIBIT I

19-12346-shl   Doc 55-7   Filed 09/05/19   Entered 09/05/19 18:22:01   Exhibit G
Part 5   Pg 57 of 99

E-MAIL: jliddle@liddlerobinson.com

### UPDATE REGARDING FLEET/RSG'S MAY 2, 2003
### NOTICE ADDRESSING THEIR REFUSAL TO PAY
### BENEFITS UNDER THE CASH EQUIVALENT AND
### RESTRICTED UNIT PLANS AND THE
### RESTRICTED UNIT AWARD AGREEMENT

May 13, 2003

Re:   Eric Alt, et al. v. FleetBoston Financial Corporation, et al.
      Docket No. 2002-011191

Dear Clients:

This update addresses a letter <u>sent directly to our clients</u> apparently prepared by Bingham McCutchen LLP and dated May 2, 2003 (the "May 2 Letter"). The May 2 Letter advises "that Robertson Stephens Group, Inc. ('RSGI') has reviewed the [cash equivalent and restricted unit] plans and [restricted unit award] agreement and has determined that you are due no payments or awards of stock as a result of actions taken in violation of Section 8.1 of the Cash Equivalent Plans, Section 4.6 of the Restricted Unit Plan, and Section 8 of the Restricted Unit Award Agreement."

We believe the May 2 Letter to be unfounded and merely a heavy handed tactic to try to convince you to give up on enforcing your rights. We will be amending our Statement of Claim in the NYSE arbitration case to add claims based on this most recent effort to deprive our clients of amounts due them.

In order to give you an opportunity to discuss this matter with us, we will be conducting a conference call on the morning of Friday, May 16, 2003, at 9:30 a.m. Eastern Standard time. Should you wish to participate, please call 888-677-1820 on Friday at 9:30 and provide the passcode of 41639. We look forward to talking to you on Friday.

Very truly yours,

/s/

Jeffrey L. Liddle

Barr-001496

FILED: NEW YORK COUNTY CLERK 08/13/2018 01:47 PM    INDEX NO. 159781/2014
NYSCEF DOC. NO. 161                                    RECEIVED NYSCEF: 08/13/2018

# EXHIBIT J

# LIDDLE & ROBINSON, L.L.P.

685 THIRD AVENUE
NEW YORK, N.Y. 10017
────────
(212) 687-8500
FACSIMILE: (212) 687-1505
E-MAIL: jliddle@liddlerobinson.com

AMUEL FINKELSTEIN (1906-1996)

IIRIAM M. ROBINSON (RETIRED)

AMES A. BATSON
LAINE H. BORTNICK
THAN A. BRECHER
IICHAEL E. GRENERT
EFFREY L. LIDDLE
AURENCE S. MOY
HRISTINE A. PALMIERI
IARC A. SUSSWEIN

DAVID I. GREENBERGER
DAVID MAREK
JAMES C. MALLIOS
CANDACE M. ADIUTORI
LEILA I. NOOR
CHRISTINA J. KANG
JEFFREY ZIMMERMAN*
TED J. SWIECICHOWSKI*
JOHN A. KAROL*

────────
*AWAITING ADMISSION
TO THE BAR

June 20, 2003

**Via Mail & Facsimile**

Mr. Robert S. Clemente
Director of Arbitration
New York Stock Exchange, Inc.
20 Broad Street, 5th Floor
New York, New York 10005

**AMENDED STATEMENT
OF CLAIM**

> Re:   Eric E. Alt, Michael Barr, J.J. Beaghan, Brian S. Bean, Charles Bolton, Vincent Bowen III, Richard A. Brand, Clark Callander, Georgene Carambat, Michael Casey, Jeffrey W. Colin, Alex Dean, Christopher Dodge, David Fullerton, Philip Gardner, Jonathan Goldman, Christopher W. Greer, Tony Haertl, Gregory C. Holmes, Frederick M. Hughes, Daniel Hurwitz, Andrew Kaye, Maureen McCarthy, Kevin McGinty, Todd H. McWilliams, Samuel A. Morse, Agnes Murphy, Diane P. Murphy, David O'Brian, Joseph Piazza, Michael P. Perrella, Larry Rehmer, David Reilly, John T. Rossi, Mark J. Salter, Scott Scharfman, Allen Smith, Scott Sullivan, Steven Tishman, Ted E. Tobiason, Daniel P. White III and Jeff Winaker v. FleetBoston Financial Corporation, Fleet Securities, Inc., Robertson Stephens, Inc., and Robertson Stephens Group, Inc.

Dear Mr. Clemente:

We represent the Claimants in the above-referenced matter and submit this amended Statement of Claim against Respondents, FleetBoston Financial Corporation, Fleet Securities, Inc., Robertson Stephens, Inc., and Robertson Stephens Group, Inc.[1] Claimants amend their Statement

─────────────

[1] Respondents FleetBoston Financial Corporation ("FBF") and Fleet Securities, Inc. ("FSI") shall be referred to collectively as "Fleet." Respondents Robertson Stephens, Inc. ("RSI") and Robertson Stephens Group, Inc.

Barr-000152

19-12346-shl    Doc 55-7    Filed 09/05/19    Entered 09/05/19 18:22:01    Exhibit G
Part 5    Pg 60 of 99

LIDDLE & ROBINSON, L.L.P.

Mr. Robert S. Clemente                 -2-                    June 20, 2003

of Claim (initially filed on December 11, 2002) to add claims arising out of Respondents' recent refusal to pay Claimants at least $13 million of deferred compensation, which Respondents previously acknowledged would be paid to the Claimants.

## Preliminary Statement

The Claimants, all former executives of Robertson Stephens, seek over $181 million in damages in this arbitration, plus punitive damages in an amount not less than $100 million,[2] attorneys' fees, interest and costs, based on, inter alia: Respondents' failure to pay promised, earned, and deferred bonus compensation for 2001 and 2002; Respondents' failure, in violation of the Worker Adjustment and Retraining Notification ("WARN") Act, 29 U.S.C. §§ 2101-2109, to make proper notice pay payments to Claimants; Respondents' threats and subsequent wrongful withholding of Claimants' deferred compensation, in breach of the parties' agreement and in violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO") 18 U.S.C. §1961 et seq.; Respondents' fraudulent misrepresentations and material omissions concerning Claimants' employment, compensation and equity interests in Robertson Stephens; Fleet's breach of its fiduciary duties as majority shareholder of Robertson Stephens; and Respondents' breach of contract and violation of unfair and deceptive trade practice statutes.

In addition to seeking earned compensation and other payments in connection with their employment and the ultimate termination of that employment, Claimants seek damages for Fleet's actions in encouraging Claimants to remain at Robertson Stephens until it abruptly decided to close Robertson Stephens's business on July 12, 2002, misrepresenting the "non-cash" compensation earned by the Claimants, misrepresenting and concealing its intention to shut down Robertson Stephens irrespective of its ability to sell Robertson Stephens either to outside buyers or to Robertson Stephens' management, exercising control over Robertson Stephens purely for Fleet's benefit, and otherwise conducting itself in a fraudulent and deceitful manner to Claimants' detriment. Fleet's conduct, beginning with the termination of Robertson Stephens' successful CEO and continuing through numerous stages of layoffs and a negative announcement concerning Fleet's desire to sell Robertson Stephens, resulted in the complete elimination of the Robertson Stephens firm, which had generated significant revenues and earnings for Fleet and its predecessor BankBoston, which Fleet acquired in October 1999. As a result, Claimants' careers and reputations were damaged, their earned compensation (largely invested in non-cash compensation) was deemed "forfeited," and they suffered the loss of prospective compensation, both from other employers and from the continuation of Robertson Stephens's operations through a management buy-out.

## Background

Robertson Stephens is an investment banking firm that had been in existence for 24 years before Fleet announced, on July 12, 2002, that it was ceasing Robertson Stephens's

---

collectively as "Fleet." Respondents Robertson Stephens, Inc. ("RSI") and Robertson Stephens Group, Inc. ("RSGI") shall be referred to collectively as "Robertson Stephens."

[2] The market capitalization of Respondent FBF alone exceeds $32 billion as of June 20, 2003.

Barr-000153

19-12346-shl    Doc 55-7    Filed 09/05/19    Entered 09/05/19 18:22:01    Exhibit C
Part 5 Pg 61 of 99

LIDDLE & ROBINSON, L.L.P.

Mr. Robert S. Clemente                    -3-                    June 20, 2003

operations. Claimants were Managing Directors and Principals of Robertson Stephens. and among the most senior and most productive individuals within the firm. Claimants were employed in the cities of New York, Atlanta, Boston and Chicago, the state of California and the country of Israel.

Robertson Stephens was founded in 1978 and was acquired by Bank of America in 1997. Bank of America sold Robertson Stephens to BankBoston in 1998. In October 1999, Fleet merged with BankBoston and, as a result, acquired Robertson Stephens.[3] Thus, from October 1999 to date, Fleet has controlled the operations of Robertson Stephens. Indeed, as detailed below, at times Fleet exercised its control over the business of Robertson Stephens without first informing the management of Robertson Stephens of its true intentions.

(Each of the Respondents may be held liable for the actions of the others given that together they constitute a "single employer." "The single employer doctrine allows two entities to be regarded as a single employer subject to joint liability if they have interrelated operations, common management, centralized control of labor relations, and common ownership." Yoder v. Novo Mediagroup, Inc., No. 00 Civ. 5444 (JSM), 2001 WL 62861, at *4 (S.D.N.Y. Jan. 24, 2001). Respondents have reflected their interrelated operations regarding the focal point of the parties' dispute – i.e., Respondents' incentive and deferred compensation plans and compensation obligations towards Claimants – in financial statements and other regulatory filings, as well as the releases offered to Claimants upon the termination of their employment. Those releases provide that the Claimants would receive benefits given their participation in "certain Robertson Stephens and FleetBoston plans" and that they "will continue to be bound by the Robertson Stephens and FleetBoston policies and procedures that applied to you as an active employee...." (See Separation Agreement and Release, attached as Exhibit A at pp. 2, 4) (emphasis added). Additionally, FBF controlled the five-member board of directors of the now-defunct RSI through three Fleet-appointed board members. These facts demonstrate the common management and centralized control necessary to invoke the single employer doctrine and subject all four Respondents to liability for the actions of any one of them.[4])

Since Fleet's acquisition of the firm, Robertson Stephens generated billions of dollars of revenue for Fleet. By 2000, Robertson Stephens was a leading underwriter for all equity issues, including the number one "lead underwriter" for initial public offerings in the technology sector. Moreover, the firm was a leading adviser in mergers and acquisitions transactions and a top market maker of publicly-traded securities, and it consistently generated millions of dollars in profits through the efforts of each of its departments: sales and trading, investment banking, money management, and research. In 2000, Robertson Stephens Group generated revenues of $1.55 billion and net income of $250 million. On a cumulative GAAP basis since its acquisition in 1999, Robertson Stephens has contributed nearly $3.5 billion in revenue to Fleet.

---

[3] The current Chairman and CEO of FleetBoston Financial Corporation, Chad Gifford, consummated BankBoston's acquisition of Robertson Stephens in his capacity as CEO of BankBoston.

[4] See Local 397 v. Midwest Fasteners, Inc., 779 F. Supp. 788 (D.N.J. 1992) (parent liable for subsidiary's violation of WARN Act in part because parent was involved in decision to shut down subsidiary).

19-12346-shl    Doc 55-7    Filed 09/05/19    Entered 09/05/19 18:22:01    Exhibit C
Part 5    Pg 62 of 99

LIDDLE & ROBINSON, L.L.P.

Mr. Robert S. Clemente                    -4-                    June 20, 2003

**Respondents Promise Claimants**
**Valuable Equity in Robertson Stephens**

In December 2000, at the conclusion of a very successful year for Robertson Stephens, Fleet advised Robertson Stephens that Robertson Stephens employees would be granted equity in the firm, and that a Board of Directors would be established — consisting of two members each from Fleet and Robertson Stephens — to protect the interests of Robertson Stephens's minority shareholders, including Claimants. Of 100 million "Robertson Stephens Restricted Units" (at the time valued by Lazard Freres at $1 billion, or $10 per unit), Robertson Stephens employees were to receive 30 percent (30 million units), with 22.5 percent to be granted initially and the remaining 7.5 percent to be retained for future allocations to existing and future Robertson Stephens employees. These measures were considered necessary to retain key employees, since Robertson Stephens had lost more than 10 principals to competitors in the prior 18-month period.

Rather than creating support from Fleet for Robertson Stephens, Robertson Stephens's $1.55 billion revenue year for 2000 ultimately resulted in hostility by Fleet's top management towards Robertson Stephens and its employees. Terrance Murray, ("Murray"), FleetBoston's CEO, and Bob Emery ("Emery"),[5] the CEO of Robertson Stephens, were involved in a very public dispute over how Robertson Stephens employees were to be compensated for the banner year achieved in 2000. Under compensation agreements entered into as part of BankBoston's acquisition of Robertson Stephens in 1998 (which were assumed by Fleet when it acquired BankBoston in 1999), Robertson Stephens was to receive 55 percent of the net revenues generated by the firm to distribute as compensation to its employees for each year through 2001. The dispute concerned whether the 55 percent threshold applied to cash compensation only, or to both cash and non-cash compensation. Believing the dispute had been resolved in its favor and that it had an additional $70 million in compensation to distribute for the year 2000, Robertson Stephens's management distributed such amount.[6] Following the $70 million distribution, Jay Sarles ("Sarles") (Head of Wholesale Banking for FleetBoston) fired Emery, at Murray's direction, and appointed John Conlin ("Conlin") (then President of Robertson Stephens) to head the firm going forward. Following these events, Fleet failed to honor its obligations regarding the distribution of Robertston Stephens Restricted Units, stalling such distribution until May 2001. At that time, moreover, only 20 percent of the firm's equity (and not the 22.5 percent that had been promised) was distributed to Robertson Stephens employees. (In addition, Respondents ultimately failed to distribute the full 30 percent, or 30 million units, that had previously been agreed upon.)

