FILED: NEW YORK COUNTY CLERK 08/13/2018 01:47 PM
NYSCEF DOC. NO. 163
INDEX NO. 159781/2014
RECEIVED NYSCEF: 08/13/2018
19-12346-shl    Doc 55-9    Filed 09/05/19    Entered 09/05/19 18:22:01    Exhibit C
Part 7    Pg 1 of 8

owned RSI during the period in which Defendants represented Plaintiff and the other Claimants.

- On December 10, 2002, Defendants, without the knowledge, authorization, or consent of Plaintiff, contacted journalists at the *New York Times* and the *Wall Street Journal*. Defendants sent those reporters copies of a draft Statement of Claim. At the time, the Statement of Claim had not been filed. Defendants did not consult Plaintiff before sending out the draft Statement of Claim.

- At his deposition, Liddle initially denied that he or anyone from his office reached out to the press prior to the filing of the Statement of Claim. (*See* Liddle deposition, p. 57)

- Liddle also spoke on the phone to Susanne Craig of the *Wall Street Journal* regarding the claim and indicated plans to hand deliver the Statement of Claim to the *New York Times* (*See* Liddle deposition, p. 83)—all prior to filing the Statement of Claim, and all without the knowledge, authorization, or consent of Plaintiff.

- On December 10, 2002, Defendants also sent the *Wall Street Journal* two draft press releases regarding the upcoming arbitration. (Liddle deposition, pp. 68, 80) The Defendants' press releases stated, in relevant part, the following:

    o 34 former Managing Directors and 8 former Principals of Robertson Stephens Group, Inc., sued FleetBoston Financial Corporation, Fleet Securities, Inc., Robertson Stephens, Inc. and Robertson Stephens Group, Inc. for unpaid compensation and other damages emanating from the fraudulent cancellation last summer of a management buyout of the Robertson Stephens operation.

    o Damages are based on, among other things, Fleet's and Robertson Stephens's failure to pay promised and earned bonus compensation.

9

FILED: NEW YORK COUNTY CLERK 08/13/2018 01:47 PM
NYSCEF DOC. NO. 163
INDEX NO. 159781/2014
RECEIVED NYSCEF: 08/13/2018

19-12346-shl    Doc 55-9    Filed 09/05/19    Entered 09/05/19 18:22:01    Exhibit C
Part 7    Pg 2 of 8

- o Fleet made fraudulent misrepresentations and material omissions concerning Claimants' employment, compensation and equity interests in Robertson Stephens, and breached its fiduciary duties as majority shareholder of Robertson Stephens by acting in the interests of its own shareholders in first announcing the sale of, and then shutting down, Robertson Stephens.

- o Fleet abruptly announced that it was putting Robertson Stephens up for sale...Not surprisingly after this announcement, Fleet was unable to obtain a buyer.

- o Upon termination of their employment, Claimants were not offered any bonus compensation for 2002.

- o Claimants forfeited substantial amounts of non-cash deferred compensation, including Robertson Stephens Restricted Units, which had previously been valued by Fleet at no less than $7 per share, but accorded a zero value by the separation agreements offered to Claimants.

- At his deposition, Liddle initially denied that he or anyone from his office reached out to the press prior to the filing of the Statement of Claim. He also denied sending press releases. (*See* Liddle deposition, p. 64) However, at the top of the press releases, in all capital letters, was an invitation to call Liddle directly for more information. Liddle did not inform Plaintiff that he would be sending draft press releases to the *New York Times* and the *Wall Street Journal*. Thus, the press releases were sent without the knowledge, authorization, or consent of Plaintiff.

- On December 10, 2002, Liddle received a memorandum from Christine Palmieri, an attorney at L&R, advising him that Susanne Craig at the *Wall Street Journal* did not believe there was much interest in an article on the claims set forth

10

FILED: NEW YORK COUNTY CLERK 08/13/2018 01:47 PM
NYSCEF DOC. NO. 163
INDEX NO. 159781/2014
RECEIVED NYSCEF: 08/13/2018

19-12346-shl    Doc 55-9    Filed 09/05/19    Entered 09/05/19 18:22:01    Exhibit C
Part 7    Pg 3 of 8

in the Statement of Claim as Robertson Stephens was winding up. Ms. Palmieri indicated to Liddle that she would continue to let the *Wall Street Journal* believe they had an exclusive on the story in order to drum up interest. A plan to hand deliver documents to the *New York Times* in advance of the filing of the Statement of Claim was also discussed between Liddle and Palmieri. (Liddle deposition, p. 83)

- On December 11, 2002, the Statement of Claim was filed by L&R for the NYSE Arbitration.

- On December 12, 2002, the *Wall Street Journal* published an article entitled "Robertson Band Claims Fleet Owes Some Bonuses," in which Liddle's remarks on the case were referenced.

- Prior to the publishing of the December 12, 2002 *Wall Street Journal* article, Plaintiff had no idea Defendants were speaking with the *Wall Street Journal* or the *New York Times*, nor was Plaintiff asked if he would consent to or authorize such communications.

