Blaine H. Bortnick
c/o Rasco Klock Perez & Nieto, LLC
555 Fifth Avenue, 17th Floor
New York, NY 10017
Tel: (305) 476-7100
Fax: (305) 675-7944
*Creditor, pro se*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------x
In re                                           :      Chapter 11
                                                :
LIDDLE & ROBINSON, L.L.P.,                      :      Case No. 19-12346 (SHL)
                                                :
Debtor                                          :      (Jointly Administered with Case No.
-----------------------------------------------------------:      19-10747)

**OBJECTION TO MOTION BY DEBTOR LIDDLE & ROBINSON, L.L.P. PURSUANT TO BANKRUPTCY RULE 2004 AND § 105(a) OF THE BANKRUPTCY CODE, FOR AN ORDER DIRECTING (I) EXAMINATION OF BLAINE H. BORTNICK, AND (II) PRODUCTION OF DOCUMENTS BY BLAINE H. BORTNICK, ALONG WITH RELATED RELIEF**

Blaine H. Bortnick, a creditor in this action, hereby objects to the motion of Debtor Liddle & Robinson, L.L.P. and respectfully states as follows:

**Preliminary Statement**

1.      Debtor's motion ostensibly seeks my deposition for two purposes – to inquire about my dealings with Counsel Financial (as that term is defined in the motion), and the accusation of diverting clients and fees when I departed in 2017. Both ostensible purposes are groundless, both in fact and law. The motion should be denied for at least three independent reasons.

2.      First, there is a threshold issue of whether this bankruptcy should be converted to Chapter 7 in which a trustee, and not Mr. Liddle, is in charge of managing the estate for the benefit of creditors. Indeed, Counsel Financial has indicated to this Court that it intends to move to dismiss or convert to Chapter 7.

1

3. Second, even if the bankruptcy is not dismissed or converted to Chapter 7, Mr. Liddle's actions demonstrate that he cannot be trusted to be in charge of managing the estate for the benefit of creditors.

4. Third, Mr. Liddle's conspiracy theories regarding my actions are demonstrably false – and known by Mr. Liddle to be false as shown below. This shows the real purpose of the instant motion, to weaponize the bankruptcy proceeding by wasting estate assets to pursue objectively baseless litigation in furtherance of Mr. Liddle's personal animus toward me. The motion and the relief its seeks constitute nothing but harassment.

**Background**

5. I am a creditor of Debtor. I am also a former employee or partner (depending on the time frame) of Debtor's prior and dissolved incarnations.[1] I worked at the firm from July 1993 until June 2, 2017.

6. Contrary to Mr. Liddle's declaration dated July 22, 2019 ("First Day Declaration") in support of this motion that the firm for more than 40 years "had a strong litigation practice with an emphasis on corporate, real estate, and employment law," *Decl. at ¶2.*, during all the years I was at the firm (July 1993 – June 2, 2017), this was not true. Indeed, I cannot think of any real estate litigation the firm undertook during my tenure, and while the firm did on occasion engage

---

[1] As used herein, "Liddle & Robinson, L.L.P." refers to the Debtor. I never was a partner or employee of the Debtor. Liddle & Robinson, L.L.P. and its predecessors never had a written partnership agreement. Accordingly, whenever an equity partner lost such status, by operation of law the firm dissolved. *N.Y. Partnership Law § 60, 61*. The last entity called Liddle & Robinson, L.L.P. consisted of two equity partners – James Hubbard and Mr. Liddle. Prior partnerships are referred to herein as "L&R." The most recent L&R partnership and all prior ones dissolved long ago and have not existed for several years. The Debtor by operation of law is not a continuing business of any law firm in which I was an equity partner. *Id.*

2

in corporate litigation, the firm was known as an employment law firm. Employment law generated the overwhelming amount of revenue.[2]

7.  It is noteworthy that an examination of the firm's financial statements as of 2015 demonstrate that the reason it required a credit line at that time (or at least a credit line of significance), was that although the firm was profitable that through 2015, Mr. Liddle had taken nearly $2 million from the firm to pay for his lifestyle of two conjoined Fifth Avenue apartments and a lavish Hamptons residence. Had Mr. Liddle not withdrawn this sum from the firm which he had not earned, it would not have experienced the extreme cash flow crisis with the resulting flight of the vast majority of its partners.

