**DAVIDOFF HUTCHER & CITRON LLP**         **Hearing Date and Time**
605 Third Avenue        June 18, 2020, at 10:00 a.m.
New York, New York 10158
212.557.7200 (tel)
David H. Wander, Esq. (dhw@dhclegal.com)
Robert L. Rattet, Esq. (rlr@dhclegal.com)
Alexander R. Tiktin, Esq. (art@dhclegal.com)

*Attorneys for Counsel Financial II LLC,*
*LIG Capital LLC, and Counsel Financial Holdings LLC*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------X

| | |
|---|---|
| In re: | Chapter 11 |
| LIDDLE & ROBINSON, L.L.P., | Case No.19-12346 (SHL)<br>(Jointly Administered with Case No. 19-10747)<br>Related Docs. 103, 130 and 155 |
| Debtor. | |

---------------------------------------------------------------X

**DECLARATION OF DAVID H. WANDER IN OPPOSITION
MOTION BY JEFFREY LEW LIDDLE FOR ALLOWANCE AND
PAYMENT OF ADMINISTRATIVE EXPENSE CLAIM
PURSUANT TO 11 U.S.C. §§ 503(b)(3)(D) AND 506(c) [DOC. 290],
AND MOTION BY JEFFREY LEW LIDDLE FOR ALLOWANCE
AND PAYMENT OF ADMINISTRATIVE EXPENSE CLIAM
PURSUANT TO 11 U.S.C. §§ 503(b)(3)(D), AND 105(a) AND
<u>OTHER AUTHORITY [DOC. 291]</u>**

1

DAVID H. WANDER, declares under 28 U.S.C. §1746:

1. I am a partner with Davidoff Hutcher & Citron LLP, attorneys for Counsel Financial II LLC ("CF2"), LIG Capital LLC ("LIG"), and Counsel Financial Holdings LLC ("Holdings" and together with CF2 and LIG, "Counsel Financial").[1]

2. I submit this declaration in support of Counsel Financial's opposition to the two motions by Jeffrey Lew Liddle ("Liddle"): (i) Motion For Allowance and Payment of Administrative Expense Claim Pursuant To 11 U.S.C. §§ 503(b)(3)(D) and 506(C), and Other Authority [Doc. 290]; and (ii) Motion for Allowance and Payment of Administrative Expense Claim Pursuant to 11 U.S.C. §§ 503(b)(3)(D), and 105(a) and Other Authority [Doc. 291].

3. As shown below and in Counsel Financial's accompanying memorandum of law, Mr. Liddle's requests for payment to him of $1,225,518 from the L&R estate and payment of $101,01,445 to Foley Hoag are indefensible and without any basis in fact or in law.

4. Also, as shown below, there are many false and misleading statements in the Motions which rely, in large part, on the supporting affirmation of Jeffrey Liddle dated June 4, 2020 (the "Liddle Affirmation")

---

[1] While paragraph 4 of the Liddle Affirmation states that CFII, LIG, and Holdings "appear to be under the common control of an entity known as Counsel Financial Services, LLC," this statement is one of the many false, misleading, or unsupported statements or half-truths in Liddle's two motions and his supporting affirmation. Moreover, there is no issue that Liddle had his law firm borrow money from each of these three entities, each of which has an allowed secured claim. *See Eighth Cash Collateral Stipulation and Ninth Cash Collateral Stipulation*, Docs. 251 and 284.

**A.      Liddle's Lavish Lifestyle Destroyed L&R**

5.      Liddle never explains why all his partners left, including the last one, Charles Hubbard, who did not even give Liddle any notice when he left in January of 2019.[2] By the end of January, 2019, Liddle had one associate and an assistant.[3]

6.      The answer comes from one of Liddle's long-time partners, Blaine Bortnick, who was with L&R for 22 years:

> [A]lthough the firm was profitable … through 2015, Mr. Liddle had taken nearly $2 million from the firm to pay for his lifestyle of two conjoined Fifth Avenue apartments and a lavish Hamptons residence. Had Mr. Liddle not withdrawn this sum from the firm which he had not earned, it would not have experienced the extreme cash flow crisis with the resulting flight of the vast majority of its partners.

