| | |
|---|---|
| William F. Gray, Jr. | Michael J. Licker |
| Alison D. Bauer | Meredith S. Parkinson |
| Jiun-Wen Bob Teoh | James Fullmer |
| FOLEY HOAG LLP | FOLEY HOAG LLP |
| 1301 Avenue of the Americas, 25th Floor | 155 Seaport Boulevard |
| New York, New York 10019 | Boston, Massachusetts 02210 |
| Tel: (646) 927-5500 | Tel: (617) 832-1000 |
| Fax: (646) 927-5599 | Fax: (617) 832-7000 |

*Attorneys for Jeffrey Lew Liddle,*
*Debtor and Debtor-in-Possession in Case No. 19-10747*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------- x
: Chapter 11
In re :
: Case No. 19-10747 (SHL)
JEFFREY LEW LIDDLE, :
: Jointly Administered with 19-12346 (SHL)
Debtor :
---------------------------------------------------------- x
---------------------------------------------------------- x
: Chapter 11
In re :
: Case No. 19-12346 (SHL)
LIDDLE & ROBINSON, L.L.P. :
: Jointly Administered with 19-10747 (SHL)
Debtor :
---------------------------------------------------------- x

**DECLARATION OF WILLIAM F. GRAY, JR. IN FURTHER SUPPORT OF THE MOTIONS OF JEFFREY LEW LIDDLE FOR ALLOWANCE AND PAYMENT OF ADMINISTRATIVE EXPENSE CLAIMS [ECF NOS. 290, 291][1] AND IN FURTHER OPPOSITION TO THE MOTION BY COUNSEL FINANCIAL II LLC, LIG CAPITAL LLC, AND COUNSEL FINANCIAL HOLDINGS LLC, PURSUANT TO § 1112(b) OF THE BANKRUPTCY CODE, TO CONVERT DEBTOR'S CHAPTER 11 REORGANIZATION TO A CHAPTER 7 LIQUIDATION [ECF NO. 249 IN 19-10747]**

---

[1] References to "ECF" refer to filings made on the docket of *In re Liddle & Robinson, L.L.P.*, Case No. 19-12346, unless otherwise specified.

William F. Gray, Jr. makes this declaration under 28 U.S.C. § 1746:

1.  I am a partner at the firm of Foley Hoag LLP ("Foley Hoag"), which represents Jeffrey Lew Liddle ("Mr. Liddle"), debtor and debtor-in-possession in the Chapter 11 Case of *In re Jeffrey Lew Liddle*, No. 19-10747 (SHL).  I am an attorney licensed to practice law in the State of New York and am admitted to practice before this Court.  I submit this declaration in further support of the *Motion of Jeffrey Lew Liddle for Allowance and Payment of Administrative Expense Claim Pursuant to 11 U.S.C. §§ 503(B)(3)(D) and 506(C), and Other Authority* [ECF No. 290] (the "Liddle Motion"), and the *Motion of Jeffrey Lew Liddle for Allowance and Payment of Administrative Expense Claim Pursuant to 11 U.S.C. §§ 503(B)(3)(D), and 105(A) and Other Authority* [ECF No. 291] (the "FH Motion"); and in reply to the *Chapter 11 Trustee's Objection to Motions of Jeffrey Lew Liddle for Allowance and Payment of Administrative Expense Claims Pursuant to 11 U.S.C. §§503(B)(3)(D), 506(C), 105(A) and Other Authority* [ECF No. 296] (the "Trustee Objection"), the *Memorandum of Law by Counsel Financial in Opposition to (I) Motion by Jeffrey Lew Liddle for Allowance and Payment of Administrative Expense Claim Pursuant to 11 U.S.C. §§ 503(B)(3)(D) and 506(C) [Doc. 290]; and (II) Motion by Jeffrey Lew Liddle for Allowance and Payment of Administrative Expense Claim Pursuant to 11 U.S.C. §§ 503(B)(3)(D) [Doc. 291]* [ECF No. 299] (the "CF Objection"), the *Declaration of David H. Wander in Opposition Motion by Jeffrey Lew Liddle for Allowance and Payment of Administrative Expense Claim Pursuant to 11 U.S.C. §§ 503(b)(3)(D) and 506(c) [Doc. 290], and Motion by Jeffrey Lew Liddle for Allowance and payment of Administrative Expense Claim Pursuant to 11 U.S.C. §§ 503(b)(3)(D), and 105(a) and Other Authority [Doc. 291]* [ECF No. 298] (the "Wander Declaration"), the *Second Supplemental Declaration of Robert L. Rattet in Further Support of Motion by Counsel Financial II LLC, LIG Capital LLC, and Counsel Financial Holdings LLC,*