**Respondents Direct the Reduction of**

---

[5] Emery, named one of the top 50 people in the technology community worldwide in 2001, had delivered two record years of performance at Robertson Stephens to Fleet.

[6] Emery and the other five members of the Robertson Stephens Executive Committee received the bulk of the $70 million.

Barr-000155

LIDDLE & ROBINSON, L.L.P.

Mr. Robert S. Clemente                    -5-                    June 20, 2003

Robertson Stephens's Workforce in a
Manner Designed to Further Their Own Goals

Throughout 2001, difficult market conditions prevailed, including an industry-wide decline in technology sector investment banking activity, as well as lower volumes in overall investment banking transactions and other industries in which Robertson Stephens engaged. The managements of Fleet and Robertson Stephens concluded that Robertson Stephens needed to reduce the number of its employees in order to remain profitable. As a result, Fleet directed Robertson Stephens to reduce Robertson Stephens's workforce by a staggering 50 percent, from approximately 2,000 to approximately 1,000 employees. Robertson Stephens's management suggested that if such a massive reduction in force was necessary, Robertson Stephens would benefit most by doing so in one downsizing, so as to achieve the benefits of reduced compensation expense immediately.

Fleet, however, insisted that Robertson Stephens take these staffing cuts over time given Fleet's financial concerns. Fleet's own corporate lending and banking business had suffered massive losses in its operations relating to Brazil and Argentina and through its exposure to various large corporate credit failures, including Enron, Kmart and Global Crossing. Fleet also suffered large write-downs in its investment portfolio, which were primarily attributable to technology and telecommunications investments wholly unrelated to Robertson Stephens. By the fourth quarter of 2001, Fleet reflected write-downs, charges and other extraordinary losses relating to its own corporate lending and banking businesses exceeding $2 billion for the year, and year-over-year comparable net income for FleetBoston fell by $3 billion in 2001. Upon information and belief, even these sizeable losses were understated, since Fleet failed to reflect the full extent of its losses until the second quarter of 2002. Moreover, Fleet's losses in Latin America may still not be fully recognized.[7]

In light of these staggering losses within its own businesses, Fleet decided against reducing Robertson Stephens's staff all at once. Instead, Fleet dictated that Robertson Stephens reduce its personnel in four stages so that Fleet would not need to reflect a write-down for severance and other charges relating to the downsizing of Robertson Stephens in one massive charge. Fleet's decision in this context, as well as its "staging" of losses and charges in South America and in its investment portfolio, was indicative of Fleet's practice of "earnings smoothing" for the purpose of artificially supporting Fleet's stock price.[8] In addition, Fleet's decision was consistent with Fleet's pattern of making decisions regarding Robertson Stephens for the benefit of Fleet and Fleet's shareholders rather than for the benefit of Robertson Stephens and Robertson Stephens's minority shareholders and employees, such as Claimants.

---

[7] Based on the criminal indictments of Fleet officers in Argentina and civil cases pending concerning Fleet's premature freezing of customer assets in Argentina, Fleet's losses in Argentina alone could rise dramatically from the current $2.3 billion in aggregate losses to date.

[8] Another reason for Fleet to shift its 2001 losses to the following year was to pave the way for a smooth retirement for Murray, who retired at the end of 2001.

19-12346-shl   Doc 55-7   Filed 09/05/19   Entered 09/05/19 18:22:01   Exhibit G
Part 5   Pg 64 of 99

LIDDLE & ROBINSON, L.L.P.

Mr. Robert S. Clemente                    -6-                    June 20, 2003

From approximately March through November 2001, Fleet and Robertson Stephens executed Fleet's plan of staged personnel layoffs. By the end of 2001, Fleet and Robertson Stephens's management had reduced the size of Robertson Stephens by half, to approximately 1,000 employees. Although Robertson Stephens Group's revenues declined to $466 million for 2001, resulting in a $98 million net loss,[9] the massive cuts in staffing put the firm in a position to regain its profitability in 2002. By November 2001, Robertson Stephens Group was once again generating a positive cash flow, and during the first quarter of 2002, the firm generated $2.4 million in normalized cash earnings.

Respondents Promise Claimants
Market Compensation for 2001

Throughout 2001, Respondents told Claimants that Respondents intended to pay Claimants "market compensation" for their efforts in 2001. Specifically, Sarles promised on innumerable occasions (nearly every two or three weeks) that despite the difficult and extraordinary circumstances faced in 2001 (including Emery's termination, the 9/11 disaster and the ongoing layoffs), key Robertson Stephens employees (retained Managing Directors and Principals) would receive "market compensation," sentiments that were frequently echoed by Conlin and Todd Carter, Robertson Stephens's CEO and President, respectively. These promises reflected Fleet's apparent effort to retain top talent among the Robertson Stephens employees despite the massive ongoing personnel cuts at Robertson Stephens.

Respondents made clear that "market compensation" would be determined by the employee's revenue production and the compensation paid by comparable Wall Street firms. In addition, the historical compensation payout formula (approximately 55 percent of revenue) was reaffirmed to promote ongoing production from Robertson Stephens employees. In order to establish appropriate pay levels for Principals, Managing Directors and other Robertson Stephens executives, Fleet subscribed to compensation surveys from McLagan Partners and Greenwich Associates that set forth pay at comparable firms for similar levels of responsibility and revenue generation.

Despite Respondents' promises, Respondents failed to pay Claimants market compensation for 2001, but instead paid on average half that amount. Claimants received on average five percent or less of the revenues they generated as compensation (when the Wall Street benchmark is at least 10 percent).[10] Upon information and belief, Claimants' compensation for 2001 also fell substantially below the compensation of their peers as indicated in the McLagan and other surveys.

---

[9] The loss Robertson Stephens incurred in 2001 represented the first loss for any year in the history of the firm.

[10] Respondents also paid 2001 bonuses later than usual in a further effort to keep employees from leaving for competitors.

Barr-000157

LIDDLE & ROBINSON, L.L.P.

Mr. Robert S. Clemente                    -7-                    June 20, 2003

Respondents Issue Restricted Units and
Other Deferred Compensation to
Claimants In Order to Retain Top Employees

Claimants' 2001 bonuses, moreover, were comprised largely of deferred compensation,[11] including Fleet options, "money market" funds vesting over the course of 2002 and 2003, equity in Robertson Stephens in the form of one million Robertson Stephens Restricted Units, and participation in Respondents' 2001 and 2002 Cash Equivalent Plans (the "Cash Equivalent Plans").[12] Whereas the convention on Wall Street is to pay 20 to 33 percent of bonus compensation in the form of deferred compensation, and in the history of Robertson Stephens no more than 20 percent of bonus compensation had been deferred, Claimants received as much as <u>100 percent</u> of their 2001 compensation in the form of deferred compensation.

Respondents told Claimants that, for each Restricted Unit granted to Claimants, they would receive one share of Robertson Stephens common stock upon the earliest of: (a) the termination of their employment, (b) the liquidation of Robertson Stephens, or (c) the expiration of the restricted period[13] of such units. These same terms applied to the 20 million Restricted Units distributed in May 2001. The remaining Restricted Units earmarked for Robertson Stephens employees (<u>i.e.</u>, the balance of the 30 million units Respondents had agreed to distribute, plus Restricted Units forfeited by employees who voluntarily resigned or were terminated for cause) were never allocated.

Through March 2002, Respondents represented to Claimants that each Restricted Unit had a value of at least $7. Indeed, in written confirmations of Claimants' compensation for 2001, which were distributed and orally confirmed in March 2002, Respondents stated that "the units are exchangeable, under certain circumstances, for shares of Robertson Stephens common stock," and that such common stock "has an estimated market value of $7 per share, consistent with an analysis performed by Lazard Freres during 2001," which valued the firm's aggregate equity in excess of $700 million. This value was consistent with the $6.75 book value per share of Robertson Stephens Group as of March 31, 2002 (prior to the fateful April 16 announcement).

Claimants relied to their detriment upon Respondents' representations regarding the "market compensation" they were to receive for 2001, the value of the non-cash deferred compensation they received in 2001 and prior years, and the amounts and value of the equity they expected to receive in the future, by, among other things, declining alternative employment opportunities, remaining at Robertson Stephens, and accepting long-term deferred compensation

---

[11] Such deferred non-cash compensation is not uncommon on Wall Street. Ostensibly, the purpose behind a non-cash deferral is to retain employees by providing an incentive for them to stay with the firm and not defect to a competitor in order to reap long-term benefits from the increased value of the company in the future.

[12] Both the Restricted Unit Plan and the Cash Equivalent Plans obligated Respondents to pay Claimants their deferred compensation even after their employment ended, as discussed below.

[13] Five years for restricted units awarded as part of Claimants' incentive compensation, and seven years for restricted units granted as "service awards."

Barr-000158

FILED: NEW YORK COUNTY CLERK 08/13/2018 01:47 PM
NYSCEF DOC. NO. 161

19-12346-shl    Doc 55-7    Filed 09/05/19    Entered 09/05/19 18:22:01    Exhibit G
Part 5    Pg 66 of 99

INDEX NO. 159781/2014
RECEIVED NYSCEF: 08/13/2018

LIDDLE & ROBINSON, L.L.P.

Mr. Robert S. Clemente                    -8-                    June 20, 2003

comprised of the Restricted Units and other non-cash compensation. In addition, Respondents concealed from Claimants Fleet's plan to sell the Robertson Stephens firm. Instead, Respondents misrepresented that Fleet had no intention of selling Robertson Stephens because Fleet understood the "strategic" importance of Robertson Stephens to Fleet.

In fact, upon the expiration of the BankBoston contracts in February 2002, which provided for the distribution of 55 percent of revenues as bonus compensation, Fleet entered into a new long-term compensation arrangement with Robertson Stephens, which provided for varied aggregate compensation payout ratios between 48 and 65 percent of revenues, depending on whether annual revenues were less than $500 million, greater than $500 million but less than $1.5 billion, or greater than $1.5 billion. (Upon information and belief, however, Fleet knew, by as early as late 2001, that Fleet secretly intended to seek to sell or close Robertson Stephens. Thus, Fleet's negotiation of long-term compensation arrangements concerning Robertson Stephens was tainted by bad faith.) The BankBoston contracts, however, provided for payment of a year's compensation to Robertson Stephens employees whose employment was terminated prior to February 28, 2002. For this reason, Fleet delayed its plans to sell or close Robertson Stephens until the expiration of those contracts. In addition, Respondents hid from Claimants Fleet's intention to sell or shut down the Robertson Stephens firm.

Fleet's Premature Announcement
Of the Sale of Robertson Stephens
Damages the Firm and Its Professionals

On April 16, 2002, Fleet suddenly announced that it was putting Robertson Stephens up for sale. In a highly unusual step, **Fleet made this announcement without any buyer in place.** By doing so, Fleet essentially advertised that it had not found a buyer for Robertson Stephens, thereby reducing the value of the Robertson Stephens concern. Worse still, Fleet released to the media – and discussed with institutional investors and Wall Street research analysts in its quarterly earnings call – its reasons for ridding itself of Robertson Stephens, including dissatisfaction with volatility in Robertson Stephens's earnings performance. Fleet also stated that Robertson Stephens's strong operating performance during 1999 and 2000 was "aberrational" and "would not return in our collective lifetimes," and expressed its belief that future benefits of the investment banking business would accrue to more diversified, larger platform firms and "not boutiques like Robbie Stephens." This language was especially disparaging given that Robertson Stephens had been a leading underwriter of public offerings since 2000, was a top market maker of NASDAQ securities, and managed billions in institutional and high net worth assets.

The timing of this announcement, in connection with the announcement of other "clean-up" measures,[14] was designed to serve Fleet and to bolster Fleet's stock price without regard to Robertson Stephens or Claimants. In fact, Fleet's stock increased by over $2 billion in

---

[14] Fleet's other announcements included a reduction in its exposure to non-strategic areas of corporate lending, the scaling back of investments in its Principal Investing business, the sale of AFSA (Fleet's outsourcing and education services business), and strategic decisions concerning its Global Banking operations.

Barr-000159

LIDDLE & ROBINSON, L.L.P.

Mr. Robert S. Clemente                    -9-                      June 20, 2003

the aggregate after its April 16 announcement.

Immediately, Fleet's rash announcement cast Robertson Stephens in a negative light, and generated speculation that Robertson Stephens's value had dropped precipitously from the $800 million BankBoston had paid for the firm in 1998. In addition, the announcement hurt Claimants' ability to bring in business, maintain existing clients, and otherwise generate revenues for Robertson Stephens. This harm spread across all departments at Robertson Stephens – new investment banking clients shied away, institutional investors reduced their commission flow, high net worth individuals transferred their assets to other institutions, and all clients expressed concern regarding the future of the firm, a subject that was speculated upon in numerous press articles.

Despite the potential impact of Fleet's announcement on every employee within the Robertson Stephens firm, Fleet failed to notify Robertson Stephens's management of the planned announcement until April 15, 2002, just one day prior to the actual announcement. (The announcement was reported in a lengthy <u>Wall Street Journal</u> article, a copy of which is attached hereto as Exhibit B, indicating that Fleet had probably made its intentions known to the media several days prior to when Fleet informed the management of Robertson Stephens.) Fleet concealed its announcement from Robertson Stephens's management and Claimants despite the fact that Fleet representatives sat on the Board of Directors of Robertson Stephens.