- Prior to the publishing of the December 12, 2002 *Wall Street Journal* article, and prior to Defendants' dissemination to the *Wall Street Journal* and *New York Times* of a draft of the Statement of Claim, Defendants never discussed with Plaintiff the possibility of communicating with the *Wall Street Journal* or *New York Times*. Nor did Defendants discuss the possibility that these communications could violate the Non-Disparagement Clause of the CEP, resulting in the forfeiture of Plaintiff's unvested Deferred Compensation.

- According to the CEP, the First Vesting would occur on January 1, 2003. Prior to the publishing of the December 12, 2002 *Wall Street Journal* article, Defendants did not consult with Plaintiff or give him a choice as to whether he wanted Defendants to speak with the *Wall Street Journal* or the press generally, risking his Deferred Compensation, or whether he preferred to wait until January 1, 2003 (*i.e.*, 22 days later) for the First Vesting to be guaranteed.

- According to the CEP, the Non-Disparagement Clause expired six months after the termination of Plaintiff's

11

FILED: NEW YORK COUNTY CLERK 08/13/2018 01:47 PM
NYSCEF DOC. NO. 163
19-12346-shl   Doc 55-9   Filed 09/05/19   Entered 09/05/19 18:22:01   Exhibit C
Part 7   Pg 4 of 8
INDEX NO. 159781/2014
RECEIVED NYSCEF: 08/13/2018

employment, *i.e.*, on January 18, 2003 (the "Non-Disparagement Term"). Prior to the publishing of the December 12, 2002 *Wall Street Journal* article, Defendants did not consult with Plaintiff or give him a choice as to whether he wanted Defendants to speak to the *Wall Street Journal* or the press generally, risking his Deferred Compensation, or whether he preferred to wait until January 18, 2003 (*i.e.*, 37 days later) for the Non-Disparagement Clause to expire. Upon the expiration of the Non-Disparagement Term, both the First Vesting and the Second Vesting of Plaintiff's Deferred Compensation would be guaranteed, regardless of any subsequent disparaging comments or communications by Defendants.

- Plaintiff never spoke to the *Wall Street Journal* about RSI or FleetBoston, nor did he ever authorize the Defendants to communicate with the *Wall Street Journal* on his behalf.

- Lisa Bisaccia was the Director of Corporate Compensation for FleetBoston Financial in 2002, and, as such, was responsible for paying Deferred Compensation under the CEP.

- Bisaccia saw the *Wall Street Journal* article on December 12, 2002 and flagged it as a potential violation of the CEP's Non-Disparagement Clause. Bisaccia testified that,

  I told [the legal department] I had read the newspaper articles about what some members of the group or their attorney had said about Fleet and did [the legal department] think that constituted a violation of the bad boy provision. (Bisaccia deposition, p. 22)

- When asked at her deposition what "newspaper articles" she was referring to, Bisaccia responded, "The Wall Street Journal." (Bisaccia deposition, p. 22)

- Bisaccia could not identify any other article, other than the December 12, 2002 *Wall Street Journal* article, that constituted a violation of the Non-Disparagement Clause.

12

- Bisaccia testified that, because of the Defendants' communications with the *Wall Street Journal*, FleetBoston cancelled Plaintiff's Deferred Compensation. She stated:

  "I was fully intending to pay the deferred comp., in early January, February of '03 when it vested, when it was due. When I saw the article, I thought there was a connection between what the article said and the provisions of the plan that could influence whether or not we should pay, and that is when I gave it to legal to see whether in fact there had been a violation of the plan provisions." (Bisaccia deposition, p. 24)

- Bisaccia also testified as to the following:

  o "[Barr] would have forfeited…the million three, roughly, that was awarded in February of '02 and was designed to be paid out in February '03, or January '03, rather, and January '04." (Bisaccia deposition, p. 25)

  o When asked if the forfeiture was a result of the Non-Disparagement Clause or "bad boy" provision, she responded "Yes." (Bisaccia deposition, p. 25)

  o When asked directly what was the "basis of that decision," namely that the "bad boy" provision had been violated, Bisaccia responded "The Wall Street Journal article." (Bisaccia deposition, pp. 39-40)

  o "The Wall Street Journal article was about the Alt group or class, whatever you call them, and Fleet made a decision that because of what was said about Fleet in the article by Mr. Liddle, that—since he was their lawyer, that they violated the bad boy provisions." (Bisaccia deposition, p. 40)

FILED: NEW YORK COUNTY CLERK 08/13/2018 01:47 PM
NYSCEF DOC. NO. 163
INDEX NO. 159781/2014
RECEIVED NYSCEF: 08/13/2018
19-12346-shl    Doc 55-9    Filed 09/05/19    Entered 09/05/19 18:22:01    Exhibit C
Part 7    Pg 6 of 8