8.  As of July 2016, Mr. Liddle placed a net value on the firm in excess of $36 million, a value accepted by Counsel Financial after performing due diligence.

9.  At the time of my departure from the firm, my relationship with Jeff Liddle, the managing partner, was such that we were not on speaking terms, with Mr. Liddle regularly resorting to wild conspiracy theories to accuse me of all manner of things. Since I departed, the relationship has unfortunately been no less contentious.[3]

---

[2] I am also certain that the firm's revenue net of expense reimbursement did not average $13.5 million per year over an eighteen year period from 1998 through and including 2015. *See First Day Declaration at ¶3* While I do not have the financial records to calculate the true number, Mr. Liddle possesses those records which would show the accurate figure.

[3] Indeed, it is Mr. Liddle who has been wrongfully interfering with my legal practice. By way of example, over my protests to both him and his bankruptcy counsel, he has continued to maintain my Liddle & Robinson email account. He reads my emails (including those from prospective clients) and does not forward them to me. Although there may have been a legitimate purpose for keeping my email address alive for a short period after my departure, there is no legitimate purpose 2-1/4 years later. Accordingly, I respectfully request that Mr. Liddle and the firm be ordered to immediately discontinue my Liddle & Robinson email address, such that any sender would receive back a notice that such email address does not exist at the liddlerobinson.com domain. Maintaining my email address constitutes both harassment of me and a deliberate misleading of the public.

**Before this Motion is Considered, The Court Should First Determine
Whether a Chapter 7 Trustee should make Deposition and Litigation Decisions**

10. As Counsel Financial has pointed out in its objections to the engagement of Richard J. Lynne and The Benefit Practice, Debtor does not qualify as a Chapter 11 debtor, citing authority that a single partner partnership cannot exist and thus cannot reorganize (Debtor's stated intention here) or liquidate under Chapter 11. *See Counsel Financial Objections, Dkt. Nos. 69 and 70, both at ¶ 5. See also NY. Partnership Law §10* (partnership must have a minimum of two partners as co-owners to carry on a business for profit). In addition, as noted above even if Debtor had two equity partners, it was nevertheless required under the New York Partnership Law to dissolve and wind down – not continue on as a business.

11. As this Court knows far better than I, under Chapter 7 a trustee, not Mr. Liddle, makes decisions such as to take non-party depositions and pursue litigation. The Chapter 7 trustee serves to protect all creditors, not just the interest of Mr. Liddle. It is inappropriate for Mr. Liddle to be making decisions that a trustee should be making.

12. Accordingly, this Court should defer any consideration of this motion (and any other motion relating to litigation Mr. Liddle wants to undertake or to engage in pre-litigation discovery) until after Counsel Financial makes its motion to dismiss or convert to Chapter 7. At this stage, the motion puts the cart before the horse.

**Mr. Liddle is Pursuing a Course of Action He Knows is Frivolous**

13. Debtor's motion ostensibly seeks my deposition for two purposes – to inquire about my dealings with Counsel Financial (as that term is defined in the motion), and the accusation of my diverting clients and fees when I departed in 2017. This is demonstrated by the motion's stated

4

purpose, as well as the document requests focused on clients of L&R that followed me to my new firm.

14. Regarding clients that followed me to my new firm, it is assumed that Mr. Liddle understands that the law in New York is crystal clear that it is the client's choice – not Mr. Liddle's or mine – to continue with L&R or not. This is a cornerstone of New York law regarding the attorney-client relationship.[4]

15. Mr. Liddle's other ostensible basis for this motion is that I colluded with Counsel Financial to divert fees owed to Liddle and Robinson, L.L.P. to Counsel Financial.[5] Mr. Liddle identifies five matters:

a. <u>Negrete v. Citibank</u>  When I departed L&R, the clients followed me with respect to a matter then pending in the United States District Court for the Southern District of New York. The clients *did not* terminate L&R as counsel. Rather, they added my new firm as counsel. Indeed, L&R continued to work on this matter, including substantial hours participating in discovery, drafting a Rule 54(b) motion, and drafting appellate briefing in the Second Circuit. Mr. Liddle knows that the case was dismissed and that the dismissal was affirmed on appeal – L&R was counsel to the clients throughout and in any event this is a matter of public record via public dockets and decisions. Accordingly, Mr. Liddle knows that no fees other than those previously paid to either