*Objection To Motion By Debtor Liddle & Robinson, L.L.P. Pursuant To Bankruptcy Rule 2004 and §105(a) of the Bankruptcy Code, for an Order Directing (I) Examination of Blaine H. Bortnick, and (II) Production of Documents By Blaine H. Bortnick, Along With Related Relief* ("Bortnick Objection"). Doc. 82, at ¶ 7.[4]

---

[2] According to Liddle, "L&R's other partner abruptly left without notice, a fact that Mr. Liddle only found out indirectly and after the fact. *Motion, para. 7.*

[3] L&R had been a successful firm, with nine partners, two of counsel, and 11 associates for a total of 22 lawyers and revenues net of expense reimbursement from 1998 or earlier, through 2015, averaged about $13.5 million per year. *Liddle Objection Affidavit, Case No. 19-10747, Doc. 263,* ¶¶ 5, 16.

[4] In addition, Liddle's former partner James R. Hubbard, Esq. explained Liddle's responsibility for the defaulted loans with Counsel Financial:

> Thereafter, at Liddle's direction, L&R proceeded to borrow the full amount of its $5.6 million line of credit under the Note, as well as additional monies from affiliates of CF2. Under Liddle's supervision and control, L&R defaulted on all those loan obligations. Liddle, who was in sole control of L&R's finances, never once caused the Firm to comply with its initial obligation to repay to CF2 against the principal amount of the Firm's borrowing an amount equal to 10% of all contingent attorneys' fees collected by the Firm within three business days of receipt thereof. That course of conduct continued when Liddle persisted in failing to remit to CF2 any collected contingency fees whatsoever. Those are a part of a series of defaults under the Firm's loan documents with CF2 caused by Liddle's management of the Firm.

3

### B.     Liddle Violated New York Partnership Law By Failing to Wind Up L&R

7.     Liddle falsely states that he "sought to wind up the affairs of L&R and take his practice and that of L&R to another firm [but] this effort was stymied by Counsel Financial." Liddle Aff., at para 7.

8.     Liddle's never-ending attempt to blame Counsel Financial for his current woes has been shown to be based on a pack of lies. Documentary evidence and sworn statements filed with the Court have shown that Counsel Financial tried to help Liddle merge his practice with another firm. *See Affidavit of Glenn Philips, Esq., managing partner of Milberg Phillips Grossman LLP sworn to on December 17, 2019,* Case No. 19-12346, Doc. 179. Additional documentary evidence and sworn statements also showed that Counsel Financial did nothing to stymie Liddle's efforts to join another firm, particularly Pierce Bainbridge. *See affidavit of Richard Silverstein dated December 16, 2019*, Case No. 19-12346, Doc. 176; *see also email dated March 13, 2019 from Carolynn Beck, a partner at Pierce Bainbridge, to Jeffrey Liddle*, Case No. 19-10747, Doc. 272, Exh. "D."

9.     In the Liddle Affirmation, he claims that he had an "offer that promised [him] a minimum annual guaranteed compensation of $600,000, plus additional compensation." (paragraph). In another Affidavit previously filed with this Court, Liddle disclosed that his purported offer for $600,000 plus a percentage of fees collected over a certain threshold was from Pierce Bainbridge. Case No. 19-12346, Doc. 163-2 ¶¶ 37-38. However, Liddle's purported "offer"

---

*Affidavit of James Ryan Hubbard, Esq. dated January 24, 2019, Annexed as Exh. "A" to the Declaration of David H. Wander in Support of Motion by Counsel Financial to Convert this Chapter 11 Reorganization to a Chapter 7 Liquidation*, Case No. 19-10747, Doc. 250).

was mere fantasy, as explained by Carolynn Beck, a partner at Pierce Bainbridge in an email to Jeffrey Liddle, dated March 13, 2019:

> After further analysis and investigation into your cases, Pierce Bainbridge has decided not to enter into a business or employment relationship with you. To be clear, this decision was made by Pierce Bainbridge alone, based on, among other things, our evaluation of your contingency cases and whether it would make business sense for the firm to take such cases.
>
> As you are no doubt aware, we do not currently have any outstanding offers to you. We respectfully decline your counter-offer, which Rose Reverendo emailed to John Pierce on your behalf on March 5, 2019 as a "draft Memorandum of Understanding." To the extent you contend any offers are outstanding, a view with which we respectfully disagree, they are now formally rescinded and/or voided. In any event, our prior offer was expressly contingent on reaching agreement on your existing contingency cases, an event which did not come to pass.
>
> \*        \*        \*

Case No. 19-10747, Doc. 272, Exh. "D."