2

*Pursuant to § 1112(b) of the Bankruptcy Code, to Convert Debtor's Chapter 11 Reorganization to a Chapter 7 Liquidation* [ECF No. 391 in Case No. 19-10747] (the "Rattet Declaration"), and the *Motion by Counsel Financial II LLC, LIG Capital LLC, and Counsel Financial Holdings LLC, Pursuant to § 1112(b) of the Bankruptcy Code, to Convert this Chapter 11 Reorganization to a Chapter 7 Liquidation* [ECF No. 249 in Case No. 19-10747] (the "CF Conversion Motion").

**The Destination of the Administrative Expense Claim Payments**

2.  Counsel Financial and, to a lesser extent, the Chapter 11 Trustee (the "Trustee") paint a grievous picture of Mr. Liddle seeking the payment of money from the estate (the "L&R Estate") of Liddle & Robinson, L.L.P. ("L&R" or the "Firm"), straight into his own "pocket." This is inaccurate. Rather, Mr. Liddle is asserting these administrative claims in his capacity as debtor in possession of the chapter 11 estate (the "Liddle Estate") in his individual case. He seeks compensation to the Liddle Estate for the income tax liability it incurred through Mr. Liddle's work as the sole remaining partner of L&R, and reasonable compensation for that work itself, which generated over $4 million in revenue for the L&R Estate. All payments allowed by this Court on account of the Liddle Motion will be deposited—into Mr. Liddle's debtor-in-possession ("DIP") account and used to fund, hopefully, a reorganization plan or as otherwise ordered by the Court.[2] Similarly, the payment requested in the FH Motion—reimbursement to the Liddle Estate for attorney fees it incurred on behalf of the L&R Estate—will be deposited into Mr. Liddle's DIP account for the same purpose.

3.  From the inception of his individual case, Mr. Liddle has been determined to seek reorganization through a chapter 11 plan. His consistent intention has been to pay legitimate

---

[2] Special consideration is given in the Liddle Motion for payment of 2019 Federal and New York State income taxes because those tax claims will constitute administrative claims of the Liddle Estate.

creditors to the best of his ability. He has chosen this route fully aware that emergence through a reorganization plan under chapter 11 subjects him to the requirements of Section 1115 of the Bankruptcy Code. In chapter 11, as opposed to chapter 7, "earnings from services performed by the debtor after the commencement of the case but before the case is . . . converted to a case under chapter 7" become property of the estate available for distribution to creditors under a plan. Nothing Mr. Liddle has done or requested evinces any intent to avoid this.

4.     Crucially there is now an imminent opportunity for the formation of a new firm and the confirmation of a chapter 11 reorganization plan, brought about by the emergence of an exit lender (the "Lender") who has signed a letter of intent and term sheet which, it is hoped, can serve as the basis for a consensual deal with the Chapter 11 Trustee for the benefit of both estates. Addressing the Liddle Motion, which is significantly motivated by the need to deal with the administrative tax claims, which have yet to be determined, is an important part of advancing the plan formation process.

5.     It is in this context which the Court should consider the Liddle Motion. Rehashing the mistakes of the past that have led to these Chapter 11 Cases should not be allowed to eclipse the goal of chapter 11: a fresh start and rehabilitation through a chapter 11 plan. There is no dispute that Mr. Liddle has the skill and commitment to take full advantage of this opportunity. As the Court noted, "Mr. Liddle has a practice, and that practice is continuing, the practice is successful." Transcript at 37:21-22, *In re Jeffrey Lew Liddle*, No. 19-10747 (Dec. 19, 2019). Armed with a willing chapter 11 plan and new firm funder, that opportunity is within grasp. We intend to make a motion promptly for approval to negotiate with the Lender on an exclusive basis with the hope of proceeding to a plan confirmation process for emergence in the early Fall. The mutual vilification that has too often characterized the litigation in this case has no place in this process

and is not in anyone's interest. Mr. Liddle is not seeking canonization, only appropriate compensation, and ultimately, plan confirmation.