Fleet Negotiated in Bad Faith a Proposed
<u>Management Buy-Out of Robertson Stephens</u>

Even after its April 16, 2002 announcement, Fleet continued to make material misrepresentations to Robertson Stephens employees concerning their future employment. On April 26, 2002, Sarles declared that Fleet had no intention of liquidating Robertson Stephens.

Fleet engaged Goldman Sachs, which, after interviewing the Robertson Stephens Executive Management team, put together a summary information statement outlining the opportunity to acquire Robertson Stephens. The statement was circulated to 72 prospective purchasers, signaling an auction of the firm. Not surprisingly, given Fleet's disastrous April 16 announcement and comments concerning the undesirability of Robertson Stephens, none of the prospective purchasers sustained interest in Robertson Stephens. By June 2002, after Fleet was unable to locate a buyer, Fleet and Robertson Stephens's management had begun discussions concerning management's potential purchase of Robertson Stephens. Robertson Stephens representatives conducted more than 250 hours of negotiations with Fleet and more than 12 hours of presentations to the entire group of Robertson Stephens professionals outlining the terms of the planned management buy-out ("MBO"), and more than 1,000 pages of legal agreements were fully drafted and awaiting execution. Moreover, Robertson Stephens's management (and, upon information and belief, Fleet's management), confirmed to clients and the media that the MBO was being negotiated and that an agreement in principle had been reached to continue the operations of Robertson Stephens.

Barr-000160

FILED: NEW YORK COUNTY CLERK 08/13/2018 01:47 PM
INDEX NO. 159781/2014

19-12346-shl    Doc 55-7    Filed 09/05/19    Entered 09/05/19 18:22:01    Exhibit C
Part 5    Pg 68 of 99

NYSCEF DOC. NO. 161

RECEIVED NYSCEF: 08/13/2018

LIDDLE & ROBINSON, L.L.P.

Mr. Robert S. Clemente                    -10-                    June 20, 2003

       Also in connection with the MBO, Terrence Laughlin, Fleet's head of Corporate Strategy and Development, advised that Robertson Stephens would need to endure further cuts in personnel to enable an MBO. In a good faith effort to effect the MBO, Robertson Stephens cut personnel further — to approximately 500 employees by July 12, 2002.[15] Each Managing Director who was to remain with the newly-constituted MBO firm was given a pro forma allocation of equity and a draft term sheet. Fleet concealed from Robertson Stephens and Claimants, however, that Fleet never intended to complete the MBO transaction.

### Fleet Closes Robertson Stephens

       At Fleet's insistence, and based upon the apparent willingness of Fleet to sell Robertson Stephens to its management, Robertson Stephens had taken the drastic step of reducing its staff from 2000 to 500 employees in just over one year. Despite having imposed such requirements as a condition of enabling an MBO, and having negotiated the MBO to near-completion, on July 12, 2002 – the very day that the MBO agreements were to be distributed for signature – Fleet informed Robertson Stephens that it had "run out of time" and discontinued all efforts to negotiate an MBO.[16] Three days later, Fleet announced the liquidation of Robertson Stephens. Eugene McQuade ("McQuade"), a Fleet Vice Chairman and Fleet's Chief Financial Officer, stated "we have decided a wind-down is in the best interest of **our** shareholders." (emphasis added)

       On August 6, 2002, Fleet scheduled an extraordinary intra-quarter conference call with the Wall Street analyst community to calm rumors and concerns over the soundness of Fleet — rumors that began circulating after further sizeable write-downs in Latin America and other areas of the bank had been disclosed in the prior month's quarterly earnings call and Fleet's stock price decreased by 50 percent. On the call, to alleviate concerns over future dividend cuts, McQuade stated that Fleet would be able to continue to pay the current quarterly dividend rate to its shareholders, in large part because the liquidation of Robertson Stephens provided sufficient cash and freed-up capital to meet certain "liquidity tests" set forth in relevant dividend covenants.

       Fleet's decision to close Robertson Stephens resulted in the termination of Claimants' employment. Respondents offered Claimants severance packages that required Claimants to sign a release of all claims in order to receive "supplemental incentive bonus" amounts, which represented earned bonus compensation for prior years that had been paid in the form of Fleet stock and options. Moreover, the severance packages included "WARN Period Salary" which Respondents (a) improperly calculated based only on base salary, and (b) improperly deducted from severance due Claimants based on their tenure with the firm.

---

[15] The Claimants in this arbitration (with few exceptions) were Robertson Stephens employees through at least July 12, 2002.

[16] Documents from Fleet rejecting the MBO were dated two weeks earlier than the date on which they were received by Robertson Stephens.

Barr-000161

LIDDLE & ROBINSON, L.L.P.

Mr. Robert S. Clemente                    -11-                    June 20, 2003

Claimants were offered no bonus compensation for the services they provided and the revenue they produced under extremely difficult conditions in 2002. In addition, although acknowledging that Claimants would be entitled to shares of Robertson Stephens common stock equivalent to the number of all of their Robertson Stephens Restricted Units, Respondents' severance proposals to Claimants attributed a zero value to the Restricted Units and common stock. Only weeks earlier, Respondents had reassured Claimants of the at least $7 per share value of the Restricted Units and had described Robertson Stephens as a viable ongoing firm valued at over $700 million, rendering it unbelievable that "neither the restricted units under the Restricted Unit Plan, nor the underlying shares of Robertson Stephens common stock, have a positive value," as stated in the severance proposals. Moreover, Fleet paid $5 per Restricted Unit to Robertson Stephens employees terminated in November 2001 and in Europe in mid-2002.

**Respondents Reneged on Their Obligation To**
**Pay Claimants Deferred Compensation To**
**Which They Were Entitled Under Respondents' Plans**

By letter dated May 2, 2003 (the "May 2 Letter"), Respondents reneged on their agreement to pay Claimants the deferred portion of their 2001 and 2002 bonus compensation. The May 2 Letter advised Claimants that "Robertson Stephens Group, Inc. ('RSGI')[17] ... has determined that you are due no payments or awards of stock as result of actions taken in violation of Section 8.1 of the Cash Equivalent Plans, Section 4.6 of the Restricted Unit Plan, and Section 8 of the Restricted Unit Award Agreement."

Claimants, to be sure, have not taken any actions in violation of these sections, and thus remain entitled to their deferred compensation. According to the express terms of these Plans, only the termination of Claimants' employment for "Cause"[18] would jeopardize the payment of their deferred compensation. Here, Respondents have not even alleged that any of the Claimants' employment was terminated for "Cause." Thus, Claimants' deferred compensation would continue to vest and be paid in accordance with the terms of the plans. Section 7.3(vii) of the Cash Equivalent Plans[19] provides (emphasis added):

---

[17] The May 2 Letter (attached as Exhibit C) bears a "Robertson Stephens" logo, and purports to be signed by "Robertson Stephens Group, Inc." The May 2 Letter appears to be merely a ploy by Bingham McCutchen LLP, Respondents' lawyers, however, to pressure Claimants into withdrawing from this arbitration. Instead of contacting Claimants' counsel, Respondents' attorneys took the tack of delivering their message directly to Claimants in the hope of driving a wedge between Claimants and their counsel. It is impossible for RSGI to have sent the May 2 Letter because, by Respondents' own admission, "RSGI itself has no employees." (Complaint, Exhibit D at ¶ 3)

[18] The relevant documents define "cause" as egregious misconduct, such as "dishonesty," "continued failure ... to substantially perform his or her duties," "material misconduct," or "entering a plea of guilty ... to a crime of moral turpitude." (See Cash Equivalent Plan, attached as Exhibit E and Restricted Unit Plan, attached as Exhibit F.) Furthermore, by offering Claimants severance pay pursuant to Respondents' Severance Plan, Respondents concede that Claimants' employment was not terminated for "cause."

[19] The 2001 Cash Equivalent Plan is attached as Exhibit E.

LIDDLE & ROBINSON, L.L.P.

Mr. Robert S. Clemente                    -12-                         June 20, 2003

> If a Participant's employment has been terminated by the RS Group due solely to a determination by the RS Group to reduce the size of its workforce generally or specifically in respect of any line of business and not due to any cause relating to any performance of the Participant (a "RIF Termination") *the Participant's Deferred Amount will continue to vest and earnings thereon will continue to be paid following a Participant's Termination Date*, in accordance with the vesting schedule set forth in Section 7.1 above, subject to the Participant's continued compliance with the 'Post-Termination Forfeiture Provisions' described in Article 8.

Likewise, Section 3(d) of the Restricted Unit Award Agreement (Exhibit F) promises that if a Grantee's employment was terminated as a result of a liquidation[20] -- as happened here -- "all of the Awards that have not previously become Vested will become Vested effective as of such Termination Date."

Moreover, prior to the commencement of this arbitration proceeding, Respondents advised Claimants, in writing and orally, that Respondents would pay Claimants their deferred compensation whether or not Claimants signed the Separation Agreements and Releases.[21] Indeed, in the form Separation Agreement and Release itself (Exhibit A at p. B-3), Respondents made clear that:

> Your 2001 Deferred Amount and any accrued interest thereon will continue to accrue and be paid in accordance with the regular vesting schedule under such Plan. This means that one-half (1/2) of your 2001 Deferred Amount and any accrued earnings on the 2001 Deferred Amount will vest on (and be paid as soon as reasonably practicable after) January 1, 2003, and the remaining one-half (1/2) of your 2001 Deferred Amount and any accrued earnings thereon will be paid as soon as reasonably practicable after January 1, 2004, subject to your continued compliance with the non-solicitation and non-disparagement provisions of Section 8.1 of the 2001 Cash Equivalent Plan.

(Exhibit A at p. B-3) (emphasis added).

---

[20] Both the Cash Equivalent Plans and the Restricted Unit Award Agreement define "Change in Control" as "the liquidation or dissolution of the Company" (Exhibit E, Exhibit F). Respondents' actions constituted a liquidation or dissolution of RSG, since that company has no employees (Exhibit D at ¶ 3) and served merely as a holding company for RSI, the company that FBF shut down in July 2002. RSI had no assets and no employees as of late October 2002. (Id. at ¶ 3)

[21] J.J. Beaghan, whose employment was terminated prior to FBF's liquidation of RSI, did not receive a Separation Agreement and Release.

Barr-000163

LIDDLE & ROBINSON, L.L.P.

Mr. Robert S. Clemente                    -13-                       June 20, 2003

Additionally, Lisa Bisaccia, FBF's Director of Compensation and Benefits, confirmed at a meeting held in the Summer of 2002 that participants in the Cash Equivalent Plans would receive their 2001 and 2002 deferred compensation even if they declined to sign the Separation Agreement and Release. Nonetheless, when contacted by several Claimants upon their receipt of the May 2 Letter, Ms. Bisaccia informed those Claimants that they could still receive their 2001 and 2002 deferred compensation provided that they, inter alia, withdraw from their participation in this arbitration and sign a waiver of their rights.

Contrary to the May 2 Letter, then, the forfeiture provisions of the plans have not been triggered. Even if they had been triggered, however, those provisions would not provide Respondents with a basis to deny Claimants their deferred compensation. The significant sections of the Plans – Article 8.1(ii) of the Cash Equivalent Plan and Section 8(a)(ii) of the Restricted Unit Award Agreement,[22] which describe the Plans' relevant forfeiture clauses – prohibit Respondents from reneging on their commitment to pay Claimants' deferred compensation except if Claimants disparage Respondents.[23] Statements Claimants have made in this arbitration and which are related to the subject matter of the arbitration, however, are absolutely privileged and may not constitute disparagement, as discussed below.

## CLAIMS

### WARN Act Claims

In the separation packages offered to Claimants, Respondents acknowledge that the WARN Act governs their decision to close the Robertson Stephens firm. The WARN Act provides, in pertinent part:

An employer shall not order a plant closing or mass layoff until the end of a 60-day period after the employer serves written notice of such an order --

---

[22] According to Section 4.6 of the Restricted Unit Plan, the Restricted Unit Award Agreement provides the conditions for receipt (and/or forfeiture) of the Participant's stock awards.

[23] Both the Cash Equivalent Plans (Ex. E) and the Restricted Unit Award Agreement (Ex. F), in pertinent part, provide:

In the event that, at any time during the six months period immediately following any Participant's Termination Date (other than any such Termination Date occurring due to a termination of employment within eighteen months following a Change in Control by the Participant for Good Reason or by the RS Group without Cause), the Participant ... (ii) **publicly disparages any member of the RS Group or Parent or any of their respective officers, directors or senior executive employees or otherwise makes any public statement that is adverse, inimical or otherwise materially detrimental to the interests of such Persons or individuals ....** (Emphasis added.)

Barr-000164

LIDDLE & ROBINSON, L.L.P.

Mr. Robert S. Clemente                    -14-                    June 20, 2003

> (1) to each representative of the affected employees as of the time of the notice or, if there is no such representative at that time, to each affected employee.

29 U.S.C. § 2102(a).

     The WARN Act was "designed to give workers and their families some transition time to adjust to the prospective loss of employment, to seek and obtain alternative jobs and ... to enter skill training ... that will allow these workers to successfully compete in the job market." Martin v. AMR Services, 877 F. Supp. 108, 113 (E.D.N.Y. 1995) (internal citations omitted).