- o  "I read the [Wall Street Journal] article, and I thought that what they were saying about Fleet and the fact that they had obviously --- they had given, in my opinion, they had given the claim documents to the Wall Street Journal, was violating both the bad boy provisions and confidentiality and could be grounds for canceling the payments based on those provisions." (Bisaccia deposition, p. 45)

- o  "I felt the article disparaged Fleet because it intimated that Fleet had deliberately tried to sabotage the sale, hadn't tried to sell it in good faith, and that the article said Fleet made compensation promises that it had no intention of satisfying or fulfilling, and it said that Fleet had damaged the reputation of the executives." (Bisaccia deposition, pp. 45-46)

- o  "I read the article, read what was said in the article, what was asserted by Mr. Liddle, what the content of the article – in my non-legal opinion, said this is something that I think could be a violation of the bad boy provisions." (Bisaccia deposition, p. 51)

- o  That "in [her] view the confidentiality provisions may have been violated by the Wall Street Journal article." (Bisaccia deposition, p. 55)

- On May 2, 2003, RSI sent a letter to Plaintiff notifying him of the cancellation of the CEP.

- On May 13, 2003, Liddle sent a letter to all Claimants in the arbitration proceeding regarding the May 2, 2003 letter. The letter informed the Claimants that he would be amending the Statement of Claim to include claims for the cancelled CEP and forfeited Deferred Compensation.

14

FILED: NEW YORK COUNTY CLERK 08/13/2018 01:47 PM
NYSCEF DOC. NO. 163
19-12346-shl    Doc 55-9    Filed 09/05/19    Entered 09/05/19 18:22:01    Exhibit C
    Part 7    Pg 7 of 8
INDEX NO. 159781/2014
RECEIVED NYSCEF: 08/13/2018

- On June 20, 2003, Defendants amended the Statement of Claim in the arbitration to include a claim for recovery of the forfeited Deferred Compensation.

- On September 12, 2007, FINRA issued a decision in the arbitration, whereby the arbitration panel ordered RSI to pay awards to 27 Claimants, but denied the claims of 15 Claimants, including Plaintiff. Arbitrator John Daly dissented, stating that "[he] would award Claimants' monetary damages representing the value of the deferred compensation plans purportedly forfeited by the terms of the letter dated May 2, 2003." Further, he found that the panel had the authority to render such award based on the evidence presented in the arbitration, and that he would also have awarded severance to Claimants.

- Following the arbitration decision, Defendants attempted to press Plaintiff's Deferred Compensation claims in a District Court action and, subsequently, before the First Circuit. In amended pleadings filed by Defendants in the District Court action, Defendants admitted in paragraphs 52:

"On July 25, 2003, RSI…filed its Answer to the Amended Statement of Claim. This was the first time Counterdefendants attempted to articulate to Counterplaintiffs their reason for declaring the May 2 forfeiture. In this document, Counterdefendants claimed that Counterplaintiffs 'engaged in action adverse and inimical to RSI, thereby triggering the forfeiture of the Cash Equivalent Plan. Among such acts, prior to serving RSI with their original Statement of Claim (which includes false and disparaging allegations concerning RSI, [RS Group and its parents] and their officers, directors and senior executive employees) [Claimants caused / permitted their attorney to send the Statement of Claim] to certain news outlets, including the Wall Street Journal. Moreover, Claimants caused / permitted their attorney to disseminate false and disparaging allegations as to RSI, [RS Group and its parents] to third parties,

15

FILED: NEW YORK COUNTY CLERK 08/13/2018 01:47 PM
NYSCEF DOC. NO. 163
INDEX NO. 159781/2014
RECEIVED NYSCEF: 08/13/2018

19-12346-shl    Doc 55-9    Filed 09/05/19    Entered 09/05/19 18:22:01    Exhibit C
Part 7    Pg 8 of 8

including through interviews with newspaper reporters.'"

- By a decision dated December 1, 2009, the claims asserted in the District Court action were dismissed based on *res judicata*. On March 3, 2011, the First Circuit affirmed this decision. On October 11, 2011, the United States Supreme Court denied *certiorari*.

## V. QUESTIONS POSED

10. The Firm has posed the following questions, based upon the assumed facts, accepted standards, and applicable ethical rules:

- Did Defendants competently pursue Plaintiff's legal interests?
- Did Defendants intentionally prejudice the Plaintiff?
- Did Defendants reasonably consult with Plaintiff about the means by which Plaintiff's objectives were to be accomplished?
- Did Defendants comply with the pertinent ethics rules governing conflicts of interest?
- Did Defendants adhere to their duties of honesty and loyalty?
- Did Defendants engage in conduct that adversely reflects on the lawyer's fitness as a lawyer?
- Did Defendants engage in legal malpractice?

## VI. OPINIONS

11. My opinions are predicated upon the standards of care and governing regulations of professional responsibility applicable to New York lawyers, principally the New York Rules of Professional Conduct (the "Rules" or the "RPCs"). Specifically, I have relied on pertinent provisions of the RPCs as well as related comments, ethics opinions, and case law.

16