---

[4] Because this is such a cornerstone legal principle and likely unethical to interfere with a client's choice of attorney, it is assumed that Mr. Liddle will drop any argument that clients are free to follow their chosen counsel to a different law firm. If Mr. Liddle persists in this apparent position, then it is respectfully requested that I be permitted to provide the relevant law to this Court in a supplemental submission.

[5] Mr. Liddle's statement in his First Day Declaration that I was the principal negotiator of the lending relationship between the firm and Counsel Financial is, put diplomatically, untrue. Rather, I was generally shut out of the negotiations snd in the dark until Mr. Liddle had completed the negotiations and presented the deal in principle to partners and others at the firm.

Debtor or L&R were due to it. This is a frivolous line of inquiry, and Mr. Liddle possesses the file.

b. <u>The American Express Class Action</u>  L&R was one of three firms representing The Marcus Corporation in a class action antitrust publicly filed by it in 2003. L&R devoted substantial hours to this matter, but it was never appointed lead counsel, although the other two firm representing the client (as well as a third firm) were so appointed. As Mr. Liddle knows, a settlement agreement was reached, and L&R submitted its fees and costs request as part of the Court settlement approval procedure. Unfortunately, the settlement was rejected by the Court due to the misconduct of one of the lead counsels. New lead counsel was appointed. This all occurred before I departed the firm. As Mr. Liddle is well aware and as can be easily confirmed from the public court docket, the case continues on to this day. Mr. Liddle also knows that no firm may be paid without court approval, whether by prevailing in the courtroom or by settlement. He needs merely to follow the public court docket and submit a fee request (previously drafted and sitting in the file he possesses) should a recovery be achieved. This is a frivolous line of inquiry, and Mr. Liddle possesses the file.

c. <u>Gustavo Albuquerque</u>  This client followed me when I departed the firm. While L&R could have been seen to have been terminated for cause and thus be owed nothing, this is irrelevant because to the extent that either Debtor or L&R was owed any monies, *Mr. Liddle, on behalf of the firm, expressly authorized any such monies to be turned over to Counsel Financial.* This is a frivolous line of inquiry.

d. <u>Darren Weiner</u>  This client followed me when I departed the firm. While L&R could have been seen to have been terminated for cause and thus be owed nothing, this is

6

irrelevant because to the extent that either Debtor or L&R was owed any monies, *Mr. Liddle, on behalf of the firm, expressly authorized any such monies to be turned over to Counsel Financial.* This is a frivolous line of inquiry.

e. <u>Innucci v. Santander Securities</u> This client followed me when I departed the firm. I handled the matter through the completion of discovery and the case was trial ready. Approximately two months before the first day of arbitration hearings, the client terminated my firm's representation and went back to Debtor. Mr. Liddle prevailed in the arbitration, and his bankruptcy schedules indicate that approximately $165,000 is owed to Debtor as a result, apparently as a contingency fee. The Respondent in that arbitration paid the arbitration award directly to Ms. Innucci. My current firm filed an attorneys' lien, however, and the matter is currently being litigated in the Supreme Court for the State of New York, New York County. Debtor is defending Ms. Innucci in that action. Here Mr. Liddle seeks my firm's time records and invoices concerning its representation of her. In other words, Mr. Liddle is seeking discovery *not to aid the estate, but to defend Debtor's client in an unrelated state court action.* Thus, this is not only a frivolous line of inquiry, but it is also an attempt to use (i.e. waste) estate assets to obtain discovery on behalf of a client in a state court litigation between my current firm and Ms. Innucci. Ms. Innucci should be expending resources obtaining discovery in that state court action, not the estate.