10.  Rather than wind up L&R, Liddle has continued to enter engagements with new clients for the past 17 months, in violation of New York's Partnership Law and in breach of his fiduciary duties to the firm and the L&R estate.[5] Liddle even brags about his improper conduct: "[T]he Firm is taking on new clients and maintaining a robust practice." *Liddle Aff, ¶ 20.*

11.  Counsel Financial received a list of L&R's cases from the chapter 11 trustee and it includes nine clients retained in 2019, after July 2019, or in 2020, summarized as follows:

| **Client** | **Date of Retention** |
|---|---|

---

[5] Let's unpack Liddle's backslap that he "could have focused on his own self-preservation and abandoned the firm, taking clients with him, and requiring creditors and former partners to chase him down to satisfy their claims." *Liddle Aff., ¶ 37*-38. First, what Liddle now characterizes as 'abandoning' the firm, is what he was statutorily required to do under New York's Partnership Law. *See Point IV of the Memorandum of Law by Counsel Financial in Opposition to Liddle's Motions for Payment of Administrative Claims, filed in Case No. 19-12346 on June 15, 2020.* Evidently, Liddle tried to 'abandon' the firm but no one would take him. *See email dated March 13, 2019 from Carolynn Beck, a partner at Pierce Bainbridge, to Jeffrey Liddle*, Case No. 19-10747, Doc. 272, Exh. "D"; *See also Liddle Affirmation, Doc. 290-3*. In fact, Liddle admits that he tried to "take his practice … to another firm …." *Liddle Aff., T ¶7.*

5

| | |
|---|---|
| #1 | 2019 |
| #2 | 2019 |
| #3 | 2019 |
| #4 | 2019 |
| #5 | After July 2019 |
| #6 | After July 2019 |
| #7 | After July 2019 |
| #8 | After July 2019 |
| #9 | 2020 |
| #10 | 2020 |

12.     Upon information and believe, L&R retained additional clients in 2019 or after July 2019 but their cases were somehow resolved and therefore these clients have not been given to Counsel Financial.

C.  **Counsel Financial Funded L&R For Fifteen Months**

13.     Counsel Financial has funded L&R since Liddle filed his personal chapter 11 petition on March 2019. Month after month Counsel Financial consented to the use of its cash collateral to pay L&R's rent, payroll, utilities, storage fees, and other expenses to operate L&R while the firm was supposed to be winding up its operations. Only after Counsel Financial became completely frustrated with the lack of any apparent progress in winding up L&R did Counsel Financial advise the L&R trustee that it would be terminating its consent to use of its cash collateral in June, 2020.

14. Accordingly, Liddle's statement that he "funded the Firm operations from the personal portion of the sale proceeds of the sale of [his and his wife's] cooperative apartment" is simply untrue. See Liddle Aff., para 12.

### D. Liddle's Work Representing Clients Has Resulted in Little Benefit to the Estate

15. Liddle's contention that his "work representing clients for the Firm … has resulted in great success" is a gross misstatement of the record. Liddle Aff., para 13. The only one who has benefited from Liddle's work representing clients for L&R is Liddle and only Liddle.

16. Operating L&R has been costing this estate almost $90,000 a month. While standing alone, this amount may not seem significant, when Liddle's delay in winding up the firm is taken into account, the out-of-pocket cost of operating L&R, under the protection of the bankruptcy court, has exceeded more than $1,200,000.

17. Even worse, Liddle has saddled this estate with huge administrative expense claims in the form of legal and accounting fees.

18. Foley Hoag has filed fee applications totaling $801,819 and Liddle now wants the L&R estate to pay an additional $101,445 to the firm for fees billed to Liddle's individual chapter 11 estate, for total compensation of $903,264. In addition, EisnerAmper seeks fees and expenses totaling $78,593 from L&R's estate.

19. This estate will also be burdened by administrative claims for legal and accounting fees of professionals retained by L&R's chapter 11 trustee. Upon information and belief, the L&R trustee and his professionals will be seeking payment of approximately $500,000.