**Mr. Liddle's Right to Compensation**

6. Underlying both the Trustee Objection and the CF Objection is a hostility to Mr. Liddle seeking compensation for the services he has performed. The Liddle Motion has been characterized as some gross distortion of the Bankruptcy Code and worse. Respectfully, this does not make sense. Mr. Liddle has been receiving a "draw" all along. There is, of course, nothing inappropriate or contrary to the Bankruptcy Code about this. The only question is what the amount of compensation should be. Mr. Liddle has every right to assert a claim on behalf of his Chapter 11 estate that he should be paid appropriately for the services he rendered to the L&R Estate. The Liddle Estate, through Mr. Liddle, is entitled to seek a claim for "wages, salaries, and commission for services rendered after the commencement of the case." 11 U.S.C. § 503(b)(1)(A). Any compensation paid out from L&R will be available to pay creditors. *See* 11 U.S.C. § 1115(a)(2). The funds will not be leaving the supervision of the Court; all payments will be deposited into the DIP account. Indeed, as many of the creditors between the Liddle Estate and the L&R Estate overlap (and many creditors of the Liddle Estate are only creditors of Mr. Liddle because they were first creditors of L&R), payment of compensation to the Liddle Estate will be available for distribution under a plan in the individual case.

7. Mr. Liddle received a draw of $15,000 monthly. Counsel Financial resisted even this draw payment; The Chapter 11 Trustee suggests that $15,000 is enough. But a draw is, by definition, an interim payment taken against future income, not income itself and not meant to limit the total income a partner ultimately receives. As the Court noted, "He only gets a draw.

5

He's not getting a salary. He has a claim against the estate." Transcript at 25:9-11, *In re Jeffrey Lew Liddle*, No. 19-10747 (Mar. 28, 2019).

8. The Court further noted that, contrary to the Trustee's contention that this draw was "quite generous," the budget including the $15,000 draw for Mr. Liddle was entirely appropriate:

> We had a debate about what the draw number should be. And so -- and I think it was addressed by counsel saying now that for May it should be 15,000 dollars. And I do think that that's appropriate in the context of a law firm which here for a second we're considering as essentially a separate entity, right, which is why we're discussing whether the law firm's going to file for bankruptcy, paying its employees.

Transcript at 70:11-17, *In re Jeffrey Lew Liddle*, No. 19-10747 (Apr. 11, 2019).

9. The draw amount was, of course, negotiated before Mr. Liddle, acting as the sole remaining "partner" of L&R, the Debtor in Possession, generated significant revenue and substantial profits for L&R in the latter half of 2019—and before he incurred a large tax liability for doing so. Draws, by definition, are merely loans against future income as determined at the end of the fiscal year based on the partnership's profitability. The draw was established when L&R had almost no liquid assets and negligible accounts receivable. In fact, the individual Chapter 11 estate financed L&R's operations from March through October, largely from the sale proceeds of Mr. Liddle's home.

10. Now that the Firm's 2019 income can be computed, it is clear that the draw does not fairly compensate Mr. Liddle. In fact, the draw is grossly insufficient to even satisfy the tax liability apparently incurred by Mr. Liddle as a result of the net income generated in 2019.[3] Mr. Liddle does not dispute that the Firm, as a partnership, is a "pass-through" entity for tax purposes.

---

[3] The Firm has not yet filed its 2019 tax return nor issued a K-1 to Mr. Liddle.

6

He does challenge the way that "pass-through" status is being applied here. A partnership is a "pass-through" entity because the partner's share of the profits <u>and</u> the attendant tax liability pass through the firm to the individual partner. It is designed to avoid the problem of double taxation. Here, Counsel Financial and the Chapter 11 Trustee want to retain the net income at the partnership level and only "pass through" the attendant tax liability. That is not how a "pass-through" is intended to work, nor is it fair and just. In fact, it is grossly inequitable to the creditors of Mr. Liddle's individual estate. The taxes should apply at the level where the profits are maintained. Like water seeking its proper level, the taxes should be paid out of the profits which, in this case, are being held by L&R, the partnership debtor.

11. Nor is there merit in the argument, made by both the Trustee and Counsel Financial, that the statutory basis relied on by Mr. Liddle is insufficient for allowance and payment of his claims. Section 503(b)'s language of "actual and necessary expenses" does not limit the payment of administrative claims so severely as the Trustee and Counsel Financial contend. The largest portion of the administrative claims Mr. Liddle seeks are for the payment of taxes. It is hard to envision any expense more "actual and necessary" than taxes—especially given that Mr. Liddle must file his 2019 tax returns by July 15, 2020, less than a month away. Moreover, bankruptcy courts routinely grant payment of administrative claims pursuant to section 503(b) in situations similar to that here. *See, e.g.*, *In re Bayou Group, LLC*, 431 B.R. 549, 562 (Bankr. S.D.N.Y. 2010) (noting that the majority of cases allowing creditor's substantial contribution claim have found that "the creditor played a leadership role that normally would be expected of an estate-compensated professional but was not so performed").