     Respondents violated the WARN Act by failing to provide the requisite 60-day notice prior to closing Robertson Stephens' operations (or, alternatively, to pay 60 days of notice pay). Failure to give written notice of termination within the 60 days prescribed constitutes a violation of the WARN Act. See, e.g., Finnan v. L.F. Rothschild & Co., Inc., 726 F. Supp. 460 (S.D.N.Y. 1989); New Orleans & Vicinity v. Dillard Department Stores, 15 F.3d 1275 (5th Cir. 1994).

     When proper notice is not provided, employees are entitled to back pay damages of up to 60 days of notice pay. The notice pay offered to Claimants in lieu of Respondents' providing 60-days' notice of the closing of Robertson Stephens violates the WARN Act in two respects. First, the payment should have been calculated on a total compensation basis. Respondents instead offered notice pay based only on base salary. The WARN Act describes the extent of an employer's liability for failure to provide the required notice as:

> "back pay for each day of violation at a rate of compensation not less than the higher of —
>
> (i)    the average regular rate received by such employee during the last 3 years of the employee's employment; or
>
> (ii)   the final regular rate received by such employee...."

29 U.S.C. § 2104(a)(1). The WARN Act back pay remedy must be calculated to reflect the amount an "employee actually would have earned" and not merely an employee's base salary. Local Joint Exec. Bd. of Culinary/Bartender Trust Fund v. Las Vegas Sands, Inc., 244 F.3d 1152 (9th Cir. 2001).

     Second, Respondents deducted the WARN notice pay offered to Claimants from severance due Claimants pursuant to an entirely separate obligation, namely, Respondents' severance plans and ERISA. This deduction is not permitted by the WARN Act. 29 U.S.C. § 2104(a)(2) provides in pertinent part:

> The amount for which an employer is liable under paragraph (1) shall be reduced by

Barr-000165

19-12346-shl    Doc 55-7    Filed 09/05/19    Entered 09/05/19 18:22:01    Exhibit C
Part 5    Pg 73 of 99

LIDDLE & ROBINSON, L.L.P.

Mr. Robert S. Clemente                                    -15-                                    June 20, 2003

> (A) any wages paid by the employer to the employee of the period of the violation;
>
> (B) any voluntary and unconditional payment by the employer to the employee that is not required by any legal obligation; and
>
> (C) any payment by the employer to a third party or trustee (such as premiums for health benefits or payments to a defined contribution pension plan) on behalf of and attributable to the employee for the period of the violation.

Severance payments, however,

> are not "wages" as contemplated by 29 U.S.C. § 2104(a)(2)(A), but rather ERISA payments that the company was already legally obligated to make regardless of the work the [claimants] performed. The fact that these payments happened to be labeled ["WARN Period Salary Offset"], and that they happened to be set at the level of the [claimants'] wages, is irrelevant. The payments were not made in exchange for work that the[claimants] would have performed during the period of the violation. Accordingly, they are not "wages" according to 29 U.S.C. § 2104(a)(2)(A).

Ciarlante v. Brown & Williamson Tobacco Corp., 143 F3d 139, 152 (3rd Cir. 1998). See also Tobin v. Ravenswood Aluminum Corp., 838 F. Supp 262, 273 (S.D.W.Va. 1993) ("The court notes that severance pay under ERISA does not constitute wage compensation."); 29 U.S.C. § 2104(a)(1)(B) (providing that damages for failure to provide proper notice under the WARN Act include payment of benefits under an employee benefit plan in addition to backpay). Here, where the severance package attempts to deduct WARN Act back pay damages from an already present legal obligation under ERISA, the deduction is improper, and Claimants should receive the full value of both the WARN and ERISA payments.

Based on Respondents' violation of the WARN Act, Claimants each should be awarded damages based on their individual rates of compensation, in accordance with 29 U.S.C. § 2104, together with their attorneys' fees and costs.

## Bonus Claims

Claimants were employed in the following divisions: investment banking, sales and trading, research, and retail brokerage. Except for retail salespeople, all of the Claimants were

19-12346-shl    Doc 55-7    Filed 09/05/19    Entered 09/05/19 18:22:01    Exhibit C
Part 5    Pg 74 of 99

LIDDLE & ROBINSON, L.L.P.

Mr. Robert S. Clemente                    -16-                         June 20, 2003

compensated in similar fashion – in addition to base salary, they earned year-end bonuses, which accounted for the bulk of their total compensation.   Claimants understood that their bonus was a function of the firm's performance, their department's performance and their individual performance. Not only was this manner of calculating bonuses Respondents' practice and policy for several years, but Respondents made express representations to many of the Claimants that this is precisely how their bonuses would be determined.

For 2001, moreover, Respondents expressly promised Claimants that they would receive "market compensation" based on their performance and the compensation paid by comparable Wall Street firms. Respondents failed to fulfill this promise, paying bonuses that were well below market and overwhelmingly comprised of deferred compensation.   Respondents also failed to fulfill their promise that Robertson Stephens employees would receive 30 percent of the firm's equity in the form of Restricted Units.

In addition, **Respondents repeatedly advised Claimants throughout their employment during 2002 that Respondents had been accruing a 2002 bonus pool that totaled approximately $40 million.** Upon the termination of Claimants' employment, however, Respondents told Claimants that Claimants would receive no bonus compensation for 2002. Claimants are nonetheless entitled to such earned compensation.

Courts recognize implied, as well as express, contracts.   The bonus compensation Claimants should have been paid for both 2001 and 2002 was owed to them under an implied contractual promise. "[A]n implied-in-fact contract ... [is] based on the conduct of the parties, from which ... [they] fairly infer the existence and terms of a contract." Radio Today, Inc. v. Westwood One, Inc., 684 F. Supp. 68, 71 (S.D.N.Y. 1988).[24] see also Division of Labor Law Enforcement v. Transpacific Transportation Co., 69 Cal.App.3d 268, 275, 137 Cal.Rptr.855 (1977) ("As to the basic elements, there is no difference between an express and implied contract. While an express contract is defined as one, the terms of which are stated in words, an implied contract is an agreement, the existence and terms of which are manifested by conduct."); LiDonni, Inc. v. Hart, 355 Mass. 580, 583, 246 N.E.2d 446, 449 (1969) ("In the absence of an express agreement, a contract implied in

---

[24] The practice of paying bonuses makes bonus compensation an implied part of any employment agreement. See, e.g., Credit Suisse First Boston v. Crisanti, 734 N.Y.S.2d 150, 151 (1st Dep't 2001) ("We find no basis for judicial disturbance of the arbitrators' primarily factual conclusion that the bonus sought by respondent was an essential component of his compensation and that the parties' course of dealing and the industry practice gave rise to an implied right to a bonus."); Mirchel v. RMJ Securities Corp., 613 N.Y.S.2d 876, 878-79 (1st Dep't 1994) ("The course of dealing between the parties evinces an implied promise that annual or semi-annual bonus payments constitute a part of plaintiff's compensation."); Guintoli v. Garvin Guybutler Corp., 726 F. Supp. 494, 507-08 (S.D.N.Y. 1989) (an implied promise that bonus payments constitute a term of employment can be shown through a course of dealing between employer and employee).   Numerous bonus cases have been brought in arbitration and won by the claimants. See Randall Smith, "Losing a Job on Wall Street These Days Often Doesn't Mean Losing a Bonus, Too," Wall Street Journal, July 19, 2000, at C1 (attached hereto as Exhibit B); Marais v. Barclays De Zoete Wedd, Inc. and Barclays Capital, NASD Case No. 00-02520 (panel awarded bonus compensation totaling $417,500 plus interest); Brown, et al. v. ING Baring Furman Selz, NYSE Docket No. 2000-8755 (panel awarded bonus of $206,750 plus interest); Alban-Davies v. Credit Lyonnais Securities (USA) Inc.; NYSE Docket No. 2000-8631 (panel awarded bonus of $650,000 plus interest); Halpern, et al. v. ING Baring (U.S.) Securities Inc., NYSE Docket No. 1998-7179 (panel awarded bonuses totaling $298,154.76, including interest).

19-12346-shl   Doc 55-7   Filed 09/05/19   Entered 09/05/19 18:22:01   Exhibit C
Part 5   Pg 75 of 99

LIDDLE & ROBINSON, L.L.P.

Mr. Robert S. Clemente                    -17-                      June 20, 2003

fact may be found to exist from the conduct and relations of the parties"); Century 21 Castles By King, LTD. v. First National Bank of Western Springs, 170 Ill.App.3d 544, 548, 524 N.E.2d 1222 (1988) ("a contract implied in fact arises not by express agreement but, rather, by a promissory expression which may be inferred from the facts and circumstances which show an intent to be bound"); Fortner v. McCorkle, 78 Ga.App. 76, 80, 50 S.E.2d 250, 253 (1st Div. 1948) ("In the absence of an express contract between the parties for the payment of such services, there may arise an implied contract by which the person to whom the services are rendered shall pay the other for the services, where from all the facts and circumstances it can reasonably be inferred that it is in the contemplation of the parties.").

Here, an implied contract for the payment of bonuses is established between Respondents and Claimants because (1) Respondents had a long-standing policy and practice of paying bonuses as part of annual compensation; (2) Claimants received bonuses in the past based upon this long-standing practice; (3) bonuses constituted a substantial portion of Claimant's annual compensation packages; and (4) Claimants were aware of Respondents' long-standing bonus practice and relied upon it in rendering services their employment.

In Hall v. United Parcel Service, 76 N.Y.2d 27, 556 N.Y.S.2d 21 (1990), the court determined that "[a]n employee's entitlement to a bonus is governed by the terms of the employer's bonus plan." Although the plaintiff in Hall did not qualify for his employer's bonus plan, there is no question that Claimants qualified for Respondents' bonus plan. The Claimants all performed their jobs during 2002 based upon the understanding that their year-end bonus would be determined by their individual performance, their department's performance, and the performance of the firm. Since Robertson Stephens' practices, policies and verbal assurances constitute a "bonus plan," Claimants are entitled to bonus compensation for 2002 in accordance with that plan.

Respondents are also liable to Claimants for their unpaid bonus compensation under the doctrine of quantum meruit. Under this theory, one who accepts and benefits from the services of another who expects to be paid must pay the individual the reasonable value of those services. See Martin H. Bauman Assoc. v. H&M International Transport, 171 A.D.2d 479, 567 N.Y.S.2d 404, 408 (1st Dep't 1991); Griner v. Foskey, 158 Ga.App.769, 771, 282 S.E.2d 150, 152 (1981); J. A. Sullivan Corp. v. Commonwealth, 397 Mass. 789, 792-98, 494 N.E.2d 374, 376-79 (1986); Earhart v. William Low Company, 25 Cal.3d 503, 600 P.2d 1344 (1979); First National Bank of Springfield v. Malpractice Research, Inc., 179 Ill.2d 353, 688 N.E.2d 1179 (1997). Claimants provided substantial services to Respondents in 2002, and should be compensated accordingly.

In prior years, Claimants received substantial bonuses based on their performance, as shown by the chart below. In most instances, Claimants earned bonuses over the course of the last three years averaging from $1 million to $4 million as compared to annual base salaries of no more than $200,000 (except for one Claimant who earned a $250,000 annual base salary). Respondents' refusal to pay Claimants their earned bonuses is improper. Instead, Respondents should be compelled to pay Claimants their earned and promised 2001 and 2002 bonus compensation, plus interest.

Barr-000168

19-12346-shl    Doc 55-7    Filed 09/05/19    Entered 09/05/19 18:22:01    Exhibit C
Part 5    Pg 76 of 99

LIDDLE & ROBINSON, L.L.P.

Mr. Robert S. Clemente                    -18-                        June 20, 2003

**Claim For Severance Pay**

        Claimants were dismissed without receiving any severance pay. Respondents offered to pay Claimants severance only if they agreed to release Respondents from "any claim, demand or cause of action of any kind" they may have against Respondents. Claimants were entitled, however, to receive severance pay from Respondents under Respondents' severance plans, policies and practices, and Claimants ask that they be awarded all amounts, as of yet undetermined, to which they are entitled as former executives of the firm.

        Severance plans are "employee welfare benefit plans" within the meaning of the federal Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1001 et seq. ("ERISA"); see Gilbert v. Burlington Industries, Inc., 765 F.2d 320, 325 (2d Cir. 1985). As a result, each of Respondents' severance plans, practices and policies constitutes an employee benefit plan under ERISA. Respondents' failure to pay severance benefits to Claimants under the most favorable severance arrangement applicable to them constitutes a violation of ERISA. Claimants are therefore entitled to the severance payments they should have received, as well as recovery of their reasonable attorneys' fees expended in obtaining those payments. See ERISA, 29 U.S.C. § 1132(g)(1).

        Additionally, it is unlawful under ERISA to take an adverse employment action for the purpose of interfering with any employee's attainment of any right to which he or she may become entitled. See ERISA, 29 U.S.C. § 1140. Here, Respondents conditioned the payment of severance on Claimants' waiving their rights to pursue earned bonus compensation to which they are entitled. Given the substantial amounts of bonus compensation involved, Respondents knew that Claimants would not forfeit these amounts in order to receive the offered severance. The imposition of a release thus constitutes interference with Claimants' attainment of benefits pursuant to an ERISA plan in violation of ERISA Section 510.

        Claimants ask the Panel to award them the unpaid severance to which they are entitled, plus their attorneys' fees and liquidated damages in recovering such benefits.