**The Balance of the Documents Sought Also Constitute Pure Harassment**

16.    Most of Mr. Liddle's other requests concern my interactions with Counsel Financial as part of an alleged, unfounded and baseless plot to divert fees in these five cases to it. As described above, Debtor's claim of interference or diversion in this regard is, too put it mildly,

without merit. This is true regardless of whether a settlement agreement exists between me and Counsel Financial. Curiosity, the desire to *know* the negotiations, drafts and terms of a settlement, if any, between Counsel Financial and myself appears to be Mr. Liddle's primary motivation, not a desire to *benefit* the estate. At a minimum, Debtor must articulate what it is looking for, the basis, and how such information would benefit the estate.

17. The other document requests appear to be a hodgepodge of bad faith harassment. Mr. Liddle wants my tax returns and K-1s for the years 2015 -2018. My tax returns cannot possibly contain information that could shed light on my alleged diversion of clients (I departed the firm in 2017). Leaving aside that I file joint returns with my wife and the returns contain substantial information relating solely to her or financial information having nothing to do with Debtor, Mr. Liddle must articulate why the disclosure of my sensitive and personal of financial documents (including that which relates to my wife) over a four year period will benefit the estate. Given Mr. Liddle's clear alternative motives, in any event he should never be allowed to view such private and personal financial information or learn the contents thereof. Similarly, any communications between myself and my current firm can have no benefit to the estate. Mr. Liddle wants to know about arrangements and communications between myself and my current firm – on its face harassment that serves no legitimate purpose. The request for attorney client communications between myself and clients (Request No. 3) is troubling, to say the least. The request for communications between myself and James Halter, Esq. during Mr. Liddle's 341 Examinations is downright bizarre. Mr. Halter has been associated with my present firm since approximately April/May 2018 when he departed Debtor. Mr. Liddle apparently thinks we are working together to harm him in some manner. Regarding client files Mr. Liddle apparently believes I received or removed from the firm (including from any partner or former partner), this again is simply an

exercise in harassment. Mr. Liddle wells knows that in each and every matter save two, he refused client requests to turn over files, requiring me to reconstruct them to the extent possible. This even extended to one client who had an expense refund from JAMS arbitration services mistakenly sent to the firm by it, and Mr. Liddle refused to even return that money which never belonged to the firm. If Mr. Liddle wants to view the two client files he delivered to me, he should obtain attorney client waivers from those two former clients with a request that the files be delivered to him.[6]

### The Estate Will be Financially Harmed if This Motion is Granted

18. A simple glance at the reports filed by Mr. Liddle show that as of the end of July, five months after Debtor filed for bankruptcy, post-petition professional fees amounted to $679,270 -- a rate of $135,854 per month. At this rate, by the time this motion is scheduled for a hearing in October or November, the post-petition professional fees will certainly amount to in excess of $950,000. In other words, what has been called the "Cash Collateral" in this matter will have been spent. Fortunately, Debtor's counsel has represented to the Court that $2.25 - $2.5 million in contingency fees from ongoing cases will be imminently placed into the DIP account. This money needs to be protected for the benefit of all creditors. Mr. Liddle should not be allowed to use it for what is clear is his intended purpose – to pursue baseless litigations against (1) myself, (2) Counsel Financial (he has recently sought depositions and documents from Counsel Financial and a non-party whom he believes was assigned part of the loans Counsel Financial made to eithr Debtor or L&R), (3) his former attorneys in the litigation in which Counsel Financial obtained its judgment against him and the firm, (4) three principles and John Does of Counsel Financial, (5)

---

[6] Some of these requests overlap with the motions of Debtor and Mr. Liddle to take the deposition of Counsel Financial. *See, e.g., Dkt. No. 77* Since this would be getting through the back door that which should not be obtained here, this objection also serves as an objection to any request directed to Counsel Financial or others currently pending before the Court with respect to matters involving/allegedly involving myself.

Counsel Financial's outside counsel (the same firm representing it in the bankruptcies), and (6) eight former partners of Debtor's predecessors, some of whom departed seven or more years ago.

19.   This desire to pursue everyone and anyone shows what is truly going on here – Mr. Liddle blames everyone for situation caused by his actions. As the largest partner by multiples in the firm, he made virtually every single significant decision without consultation, including the decision to dramatically overpay himself to support a lifestyle as described above and all the accoutrements that come with it. Indeed, Mr. Liddle's capital account stood at approximately negative $3.4 million in August 2016.