20. And now Liddle seeks payment of additional compensation totaling $1,225,518! In total, the compensation now sought by Liddle, along with his professionals' fees and expenses, exceed $2 million.

21. Meanwhile, Counsel Financial has not received a single dollar from this estate.

22. In sum, Liddle wants to turn L&R's chapter 11 reorganization into an administratively insolvent disaster like he has done to his individual chapter 11 estate.

23. If the Motions are approved, the total cost for operating L&R in chapter 11, paying L&R's professionals, paying the L&R trustee and his professionals, and paying Liddle additional compensation may exceed $4.0 million. Meanwhile, there is less than $2.4 million in the L&R trustee's account.

E.   **Liddle's Reorganization Strategy Has Been a Disaster**

24. Liddle's strategy of filing a chapter 11 petition for L&R, with its attendant expenses of administration, and then delaying L&R's wind up, while remaining in chapter 11 personally, has been an unmitigated disaster for both estates. Liddle's individual chapter 11 estate is administratively insolvent and is now facing a huge tax liability[6] that Liddle and his professionals should have disclosed to the Court long ago.[7]

25. Due to Liddle's intransigence in forming a new firm, L&R is now being shut down at the end of June with no transition plan presently in place. The frantic, last-minute wind up of L&R now underway is of great concern to Counsel Financial because the fees to be generated from L&R's current cases constitutes L&R's collateral and primary source of any recovery on its $8 million allowed claim.

26. Liddle's decision to file a chapter 11 petition for L&R was so unnecessary because, under well-established law in this circuit, the law firm was already protected by the automatic stay of section 362(a). *See generally, Queenie, Ltd. v. Nygard Int'l*, 321 F.3d 282 (2d Cir. 2003); *In re*

---

[6] It is unclear whether Liddle's attorneys and accountants warned Liddle, in a timely fashion, that his actions would result in a huge tax liability and he ignored them, or whether this issue was not raised until after 2019 ended.

[7] Had this Court known of Liddle's 2019 tax liability, on December 19, 2019 when the Court had oral argument on Counsel Financial's motion to convert the individual case, the Court may have granted the motion at that time. Now, Liddle will receive additional "pass through" income for 2020 and there will be another administrative tax liability against Liddle's individual estate.

8

*Residential Capital*, 2013 WL 3491311 at *1 (2d Cir. July 15, 2013). The Second Circuit's seminal decision in *Queenie*, along with its progeny, was cited by Counsel Financial well in advance of the July 22, 2019 chapter 11 filing by L&R:

> Moreover, because claims against L&R will have "an immediate adverse economic consequence" for the Debtor's estate, the automatic stay should apply to this nondebtor. See generally, Queenie, Ltd. v. Nygard Int'l, 321 F.3d 282 (2d Cir. 2003); In re Residential Capital, 2013 WL 3491311 at *1 (2d Cir. July 15, 2013). As the Debtor stated, "[p]aramount for reorganization is my ability to operate the business of Liddle & Robinson from which I expect to fund a plan of reorganization." Motion, ¶ 16.

*See Response to the Debtor's Motion for Turnover of Property* [Doc. 23] early on in Liddle's chapter 11 case. *See Case No. 19-10747, Doc. 23, ¶ 27*. It was also discussed on the record BY Counsel Financial's attorney. *See April 11, 2019 Hearing Tr.*, Case No. 19-10747, Doc. 248 20:11-13 ("I believe the law in this circuit is very clear that the automatic stay applies to the debtor's law firm"). I also discussed Queenie and its progeny, off the record, with Foley Hoag.

27. Liddle claims that Counsel Financial argued that he should receive no draw, an assertion which is plainly false. Counsel Financial affirmatively stated in open court that it did not object to Liddle's draw. *April 11, 2019 Hearing Tr.*, Case No. 19-10747, Doc. 248, 68:13-20 ("I'm not objecting to Mr. Liddle getting paid. I'm just asking where's the money coming from, because it was my understanding -- it's not coming from the -- law firm.").]

28. For all of the reasons set forth above and in Counsel Financial's accompanying memorandum of law, the Motions should be denied.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated: New York, New York
       June 15, 2020

                                              /s/ David H. Wander

9

David H. Wander

David H. Wander