12. The Trustee incorrectly interprets Mr. Liddle as relying on his "former rights as a partner to share in the income of the partnership." Trustee Objection ¶ 21. Obviously Mr. Liddle

7

is not doing so; he stated as much in his Motion. If Mr. Liddle were under the misapprehension that he were entitled to share in the income of the partnership, he would have asked for the full $2.7 million of pass-through profit. If the Firm were not in bankruptcy, that is what he would be entitled to as his share of income. But he did not ask for that, because he is seeking reasonable compensation as a wind-up partner. *See, e.g.*, *Rosen Tr. v. Rosen*, 53 A.D.2d 342, 350-51 (4th Dep't 1976) (distinguishing between compensation as share of profits and compensation for winding up partnership affairs).

13.     It is also argued that Mr. Liddle does not have standing to seek allowance and payment of an administrative claim under section 506(c) insofar as he is not the Trustee. This argument ignores that for he was the managing partner of L&R for all of 2019, including the first five months of this Chapter 11 Case, as debtor-in-possession. *E.g.*, *In re Lane*, 108 B.R. 6, 8 (Bankr. D. Mass. 1989) ("Section 506(b), moreover, makes a secured creditor's right to accruing interests and expenses subordinate to the § 506(c) right of a trustee ***or debtor in possession*** to be reimbursed from the collateral for the reasonable and necessary costs of preservation or disposition." (emphasis added)).

14.     Counsel Financial argues that the only "surviving partners" entitled to wind-up a partnership's affairs are those who are the sole remaining partner due to the death of other partners. CF Objection at 15-16. Even if this cramped reading were correct, New York courts "have found a way to avoid the harshest application of the no compensation rule – at least in the limited context of 'unfinished business' claims arising out of contingent fee legal representations." *Dev. Specialists, Inc. v. Akin Gump Strauss Hauer & Feld LLP*, 480 B.R. 145, 158 (S.D.N.Y. 2012). "They have done so, not by rejecting the rule outright, but by reducing the profits for which a former partner must account by an amount that reflects the value of his post-dissolution 'efforts,

8

skill, and diligence.'" *Id.* Applying this reasoning, the Second Circuit has held that, "in a case where a lawyer departs from a dissolved partnership and takes with him a contingent fee case which he then litigates to settlement, the dissolved firm is entitled only to the value of the case at the date of dissolution, with interest" and that "to the extent that the 'successful settlement of a pending contingent fee case post-dissolution is due to a surviving partner's post-dissolution efforts, skill and diligence,' the dissolved firm does not have a cognizable property interest in the fee." *Santalucia v. Seabright Transp., Inc.*, 232 F.3d 293, 298 (2d Cir. 2000) (citing *Shandell v. Katz*, 629 N.Y.S.2d 437, 439 (N.Y. 1st Dep't 1995); *Kirsch v. Leventhal*, 586 N.Y.S.2d 330, 333 (N.Y. 3d Dep't 1992)). Notably, the New York Court of Appeals has never considered this application to run afoul of the "no compensation rule" codified in Partnership Law § 40(6). *Dev. Specialists*, 480 B.R. at 158. Given the extensive services Mr. Liddle has provided on behalf of the Firm, he is entitled to the value of his efforts, skill and diligence.

**The Unsuccessful Attempts to Cast Aspersions on Mr. Liddle's Conduct**

15. The Trustee Objection and CF Objection also seek to impugn Mr. Liddle's conduct in operating the Firm and otherwise as unlawful, irresponsible, and/or of no benefit to the L&R Estate. These are all unconvincing. Mr. Liddle's continued operation of the Firm during the wind-up created value for L&R's creditors. *See* 11 U.S.C. § 1115(a)(1). As the Court recognized, Mr. Liddle's continued legal practice was an important component of the ongoing wind-up of the Firm:

> The other thing to stress is that the Chapter 11 trustee no doubt will be somebody with experience in this kind of case. The U.S. Trustee's office has -- we've all had to deal with law-firm cases in this courthouse before. And they will find somebody with the appropriate expertise. They will talk to the stakeholders. And that trustee is responsible to look out for the interest of all stakeholders and preserve value, maximize value. And much like doctors, the first rule is not to do any harm. So they should be coming in to think about continuing to advance the ball and potential settlements of cases involving -- against a law firm, as the debtor-in- possession

9

>     has done. They should be thinking about how best to transition any business, and those sorts of issues that will no doubt have to be addressed in a way that is beneficial to the estate and all stakeholders. And they're going to have to preserve value.