**Fraud, Negligent Misrepresentation and Breach of Fiduciary Duty Claims**

        An action for fraud can be shown by proof that Respondents made a false, material misrepresentation of an existing fact with knowledge that it was false (or reckless disregard as to whether it was true or false), with the intent that Claimants rely on such misrepresentations, and upon which Claimants reasonably relied to their detriment. Higginbottom v. Thiele Kaolin Co., 251 Ga. 148, 152, 304 S.E.2d 365 (1983); see also Werner v. American Int'l Group, Inc., 201 F.3d 446 (9th Cir. 1999) ("[T]he elements of a fraudulent inducement claim are: (a) misrepresentation; (b) scienter; (c) intent to defraud; (d) justifiable reliance; and (e) resulting damage."); Northeastern Univ. v. Deutsch, 2002 WL 968857, at *3 (Mass.Super. March 21, 2002) ("To state a claim for fraudulent misrepresentation, the plaintiff 'must show a false statement of material fact made to induce the plaintiff to act, together with reliance on the false statement by the plaintiff to the plaintiff's detriment."); Bd. of Educ. of City of Chicago v. A, C and S, Inc., 131 Ill.2d 428, 546 N.E.2d 580 (1989) (elements in a fraudulent misrepresentation are "(1) a false statement of

Barr-000169

FILED: NEW YORK COUNTY CLERK 08/13/2018 01:47 PM

NYSCEF DOC. NO. 161

19-12346-shl    Doc 55-7    Filed 09/05/19    Entered 09/05/19 18:22:01    Exhibit C
Part 5    Pg 77 of 99

INDEX NO. 159781/2014

RECEIVED NYSCEF: 08/13/2018

LIDDLE & ROBINSON, L.L.P.

Mr. Robert S. Clemente                  -19-                  June 20, 2003

material fact, (2) knowledge or belief of the falsity by the party making it, (3) intention to induce the other party to act, (4) action by the other party in reliance on the truth of the statements, and (5) damage to the other party resulting from such reliance"). Alternatively, Claimants can show that the Respondents, instead of misrepresenting an existing fact, made promises with the present intention not to perform "or with knowledge that the future event would not occur." Higginbottom, 251 Ga. at 152.

The elements of a claim for negligent misrepresentation are the same as those for a fraudulent misrepresentation claim, except that Claimants need not show that Respondents knew their statement was false at the time it was made. Respondents' carelessness or negligence in ascertaining the truth of their statement is sufficient. Bd. of Educ., 131 Ill. 2d at 453.

The elements of a fraudulent concealment claim are: (1) a relationship between parties that creates a duty to disclose; (2) knowledge of material facts by a party bound to make such disclosures; (3) non-disclosure; (4) scienter; (5) reliance by the injured party, and (6) damages. Zackiva Communications Corp. v. Horowitz, 826 F. Supp. 86 (S.D.N.Y. 1993); see also Brass v. American Film Technologies, Inc., 987 F.2d 142 (2d Cir. 1993); Mosier v. Southern California Physicians Insurance Exchange, 63 Cal.App.4th 1022, 74 Cal.Rptr.2d 550 (1998); Tigner v. Shearson-Lehman Hutton, Inc., 201 Ga.App. 713, 411 S.E.2d 800 (1991). A duty to disclose arises when one party has superior knowledge not readily available to the other party, or where the parties stand in fiduciary or confidential relationship to one another. Ceribelli v. Elghanayan, 990 F.2d 62 (2d Cir. 1993).

Respondents' fraudulent statements and concealments, including misrepresentations regarding Fleet's intent to sell and/or liquidate Robertson Stephens, misrepresentations concerning the value of Robertson Stephens Restricted Units, and Fleet's lack of intent to complete the MBO, form the basis for Respondents' liability for fraudulent misrepresentation, fraudulent concealment, and negligent misrepresentation. Moreover, Respondents' misrepresentations regarding the value of Claimants' Robertson Stephens restricted units, and Fleet's intentions regarding the sale of Robertson Stephens and the MBO constitute additional bases for fraud and negligent misrepresentation claims. Claimants' reliance included accepting Robertson Stephens restricted units, declining other employment, and continuing to perform services yielding substantial revenues to Respondents.

Respondents, by virtue of their superior knowledge of the facts at issue, owed a duty to Claimants. Respondents also owed a duty to Claimants by virtue of Respondents' status as majority shareholders of Robertson Stephens common stock. As courts in California and New York have recognized, "'[w]hen a number of stockholders combine to constitute themselves a majority in order to control the corporation as they see fit, they become for all practical purposes the corporation itself, and assume the trust relation occupied by the corporation towards its stockholders.'" Jones v. H.F. Ahmanson & Co., 1 Cal.3d 93, 111, 460 P.2d 464 (1969) (quoting Ervin v. Oregon Ry. & Nav. Co., 27 F. 625, 631 (C.C.S.D.N.Y. 1886)). Thus, the majority shareholders stand in a position of fiduciaries to the minority shareholders, and a parent company cannot "operate the subsidiary for the benefit of the group as a whole [rather than] for the benefit of

Barr-000170

LIDDLE & ROBINSON, L.L.P.

Mr. Robert S. Clemente                    -20-                    June 20, 2003

that particular subsidiary." Id.; Robb v. Eastgate Hotel, 347 Ill. App. 261, 106 N.E.2d 848 (1952) ("The majority shareholders do not by the mere reason of their holdings thereby become trustees for the minority stockholder in voting on a sale of assets. However, equity will impose upon them the obligation of trustees if in forcing disposition of assets they overreach the minority stockholders and reap benefits in which the minority does not share."). "Where, as here, it is sufficiently alleged that the effect of the controlling stockholders self-serving manipulation of corporate affairs causes a singular economic injury to minority interests alone, the minority have stated a cause of action for 'special' injury." Grace Brothers, Ltd. v. Farley Industries Inc., 264 Ga. 817, 819, 450 S.E.2d 814, 816 (1995) (quoting In re Tri-Star Pictures, Inc. Litigation, 634 A.2d 319, 330 (Del. 1993)) (recognizing cause of action for minority shareholders where majority shareholders breached a fiduciary duty when they caused a merger where minority stock holders suffered from depressed price).

Respondents violated their fiduciary duty to Claimants by engineering the failed sale and failed MBO of the Robertson Stephens firm, depriving Claimants of all of the value of their Robertson Stephens restricted units, concealing and misrepresenting material facts relating to such sale, the MBO and the value of the restricted units, and other conduct reflecting Respondents' mpaign to place the interests of Fleet ahead of those of the Claimants and Robertson Stephens.

**Breach of Contract**

Respondents breached their contract with Claimants by refusing to pay Claimants their deferred compensation under the Cash Equivalent Plans and Restricted Unit Plan. Those plans provide that Claimants will receive their deferred compensation pursuant to a prescribed vesting schedule and subject to limited restrictions (i.e., the anti-disparagement provision). (Exs. E, F) The Separation Agreement and Release provided to Claimants confirmed that they would receive their deferred compensation irrespective of whether they signed the Separation Agreement and Release. (Ex. A) Respondents further confirmed this agreement during a meeting held in the Summer of 2002. Notwithstanding this agreement, Respondents have refused to pay Claimants their deferred compensation unless they withdraw from the arbitration and sign a waiver.

Respondents' statement in the May 2 Letter that Claimants forfeited their deferred compensation is simply untrue.[25]  The anti-disparagement clause has no application to this arbitration. Under the Cash Equivalent Plans, the anti-disparagement clause does *not* apply if there is a "change in control" (defined as liquidation of dissolution) of the "Company."

Even if the anti-disparagement clause was triggered (which it was not), Claimants did not disparage Respondents. Statements made by the parties and/or their attorneys during the course of litigation that relate to the subject matter of the litigation are absolutely privileged. See Weiner v. Weintraub, 22 N.Y.2d 330, 331, 239 N.E.2d 540, 540, 292 N.Y.S.2d 667, 668 (1968)

---

[25] Certainly, Claimants did not violate Section 8.1(i), which prohibits Claimants from "solicit[ing] for employment ... any individual who is then employed by or otherwise engaged to perform services ... for any member of the RS Group...." (Ex. C) As Respondents have acknowledged, following the firing of Claimants there were no Robertson Stephens employees to solicit.

LIDDLE & ROBINSON, L.L.P.

Mr. Robert S. Clemente                    -21-                    June 20, 2003

(stating that, "[t]here can, of course, be no doubt that statements made by counsel and parties in the course of judicial proceedings [are] privileged as long as such statements are material and pertinent to the questions involved ... irrespective of the motive with which they are made.") (internal quotations omitted) (citations omitted); see also Zortman v. Bildman, No. 962529B, 1999 WL 1318959 at, *9-10 (Mass. Super. Jan. 15, 1999); Nix v. Sawyer, 466 A.2d 407, 410 (Del. Super. Ct. 1983).

Moreover, the non-disparagement clause is invalid because it contravenes public policy. See, e.g., Lucas v. Newton Wellesley Hosp., No. Civ. A. 01-0635, 2001 WL 834618, at *2 (Mass. Super. July 20, 2001) (stating that the privileged nature of attorneys' statements made during the course of litigation is grounded in "the public policy of permitting attorneys complete freedom of expression and candor in communications in their efforts to secure justice for their clients.") (citation omitted); see also Barker v. Huang, 610 A.2d 1341, 1345 (Del. 1992).[26] In Lucas, the Plaintiff brought a fraud claim that relied on statements and actions made in the course of litigation. In dismissing the fraud claim, the Court held that "[i]t is well-settled that an attorneys' statements are privileged 'where such statements are made by an attorney engaged in his function as an attorney whether in the institution or conduct of litigation ...;" and, "[t]his absolute privilege 'provides a complete freedom of expression and candor in communications in their efforts to secure justice for their clients." Id. (Citation omitted.)

As a result, Respondents are liable to Claimants for breach of contract based on Respondents' willful failure to pay them their deferred compensation to which they are entitled.

### Imposition of a Constructive Trust

"A constructive trust is the formula through which the conscience of equity finds expression. When property has been acquired in such circumstances that the holder of the legal title may not in good conscience retain the beneficial interest equity converts him into a trustee." Beatty v. Guggenheim Exploration Co., 225 N.Y. 380, 122 N.E. 378, 380 (1919) (Cardozo, J.). Under New York law, the right to impose a constructive trust generally requires proof of (1) a confidential or fiduciary relationship, (2) a promise, (3) a transfer in reliance on the promise, and (4) unjust enrichment. In re Schick, 246 B.R. 41, 45 (S.D.N.Y. 2000); see also Vornado PS, L.L.C. v Primestone Investment Partners, L.P., 821 A.2d 296, 322 (Del. Ch. 2002) (same elements under Delaware law). Because a constructive trust is a flexible remedy, however, courts "do not insist that the facts fit within the framework of these four elements, provided the 'trustee'[27] acquired and holds property under unconscionable and inequitable circumstances, and

---

[26] The Restricted Unit Award Agreement (Ex. E at 21) and the 2001 Cash Equivalent Plan (Ex. F at 11) each contain a Delaware choice of law provision. Although neither is now operating, RSG and RSI were incorporated in Delaware and Massachusetts, respectively.

[27] "Though analogized to a trust, a constructive trust is not a trust at all, but an equitable remedy designed to prevent unjust enrichment. In other words, a constructive trustee is not compelled to convey the property to the beneficiary because he is a constructive trustee; it is because he can be compelled to convey it that he is a constructive trustee." In re Schick, 246 B.R. 41 at 45 (S.D.N.Y. 2000) (internal citations omitted).

LIDDLE & ROBINSON, L.L.P.

Mr. Robert S. Clemente                    -22-                         June 20, 2003

is unjustly enriched." In re Schick, 246 B.R. at 45 (citing Counihan v. Allstate Ins. Co., 194 F.3d 357, 362 (2d Cir. 1999)).

As described above, Respondents have withheld Claimants' deferred 2001 and 2002 compensation under inequitable circumstances and have thus been unjustly enriched. The applicable plans provide for continued vesting and payment of the deferred compensation if a participant's employment has been terminated as part of a workforce reduction or liquidation and not for cause. (Ex. E at § 7.3(vii); Ex. F at § 3(d)) Moreover, Respondents promised Claimants that they would receive their deferred compensation even if they did not sign the Separation Agreements and Releases offered to them at the termination of their employment. After Claimants filed this arbitration, however, Respondents reneged on this promise and improperly withheld the deferred compensation on the basis of Claimants' filing of the arbitration.

Under California law[28], imposition of a constructive trust merely requires (1) the existence of property or some interest in property ("res"), (2) the right of the complaining party to the res, and (3) some wrongful acquisition or detention of the res by another party who is not entitled to it. In re Real Estate Assoc. Limited Partner Litigation, 223 F. Supp.2d 1109, 1140 (C.D. Cal. 2002) (seeking constructive trust over money damages, if any, recovered in a lawsuit) (citation omitted). The circumstances under which constructive trusts are generally imposed are set out in Cal. Civil Code §§ 2223 and 2224. Section 2223 provides that "[o]ne who wrongfully detains a thing is an involuntary trustee thereof, for the benefit of the owner." Because Respondents wrongfully detained Claimants' deferred compensation, Respondents have become involuntary trustees of those amounts. "One who gains a thing by fraud, accident, mistake, undue influence, the violation of a trust, or other wrongful act, is, unless he or she has some other and better right thereto, an involuntary trustee of the thing gained, for the benefit of the person who would otherwise have had it." Cal. Civil Code § 2224. Respondents lack any basis to withhold Claimants' earned deferred compensation. Claimants thus request the imposition of a constructive trust over the deferred compensation due them under the Cash Equivalent Plans, the Restricted Unit Plan, and the Restricted Unit Award Agreement.