20.   This is the same person who by his own submission to this Court stated that the firm received approximately $5 million in revenues in 2017. *See Statement of Debtor's Financial Affairs dated 9/10/19, Dkt. No. 61* This $5 million is in addition to a new loan agreed to in December 2017 with Counsel Financial for another $775,000. The 2018 revenues were nearly $2 million. *Id.* Yet by his own admission to this Court, when the firm had revenues and new loans totaling approximately $7.75 million for 2017-2018, Mr. Liddle:

   a. Failed to file tax returns for the firm for 2017 (and possibly himself). *See Motion to Employ Richard J. Lynne as Tax Accountant at ¶9, Dkt. No. 61*

   b. Failed to file tax returns for 2018. *Id.*

   c. Failed to file payroll tax returns for 2018-2019. *Id.*

   d. Failed to file required tax forms for the firm's retirement plans (both 401(k) and commingled employee profit sharing) for 2017 and 2018. *See Motion to Employ The Benefit Practice at ¶9, Dkt. No. 58; Id.*

   e. Failed to perform any compliance, valuation, government reporting, or census data calculations (Mr. Liddle is the sole trustee of the firm's retirement plans). *Id.*

   f. Failed to pay New York State unemployment contributions *See NYSDOL Proof of Claim (Claim No. 12)*

    g. Failed to pay a mere $3,459 owed by Debtor to the IRS covering the month of July 2018. *See IRS Proof of Claim (Claim No. 11)*

    h. Failed to pay his own taxes, owing the IRS $114,157.72 for tax years 2015 -2018. *See IRS Proof of Claim (Claim No. 11)*[7]

    i. Lists at least 6 current employees apparently owed wages as "disputed" claims. *See Schedule E/F, Dkt. No. 60*

    j. Lists at least one current employee – for whom he has obtained this Court's permission to pay during the wind down of the estate (Rose Reverendo) – as being owed back wages, yet such owed wages are "disputed." *Id.*

    k. Failed to list himself in his personal bankruptcy as owing a debt the Debtor (or file a proof of claim in this bankruptcy), despite his overpaying himself millions of dollars and a negative capital account on August 2016 of approximately negative $3.4 million. While admittedly this amounts to not filing a proof of claim against himself on behalf of a dissolved and winding down partnership, it highlights the inherent conflict of Mr. Liddle wearing two hats at the same time – one representing his personal interests and one that is supposed to be looking out for creditors.

    21. The foregoing is undoubtedly the tip of a very large iceberg. Rather than pay and file tax returns or fulfill his trustee obligations in years when the firm took in millions of dollars in revenue, Mr. Liddle chose to engage in in a lifestyle that he would not have been able to afford had he paid debts due and owning by him and the firm. He cannot, and must not, be allowed to maintain a fiduciary role with respect to both his own and his firm's creditors. He cannot, and must not, be allowed to make decisions to spend what will undoubtedly be millions of estate dollars, over and above what by now must be in excess of $1 million in professional fees.

## Legal Considerations

    22. A request for discovery under Rule 2004 is committed to the sound discretion of the bankruptcy court. *See In re Bd. Of Dirs. Of Hopewell Int'l Ins. Ltd*, 58 B.R. 580, 587 (Bankr.

---

[7] It is remarkable that failure to pay taxes covers 2015, a time period in which Mr. Liddle does not claim that the firm was in financial distress (and indeed was profitable). This is even more remarkable given that Mr. Liddle had an IRS tax lien in excess of $1.1 million which was paid off in its entirety August 2016 using loan proceeds from Counsel Financial in violation of the loan agreement. In other words, his lifestyle took precedence over his tax obligations.

S.D.N.Y. 2001). The scope of Rule 2004 examinations, however, has limits. For example, examinations cannot be used to abuse or harass a party, nor can the examinations "stray into matters which are not relevant to the basic inquiry. *Washington Mutual*, 408 B.R. at 50, *citing In re Table Talk, Inc.*, 51 B.R. 143, 145 (Bankr. D.Mass. 1985).