Transcript at 74:14-75:4 (Dec. 19, 2019).

16.     The Trustee accuses Mr. Liddle of "continuing financial irresponsibility." Trustee Objection ¶ 32. But in addition to the $4 million in revenue that Mr. Liddle generated for the L&R estate, he is currently pursuing a summer lease of his Hamptons residence, the proceeds from which will be used as part of a plan to finance a new firm. This will generate future value for Mr. Liddle's estate as well as L&R's estate under section 1115.

17.     The Trustee further contends that Mr. Liddle could not have acted for the benefit of L&R in incurring legal fees on its behalf, because in seeking his own administrative expense claim, he is "deplet[ing]" the Estate (and therefore acting against the Firm's interests). Trustee Objection ¶ 38. By this Catch-22 logic, no substantial contribution claim could ever be granted, because the very act of asking for the claim would prove that claimant was not acting in the estate's best interests. Beyond this, it also ignores all the actions Mr. Liddle directed be undertaken by counsel for the benefit of L&R: establishing the use of cash collateral, funding L&R's payroll out of the Liddle Estate, extending the automatic stay, and eventually filing the Firm into bankruptcy, which has given the Firm the protections of section 552 of the Bankruptcy Code. The filing was openly discussed in the Court for months. For the Trustee to suggest now that it was actually such a bad idea that it shows Mr. Liddle was not acting in L&R's benefit is ludicrous.

18.     Counsel Financial has an equally unfounded assertion: that it funded L&R throughout the difficult days of early 2019. Wander Decl. ¶ 13. But this is not so. It was Mr. Liddle who funded L&R through the proceeds from the sale of his apartment—which proceeds Counsel Financial sought, unsuccessfully, to claim as belonging to them.

10

19.     And after Mr. Liddle kept the Firm afloat, he brought it back to profitability. L&R generated approximately $2.7 million in net profits last year. Almost all of this came in on a cash basis after the Firm filed for bankruptcy, especially in the final three months of the year after the traditionally slower late summer months. In the month of October, L&R brought in revenue of $1,940,322 against ordinary operating expenses of $85,232 for a net monthly profit of $1,855,090. ECF No. 187 at 3. In the month of November, L&R brought in revenue of $257,413 against ordinary operating expenses[4] of $151,039 for a net monthly profit of $106,374. ECF No. 188 at 3. In the month of December, L&R brought in revenue of $1,330,050 against ordinary operating expenses of $140,497 for a net monthly profit of $1,189,553. ECF No. 208 at 3. The Firm continued to operate profitably at the beginning of the new year, bringing in an additional $163,276 in income in January. ECF No. 235 at 2. The Firm's January expenses are not recorded in an itemized fashion on the January monthly operating report, because payment for those expenses was loaned to the Firm by Mr. Liddle and only partially reimbursed in January. The bulk of the reimbursement to Mr. Liddle occurred in February, thus artificially inflating the Firm's expenses and net loss as recorded in the February monthly operating report. ECF No. 260. As with the rest of the legal industry, the strains of the COVID-19 pandemic and court closures and arbitration shutdowns have slowed the Firm's collections since then.

20.     Mr. Liddle's request for reasonable contribution for his substantial contributions to the L&R estate, including the allowance and payment of an administrative claim to cover the tax liability he incurred by creating value for the Firm, does not threaten the effective wind-up of the Firm. Indeed, a plan by which Mr. Liddle can transfer his practice to a new law firm, working in

---

[4] This excludes $318,706 in reimbursements to Mr. Liddle's DIP account.