## Violation of the Racketeer Influenced and Corrupt Organizations Act

Respondents' actions constitute a violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO"). 18 U.S.C. §1961 et seq. "Even though the statute targets activities traditionally associated with organized criminal activity, Congress adopted a definition of 'racketeering activity' that encompasses many offenses that are the mainstay of white collar prosecutions. Hence, RICO has handed the government 'a significant weapon against white collar and organized criminals.'" Brickley, CORPORATE AND WHITE COLLAR CRIME, CASES AND MATERIALS, at 417 (Aspen Publ. Inc. 1995) (citing U.S. Dep't of Justice, An Explanation of the Racketeer Influenced and Corrupt Organizations Statute at 2 (4th ed.)); see also U.S. v. Turkette, 452 U.S. 576 (1981) (RICO applies to both legitimate and illegal enterprises).

---

[28] ___ of the Claimants were employed in California.

Barr-000173

LIDDLE & ROBINSON, L.L.P.

Mr. Robert S. Clemente                    -23-                    June 20, 2003

Under RICO, it is unlawful "for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity..." 18 U.S.C. §1962(c).[29,30]

An "enterprise" is defined as "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4). Corporations are considered "persons" under RICO, and where two or more are involved, the enterprise statutory requirement is satisfied. See, e.g., U.S. v. Goldin Industries, Inc. et al., 219 F.3d 1271 (although corporations had overlapping management and subsidiary relationships, they constituted separate persons and an enterprise for the purposes of RICO). Here, Respondents collaborated to deprive Claimants of deferred compensation due Claimants in an overall effort to enrich Fleet improperly at Claimants' expense. This collaboration constitutes an enterprise under RICO.

Respondents, in furtherance of their enterprise, have engaged in a pattern of racketeering activity. Here, Respondents have engaged in numerous acts of racketeering activity and other conduct for over a year with the intent of depriving Claimants of their compensation for the purpose of profiting Fleet.

"Racketeering activity" is defined under 18 U.S.C. § 1961 (listing numerous offenses constituting racketeering activity, including, *inter alia*, extortion, Hobbs Act violations, mail fraud, wire fraud, embezzlement, and securities fraud). Respondents have engaged in at least two predicate acts of "racketeering activity" in the past year that have proximately resulted in financial harm to Claimants.

By sending the May 2 Letter to Claimants, Respondents[31] committed on the order of 42 separate violations of the Hobbs Act, codified at 18 U.S.C. § 1951. Extortion is prohibited under the Hobbs Act. The May 2 Letter constitutes extortion because it threatened Claimants with economic injury. See Turkish v. Kasenetz, 27 F.3d 23 (2nd Cir. 1994) (allegations of plaintiffs' fear that defendants would withhold assets due from estate if plaintiffs failed to execute releases asserted violation of Hobbs Act). In addition, the extortion need not have been successful, since attempted extortion is statutorily proscribed. See United States v. Marcy, 777 F. Supp. 1393 (N.D. Ill. 1991).

---

[29] Allegations supporting a civil RICO claim need be proven by only the "preponderance of the evidence" standard, not the criminal standard. Sedima, S.P.R.L. v. IMREX Co., 473 U.S. 479 (1985).

[30] Respondents' activities affected interstate commerce as required under RICO, since their activities deprived Claimants of their funds across many states, and the corporate entities themselves affected interstate commerce. All that is needed under the statute is a minimal contact with interstate commerce. See Nat'l Org. for Women v. Scheidler, 114 S. Ct. 798 (1994).

[31] As discussed, it appears Respondents' attorneys, Bingham McCutchen, sent the letter.

FILED: NEW YORK COUNTY CLERK 08/13/2018 01:47 PM

NYSCEF DOC. NO. 161

19-12346-shl    Doc 55-7    Filed 09/05/19    Entered 09/05/19 18:22:01    Exhibit C

Part 5    Pg 82 of 99

INDEX NO. 159781/2014

RECEIVED NYSCEF: 08/13/2018

LIDDLE & ROBINSON, L.L.P.

Mr. Robert S. Clemente                    -24-                    June 20, 2003

Claimant Michael Barr, in responding to the May 2 letter, called Lisa Bisaccia, FBF's Director of Compensation and Benefits, and was told, in essence, to drop his claims against Respondents in this arbitration or he would not receive the deferred compensation due him. This not only satisfies the Hobbs act but would also constitute a violation of New York State's extortion statute. See New York Penal Code §155.05(e), Larceny by Extortion (which would qualify as an additional predicate act under RICO). "Fear of future economic harm that is reasonable is sufficient to establish extortion under the statute." Kraft General Foods v. Cattell, 18 F. Supp.2d 280 (S.D.N.Y. 1998).

Additionally, Respondents' other actions also constitute predicate acts under RICO. In assuring Claimants, via interstate telephonic conference call, that they would be paid the restricted stock unit and deferred compensation plan monies whether or not they signed the severance releases, Respondents committed wire fraud. Claimants relied upon this information and chose not to take further steps to secure their deferred compensation. Respondents had no intention of paying these amounts, and then depleted Robertson Stephens of its assets. See 18 U.S.C. §1533 (Wire Fraud).

Here, Respondents engaged in these activities specifically to deprive Claimants of the fruits of their labor for the benefit of Fleet. They did so for at least a one-year period, and on a continuing basis through denial of moneys owed by statute, by contract, and in equity. Given that Respondents wrongful conduct through as recently as the May 2 letter, and Fleet's interstate communications subsequent to the letters, and the fact that Respondents have victimized 42 former Robertson Stephens employees, i.e. the Claimants in this proceeding, there exists ample basis to believe that Respondents will continue their racketeering activity into the future.

## Violation of Unfair and/or Deceptive Trade Practices Statutes

Respondents' refusal to pay Claimants their deferred compensation under the Cash Equivalent Plans and the Restricted Stock Plan, unless Claimants withdraw from the arbitration, violates various state statutes that prohibit unfair or deceptive trade practices.

Under the Massachusetts Deceptive Trade Practices Act, Mass. Gen. Laws Ann. Ch. 93A, § 2 (West 2003), it is unlawful for Respondents to employ "[u]nfair methods of competition and unfair or deceptive practices in the conduct of any trade or commerce...." See also Citicorp N.A., Inc. v. Ofden Martin Sys. of Haverhill Inc., 8 F. Supp. 2d 72, (D. Mass. 1998) (denying defendant's motion to dismiss plaintiff's unfair/deceptive trade practices claim, which asserted that defendant was "unfairly attempting to use the burdens and risks associated with the litigation process as a lever to obtain a benefit to which it clearly is not entitled."). In addition to violating this statute, Respondents have violated similar statutes in other states. See Cal. Bus. & Prof. Code § 17200 (West 2003) (prohibiting unfair competition which includes any unlawful, unfair or fraudulent business act or practice); see also Ill. Rev. Stat. Ch. 815, § 1 et. seq. (West 2003) (prohibiting unfair methods of competition and unfair or deceptive acts or practices).

Barr-000175

19-12346-shl    Doc 55-7    Filed 09/05/19    Entered 09/05/19 18:22:01    Exhibit G
Part 5    Pg 83 of 99

LIDDLE & ROBINSON, L.L.P.

Mr. Robert S. Clemente                    -25-                         June 20, 2003

California's unfair competition statute allows for the recovery of withheld wages:

> [E]arned wages that are due and payable pursuant to section 200 et seq. of
> the Labor Code are as much the property of the employee who has given
> his or her labor to the employer in exchange for that property as is property
> a person surrenders through an unfair business practice.  An order that
> earned wages be paid is therefore a restitutionary remedy authorized by the
> UCL.

Cortez v. Purolator Air Filtration, 23 Cal.4[th] 163, 999 P.2d 706, 715 (2000) (emphasis added);
see also McCollum v. Xcare.net, Inc., 212 F. Supp.2d 1142, 1153-54 (N.D. Cal. 2002)
(corporation's denial of already earned commissions based on contract's escape clause
constituted an independent violation of § 17200, as well as violation of CA Labor Law).

        A court may also issue injunctive relief under § 17200 if it determines that the
moving party is likely to succeed on the merits and a possibility of irreparable injury exists, or
alternatively, the moving party raises serious questions on the merits, and the balance of the
hardships tips sharply in its favor.  Churchill Village v. General Electric Co., 169 F. Supp.2d
1119, 1123-25 (N.D. Cal. 2000).

        As a result of Respondents' violation of the state statutes prohibiting unfair or
deceptive trade practices, Claimants are entitled to the remedies available under such statutes,
including double (or treble) damages, attorneys' fees, costs, and punitive damages.

**Violation of Wage Statutes**

        In addition, Respondents' willful failure to pay Claimants amounts due them also
entitles Claimants to statutory relief under their respective State's laws.  (See relevant sections of
state statutes attached hereto as Exhibit G.)  For example, Cal. Labor Law § 200(a) defines "wages"
to include "all amounts for labor performed by employees of every description, whether the amount
is fixed or ascertained by the standard of time, task, piece, commission basis, or other method of
calculation."[32]  Pursuant to these "wage statutes," Claimants seek all unpaid wages, including all
bonus and severance pay, liquidated damages, and costs and attorneys' fees.

**Individual Claims**

        As stated earlier, each Claimant's bonus was primarily a function of performance.
The following table will provide a breakdown of each Claimant's bonus compensation paid to

---

[32] See, e.g., Cap Gemini America, Inc. v. Judd, 597 N.E.2d 1272 (Ill. 1992) (interpreting CA law to find employee's
accrued and earned incentive bonus, which employer agreed to pay pursuant to resignation agreement, was "wages"
since it was based on work done); Ware v. Merrill Lynch, 100 Cal.Rptr. 791, 24 Cal.App.3d 35 (1972) (employee
contributions to profit sharing plans were "wages" since they were intended to induce employees), aff'd 414 U.S.
117, 94 S. Ct. 383 (1973).

19-12346-shl    Doc 55-7    Filed 09/05/19    Entered 09/05/19 18:22:01    Exhibit G
Part 5    Pg 84 of 99

LIDDLE & ROBINSON, L.L.P.

Mr. Robert S. Clemente                    -26-                    June 20, 2003

Claimants for the years 1999, 2000 and 2001.[33]  This illustrates the simple fact that bonuses comprised a significant portion of each Claimant's total annual compensation, and also provides a backdrop against which the Panel can determine the amounts Claimants should have received in WARN Act notice pay and bonus compensation for 2002.

The chart is not in alphabetical order (the order in the caption) but has been coded to maintain the confidentiality of each Claimant's specific compensation information.  Claimants' names, job titles and any additional identifying information will be submitted as soon as the parties agree to a suitable confidentiality agreement and/or the Arbitrators provide for such confidentiality.

| Name | 2002 Base Salary | 2001 Bonus Compensation | 2000 Bonus Compensation | 1999 Bonus Compensation | RS Restricted Units[34] | WARN Damages[35] |
|------|------------------|--------------------------|--------------------------|--------------------------|--------------------------|-------------------|
| 1 | $200,000 | $2,576,000 | $2,320,000 | $687,000 | $438,382 | $309,277 |
| 2 | $200,000 | $350,000 | $600,000[36] | N/A | $469,693 | $128,000 |
| 3 | $200,000 | $750,000 | $6,851,917 | $3,500,000 | $2,436,917 | $650,106 |
| 4 | $200,000 | $390,000 | $3,800,000 | $1,700,000 | $1,409,086 | $360,000 |
| 5 | $150,000 | $200,000 | $1,000,000 | N/A | $72,023 | $133,333 |
| 6 | $200,000 | $450,000 | $3,000,000 | $1,500,000 | $1,452,780 | $266,388 |
| 7 | $150,000 | $200,000 | $1,250,000 | $575,000 | $484,400 | $136,111 |
| 8 | $200,000 | $700,000 | $7,000,000 | $4,424,998 | $2,505,048 | $695,000 |
| 9 | $200,000 | $1,300,000 | $3,900,000 | N/A | $1,158,584 | $466,666 |
| 10 | $150,000 | $1,300,000 | $2,150,000 | $1,010,000 | $1,459,395 | $266,388 |
| 11 | $200,000 | $750,000 | $3,400,000 | $2,200,000 | $1,722,217 | $386,111 |
| 12 | $200,000 | $450,000 | $2,500,000 | $1,900,000 | $438,382 | $302,777 |
| 13 | $200,000 | $650,000 | $4,482,500 | $2,800,000 | $1,252,524 | $474,027 |
| 14 | $200,000 | $1,300,000 | $5,200,000 | $4,800,000 | $1,929,088 | $661,111 |
| 15 | $200,000 | $1,300,000 | $4,247,535 | N/A | $1,158,584 | $364,794 |
| 16 | $200,000 | $745,000 | $2,205,923 | $1,453,484 | $671,349 | $278,000 |
| 17 | $125,000 | $650,000 | $675,000 | $435,000[37] | $100,205 | $115,227 |
| 18 | $150,000 | $1,200,000 | $1,650,000 | $1,050,000 | $580,860 | $241,388 |
| 19 | $200,000 | $1,300,000 | N/A | N/A | $866,117 | $250,000 |

[33] Claimants' compensation figures are based on the best information available to Claimants and are subject to revision upon the receipt of official compensation records from Respondents.

[34] For the purposes of this chart, the RS Restricted Units have been valued at $7 per unit.  These amounts do not include Restricted Units earmarked for Robertson Stephens employees but not allocated.

[35] Pursuant to the statute, the WARN damages were calculated using the average total compensation for the past three years.  Where an employee had not been employed at Robertson Stephens for three years, the damages were calculated using the average total compensation for all years worked at Robertson Stephens.

[36] This employee began working at Robertson Stephens in April 2000; this bonus reflects 8 months of work.