23. As a result, courts have recognized the need to impose limits and safeguards to keep the rule from being abused. It is well-established that a party in interest seeking authority to use Bankruptcy Rule 2004 bears the burden to establish "good cause" for the relief requested. *In re Express one Int'l, Inc.*, 217 B.R.215, 217 (Bankr. E.D. Tex. 1998) ("[T]he one seeking to conduct a 2004 examination has the burden of showing good cause for the examination which it seeks." (*quoting In re Eagle-Picher Indus., Inc.* 169 B.R. 130, 134 (Bankr. S.D. Ohio 1994)); *In re Hammond*, 140 B.R. 197, 201 (S.D. Ohio 1992) (holding that "the examiner has the burden of establishing that "good cause" exists for the taking of the [Rule 2004] examination"); *In re Coffee Cupboard, Inc.*, 128 B.R. 509, 514 (Bankr. E.D.N.Y. 1991) (Holding that just because "documents meet the requirement of relevance does not alone demonstrate that there is good cause for requiring their production.")

24. "The burden of showing good cause is an affirmative one in that it is not satisfied merely by a showing that justice would not be impeded by production of the documents." *In re Drexel Burnham Lambert Group, Inc.*, 123 B.R. 702, 712 (Bankr. S.D.N.Y. 1991). Instead, good cause only exists where the "examination sought is necessary to establish the claim of the party seeking the examination, or the denial of such request would cause the proposed examiner undue hardship or injustice." *In re Express one Int'l, Inc.*, 217 B.R. at 217 (*citing In re Dinubilo*, 177 B.R. 932, 940 (E.D. Cal. 1993).

25. Rule 2004 requires the "balanc[ing] [of] the competing interests of the parties, weighing the relevance of and necessity of the information sought by examination." *In re Eagle-Picher Indus., Inc.* 169 B.R. at 134. "[I]f the cost and disruption to the examinee attendant to a requested examination outweigh the benefits to the examiner, the request should be denied," *In re Express One Int'l, 217 B.R. at 217.*

26. Regarding this last point, the burden and disruption to myself would be enormous. Mr. Liddle seeks a virtually limitless examination of myself, my practice, and the personal finances of myself and my wife, for what has been shown above to be based on accusations that would be defamatory if not protected by the litigation privilege of the bankruptcy proceedings.

27. The motion to take my deposition and produce documents is nothing short of Mr. Liddle's attempt to channel his hatred and fury toward me, and it has no possibility of benefitting the estate. Instead, it constitutes a wasting of estate assets, and attempt to further waste assets with pre-litigation discovery over demonstrated frivolous claims and future frivolous litigation. This will undoubtedly cost the creditors hundreds of thousands, if not in excess of a million, dollars.

## Conclusion

28. It is clear that Mr. Liddle cannot act as a debtor in possession for the purpose of winding up the Debtor's affairs and pay off creditors. He is irreparably conflicted. His past behavior demonstrates that even when the Debtor has received nearly $8 million in combined revenue and loans for 2017 – 2018, he was incapable of performing basic obligations such as the preparation and filing of Debtor's (and perhaps his own) tax returns and the accounting/tax filings for the Debtor's ERISA retirement plans for which he is the fiduciary (and admittedly has failed to pay/rollover sums owed to participants from such funds segregated from Debtor's bank accounts). Indeed, this alone calls into question his fitness to practice law. Rather than focus on

the best interests of the creditors, he is intent on pursuing bad faith discovery and litigation as part of his mindset to blame anyone but himself for his actions and to harass his perceived "enemies." This must stop.

29. Accordingly, I respectfully request:

A. This motion be denied in its entirety;

B. Alternatively, that this motion be stayed until this Court decides to convert the bankruptcies to Chapter 7 or remove Mr. Liddle/the firm as a debtor in possession; and

C. An Order that the Debtor and Mr. Liddle to immediately discontinue in perpetuity my liddlerobinson.com email address, such that any sender would receive back a notice that such email address does not exist at the liddlerobinson.com domain name.

Dated: New York, New York
September 28, 2019

                                Blaine Bortnick
                                c/o Rasco Klock Perez & Nieto, LLC
                                555 Fifth Avenue, 17th Floor
                                New York, NY 10017
                                Tel: (305) 476-7100

*Creditor, pro se*