11

cooperation with the Trustee, and now, with financing within grasp, is in development. *See* ECF No. 393 in Case No. 19-10747. Rather, it is the threatened closing of the Firm, at the end of this month without provision for existing clients in place, *see* Trustee Objection ¶ 7—announced without notice to or consultation with Mr. Liddle—that endangers the effective wind-up and the hope of maximization of value. This premature shutdown seems driven by the refusal of Counsel Financial to consent to the use of cash collateral. But there has been no diminution of cash collateral; rather, as the profitability of the firm reflects, the value of the cash collateral has increased. More importantly, all agree that the value of the ongoing cases is best maximized if they are to be handled by Mr. Liddle. The cessation of the Firm's operations without provision for the transition of the Firm's clients and the Firm's ongoing business threatens the value of those assets to the L&R Estate. The Trustee's haste to close the Firm driven by the denial of access to cash collateral is destructive of the best returns for the L&R Estate's creditors.

21. The argument that the payment of compensation to Mr. Liddle will dangerously drain the L&R Estate rings hollow in light of the fact that Counsel Financial sought to extract a $1.2 million payment from the Chapter 11 Trustee in April in exchange for continued use of cash collateral for thirty days. Only after we informed the Trustee that we would file an objection that there was no basis for such a payment to Counsel Financial in the context of an interim cash collateral order which entitled Counsel Financial only to adequate protection was the Chapter 11 Trustee able to successfully resist this demand.[5]

22. The Trustee also discusses Mr. Liddle's negative capital account balance, while conceding that in "the ordinary course," the income Mr. Liddle generated for the firm would reduce

---

[5] On information and belief, Andrea Schwartz, representing the U.S. Trustee, also interceded to stop this transfer.

12

his obligation to repay his negative capital account. Trustee Objection ¶ 30. The Trustee fails to explain why that is still not the case. In fact, it likely is the case that L&R's income tax return and Mr. Liddle's 2019 K-1, when issued, will reflect a significant decrease in the negative capital account as a result of the profitability of the Firm. Nor is it any secret that the Firm suffered financial difficulties in the years prior to the bankruptcy filing. What the Trustee fails to acknowledge is that L&R's significant profits, reaped through the efforts of Mr. Liddle, have placed L&R in a better financial position, one in which value is preserved for the creditors of the L&R Estate. Claiming, as the Trustee appears to do, that Mr. Liddle cannot receive any compensation for this because of his negative capital account, and that his capital account balance also remains unchanged even after these profits have come into the Firm, defies both logic and equity. The Trustee cannot ignore his obligations with respect to the adjustment of Mr. Liddle's capital account in this way. Moreover, the pre-petition conduct of Mr. Liddle and the Firm, for good or ill, and whatever valid debts were incurred or not, are not germane to the issue of what compensation Mr. Liddle's estate should receive for his work in 2019.

23.    The hackneyed complaints about the Mr. Liddle's "lavish lifestyle" and the Hamptons "mansion" have been made before and answered before. *See* ECF No. 353, in Case No. 19-10747. Mr. Liddle's spending is plain for all to see in the monthly operating reports, and has been conducted pursuant to the budget approved by the Court. One particularly outlandish accusation, however, bears additional response here. Attorney Rattet notes that Mr. Liddle has visited ATMs "more than" 159 times in the past more than a year, withdrawing an average of approximately $300 each time. Rattet Decl. ¶ 5. The implication, presumably, is that Mr. Liddle has been surreptitiously taking cash out without any accountability. To the contrary, as Attorney Rattet concedes, all these withdrawals were disclosed in the monthly operating reports. What

13

Attorney Rattet leaves out is that Mr. Liddle does not have a credit card, only a debit card; that due to a foot injury Mr. Liddle was compelled to take taxis for business purposes when he otherwise would have walked; and that these cash withdrawals are within the approved budget.

24.     Finally, the Trustee makes the unusual argument that neither Mr. Liddle nor the Liddle Estate is a "creditor" of the L&R Estate. Trustee Objection ¶ 16. The bar date in this matter has not yet passed; Mr. Liddle will shortly be filing a proof of claim. To say that Mr. Liddle is not a creditor of L&R ignores that he is effectively an employee; ignores his work when, prior to the appointment of the Trustee, Mr. Liddle served as managing partner of L&R as debtor in possession and as L&R's wind-up partner; and ignores the Court's recognition that Mr. Liddle has a claim against L&R. *See* Transcript at 25:9-11, *In re Jeffrey Lew Liddle*, Case No. 19-10747 ("He has a claim against the estate.").