[37] This employee began working at Robertson Stephens in April 1999; this bonus reflects 8 months of work.

18-12346-shl    Doc 55-7    Filed 09/05/19    Entered 09/05/19 18:22:01    Exhibit C
Part 5    Pg 85 of 99

LIDDLE & ROBINSON, L.L.P.

Mr. Robert S. Clemente                    -27-                    June 20, 2003

| Name | 2002 Base Salary | 2001 Bonus Compensation | 2000 Bonus Compensation | 1999 Bonus Compensation | RS Restricted Units[34] | WARN Damages[35] |
|------|------------------|-------------------------|-------------------------|-------------------------|------------------|----------------|
| 20 | $200,000 | $1,300,000 | N/A | N/A | $350,000 | $250,000 |
| 21 | $150,000 | $1,000,000 | N/A | N/A | $322,000 | $191,000 |
| 22 | $200,000 | $2,410,000 | $950,000 | $325,000 | $876,764 | $237,944 |
| 23 | $150,000 | $300,000 | $1,500,000 | $1,100,000 | $288,708 | $188,000 |
| 24 | $150,000 | $1,000,000 | N/A | N/A | $329,000 | $167,000 |
| 25 | $150,000 | $450,000 | $850,000 | $600,000 | $866,117 | $200,000 |
| 26 | $150,000 | $1,300,000 | $1,000,000 | $850,000 | $288,708 | $201,000 |
| 27 | $200,000 | $600,000 | $7,300,000 | $2,300,000 | $3,131,310 | $600,000 |
| 28 | $200,000 | $1,500,000 | $1,300,000 | N/A | $866,117 | $200,000 |
| 29 | $200,000 | $1,000,000 | $525,000[38] | N/A | $866,117 | $200,000 |
| 30 | $200,000 | $1,300,000 | $2,200,000 | $850,000 | $782,824 | $280,000 |
| 31 | $200,000 | $1,500,000 | $4,300,000 | $2,050,000 | $2,478,784 | $470,000 |
| 32 | $150,000 | $1,350,000 | $1,350,000 | N/A | $626,262 | $250,000 |
| 33 | $200,000 | $1,600,000 | $2,900,000 | $1,800,000 | $1,904,777 | $383,333 |
| 34 | $200,000 | $475,000 | $2,850,000 | $1,950,000 | $822,906 | $326,000 |
| 35 | $200,000 | $1,300,000 | $800,000 | N/A | $876,764 | $208,333 |
| 36 | $300,000 | $600,000 | $6,900,000 | $4,400,000 | $2,245,348 | $711,000 |
| 37 | $200,000 | $300,000 | $1,625,000 | $1,025,000 | $876,764 | $192,000 |
| 38 | $200,000 | $400,000 | $4,000,000 | $3,500,000 | $1,252,524 | $472,222 |
| 39 | $200,000 | $1,000,000 | $4,970,000 | $3,850,000 | $1,781,269 | $523,416 |
| 40 | $200,000 | $100,000 | $3,040,000 | $2,850,000 | $866,117 | $366,000 |
| 41 | $150,000 | $200,000 | $2,800,000 | $1,100,000 | $871,290 | $257,756 |
| 42 | $200,000 | $2,300,000 | $5,400,000 | $1,250,000[39] | $1,409,086 | $650,000 |

In addition, the following chart provides a breakdown of each Claimant's claims under the 2001 and 2002 Cash Equivalent Plans.[40] This chart illustrates that the Cash Equivalent Plans represented a substantial sum for each of the Claimants, and highlights the significance of Respondents' withholding of these funds with the express intent of forcing Claimants to withdraw from this action. (The following chart has also been coded to maintain the confidentiality of each Claimant's specific compensation information.)

---

[38] The employee began working at Robertson Stephens in July 2000; this bonus reflects six months of work.

[39] This employee began working at Robertson Stephens in November 1999; this bonus reflects one month of work.

[40] Claimants' compensation figures are based on the best information available to Claimants and are subject to revision upon the receipt of official compensation records from Respondents.

LIDDLE & ROBINSON, L.L.P.

Mr. Robert S. Clemente                    -28-                    June 20, 2003

| Name | 2001 Cash Eq. Plan | 2002 Cash Eq. Plan | Total | Treble Damages Under RICO |
|------|--------------------|--------------------|-------|---------------------------|
| 1 | $39,375 | $0 | $39,375 | $118,124 |
| 2 | $0 | $779,998 | $779,998 | $2,339,994 |
| 3 | $0 | $390,000 | $390,000 | $1,170,000 |
| 4 | $0 | $12,500 | $12,500 | $37,500 |
| 5 | $0 | $183,683 | $183,683 | $551,050 |
| 6 | $0 | $225,000 | $225,000 | $675,000 |
| 7 | $0 | $127,696 | $127,696 | $383,087 |
| 8 | $0 | $455,000 | $455,000 | $1,365,000 |
| 9 | $0 | $0 | $0 | $0 |
| 10 | $0 | $422,500 | $422,500 | $1,267,500 |
| 11 | $0 | $455,000 | $455,000 | $1,365,000 |
| 12 | $0 | $1,300,000 | $1,300,000 | $3,900,000 |
| 13 | $0 | $779,998 | $779,998 | $2,339,994 |
| 14 | $0 | $487,500 | $487,500 | $1,462,500 |
| 15 | $0 | $281,250 | $281,250 | $843,750 |
| 16 | $0 | $150,000 | $150,000 | $450,000 |
| 17 | $0 | $150,000 | $150,000 | $450,000 |
| 18 | $269,538 | $0 | $269,538 | $808,613 |
| 19 | $0 | $80,086 | $80,086 | $240,259 |
| 20 | $0 | $371,058 | $371,058 | $1,113,175 |
| 21 | $0 | $930,000 | $930,000 | $2,790,000 |
| 22 | $0 | $0 | $0 | $0 |
| 23 | $0 | $0 | $0 | $0 |
| 24 | n/a | $401,577 | $401,577 | $1,204,731 |
| 25 | $0 | $558,270 | $558,270 | $1,674,810 |
| 26 | $0 | $270,000 | $270,000 | $810,000 |
| 27 | $0 | $150,000 | $150,000 | $450,000 |
| 28 | $0 | $225,000 | $225,000 | $675,000 |
| 29 | $0 | $390,000 | $390,000 | $1,170,000 |
| 30 | $0 | $0 | $0 | $0 |
| 31 | $60,000 | $315,000 | $375,000 | $1,125,000 |
| 32 | $0 | $225,000 | $225,000 | $675,000 |
| 33 | $0 | $900,002 | $900,002 | $2,700,006 |
| 34 | $170,000 | $405,000 | $575,000 | $1,725,000 |
| 35 | $0 | $339,049 | $339,049 | $1,017,147 |
| 36 | $0 | $112,848 | $112,848 | $338,544 |
| 37 | n/a | n/a | n/a | n/a |
| 38 | $0 | $390,000 | $390,000 | $1,170,000 |

FILED: NEW YORK COUNTY CLERK 08/13/2018 06:47 PM
INDEX NO. 159781/2014
NYSCEF DOC. NO. 161
RECEIVED NYSCEF: 08/13/2018

19-12346-shl    Doc 55-7    Filed 09/05/19    Entered 09/05/19 18:22:01    Exhibit C
Part 5    Pg 87 of 99

LIDDLE & ROBINSON, L.L.P.

Mr. Robert S. Clemente                    -29-                    June 20, 2003

| 39 | $0 | $300,000 | $300,000 | $900,000 |
|----|-----|-----------|-----------|------------|
| 40 | $0 | $390,000 | $390,000 | $1,170,000 |
| 41 | $0 | $262,500 | $262,500 | $787,500 |
| 42 | $0 | $80,000 | $80,000 | $240,000 |
|    |    |          |          |           |
| TOTAL | $538,912 | $13,295,516 | $13,834,428 | $41,503,284 |

## Conclusion

For the reasons stated herein, Claimants seek relief, including punitive damages, treble damages, attorneys' fees and costs, on their claims of breach of contract, quantum meruit, fraud, negligent misrepresentation, breach of fiduciary duty, violation of ERISA, violation of the WARN Act, violation of RICO, violations of state wage statutes, unpaid bonus compensation, severance, violations of state unfair and deceptive trade practices statutes, and imposition of a constructive trust, all in amounts to be determined at trial, as well as such other relief as the Panel may deem appropriate.

Respectfully submitted,

LIDDLE & ROBINSON

By: _____  LSM
Jeffrey L. Liddle
Attorneys for Claimants
685 Third Avenue
New York, New York 10017
(212) 687-8500



# EXHIBIT K

FILED: NEW YORK COUNTY CLERK 08/13/2018 01:47 PM

NYSCEF DOC. NO.

19-12346-shl   Doc 55-7   Filed 09/05/19   Entered 09/05/19 18:22:01   Exhibit G
Part 5   Pg 89 of 99

INDEX NO. 159781/2014

RECEIVED NYSCEF: 08/13/2018



FINRA
Financial Industry Regulatory Authority

Robert E. Kreuter
*Senior Arbitration Counsel*

Tel: (212) 656-3728
Fax: (212) 656-2727
robert.kreuter@finra.or

September 12, 2007

RE:   Eric E. Alt, Michael Barr, J.J. Beaghan, Brian S. Bean, Charles Bolton, Vincent Bowen III, Richard A. Brand, Clark Callander, Georgene Carambat, Michael Casey, Jeffrey W. Colin, Alex Dean, Christopher R. Dodge, David Fullerton, Philip Gardner, Jonathan Goldman, Christopher W. Greer, Tony Haertl, Gregory C. Holmes, Frederick M. Hughes, Daniel Hurwitz, Andrew Kaye, Maureen McCarthy, Kevin McGinty, Todd H. McWilliams, Samuel A. Morse, Agnes Murphy, Diane P. Murphy, David O'Brian, Michael P. Perrella, Joseph Piazza, Larry Rehmer, David Reilly, John T. Rossi, Mark J. Salter, Scott Scharfman, Allen Smith, Scott Sullivan, Steven Tishman, Ted P. Tobiason, Daniel P. White, Jeff Winaker v. Fleetboston Financial Corporation, Robertson Stephens, Inc., and Fleet Securities, Inc.
        NYSE Docket #2002-011191

TO THE PARTIES:

Jeffrey Liddle, Esq.
Liddle & Robinson, L.L.P.
800 Third Avenue
New York, NY 10022
Claimant Representative

S. Elaine McChesney, Esq.
Bingham McCutchen LLP
150 Federal Street
Boston, MA 02110-1726
Respondent Representative

Attached please find a copy of the award in the above-captioned matter in which typograhic errors have been corrected, as confirmed by the arbitrators, to reflect that Robertson Stephens Inc. is the respondent responsible for paying the award, and to reflect accurately the amounts awarded to Mr. Bolton, Mr. Callander, and Mr. White. The award to Mr. Bolton should have been $525,000.00; to Mr. Callender, $1,950,000.00; and to Mr. White, $1,500,000.00. The total amount in the award column has also been corrected with the total award being $14,690,000.00.

Investor protection. Market integrity.

Arbitration          www.finra.org
20 Broad Street
New York NY
10940

Barr-000141

Page Two
September 12, 2007

Additionally, the award has been corrected, as confirmed by the arbitrators, to reflect that Fleet Securities Inc. was dismissed as a named respondent, and that Banc of America Securities LLC was not a named party but did have an attorney present during the hearings with the consent of the arbitrators

Robert E. Kreuter
REK/ms
Enclosure

Barr-000142

19-12346-shl    Doc 55-7    Filed 09/05/19    Entered 09/05/19 18:22:01    Exhibit C
Part 5    Pg 91 of 99



**FINRA**

FINRA DR
In the Matter of Arbitration Between

Case:   Eric E. Alt, Michael Barr, J.J. Beaghan, Brian S. Bean, Charles Bolton, Vincent Bowen III,
        Richard A. Brand, Clark Callander, Georgene Carambat, Michael Casey, Jeffrey W. Colin, Alex
        Dean, Christopher R. Dodge, David Fullerton, Philip Gardner, Jonathan Goldman, Christopher
        W. Greer, Tony Haertl, Gregory C. Holmes, Frederick M. Hughes, Daniel Hurwitz, Andrew
        Kaye, Maureen McCarthy, Kevin McGinty, Todd H. McWilliams, Samuel A. Morse, Agnes
        Murphy, Diane P. Murphy, David O'Brian, Michael P. Perrella, Joseph Piazza, Larry Rehmer,
        David Reilly, John T. Rossi, Mark J. Salter, Scott Scharfman, Allen Smith, Scott Sullivan, Steven
        Tishman, Ted E. Tobiason, Daniel P. White, Jeff Winaker v. Fleetboston Financial Corporation
        Robertson Stephens, Inc., and Fleet Securities, Inc.
Docket: 2002-011191

Attorneys:
        For Claimant(s):    Jeffrey L. Liddle - New York, NY
        For Respondent(s):  S. Elaine McChesney - Boston, MA

Date Filed: 12/20/2002      First Scheduled: 11/01/2004      Decided: 9/12/2007

Case Summary: Claimants, former employees, allege violation of the WARN Act, RICO, fraud,
breach of contract, negligence and breach of fiduciary duty. Claimants seek unpaid compensation,
severance, bonuses and attorneys' fees. During the hearing, Claimants withdrew the breach of
fiduciary duty claim.