**The *Flagstaff* Argument**

25.     Counsel Financial relies heavily on an argument it has tried, and failed, to make before: that the cases of *General Electric Credit Corp. v. Levin & Weintraub (In re Flagstaff Foodservice Corp.)*, 739 F.2d 73, 76 (2d Cir. 1984) ("*Flagstaff I*"), and *In re Flagstaff Foodservice Corp.*, 762 F.2d 10, 12 (2d Cir. 1985) ("*Flagstaff II*"), prevent the payment of an administrative expense claim in this case.

26.     This Court has previously rejected Counsel Financial's *Flagstaff* argument. *See* Transcript at 114:3-21; 118:9-23 (Dec. 19, 2019). The Court was correct to do so. *Flagstaff I* stands for the proposition that where a secured creditor had an undersecured, super-priority, post-petition lien from acting as a DIP lender, professional fees can only be paid out of the secured creditor's collateral pursuant to an agreed upon carve-out or if the standards of section 506(c) (requiring benefit to the creditor or consent) are met. *Flagstaff I*, 739 F.2d at 75-76.

14

27. Here, though, Counsel Financial does not have a super-priority post-petition lien from acting as a DIP lender. Pursuant to the Interim Cash Collateral Orders entered in this case, it has adequate protection liens, without a 506(c) waiver and therefore without any carve-out, and only "to the extent of any Diminution in Value . . . ." *E.g.*, Eighth Interim Cash Collateral Order, ECF No. 251 ¶ 4.

28. Whether there has been any diminution in value has not been determined, and the value of its liens have not yet been calculated. It is our position that Counsel Financial's "liens" in contingency fees cases were of at best nominal value on the date of the filing of the L&R petition, and even less value on the filing date of the individual case, and the dissolution date of the Firm. Notably, this matter is left open in the interim cash collateral orders and subject to negotiation. *See id.* ¶ 10 ("Each of the Prepetition Lenders, on the one hand, and the Trustee, on the other hand, hereby acknowledges and agrees that, in accordance with section 552 of the Bankruptcy Code, with respect to each of the CFII Lien, LIG Lien, and CFH Lien, (a) on or attaching to any fee to which the Debtor becomes entitled in connection with a contingency fee engagement entered into prior to the Petition Date that may be paid to the Debtor post-petition or that may in the future be owed to the Debtor, or (b) on or attaching to (i) any reimbursement of expenses (whether in connection with an hourly fee engagement or a contingency fee engagement) or (ii) any fee owed in connection with an hourly fee engagement, in each case where the Debtor's engagement commenced prior to the Petition Date, the amounts paid to the Debtor must be allocated under and in accordance with Section 552 of the Bankruptcy Code. The Trustee and Prepetition Lenders shall negotiate in good faith to resolve the allocation issue described above and, in the event agreement cannot be reached, will submit the dispute to this Court for resolution."). An evidentiary hearing would be required for this (and Mr. Liddle is perfectly

15

willing to have an evidentiary hearing on the benefit his actions and those of his counsel have had for the L&R estate).

29. As this Court recognized, Counsel Financial is entitled to adequate protection. It has adequate protection. And where a secured creditor is "adequately protected so long as the Debtors only use cash collateral pursuant to the Cash Collateral Order, 'by definition, there is no surcharge and section 506(c) does not come into play.'" *Official Comm. Of Unsecured Creditors v. UMB Bank (In re Residential Capital, LLC)*, 497 B.R. 403, 422 (Bankr. S.D.N.Y. 2013).

30. As for *Flagstaff II*, this also does not help Counsel Financial. Attorney Rattet complains of the professional fees Mr. Liddle has incurred. Rattet Decl. ¶ 3. Such fees, of course, are subject to the Court's approval and, moreover, Mr. Liddle has not been the party initiating the vast majority of the litigation in this case. Counsel Financial has only itself to blame if it believes Mr. Liddle has incurred a lot of professional fees. The Second Circuit noted in *Flagstaff II* that even in situations where a secured creditor has a basis to rely on section 506(c), that creditor's causing of the incurring of professional fees may constitute implied consent to the use of its cash collateral to pay such fees. *Flagstaff II*, 762 F.2d at 12 ("Implied consent, as distinguished from actual consent, generally is limited to cases where the creditor has in some way caused the additional expense.").

I declare under penalty of perjury that, to the best of my knowledge and after reasonable inquiry, the foregoing is true and correct.

Executed this 17th day of June, 2020

                                                               */s/ William F. Gray, Jr.*
                                                               William F. Gray, Jr.
                                                               Partner, Foley Hoag LLP