Product:                              Market:

Claim:

|            | Claim          |
|------------|----------------|
| Claim:     | $408,194,462.00 |
| Punitive:  | $0.00          |
| Atty Fees: | UNSPECIFIED    |
| Deposit:   | $1,500.00      |

Award:

|            | Award          |
|------------|----------------|
| Award:     | $14,690,000.00 |
| Punitive:  | $0.00          |

Barr-000143

FILED: NEW YORK COUNTY CLERK 08/13/2018 01:47 PM    INDEX NO. 159781/2014
NYSCEF DOC. NO. 162                                          RECEIVED NYSCEF: 08/13/2018

| Atty Fees:  | $0.00      |
| Costs:      | $11,700.00 |
|             |            |
| Forum Fees: | $217,500.00 |

Barr-000144

FILED: NEW YORK COUNTY CLERK 08/13/2018 01:47 PM      INDEX NO. 159781/2014
NYSCEF DOC. NO. 162                                    RECEIVED NYSCEF: 08/13/2018

Case:  Eric E. Alt, Michael Barr, J.J. Beaghan, Brian S. Bean, Charles Bolton, Vincent Bowen III,
Richard A. Brand, Clark Callander, Georgene Carambat, Michael Casey, Jeffrey W. Colin, Alex
Dean, Christopher R. Dodge, David Fullerton, Philip Gardner, Jonathan Goldman, Christophe
W. Greer, Tony Haertl, Gregory C. Holmes, Frederick M. Hughes, Daniel Hurwitz, Andrew
Kaye, Maureen McCarthy, Kevin McGinty, Todd H. McWilliams, Samuel A. Morse, Agnes
Murphy, Diane P. Murphy, David O'Brian, Michael P. Perrella, Joseph Piazza, Larry Rehmer,
David Reilly, John T. Rossi, Mark J. Salter, Scott Scharfman, Allen Smith, Scott Sullivan, Steven
Tishman, Ted E. Tobiason, Daniel P. White, Jeff Winaker v. Fleetboston Financial Corporation
Robertson Stephens, Inc., and Fleet Securities, Inc.

Docket: 2002-011191

**Decision:** The undersigned arbitrator(s) have decided and determined that in full and final
settlement of all claims between the parties that:

Respondent Robertson Stephens Inc. shall pay to the claimants listed below the following amounts:
Claimant Brian Bean is awarded the sum of $1,200,000.00;
Claimant J.J. Beaghan is awarded the sum of $220,000.00;
Claimant Charles Bolton is awarded the sum of $525,000.00;
Claimant Vincent Bowen is awarded the sum of $290,000.00;
Claimant Richard A. Brand is awarded the sum of $200,000.00;
Claimant Clark Callander is awarded the sum of $1,950,000.00;
Claimant Georgene Carambat is awarded the sum of $400,000.00;
Claimant David Fullerton is awarded the sum of $190,000.00;
Claimant Philip Gardner is awarded the sum of $315,000.00;
Claimant Christopher W. Greer is awarded the sum of $400,000.00;
Claimant Tony Haertl is awarded the sum of $310,000.00;
Claimant Gregory C. Holmes is awarded the sum of $380,000.00;
Claimant Frederick M. Hughes is awarded the sum of $580,000.00;
Claimant Maureen McCarthy is awarded the sum of $1,075,000.00;
Claimant Kevin McGinty is awarded the sum of $85,000.00;
Claimant Todd H. McWilliams is awarded the sum of $40,000.00;
Claimant Agnes Murphy is awarded the sum of $110,000.00;
Claimant Diane P. Murphy is awarded the sum of $410,000.00;
Claimant Michael P. Perrella is awarded the sum of $385,000.00;
Claimant Joseph Piazza is awarded the sum of $385,000.00;
Claimant Larry Rehmer is awarded the sum of $1,090,000.00;
Claimant David Reilly is awarded the sum of $1,065,000.00;
Claimant John T. Rossi is awarded the sum of $595,000.00;
Claimant Mark J. Salter is awarded the sum of $305,000.00;
Claimant Allen Smith is awarded the sum of $585,000.00;
Claimant Scott Sullivan is awarded the sum of $100,000.00;
Claimant Daniel P. White is awarded the sum of $1,500,000.00.
Interest at the California legal rate is awarded from 2/15/2002 until the date of the award.

The claims of Claimants Eric Alt, Michael Barr, Michael Casey, Jeffrey W. Colin, Alex Dean,
Christopher R. Dodge, Jonathan Goldman, Daniel Hurwitz, Andrew Kaye, Samuel A. Morse, David
O'Brian, Scott Scharfman, Steven Tishman, Ted E. Tobiason and Jeff Winaker are denied in all
respects.

NYSE Regulation forum fees in the amount of $217,500.00 and costs in the amount of $11,700.00,

Barr-000145

19-12346-shl    Doc 55-7    Filed 09/05/19    Entered 09/05/19 18:22:01    Exhibit C
Part 5    Pg 94 of 99

representing eight pre-hearing conferences and three adjournments are assessed jointly and
severally against Respondents. There is no award of attorneys' fees.

Arbitrator John Daly dissents in part in that he would award Claimants monetary damages
representing the value of the deferred compensation plans purportedly forfeited by the terms of the
letter dated May 2, 2003; further, he finds the panel has the authority to render such award based
on the evidence presented in the arbitration; he would also have awarded severance to Claimants.

Arbitrator Thomas M. Gandolfo dissents in that, for those Claimants receiving an award, he would
award monetary damages in a lesser amount, and he would award no monetary damages to
Claimants J.J. Beaghan, Kevin McGinty, Todd H. McWilliams, Agnes Murphy, Joseph Piazza and
Scott Sullivan.

**Remarks:**

Claimant dismissed Fleet Securities Inc. as a named respondent.
Banc of America Securities LLC was not specifically named as a party, but had an attorney present
during the hearings with the consent of the arbitrators.

The undersigned arbitrators hereby affirm that they have executed this instrument which is their
award:

**Arbitrators: (D = Dissents)**        **Signatures:**

   Gerald Goldsmith                    _____

   John Daly                          _____

   Thomas M. Gandolfo                 _____

**City, State:** New York, NY          **Date:** 9/12/2007

**Sessions: 145**
**Hearing Dates:**
     07/01/2005 , (2)
     09/12/2005 , (2)
     09/13/2005 , (2)
     09/14/2005 , (2)
     11/21/2005 , (2)
     11/22/2005 , (2)
     04/12/2005 , (2)
     04/13/2005 , (2)
     04/14/2005 , (2)
     01/11/2006 , (2)
     01/12/2006 , (2)
     01/13/2006 , (2)

19-12346-shl    Doc 55-7    Filed 09/05/19    Entered 09/05/19 18:22:01    Exhibit C
Part 5    Pg 95 of 99

02/13/2006 , (2)
02/14/2006 , (2)
02/15/2006 , (2)
02/16/2006 , (2)
09/22/2005 , (2)
11/14/2005 , (2)
11/15/2005 , (2)
01/09/2006 , (2)
01/10/2006 , (2)
01/17/2006 , (2)
01/18/2006 , (2)
06/13/2006 , (2)
06/14/2006 , (2)
06/27/2006 , (2)
06/28/2006 , (2)
04/10/2006 , (2)
04/11/2006 , (2)
05/04/2006 , (2)
05/05/2006 , (2)
10/04/2006 , (2)
10/05/2006 , (2)
10/06/2006 , (2)
10/12/2006 , (2)
10/30/2006 , (2)
10/31/2006 , (2)
11/01/2006 , (2)
12/11/2006 , (2)
12/12/2006 , (2)
12/13/2006 , (2)
12/14/2006 , (2)
12/15/2006 , (2)
10/26/2006 , (2)
01/11/2007 , (2)
01/12/2007 , (2)
02/07/2007 , (2)
02/08/2007 , (2)
03/01/2007 , (2)
03/02/2007 , (2)
04/23/2007 , (2)
04/24/2007 , (2)
06/05/2007 , (2)
06/06/2007 , (2)
01/04/2005 , (2)
01/05/2005 , (2)
01/06/2005 , (2)
01/27/2005 , (2)
01/28/2005 , (2)
03/09/2005 , (2)
03/10/2005 , (2)
03/11/2005 , (2)
05/23/2005 , (2)
05/24/2005 , (2)

Barr-000147

FILED: NEW YORK COUNTY CLERK 08/13/2018 01:47 PM    INDEX NO. 159781/2014
NYSCEF DOC. NO. 162    RECEIVED NYSCEF: 08/13/2018

05/25/2005 , (2)
05/26/2005 , (2)
05/27/2005 , (1)
06/20/2005 , (2)
06/22/2005 , (2)
06/24/2005 , (2)
06/27/2005 , (2)
06/29/2005 , (2)
06/30/2005 , (2)

Barr-000148

Respondents. There is no award of attorneys' fees.

Arbitrator John Daly dissents in part in that he would award Claimants monetary damages representing the value of the deferred compensation plans purportedly forfeited by the terms of the letter dated May 2, 2003; further, he finds the panel has the authority to render such award based on the evidence presented in the arbitration; he would also have awarded severance to Claimants.

Arbitrator Thomas M. Gandolfo dissents in that, for those Claimants receiving an award, he would award monetary damages in a lesser amount, and he would award no monetary damages to Claimants J.J. Beaghan, Kevin McGinty, Todd H. McWilliams, Agnes Murphy, Joseph Piazza and Scott Sullivan.

Remarks:

The undersigned arbitrators hereby affirm that they have executed this instrument which is their award:

Arbitrators: (D = Dissents)                    Signatures:

    Gerald Goldsmith
    John Daly
    Thomas M. Gandolfo

City, State: New York, NY                      Date: 9/12/07

Sessions: 145
Hearing Dates:
    07/01/2005 , (2)
    09/12/2005 , (2)
    09/13/2005 , (2)
    09/14/2005 , (2)
    11/21/2005 , (2)
    11/22/2005 , (2)
    04/12/2005 , (2)
    04/13/2005 , (2)
    04/14/2005 , (2)
    01/11/2006 , (2)
    01/12/2006 , (2)
    01/13/2006 , (2)
    02/13/2006 , (2)
    02/14/2006 , (2)
    02/15/2006 , (2)
    02/16/2006 , (2)
    09/22/2006 , (2)

Barr-000149

FILED: NEW YORK COUNTY CLERK 08/13/2018 01:47 PM    INDEX NO. 459781/2014
NYSCEF DOC. NO. 162                                                    RECEIVED NYSCEF: 08/13/2018

Respondents. There is no award of attorneys' fees.

Arbitrator John Daly dissents in part in that he would award Claimants monetary damages representing the value of the deferred compensation plans purportedly forfeited by the terms of the letter dated May 2, 2003; further, he finds the panel has the authority to render such award based on the evidence presented in the arbitration; he would also have awarded severance to Claimants.

Arbitrator Thomas M. Gandolfo dissents in that, for those Claimants receiving an award, he would award monetary damages in a lesser amount, and he would award no monetary damages to Claimants J.J. Beaghan, Kevin McGinty, Todd H. McWilliams, Agnes Murphy, Joseph Piazza and Scott Sullivan.

---

**Remarks:**

---

The undersigned arbitrators hereby affirm that they have executed this instrument which is their award:

**Arbitrators: (D = Dissents)**     **Signatures:**

    Gerald Goldsmith

    John Daly

    Thomas M. Gandolfo

**City, State:** New York, NY     **Date:** 9-12-07

**Sessions:** 145
**Hearing Dates:**
    07/01/2005 , (2)
    09/12/2005 , (2)
    09/13/2005 , (2)
    09/14/2005 , (2)
    11/21/2005 , (2)
    11/22/2005 , (2)
    04/12/2005 , (2)
    04/13/2005 , (2)
    04/14/2005 , (2)
    01/11/2006 , (2)
    01/12/2006 , (2)
    01/13/2006 , (2)
    02/13/2006 , (2)
    02/14/2006 , (2)
    02/15/2006 , (2)
    02/16/2006 , (2)
    09/22/2005 , (2)

Barr-000150

19-12346-shl    Doc 55-7    Filed 09/05/19    Entered 09/05/19 18:22:01    Exhibit C
Part 5    Pg 99 of 99

Respondents. There is no award of attorneys' fees.

Arbitrator John Daly dissents in part in that he would award Claimants monetary damages representing the value of the deferred compensation plans purportedly forfeited by the terms of the letter dated May 2, 2003; further, he finds the panel has the authority to render such award based on the evidence presented in the arbitration; he would also have awarded severance to Claimants.

Arbitrator Thomas M. Gandolfo dissents in that, for those Claimants receiving an award, he would award monetary damages in a lesser amount, and he would award no monetary damages to Claimants J.J. Beaghan, Kevin McGinty, Todd H. McWilliams, Agnes Murphy, Joseph Piazza and Scott Sullivan.

Remarks:

_____

The undersigned arbitrators hereby affirm that they have executed this instrument which is their award:

Arbitrators: (D = Dissents)        Signatures:

    Gerald Goldsmith               _____

    John Daly                      _____

    Thomas M. Gandolfo             _____

City, State: New York, NY          Date: 9·12·07

_____

Sessions: 145
Hearing Dates:
    07/01/2005 , (2)
    09/12/2005 , (2)
    09/13/2005 , (2)
    09/14/2005 , (2)
    11/21/2005 , (2)
    11/22/2005 , (2)
    04/12/2005 , (2)
    04/13/2005 , (2)
    04/14/2005 , (2)
    01/11/2006 , (2)
    01/12/2006 , (2)
    01/13/2006 , (2)
    02/13/2006 , (2)
    02/14/2006 , (2)
    02/15/2006 , (2)
    02/16/2006 , (2)
    09/22/2005 , (2)

Barr-000151